UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Helen Jane Wilson                                    :
                                                     :
and                                                  :
                                                     :
Valerie Wilson                                       :
                                                     :
and                                                  :
                                                     :
Cynthia Lahne                                        :
                                                     :
and                                                  :
                                                     :
Melanie Ann Nicholson                                :        Civil Action No.
                                                     :
and                                                  :
                                                     :
Tim William Russell                                  :
                                                     :
and                                                  :
                                                     :
Estate Of Justin Shults                              :
By And Through Its Administratrix                    :
Sheila Shell                                         :
                                                     :
and                                                  :
                                                     :
Sheila Shell                                         :
                                                     :
and                                                  :
                                                     :
Jeffrey Shults                                       :
                                                     :
and                                                  :
                                                     :
Tiffany Shults-Ristine                               :
                                                     :
and                                                  :
                                                     :
Levi Sutton                                          :
                                                     :
and                                                  :
                                                     :
Estate of Stephanie Moore-Shults                     :

1

By and through its Executor                :
Carolyn G. Moore                           :
                                           :
and                                        :
                                           :
Carolyn G. Moore                           :
                                           :
and                                        :
                                           :
Geary Moore                                :
                                           :
and                                        :
                                           :
Holly E. Wood                              :
                                           :
and                                        :
                                           :
Estate of James Logan Gragg                :
By and through its Executrix               :
Glenda S. Gragg                            :
                                           :
and                                        :
                                           :
Trella Elizabeth Newsom                    :
                                           :
and                                        :
                                           :
Melchizedek Martinez                       :
as the Statutory Heir of                   :
The Estate of Gail Minglana Martinez       :
                                           :
and                                        :
                                           :
Melchizedek Martinez                       :
                                           :
and                                        :
                                           :
Kianni Martinez                            :
                                           :
and                                        :
                                           :
Kimo Martinez                              :
                                           :
and                                        :
                                           :
Kailani Martinez

:

and                                                  :

                                                     :

N.M.                                                 :
By and through her Natural Guardian                  :
Melchizedek Martinez                                 :

                                                     :

and                                                  :

                                                     :

Rosie T. Martinez                                    :

                                                     :

and                                                  :

                                                     :

Maria Luisa Martinez                                 :

                                                     :

and                                                  :

                                                     :

Angelito Minglana, Sr.                               :

                                                     :

and                                                  :

                                                     :

Teofista Minglana                                    :

                                                     :

and                                                  :

                                                     :

Gerard Minglana                                      :

                                                     :

and                                                  :

                                                     :

Gilda Minglana-Harwood                               :

                                                     :

and                                                  :

                                                     :

Angelito Minglana, Jr.                               :

                                                     :

and                                                  :

                                                     :

Angelo Minglana                                      :

                                                     :

                                                     :

and                                                  :

                                                     :

Joseph D. Empey                                      :

                                                     :

and                                                  :

                                                     :

Amber Orton-Empey                                    :
                                                     :
and                                                  :
                                                     :
Joseph C. Empey                                      :
                                                     :
and                                                  :
                                                     :
D.E.                                                 :
By and through her Natural Guardians                 :
Amber Otron Empey and Joseph C. Empey                :
                                                     :
and                                                  :
                                                     :
H.E.                                                 :
By and through his Natural Guardians                 :
Amber Otron Empey and Joseph C. Empey                :
                                                     :
and                                                  :
                                                     :
Isabelle Empey                                       :
                                                     :
and                                                  :
                                                     :
Abraham Empey                                        :
                                                     :
and                                                  :
                                                     :
Richard I. Norby                                     :
                                                     :
and                                                  :
                                                     :
Pamela J. Norby                                      :
                                                     :
and                                                  :
                                                     :
Tiffany Allred                                       :
and                                                  :
                                                     :
Jason Norby                                          :
                                                     :
and                                                  :
                                                     :
Chelsea Snell                                        :
                                                     :
and                                                  :

Mason Wells                                    :
                                               :
and                                            :
                                               :
Chad S. Wells                                  :
                                               :
and                                            :
                                               :
Kymberly E. Wells                              :
                                               :
and                                            :
                                               :
Porter J. Wells                                :
                                               :
and                                            :
                                               :
Mia Wells                                      :
                                               :
and                                            :
                                               :
T.W.                                           :
By and through her Natural Guardians           :
Chad S. Wells and Kymberly E. Wells            :
                                               :
and                                            :
                                               :
Colby S. Wells                                 :
                                               :
and                                            :
                                               :
Chaim Winternitz                               :
                                               :
and                                            :
                                               :
A.W.                                           :
By and through his Parents and Guardians       :
Chaim and Esther Winternitz                    :
                                               :
and                                            :
                                               :
B.W.                                           :
By and through her Parents and Guardians       :
Chaim and Esther Winternitz                    :
                                               :
and                                            :

D.W.                                              :
By and through her Parents and Guardians          :
Chaim and Esther Winternitz                       :
                                                  :
and                                               :
                                                  :
M.W.                                              :
By and through her Parents and Guardians          :
Chaim and Esther Winternitz                       :
                                                  :
and                                               :
                                                  :
M.W.                                              :
By and through his Parents and Guardians          :
Chaim and Esther Winternitz                       :
                                                  :
and                                               :
                                                  :
Ester Winternitz                                  :
                                                  :
and                                               :
                                                  :
Faige Winternitz                                  :
                                                  :
and                                               :
                                                  :
Jacob Winternitz                                  :
                                                  :
and                                               :
                                                  :
Moshe Winternitz                                  :
                                                  :
and                                               :
                                                  :
Yitel Winternitz                                  :
                                                  :
and                                               :
                                                  :
Shastri Boothe                                    :
                                                  :
and                                               :
                                                  :
                                                  :
Morgan Boothe-Durdino                             :
                                                  :

and                                             :
                                                :
Jared Bland                                     :
                                                :
and                                             :
                                                :
G.B.                                            :
By and through his Parent and Guardian          :
Jared Bland                                     :
                                                :
and                                             :
                                                :
Jared Bland, Jr.                                :
                                                :
and                                             :
                                                :
Joshua Chambers                                 :
                                                :
and                                             :
                                                :
Erin Chambers                                   :
                                                :
and                                             :
                                                :
Kevin Chambers                                  :
                                                :
and                                             :
                                                :
Nancy Chambers                                  :
                                                :
and                                             :
                                                :
John Mitchell, III                              :
                                                :
and                                             :
                                                :
John Mitchell, Jr.                              :
                                                :
and                                             :
                                                :
Diane Mitchell                                  :
                                                :
and                                             :
                                                :
Stacey Atkins                                   :
                                                :

and                                                    :
                                                       :
Sally Mitchell                                         :
                                                       :
and                                                    :
                                                       :
Alex Murtha                                            :
                                                       :
and                                                    :
                                                       :
Kelly McHenry                                          :
                                                       :
and                                                    :
                                                       :
Brian Worbington                                       :
                                                       :
and                                                    :
                                                       :
Wendy Worbington                                       :
                                                       :
and                                                    :
                                                       :
Constance Worbington                                   :
                                                       :
and                                                    :
                                                       :
Shawn Kenny                                            :
                                                       :
and                                                    :
                                                       :
Oksana Kenny                                           :
                                                       :
and                                                    :
                                                       :
Lucille Selig                                          :
                                                       :
and                                                    :
                                                       :
Estate Of Herbert Selig                                :
By and through its Administrator                       :
Lucille Selig                                          :
                                                       :
and                                                    :
                                                       :
Jill Lasman                                            :
                                                       :

|                                              |     |
|----------------------------------------------|-----|
| Plaintiffs,                                  | :   |
|                                              | :   |
| v.                                           | :   |
|                                              | :   |
| Ericsson Inc.                                | :   |
|                                              | :   |
| and                                          | :   |
|                                              | :   |
| Ericsson AB                                  | :   |
|                                              | :   |
| and                                          | :   |
|                                              | :   |
| Telefonaktiebolaget LM Ericsson              | :   |
|                                              | :   |
| and                                          | :   |
|                                              | :   |
| Rafiah Ibrahim                               | :   |
|                                              | :   |
| and                                          | :   |
|                                              | :   |
| Börje Ekholm                                 | :   |
|                                              | :   |
| Defendants.                                  | :   |
|                                              | :   |

## **COMPLAINT**

## **INTRODUCTION**

1. This lawsuit seeks damages under the federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) and (d), on behalf of American civilians and service members, and the family members thereof, who were killed or wounded (a) during the coordinated Paris terrorist attacks, particularly the Bataclan Theatre attack committed on November 13, 2015 ("Paris Bataclan Theatre Terrorist Attack" or "Paris Bataclan Attack"), (b) the suicide bombing terrorist attacks committed at the Brussels Airport in Brussels, Belgium on March 22, 2016 ("Brussels Airport Attack"), (c) while deployed in Afghanistan in 2012 and 2013 ("Expulsion Attacks"), (d) the prolonged terrorist attack on the Intercontinental Hotel in Kabul, Afghanistan, on January 20 and January 21, 2018 (the "Intercontinental Hotel Attack"), and (e) the prolonged terrorist

attack on the Park Palace Hotel in Kabul, Afghanistan on May 13 and May 14, 2015 (the "Park Palace Hotel Attack") (collectively, the "Relevant Attacks"). These attacks were carried out by Specially Designated Global Terrorist Entities ("SDGTE") al-Qaeda, so designated by the U.S. Department of State on October 8, 1999, and the Afghan Taliban so designated under Executive Order (E.O) 13224 in 2002, and by Foreign Terrorist Organizations ("FTO" or "FTOs"), the Afghan Taliban's militant terrorist arm the Haqqani Network, so designated by the U.S. Department of State on September 19, 2012, (together, the Afghan Taliban and the Haqqani Network are referred to hereinafter as the "Taliban"), and THE ISLAMIC STATE (a.k.a. "Islamic State", "ISIS," "ISIL," or "IS") so designated by the U.S. Department of State on December 17, 2004 (collectively, the "Relevant Terror Organizations", "Global Terror Syndicate" or "Syndicate") which Defendants Ericsson Inc. ("Ericsson Inc."), Ericsson Aktiebolag ("Ericsson AB"), Telefonaktiebolaget LM Ericsson (individually, "LM Ericsson" and collectively with Ericsson Inc. and Ericsson AB, "Ericsson" or "Corporate Defendants"), Rafiah Ibrahim, and Borje Ekholm ("Ibrahim" and "Ekholm," respectively, and together "Individual Defendants") (the Corporate Defendants and Individual Defendants collectively being "Defendants") helped finance and logistically aid, and concealed from discovery through fraudulent means until investigative leaks in February 2022 for the first time put Plaintiffs on notice of Defendants' material support to the Global Terror Syndicate.

2.  Specifically, from at least 2004 until at least February 15, 2022, Defendants – themselves and through their strategic partners, consultants, and subcontractors – made substantial protection payments to al-Qaeda, al-Qaeda-in-Iraq, the Taliban and the Islamic State in both America-sourced U.S. dollars and in free state-of-the-art U.S. communications devices and technologies like cell phones and tablets, which provided encryption while doubling as cash equivalents.

Starting no later than 2013, Ericsson also intentionally obstructed vital U.S. government counterterrorism operations, including by lying to the U.S. government repeatedly about the terrorists' operations and Ericsson's related conduct. In doing so, Ericsson provided key "cover" and "concealment" to – and thereby logistical aid and support for – al-Qaeda's, the Taliban's and Islamic State's fundraising rackets while these FTOs and SDGTEs were killing, maiming and kidnapping Americans.

3.  After the U.S. military's post-9/11 invasions of Afghanistan and Iraq, al-Qaeda and its regional branches, led by al-Qaeda-in-Iraq (which evolved into Islamic State, aka ISIS and ISIL, in 2014) and the Taliban, collaborated to expel the United States from the Middle East by sponsoring waves of terrorist attacks against Americans throughout the region. To date, the Relevant Terror Organizations have collectively killed, or helped kill, well more than 2,500 U.S. service members and wounded roughly 30,000 more, primarily in Iraq and Afghanistan, but also in Syria and other countries in the Middle East, Europe, Asia, and Africa.

4.  After consolidating their networks in the Middle East, the Relevant Terror Organizations, turned their focus toward Europe as both a symbolic and strategic target. From the mid-2000s onward, these groups and their affiliates directed, inspired, or enabled mass-casualty attacks across the continent, seeking to punish European nations for participation in U.S.-led coalitions and to fracture Western unity. Al-Qaeda coordinated or inspired assaults such as the 2004 Madrid train bombings and the 2005 London transit bombings, which together killed nearly 250 civilians and injured more than 2,000. After ISIS's declaration of a caliphate in 2014, the group launched an intensified European campaign—conducting or inspiring atrocities including the 2015 Paris Bataclan Attack and 2016 Brussels Airport Attack, the Nice truck massacre, the Manchester Arena bombing, and multiple assaults in Germany, Austria, and the

United Kingdom. Collectively, ISIS and al-Qaeda operations in Europe have killed more than 800 people and injured several thousand others, demonstrating both organizations' enduring capacity and intent to strike Western civilians far beyond their Middle Eastern strongholds.

5. Reliable funding was vital to the terrorists' campaigns. By 2005, al-Qaeda's branches in Iraq and Syria – most notoriously, al-Qaeda-in-Iraq under the leadership of notorious terrorist Abu Musab al-Zarqawi – began systematically extracting protection payments from international businesses operating in the Iraqi and Syrian geographies in which al-Qaeda-in-Iraq posed a threat. The terrorists motivated companies to pay by presenting them with a choice: either meet the terrorists' demands and help fund terrorist attacks, or else spend even more money on expensive security measures.

6. LM Ericsson, Ericsson AB, and Ericsson Inc. agreed to the terrorists' demands. Under Ericsson's business model, LM Ericsson's and Ericsson AB's primary goal in Iraq between 2003 and 2022 was to sell goods, technologies, and services manufactured, provided, or serviced by Ericsson Inc. because Ericsson AB's large-scale infrastructure projects in Iraq required Ericsson Inc.'s goods, technologies, and services. To maximize their profits, Defendants funded the terrorists to leave them alone. The payments saved Ericsson money: it was cheaper to pay off the Relevant Terror Organizations than to invest in the security necessary to mitigate the terrorists' threats. And the payments generally worked as intended. Paying the terrorists reduced the frequency with which Defendants faced the threat of terrorists attacking their assets in the region, and it allowed them to cut corners on security, too.

7. LM Ericsson, Ericsson AB, and Ericsson Inc. financed the Relevant Terror Organizations through such protection payments from at least 2004 until at least 2019. Below, Plaintiffs identify: contracts on which Defendants made payments; identities of subcontractors they used

to facilitate the flow of money; indications of how they concealed payments on their books; and examples of specific payments made by each. Some details varied over time (e.g., different subcontractor buffers) while others endured (e.g., the use of a corrupt consultant as a buffer for more than a decade). Throughout, however, Ericsson's objective was the same – to ensure that Defendants' funds reached the terrorists so that Ericsson's lucrative Iraq-based projects, and attendant profits, continued flowing.

8. On behalf of Ericsson Inc., LM Ericsson and Ericsson AB often (but not always) paid these designated FTOs through Ericsson's local strategic partners, consultants, and subcontractors, in an effort to reduce the risk those illegal payments would be traced back to Ericsson. Many projects in Iraq involved chains of subcontractors – in which a prime contractor funneled both the work and the money through layers of additional corporate entities – and Ericsson exploited that structure to facilitate payments to the Relevant Terror Organizations. Indeed, Ericsson often hired local subcontractors intending for those companies to deliver "security" for Defendants' projects by paying off al-Qaeda-in-Iraq and Islamic State using either transfers through intermediaries or payments from uncontrolled slush funds.

9. Protection payments like the ones Ericsson made have been closely studied by U.S. military intelligence agencies, and Congress, which have confirmed that the Relevant Terror Organizations depended on Western companies making such payments, and that the amounts paid in Iraq typically were worth at least 10 percent to 20 percent – and often much more – of the thing being "protected" or the income being earned.

10. Defendants also likely facilitated Ericsson Inc.'s direct transfer of high-tech, U.S. military-grade, U.S. origin communications technologies to al-Qaeda in Afghanistan stronghold from 2008 through 2017. One Confidential Witness, a retired U.S. Army Colonel, stated: Ericsson

in Iraq and Afghanistan would consciously leave free communications equipment, including trucks, trailers, signal communications equipment, operation based sustainment equipment, phones, radios, computers, laptops, desktops, signals pieces, satellite nodes and capabilities. According to the same Confidential Witness, who directly observed Ericsson Inc. in Iraq and Afghanistan, Ericsson Inc. "likely" made protection payments directly to al-Qaeda in Afghanistan through a "free goods" scheme in which Ericsson Inc. personnel consciously purchased protection directly from al-Qaeda in Afghanistan by transferring Ericsson Inc.'s high tech, U.S.-origin communications devices – including cellular phones, satellite phones, laptop computers, and more sophisticated technology used by Americans in Afghanistan – to al-Qaeda. Notably, according to this Confidential Witness, Ericsson Inc.'s "likely" transfers of U.S.-origin cell phones, laptops, and other devices to al-Qaeda were transmitted directly from Ericsson Inc. to al-Qaeda in Afghanistan because, this Confidential Witness assessed, Ericsson Inc. and al-Qaeda used a coordinated "dead drop" approach to accomplish the "free goods" transfers without anyone between Ericsson Inc. and al-Qaeda.

11. Defendants bribed the Relevant Terror Organizations to allow LM Ericsson and Ericsson AB to sell Ericsson Inc.'s U.S.-sourced technology, goods, and services in Iraq and Afghanistan. By doing so, Ericsson participated in one of the Syndicate's longest running and most effective terrorist finance schemes: the collection of protection money from corrupt multinational corporations that were willing to place their own business interests above the national security interests of the United States and the safety of American lives in the Middle East. By offering a percentage of their profits as well as free U.S.-manufactured technology and goods to the terrorists as tribute, Ericsson redirected terrorist violence away from Defendants' Middle Eastern operations – and toward honest businesses and people, including Plaintiffs.

12. It is impossible to overstate the culpability of Ericsson's conduct, as illustrated by a few examples: After Islamic State seized Mosul, Defendants rejected the "the strong recommendation" of their top lawyer in the Middle East to invoke force majeure and exit the area "because," Ericsson calculated, "it would be 'premature' and 'destroy [Ericsson's] business.'" Instead, LM Ericsson, Ericsson AB, and Ericsson Inc. paid off Islamic State, literally using the word "please" and "thank[ing]" ISIS for its "cooperation" with Ericsson.

13. As another example, in 2017, Defendants chose to move their goods in Iraq using the "Speedway" as opposed to the "legal way" – the former involved payoffs to terrorists and greater profits for Defendants, while the latter avoided enriching terrorists but burdened Ericsson with lower profit margins from its Iraq business. LM Ericsson, Ericsson AB, and Ericsson Inc. rejected following what their own employees called the "legal way."

14. As yet another example, in 2014, Defendants and Asiacell (one of their "strategic partners" in Iraq) effectively offered up one of their Iraqi subcontractors as a human sacrifice to Islamic State. As that subcontractor explained: "Ericsson put pressure on my company, and my company put pressure on me," resulting in his capture and detention by Islamic State. In the victim's own words, Defendants "destroyed" him when they effectively "sold" him to Islamic State. Transacting business with terrorists at the cost of innocent human lives, while repugnant to most, was business as usual for Ericsson in Iraq.

15. Plaintiffs understand that there are Confidential Witnesses who can confirm key aspects of these allegations.

16. Ericsson's protection payments aided and abetted terrorism by funding the Relevant Terror Organizations' attacks against Americans in France, Belgium, Iraq, Afghanistan, Syria, and Turkey. Although Defendants made their payments in Iraq, those payments aided the Relevant

Terror Organizations in France, Belgium, Iraq, Afghanistan, Syria, and Turkey, facilitating attacks on Americans in all those places. That is because these Relevant Terror Organizations maintained global operations, under which financial, technical, and logistical resources raised in one area flowed through to the others to support their transnational campaign against Americans.

17. Ericsson's conduct supported the Syndicate's global terrorist campaign against Americans in France, Belgium, Iraq, Syria, Afghanistan, and Turkey. When Ericsson paid the Relevant Terror Organizations not to attack them, they were not reducing the overall threat of terrorist violence; they were redirecting the attacks to other targets – including Plaintiffs and their family members. At the same time, Ericsson's financing intensified the terrorist campaigns waged by the Relevant Terror Organizations against those very targets. Protection money was quantitatively significant – by most accounts, the Relevant Terror Organizations' largest (or second largest) funding source overall – and such Relevant Terror Organizations' substantially similar and highly disciplined process for extracting it made for an especially potent form of terrorist finance. Even relatively low-dollar protection payments had an outsized effect on the Relevant Terror Organizations' terrorist capabilities by subsidizing salaries and weapons for multiple terrorists. Ericsson's decision to make larger, regular, six- and seven-figure payments had an even greater effect: it translated directly into substantial numbers of terrorists, weapons, and bombs that the Relevant Terror Organizations used to kill and injure Americans in Belgium, France, Iraq, Afghanistan, Syria, and Turkey.

18. Defendants necessarily knew that by making protection payments to terrorists, they were playing a role in violent terrorism. As practiced by criminal foreign telecom companies like Ericsson, the entire point of corporate protection payments is to appease violent actors so that

they will not direct violence at the corporation's valuable physical assets (such as infrastructure sites) and goods (such as product shipments). Thus, any corporation that makes protection payments necessarily intends that the money will reach the violent actor. More specifically, robust public information explained to contractors that terrorist organizations in Iraq were soliciting protection payments from corporations to fund their ongoing campaigns of terrorist violence against Americans. And the specific Relevant Terror Organizations at issue here – al-Qaeda, al-Qaeda-in-Iraq, the Taliban and Islamic State – were globally notorious for putting their resources, including protection money funds, to violent ends. That is why the U.S. government publicly designated them as FTOs and SDGTEs in the first place.

19. Consistent with that understanding, the U.S. government has long opposed the payment of protection money to terrorist organizations. An Assistant Attorney General said it plainly in a 2007 criminal resolution concerning similar conduct: "corporations are on notice that they cannot make protection payments to terrorists." A Deputy Attorney General similarly noted in 2022 that "business with terrorists cannot be business as usual." Multiple agencies set up task forces designed to interrupt the flow of protection money to terrorists in Iraq and Afghanistan, and U.S. officials stated repeatedly that such payments were illegal and counterproductive. Applicable regulations and financial rules also required companies to ensure that their contracting practices – including the money spent by their subcontractors – did not finance terrorism. Defendants violated those requirements and concealed their payments in part because they knew the U.S. government considered such payments to be illegal. Thus, Ericsson paid off terrorists even while knowing that the U.S. government publicly opposed protection payments and tried to stop them.

20. Ericsson's aid to terrorists did not end at money, although that was plenty. Defendants provided key logistical aid to al-Qaeda, al-Qaeda-in-Iraq, the Taliban, and the Islamic State from at least 2004 through at least February 15, 2022 by providing critical cover and concealment for their protection rackets. LM Ericsson and Ericsson AB did so by paying off the terrorists while simultaneously keeping secret their knowledge of the protection rackets that were instrumental in financing attacks on Americans in France, Belgium, Iraq, Afghanistan, Syria, and Turkey. Defendants did so even when they had affirmative legal obligations requiring disclosure to the U.S. government and Defendants' shareholders, among others.

21. By fraudulently concealing the Syndicate's protection rackets when they had a duty to share what they knew, LM Ericsson, Ericsson AB, and Ericsson Inc. also provided vital operational aid to the functioning of al-Qaeda's, al-Qaeda-in-Iraq's, the Taliban's and Islamic State's protection rackets – independent of the U.S. dollars that Defendants paid such SDGTEs and FTOs – by depriving the U.S. government, LM Ericsson's shareholders, and Plaintiffs of actionable intelligence and accurate information, which prevented U.S. military, intelligence, law enforcement, shareholder, and litigation pressure that would otherwise make it harder for the terrorists to extract comparable value from their protection rackets in Iraq and Afghanistan. Specifically, Ericsson knew who was soliciting money on behalf of terrorists; knew which subcontractors were funneling corrupt payments to the terrorists; and knew which geographies were focal points for terrorists, including Afghanistan and Europe – but instead of disclosing that information, Ericsson held it close for its own benefit. This conduct was in direct conflict with the position of the U.S. government and terrorism scholars, who have long emphasized that public-private cooperation is a key tool in the U.S. government's counterterrorism strategy

to protect American lives. The corollary is equally true: corporate obstruction aids the Global Terror Syndicate's terrorist attacks against Americans.

22. Ericsson's misconduct is now coming to light. The first domino fell in 2019, when LM Ericsson pleaded guilty to violating the Foreign Corrupt Practices Act ("FCPA"), paying more than $1 billion in combined penalties to the DOJ and SEC as part of a Deferred Prosecution Agreement ("DPA") relating to its decades-long, enterprise-wide pattern of bribery and corruption throughout the world.

23. In February 2022, Defendants admitted that their money may have flowed to anti-American terrorists from at least 2011 through at least 2019. Defendants announced that they had "identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes" and admitted that their "[i]nvestigators could not determine the ultimate recipients of these payments." Indeed, Ericsson itself concluded that "[b]y avoiding official customs by transporting through areas controlled by militias, including ISIS, it cannot be excluded that [an Ericsson subcontractor] engaged in … potential illicit financing of terrorism to carry out transportation operations for Ericsson."

24. After Ericsson's recent admission regarding funding the terrorists, the U.S. government has concluded that LM Ericsson breached its DPA, and is now actively investigating LM Ericsson a second time, because Ericsson's conduct made a mockery of U.S. law and regulators, including the DOJ and SEC. Other governments are also investigating. For example, in April 2022 the Swedish judiciary announced the opening of an investigation into "possible corruption crimes that … Ericsson is suspected of being involved in, linked to the payment of

bribes to ISIS." It is highly likely that these investigations will reveal additional evidence of Ericsson's longstanding support for terrorists and terrorist groups.

25. Plaintiffs are U.S. citizens who were killed or wounded during the Relevant Attacks and their family members, in attacks carried out by terrorists of the Relevant Terrorist Organizations, often working together with other groups as part of global anti-American Global Terror Syndicate. Plaintiffs are entitled to recover for their injuries under the ATA because Defendants engaged in acts of international terrorism and also aided and abetted al-Qaeda's, al-Qaeda-in-Iraq's, the Taliban's, and Islamic State's terrorist attacks and campaigns in France, Belgium, and Afghanistan. 18 U.S.C. § 2333(a), (d)(2). With this statute, Congress sought "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Justice Against Sponsors of Terrorism Act ("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016). This case falls within the heartland of the ATA's prohibitions.

## THE PARTIES

## THE PLAINTIFFS

**The Wilson Family**

26. Plaintiff, Helen Jane Wilson ("Ms. Wilson") was present and severely and permanently injured in the Paris Bataclan Theatre Terrorist Attack, which was committed by ISIS, a Foreign Terrorist Organization. At the time of the acts alleged, and at all other times relevant hereto, Ms. Wilson was a United States citizen. Plaintiff Helen Jane Wilson can sue and be sued in this Court.

20

27. Plaintiff Valerie Wilson-Hudson was, and at all times relevant hereto, the biological sister of Helen Jane Wilson, and a citizen of the United States. Plaintiff Valerie Wilson-Hudson has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her sister, Ms. Wilson, suffered in the Paris Bataclan Theatre Terrorist Attack. Plaintiff Valerie Wilson-Hudson can sue and be sued in this Court.

28. Plaintiff Cynthia Lahne was, and at all times relevant hereto, the biological sister of Helen Jane Wilson, and a citizen of the United States. Plaintiff Cynthia Lahne has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her sister, Ms. Wilson, suffered in the Paris Bataclan Theatre Terrorist Attack. Plaintiff Cynthia Lahne can sue and be sued in this Court.

29. Plaintiff Melanie Ann Nicholson was, and at all times relevant hereto, the biological sister of Helen Jane Wilson, and a citizen of the United States. Plaintiff Melanie Ann Nicholson has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her sister, Ms. Wilson, suffered in the Paris Bataclan Theatre Terrorist Attack. Plaintiff Melanie Ann Nicholson can sue and be sued in this Court.

30. Plaintiff Tim Russell was, and at all times relevant hereto, the biological brother of Helen Jane Wilson, and a citizen of the United States. Plaintiff Tim Russell has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries his sister, Helen, suffered in the Paris Bataclan Theatre Terrorist Attack. Plaintiff Tim Russell can sue and be sued in this Court.

**The Shults Family**

31. Plaintiff Estate of Justin Shults ("Justin"), a Sevier County, Tennessee estate, is represented in this action by its duly appointed Administratrix, Sheila Shell. Justin was, and at all times

relevant hereto, the husband of Stephanie Moore-Shults. Justin was murdered in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Justin was a citizen of the United States. Plaintiff Estate of Justin Shults can sue and be sued in this Court.

32. Plaintiff Sheila Shell was, and at all times relevant hereto, the biological mother of Justin Shults, and a citizen of the United States. Plaintiff Sheila Shell has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her son, Justin, in the Brussels Airport Attack. Plaintiff Sheila Shell can sue and be sued in this Court.

33. Plaintiff Jeffrey Shults was, and at all times relevant hereto, the biological father of Justin Shults, and a citizen of the United States. Plaintiff Jeffrey Shults has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his son, Justin, in the Brussels Airport Attack. Plaintiff Jeffrey Shults can sue and be sued in this Court.

34. Plaintiff Tiffany Shults-Ristine was, and at all times relevant hereto, the biological sister of Justin Shults, and a citizen of the United States. Plaintiff Tiffany Shults-Ristine has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her brother, Justin, in the Brussels Airport Attack. Plaintiff Tiffany Shults-Ristine can sue and be sued in this Court.

35. Plaintiff Levi Sutton was, and at all times relevant hereto, the biological brother of Justin Shults, and a citizen of the United States. Plaintiff Levi Sutton has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his brother, Justin, in the Brussels Airport Attack. Plaintiff Levi Sutton can sue and be sued in this Court.

**The Moore Family**

36. Plaintiff Estate of Stephanie Moore-Shults ("Stephanie"), a Fayette County, Kentucky estate, is represented in this action by its duly appointed Executor, Carolyn G. Moore. Stephanie was, and at all times relevant hereto, the wife of Justin Shults. Stephanie was murdered in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Stephanie was a citizen of the United States. Plaintiff Estate of Stephanie Moore-Shults can sue and be sued in this Court.

37. Plaintiff Carolyn G. Moore was, and at all times relevant hereto, the biological mother of Stephanie Moore-Shults, and a citizen of the United States. Plaintiff Carolyn G. Moore was also at the Brussels Airport at the time of the attack by THE ISLAMIC STATE and was physically injured in the Brussels Airport Attack. Carolyn G. Moore has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and as a result of the murder of her daughter, Stephanie, in the Brussels Airport Attack.   Plaintiff Carolyn G. Moore can sue and be sued in this Court.

38. Plaintiff Geary Moore was, and at all times relevant hereto, the biological father of Stephanie Moore-Shults, and the spouse of Carolyn G. Moore, and was a citizen of the United States. Plaintiff Geary Moore has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his daughter, Stephanie, and also as a result of the injuries to his wife, Carolyn G. Moore, in the Brussels Airport Attack. Plaintiff Geary Moore can sue and be sued in this Court.

39. Plaintiff Holly E. Wood was, and at all times relevant hereto, the biological sister of Stephanie Moore-Shults, and daughter of Carolyn G. Moore and a citizen of the United States. Plaintiff Holly E. Wood has suffered severe mental anguish and extreme emotional pain and suffering

as a result of the murder of her sister, Stephanie, and also as a result of the injuries to her mother, Carolyn, in the Brussels Airport Attack. Plaintiff Holly E. Wood can sue and be sued in this Court.

40. Plaintiff Estate of James Logan Gragg, a Fayette County, Kentucky estate, is represented in this action by its duly appointed Executrix, Glenda S. Gragg. James Logan Gragg was, and at all times relevant hereto, the biological brother of Carolyn G. Moore and a citizen of the United States. James Logan Gragg suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to his sister, Carolyn, in the Brussels Airport Attack. Plaintiff Estate of James Logan Gragg can sue and be sued in this Court.

41. Plaintiff Trella Elizabeth Newsom was, and at all times relevant hereto, the biological sister of Carolyn G. Moore and a citizen of the United States. Plaintiff Trella Elizabeth Newsom has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her sister, Carolyn, in the Brussels Airport Attack. Plaintiff Holly E. Wood can sue and be sued in this Court.

**The Martinez Family**

42. Melchizedek Martinez as the Statutory Heir of the Estate of Gail Martinez ("Gail") is a Plaintiff in this action. Gail was, and at all times relevant hereto, the wife of Melchizedek Martinez. Gail was murdered in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Gail was a citizen of the United States. Plaintiff Melchizedek Martinez as the Statutory Heir of the Estate of Gail Martinez can sue and be sued in this Court.

43. Plaintiff Melchizedek "Kato" Martinez was, and at all times relevant hereto, the husband of Gail Martinez, and a citizen of the United States. Plaintiff Melchizedek Martinez and all of his

and Gail's children were also present at the Brussels Airport at the time of the attack committed by THE ISLAMIC STATE and he and each of the children named as Plaintiffs in this Complaint were physically injured in the Brussels Airport Attack. Melchizedek Martinez has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of the murder of his wife and injuries to himself and each of his children in the Brussels Airport Attack.   Plaintiff Melchizedek Martinez can sue and be sued in this Court.

44. Plaintiff Kianni Martinez was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Plaintiff Kianni Martinez and all of her siblings and her father were also physically injured in the Brussels Airport Attack. Kianni Martinez has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and the murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff Kianni Martinez can sue and be sued in this Court.

45. Plaintiff Kailani Martinez was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Plaintiff Kailani Martinez and all of her siblings and her father were also physically injured in the Brussels Airport Attack. Kailani Martinez has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and as a result of the murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff Kailani Martinez can sue and be sued in this Court.

46. Plaintiff Kimo Martinez was, and at all times relevant hereto, the biological son of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Plaintiff Kimo

Martinez and all of his siblings and his father were also physically injured in the Brussels Airport Attack. Kimo Martinez has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of his own injuries and as a result of the murder of his mother and injuries to his father and each of his siblings in the Brussels Airport Attack. Plaintiff. Kimo Martinez can sue and be sued in this Court.

47. Plaintiff N.M. was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. N.M. is a minor born March 16, 20XX who lives with her father and three of her siblings. Plaintiff N.M. and all of her siblings and her father were also physically injured in the Brussels Airport Attack. N.M. has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and as a result of murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff N.M. can sue and be sued in this Court.

48. Plaintiff Rosie T. Martinez was, and at all times relevant hereto, the biological mother of Melchizedek Martinez, and a citizen of the United States. Rosie T. Martinez has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her son in the Brussels Airport Attack. Plaintiff Rosie T. Martinez can sue and be sued in this Court.

49. Plaintiff Maria Luisa Martinez was, and at all times relevant hereto, the biological sister of Melchizedek Martinez, and a citizen of the United States. Maria Luisa Martinez has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her brother in the Brussels Airport Attack. Plaintiff Maria Luisa Martinez can sue and be sued in this Court.

**The Minglana Family**

50. Plaintiff Angelito Minglana, Sr. was, and at all times relevant hereto, the biological father of Gail Martinez, and a citizen of the United States. Angelito Minglana, Sr. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his daughter in the Brussels Airport Attack. Plaintiff Angelito Minglana, Sr. can sue and be sued in this Court.

51. Plaintiff Teofista Minglana was, and at all times relevant hereto, the biological mother of Gail Martinez, and a citizen of the United States. Teofista Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her daughter in the Brussels Airport Attack. Plaintiff Teofista Minglana can sue and be sued in this Court.

52. Plaintiff Gerard Minglana was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Gerard Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Gerard Minglana can sue and be sued in this Court.

53. Plaintiff Gilda Minglana-Hardwood was, and at all times relevant hereto, the biological sister of Gail Martinez, and a citizen of the United States. Gilda Minglana-Hardwood has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her sister in the Brussels Airport Attack. Plaintiff Gilda Minglana-Hardwood can sue and be sued in this Court.

54. Plaintiff Angelito Minglana, Jr. was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Angelito Minglana, Jr. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister

in the Brussels Airport Attack. Plaintiff Angelito Minglana, Jr. can sue and be sued in this Court.

55. Plaintiff Angelo Minglana was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Angelo Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Angelo Minglana can sue and be sued in this Court.

**The Empey Family**

56. Joseph D. "Dres" Empey was injured in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization. At the time of the acts alleged, and at all other times relevant hereto, Joseph D. Empey was a United States citizen. Plaintiff Joseph D. Empey can sue and be sued in this Court.

57. Plaintiff Amber Orton-Empey was, and at all times relevant hereto, the biological mother of Joseph D. Empey, and a citizen of the United States. Plaintiff Amber Orton-Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of her son, Joseph, being injured in the Brussels Airport Attack. Plaintiff Amber Orton-Empey can sue and be sued in this Court.

58. Plaintiff Joseph C. Empey was, and at all times relevant hereto, the biological father of Joseph D. Empey, and a citizen of the United States. Plaintiff Joseph C. Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of his son, Joseph D. Empey, being injured in the Brussels Airport Attack. Plaintiff Joseph C. Empey can sue and be sued in this Court.

59. Plaintiff Dorothy Empey was, and at all times relevant hereto, the biological sister of Joseph D. Empey, and a citizen of the United States. Plaintiff Dorothy Empey has suffered severe

mental anguish and extreme emotional pain and suffering as a result of her brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff Dorothy Empey can sue and be sued in this Court.

60. Plaintiff Henry Empey was, and at all times relevant hereto, the biological brother of Joseph D. Empey, and a citizen of the United States. Plaintiff Henry Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff Henry Empey can sue and be sued in this Court.

61. Plaintiff Isabelle Empey was, and at all times relevant hereto, the biological sister of Joseph D. Empey, and a citizen of the United States. Plaintiff Isabelle Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff Isabelle Empey can sue and be sued in this Court.

62. Plaintiff Abraham R. Empey was, and at all times relevant hereto, the biological brother of Joseph D. Empey, and a citizen of the United States. Plaintiff Abraham R. Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff Abraham R. Empey can sue and be sued in this Court.

**The Norby Family**

63. Richard I. Norby was injured in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Richard I. Norby was a United States citizen. Plaintiff Richard I. Norby can sue and be sued in this Court.

64. Plaintiff Pamela J. Norby was, and at all times relevant hereto, the wife of Richard I. Norby, and a citizen of the United States. Plaintiff Pamela J. Norby has suffered severe mental anguish and extreme emotional pain and suffering as a result of her husband, Richard, being injured in the Brussels Airport Attack. Plaintiff Pamela J. Norby can sue and be sued in this Court.

65. Plaintiff Tiffany Allred was, and at all times relevant hereto, the daughter of Richard I. Norby, and a citizen of the United States. Plaintiff Tiffany Allred has suffered severe mental anguish and extreme emotional pain and suffering as a result of her father being injured in the Brussels Airport Attack. Plaintiff Tiffany Allred can sue and be sued in this Court.

66. Plaintiff Jason Norby was, and at all times relevant hereto, the son of Richard I. Norby, and a citizen of the United States. Plaintiff Jason Norby has suffered severe mental anguish and extreme emotional pain and suffering as a result of his father being injured in the Brussels Airport Attack. Plaintiff Jason Norby can sue and be sued in this Court.

67. Plaintiff Chelsea Snell was, and at all times relevant hereto, the daughter of Richard I. Norby, and a citizen of the United States. Plaintiff Chelsea Snell has suffered severe mental anguish and extreme emotional pain and suffering as a result of her father being injured in the Brussels Airport Attack. Plaintiff Chelsea Snell can sue and be sued in this Court.

**The Wells Family**

68. Mason Wells was injured in the Brussels Airport Attack, which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Mason Wells was a United States citizen. Plaintiff Mason Wells can sue and be sued in this Court.

69. Plaintiff Chad S. Wells was, and at all times relevant hereto, the biological father of Mason Wells, and a citizen of the United States. Plaintiff Chad S. Wells has suffered severe mental

anguish and extreme emotional pain and suffering as a result of his son, Mason, being injured in the Brussels Airport Attack. Plaintiff Chad S. Wells can sue and be sued in this Court.

70. Plaintiff Kymberly E. Wells was, and at all times relevant hereto, the biological mother of Mason Wells, and a citizen of the United States. Plaintiff Kymberly E. Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of her son, Mason, being injured in the Brussels Airport Attack. Plaintiff Kymberly E. Wells can sue and be sued in this Court.

71. Plaintiff Porter Wells was, and at all times relevant hereto, the biological brother of Mason Wells, and a citizen of the United States. Plaintiff Porter Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Mason, being injured in the Brussels Airport Attack. Plaintiff Porter Wells can sue and be sued in this Court.

72. Plaintiff Mia Wells was, and at all times relevant hereto, the biological sister of Mason Wells, and a citizen of the United States. Plaintiff Mia Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Mason, being injured in the Brussels Airport Attack. Plaintiff Mia Wells can sue and be sued in this Court.

73. Plaintiff T.W. was, and at all times relevant hereto, the biological sister of Mason Wells, and a citizen of the United States. Plaintiff T.W. is a minor born August 28, 20XX who lives with her mother, father and siblings. Plaintiff T.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Mason, being injured in the Brussels Airport Attack. Plaintiff T.W. can sue and be sued in this Court.

74. Plaintiff Colby S. Wells was, and at all times relevant hereto, the biological brother of Mason Wells, and a citizen of the United States. Plaintiff Colby S. Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Mason, being

injured in the Brussels Airport Attack. Plaintiff Colby S. Wells can sue and be sued in this Court.

**The Winternitz Family**

75. Plaintiff Chaim Winternitz ("Mr. Winternitz") was injured in the Brussels Airport Attack, which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization. Plaintiff Chaim Winternitz has been at all relevant times a United States citizen and can sue and be sued in this Court.

76. Plaintiff Jacob Winternitz was, at all times relevant hereto, the biological father of Chaim Winternitz, and a United States citizen. Plaintiff Jacob Winternitz can sue and be sued in this Court.

77. Plaintiff Moshe Winternitz was, at all times relevant hereto, the biological brother of Chaim Winternitz, and a United States citizen. Plaintiff Moshe Winternitz can sue and be sued in this Court.

78. Plaintiff Ester Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Ester Winternitz can sue and be sued in this Court.

79. Plaintiff Faige Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Faige Winternitz can sue and be sued in this Court.

80. Plaintiff Yitel Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Yitel Winternitz can sue and be sued in this Court.

81. Plaintiff B.W., a minor born December XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff B.W. can sue and be sued in this Court.

82. Plaintiff D.W., a minor born December XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff D.W. can sue and be sued in this Court.

83. Plaintiff M.W., a minor born July XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff M.W. can sue and be sued in this Court.

84. Plaintiff A.W., a minor born April XX, 20XX, was, at all times relevant hereto, the biological son of Chaim Winternitz, and a United States citizen. Plaintiff A.W. can sue and be sued in this Court.

85. Plaintiff M.W., a minor born January XX, 20XX, was, at all times relevant hereto, the biological son of Chaim Winternitz, and a United States citizen. Plaintiff M.W. can sue and be sued in this Court.

**The Boothe Family**

86. Plaintiff Captain ("CAPT") Shastri Boothe served in Afghanistan as a member of the U.S. Army.  On August 7, 2012, CAPT Boothe was injured in a motor truck bomb terrorist attack committed by the Afghanistan Syndicate in Logar Province, Afghanistan. CAPT Boothe has experienced severe physical and emotional pain and suffering.  CAPT Boothe has been a national of the United States at all relevant times and can sue and be sued in this Court.

87. Plaintiff Morgan Boothe-Durdio is the biological child of CAPT Boothe. Plaintiff MB has been a national of the United States at all relevant times and can sue and be sued in this Court.

88. As a result of the August 7, 2012 attack and CAPT Boothe's injuries, Plaintiff Morgan Boothe-Durdio has experienced severe mental anguish and emotional pain and suffering.

**The Bland Family**

89. Plaintiff Specialist ("SPC") Jared Bland served in Afghanistan as a member of the U.S. Army. On June 20, 2012, SPC Bland was injured in a suicide bomb terrorist attack committed by the Syndicate in Khost Province, Afghanistan. As a result of the June 20, 2012 attack and his injuries, SPC Bland has experienced severe physical and emotional pain and suffering. SPC Bland has been a national of the United States at all relevant times and can sue and be sued in this Court.

90. Plaintiff GB is the minor biological child of SPC Bland. Plaintiff GB is represented in this civil action by his father and next of kin, SPC Bland. Plaintiff GB has been a national of the United States at all relevant times and can sue and be sued in this Court.

91. Plaintiff Jared Bland, Jr. is the biological son of SPC Bland. Plaintiff Jared Bland, Jr. has been a national of the United States at all relevant times and can sue and be sued in this Court.

92. As a result of the June 20, 2012 attack and SPC Bland's injuries, each member of the Bland family has experienced severe mental anguish and emotional pain and suffering.

**The Chambers Family**

93. Plaintiff Senior Airman ("SRA") Joshua Chambers served in Afghanistan as a member of the U.S. Air Force. On November 16, 2013, SRA Chambers was injured in a terrorist attack committed by the Syndicate in Parwan Province, Afghanistan. As a result of the November 16, 2013 attack and his injuries, SRA Chambers has experienced severe physical and emotional pain and suffering. SRA Chambers has been a national of the United States at all relevant times and can sue and be sued in this Court.

94. Plaintiff Erin Chambers, was at all relevant times, the spouse of SRA Chambers and a national of the United States and can sue and be sued in this Court.

95. Plaintiff Kevin Chambers is the biological father of SRA Chambers. He has been a national of the United States at all relevant times and can sue and be sued in this Court.

96. Plaintiff Nancy Chambers is the biological mother of SRA Chambers. She has been a national of the United States at all relevant times and can sue and be sued in this Court.

97. As a result of the November 16, 2013 attack and SRA Chambers' injuries, each member of the Chambers family has experienced severe mental anguish and emotional pain and suffering.

**The Mitchell Family**

98. Plaintiff Airman First Class ("AFC") John Mitchell, III served in Afghanistan as a member of the U.S. Air Force. On June 26, 2013, AFC Mitchell was injured in a rocket terrorist attack committed by the Syndicate in Jalalabad, Nangarhar Province, Afghanistan. As a result of the June 26, 2013 attack and his injuries, AFC Mitchell has experienced severe physical and emotional pain and suffering. AFC Mitchell has been a national of the United States at all relevant times and can sue and be sued in this Court.

99. Plaintiff John Mitchell, Jr. is the biological father of AFC Mitchell. He has been a national of the United States at all relevant times and can sue and be sued in this Court.

100.    Plaintiff Diane Mitchell is the biological mother of AFC Mitchell. She has been a national of the United States at all relevant times and can sue and be sued in this Court.

101.    Plaintiff Stacey Atkins is the biological sister of AFC Mitchell. She has been a national of the United States at all relevant times and can sue and be sued in this Court.

102.    Plaintiff Sally Mitchell is the biological sister of AFC Mitchell. She has been a national of the United States at all relevant times and can sue and be sued in this Court.

103.    As a result of the June 26, 2013 attack and AFC Mitchell's injuries, each member of the Mitchell family has experienced severe mental anguish and emotional pain and suffering.

**The Murtha Family**

104.    Plaintiff Private Second Class ("PSC") Alex Murtha served in Afghanistan as a member of the U.S. Army. On June 3, 2013, PSC Murtha was injured in a terrorist attack committed by the Syndicate in Paktika Province, Afghanistan. As a result of the June 3, 2013 attack and his injuries, PSC Murtha has experienced severe physical and emotional pain and suffering. PSC Murtha has been a national of the United States at all relevant times and can sue and be sued in this Court.

105.    Plaintiff Kelly McHenry is the biological mother of PSC Murtha. She has been a national of the United States at all relevant times and can sue and be sued in this Court.

106.    As a result of the June 3, 2013 attack and PSC Murtha's injuries, each member of the Murtha family has experienced severe mental anguish and emotional pain and suffering.

**The Worbington Family**

107.    Plaintiff Gunnery Sergeant ("GYSGT") Brian Worbington served in Afghanistan as a member of the U.S. Marine Corps. On January 17, 2013, GYSGT Worbington was injured in an IED attack committed by the Syndicate in Nawzad District, Hemland Province, Afghanistan. As a result of the January 17, 2013 attack and his injuries, GYSGT Worbington has experienced severe physical and emotional pain and suffering. GYSGT Worbington has been a national of the United States at all relevant times and can sue and be sued in this Court.

108.    Plaintiff Wendy Worbington was, at all relevant times, the spouse of GYSGT Worbington, and a national of the United States and can sue and be sued in this Court.

109.    Plaintiff Constance Worbington is the biological daughter of GYSGT Worbington. Plaintiff Constance Worbington has been a national of the United States at all relevant times and can sue and be sued in this Court.

110.    As a result of the January 17, 2013 attack and GYSGT Worbington's injuries, each member of the Worbington family has experienced severe mental anguish and emotional pain and suffering.

**The Selig Family**

111.    Plaintiff Estate of Glenn L. Selig is represented in this action by its duly appointed Administrator, Charyn F. Selig.  Glenn L. Selig was murdered in the Intercontinental Hotel Attack.   At the time of the acts alleged, and at all other times relevant hereto, Glenn L. Selig was a citizen of the United States.   Plaintiff Estate of Glenn L. Selig can sue and be sued in this Court.

112.    Plaintiff Charyn F. Selig is, and at all times relevant hereto was, the lawful wife of Glenn L. Selig, and a citizen of the United States. Plaintiff Charyn F. Selig can sue and be sued in this Court.

113.    Plaintiff Joshua Selig is, and at all times relevant hereto was, the biological son of Glenn L. Selig and Charyn F. Selig, and a citizen of the United States. Plaintiff Joshua Selig can sue and be sued in this Court.

114.    Plaintiff Drew Selig is, and at all times relevant hereto was, the biological daughter of Glenn L. Selig and Charyn F. Selig, and a citizen of the United States. Plaintiff Drew Selig can sue and be sued in this Court.

115.    Plaintiff Lucille Selig is, and at all times relevant hereto was, the biological mother of Glenn L. Selig, and a citizen of the United States. Glenn L. Selig was murdered in the Intercontinental Hotel Attack. Plaintiff Lucille Selig can sue and be sued in this Court.

116.    Plaintiff Estate of Herbert Selig is represented in this action by its duly appointed Administrator, Lucille Selig.  At all times relevant hereto, Herbert Selig was the biological father of Glenn L. Selig, and a citizen of the United States.  Plaintiff Estate of Herbert Selig can sue and be sued in this Court.

117.    Plaintiff Jill Lasman is, and at all times relevant hereto was, the biological sister of Glenn L. Selig, and a citizen of the United States. Plaintiff Jill Lasman can sue and be sued in this Court.

**The Waheed Family**

118.    Plaintiff Estate of Abdullah Waheed is represented in this action by its duly appointed Administrator, Alya Waheed.  Abdullah Waheed was murdered in the Intercontinental Hotel Attack.  At the time of the acts alleged, and at all other times relevant hereto, Abdullah Waheed was a citizen of the United States.  Plaintiff Estate of Abdullah Waheed can sue and be sued in this Court.

119.    Plaintiff Alya Waheed is, and at all times relevant hereto was, the lawful wife of Abdullah Waheed, and a citizen of the United States. Plaintiff Alya Waheed can sue and be sued in this Court.

120.    Plaintiff Mina Waheed is, and at all times relevant hereto was, the biological daughter of Abdullah Waheed and Alya Waheed, and a citizen of the United States. Plaintiff Mina Waheed can sue and be sued in this Court.

121.    Plaintiff Meelod Waheed is, and at all times relevant hereto was, the biological son of Abdullah Waheed and Alya Waheed, and a citizen of the United States. Plaintiff Meelod Waheed can sue and be sued in this Court.

122.    Plaintiff Amanullah Waheed is, and at all times relevant hereto was, the biological son of Abdullah Waheed and Alya Waheed, and a citizen of the United States. Plaintiff Amanullah Waheed can sue and be sued in this Court.

**The Kantor Family**

123.    Plaintiff Estate of Paula L. Kantor is represented in this action by its duly appointed Administrator, Anthony C. Kantor.  Paula L. Kantor was murdered in the Park Palace Hotel Attack.   At the time of the acts alleged, and at all other times relevant hereto, Paula L. Kantor was a citizen of the United States.  Plaintiff Estate of Paula L. Kantor can sue and be sued in this Court.

124.    Plaintiff Anthony C. Kantor is, and at all times relevant hereto was, the biological father of Paula L. Kantor, and a citizen of the United States. Plaintiff Anthony C. Kantor can sue and be sued in this Court.

125.    Plaintiff Barbara B. Kantor is, and at all times relevant hereto was, the biological mother of Paula L. Kantor, and a citizen of the United States. Plaintiff Barbara B. Kantor can sue and be sued in this Court.

126.    Plaintiff Anthony J. Kantor is, and at all times relevant hereto was, the biological brother of Paula L. Kantor, and a citizen of the United States. Plaintiff Anthony J. Kantor can sue and be sued in this Court.

127.    Plaintiff Laura L. Styrlund is, and at all times relevant hereto was, the biological sister of Paula L. Kantor, and a citizen of the United States. Plaintiff Laura L. Styrlund can sue and be sued in this Court.

**The Kenny Family**

128.    Plaintiff Shawn Kenny is, and at all times relevant hereto was, a citizen of the United States,.  Shawn Kenny was injured in the Intercontinental Hotel Attack. Plaintiff Shawn Kenny can sue and be sued in this Court.

## THE DEFENDANTS

129.    Defendant LM Ericsson is publicly traded on the NASDAQ under the ticker ERIC. LM Ericsson is incorporated in the Kingdom of Sweden ("Sweden"), and its principal place of business is in Stockholm, Sweden.

130.    Defendant Ericsson Inc. is a wholly owned subsidiary of Ericsson Holding II, Inc., which is a wholly owned subsidiary of LM Ericsson. It is incorporated in Delaware, and its principal place of business is in Plano, Texas. Ericsson Inc. has an agent and maintains an office in this District.

131.    Defendant Ericsson AB is a wholly owned subsidiary of LM Ericsson. It is incorporated in the Kingdom of Sweden, and its principal place of business is in Stockholm, Sweden. Ericsson AB has appointed Ericsson Inc. as its agent for service of process in the United States.

132.    Defendant Rafiah Ibrahim is a purported "advisor" to LM Ericsson CEO (and codefendant) Börje Ekholm, a role that Ericsson claims she has served since August 31, 2019. Ibrahim is a foreign national and is known to have recently resided in the United Arab Emirates. Ibrahim first joined Ericsson in 1996 and held several high-profile positions during her tenure. Immediately before becoming an advisor to Ekholm, Ibrahim was a Senior Vice President and

Ericsson's Head of Market Area Middle East and Africa, as well a member of LM Ericsson's Executive Team—positions she assumed on July 1, 2014.

133.    Defendant Börje Ekholm ("Ekholm") is the President and CEO of LM Ericsson and has served in that role since January 16, 2017. Ekholm has been a member of LM Ericsson's board of directors since 2006. Ekholm is a United States citizen who has led LM Ericsson from the United States while a resident of Connecticut from 2017 until at least 2022 and of Colorado thereafter. On March 29, 2022, LM Ericsson's shareholders voted not to discharge Ekholm (and the other members of LM Ericsson's board) from liability arising from Ericsson's alleged conduct in Iraq.

134.    Ericsson AB and Ericsson Inc. are LM Ericsson's two largest operating subsidiaries.

135.    Ericsson AB manufactures communications equipment, including mobile broadband, routers, switches, software, and network equipment for microwave, transport, and internet protocol. Ericsson AB also sells Ericsson products and services all over the world, including directly to Ericsson's customers and to certain of LM Ericsson's other subsidiaries.

136.    In addition to acting in their capacities as employees of Ericsson AB, several executives and other employees of Ericsson AB acted as agents of LM Ericsson in conducting Ericsson business in Iraq. From 2000 through 2022, LM Ericsson was a multinational telecommunications equipment and service company headquartered in Stockholm, Sweden.

137.    From 2000 through 2022, LM Ericsson functioned as the holding company for a multinational telecommunications equipment and service behemoth that operated all over the world through its many subsidiaries and affiliated entities. Although LM Ericsson purports not to conduct operating activities, LM Ericsson employees have been implicated in widespread unlawful activity relating to its operating companies' operations.

138.    LM Ericsson admitted in its DPA that its "subsidiaries," including Ericsson AB and

Ericsson Inc., "acted as divisions of the parent, rather than separate and independent entities."

Deferred Prosecution Agreement at A1-A2, United States v. Telefonaktiebolaget LM Ericsson,

No. 1:19-cr-00884 (S.D.N.Y. Dec. 6, 2019), ECF No. 6.

139.    Consistent with that admission, LM Ericsson's global business operated as a singular "One

Ericsson" organization, combining Ericsson's manufacturing, R&D, and other arms under the

control of LM Ericsson headquarters in Stockholm to deliver complete products and services

to its global customers. In 2007, for example, an LM Ericsson employee publicly explained

that LM Ericsson's business strategy was to achieve long-term growth based on the

interrelationships of the various technological products offered by LM Ericsson's subsidiaries

to operators of mobile networks and fixed communication systems throughout the world,

which LM Ericsson marketed through "portfolio" and "bundled" offerings.

140.    In 2012, similarly, LM Ericsson's CEO at the time publicly observed that Ericsson's

globally integrated "One Ericsson" business model drew on Ericsson's global employees,

technologies, and services – including those in the U.S. – to optimize value for Ericsson's

operations and LM Ericsson's shareholders. In the same speech, LM Ericsson's CEO in 2012

explained that "[a]ny strategic decision" that Defendants adopted was "buil[t] on" Ericsson's

"three" "competitive advantages":

        *a.* Ericsson's "technology leadership" which was "the foundation for our

            Company";

        *b.* Ericsson's "service leadership," through which Defendants leverage

            Ericsson's "global scale[,] which [was] unique" because Defendants offered

            their potential telecom customers worldwide the "unique possibility to" drive

value by "working in an efficient way globally, using IT support," and benefiting from Defendants' "use [of] the [O]ne Ericsson [business model] across the globe"; and

    *c.*  Ericsson's "commercial management," which was "a key" for Defendants given that they "work[ed] as [O]ne Ericsson" "globally to keep control [of] where the commercials"– i.e., the contractual bids, relationships, and projects worldwide in which LM Ericsson and Ericsson Inc. collaborated with other Ericsson entities as "One Ericsson," – are going."

141.    Ericsson Inc. was a wholly owned subsidiary of LM Ericsson that operated in the United States, served as Ericsson's vital technology hub in the United States, and regularly sold goods (through LM Ericsson) to customers in the Middle East. Throughout this period, Ericsson Inc. manufactured and serviced core communications network products including, but not limited to, antennas, transmitters, switching systems, and other gear used to build wireless telecommunications networks. Ericsson Inc. primarily served network operators, transportation companies, utilities, and broadcasters, and specialized in offering full-spectrum consulting, network build-out, network optimization, and network management and maintenance services.

142.    Under its "One Ericsson" approach, to which Defendants always adhered, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely collaborated with one another through crossfunctional teams based and led in the United States by U.S. personnel who reported to LM Ericsson, Ericsson AB, and Ericsson Inc. management. Ericsson's U.S.-based cross-functional teams developed products for Ericsson Inc., helped LM Ericsson win and execute bids on behalf of Ericsson Inc. and Ericsson AB, and enabled Ericsson Inc.'s services and

technologies to benefit Ericsson AB and LM Ericsson. LM Ericsson and Ericsson AB sold bundles of goods and services across the world, including in Iraq and Syria, and the services portion of those bundles was provided, in whole or in part, by Ericsson Inc. in the United States.

143.    Ericsson's cross-functional teams were also responsible for assessing Ericsson's legal and compliance risks worldwide flowing out of extreme risk geographies like Iraq, including Defendants' anti-corruption and associated terrorist finance risks, technology- and diversion-related anti-terrorism risks, and overlapping corporate social responsibility portfolios, e.g., sustainable development and corporate responsibility, in which these concerns were core considerations. On May 13, 2014, for example, LM Ericsson's Group Vice President of Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald, explained how Ericsson Inc. in the United States and LM Ericsson in Sweden partnered closely with their respective divisions around the world through Ericsson's reliance upon cross-functional teams:

> "When I set up [LM Ericsson's Sustainability and Corporate Responsibility Program], it was really important to me that key functions in the [C]ompany were part of it. So I didn't run it just as part of the corporate responsibility program. I really made sure over this two-year period that we had, for example, executives from our sourcing department, security, our government affairs, our different business units, sales and marketing, so we had cross-functional representation on the team. That was part of the business learning program. The whole idea … to running a sustainability function within a company is you have to integrate across the organization and into the relevant functions. I see my role as guiding that, but if sourcing doesn't run the responsible sourcing program or if the product lines don't run with the design from [the beginning], it won't really work. You can never get the scale or the impact having just a separate sustainability organization. That's not my goal. It's really about integration into the business."

144.    Ericsson Inc. was essential to LM Ericsson's and Ericsson AB's ability to market their full-spectrum, turnkey network communications systems in the Middle East. Among other reasons, Ericsson Inc.'s personnel, expertise, products, and intellectual property holdings meant that it

was impossible for LM Ericsson and Ericsson AB to service their customers in the Middle East without Ericsson Inc. For example, LM Ericsson's ability to market its radio base stations, including the RBS 6000, to customers in the Middle East depended upon LM Ericsson's access to Ericsson Inc.'s American technologies and services. Similarly, one of its contracts with Iraqi mobile provider Korek required ASR 9000 routers supplied by American manufacturer Cisco.

145.    Ericsson Inc. was also essential to providing the bundled services that Ericsson AB marketed to its customers in the Middle East, including those in Iraq. On information and belief, given how LM Ericsson and Ericsson AB structured their service offerings to rely on Ericsson Inc. personnel in the United States as a core component of Defendants' "One Ericsson" strategy, LM Ericsson and Ericsson AB would not have been able to provide the turnkey offerings they provided to their Iraqi customers, as alleged in this complaint, without the services provided to LM Ericsson and Ericsson AB – and their end-point customers in Iraq – by Ericsson Inc.'s services personnel.

146.    In light of LM Ericsson's written admission that all its subsidiaries operated as mere divisions of LM Ericsson, and not as independent entities, all the conduct here attributed to Ericsson AB, Ericsson Inc., or any other LM Ericsson subsidiary, was performed at the direction and for the benefit of, and is ultimately attributable to, LM Ericsson. All profits from LM Ericsson's subsidiaries ultimately flow to LM Ericsson.

## **JURISDICTION AND VENUE**

147.    This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

148.    This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

149.    Ericsson Inc.'s U.S. operations (Texas HQ, Delaware incorporation) provide the domestic

nexus required under JASTA. the plaintiffs' claims arise from Defendants' conduct within the

United States and abroad that caused foreseeable injury to U.S. nationals.

150.    Venue is proper in this District under 18 U.S.C. § 2334(a) because Defendant Ericsson Inc.

has an agent in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2)

because a substantial part of the events giving rise to the claims occurred in this District.

## SOURCING

151.    The factual allegations that follow are based on an extensive investigation drawing on a

broad array of public and non-public information, some of which is sourced from the First

Amended Complaint for Violation of the Anti-Terrorist Act, *Schmidt et al. v. Ericsson Inc. et

al.*, 1:22-cv-02317-CKK (D..D.C., Dec 20, 2022) (D.E. 38) ("*Schmidt* Case") and incorporated

by reference herein including, but not limited to:

      *a.*  evidence obtained from witnesses with direct and indirect knowledge of the

alleged facts, including five (5) Confidential Witnesses;

      *b.*  LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, Ibrahim's and Ekholm's

admissions, including, but not limited to, such admissions made in the DPA;

      *c.*  leaked internal LM Ericsson, Ericsson AB, and Ericsson Inc. company data;

      *d.*  LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, Ibrahim's and Ekholm's

public and private statements, including emails and quotes memorialized by

Ericsson investigators;

      *e.*  reports and recommendations by LM Ericsson's and Ericsson AB's

compliance personnel;

      *f.*  declassified military and intelligence agency reporting;

> g.  U.S. diplomatic and military cables (as published online);
>
> h.  Congressional factfinding;
>
> i.  Executive branch public statements and reports to Congress;
>
> j.  United Nations and Financial Action Task Force ("FATF")[1] reports;
>
> k.  media accounts; and
>
> l.  Plaintiffs' recollections.

152.    Upon information and belief, it is alleged that the Confidential Witnesses identified in the *Schmidt* Case have offered an array of first-hand perspectives on various aspects of the terrorist-financing scheme alleged below. Those witnesses include a former senior official employed by LM Ericsson and Ericsson AB with direct experience regarding Ericsson's enterprise-wide strategy to boost profits through illicit payments in high-risk jurisdictions; a former Ericsson Inc. employee with direct knowledge of Ericsson Inc.'s provision of essential support from the United States to LM Ericsson and Ericsson AB in the Middle East, including Iraq and Afghanistan; a former U.S. official stationed in Iraq with direct knowledge of the smuggling routes and strategies relevant to Iraqi transportation routes in the post-Saddam era; a former security contractor who deployed to Iraq in 2003-2004 with the U.S. military and returned in 2006-2007 as a contractor; and a retired U.S. Army Colonel who deployed to Iraq in 2003-2004 and to Afghanistan in 2008 and concluded that Ericsson Inc. likely purchased protection from al-Qaeda in Afghanistan by directly transferring U.S.-origin communications technologies directly to al-Qaeda through a "dead drop" approach that eschewed the usual

---

[1] The FATF is an inter-governmental global money laundering and terrorist financing watchdog. It develops standards to ensure a coordinated global response to prevent organized crime, corruption and terrorism. *See* https://www.fatf-gafi.org/about/.

buffers that Defendants seek to interpose between Ericsson and the terrorists with whom they did business.

153.    The following allegations are based in part on the *Schmidt* Case's witnesses' observations and recollections, corroborated by public and non-public documents and press reports.

## FACTUAL ALLEGATIONS

**A.    THE RELEVANT TERRORIST ORGANIZATIONS COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN IRAQ, SYRIA, AFGHANISTAN AND EUROPE STARTING WITH THE SYNDICATE'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST**

154.    Ericsson's conduct occurred against the backdrop of three decades of al-Qaeda history, during which al-Qaeda and its branches in Afghanistan, Iraq, Syria, and elsewhere survived as a globalized terrorist campaign in which such Relevant Terrorist Organizations needed Defendants' money to kill and injure Americans. In this section, Plaintiffs describe that background, which is broken out into four eras: (1) 1992 through 2002, when al-Qaeda emerged as a threat and executed a series of attacks targeting Americans overseas and in the United States, culminating in 9/11 and the immediate American campaign in Afghanistan thereafter; (2) 2003 through 2007, when al-Qaeda focused its terrorist campaign on Iraq as the top theater in which to attack and kill Americans; (3) 2008 through 2013, when al-Qaeda greatly accelerated its terrorist campaign in Afghanistan in collaboration with the Taliban; and (4) 2014 through 2022, when Islamic State emerged as an al-Qaeda splinter group and conducted its own globalized terrorist campaign targeting Americans in France, Belgium, Iraq, Afghanistan, Syria, and elsewhere in Europe, the Middle East, Asia and Africa.

155.    Defendants' payments supported acts of international terrorism that killed and injured Plaintiffs. In this section, Plaintiffs identify the terrorist groups, subgroups, and partnerships

responsible for the specific attacks that killed and injured them. Each worked in concert and shared resources, personnel, and operational plans.

156.    In Iraq, due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in- Iraq, support for the one benefited the other. Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects: they enabled wide-ranging terrorist attacks against Americans in Iraq and Syria, executed mostly by al-Qaeda-in-Iraq in Iraq and Syria, but supported by (and sometimes jointly committed with) al-Qaeda.

157.    In Afghanistan, al-Qaeda and its allies also coordinated, causing the U.S. government to conclude that the resulting terrorist superstructure was an "Afghanistan Syndicate" composed of al-Qaeda, the Taliban (including its Haqqani Network),[2] and other allied FTOs. Osama bin Laden himself conceived of al-Qaeda as the leader of a terrorist coalition, including the Taliban, across Pakistan and Afghanistan. Due to the mutually reinforcing ties between al-Qaeda and al-Qaeda-in-Iraq, on the one hand, and the Taliban, on the other, support for the one benefited the other. Defendants' protection payments to al-Qaeda and al-Qaeda-in-Iraq thus had crosscutting effects: they enabled wide-ranging terrorist attacks against Americans in France, Belgium, Iraq, Afghanistan, Syria, and Turkey that were committed, planned, and/or authorized by al-Qaeda and/or the Islamic State. (Islamic State followed this approach, as well, so Defendants' payments to Islamic State produced similar crosscutting effects on ISIS's capabilities in all three countries.)

158.    Each of the Relevant Terrorist Organizations used indiscriminate violence against American armed forces members serving as part of Operation Iraqi Freedom (in Iraq) and Operation Enduring Freedom (in Afghanistan), against American civilians in both countries

---

[2] The Haqqani Network has always been, and remains, a part of the Taliban. In this Complaint, all references to the "Taliban" include the Haqqani Network.

and upon Western American allied countries in Europe, such as France and Belgium, where they knew they could also target American civilians, all to achieve political ends. Their primary goal was to intimidate and coerce—using mass destruction, assassinations, and kidnapping—the U.S. government to withdraw its personnel from Iraq and Afghanistan. The terrorists initially sought to intimidate the newly elected (and U.S.- backed and recognized) governments of Iraq and Afghanistan to, among other things, expel the United States from Iraq and Afghanistan and they expanded the fight to Europe where they could expand their reign of terror against American allies, such as with the Paris Bataclan Attack and Brussels Airport Attack, knowing that America civilians would be killed and/or injured in those attacks.

159.    None of the terrorist entities involved in the attacks detailed herein adhered to the Geneva Conventions or the laws of war. Among other violations, they refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons. None was associated with a recognized government. None was waging a civil war, and none had a legitimate claim to sovereignty over Iraq or Afghanistan.

**Al-Qaeda Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East**

160.    Osama bin Laden established and operationalized al-Qaeda in the late 1980s. Ever since, al-Qaeda has been a global terrorist organization notoriously targeting Americans.[3]

161.    From the early 1990s through approximately 1998, al-Qaeda was based primarily in Africa, where it developed its various economic theories and associated terrorist tradecraft, including

---

[3] Al-Qaeda translates as "the base" in Arabic. This name is a reference to bin Laden's vision of al-Qaeda serving as a consortium of allied jihadist groups under his leadership.

operationalization of protection rackets and the leveraging of intermediaries to move money so as to evade detection and obfuscate the true parties-in-interest.

162.    In 1996, bin Laden issued a fatwa authorizing attacks against Americans worldwide. In 1998, bin Laden issued another fatwa, in which he instructed al-Qaeda operatives "to kill the Americans and their allies – civilians and military," while commanding that this was "an individual duty for every Muslim who can do it in any country in which it is possible to do it." That same year, al-Qaeda committed simultaneous attacks targeting U.S. embassies in Kenya and Tanzania, which it facilitated through an array of cells around the world. Thereafter, al-Qaeda relocated the bulk of its terrorists from Africa to camps in Afghanistan that al-Qaeda had established in 1996.

163.    On October 8, 1999, the United States designated al-Qaeda as an FTO, and it has maintained that designation ever since.

164.    In 2000, al-Qaeda committed an attack against the USS Cole, a U.S. Navy destroyer, while it was docked in Yemen, which attack al-Qaeda executed from its base in Afghanistan.

165.    From its headquarters in Afghanistan, al-Qaeda planned and executed the September 11, 2001 terrorist attacks against the United States.

166.    In the wake of the 9/11 attacks, the United States demanded that the Taliban stop harboring al-Qaeda and turn Osama bin Laden over to U.S. custody. The Taliban refused. Instead, eight days after 9/11, Taliban leader Mullah Omar issued an "Order" decreeing that "[a]ll the infidel powers of the world have united against the [Taliban]" and instructing Taliban mujahedin to be "ready" to "mak[e] sacrifices" to "defeat" the "infidel powers."

167.    On October 7, 2001, the United States initiated Operation Enduring Freedom and invaded Afghanistan. The operation's purpose was to destroy the Taliban regime and degrade Afghanistan's utility as a base of operations for anti-American terrorists, including al-Qaeda.

168.    U.S. forces quickly defeated the Taliban contingent in Kabul. By November 2001, the Taliban fled Kabul, and it abandoned Kandahar, its historical stronghold in southern Afghanistan, the following month. Rank-and-file Taliban fighters dispersed back into the countryside, while the Taliban leadership – including Mullah Omar – scattered with most taking refuge in Pakistan but some decamping to Iran and Iraq. One such al-Qaeda terrorist was Abu Musab al-Zarqawi, who had joined al-Qaeda in Afghanistan in the late 1990s.

169.    In the decades after 9/11, al-Qaeda continued to wage its campaign of anti-U.S. terrorism, attacking Americans in Afghanistan, Iraq, and Syria, in an effort to intimidate the United States into withdrawing from the Middle East.[4]

170.    From the mid-2000s throughout the 2010s, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda's leadership in Afghanistan and Pakistan – which many people dubbed "al-Qaeda core" or "AQC"[5] – remained key to the funding, training, and logistics of its branches (like al-Qaeda-in-Iraq) and affiliates (like the Taliban).[6] Plaintiffs outline al-Qaeda's relevant history in this section.

---

[4] Bin Laden claimed, inter alia, that "[t]he American people [were] the ones who pa[id] the taxes which fund[ed] the planes that bomb [al-Qaeda] in Afghanistan, … and … Iraq."

[5] At all times, al-Qaeda comprised far more than simply al-Qaeda core. In this Complaint, references to "al-Qaeda" mean—consistent with the scope of the U.S.'s FTO designation—the entire network, while references to "al-Qaeda core" mean al-Qaeda's Afghanistan, Pakistan, and Iran-based senior leadership.

[6] Al-Qaeda's web of relationships are commonly described as "branches," "franchises," "affiliates," "alliances," and the like. As used in this Complaint, an al-Qaeda "branch" comprises another designated terrorist organization for which the leadership and members are formally part of al-Qaeda through, inter alia, their oath of loyalty to al-Qaeda and Usama bin Laden, and later, Ayman al-Zawahiri, and an al-Qaeda "affiliate" comprises another designated terrorist organization for which the leaders and members have closely integrated with al-Qaeda to the point of being fused, but have not formally pledged an oath of allegiance. Al-Qaeda-in-Iraq and Jabhat al-Nusra were al-Qaeda branches, while the Taliban (including its Haqqani Network) were al-Qaeda affiliates. Even then, however, al-Qaeda's intricate terrorist superstructure included additional overlap points. For example, it was not uncommon for terrorists who served an al-Qaeda affiliate to be members of al-Qaeda itself, even if the broader organization had not sworn an

171.    Afghanistan and Iraq were the first two primary theaters of mass anti-American terror by al-Qaeda and its branches for the first decade after 9/11. In the second decade after 9/11, however, al-Qaeda and its branches expanded from Afghanistan and Iraq into Syria, among other places, following the same al-Qaeda playbook, using al-Qaeda's resources, and deploying al-Qaeda's personnel. Terrorists recruited into al-Qaeda's expanding branch network, including in Syria, ultimately became part of al-Qaeda, taking an oath of allegiance to it, which al-Qaeda accepted. Although there is substantial temporal overlap, Plaintiffs address Afghanistan, Iraq, and Syria in that order, roughly tracing the explosion of protection money strategies across all al-Qaeda-affiliated terrorist groups, which began in the mid-2000s.

172.    In Afghanistan and Pakistan, al-Qaeda and the Taliban, including its Haqqani Network, operated as part of an al-Qaeda-led "Syndicate" of terrorists, working in Afghanistan and Pakistan as joint venture partners sharing the common purpose of conducting terrorist attacks against Americans to expel the United States from Afghanistan.

173.    In December 2001, the United Nations passed Resolution 1386, authorizing the International Security Assistance Force ("ISAF," often called the "Coalition"), whose mandate was to assist the newly formed Afghan government in rebuilding the country.

174.    From late 2001 through late 2002, al-Qaeda relocated most of its leadership to Pakistan, Iran, and Iraq, and was busy planning long-term terrorist campaigns against America in Afghanistan and Iraq, which al-Qaeda correctly anticipated the United States would invade.

175.    As 2003 began, al-Qaeda viewed its campaigns in Iraq and Afghanistan as linked in the following two primary objectives. First, reconstitute al-Qaeda's leadership outside of the areas within Afghanistan that were vulnerable to immediate attack by America, and help the Taliban

---

oath to al-Qaeda. For example, Sirajuddin Haqqani was both a sworn member of al-Qaeda and a leader of an al-Qaeda affiliate (the Taliban).

regenerate itself as an anti-American terrorist group based in Pakistan, so that al-Qaeda would have a reliable haven from which to plan and facilitate terrorist attacks against Americans throughout the Middle East. Second, prepare for, and eventually launch, a new terrorist campaign against Americans in Iraq. Both goals dominated al-Qaeda strategy from 2003 through 2007.

176.    With respect to Afghanistan, in 2003, Mullah Omar formed the Quetta Shura, a leadership council that functioned as the Taliban's governing body. Thereafter, the Taliban regenerated as a deadly terrorist group intent on expelling the United States from Afghanistan, overthrowing the U.S.-backed and recognized government of Afghanistan, and re-establishing Islamic rule.

177.    With respect to Iraq, in early 2003, al-Qaeda anticipated the U.S. invasion of Iraq and prepared for Iraq's emergence as a primary theater for al-Qaeda's anti-American jihad. Even though al-Qaeda and its ally the Taliban would successfully rebuild themselves by 2005-2006 into a formidable terrorist threat to Americans in Afghanistan, al-Qaeda core's attention was also substantially focused on Iraq in 2003 because it believed—by virtue of the rapid growth in American troop presence there—Iraq was the theater that offered al-Qaeda the best opportunity to attack and kill Americans en masse from 2003 through 2007.

178.    On March 19, 2003, the United States invaded Iraq. U.S. troops seized control of Baghdad within weeks, and on April 9, 2003, Saddam Hussein's government fell. Shortly thereafter, the Coalition Provisional Authority ("CPA") began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

179.    Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003. After that date, American troops deployed to Iraq performed a peacekeeping and

nation-building function, rather than a warfighting function. American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy.

180.    As it did in Afghanistan, al-Qaeda responded to America's involvement in Iraq with a campaign of terror that leveraged al-Qaeda core's expertise, funds, logistics, and financial management skills with local al-Qaeda branches' fighters and funding streams, through a continuous two-way carousel of terrorist value flow between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda's branches in Afghanistan, Iraq, and Syria.

181.    Al-Qaeda built its campaign of anti-American terror in Iraq in three primary ways. First, al-Qaeda unleashed a flood of propaganda and fatwas calling for violent attacks on Americans in Iraq. Second, al-Qaeda relied upon a secret agreement it had with the Islamic Revolutionary Guard Corps ("IRGC") to secure a direct land corridor, through Iran, that connected Iraq and al-Qaeda's sanctuaries in Afghanistan and Pakistan. Third, al-Qaeda intensified its support for its eventual Iraqi branch led by Zarqawi.

182.    Al-Qaeda spent most of 2003 building up its presence inside Iraq, with a focus on indoctrination, propaganda, recruiting, operationalizing the Sunni insurgency, and the development of the illicit networks necessary to smuggle terrorists, money, and weapons into Iraq to attack Americans there. On April 25, 2003, al-Qaeda issued a fatwa that declared jihad in Iraq and called on all pious Muslims to help attack and kill Americans there. In the summer of 2003, Zarqawi directly communicated to Osama bin Laden and Ayman al-Zawahiri in writing that Zarqawi's group in Iraq wished to be officially designated as "al-Qaeda-in-Iraq." In that message, Zarqawi described a new terrorist force to attack the United States under al-Qaeda's banner and led in-country by Zarqawi. Zarqawi asserted that his terrorist campaign against the U.S. in Iraq was the real "field of jihad" and sought bin Laden's blessing for an

expanded terrorist campaign against Americans in Iraq and throughout the Middle East. Zarqawi therefore requested al-Qaeda core's strategic aid in Iraq. By late 2003, Sunni jihadist networks throughout Iraq were nesting their operational-level activities under the ideological, strategic, and financial umbrella of al-Qaeda, which flowed a river of aid to the nascent Sunni insurgency.

183.    On or about November 2003, Osama bin Laden personally approved al-Qaeda's direct role in funding Sunni terrorists in Iraq, when he authorized regular monthly payments of $1.5 million, ordinarily denominated in U.S. dollars, to finance the leadership cells and "startup" costs of al-Qaeda affiliated terrorists in Iraq. Al-Qaeda continued making such payments to al-Qaeda's terrorist allies in Iraq throughout bin Laden's tenure, and on information and belief, al-Qaeda continued making regular payments of a similar amount to al-Qaeda-in-Iraq until the latter split from al-Qaeda in 2014, which payments were at all relevant times supervised by senior personnel from al-Qaeda "core" in Afghanistan and Pakistan.

184.    By late 2003, al-Qaeda had established a deadly Sunni terrorist insurgency against Americans in Iraq, every member of which was an al-Qaeda-affiliated U.S.-government designated Foreign Terrorist Organization, which al-Qaeda led alongside Zarqawi.

185.    From 2004 onward, al-Qaeda remained a persistent threat in Iraq while vastly expanding its activities in Afghanistan and Syria. By then, Zarqawi had more than 1,000 well-trained terrorists under his command throughout Iraq. While his coalition of Sunni terrorists conducted attacks throughout Iraq, their primary area of operations were: (a) the Sunni Triangle, a central Iraqi region traced by Tikrit in the north, Ramadi in the southwest, and Baghdad in the southeast; (b) northern Iraq, including Mosul and Kirkuk, which sat astride key facilitation routes used by al-Qaeda and al-Qaeda-in-Iraq; and (c) the Iraqi/Syrian border, which al-Qaeda

and al-Qaeda-in-Iraq cultivated as part of their network to move foreign fighters from dozens of countries into Iraq, who often entered Iraq via Syria.

186.    In a January 2004 letter to al-Qaeda attributed to Zarqawi by the U.S. government, Zarqawi asked for al-Qaeda's expanded aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> We need to create armies of mujahidin … to fight the enemy—the Americans … We are continuing to train ourselves and strengthen our ranks. We will strike at them with suicide operations and car bombs. … If you are of the same opinion, if you adopt it as your program, … and you are convinced by the idea of fighting the infidels, we will be your soldiers, under your banner, obeying your orders …

187.    Powered in substantial part by the reliable, potent, and hard-to-trace U.S. dollars afforded to al-Qaeda by its protection rackets in Iraq, al-Qaeda launched a devastating terrorist campaign in Iraq in 2004 that was designed to expel America from Iraq and the Middle East, which al-Qaeda and its branches have pursued ever since.

188.    In the spring of 2004, al-Qaeda further escalated its support for the Sunni terrorist insurgency in Iraq from its safe havens in Iran, Afghanistan, and Pakistan. On March 24, 2004, al-Qaeda called for Muslims "to take part in jihad against the United States in Iraq."

189.    In April 2004, Zarqawi led a large group of terrorists against American forces in Fallujah, Iraq. In so doing, he quickly became the face of the Sunni insurgency in Iraq, which enabled him to rapidly scale up al-Qaeda's enterprise there. Boasting about his ability to transit between Iran, Iraq, and Syria in support of his attacks against Americans there, on May 25, 2004, Zarqawi declared: "I am global, and no land is my country."

190.    By late 2004, al-Qaeda-in-Iraq had effectively seized Ninewa and Anbar provinces and was conducting attacks throughout Iraq. Even when Coalition forces experienced success in one area, e.g., Fallujah, al-Qaeda-in-Iraq's resources allowed the group to seamlessly

reconstitute its headquarters elsewhere. In late 2004, for example, al-Qaeda surged in Mosul in response to U.S. pressure on the terrorists in Fallujah.

191.    In October 2004, the United States launched a concerted campaign against al-Qaeda's presence in Iraq that focused on Zarqawi and his network.

192.    On October 15, 2004, the United States designated al-Qaeda-in-Iraq as a Specially Designated Global Terrorist ("SDGT"), and it has maintained that designation ever since. The next day, the U.S. military launched a major counterterrorism campaign against al-Qaeda in its Fallujah stronghold in Anbar Province.

193.    On October 17, 2004 – the day after the start of the comprehensive American campaign to oust al-Qaeda from Fallujah – Zarqawi's group, Tawhid wal Jihad, publicly declared that it was joining al-Qaeda in order to coordinate the Sunni terrorist campaign against Americans in Iraq under one in-theater leader, a "prince," (i.e., Zarqawi) who was acting on behalf of, and supported by, al-Qaeda's emir (i.e., bin Laden), to whom al-Qaeda-in-Iraq and each al-Qaeda-in-Iraq operative swore an oath of loyalty (the bayat). Zarqawi did so in a boldly titled public oath, entitled "The Tawhid wal Jihad Movement, its Emir [Zarqawi], and its Fighters Have Joined the Cause of al-Qaeda and Sworn Allegiance to Sheikh Osama bin Laden," in which Zarqawi declared, "We announce that Tawhid and Jihad, its princes and soldiers, have pledged allegiance to the leader of the mujahedin, Osama bin Laden," and he signed "Abu Musab Al-Zarqawi, commander of the Tawhid wal Jihad movement." Unambiguously and publicly confirming the Tawhid wal Jihad's status as an al-Qaeda affiliate, Zarqawi announced that Tawhid wal Jihad would now be known as "al-Qaeda in the Land of Two Rivers," i.e., al-Qaeda-in-Iraq.[7] Zarqawi's declaration recognized bin Laden's authority, publicly embraced al-

_____

[7] This was Zarqawi's second loyalty oath to al-Qaeda, because he was already a long-standing member of al-Qaeda who had sworn fealty to bin Laden, and Tawhid wal Jihad was already al-Qaeda's widely recognized affiliate in Iraq.

Qaeda's terrorist campaign against Americans in Iraq, and urged all others to do so.[8] That same day, bin Laden formally accepted Zarqawi's and al-Qaeda-in-Iraq's public declaration of fealty and commitment to al-Qaeda's global organization. In his acceptance announcement, bin Laden's first directive to his new branch in Iraq was to grow al-Qaeda's presence in Iraq while partnering with local Iraqis: "My greatest wish is for you to keep the resistance alive and growing, to increase the number of local Insurgents and give the Iraqis more decision-making powers."

194.    Zarqawi's and bin Laden's public proclamations on October 17, 2004 formally merged al-Qaeda with al-Qaeda-in-Iraq, through a relationship in which the latter was a branch of the former. Such status endured until al-Qaeda-in-Iraq's departure from al-Qaeda in February 2014. Though al-Qaeda-in-Iraq had many brandings over time,[9] it was one organization – Iraq's al-Qaeda branch – and pursued a consistent mission at all times between October 2004 and February 2014: support the terrorist campaign against America led by al-Qaeda, including its emir, by targeting Americans in Iraq and Syria and facilitating al-Qaeda operations in Afghanistan and Pakistan for the purpose of permitting al-Qaeda to create a "jihad wave" stretching from Afghanistan to Iraq that would support an al-Qaeda-led caliphate that would grow throughout the Middle East, including Afghanistan, Iraq, and Syria.

---

The date chosen for the announcement, however, demonstrated the tight nexus between al-Qaeda and al-Qaeda-in-Iraq with respect to Sunni extremists' efforts to rally against the U.S. presence in Iraq.

[8] Zarqawi's declaration provided: "O Sheikh of the mujahidin, if you cross the sea, we shall cross it with you. If you give orders, we shall listen; if you forbid, we shall obey. You are the designated leader for the armies of Islam against all infidels, Crusaders, and apostates."

[9] Zarqawi's al-Qaeda affiliate has had various names since its creation, including Tawhid wal Jihad, aka al-Tawhid & al-Jihad (from inception to October 2004), al-Qaeda in the Land of Two Rivers, aka al-Qaeda-in-Iraq (from October 2004 through January 2006), the Mujahideen Shura Council (from January 2006 through October 2006), the Islamic State of Iraq (from October 2006 through April 2013), Islamic State in Iraq and Syria, aka ISIS (from April 2013 through June 2014) and finally the Islamic State (from June 2014 through present). While the names changed, at all relevant times, the organization built by Zarqawi with Iran's backing pursued attacks against Americans in Iraq. In this Complaint, Plaintiffs collectively refer to all such groups, prior to al-Qaeda's split from ISIS in February 2014, as "al-Qaeda-in-Iraq" or "AQI" and Plaintiffs refer to the group post-February 2014 split as "Islamic State," "ISIS," or "ISIL."

195.    Al-Qaeda's merger with al-Qaeda-in-Iraq was mutually beneficial. For al-Qaeda core and its leader bin Laden, al-Qaeda-in-Iraq was immediately the most active and violent branch of al-Qaeda's global franchise, and by late 2004, bin Laden had determined that Iraq should be a central front of al-Qaeda's terrorist campaign against Americans in the Middle East. Zarqawi concurred regarding the centrality of Iraq to al-Qaeda's terrorist campaign against Americans in the Middle East and declared, in fall 2004: "The spark has been lit here in Iraq and its heat will continue to intensify—by Allah's permission—until it burns the Crusader Armies in Dabiq." By referencing Dabiq, Zarqawi explicitly connected al-Qaeda's terrorist campaign against the United States in Iraq with a global conflict against America through which Islam would triumph over the West in Armageddon.

196.    From late 2004 through 2014, al-Qaeda-in-Iraq deployed a vast network of terrorists throughout Iraq, which was estimated at approximately 15,000 members. A substantial percentage of whom were foreign fighters who came from outside Iraq and often had prior relationships, experience, training, or indoctrination with or from al-Qaeda "core," which always sourced terrorist talent for al-Qaeda-in-Iraq until their split in 2014.

197.    Al-Qaeda-in-Iraq maintained notorious strongholds in Anbar province in Western Iraq and Ninewa Province in northern Iraq, including their respective capitals, Ramadi and Mosul. For example, the U.S. government described Mosul as the "strategic center of gravity" for al-Qaeda-in-Iraq, and one senior commander of U.S. forces observed that "If AQI had a Pentagon, it would be in Mosul."

198.    Al-Qaeda-in-Iraq also maintained large cells throughout Iraq, which were in each instance commanded by hand-selected Zarqawi lieutenants, including in Baghdad (Umar Bazyani), northern Iraq (Husain Salim), and Anbar (Abu Azzam Abdallah). Zarqawi also prioritized

building cells at key transport and smuggling nodes for al-Qaeda and al-Qaeda-in-Iraq and stood up al-Qaeda-in-Iraq cells in an array of other Iraqi cities and provinces including Samarra (on the approach to Baghdad), Diyala (near the border with Iran, and a critical waypoint on the road to Lebanon), and al-Qaim (on the border of Syria).

199.   Like other al-Qaeda branches, al-Qaeda-in-Iraq relied upon a hierarchical organization in which there was both top-down leadership as well as local initiative headed by provincial leaders in order to conduct terrorist operations throughout Iraq.

200.   Al-Qaeda-in-Iraq modeled al-Qaeda's corporate approach, including al-Qaeda's reliance upon top-down bureaucracies to manage the terrorist finances, logistics, recruiting, and communications of al-Qaeda and al-Qaeda-in-Iraq terrorists as a precursor to al-Qaeda's desired global caliphate. Like its parent al-Qaeda, al-Qaeda-in-Iraq also maintained detailed corporate structures, bylaws, committees, and the like, who, in turn, used al-Qaeda-in-Iraq letterhead, forms, receipts, and permission slips.

201.   Al-Qaeda-in-Iraq operated provincial shadow governments that roughly tracked the provincial structure of the Iraqi government. Al-Qaeda-in-Iraq divided each province into geographic sectors, each of which had an administrator who oversaw smaller highly bureaucratized operational units, such as "brigades," "battalions," or "groups."

202.   Al-Qaeda-in-Iraq organized its bureaucracy similarly at the province and sector levels, both of which relied upon administrative emirs who operationalized its cross-cutting terrorist logistics, finance, and attack planning needs, including bureaucracies governing "movement and maintenance," "legal," "military," "security," "medical," "spoils," and "media."

203.   At all times, al-Qaeda-in-Iraq relied upon the same al-Qaeda-designed corporate structures, including an array of committees governing the group's media, terrorist attack planning, and

financial affairs. Through its emulation of al-Qaeda's model, al-Qaeda-in-Iraq also, among other things, paid salaries to its members, provided comprehensive training to its recruits, had detailed expense reimbursement processes, and required prospective members or guests to fill out a detailed application form before joining.

204.    Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, al- Qaeda-in-Iraq ensured that funds raised in one part of Iraq could be redeployed both to other parts of Iraq as well as to fund al-Qaeda "core" in Afghanistan and Pakistan, or facilitate the flow of al-Qaeda and al-Qaeda-in-Iraq terrorists between Iraq, Syria, Iran, other Persian Gulf countries, Afghanistan, and Pakistan from 2004 through 2014.

205.    Through al-Qaeda-in-Iraq's emulation of al-Qaeda's organizational approach, al- Qaeda-in-Iraq relied upon local fundraising schemes, including protection rackets, as a key source of funding for operations in Iraq and Syria, and flowing money, fighters, and logistical aid to al-Qaeda in Afghanistan, Pakistan, Iran, and the Persian Gulf from 2004 through 2014.

206.    On December 17, 2004, the U.S. State Department designated al-Qaeda-in-Iraq as an FTO, and it has maintained that designation ever since.

207.    By the start of 2005, al-Qaeda-in-Iraq had cemented al-Qaeda's control over the Sunni insurgency targeting Americans in Iraq. This represented a tectonic shift in the Sunni insurgency, which was dominated thereafter by al-Qaeda-linked terrorists, often non-Iraqi Arabs who served as poly-terrorists for al-Qaeda core and al-Qaeda-in-Iraq under bin Laden's franchise model.

208.    In June 2005, al-Qaeda core transmitted instructions to Zarqawi concerning the overall goals of the Iraqi campaign and means to achieve them. Al-Qaeda emphasized two points above all. First, Iraq remained central to al-Qaeda's global strategy, and al-Qaeda core's

instruction to al-Qaeda-in-Iraq was to continue to focus on reestablishing the caliphate in Iraq; as al-Qaeda core put it: "The victory of Islam will never take place until a Muslim state is established in the manner of the Prophet in the heart of the Islamic world, specifically in the Levant, Egypt, and the neighboring states of the Peninsula and Iraq." Second, al-Qaeda-in-Iraq's primary goal was to expel the United States from Iraq and the Middle East.

209.    In July 2005, Zarqawi transmitted a detailed four-phase plan to al-Qaeda core in Afghanistan and Pakistan. Phase One was to expel the United States from Iraq. Phase Two was to develop an Islamic Emirate of Iraq to the point that al-Qaeda could declare a caliphate. Phase Three was to extend al-Qaeda's "jihad wave" to the other countries of the Middle East, including Afghanistan. And Phase Four was to initiate a direct clash with Israel.

210.    Throughout 2005, al-Qaeda-in-Iraq expanded its suicide bombing networks in. Iraq (and the broader Middle East, which supported it) side-by-side with the growth of its protection rackets in Iraq. Most of al-Qaeda-in-Iraq's suicide bombers were foreigners, usually Arabs, who were often personally selected by Zarqawi for their dedication to al-Qaeda's mission. Al-Qaeda-in-Iraq followed al-Qaeda's suicide bombing playbook, including al-Qaeda's tactic of having suicide bombers officially join the organization prior to the attack as a means of cementing their psychological commitment to what al-Qaeda terms its "martyrdom operations."

211.    Ascendant throughout Iraq, al-Qaeda-in-Iraq leaders met in May 2006 to finalize their plans to establish a caliphate over several provinces in Iraq, including Anbar, Salahuddin, Diyala, and Ninewa provinces. At this meeting, Zarqawi instructed his al-Qaeda-in-Iraq subordinates to communicate to their cells that all agents of the United States were to be killed immediately without prior approval from their superiors. The meeting ended with Zarqawi

distributing cash payments, denominated in U.S. dollars, ranging from $500 to $10,000 to selected lieutenants, to finance their attacks.

212.    Zarqawi did not live to see his caliphate. On June 7, 2006, American forces killed Zarqawi in an airstrike on an al-Qaeda-in-Iraq safehouse in Diyala Province.

213.    Al-Qaeda quickly designated al-Qaeda polyterrorist (and Zawahiri lieutenant) Abu Ayyub al-Masri as Zarqawi's successor and leader of al-Qaeda-in-Iraq. Masri's rapid succession permitted al-Qaeda-in-Iraq to continue its advance across Iraq without skipping a beat (despite Zarqawi's righteous demise). Indeed, by late 2006, al-Qaeda-in-Iraq was more powerful than ever and committing more – and more lethal – attacks against Americans throughout Iraq.

214.    On October 12, 2006, al-Qaeda rebranded al-Qaeda-in-Iraq as the Islamic State of Iraq (or "ISI"), for which it announced a purported cabinet and governance structure, and claimed authority over the provinces of Anbar, Baghdad, Diyala, Kirkuk, Salah al-Din, and Ninewa, as well as parts of Babil and Wasit provinces. This announcement, fully supported by al-Qaeda core, was the first time any al-Qaeda affiliate openly declared territorial control, and the elevation of Abu Umar al-Baghdadi to its leadership gave al-Qaeda-in-Iraq's leadership a partial Iraqi face (while al-Qaeda-in-Iraq's leader, Masri, was Egyptian, Abu Umar al-Baghdadi was Iraqi).

215.    By the end of 2006, ISI so dominated the Sunni insurgency that most of the remaining Sunni groups were assimilated into ISI or, at a minimum, compelled to facilitate ISI attacks against Americans even if they remained nominally outside of the group.

216.    Al-Qaeda's resurgence in Iraq also coincided with its renewal in Afghanistan and Pakistan. By early 2006, al-Qaeda and a rebuilt Taliban began staging terrorist attacks on American forces there with increasing frequency. These two developments created a vicious feedback

loop, in which al-Qaeda-affiliated terrorists could fund, staff, and supply one another's attacks from their respective havens in Iraq, Iran, Afghanistan, and Pakistan.

217.    By the start of 2007, the U.S. government recognized that al-Qaeda's presence in Iraq had grown so extensive as to threaten the viability of the reconstructed Iraqi state.

218.    In February 2007, the U.S. "surged" tens of thousands of additional American forces in Iraq to halt the explosive growth of ISI. This was accompanied by a string of statements in which senior U.S. officials repeatedly identified ISI as the driving force of the anti-American insurgency there. On February 27, 2007, Director of the Defense Intelligence Agency, Lieutenant General Michael Maples, publicly characterized ISI as "the largest and most active of the Iraq-based terrorist groups." On April 26, 2007, the top American commander in Iraq, General David Petraeus, called ISI "probably public enemy number one." On July 12, 2007, the U.S. military spokesman in Iraq, Brigadier General Kevin Bergner, observed that ISI was responsible for 80% to 90% of suicide attacks, and stated that defeating ISI was a focus of U.S. operations.

219.    From the start of the surge in early 2007, ISI experienced meaningful pressure across multiple fronts in Iraq for the first time in its existence. As such, al-Qaeda and ISI terrorists operated along two tracks in which some continued the assault in Iraq, while others redeployed from Iraq to al-Qaeda's havens along the Afghanistan/Pakistan border.

220.    At the same time, al-Qaeda core in Afghanistan had spent years patiently rebuilding itself, and its Taliban proxy, and stood poised to dramatically intensify its terrorist campaign in Afghanistan and Pakistan in 2007. These parallel dynamics meant that al-Qaeda had a ready-made safety valve for its ISI terrorists if they needed to flee American forces in Iraq – the haven afforded to al-Qaeda "core" by the Taliban in Afghanistan and Pakistan. Indeed, starting

in 2007 and continuing until 2014 ISI terrorists flowed back to al-Qaeda's traditional havens in Afghanistan and Pakistan, where they joined al-Qaeda's pre-existing joint cells in Afghanistan or its training and bomb-making camps in Pakistan. Such ISI turned al-Qaeda in Afghanistan operatives helped power al-Qaeda's resurgence in Afghanistan and Pakistan when Plaintiffs and their loved ones were injured there between 2012 and 2018.

221.    Al-Qaeda and ISI continued al-Qaeda's terrorist campaign against Americans in Iraq and Syria from 2008 through ISI's split with al-Qaeda in February 2014, and continued to always support al-Qaeda's campaign against Americans in Afghanistan.

222.    By 2010, every metric confirmed that al-Qaeda was far stronger than it had been when it executed its attacks on 9/11, principally because of the financial, operational, logistical, training, and safe havens it derived from the interplay between al-Qaeda core in Afghanistan and Pakistan and al-Qaeda's key branches like ISI, which facilitated a regular flow of fighters, logistical aid, funds, training, and other key aid to al-Qaeda core and, through al-Qaeda core, to other al-Qaeda affiliates, like the Taliban.

223.    On April 19, 2010, Coalition forces killed al-Qaeda's and ISI's top two leaders in Iraq, the poly-terrorists Masri and Abu Umar al-Baghdadi. Then-Vice President Joe Biden observed at the time that "[t]heir deaths [were] potentially devastating blows to al Qaeda Iraq." After Masri was killed, he was succeeded by al-Qaeda and al-Qaeda-in-Iraq operative Abu Bakr al-Baghdadi al-Husseini al-Qurashi (commonly known as Abu Bakr al-Baghdadi), who led al-Qaeda-in-Iraq thereafter.

224.    Al-Qaeda continued its dominance of ISI's leadership after Masri and Abu Umar al-Baghdadi were taken out on April 9, 2010, when al-Qaeda installed another senior al-Qaeda core terrorist into ISI's command structure by appointing longstanding bin Laden lieutenant

Nu'man Salman Mansur al-Zaydi as ISI's "Minister of War" for Iraq. In this role, Zaydi was effectively the number 2 ISI terrorist, behind only Abu Bakr al-Baghdadi.

225.    As of late 2010, al-Qaeda and al-Qaeda-in-Iraq endured in Iraq through their strongholds in Ninewa Province, from which the terrorists continued to successfully threaten and attack Americans throughout much of Iraq, including Ninewa, Anbar, Baghdad, and Diyala.

226.    Al-Qaeda's fortunes in Iraq, and those of its affiliate there, further improved in 2011. In the spring of 2011, civil war erupted in Syria. This afforded al-Qaeda and ISI with an expanded chessboard. While Syria had long been a haven for al-Qaeda and ISI (owing to the Assad regime's calculated embrace of both groups in an effort to help kill Americans in Iraq), the Syrian geographies available to them were somewhat limited. From 2011 onward, however, the map expanded greatly for al-Qaeda and ISI, which sought to rapidly grow into the void created by the violence.

227.    In mid-2011, al-Qaeda instructed ISI to establish an al-Qaeda/ISI affiliate in Syria. Following al-Qaeda's instruction, ISI supplied its resources, terrorists, and logistical networks in support of the creation of a new al-Qaeda affiliate in Syria, which the terrorists named Jabhat al-Nusra, meaning the "Victory Front." Among other things, ISI leader Abu Bakr al-Baghdadi personally appointed ISI terrorist, Abu Mohammad al-Jolani, as head of Jabhat al-Nusra.

228.    In so doing, al-Qaeda, ISI, and Jabhat al-Nusra relied upon the same al-Qaeda-crafted protection money playbook and strategies, al-Qaeda designed organizational and management practices, and often even the same "polyterrorist" operatives who were simultaneously members of al-Qaeda, ISI, and Jabhat al-Nusra.

229.    From 2011 through 2013, ISI resumed its expansion across Iraq and Syria and boasted thousands of terrorist operatives dedicated to facilitating al-Qaeda's and ISI's terrorist campaign against Americans in the Middle East.

230.    In 2013, al-Qaeda and ISI rebranded ISI (which they began interchangeably calling "Islamic State of Iraq" in 2006) as Islamic State in Iraq and Syria (or "ISIS") or Islamic State in Iraq and the Levant (or "ISIL"). Specifically, on April 8, 2013, al-Qaeda and ISI polyterrorist Abu Bakr al-Baghdadi announced that Islamic State in Iraq (i.e., al-Qaeda-in-Iraq) had merged with al-Qaeda's and al-Qaeda-in-Iraq's Syrian affiliate, Jabhat al-Nusra, and formed Islamic State of Iraq and Syria.

231.    Even after being rebranded as ISIS (and publicly referring to itself as both ISIS and ISIL interchangeably), ISI continued to be al-Qaeda's branch in Iraq until on or about February 2014, when al-Qaeda and ISIS formally separated. The following day, Abu Mohammed al-Jolani, the leader of Jabhat al-Nusra, rejected Baghdadi's announcement as premature, while professing Jabhat al-Nusra's continued fealty to al-Qaeda, which Jolani invited to mediate the dispute.

232.    For the remainder of 2013, al-Qaeda core, led by Zawahiri and his lieutenants, attempted to mediate the disagreement between Baghdadi and Jolani. While al-Qaeda core was doing so, a substantial number of Jabhat al-Nusra terrorists joined ISI.

233.    Despite their disagreements, ISI and Jabhat al-Nusra continued to closely cooperate on tactical matters in Iraq and Syria throughout 2013.

234.    By the end of 2013, Western and Iraqi analysts were publicly and privately observing how ISI had successfully regrouped into a terrorist force that was larger, more capable, and more threatening to the United States than it had been between 2003 and 2007. Among other

concerns, such analysts often warned that: (1) ISI's renewed strength could spill over beyond Iraq and further aid al-Qaeda attacks against Americans throughout the region, including in Syria and Afghanistan, based upon al-Qaeda's cross-pollination model; (2) ISI's terrorist campaign could threaten Americans throughout Iraq with attacks that were more lethal and sophisticated than before; and (3) stakeholders should assume ISI would continue growing, and that such growth would continue to fuel violence by other al-Qaeda branches (like al-Qaeda core) and affiliates (like the Taliban) around the world. All three warnings were correct on the merits and widely shared views amongst Western and Iraqi businesses, officials, media, and NGOs in Iraq.

235.    By the end of 2013, al-Qaeda was ascendant in Afghanistan, Pakistan, Iraq, and Syria, and al-Qaeda core provided key funding, training, and logistical aid to its branches and affiliates. Indeed, its branch in Iraq, ISI, ended the year by seizing Fallujah.

236.    As 2014 began, ISI was on the march in Iraq and Syria, having freshly seized most of Anbar Province, while moving forward to attempting a complete takeover of Ninewa Province (already an ISI stronghold at the time). In January 2014, al-Qaeda-in-Iraq complemented its December 2013 seizure of Fallujah by seizing a comparable target in Syria, the city of Raqqa, which ISI declared to be its capital upon seizure. In February 2014, ISI split with al-Qaeda and rebranded itself as the "Islamic State."

237.    With respect to Afghanistan, from 2003 through 2004, under the Quetta Shura's leadership, guided by al-Qaeda's experts, the Taliban regenerated as a deadly terrorist group intent on expelling America from Afghanistan, overthrowing the recognized government of Afghanistan, and re-establishing Islamic rule. To that end, in 2005 and early 2006, al-Qaeda

and a rebuilt Taliban began staging increasingly frequent terrorist attacks on U.S. forces, Afghan government personnel, and civilians.

238.    Al-Qaeda's posture in Afghanistan from 2007 to 2015 was closely linked to the developments described above. While al-Qaeda and ISI renewed and expanded their terrorist campaigns in Iraq and Syria, their primary focus from 2008 through 2013 shifted to Afghanistan – because that was where they could kill the most Americans.[10]

239.    Al-Qaeda's resurgence continued largely unabated between 2007 and 2016, as ISI terrorists, funds, and material melted back into al-Qaeda via al-Qaeda's havens in Afghanistan and Pakistan. During this period, al-Qaeda led an Afghanistan Syndicate of affiliated terrorists that supported al-Qaeda's efforts against the United States and the overthrow of the lawfully elected government of Afghanistan by the Taliban, including its Haqqani Network. From 2007 through 2016, al-Qaeda and its Afghanistan Syndicate partners focused on suicide bomb attacks against Americans throughout Afghanistan, as well as attacks against Americans in Kabul, and in geographies in Afghanistan and Pakistan where joint al-Qaeda/Taliban cells operated, including, but not limited to, Nuristan, Nangarhar, Kunar, Laghman, Ghazni, and the Haqqani-controlled areas in both countries.

240.    Al-Qaeda's activities in Afghanistan and Pakistan dramatically escalated in 2007. At around that time, al-Qaeda's Afghanistan Syndicate of affiliated FTOs and SDGTs was fully built, and the Afghanistan Syndicate was actively sponsoring attacks against Americans throughout the Middle East, principally by committing attacks against Americans in Afghanistan and by facilitating attacks against Americans in Iraq through al-Qaeda's provision

---

[10] Al-Qaeda's rationale for its strategic escalation in Afghanistan from 2008 through 2013 mirrored the group's earlier basis for focusing on Iraq from 2003 through 2007: in both instances, the geography in question represented the location in the Middle East in which al-Qaeda could attack and kill the most Americans possible.

of training, logistical aid, recruiting, and fundraising networks in Afghanistan, Pakistan, and the Middle East.

241.    Collectively, the Relevant Terrorist Organizations committed many of the attacks in furtherance of al-Qaeda's campaigns in Iraq, Syria, and Afghanistan that killed and injured Plaintiffs in Afghanistan and Europe. See infra Part XI (Iraq and Syria); XII (Afghanistan).

242.    Islamic State had a sophisticated, well-developed, and complex financial structure. Islamic State's Finance Council was a cabinet level entity that managed Islamic State's revenue and expenditures derived from illicit proceeds from occupation of territory, including from its protection rackets and illicit taxation of goods and cash that transited territory where Islamic State operated. The "Finance Council" governed all revenue and expenditure streams, established and approved annual budgets, and even had a "Chief Financial Officer" to manage it all. Islamic State's Finance Council oversaw the financial infrastructure of the organization and managed Islamic State's cash-based finances via "finance distribution and tax collection centers" in Mosul and "finance storage centers" or cash storage sites in Al Qaim, near the Iraqi-Syrian border. Islamic State also operated multiple "taxation offices" replete with financial auditors.

**Al-Qaeda and ISIS Comprised A Globally Integrated Terror Network That Relied Upon A Cooperative, Corporate Model Internally And With Other Allied Foreign Terrorist Organizations To Facilitate Its Terrorist Campaign Against The United States**

243.    Al-Qaeda's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, al-Qaeda's: (1) integrated global network, which disregarded national boundaries; (2) doctrinal emphasis on unity amongst Islamist groups, and cooperation with otherwise hostile groups that were also targeting the United States, which comprised a "joint operations" model to terrorist campaigns

that revolutionized terrorism; (3) multinational corporate model, which emphasized partnership between al-Qaeda branches and affiliates; (4) reliance upon protection money payments extracted from companies to finance terrorist operations; (5) use of Iranian territory as a safe haven and logistical pipeline through a secret deal with the Iranian regime to connect al-Qaeda operatives in Iraq, Iran, and Afghanistan; and (6) practice of flowing value from al-Qaeda-in-Iraq to al-Qaeda "core" and its partners in Afghanistan and Pakistan.

Al-Qaeda's Integrated Global Network

244.    Al-Qaeda served as a global network and umbrella group that organized the anti-American terrorist campaigns of its branches (like al-Qaeda-in-Iraq, inclusive of Jabhat al-Nusra) and affiliates or allies (like the Taliban, including its Haqqani Network).

245.    Al-Qaeda operated in both a centralized and decentralized manner, extracting advantage from what each approach offered. While al-Qaeda's core set the strategy, facilitated attacks, provided fighters and funding, and led the overall campaign, al-Qaeda's branches around the world had autonomy to conduct operations on a cellular level. This balanced approach modeled that of the U.S. military (which also relied upon a chain-of-command that facilitated local innovation) and made al-Qaeda far more formidable.

246.    Throughout al-Qaeda's more than 25-year history, al-Qaeda has operated as a highly structured organization, rather than a loose network.

247.    At all times, thousands of al-Qaeda operatives served al-Qaeda's global terrorist network.

248.    After 9/11, the United States government launched a globalized war against al-Qaeda and its branches and affiliates, to which al-Qaeda replied with an equally globalized response. In the twenty years following 9/11, al-Qaeda and its branches and affiliates used shared strategies, training sites, terrorist operatives (who wore multiple organizations' hats and were known as

"polyterrorists"), financiers, and the like, under al-Qaeda's multinational corporate approach. As a result, while al-Qaeda's footprint grew over time to encompass Syria and other countries in the Middle East, Africa, and Europe, al-Qaeda and its allies pursued consistent approaches that drew resources, personnel, and expertise, from a global lattice-work of cells in Afghanistan, Pakistan, Iraq, Syria, Lebanon, Jordan, and dozens of other nations on every continent but Antarctica. This was made possible by al-Qaeda's long-time service as a terrorist innovation hub in which transnational al-Qaeda terrorists trained al-Qaeda branches and affiliates regarding terrorist practices, including terrorist fundraising tactics, techniques, and procedures.

249.    Al-Qaeda's post-9/11 strategy reflected bin Laden's long-standing vision of al-Qaeda (and him, specifically) as the leader of a grand terrorist coalition across Iraq, Afghanistan, and Pakistan. Due to the mutually reinforcing ties between al-Qaeda and its Sunni allies – including their practice of cross-donations to each other – support for one benefited all.

250.    Under al-Qaeda's global network approach, the Relevant Terrorist Organizations and their allies collaborated in Iraq, Syria, Afghanistan, Pakistan, the U.A.E., Europe, Africa, the United States and elsewhere to carry out terrorist attacks against Americans worldwide from 9/11 through today.

251.    Al-Qaeda exemplified how terrorist networks could harness the benefits of an increasingly interconnected, globalized environment to serve their agenda by operating as a multinational enterprise with operations in more than 60 countries. Al-Qaeda's global activities were coordinated using personal couriers and communication technologies emblematic of the era— cellular phones, encrypted e-mail, internet chat rooms, and online videos. Members of al-Qaeda traveled from continent to continent with the ease of a recreational or business traveler

in an age marked by unprecedented mobility and migration, paid for with the funds al-Qaeda

raised through, among other things, protection rackets, front businesses, and donations.

252.    Indeed, al-Qaeda experts have long warned against attempts to treat al-Qaeda core in

Afghanistan and Pakistan as a separate operational, financial, logistical, and doctrinal

organization from al-Qaeda branches and affiliates like al-Qaeda-in-Iraq and Jabhat al-Nusra.

Instead, to properly understand how al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra plan and

execute attacks, one must consider al-Qaeda's relationships with its subsidiaries like al-

Qaedain-Iraq and Jabhat al-Nusra, which operated from 2001 through 2014 as part of a single

structure in which al-Qaeda facilitated attacks by al-Qaeda-in-Iraq and Jabhat al-Nusra in their

capacity as al-Qaeda subsidiaries serving as part of al-Qaeda's integrated global terrorist

organization.

253.    Al-Qaeda's global network approach also comported with its multinational corporate

model. As a result, the Relevant Terrorist Organizations and their allies regularly pursued fused

terrorist finance and logistics strategies—e.g., joint al-Qaeda and Haqqani Network cells in

Europe, Afghanistan, or Pakistan, and/or allied terrorist finance and logistics strategies, such

as when al-Qaeda and al-Qaeda-in-Iraq collaborated to distribute ransoms paid to either group

to al-Qaeda's other global franchises and partners between their respective global cells and

financiers for the shared purpose of routing funds, arms, and fighters to terrorist cells targeting

Americans in the Middle East and elsewhere.

254.    After 9/11, the al-Qaeda network demonstrated how terrorists could harness technology to

disperse leadership, training, and logistics not just regionally but globally because establishing

and moving cells in virtually any country was relatively easy in a world where more than 140

million people lived outside of their country of origin and millions of people crossed international borders every day.

255.    Thus, al-Qaeda benefited from a flexible, transnational network structure, enabled by modern technology, in which terrorists worked together in funding, sharing intelligence, training, logistics, planning, and executing attacks. Under this approach, al-Qaeda terrorists with objectives in one country or region drew strength and support from branches in other countries or regions, producing a mutually reinforcing, dynamic al-Qaeda network structure.

256.    Al-Qaeda's global network created a force multiplier effect for al-Qaeda terrorists by establishing links with other like-minded organizations around the globe. The resultant terrorist interconnectivity changed the nature of terrorism.

257.    Al-Qaeda-in-Iraq was al-Qaeda's most important affiliate outside of Afghanistan/Pakistan, served as an indispensable component of al-Qaeda's global terrorist finance, logistics, operational, and communications infrastructure, and vice versa. Through their shared networks, al-Qaeda and al-Qaeda-in-Iraq greatly facilitated, and greatly enhanced the lethality of, both groups' attacks in Afghanistan, Iraq, Syria, and elsewhere. This outcome was the entire point of al-Qaeda's and al-Qaeda-in-Iraq's respective terrorism "business models." With respect to al-Qaeda, al-Qaeda core's terrorism "business model" sought to facilitate attacks against Americans around the world through al-Qaeda core's ability to leverage the resources of al-Qaeda-in-Iraq to facilitate attacks by al-Qaeda core (and other al-Qaeda branches and affiliates) around the world, which was a prime motivation for al-Qaeda core's support for al-Qaeda-in-Iraq in the first instance, and was also the direct result of bin Laden's transactional and franchise-based approach to transnational terrorism. Likewise, al-Qaeda-in-Iraq's terrorism "business model" also sought to facilitate attacks against Americans around the

world through al-Qaeda-in-Iraq's ability to leverage both its own financial and logistical resources from its protection rackets in Iraq, but also through the network of resources provided by al-Qaeda core in Afghanistan and Pakistan and elsewhere in the Middle East.

258.    With respect to its operations outside of Iraq, al-Qaeda-in-Iraq initially prioritized the Afghanistan/Pakistan region as key theater in which it would facilitate attacks against Americans. This reflected al-Qaeda-in-Iraq's institutional viewpoint that its Iraqi strongholds, like Mosul, represented the best location for the capital of a global caliphate that would expand westward to Syria and eastward into Afghanistan.

Al-Qaeda's Doctrinal Emphasis Of "Unity" Amongst Islamists

259.    At all times, al-Qaeda emphasized unity with other Islamists – as long as they sought to attack America. Under this approach, al-Qaeda's strategy, under bin Laden and thereafter, was to use its money, polyterrorists, and good offices to build bridges between and otherwise unite Islamists who targeted American in order to expel the U.S. from the Middle East.

260.    Al-Qaeda's doctrinal emphasis on unity, and the cooperation with other terrorists demanded by it, served al-Qaeda's programmatic interests by positioning al-Qaeda as the leader of an anti-American vanguard, facilitating cooperation with potential Islamist allies who might otherwise be enemies (like the IRGC), and promoting an ethos consistent with al-Qaeda's "joint cell" model in which al-Qaeda terrorists ordinarily co-located with their branch or affiliate/ally, such as a joint al-Qaeda/Taliban cell in Afghanistan, and through which al-Qaeda further expanded its reach.

Al-Qaeda's Multi-National Corporate Model

261.    Al-Qaeda followed a corporate model in which it operated as a devolved network hierarchy where al-Qaeda core facilitated attacks, approved campaigns and geographies targeting

Americans, provided training and technical expertise, supported logistics and smuggling, operated a transnational travel network of safe havens for operatives to move between Iraq/Syria and Afghanistan/Pakistan (often through Iran via al-Qaeda's deal with the IRGC), and enabled cross-pollination between al-Qaeda's branches and/or affiliates (e.g., within and between al-Qaeda-in-Iraq, and the Taliban (including the Haqqanis) or Jabhat al-Nusra, to name two examples).

262.    After 9/11, al-Qaeda leaned heavily into its strategic doctrinal emphasis on corporate and cooperative game-theoretic principles, including concepts such as cooperation theory, franchising, and joint ventures. This reflected al-Qaeda's tactical and operational fusion with its affiliates in Afghanistan and Pakistan.

263.    Under al-Qaeda's corporate model, al-Qaeda core leaned heavily into al-Qaeda's subsidiaries (like al-Qaeda-in-Iraq) when the former was under pressure and the latter were not (as was the case from 2003 through 2008), and al-Qaeda core also served as a haven for the same subsidiaries, like al-Qaeda-in-Iraq, when the tables were turned and the subsidiaries were under pressure while the core was stronger (as was the case from 2008 through 2014). Al-Qaeda's interdependence and joint venture with its allies in Iraq, Syria, Afghanistan, Pakistan and Europe continued throughout the period in which Plaintiffs were killed and injured.

264.    **Oath of Allegiance**. Al-Qaeda required every al-Qaeda branch, like al-Qaeda-in-Iraq or al-Qaeda in the Arabian Peninsula ("AQAP"), to swear an oath of allegiance to al-Qaeda (which often swore a reciprocal oath to its counterpart), and al-Qaeda required both its branches and its allies or affiliates (like the Taliban, including its Haqqani Network) to follow al-Qaeda's playbook concerning terrorist operations, finance, logistics, doctrine, and communication.

265.    **Structure**. Al-Qaeda's corporate approach was also reflected in its goal of establishing and maintaining a top-down global bureaucracy through which al-Qaeda "core" managed the terrorist finances, logistics, recruiting, and communications of al-Qaeda branches as a precursor to al-Qaeda's desired global caliphate. Accordingly, al-Qaeda created and maintained detailed bylaws and established formal governing committees and a chain of command among its leaders — who corresponded on al-Qaeda letterhead and used al-Qaeda-branded forms, receipts, and permission slips to conduct al-Qaeda's affairs.

266.    At all times, al-Qaeda relied upon a substantial corporate structure with an array of committees governing the group's media, terrorist attack planning, and financial affairs. Through these structures, al-Qaeda implemented a corporate-style chain of command complete with a CEO, paid salaries to its members, offered vacation (when requested at least ten weeks in advance), provided comprehensive and organized training to its recruits, and required every prospective al-Qaeda member or guest to fill out a detailed application form or attend an al-Qaeda-sponsored camp.

267.    Al-Qaeda had an official organizational structure, with a formalized hierarchy and official positions. Al-Qaeda was led worldwide by an emir, to whom all branches (and their members) pledged allegiance. Al-Qaeda's emir was advised by the Shura Council. Al-Qaeda also maintained a Military Committee, Political Committee, Media Committee, Administrative and Financial Committee, Religious Committee, and Foreign Affairs Committee, each of which had a formal structure, objectives, and authorities.

268.    Al-Qaeda's formal organizational structure ran from al-Qaeda "core" in Afghanistan and Pakistan to al-Qaeda's branches, including al-Qaeda-in-Iraq. Among other things, al-Qaeda's emir appointed a representative co-located with the leadership of each affiliate to act as a direct

channel to al-Qaeda core in Afghanistan and Pakistan. Through its direct chain of command that emanated from al-Qaeda "core" to al-Qaeda's branches, including al-Qaeda-in-Iraq, al-Qaeda's branches reinforced their subordination to al Qaeda "core."

269.    Al-Qaeda also ensured that its branches, including al-Qaeda-in-Iraq, followed an organizational structure similar to that of al-Qaeda core.

270.    **Franchises**. After 9/11, al-Qaeda often conducted its attacks against the United States through al-Qaeda branches, like al-Qaeda-in-Iraq. In such cases, the attack in question was committed by al-Qaeda and its affiliate.

271.    Consistent with its adherence to a corporate-style structure, al-Qaeda also followed a "franchise" model around the world after 9/11, under which al-Qaeda "branches" (like al-Qaeda-In-Iraq and Jabhat al-Nusra) and "affiliates" or "allies" (like the Taliban, including its Haqqani Network), operated as part of al-Qaeda's network and cross-pollinated with all the other Relevant Terrorist Organizations.

272.    In the decades after 9/11, al-Qaeda's "core" in Afghanistan/Pakistan established al-Qaeda branches (also known as "franchises") in Iraq (i.e., al-Qaeda-in-Iraq), Syria (i.e., al-Qaeda-in-Iraq and later Jabhat al-Nusra), and elsewhere, through which al-Qaeda raised funds and resources, which flowed from the affiliates in Iraq, Syria, and elsewhere, back to al-Qaeda "core" in Afghanistan to facilitate attacks against Americans worldwide.

273.    The value flowed both directions. For example, after al-Qaeda-in-Iraq's official accession to al-Qaeda's global organization, al-Qaeda core escalated the flow of funds, fighters, and logistical aid to al-Qaeda-in-Iraq, and al-Qaeda provided at least $1,000,000 per month in total value to al-Qaeda-in-Iraq thereafter.

274.    From 2004 through 2014, al-Qaeda-in-Iraq was al-Qaeda's top wholly owned subsidiary, and responsible for more support to al-Qaeda "core" than any other al-Qaeda branch or affiliate. Because of the parent/subsidiary and franchisor/franchisee relationship between al-Qaeda core in Afghanistan and Pakistan, and al-Qaeda-in-Iraq in Iraq and Syria, aid to one necessarily benefited the other. Indeed, this was the goal of bin Laden's corporate model in the first place: to maximize the potency of al-Qaeda's campaign against America by leveraging the financial, logistical, and operational capabilities of al-Qaeda's branches, and vice versa.

275.    At all times, such two-way value flows – in which al-Qaeda core provided funds, logistical aid, and fighters to other Relevant Terrorist Organizations including in Iraq, Syria, Afghanistan and Europe while other Relevant Terrorist Organizations also provided funds, logistical aid, and fighters to al-Qaeda core in Afghanistan and Pakistan – were a hallmark of al-Qaeda's relationships with its branches, including other Relevant Terrorist Organizations.

276.    **Command and Control**. Under al-Qaeda's corporate model, when any al-Qaeda branch, like other Relevant Terrorist Organizations, facilitates attacks against Americans or the growth of al-Qaeda outside of such branch's al-Qaeda-assigned territory, the subsidiary must communicate directly with al-Qaeda core, receive al-Qaeda's authorization, follow al-Qaeda's plan, and strictly adhere to al-Qaeda doctrine.

277.    These al-Qaeda rules applied, for example, when al-Qaeda-in-Iraq worked with Sirajuddin Haqqani to establish a two-way training pipeline between Iraq/Syria and Afghanistan/Pakistan training pipeline from 2005 through 2014 in which al-Qaeda, al-Qaeda-in-Iraq, Jabhat al-Nusra, the Taliban (including its Haqqani Network), and other al-Qaeda affiliates and "Syndicate" members, like Lashkar-e-Taiba, all jointly trained in cross-pollinating terrorist

networking sessions that epitomized bin Laden's "first principles" view of al-Qaeda's terrorist business model.

278.    Al-Qaeda's core also maintained a designated representative co-located with each al-Qaeda affiliate, including al-Qaeda-in-Iraq, who interacted with affiliate leadership and ensured that the relationship ran directly through the affiliate's leadership in Iraq and Syria to al-Qaeda core's leadership in Afghanistan and Pakistan.

279.    **Cross-Pollination**. Al-Qaeda core's emphasis on command-and-control did not stifle innovation amongst its branches and affiliates. To the contrary, al-Qaeda also encouraged horizontal relationships amongst its branches and affiliates as long as it was mediated by al-Qaeda, e.g., al-Qaeda-brokered cooperation between the Taliban and al-Qaeda-in-Iraq for the mutual benefit of both.

280.    Al-Qaeda core's desire to serve as a hub for cross-pollination amongst al-Qaeda's various branches like ISI reflected its "franchise" approach to anti-American terrorism. For example, from 2003 through 2014, al-Qaeda core facilitated substantial training programs conducted by ISI terrorists at al-Qaeda camps in Afghanistan and Pakistan, which were for the mutual benefit of the ISI terrorists providing the training (who used the opportunity to network, improve their own skills, and develop new fundraising relationships) as well as al-Qaeda-affiliated terrorists in the camps (e.g., the Taliban, who learned from ISI how to more effectively attack U.S. armor).

281.    While Iraq was al-Qaeda's top focus from 2003 through 2006, Afghanistan was always at least a close second, which eventually surpassed Iraq as al-Qaeda's top priority after 2009. Afghanistan remained al-Qaeda's top focus until the United States fully withdrew from the country in 2021 (with Syria assuming co-equal importance once the violence there began).

282.    Given that Iraq (inclusive of parts of Syria) and Afghanistan were at all relevant times al-Qaeda's top two priorities, al-Qaeda aggressively pursued cross-pollination of strategies, personnel, fundraisers, and the like between these geographies. In such a dynamic learning environment for the terrorists, successful strategies were quickly "ported" from one geography to another (the boundaries between which al-Qaeda and its branches generally rejected on principle and ignored in practice).[11] As a result, al-Qaeda's living/learning approach to cross-pollinating knowledge and practices amongst its branches had a devastating effect on Americans in Iraq, Syria, and Afghanistan.  This would eventually also expand to ISIS's operations in Europe, including in particular the Paris Bataclan Attack and the Brussels Airport Attack.

283.    **Finance**. Throughout its existence, and in keeping with its corporate model, al-Qaeda developed a comprehensive infrastructure designed to route money anywhere in the world that the Global Terror Syndicate needed resources.

284.    True to its multinational corporate structure, al-Qaeda (the parent) devised and oversaw the financial bureaucracy of al-Qaeda-in-Iraq (the subsidiary) throughout Iraq, which al-Qaeda-in-Iraq operationalized and executed at the national, provincial, and local levels throughout Iraq. The resulting al-Qaeda and al-Qaeda-in-Iraq financial infrastructure was purpose-built to ensure that the protection money both received through any level of their Iraq and Syria-related protection rackets was optimized to maximize the lethality of their terrorist campaign in Iraq, Syria, Afghanistan, and Pakistan, for example, by ensuring that al-Qaeda and al-Qaeda-in-Iraq senior leadership could redirect payments from one geography to another, as necessary, to

---

[11] Al-Qaeda and its affiliates rejected nearly every major border and geographic concept relevant to today's Middle East as having been created by the infidels. Al-Qaeda and its allies, as a result, often organized themselves along transnational lines that crossed several countries' borders.

maximize the tempo of their terrorist campaigns and ensure that protection payments to local or provincial terrorists were passed up both groups' chains, ultimately reaching al-Qaeda core in Afghanistan and Pakistan and al-Qaeda-in-Iraq's national finance emir.

285.    **Safe Haven**. Al-Qaeda core's sanctuary in Afghanistan and Pakistan also served as a permanent safe haven for al-Qaeda affiliate terrorists who needed to flee their own geographies whenever pressure from the United States grew too intense.

286.    **Learning Organizations**. Al-Qaeda and its branches, including al-Qaeda-in-Iraq, were "learning organizations" in which operatives were allowed to criticize leaders and were encouraged to evaluate operations afterwards to learn from them and port their experiential wisdom (aka "lessons learned") throughout the broader al-Qaeda network.

In Collaboration With Iran's Islamic Revolutionary Guard Corps, Al-Qaeda Used Iranian Territory To Securely Move Money, Fighters, Weapons, and Communications Between Afghanistan And Iraq In Order To Facilitate Attacks Against Americans In Both Places

287.    Al-Qaeda made a secret deal with the Islamic Revolutionary Guard Corps that allowed al-Qaeda to seamlessly transfer terrorists, funds, weapons, communications, and expertise between Iraq and Afghanistan from 2005 through 2022. Al-Qaeda's ability to transit Iran was vitally important for its ability to facilitate attacks in Iraq and Afghanistan by creating a land-bridge connecting those two countries (extended by their borders with Syria and Pakistan, respectively). Moreover, the Iranian havens provided as part of the secret deal protected key al-Qaeda leaders from U.S. strikes.

288.    Following 9/11 and the United States' subsequent rout of Sunni terrorists in Afghanistan (including al-Qaeda) in late 2001, the IRGC met in Iran with senior al-Qaeda leaders who had fled Afghanistan to offer military aid to support al-Qaeda's fight against America. The IRGC hosted these meetings for its al-Qaeda "guests" throughout 2001 and 2002.

289.    Under their secret deal, the IRGC intensified its material support for al-Qaeda's terrorist campaign against Americans around the world and was responsible for—as bin Laden himself concluded—al-Qaeda's survival as a terrorist organization after 9/11 and, consequently, the Global Terror Syndicate's terrorist attacks against Americans in Afghanistan and Europe, including Plaintiffs, that inevitably followed.

290.    Osama bin Laden personally concluded that al-Qaeda would have collapsed after 2001 without the secret deal and Iran's key support for al-Qaeda in the years following 9/11, and al-Qaeda's subsequent ability to execute terrorist attacks depended upon the "artery" provided by the IRGC. For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets; in a secret internal al-Qaeda communique authored by bin Laden himself, bin Laden identified the key, organization-saving aid that the IRGC had been providing to al-Qaeda after 9/11, stating because of Iran's historical support for al-Qaeda's terrorist operations, Iran was al-Qaeda's "main artery for funds, personnel, and communication."

291.    The U.S. government has also recognized the significance of the close partnership between the IRGC and al-Qaeda after the secret deal between the two. In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under the previously described secret agreement between the IRGC and al-Qaeda. In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit

point for funding to support [al-Qaeda's] activities." The Treasury Department also found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serve[d] as the core pipeline through which al-Qa'ida move[d] money, facilitators and operatives from across the Middle East to South Asia." Indeed, al-Qaeda has honored its commitment to the IRGC despite its attacks on Shiite Muslims elsewhere in the Middle East.

ISIS's External-Operations Campaign in Europe (Paris 2015; Brussels 2016).

292.      On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid Wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS," which is how the FTO will be referenced herein),The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL and ISIS.  To date, ISIS has remained a designated FTO.  ISIS has claimed credit for numerous terrorist activities.

293.    By 2014–2016, as al-Qaeda-in-Iraq, previously rebranded as ISI, again rebranded into the "Islamic State" as a distinct entity from al-Qaeda, and entrenched itself across eastern Syria and northern Iraq, ISIS established a dedicated external-operations arm to project attacks into

Europe using veteran foreign fighters and logistics pipelines running through Belgium and France. Contemporaneous United Nations reporting described ISIS's capability to direct "complex, multi-wave attacks" in Europe carried out by returnees from ISIS-held territory—explicitly citing the November 2015 Paris and March 2016 Brussels massacres as proof of concept.[12]

294.    Europol's official *EU Terrorism Situation & Trend Report (TE-SAT 2016)* concluded that ISIS had "command-and-control links from Syria" to EU-based cells and that the Paris (2015) and Brussels (2016) attacks were hallmark operations—coordinated, multi-cell, and enabled by common facilitators, safehouses, forged documents, and shared bomb-making tradecraft. Europol emphasized that the same Franco-Belgian network was implicated in both attacks.[13]

295.    On November 13, 2015, ISIS directed a coordinated series of shootings and suicide bombings across Paris and Saint-Denis, killing 130 and wounding hundreds at the Stade de France, cafés and restaurants, and the Bataclan theatre. ISIS publicly claimed responsibility the following day.[14]

296.    Belgian-based operatives linked to Molenbeek and Anderlecht provided logistics, safehouses, vehicles, and explosives for Paris, including rentals in Auvelais and Schaerbeek that served as fabrication or staging sites. Investigators identified Salah Abdeslam, a Brussels resident, as the logistics lead who transported bombers to the Stade de France and then fled to

---

[12] U.N. Sec. Council, Rep. of the Sec'y-Gen. on the Threat Posed by ISIL (Da'esh) to Int'l Peace & Security, U.N. Doc. S/2016/92 (Feb. 2016), available at https://digitallibrary.un.org/record/831150.
[13] Europol, European Union Terrorism Situation and Trend Report 2016 (TE-SAT 2016), available at https://www.europol.europa.eu/sites/default/files/documents/europol_tesat_2016.pdf.
[14] *Eur. Union Judicial Coordination, Paris Terrorist Attack: Judicial Cooperation Measures (Nov. 2015)*, https://www.eurojust.europa.eu/sites/default/files/assets/2015-11-paris-terrorist-attack.pdf; see also France 24, "Paris November 2015 Attacks: A Timeline of the Night That Shook the City," https://www.france24.com/en/france/20210908-paris-november-2015-attacks-a-timeline-of-the-night-that-shook-the-city.

Belgium. EU and Belgian releases traced forensic links from these Belgian premises to the Paris devices.[15]

297.     Forensics tied Najim Laachraoui—a Belgian ISIS bomb-maker operating under the alias Soufiane Kayal—to the Paris suicide vests and TATP charges, with his DNA recovered on a Stade de France vest and Bataclan materials. Belgian authorities later confirmed Laachraoui as one of the two Brussels Airport suicide bombers. These findings establish a direct material and personnel bridge between the Paris and Brussels plots.[16]

298.     After Abdeslam's arrest in Brussels on March 18, 2016, the same ISIS network executed retaliatory mass-casualty bombings at Brussels Zaventem Airport and Maelbeek metro on March 22, 2016, killing 32 and injuring hundreds. Belgian federal prosecutors later stated that the cell had initially intended a second attack in France but accelerated plans against Brussels under police pressure—further evidence of the common authorship and operational continuity from Paris to Brussels.[17]

299.     Multiple official and expert syntheses identify the external-operations hierarchy behind these plots as rooted in ISIS's Amn al-Kharji (Emni) and overseen by Abu Muhammad al-Adnani (killed Aug. 2016), with Oussama Atar—a Belgian-Moroccan ISIS planner in Syria— repeatedly named in proceedings and analysis as a coordinator for the Franco-Belgian network.[18]

---

[15] *The Guardian, "Belgian Police Arrest Paris Attacks Suspect Salah Abdeslam," Apr. 8, 2016*, https://www.theguardian.com/world/2016/apr/08/belgian-mohamed-abrini-paris-attacks-arrested-salah-abdeslam.

[16] *The Straits Times, "Najim Laachraoui Confirmed as Second Brussels Airport Bomber; DNA Also Found at Paris Sites," Mar. 26, 2016*, https://www.straitstimes.com/world/europe/najim-laachraoui-confirmed-as-second-brussels-airport-bomber-dna-also-found-at-paris.

[17] *The Guardian, "Brussels Attackers Planned Second Assault on France, Say Belgian Prosecutors," Apr. 10, 2016*, https://www.theguardian.com/world/2016/apr/10/brussels-attackers-planned-second-assault-on-france-belgian-prosecutors.

[18] *Counter Extremism Project, Profiles: Abu Muhammad al-Adnani & Oussama Atar (2020)*, https://www.counterextremism.com/extremists/abu-muhammad-al-adnani; https://www.counterextremism.com/extremists/oussama-atar; see also West Point Combating Terrorism Center, "The

300.    In addition to personnel overlaps, authorities documented tradecraft continuity between the Paris and Brussels devices—TATP-based explosive vests and IEDs produced with similar methods and precursor sourcing from the same Belgian safehouses. Europol's *Changes in Modus Operandi of Islamic State Revisited* (2016) emphasized that returning foreign fighters embedded in European communities provided bomb-making expertise, operational security, and document forgery capabilities shared across both plots.[19]

301.    The causal chain documented in these records shows: (i) ISIS's consolidation of a Syria–Iraq sanctuary (2014–2015) with a finance/logistics bureaucracy; (ii) deployment of vetted returnees and EU-based supporters to build a Franco-Belgian facilitation hub; (iii) directed mass-casualty operations in Paris (Nov. 2015); and (iv) a follow-on attack in Brussels (Mar. 2016) by the same network under heightened investigative pressure—each step expressly claimed by ISIS and described in U.N. and EU threat reporting as externally coordinated from ISIS territory.[20]

302.    Accordingly, ISIS's European campaign—including the Bataclan and Brussels Airport/Metro atrocities—was not ad hoc or merely "inspired"; it reflected organizational continuity from al-Qaeda-in-Iraq's franchised model to ISIS's external-ops directorate, leveraging shared intermediaries, safe havens, and financing conduits to enable directed attacks against U.S. allies and civilians in France and Belgium.[21]

---

Islamic State's External Operations and the French-Belgian Nexus," CTC Sentinel, Vol. 9, No. 11 (2016), https://ctc.westpoint.edu/the-islamic-states-external-operations-and-the-french-belgian-nexus/.

[19]    *Europol,    Changes    in    Modus    Operandi    of    Islamic    State    Revisited    (Dec.    2016)*, https://www.europol.europa.eu/publications-events/publications/changes-in-modus-operandi-of-islamic-state-revisited.

[20]    *U.N.    Doc.    S/2016/92    (Feb.    2016)*;    *Europol    TE-SAT    2016*, https://www.europol.europa.eu/sites/default/files/documents/europol_tesat_2016.pdf.

[21]    *CTC Sentinel, "The Islamic State's External Operations and the French-Belgian Nexus," Vol. 9 No. 11 (2016)*, https://ctc.westpoint.edu/the-islamic-states-external-operations-and-the-french-belgian-nexus/.

303.    The foregoing official materials—together with forensic announcements by Belgian and French authorities regarding Laachraoui's DNA and the identification and arrest of Abdeslam and Abrini—constitute publicly available evidentiary corroboration that the Paris and Brussels attacks were interconnected operations executed by a single ISIS cell under Syria-based direction.[22]

### D.  DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING FINANCIAL ASSISTANCE TO THE RELEVANT TERROR ORGANIZATIONS BY MAKING PROTECTION PAYMENTS TO THEM

1.  <u>Defendants Operated In Insecure And Corrupt Iraqi And Afghan Contracting Environments That Encouraged Protection Payments To The Relevant Terror Organizations</u>

304.    LM Ericsson, Ericsson AB, and Ericsson Inc. operated lucrative businesses in which their profits depended upon transactions in, and transporting lucrative goods through, Iraq, Syria, Afghanistan and Turkey. LM Ericsson and Ericsson AB operated as one of the largest telecom companies in Iraq, which required regular transportation of goods throughout Iraq as well as Syria and Turkey. LM Ericsson, Ericsson AB, and Ericsson Inc. earned at least $1.9 billion combined in net profits in Iraq alone from 2003 through 2019 through large-scale U.S.-government and U.S.-funded Iraqi-government contracts and by providing logistical support to other companies in Iraq and Syria.

305.    To increase their profit margins by redirecting terrorist attacks away from their business interests, LM Ericsson, Ericsson AB, and Ericsson Inc. knowingly facilitated protection money or "tax" payments to the Relevant Terror Organizations terrorists in Iraq and Syria between at

---

[22] *The Straits Times, Mar. 26, 2016*, https://www.straitstimes.com/world/europe/najim-laachraoui-confirmed-as-second-brussels-airport-bomber-dna-also-found-at-paris; *The Guardian, Apr. 8, 2016*, https://www.theguardian.com/world/2016/apr/08/belgian-mohamed-abrini-paris-attacks-arrested-salah-abdeslam; *DHS-FBI-NCTC, Brussels Attacks Joint Intelligence Bulletin (Mar. 24, 2016)*, https://info.publicintelligence.net/DHS-FBI-NCTC-BrusselsAttacks.pdf.

least 2004 and at least 2019, and thereby provided millions in U.S. dollars to these FTOs each year.

306.    The specifics of Ericsson's protection payments and obstruction of American counterterrorism efforts in the United States and the Middle East are discussed *supra*. To lay the groundwork for those allegations, the next two sections describe the contracting environment in geographies that were controlled or contested by the Relevant Terror Organizations between 2003 and 2022 and survey the evidence that illicit Iraq-related transactions by multinational corporations, including Defendants, commonly served as vehicles to route protection payments to the Relevant Terror Organizations in Iraq and Syria.

a.    Al-Qaeda, Islamic State, And Their Allies Operated Sophisticated Protection Money Networks In Iraq And Afghanistan

307.    LM Ericsson's and Ericsson AB's and Ericsson Inc.'s protection payments and obstruction of American counterterrorism activities against al-Qaeda and Islamic State occurred in contracting environments in Iraq marked by widespread insecurity and endemic corruption.

308.    From 2004 through 2022, al-Qaeda and al-Qaeda-in-Iraq (2004-2014) and Islamic State (2014-2022) successfully extracted protection payments throughout Iraq because they controlled or contested key transportation nodes relevant to shipping nearly anything nearly anywhere in the country including, but not limited to, key geographies astride transportation routes linking Iraq with Jordan and Syria (through Qaim, in western Iraq), Turkey (through Mosul and Erbil, in northern Iraq), the Persian Gulf (through the western and southern approaches to Baghdad, in central Iraq), and Iran (through Diyala, in eastern Iraq).

309.    Throughout this period, the Relevant Terror Organizations operationalized their protection rackets vis-à-vis commerce conducted throughout Iraq, not just the areas these terrorists controlled or contested. This was a function of geography and then-existing transportation

routes. In short, most companies shipped their products and other materials overland from northern or western Iraq, rather than using the port at Umm Qasr in Southern Iraq. The terrorists controlled or contested key chokepoints relevant to all transportation routes, and thus financially benefitted from protection money payments for all types of commercial activity, ranging from shipments of lucrative goods (e.g. consumer electronics) to shipments of building supplies used for infrastructure projects (e.g. cell towers)—even when the projects in question were built in areas of Iraq far outside the terrorists' strongholds in Anbar, Baghdad, Ninewa, Kirkuk, and Diyala.

310.    In the decade prior to the U.S. invasion of Iraq in 2003, the rule of law broadly collapsed in Iraqi society, as nearly all Iraqi elites engaged in corruption.

311.    Following the 2003 invasion, al-Qaeda-affiliated clerics explicitly blessed corruption and criminality as long as it related to financing attacks against Americans in Iraq through a series of fatwas that turbocharged the willingness of Iraqis to engage in corruption.

312.    These messages were favorably received throughout Iraq, as the security climate worsened after 2003 and corruption became entrenched to a level it had not achieved even under Saddam. From 2003-2020, Iraq was one of the most corrupt countries in the world – falling into a category some refer to as "hyper-corruption." In Transparency International's Corruption Perceptions Index – widely considered the most authoritative measure of country-level corruption – Iraq ranked near the very bottom each year. In 2007, for example, Transparency International ranked Iraq 161st out of 163 countries. Such rankings reflected longstanding traditions of corruption that affected virtually every aspect of Iraqi civil society.

313.    The U.S. government concurred. In a since-declassified study of al-Qaeda finance in Iraq in the mid-2000s, the U.S. military's Central Command ("CENTCOM"), which is responsible

for U.S. operations throughout the Middle East, including Iraq, Afghanistan, Syria, and Turkey, observed that the "rampant corruption" that Saddam Hussein's regime programmatically pursued from the late 1990s until 2003 set the conditions for terrorists to later leverage corruption as a key source of terrorist finance and logistics flow.

314.    When LM Ericsson, Ericsson AB, and Ericsson Inc. sought to profit off the Iraqi market, Defendants faced an equally corrupt business environment. When they sought to profit from economic transactions in Iraq's corruption-based economy – including those linked to U.S. government dollars directly through U.S. government contracts or indirectly through Iraqi government contracts funded by the U.S. government – they therefore faced unusually high corruption and money laundering risks, including the associated terrorism risks.

315.    Western corporations operating in Iraq used the same corruption manners and means to route payoffs to corrupt government officials who could influence their business as they used to pay off terrorists who could also influence their business, and knowingly structured their transactions to exploit their corrupt business environments as the cost of doing business. They did so by laundering money through a latticework of local partners including, but not limited to, their local customers (for whom elite Western bribe-paying companies, not the customer, held the real power), and their subcontractors – hired for ostensible tasks such as security, transportation, logistics, sales, government relations, and business intelligence, among others – that could make corrupt payoffs downstream while (in theory) maintaining plausible deniability for the corporations, like LM Ericsson, Ericsson AB, and Ericsson Inc., whose money they were diverting to terrorists.

316.    Some protection payments passed through a single intermediary, but other projects had as many as five different companies in the contracting chain: a prime contractor, acting in a

supplier and agent role (e.g., Ericsson AB), would interface with the customer, usually the U.S. or Iraqi government, as well as any key stakeholders like the World Bank, to facilitate large-scale contracts involving the sale of goods or services manufactured by the supplier's affiliated manufacturer (e.g., Ericsson Inc.); the prime contractor would then outsource performance or implementation of key aspects of the contract to a partner (including its customer) or a subcontractor; the partner or subcontractor would hire another partner or subcontractor, which would hire another in turn; and eventually some local company would perform the work on the ground on the prime contractor's behalf. This structure was commonplace for protection payments made by Western companies in terrorist-contested areas in the Middle East, who (for obvious reasons) preferred to funnel their payments to terrorists through intermediaries. This structure allowed the final subcontractor to make corrupt payments while the companies higher up in the chain denied involvement; it also ensured that there was always a demand for more work, as the jobs in question were rarely completed on time (if ever).

317.    Ericsson was no stranger to such multi-layered illicit payment schemes. In its Deferred Prosecution Agreement, LM Ericsson admitted to making illegal payments in China that flowed from multiple Ericsson entities via sham contracts to consulting companies; from the consulting companies to individual "sales agents"; and from the sales agents to Ericsson's Chinese state-owned customers.

318.    These same contracting practices typically led to poor-quality work that undermined U.S. reconstruction objectives in Iraq.

319.    Enormous amounts of American taxpayer dollars disappeared into this web of corrupt contractors and subcontractors. With prime contractors abdicating their oversight role, in part to maintain plausible deniability over the protection payments they were encouraging,

subcontractors rarely spent the U.S. dollars provided by their U.S. government, Iraqi government, and/or World Bank-funded customers on the intended projects.

320.    Western contractors' exploitation of chains of unethical subcontractors in Iraq and Afghanistan was widely understood to be corrupt. A 2009 study for the U.S. Agency for International Development ("USAID") detailed that "perceptions of rampant corruption include corruption in the donor community, due to the high costs, bureaucratic procedures, and layers of contracting and subcontracting in many projects." A 2011 report by the U.S. Senate Committee on Foreign Relations likewise criticized the widespread "use of large numbers of contractors" as inviting "corruption through multiple subcontractors." The prevailing criticism of such practices led General Petraeus to issue formal contracting guidance in 2010 that emphasized the importance of "contract[ing] with vendors that have fewer sub-contractors. Excessive subcontracting tiers provide opportunities for … insurgents to divert contract money from its intended purpose." Although not the only cause, Defendants' use of multiple contracting tiers enabled them to make enormous profits while delivering substandard work. It also, as alleged below, helped them fund the Relevant Terror Organizations for nearly two decades.

a. *Al-Qaeda and Al-Qaeda-in-Iraq Ran a Sophisticated Protection Money Operation in Iraq from 2004 through 2014*

321.    From 2004 until 2014, al-Qaeda and al-Qaeda-in-Iraq jointly managed and profited from a sophisticated, nationwide protection money operation in Iraq, through which al- Qaeda, al-Qaeda-in-Iraq and successfully extracted payments using their ability to control or contest vital transport nodes relevant to transporting nearly anything nearly anywhere in Iraq.

322.    In 2003 and 2004, al-Qaeda, including its polyterrorist leader Abu Musab al-Zarqawi, spearheaded the development of al-Qaeda's and al-Qaeda-in-Iraq's protection rackets in Iraq

and Syria, which Zarqawi and his allies operated to profit from protection "taxes" applied to commercial activities in any Iraqi territories that al-Qaeda and al-Qaeda-in-Iraq could contest – i.e., most of the country. To do so, Zarqawi did not have to build these protection rackets from scratch. Instead, al-Qaeda just took them over from the incumbent owners (usually, middlemen affiliated with Saddam), declared that al-Qaeda was now in charge, and followed al-Qaeda's protection money playbook thereafter.

323.    Al-Qaeda-in-Iraq's surge throughout Iraq in 2004 was powered by its wholesale adoption of al-Qaeda's protection money playbook, which bin Laden and his lieutenants pioneered in Africa and on which al-Qaeda trained its branches and affiliates in Afghanistan. For al-Qaeda, al-Qaeda-in-Iraq offered the first ever test case of al-Qaeda's protection money tactics in an environment rich in Western firms, as opposed to prior rackets based in Sudan and Somalia, which tended to target Middle Eastern firms because no one else did business there.

324.    By summer 2004, al-Qaeda (through Zarqawi and others) had fully operationalized al-Qaeda's protection rackets in Iraq and parts of Syria. To do so, al-Qaeda and its local branches communicated to companies doing business in these geographies that companies could absorb the expense of guard costs or take the easier and more profitable route of simply paying protection money to al-Qaeda and its branches, like al-Qaeda-in-Iraq.

325.    Zarqawi and al-Qaeda-in-Iraq took to al-Qaeda's protection money scheme with a zeal that matched the intensity of al-Qaeda's terrorist campaign in Iraq that it financed. Al- Qaeda and al-Qaeda-in-Iraq collected "taxes" and "fees" throughout the life cycle of significant economic transactions in Iraq that involved transportation of valuable products (as Ericsson's business interests in Iraq ordinarily did). Those payments included, but were not limited to, "tolls" of $400-$500 per vehicle that were assessed at or near border crossings in Qaim, Erbil, Mosul,

Diyala; similar "tolls" at key chokepoint geographies in and near Baghdad; "fees" assessed on a project basis; and/or "taxes" assessed based on targets' estimated income.

326.    Al-Qaeda-in-Iraq followed the bin Laden protection money playbook by having a specific bureaucracy dedicated to collecting and redistributing protection money payments from companies with business interests in geographies that were controlled or contested by al-Qaeda or an al-Qaeda subsidiary. For example, al-Qaeda-in-Iraq operated what it euphemistically referred to as "Spoils Groups," which were terrorist finance and logistics cells that al-Qaeda-in-Iraq had specifically designated to facilitate al-Qaeda and al-Qaeda-in-Iraq operations through the collection and redistribution of protection money at an industrial scale.[23]

327.    By April 2005, al-Qaeda-in-Iraq's protection rackets had been running for more than a year, and Zarqawi was using them to rapidly expand al-Qaeda's terrorist campaign, opening up new fronts in Baghdad and Diyala Provinces. Protection rackets in Anbar Province alone, for example, yielded several million U.S. dollars per month, which flowed back to al-Qaeda-in-Iraq and, through it, al-Qaeda core as well.

328.    Al-Qaeda's continued expansion throughout Iraq in 2006, through al-Qaeda-in-Iraq, was powered by the latter's protection rackets, which were in full bloom throughout the country. According to confidential U.S. government assessments at the time, al-Qaeda-in-Iraq was

---

[23] Al-Qaeda affiliate, the Taliban, including its Haqqani Network, followed a similar playbook, calling their protection money bureaucracy the "Contractors and Organisations Commission." Given that the Taliban's protection rackets, like those of al-Qaeda-in-Iraq, were inspired by al-Qaeda's teaching and derived from a literal al-Qaeda playbook, the terrorists' tactics, techniques, and procedures for their protection rackets in Iraq and Afghanistan were remarkably similar. They were different in at least two respects, however. First, the different groups sometimes used differing nomenclature. Second, al-Qaeda's terrorists in Iraq (i.e., al-Qaeda-in-Iraq) charged a somewhat lower rate than al-Qaeda's terrorists in Afghanistan (i.e., the Syndicate), with the former often charging 10%-20% (sometimes more) while the latter often charged 30%-40% (sometimes more). This was a simple reflection of the different terrorist market economic contexts in Iraq and Afghanistan. In Iraq, al-Qaeda-in-Iraq had to compete for the security dollar with Shiite terrorists, like Jaysh al-Mahdi, who had competing rackets. Al-Qaeda-in-Iraq (and later, Islamic State) chose to compete on price, and companies like Ericsson chose to pay al-Qaeda-in-Iraq and ISIS rather than invest in legitimate security. In Afghanistan, in contrast, there was no indigenous Shiite terrorist analogue to Jaysh al-Mahdi's role in Iraq, and al-Qaeda's Syndicate exercised a functional monopoly on the protection economy, which permitted the Taliban, as most monopolists do, to charge more.

raising US$70 million to US$200 million a year from its criminal activities, including its protection rackets. Indeed, U.S. assessments also concluded that the income stream generated by al-Qaeda-in-Iraq's criminal rackets was so pronounced that al-Qaeda-in-Iraq ran a surplus, which al-Qaeda-in-Iraq used to fund al-Qaeda core in Afghanistan and Pakistan in keeping with its status as an al-Qaeda branch under the latter's corporatist model.

329.    By the spring of 2006, and continuing through 2014, al-Qaeda-in-Iraq's (which rebranded into ISI in 2006) terrorist finance network had grown so much that ISI required additional bureaucracies in key provinces in order to adequately manage its money. These bureaucracies flowed money, including khums donations mandated as kickbacks to superiors, and created direct links between ISI cell leaders and their operatives and agents who extracted, as one CENTCOM document put it, "money from the government contracting process," including from Western companies like Defendants.

> b.    *Islamic State Ran a Sophisticated Protection Money Operation in Iraq from 2014 through at least 2022*

330.    Islamic State continuously ran a sophisticated protection money operation in Iraq and Syria from 2014 through at least 2022. Throughout, Islamic State's terrorist campaign in France, Belgium, and Afghanistan was powered by its protection rackets in Iraq and Syria.

331.    According to one confidential U.S. government report published in 2015, Islamic State raised hundreds of millions of U.S. dollars by extracting protection money from businesses in Iraq.

332.    As Islamic State seized territory in Iraq, it intensified al-Qaeda-in-Iraq's longstanding protection rackets and formalized them into a purported system of universal taxation of goods

and cash that transited territory where Islamic State operated, overseen by its Finance Council, that applied to all territory controlled or contested by Islamic State.[24]

333.    Under Islamic State's taxation system, Islamic State established a series of "taxes" and "fees," which it collected from businesses with interests in geographies controlled or contested by Islamic State, as well as companies transporting goods through the same places via Islamic State checkpoints, all under the pretense of such payments serving as zakat (donations or taxes that the terrorists claimed were mandated under applicable Islamic principles).

334.    Islamic State also expanded al-Qaeda-in-Iraq's prior taxation system on trucks, and eventually increased the rate to $1,000 per truck, which was ordinarily paid in U.S. Dollar-denominated transactions.

335.    In late 2014, Islamic State reached what amounted to a global protection money agreement with every major Kurdish party in Iraq, which the two sides reached even though Islamic State terrorists were waging a relentless campaign against Kurds in neighboring Syria. Simply put, the leading Kurdish groups in Iraq prioritized their own local interests over that of the broader Kurdish cause and reached a protection money accord with Islamic State that has largely held from 2014 through today. Under this accord, Kurdish agents collected protection money for Islamic State.

336.    As the Coalition expanded its airstrikes against Islamic State's oil and gas fields, Islamic State's protection rackets assumed even greater importance to its ability to launch attacks against Americans around the world. In September 2016, for example, Islamic State intensified

---

[24] Islamic State intensified such rackets along at least two axes. First, Islamic State expanded the outreach efforts to communicate to all businesses in ISIS-impacted geographies that Islamic State had a bureaucracy with which such businesses could engage. Second, Islamic State increased the rates previously charged by al-Qaeda-in-Iraq. While Islamic State did not deviate from the long-standing al-Qaeda strategy of competing against Shiite protection rackets in Iraq based upon price, Islamic State's tax increases did somewhat narrow the value gap between itself and Jaysh al-Mahdi (with ISIS remaining the lowest price security solution).

its protection money-related collections to offset funding losses from elsewhere. Through these rackets, Islamic State generated millions in monthly cash flow – mostly denominated in U.S. dollars – from businesses in Iraq, which Islamic State styled as zakat, commercial taxes, income taxes, administrative fees, customs taxes, and/or road tolls.

337.     ISIS institutionalized control of their protection money revenue. The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency. Al-Qaeda, al-Qaeda-in-Iraq, and ISIS Islamic State promulgated rules and regulations dictating to local field commanders how to collect protection money from foreign businesses. The money flowed both ways – from local commanders up to ISIS's respective Financial Commissions for use by ISIS central leadership, and conversely from the leadership back down to local commanders for use in the field. That discipline allowed protection money collected from all over Iraq and Syria to finance the Islamic State's terrorist machine.

338.     Protection payments supplied one of the most quantitatively significant sources of terrorist finance for ISIS. Protection payments were always one of the top two fundraising tactics, and for most of the Islamic State's existence, protection money ranked number one. The systematic payments effected by large international companies swamped other, smaller-scale protection rackets.

339.     Protection payments also strengthened ISIS by allowing it to diversify their income. For designated terrorist groups subject to crippling international sanctions, diversification was critical: it offered ISIS a degree of financial resiliency that made it less susceptible to American counterterrorism efforts. That stream of protection money – particularly from larger, well-

financed corporations, including Defendants – supplied reliable funding for ISIS and, almost as importantly, offered insurance against the risk of other funding sources drying up.

340.    ISIS's Intelligence Cell, also referred to as the "amniyat" or "Emni," directly linked Ericsson Defendants' aid and the attacks that targeted Plaintiffs. As the New York Times reported based on "thousands of pages of French, Belgian, German, and Austrian intelligence and interrogation documents," this intelligence cell was "a combination of an internal police force and an external operations branch, dedicated to exporting terror abroad," serving as a key cog in ISIS's "machinery for projecting violence beyond its borders."[25]

341.    The Emni became the crucial cog in the group's terrorism machinery, and its trainees led the Paris Bataclan Attacks and the Brussels Airport Attacks.

342.    From 2010 until his 2016 death, ISIS's Intelligence Cell was led by Abu Muhammad al-Adnani. Luqman also played a key role in ISIS's Intelligence Cell by first serving as Syria-level Emni director and then Adnani's deputy, before succeeding him in 2017.

343.    Ericsson Defendants' payments financed Abu Muhammad al-Adnani's, Abu Luqman's, and ISIS's Intelligence Cell's participation in the attacks that killed and injured Plaintiffs. From 2010 through 2017, the Intelligence Cell typically captured a substantial percentage of ISIS's protection revenue, including Ericsson Defendants' payments. Given this standard practice, Ericsson Defendants' payments likely delivered more than $1 million to Adnani, Luqman, and the Intelligence Cell.

344.    ISIS's public statements confirm that link. According to a 2014 ISIS publication, originally published by ISIS's propaganda arm al-Himma Library, ISIS used tax payments, like those made by Ericsson Defendants, to aid "[t]he mujahidin and jihad." That meant ISIS's cells in

---

[25] Rukmini Callimachi, How A Secretive Branch Of ISIS Built A Global Network Of Killers, N.Y. Times (Aug. 3, 2016).

Syria, Iraq, and elsewhere ("the mujahidin") responsible for ISIS's attacks against the United States (ISIS's "jihad"), including the Intelligence Cell, which advanced "interests of war and fighting [for the sake of] Allah, like . . . keeping watch over the enemy and . . . and other things from what serves the interest of the fighting." ISIS also deployed those tax payments to "the collectors, preservers and dividers of" ISIS's tax income. This allowed the ISIS cells that played a role in ISIS's protection rackets and associated hostage-taking attacks – both of which were true of the Intelligence Cell – to have more direct control over their terrorist operations.

345.    Throughout 2017, Islamic State increasingly relied upon its protection rackets as Coalition pressure shrunk the geographic footprint of territory the terrorists controlled.

346.    Islamic State's loss of its caliphate in late 2017 did not end its protection rackets, which continued largely unabated. Islamic State's control of, or ability to contest, the territories it seized in Iraq and Syria endured from 2014 through at least 2022 because Islamic State maintained control of key chokepoints throughout Iraq and Syria from which it exerted power over companies with business interests there.

<u>Multinational Corporations Commonly Structured Their Operations In Iraq And Afghanistan To Funnel Protection Money Payments To the Relevant Terrorist Organizations</u>

347.    Al-Qaeda and Islamic State used threats of terrorist violence to extract protection money from corrupt international companies doing business in the parts of Iraq, Syria, and Turkey in which LM Ericsson, Ericsson AB, and Ericsson Inc. did business. Such threats were especially frequent in (though not limited to) geographic areas that al-Qaeda-in-Iraq and ISIS controlled. By 2004, al-Qaeda-in-Iraq had achieved control of wide swaths of central, western, and northern Iraq, and had havens in Syria, Iran, Afghanistan, and Pakistan. By 2005, al-Qaeda and al-Qaeda-in-Iraq had consolidated Sunni anti-American terror in Iraq and Syria under al-Qaeda's organization, which control (or ability to contest) al-Qaeda, through al-Qaeda-in-Iraq

(until 2014), and Islamic State (from 2014 through present) leveraged on the ground in Iraq into protection payments. "In Iraq and Afghanistan," concluded a Congressional study in 2011, "U.S. funds have been diverted to insurgents … as a cost of doing business" and "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects." Al-Qaeda and al-Qaeda-in-Iraq perfected that practice by threatening businesses until (and sometimes even after) they met the FTOs' financial demands.

348.    The FTOs' threats presented companies with a choice: alert the government and seek the U.S. military's aid while investing in legitimate security to protect their companies' projects, shipments, and facilities in Iraq, or instead save time and money by regularly paying al-Qaeda-in-Iraq/ISI (from at least 2004 through at least 2014) and Islamic State (thereafter)—usually monthly—to direct their attacks elsewhere. Contractors, including Defendants and Defendants' agents, typically chose the former option. Simply put, many with business interests in Iraq paid knowing full well the money would be used for bombs and weapons to take the lives of others.[26]

349.    Al-Qaeda and al-Qaeda-in-Iraq/ISI consistently extracted protection money payments from Western companies with business interests in Iraq, like Defendants, and the subcontractors who served as their agents, throughout the period from 2004 through 2014, usually doing so monthly. The case of one long-standing business owner in Mosul named Abdali was typical: his business made regular monthly protection payments to al-Qaeda-in-Iraq/ISI, and later Islamic State, consistently from 2004 through 2017, which he justified as a cost of doing business.

---

[26] The same outcome was true in Afghanistan, which was a feature, not a bug, of al-Qaeda-designed protection rackets: the point of them was to induce a similar response from Western companies facing similar incentives, performing similar work, in a similar threat environment.

350.    Companies, including Defendants, rationalized their payments to al-Qaeda-in-Iraq/ISI and Islamic State by framing them as a necessary cost of business. But the payments were unnecessary – even from the standpoint of Defendants' own security needs – and counterproductive. In reality, Western businesses chose to pay not because of any reconstruction imperative in Iraq, but because it served their financial interests. By diverting money to al-Qaeda-in-Iraq/ISI and Islamic State, the payments lowered the projects' quality and undermined whatever alleged counterinsurgency benefits they might have otherwise delivered.

351.    Upon information and belief, the *Schmidt* Case Confidential Witnesses have confirmed the accuracy of this conclusion based on their own experiences in Iraq. It is believed that according to one Confidential Witness,, it would have been extraordinarily tempting financially for any contractor or subcontractor to pay off terrorists in Iraq because "at least 70 percent" of every U.S. dollar allocated to a project "went to overhead and armed protection," with armed protection likely being the single largest expense within that 70 percent and much larger than the minimum amount of 10-20 percent – and often much more – always charged by al-Qaeda's, al-Qaeda-in-Iraq's, and ISIS's protection networks in Iraq.

352.    Upon information and belief another Confidential Witness who has been identified in the *Schmidt* Case and who also had extensive security-related experience in post-Saddam Iraq, has alleged that no Western corporation could have had people on the ground in Iraq during the early years of Iraqi reconstruction without either using a "Western security firm" or paying protection money to terrorists, and any Western corporation with business in Iraq would have known that those were their only two options. The same Confidential Witness it is believed has further explained one of the prevailing, and widely known, strategies that Western

contractors, like Ericsson, deployed to route protection money to terrorists in Iraq: The local militia, al-Qaeda, whomever, they all know you're there, you're not in their country without them knowing you're there, so eventually you're going to get approached, or if you have a savvy security team that has a local national with them, they'll use that local national to find out who the payoff guys are . . . If you were in Baghdad and you did not have western security you would have to pay, find someone to get your money to al-Qaeda or [Jaysh-al-Mahdi].

353.    Although some contracts required the U.S. government to reimburse the prime contractor for local security costs, that did not eliminate the profit motive for Defendants to orchestrate protection payments. Even on "cost plus" contracts, where profits were pegged to a fixed percentage of the government's costs, such payments benefited the prime contractor in two significant ways. First, had Defendants implemented legitimate, more-expensive security measures, that would have raised the cost of their proposals on the front end and jeopardized their ability to win as many contracts. By purchasing their security from the terrorists, Defendants artificially lowered the price of their bids, thereby helping them obtain the contracts in the first place. Second, protection payments offered a simpler and less time-consuming way of purchasing project security, which freed up internal resources and bandwidth for companies, like Defendants, to undertake more projects overall. Had they spent the time and effort – even apart from the expense – needed to implement legitimate security, they would have been able to perform fewer projects, and thus would have made less money on an aggregate basis.

354.    As a negotiating ploy, al-Qaeda-in-Iraq/ISI and Islamic State terrorists occasionally threatened or even attacked employees or agents affiliated with corporations that were paying protection money, albeit less frequently than those that elected not to pay. For that reason, a

corporation's experience facing actual or threatened attacks was not inconsistent with it having made protection payments. Often, such threats were merely an indication of ongoing negotiations over price. On balance, though, corporations who paid al-Qaeda-in-Iraq/ISI and Islamic State bought themselves relative security (in the related geographies in Iraq and Syria) at an attractive price.

355.    Multinational corporations, including Defendants, often routed money to al-Qaeda and Islamic State through their contractor networks, using contractors as their agents to guide the money home to the Relevant Terrorist Organizations as intended. Just as delegating contract performance to corrupt subcontractors worsened the quality of the services provided, so too did it create opaque pools of money from which to pay off the Relevant Terrorist Organizations.

356.    Multinational corporations, including Defendants, used their agents and subcontractors to supply their own security to the American and Iraqi customers who hired them by paying off Iraqi insurgents with protection money, resulting in American money sustaining the Global Terror Syndicate As explained *infra*, Defendants both actively facilitated and benefited from such payments that their agents and subcontractors delivered on their behalf.

357.    Cargo Iraq, a now-infamous Iraqi security subcontractor, offers an example. Cargo Iraq was one of the largest private-security companies in Iraq, and it made its money on subcontracts to protect convoys ferrying goods and fuel between Iraq, Jordan, and Syria. In that capacity, Cargo Iraq worked for Ericsson in Iraq.

358.    Cargo Iraq was profitable because it paid al-Qaeda-in-Iraq and Islamic State. Companies that outsourced security to Cargo Iraq were, in effect, knowingly hiring the Relevant Terror Organizations to provide security for company resources and shipments in terrorist-influenced

geographies in Iraq and Syria. Decisions to hire Cargo Iraq for security supplied the Relevant Terror Organizations with money and intelligence that undermined American interests.

359.    Middle East Shipping Services ("MESS") is another example. MESS was a Middle East shipping subcontractor based in Amman, Jordan, and used by numerous large U.S. and European corporations operating in Iraq. MESS's specialty was shipping product overland from Jordan, Turkey, and/or Syria into Iraq. In discussions with the State Department, MESS's CEO admitted that MESS paid U.S. Dollar-denominated protection money to anti-American terrorists in Iraq. For example, according to a 2004 State Department cable, as published online, Amman-based Middle East Shipping Services (MESS) … maintains offices in Baghdad, Basra and Umm Qasr inside Iraq … MESS provides transportation and shipping services for contractors within Iraq, most notably Bechtel Corporation. … [A]fter renting a warehouse in Baghdad, … MESS eventually had to pay 'protection money' to a group of Iraqis who accused the company of collaborating with coalition forces. Despite [MESS's] providing cash for 'protection,' the MESS warehouse was burned to the ground … [MESS never] approached the CPA for security assistance [because MES did not want to] confirm[] … that [MESS] was directly in league with U.S. troops.

360.    Cargo Iraq and MESS illustrate a broader pattern in which companies, including Defendants, knowingly (or recklessly) paid protection money to al-Qaeda-in-Iraq/ISI and Islamic State. The widespread existence of such protection-money payments has been confirmed by congressional investigators, U.S. and Iraqi officials, industry participants, and journalists.

361.    For starters, Congress's Commission on Wartime Contracting documented the pattern of how "[i]n Iraq and Afghanistan, U.S. funds" were "diverted to insurgents" through "payments

commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects."[27]

362.    U.S. military officials also documented the pattern. A since-declassified 2007 study by CENTCOM concluded that the number one aspect of al-Qaeda-in-Iraq/ISI's "funding strategy" was to "[e]xploit the Coalition's civil-military reconstruction contracts by gathering information on reconstruction or economic development initiatives to gauge which Iraqi contractors [were] most likely to win Coalition contracts"; "[t]he contractors were then targeted for … extortion[] or co-opting to force them to contribute a part of their profits to AQI." As Major General Rick Lynch, commander of U.S. forces in central Iraq in 2007, explained: "I tell a lot of my soldiers: A good way to prepare for operations in Iraq is to watch the sixth season of 'The Sopranos.' … You're seeing a lot of Mafioso kind of activity."

363.    The Iraq Threat Finance Cell, an interagency group that drew on law-enforcement and intelligence assets to interdict insurgent funding sources, performed a series of sophisticated audits of Sunni insurgent financing, and reached the same conclusion. As former senior Treasury official Juan Zarate summarized in 2015, "the Iraq threat finance cell" was "created in 2006 to look at how Al Qaida in Iraq and the insurgents were funding themselves" and concluded that the terrorists "were engaged in" criminal activities which were "[a]ll the things we're talking about now" (in 2015 with respect to ISIS) "they were doing … then" (i.e., during al-Qaeda-in-Iraq's heyday in the mid-2000s).

---

[27] Notably, Congress made the same finding concerning both Iraq and Afghanistan, reflecting the common influence of al-Qaeda's protection money playbook, and the similar response of Western corporations and contractors to such playbook in both countries.

364. Iraqi officials also confirmed the practice. For example, Fawzi Hariri, an Iraqi cabinet member who headed its Anbar Reconstruction Committee, publicly stated in 2007 that U.S. rebuilding funds certainly had gone into terrorists' pockets.

365. Those protection payments continued despite mounting concerns raised by U.S., British, and Iraqi leaders that multinational corporations who made protection payments financed terrorist attacks by the Relevant Terrorist Organizations, and their allies.

366. From 2004 (at the latest) through at least 2019, multinational corporations, including Ericsson, that cut corners in Iraq, Syria, and Afghanistan by paying off terrorists, routed their value transfers to the Relevant Terrorist Organizations through two primary channels: (i) direct transactions with the Relevant Terrorist Organizations, through which corporations, including Defendants, knowingly (and illegally) provided them with communications, economic, and technical aid; and (ii) payments to the Relevant Terrorist Organizations routed through intermediaries that corporations, including Defendants, controlled and intentionally used, mafia-style, as a "buffer" between Defendants and these Relevant Terrorist Organizations to which Defendants specifically intended to pay – and did pay – millions of U.S. dollars for "protection" from at least 2004 through at least 2019."

367. As to both of those channels, Defendants deliberately facilitated protection payments to flow to Relevant Terrorist Organizations through illegal terrorist finance transactions that included: (1) cash payments to the Relevant Terrorist Organizations, which were often U.S. Dollar-denominated and infamously called "commissions" as a euphemism for payoffs in Iraq and Syria since the 1990s; (2) "free goods" payments to the Relevant Terrorist Organizations in the form of highly lucrative U.S.- manufactured goods that functioned as cash equivalents and were supplied "free of charge" through a notorious decades-long Iraqi and Syrian

corruption scheme specifically intended to covertly route substantial value flow from corporations to violent actors; and (3) financial and technical aid to the Relevant Terrorist Organizations through their facilitation of the Global Terror Syndicate's protection rackets, corrupt black market transactions, and illicit communications technologies acquisitions, all of which facilitated the Relevant Terrorist Organizations' attacks against Americans in France, Belgium, Iraq, Afghanistan, Syria, and Turkey from 2004 through at least 2019.

368.    In every instance, each Defendant intended the Relevant Terrorist Organizations to receive the value from Defendants, which flowed substantial U.S. Dollar cash payments, and free goods payments in valuable U.S. manufactured and/or U.S.-sourced, and terrorism embargo-restricted, communications technologies and other cash equivalents that the Relevant Terrorist Organizations used as weapons of terror or resold on black markets in Iraq and Syria (for $2,000 per American smartphone) to al-Qaeda-in-Iraq and Islamic State agents, in payments that Defendants intended to serve as protection payments or "taxes" with the specific intent, by Defendants, to cause the above cash flow to reach these Relevant Terrorist Organizations in order to maximize Defendants' profits from the payoffs to the Relevant Terrorist Organizations.

369.    When using intermediaries, Defendants employed similar processes to funnel money to al-Qaeda-in-Iraq and Islamic State in Iraq. Defendants paid the money as protection: they decided that the cheapest way to shield their projects from attack was to pay al-Qaeda-in-Iraq and Islamic State to leave them alone and instead attack other targets – like Plaintiffs and their family members whether in the region or elsewhere. As detailed in this section, similar payments were pervasive throughout the Iraqi and Syrian geographies that were contested by al-Qaeda-in-Iraq and Islamic State and supplied the Relevant Terrorist Organizations – directly

when they were the recipient, and indirectly when another was the recipient through their mutual sharing – with a key stream of financing to fund not only their terrorist attacks across the parts of Iraq, Afghanistan, Syria, and Turkey controlled or contested by al-Qaeda-in-Iraq and/or Islamic State (and their local branches) from 2000 through 2022, but also their terror attacks elsewhere in the world, including France and Belgium.

370.    Defendants followed several shared strategies to operationalize their protection money payments to Relevant Terrorist Organizations.

371.    First, Defendants negotiated payments with senior terrorists from these Relevant Terrorist Organizations (e.g., a regional representative of al-Qaeda-in-Iraq). Al-Qaeda emphasized a rigorous process for negotiating an appropriate level of protection money or "tax" paid by a multinational corporation. In 2007, for example, CENTCOM concluded in a since declassified study of terrorist finance in Iraq, among other things, that:

    a.    "AQI was able to stop vehicles, including tractor trailers, from entering or exiting the Waleed and Trebil border crossing in order to extort payments of up to $200."

    b.    "AQI collected intelligence on … the contracting process through a former contractor" and had sources who "reported the names of any individual awarded a major contract to local AQI leaders along with the cash value so that AQI extortion cells could determine the appropriate amount of money to demand from a given contractor without derailing the project."

    c.    "[T]he AQI amir for the Tamim and 5 Kilo districts of [Ramadi] was considered powerful enough by local contractors that no work could take place in the area without his approval, which usually came with the condition

that he would receive up to 50% of the profit. Qutayba's situation was the norm and AQI extortion of Iraqi contracts was the standard practice in Ramadi and throughout much of Anbar. Under the new policies set down since the rise of [AQ/AQI polyterrorist Masri] AQI operatives refined their method of extortion to demanding protection money in return for 'guaranteeing' that new contracts were allowed to occur free of insurgent attacks."

372.    The same CENTCOM study noted how "one of the primary financiers of AQI in Fallujah" "received $90,000 payments from tribal and religious figures who worked for Islamic NGOs" and "then had this money returned to various AQI cells in Fallujah to cover the purchase of vehicles and weapons." Other U.S. Army publications also confirmed how al-Qaeda-in-Iraq/Islamic State leaders "financed" cells through protection "money from contractors working for the coalition."

373.    Following the bin Laden protection money playbook, the procedure through which Relevant Terrorist Organizations extracted those payments in Iraq and Syria – like that of the Afghanistan Syndicate – was straightforward. At in-person meetings conducted either directly with the corporation (inclusive of the corporation's agents) or through an intermediary, Global Terror Syndicate operatives negotiated the rate. Defendants usually agreed to pay.

374.    Al-Qaeda practices confirm its branches' systematic tactic of extracting protection payments from large firms doing business in the geographies they contested in Iraq, such as Defendants. In general, al-Qaeda terrorists kicked back a fixed percentage of any money seized in terrorist attacks as "khums" (an Islamic tax) to al-Qaeda's leadership; the remaining four-fifths was given to those on the frontline in Iraq. However, any money or property seized without fighting from Western projects or businesses – such as the fruits of successful

negotiations with a European telecommunications company – was sent to leadership to be spent on attacks against Americans by al-Qaeda and its regional branches in the Middle East.

375.    Al-Qaeda created these rules and norms to ensure that protection money would benefit the broader al-Qaeda organization—both worldwide (i.e., al-Qaeda core) and in Iraq, Afghanistan, Syria, and Turkey as the three most important terror zones to al-Qaeda core, al-Qaeda-in-Iraq, and Jabhat al-Nusra, rather than individual terrorists outside of senior leadership ranks. Islamic State, as stated above, would use its protection money to fund terror attacks everywhere, including France and Belgium.

376.    Second, in addition to high-level negotiations with senior al-Qaeda-in-Iraq and Islamic State terrorists, Defendants also paid protection money to local al-Qaeda-in-Iraq and Islamic State cell leaders in the areas where they were operating.

377.    Defendants sometimes made these more localized payments directly and sometimes routed such payments through Defendants' agents or subcontractors. Most often under this second approach, corporations routed their payments through "middlemen" known as "consultants" and/or subcontractors that arranged payment on their clients' behalf, through U.S. dollars routed through the corporation and usually falsely described as being for purported services (which were not provided) such as transportation, logistics, security, research, government relations, and legal counsel.[28] The consultants and subcontractors paid Relevant Terrorist Organizations by making cash payments through the intermediaries, corruptly routing value through illicit "free goods" deals designed to be monetized on the black market, or by providing

---

[28] In Iraq, as in many hyper-corrupt jurisdictions, multinational corporations often rely upon in-country external legal counsel, often local litigation firms, who facilitate protection payments styled as "settlements" and the like. This has always been a notorious aspect of the corruption economy in Iraq, which Defendants knew because they employed (or were served by) local Iraqi agents who had a sophisticated understanding of the Iraqi economy, including how bribes were commonly paid, and it was commonly known in Iraq that Middle Eastern law firms were a popular vehicle to route large-dollar payoffs.

embargoed U.S. technical and financial aid and communications technology to the Relevant Terrorist Organizations. Under all three strategies, the logic of the payments was simple: they reduced the threat of attacks on the corporations' own projects at the least possible cost to those corporations.

378.    Companies paid Relevant Terrorist Organizations protection money in relatively predictable percentages on each project they undertook in Iraq and Syria. The percentages could vary based on several factors, including contract size, location, and the particular al-Qaeda-in-Iraq and Islamic State terrorists involved. But overall, many analysts estimated that the Relevant Terror Organizations consistently levied a "tax" of at least 10 percent to 20 percent on every economically significant project. Often, the percentage was much higher.

379.    The Relevant Terror Organizations always maintained potent protection rackets from 2004 through 2022. From the early 2000s through 2014, under the same scheme, protection payments to al-Qaeda-in-Iraq delivered protection payment-related value (e.g., cash flow, illicit technologies flow) to al-Qaeda and Jabhat al-Nusra because all three FTOs followed the bin Laden playbook on cross-pollination, which they applied to the protection rackets for a host of reasons, including ensuring the continued facilitation of all such groups' relationships with one another. From 2014 through 2021, Islamic State continued these same protection money operations in Iraq and Syria, such that protection money payments to Islamic State in either country also benefited Islamic State's branches in Afghanistan, France and Belgium.

380.    Corporations, including Defendants, usually concealed their protection payments from their own shareholders, the U.S. government, and others, by inflating their costs and fraudulently describing their payments as legitimate security, transportation, consulting, and/or humanitarian expenses. For example, as one Iraqi company officer publicly explained in 2007,

contractors often set their prices up to four times the going rate because they budgeted fifty percent (50%) for payoffs to terrorists in exchange for the safe passage of their supply convoys, so that of every $1 million he received, $500,000 flowed through to al-Qaeda and al-Qaeda-in-Iraq. Similar ratios continued after Islamic State assumed control of al-Qaeda-in-Iraq's protection money operation in Iraq in 2014 and continued through 2022.

381.    As explained *infra*, LM Ericsson, Ericsson AB, and Ericsson Inc. followed that practice and paid protection money to the Relevant Terror Organizations including through their agents and subcontractors, using one or more of the methods described above. In doing so, they knowingly both orchestrated and benefited from their agents' and subcontractors' protection payments on their behalf. Defendants actively orchestrated the payments by obtaining the underlying contracts to pay for the work (or licenses to conduct it) that needed "protection" from the Global Terror Syndicate; by retaining and outsourcing security to the corrupt strategic partners, consultants, and subcontractors they knew would pay money to terrorists; by encouraging their strategic partners, consultants, and subcontractors to make the payments, either explicitly or implicitly; by supplying the financing that the strategic partners, consultants, and subcontractors used to make the payments; and then by knowingly approving reimbursement of the payments. Such intermediaries' contracts with Defendants typically required Defendants to review and approve their expenses, and Defendants knowingly accepted expense reports that hid or mischaracterized the payoffs. Throughout, Defendants had the right to control their consultants' and subcontractors' security activities and knew that their consultants and subcontractors were acting on their behalf. Similarly, through Defendants' offloading scheme, Defendants intentionally structured their relationships with their strategic partners to facilitate the latters' protection payments on Ericsson's behalf.

382.    When Defendants' strategic partners, consultants, and subcontractors paid Relevant Terrorist Organizations, they did so as part of their performance under their contracts with Defendants. The strategic partners, consultants, and subcontractors would have been unable to make protection payments to Relevant Terrorist Organizations without Defendants' money and approval. Defendants supplied the funds for the protection payments because they, even more than their strategic partners, consultants, and subcontractors, financially benefited from them. Indeed, the core purpose of the payments was to benefit Defendants by shielding their projects from Relevant Terrorist Organizations' attacks at an affordable price. To obtain that benefit, Defendants needed and intended for their money and other value provided to reach Relevant Terrorist Organizations.

**Defendants Made Protection Payments To Relevant Terrorist Organizations In Iraq And Afghanistan**

383.    LM Ericsson, Ericsson AB, and Ericsson Inc. made protection payments to al-Qaeda and al-Qaeda-in-Iraq agents in Iraq from 2004 through at least 2014, and to Islamic State agents in Iraq from 2014 through at least 2019. And to conceal what they did, LM Ericsson, Ericsson AB, and Ericsson Inc. intentionally obstructed United States counterterrorism efforts targeting the Relevant Terror Organizations from 2013 until at least 2022, and Ekholm did so from 2017 until at least 2022 while serving as CEO.[29]

    4.    <u>Defendants Pursued An Enterprise-Wide Corruption Scheme, Which Defendants Applied In A Substantially Similar Manner In Iraq And Afghanistan</u>

        *a.    Defendants Pursued an Enterprise-Wide Corruption Scheme*

---

[29] Even now, it remains to be seen whether LM Ericsson, Ericsson AB, and Ericsson Inc. will continue obstructing U.S. counterterrorism efforts through their unprecedented misconduct. For that reason, Plaintiffs do not wish to imply that Defendants' obstruction is over as of the date of this Complaint. Discovery will determine when, if at all, Ericsson ever changed course.

384.    LM Ericsson oversaw Ericsson's transactions in Iraq, through LM Ericsson's own officers, directors, employees and agents (including LM Ericsson's C-Suite, including Defendant Ekholm) as well as LM Ericsson's wholly owned subsidiary, Ericsson AB, and its branch in Iraq, known as Ericsson Iraq, which served as the in-country representatives for LM Ericsson and its subsidiaries around the world, including Ericsson Inc., under Ericsson's global "One Ericsson" business model. Employees of Ericsson AB frequently acted as agents for LM Ericsson.

385.    At all times, Ericsson AB (on its own, and through its local branch, Ericsson Iraq) acted as Ericsson Inc.'s sales agent in Iraq and was responsible for securing lucrative contracts in Iraq that typically involved all Defendants.

386.    Ericsson AB (on its own and via its local branch, Ericsson Iraq) ordinarily served in a supplier and agent role, as the Ericsson entity that negotiated with counterparts in Iraq and facilitated payments to the Relevant Terror Organizations agents.

387.    Ericsson Inc. ordinarily served in a manufacturer and principal role, as the Ericsson entity that provided the goods and services that Ericsson AB (on its own and through Ericsson Iraq) sold to its customers in Iraq, including (for example) RBS 6000 base stations featuring software written in the U.S. and the Charging and Billing in One ("CBiO") system developed by Telcordia, a California company acquired by Ericsson in 2011. Those and other U.S.-related goods and services were the object of Ericsson's protection money payments to Relevant Terrorist Organizations from 2004 through at least 2019.

388.    LM Ericsson, Ericsson AB, and Ericsson Inc. sought to profit from the Iraqi marketplace and were willing to pay anyone to do so, including terrorists. While operating in Iraq, Ericsson

AB understood the economic threat that insurgents posed to Ericsson's profitability and went to extreme lengths to assess how Ericsson employees would perform under terrorist threat.[30]

389.    From at least 2000 through at least 2019, Ericsson relied upon a business model built upon illegal payments to third parties who could positively or negatively influence Ericsson's bottom line. Simply put, throughout this period, LM Ericsson, Ericsson AB, and Ericsson Inc. were corporate criminals engaged on a decades-long, international corporate crime spree that spanned the United States, Europe, the Middle East, Africa, and Asia.

390.    Upon information and belief, according to a Confidential Witness identified in the *Schmidt Case* with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments to increase Ericsson profits in high-risk jurisdictions:

> *a.*  With respect to LM Ericsson and Ericsson AB, "the 'Tone-of-the-Top' management style at the Corporate level" sustained an "unofficial policy for, and willingness to, issu[e] and authoriz[e] payment orders" documenting Ericsson's bribes "in writing for most confidential [and] obscure payments to so called 'commercial agents'" in order to obscure illegal bribes through a web of obscure commercial intermediaries.

> *b.*  Under the global bribery strategy practiced by LM Ericsson and Ericsson AB, "payment orders" relating to Ericsson's "commercial agents," whom Ericsson relied upon to untraceably route illicit payments to intended recipients on Ericsson's behalf, "were archived in hiding, often in anonymous bank safes in Switzerland, thereafter subsequently to be destroyed."

---

[30] For example, in 2000, LM Ericsson employees coordinated "mock hijackings" of other unwitting LM Ericsson employees, which at least once resulted in others calling law enforcement during an exercise.

c.  LM Ericsson and Ericsson AB leadership ensured that LM Ericsson and Ericsson AB's management led the effort to ensure that "all" the features of Ericsson's global bribery strategy as described above were deployed "on a worldwide basis covering most so called emerging markets in the world."

d.  "The system" that LM Ericsson and Ericsson AB operationalized to carry out Defendants' global bribery scheme "was called WCS, Worldwide Commission Scheme."

391.  From 2000 through at least 2019, LM Ericsson and Ericsson AB engaged in a global bribery scheme, which relied on a litany of criminal tactics, including but not limited to:

a.  fraudulent due diligence reports that concealed corrupt relationships;

b.  sham contracts used to corruptly route value to illicit recipients;

c.  fake invoices used to further conceal corrupt payments;

d.  explicit contemporaneous written admissions as to LM Ericsson's and Ericsson AB's corrupt conduct;

e.  the creation, maintenance, and use of off-the-books slush funds so that LM Ericsson, its subsidiaries and their respective agents could make corrupt payments;

f.  deliberate mischaracterization of corruption-related expenses as being related to "travel," "consulting," "supply costs," "material consumption," "customer service," "cost of sales," "entitlements," "settlements," "fridge," and "marketing and sales support";[31]

---

[31] Ericsson subsidiaries' characterization of certain payoffs as being related to a "fridge" demonstrates the pervasiveness of the misconduct through LM Ericsson and its subsidiaries, as well as the obvious nature of the fraud (within Ericsson), given absurd "expenses" like "fridge."

    *g.*   willful failure to implement internal controls necessary to prevent corrupt payments; and

    *h.*   improper recording of LM Ericsson's, and its subsidiaries', corrupt payments on LM Ericsson's books and records, which were sent to shareholders and regulators in the U.S.

392. LM Ericsson's and Ericsson AB's global bribery scheme also routinely relied upon U.S.-based personnel, emails, bank accounts, and products.

393. Geoffrey S. Berman, former United States Attorney for the Southern District of New York, summarized Ericsson's global business model from 2000 through at least 2016: "Through slush funds, bribes, gifts, and graft, Ericsson conducted telecom business with the guiding principle that 'money talks.'"

394. When describing Ericsson's global business model from 2000 through at least 2016, former Assistant Attorney General, Brian A. Benczkowski, stated as follows: "Ericsson's corrupt conduct involved high-level executives and spanned 17 years and at least five countries, all in a misguided effort to increase profits. Such wrongdoing called for a strong response from law enforcement."

395. Steve Peikin, Co-Director of the SEC Enforcement Division, also summarized Ericsson's global business model from at least 2011 through at least 2017: "Ericsson engaged in an egregious bribery scheme for years, spanning multiple continents, by surreptitiously using slush funds and funneling money through sham intermediaries." The SEC found that "LM Ericsson … engag[ed] in a large-scale bribery scheme involving the use of sham consultants to secretly funnel money to government officials in multiple countries" and "Ericsson's subsidiaries… in Vietnam, Indonesia and Kuwait … maintain[ed] slush funds, us[ed] code

names, and create[ed] sham transactions and invoices." According to the SEC, "[f]rom 2011 through early 2017, Ericsson subsidiaries paid approximately $62 million in bribes to [recipients] through third parties … to obtain or retain business" and, as a result, "Ericsson realized approximately $427 million in profits from business obtained through the use of these illicit payments."[32]

396.    LM Ericsson's ability to operationalize – and later sustain – an enterprise-wide, decades-long, scheme to make illicit payments around the world depended upon the close collaboration of LM Ericsson, Ericsson AB, and Ericsson Inc. as "One Ericsson."

397.    LM Ericsson relied upon Ericsson AB's ability to identify and promote openly corrupt and criminal Ericsson AB regional managers who were willing to engage in shocking acts of terrorist finance and corruption, which Ericsson viewed as the cost of doing business in Iraq and Afghanistan. Unsurprisingly, Ericsson AB entrusted Defendants' operations in Iraq and Afghanistan—the greatest anti-terrorism and anti-corruption risks worldwide from 2001 through 2022—to the head of Ericsson AB's Middle East branch.

398.    The head of Ericsson AB's Middle East branch was a hardened white-collar criminal who openly discussed Ericsson's criminal schemes with coworkers. For Ericsson, however, the presence of such a committed criminal at the very top of its Middle East organization was a feature, not a bug. Ericsson was bribing its way to greater profitability one despot, terrorist, or communist apparatchik at a time during this period. Moreover, Ericsson perceived the Middle East as the most exciting growth market in the world given the abundance of so-called "virgin" telecom markets throughout the region. After observing the success of its deep-seated commitment to bribery as a corporate strategy, and sizing up the gigantic opportunity before

---

[32] Compl., ¶ 2, SEC v. Telefonaktiebolaget LM Ericsson, No. 1:19-cv-11214 (D.D.C. Compl. filed Dec. 6, 2019), ECF No. 1 ("Ericsson FCPA Compl.").

Ericsson thanks to the Middle East's nascent telecoms markets at the time, Ericsson made the predictable, and criminal, choice: go all-in on corruption as Ericsson's core strategy in the Middle East by empowering the least ethical, most criminal, greediest, regional leader Ericsson could find and commit the necessary resources to pay off everyone who needs it, while knowing, but not caring, about the inevitable acts of international terrorism that Ericsson's conduct would surely enable. Plaintiffs' allegation is plausible: Ericsson was on its crime spree when it chose terrorist finance as an acceptable business strategy in the Middle East, and thus Ericsson's conduct reflected the necessary criminal intent.

399.    Ericsson also relied upon widespread use of sham consulting agreements it routinely created to facilitate its corrupt payments in the Middle East. From 2011 through 2017, per the SEC, "Ericsson's practice involved either entering into agreements with third party consultants who had connections with or access to [the person who could help or hurt Ericsson's business], and/or paying for travel and entertainment expenses for [such persons] … to influence their decision-making"—and Ericsson's Djibouti, Saudi Arabia, Qatar, and Kuwait branches – all managed by the same Ericsson Middle East organizations that supervised Defendants' work in Iraq and Afghanistan—each of which adhered to "Ericsson's practice" of using "third party consultants" to route illicit payments to intended recipients from 2011 until 2017.[33]

---

[33] See, e.g., id. ¶ 2 ("Ericsson's practice"); id. ¶ 5 (Ericsson AB's Qatar branch "created a sham consultancy agreement to disguise [an illegal] payment to [an Ericsson] consultant"); id. ¶ 14 ("Egypt"); id. ¶ 66 ("Kuwait"); id. ¶¶ 19-33 (SEC found, inter alia, that: (1) "the head of Ericsson's Middle East region … devised a plan to bribe the government officials"; (2) "[t]he head of Ericsson's Middle East region … falsely booked [] payments to the … Consultant in the books … under a cost of sales account, when they were, in fact, bribes"; and (3) Ericsson AB's Middle East Regional Branch in Dubai, U.A.E. used a sham consulting agreement to route a series of corrupt payments to a decisionmaker, which flowed through U.S. banks, in furtherance of Ericsson's "Djibouti Bribery Scheme"); id. ¶¶ 34-44 (SEC found, inter alia, that: (1) "the head of Ericsson's Middle East region signed [] consulting agreements and authorized the payments to the consultants while knowing or recklessly ignoring red flags which indicated a high probability that at least a portion of these commissions were intended for, or would be passed to, [unlawful recipients]"; (2) Ericsson AB's branch in Saudi Arabia used bogus "consulting" agreements to route a series of corrupt payments to a decisionmaker, which flowed through U.S. banks in furtherance of Ericsson's "Saudi Arabia Bribery Scheme"); id. ¶¶ 72-74 (SEC found that "the head of Ericsson's Middle East region," inter alia: (1) "agreed to make a payment to [a] Kuwait Consultant in the amount of $450,000 through a sham agreement"; (2) "asked the Kuwait Consultant to

400.    Ericsson also deliberately operated a built-to-fail compliance program, which Defendants specifically intended to enable corrupt payments instead of preventing them so that Ericsson could continue to realize additional profits through its enterprise-wide corruption strategy. The SEC, for example, found that "Ericsson knowingly and willfully failed to implement adequate internal accounting controls with respect to retention of consultants and agents, payment of bribes, and making improper payments."[34]

401.    Ericsson also routinely created deliberately falsified books and records, which Defendants specifically intended to conceal, rather than reveal, corrupt payments so that Ericsson could continue to realize additional profits through its enterprise-wide corruption strategy. The SEC, for example, found that "Due to Ericsson's failure to implement and enforce effective internal accounting controls, employees were able to disguise the true nature and purpose of certain transactions in Ericsson's books and records."[35] With respect to this conduct:

   a.    "[LM] Ericsson, through its employees and agents, including senior-level employees, paid millions of dollars to various agents, consultants, and service providers who were not approved or paid in compliance with [LM] Ericsson's internal procedures. Some of the payments were made in cash and were used to create slush funds, the purpose and recipients of which are unknown. Other payments were made pursuant to sham service provider agreements under which no legitimate services were provided to Ericsson, so as to continue to use and pay agents in contravention of [Ericsson]'s policies and procedures."

---

create a sham invoice to support the [corrupt transfer disguised as a] settlement payment"; and (3) "[Ericsson AB] employees, at the direction of the head of Ericsson's Middle East region, created a sham contract to disguise the [corrupt] payment to the consultant and approved a fake invoice for services in order to conceal the transaction").

[34] Id. ¶ 83.

[35] Id. ¶ 90.

b.  "In connection with these payments, Ericsson, through its employees and agents, including senior-level employees, knowingly and willfully created or facilitated the creation of fictitious contracts, invoices, and purchase orders for services that were not rendered and were never intended to be rendered; used secret codenames for certain expenditures; and bypassed Ericsson's standard vendor sourcing process, including by using hard copy, rather than electronic, documentation to evade detection. The payments were falsely or misleadingly characterized in Ericsson's books and records, including as consulting expenses, cost of sales 'corporate marketing fees,' 'other external services' or 'service fulfillment of contract.'"[36]

402.    LM Ericsson and Ericsson AB collaborated with Ericsson Inc. to execute a whistleblower retaliation strategy designed to prevent evidence of Ericsson's crimes, e.g., its payments to ISIS, from emerging via whistleblower. LM Ericsson and Ericsson AB regularly used Ericsson Inc. to prevent discovery of their crimes through by intimidating the newly fired former Ericsson Inc. employees who serviced Ericsson AB customers in Ericsson AB's North Middle East Group, which included Afghanistan and Iraq, on behalf of Ericsson Inc., as well as LM Ericsson, Ericsson AB, and other Ericsson entities. They did so to enhance LM Ericsson and Ericson AB value by reducing the risk that their terrorist finance schemes in the Middle East would be detected, and Ericsson's outsized terrorist-finance-fueled profits would decline.

   *b. Defendants Deployed The Same Manner And Means To Operationalize Their Enterprise-Wide Scheme in Iraq and Afghanistan*

403.    From 2003 through at least 2019, LM Ericsson and Ericsson AB and Ericsson Inc. relied upon the same entities – e.g., Ericsson's offices in the Middle East – and used the same schemes

---

[36] Id. ¶¶ 91-92.

– e.g., slush funds – at issue in Ericsson's Deferred Prosecution Agreement to route value to the necessary recipients, whether a corrupt government official in Djibouti, Islamic State in Iraq, or al-Qaeda in Afghanistan.

404.    Ericsson AB divided its business units into geographies, which typically share leadership, personnel, processes, procedures, networks, customer relationships, and information consistent with Defendants' "One Ericsson" approach, to which Ericsson AB faithfully adhered in the Middle East.

405.    From 2000 until at least 2017, Ericsson's Middle East region has been, by nearly every metric, shown to be the most corrupt Ericsson business region in the world. For much of the relevant period, the head of Ericsson Middle East served as the ringleader for Defendants' corrupt payments throughout the region.

406.    Ericsson's Middle East leadership openly embraced a comprehensive commitment to corruption as a strategy to boost Ericsson's profits from the Middle East. According to the SEC, for example, from 2011 through 2017:

> *a.* "the head of Ericsson's Middle East region … devised a plan to bribe the government officials";
>
> *b.* "[t]he head of Ericsson's Middle East region … falsely booked [] payments to the … Consultant in the books … under a cost of sales account, when they were, in fact, bribes";
>
> *c.* "the head of Ericsson's Middle East region signed [sham] consulting agreements and authorized the payments to the consultants while knowing or recklessly ignoring red flags which indicated a high probability that at least a

portion of these commissions were intended for, or would be passed to, [unlawful recipients]";

d.  "the head of Ericsson's Middle East region … agreed to make a payment to [a] Kuwait Consultant in the amount of $450,000 through a sham agreement";

e.  "the head of Ericsson's Middle East region … asked the Kuwait Consultant to create a sham invoice to support the [corrupt transfer disguised as a] settlement payment"; and

f.  "the head of Ericsson's Middle East region" "direct[ed]" "[Ericsson AB] employees" to "create[] a sham contract to disguise the [corrupt] payment to the consultant and approved a fake invoice for services in order to conceal the transaction."[37]

407.    LM Ericsson, Ericsson AB, Ericsson Inc, Ibrahim, and Ekholm facilitated Defendants' protection payments to al-Qaeda and its progeny in Iraq and Afghanistan in a manner that was often virtually identical to the features of Defendants' related scheme in Iraq: pursue the same illicit goal (purchase security from al-Qaeda and its allies), using the same corrupt means as in Iraq (route protection payments to al-Qaeda through purpose-built buffers), for a similar business purpose (help Ericsson dominate a similarly-sized "virgin" telecoms market), subject to nearly identical anti-corruption and anti-terrorism risks (Iraq and Afghanistan were always, essentially, numbers 1 and 2 in both categories), to sell Ericsson's same U.S.-origin technologies, networks, and managed services solutions (e.g., Ericsson AB's and Ericsson Inc.'s "global" "end-to-end" "managed services" solutions, which Defendants sold to customers in both Iraq, e.g., Asiacell, and Afghanistan, e.g., MTN).

---

[37] Id. ¶¶ 2, 5, 19-33, 34-44 , ¶¶ 72-74.

408.    In early 2009, Ericsson revised its Middle East organization structure by creating a North Middle East Account Unit, which combined the following five countries: Jordan, Iraq, Syria, Lebanon, and Afghanistan. Tarek Saadi—who later became one of Ibrahim's key deputies and whom the ICIJ reported acted as Ibrahim's bagman on a number of illicit payments in Iraq— was simultaneously appointed as the Account Unit Head for this region, which made sense given his prior experience as Ericsson's country-level manager for Jordan and Iraq for three years each.

409.    Shortly after Ibrahim was promoted in mid-2014 to become Ericsson's Head of Market Area Middle East and Africa (which encompassed the North Middle East region, including Afghanistan), Saadi declared that he and Ericsson were "bullish on Afghanistan" — despite the political instability — because of the rapid growth of mobile call and data traffic in the country. Ibrahim echoed those sentiments in December 2015 when she announced to the market Ericsson's new long-term managed services deal with a second major Afghan mobile operator (the first being MTN Afghanistan), stating that: "As an emerging market, Afghanistan has immense potential for growth in terms of [information and communications technology]."

5.    <u>Defendants Made Protection Payments To Terrorists In Iraq</u>

410.    From 2003 through 2022, Ericsson pursued growth in the Middle East market in general and in Iraq in particular.

411.    After Baghdad fell in April 2003, LM Ericsson and Ericsson AB quickly went to work lobbying U.S. government representatives in Washington, D.C. to facilitate Ericsson's retention by the U.S.-controlled Coalition Provisional Authority, and later the U.S.-influenced Iraqi government, to build and sustain Iraq's post-war telecommunications infrastructure.

126

412.    Iraq was a key market for Ericsson, which viewed Iraq as a "virgin" market, i.e., a new market that required a complete rebuild from top to bottom, and therefore promised unusually robust profits for Ericsson. In 2009, for example, Bo-Erik Dahlström, LM Ericsson's Head of Market Unit Middle East, publicly stated that "we regard [Iraq] as [] one of the most strategic markets for growth for Ericsson."

413.    About their own profits, at least, Defendants were correct: collectively, Ericsson AB (or another LM Ericsson subsidiary acting at the direction and for the benefit of LM Ericsson) executed billions in contracts in Iraq and Syria from 2004 through 2022. For each such contract, Ericsson maintained a general policy of engaging in fraudulent transactions to aid al-Qaeda, al-Qaeda-in-Iraq, Islamic State, and other terrorists in Iraq and Syria by: (1) facilitating regular U.S. dollar-denominated protection payments to such FTOs to protect their projects they implemented in terrorist-controlled or -influenced regions; and (2) obstructing U.S. counterterrorism policy by fraudulently concealing their protection money relationships with such FTOs in Iraq from U.S. government personnel whom Defendants knew served in key counterterrorism roles.

414.    From 2004 through at least February 15, 2022, Ericsson maintained its general policy as described because doing so was vital to Ericsson's bottom line during a period when it was under tremendous competitive pressure and financial stress, and Iraq was a rare, consistent, financial bright spot for Defendants. That policy applied to each of the contracts Ericsson implemented in Iraq and Syria, including the contracts in either country that required transportation of goods or materials across or through either, as well as each of the fraudulent communications Ericsson caused to be published inside the United States concerning

transactions, services, communications, and other conduct in furtherance of the illicit payments Ericsson made on Iraq-related contracts. Among those contracts were the following:

a. 2004 Asiacell Network Contract: On or about 2004, Wataniya Telecom, on behalf of Asiacell, contracted with LM Ericsson and Ericsson AB under a global frame agreement to expand Asiacell's network in central Iraq, including Baghdad and the surrounding areas, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.[38]

b. 2004 Korek Network Expansion Contract: On or about 2004, Korek Telecom ("Korek") contracted with LM Ericsson and Ericsson AB to expand Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al- Qaeda-in-Iraq.

c. 2006 Korek Base Stations Contract: On or about 2006, Korek contracted with LM Ericsson and Ericsson AB to build RBS 6000 base stations throughout Korek's network in the Mosul and Kirkuk regions, in addition to Erbil, Dohuk and Sulaimaniya, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

d. 2008 ITPC Network Deployment Contract: On or about 2008, the Iraqi Telecommunications and Post Company ("ITPC"), a state-owned company responsible for Iraq's fixed-line infrastructure, contracted with LM Ericsson and Ericsson AB to execute the initial deployment of ITPC's network

---

[38] On information and belief, while Wataniya Telecom exited Asiacell on or about 2007, Ericsson's services under this agreement continued thereafter until its work was completed.

infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

e.  2009 Asiacell Network Expansion Contract: On or about 2009, Asiacell contracted with LM Ericsson and Ericsson AB to expand Asiacell's network throughout certain geographies in Iraq, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

f.  2009 Korek Billing System Contract: On or about 2009, Korek contracted with LM Ericsson and Ericsson AB to modernize Korek's billing systems throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

g.  2011 Korek Network Expansion Contract: On or about 2011, Korek contracted with LM Ericsson and Ericsson AB to expand Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

h.  2011 Zain Iraq Network Management Contract: On or about 2011, Atheer Telecom Iraq Limited ("Zain Iraq") entered into a five-year, $900 million, managed services contract with LM Ericsson and Ericsson AB to optimize, modernize, and manage Zain Iraq's IT operations and its entire mobile network spanning 3,700 sites located throughout Iraq, including in several areas that were controlled or contested by al-Qaeda, al-Qaeda-in Iraq, and beginning in 2014, Islamic State. Notably, this contract gave Ericsson

management responsibility over subcontractors deemed necessary for Zain Iraq's network operations.

*i.* 2012 Asiacell Business Transformation Partnership Contract: On or about 2012, Asiacell contracted with LM Ericsson and Ericsson AB to provide consultancy services covering Asiacell's "business transformation" under a three-year "partnership" agreement between Asiacell and Defendants, which work Defendants performed in Iraqi areas that were controlled or contested by al-Qaeda, al-Qaeda-in-Iraq, and beginning in 2014, Islamic State.

*j.* 2012 Korek Field Maintenance Contract: On or about 2012, Korek contracted with LM Ericsson and Ericsson AB to provide field maintenance services to Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

*k.* 2013 ITPC Network Upgrade Contract: On or about 2013, the ITPC contracted with LM Ericsson and Ericsson AB to upgrade the ITPC's network infrastructure, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

*l.* 2013 Korek Billing Contract: On or about 2013, Korek contracted with LM Ericsson and Ericsson AB to provide Ericsson's comprehensive suite of billing services to Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by al-Qaeda and al-Qaeda-in-Iraq.

m.  2014 Asiacell Base Stations Contract: On or about 2014, Asiacell contracted with LM Ericsson and Ericsson AB to support Asiacell's "Golden Province" initiative by upgrading Asiacell's core network infrastructure with new RBS 6000 base stations to prepare for LTE adoption, which work Defendants performed in Iraqi areas that were controlled or contested by the Relevant Terror Organizations.

n.  2015 Korek Spare Parts Services Management Contract: On or about 2015, Korek contracted with LM Ericsson and Ericsson AB to manage the inventory of spare parts necessary to the maintenance of Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

o.  2016 Asiacell Network Upgrade Contract: On or about 2016, Asiacell contracted with LM Ericsson and Ericsson AB to upgrade Asiacell's "backbone" network to facilitate Asiacell's value-added services, including, but not limited to, Asiacell's proprietary mobile payment system, "AsiaHawala," which work Defendants performed in Iraqi areas that were controlled by Islamic State.

p.  2016 Korek LTE Upgrade Contract: On or about 2016, Korek contracted with LM Ericsson and Ericsson AB to provide core network updates in preparation for Korek's adoption of LTE services throughout Korek's network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled by Islamic State.

q.  2017 Korek IP Network Contract: On or about 2017, Korek contracted with LM Ericsson and Ericsson AB to assist with IP network updates to Korek's network computing infrastructure through the provision of Ericsson services that depended upon Ericsson's ability to procure technology from another U.S. company, which was performed throughout Korek's entire network, including in Mosul, Kirkuk, and Erbil, which work Defendants performed in areas that were controlled or contested by Islamic State.

r.  2019 Asiacell Network Optimization Contract: On or about 2019, Asiacell contracted with LM Ericsson and Ericsson AB to provide a suite of network expansion, network design, and optimization services under a managed services agreement, which work Defendants performed in Iraqi areas that Islamic State controlled or contested.

415.  On information and belief, LM Ericsson, Ericsson AB, and Ericsson Inc. were parties to, or otherwise provided goods or services pursuant to, every major Ericsson contract in Iraq from 2004 through 2022, including, but not limited to, each contract set forth above, and made protection payments to al-Qaeda, al-Qaeda-in-Iraq, and the Islamic State in connection with all such contracts.

416.  According to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's and Ericsson AB's enterprise-wide strategy to make illicit payments in high-risk jurisdictions, she/he felt "ashamed having worked for" LM Ericsson and Ericsson AB because she/he believed that the following conclusions were "obviously" correct:

a.  LM Ericsson and Ericsson AB "seemed to have bribed such terrorist organizations," i.e., the Relevant Terror Organizations;

b. LM Ericsson and Ericsson AB paid such "bribe[s]" "for the purposes of being permitted to do businesses in territories controlled and administrated by them," i.e., al-Qaeda, al- Qaeda-in-Iraq, and Islamic State; and

c. LM Ericsson's and Ericsson AB's "top management had … approved" protection payments to the Relevant Terror Organizations.

*a. Leaked Ericsson Documents and Subsequent Public Statements Confirm Ericsson's Knowing Participation In Terrorist Protection-Money Networks In Iraq.*

417. Ericsson's public statements after its latest criminal scandal emerged in February 2022, and the revelations contained in Defendants' internal documents—first leaked and reported by the media on February 15, 2022—offer some indications of Ericsson's general policy of protection payments in Iraq and obstruction of U.S. government counterterrorism operations, including, but not limited to:

a. Ericsson Admitted Its Conduct After the Ericsson Leak in 2022: After the leak went public in February 2022 and exposed their aid to FTOs, Ericsson has admitted, in sum and substance, that it facilitated the flow of protection payments in Iraq from at least 2011 through at least 2019, and that DOJ had concluded that LM Ericsson's conduct in Iraq constituted a "breach" of Ericsson's DPA.

b. The Ericsson Leak in 2022 Revealed Ericsson's Contemporaneous Office Discussions about Protection Payments to Terrorists: Prior to at least February 15, 2022, Ericsson concealed the fact that beginning in at least 2014, Ericsson's officers, employees, and agents frequently discussed Ericsson's protection payments, and the general consensus among them was that Ericsson paid Islamic State – either directly or through its Iraqi partners,

consultants, subcontractors, or slush funds – to secure its projects in Iraq, including its transportation needs. Those discussions typically occurred in private, without official documentation. But the typical view of multiple Ericsson officers, employees, and agents—like that of other companies operating in Iraq—was that Ericsson had to pay terrorists to proceed with its work in unstable areas in Iraq.

c.   The Ericsson Leak in 2022 Revealed Ericsson's Permission Letters to Terrorists in Iraq: Prior to at least February 15, 2022, Ericsson concealed the fact that it requested "permission letters" from terrorists in Iraq granting them formal authority to work in Iraq, similar to a request Ericsson submitted to Islamic State in 2014 via its strategic partners, like Asiacell, and subcontractors, like Orbitel. Al-Qaeda, al-Qaeda-in-Iraq, and ISIS issued such letters only to contractors that had made the necessary protection payments.

d.   The Ericsson Leak in 2022 Revealed Ericsson's Indifference to Funding Consequences in Iraq: Prior to at least February 15, 2022, Ericsson concealed the fact that it had a documented track record of expressed indifference to where their money went in Iraq. For example, Ericsson admitted that, at best, it did not know, and until 2022 did not care, where its money went, as long as its profitable work remained unimpacted. That philosophy, prevalent throughout Defendants' operations, led Ericsson to pay off the Relevant Terror Organizations to maximize Ericsson's profits from customers in the Iraqi and Syrian geographies in which such groups operated.

e. The Ericsson Leak in 2022 Revealed Ericsson's Uncontrolled Iraqi Slush Funds: Prior to at least February 15, 2022, Ericsson concealed the fact that it operated, and benefited from, an uncontrolled slush fund in Iraq—which Defendants intentionally created and sustained by deliberately avoiding placing rigorous controls on what their partners, consultants, and contractors could do with Ericsson's money inside Iraq even though Iraq posed extraordinarily unique terrorist finance risk—as a strategy designed to create purpose-built buffers between Defendants and the terrorists they intentionally paid. Defendants did so to permit Ericsson to route payments to terrorists through Defendants' partners, consultants, contractors, and slush funds, which Ericsson encouraged while often avoiding the details.

f. The Ericsson Leak in 2022 Revealed Ericsson's Use of Incentives to Encourage Personnel to Make Protection Payments to Terrorists: Prior to at least February 15, 2022, Ericsson concealed the fact that it rewarded its officers, employees and agents who facilitated protection payments to terrorists, while simultaneously punishing persons who questioned their conduct.

418. Ericsson's payments were consistent with foreign-headquartered telecommunications companies' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage. In following that standard practice, Ericsson caused protection payments to flow to terrorists that were, on information and belief, worth at least 10 percent to 20 percent of the value of Ericsson's Iraqi contracts—a common rate for protection payments to al-Qaeda-sponsored Sunni terrorists in Iraq and Syria. As a result, across its

contracts, Ericsson made payments to al-Qaeda and al-Qaeda-in-Iraq worth at least several million dollars per year from 2004 through 2014, and made payments to Islamic State worth at least several million dollars per year from 2014 through at least 2019.

419.    From 2014 through at least 2019, Ericsson likely routed more than $15 million to Islamic State and Jabhat al-Nusra pursuant to LM Ericsson's approval of Ericsson AB's agreement to purchase security from Islamic State and Jabhat al-Nusra in Iraq.

420.    On information and belief, the sum and substance of Ericsson's protection agreements with al-Qaeda-in-Iraq and Islamic State from 2004 through at least 2019 were substantially like Lafarge's protection agreement with Islamic State in Syria with respect to, *inter alia*, the "rate(s)" that Ericsson agreed to pay Islamic State to purchase security in Iraq from ISIS, "tolls" assessed on Ericsson's convoys, "taxes" assessed on Ericsson's income, and other assorted fees and penalties.

> b.    *Defendants Used Strategic Partners, Consultants, Subcontractors, and Slush Funds to Funnel Protection Payments to Terrorists in Iraq*

421.    From 2004 through at least 2019, Ericsson used a broad array of strategies to route protection money payments to the Relevant Terror Organizations on Ericsson's behalf, including, but not limited to, protection payments to such FTOs that Ericsson routed through: (1) Ericsson's strategic "partners" in Iraq; (2) Ericsson's consultants; (3) Ericsson's security, logistics, and transportation subcontractors; and (4) Ericsson's slush funds, upon which Ericsson's employees and contractors relied. At all times, such conduct by Ericsson and its agents and allies was understood and intended by all concerned to purchase security from the FTOs to aid Ericsson's Iraq business.

422.    Ericsson's Strategic Partners. Close cooperation between LM Ericsson, Ericsson AB, and Ericsson Inc. and their strategic partners in Iraq, like Asiacell and Korek, was a hallmark of Ericsson's protection money strategy in Iraq from 2004 through at least 2019.

423.    From 2004 through 2022, Ericsson viewed Asiacell as one of its key strategic partners in Iraq, and Asiacell likewise viewed Ericsson as a key strategic partner of Asiacell.

424.    Even though Ericsson AB and Ericsson Inc. were nominally the supplier and manufacturer, respectively, while Asiacell was the customer, their mutual agreement that the Ericsson-Asiacell relationship was between two partners was apt—particularly with respect to protection money payments to the Relevant Terror Organizations.

425.    From 2004 through at least February 15, 2022, while Ericsson and Asiacell served as partners to one another, Ericsson (through LM Ericsson and Ericsson AB) coordinated closely with Asiacell regarding any protection payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS.

426.    When Asiacell made its protection payments to the Relevant Terror Organizations, Asiacell often did so through LM Ericsson, Ericsson AB, and/or Ericsson's subcontractors. For example, according to leaked Ericsson internal documents, "[e]vidence suggests that Asiacell [] engaged in smuggling and potential illegitimate payments directly and through Ericsson."

427.    True to their partnership, LM Ericsson and Ericsson AB were likewise willing to pay off terrorists on Asiacell's behalf. Indeed, more than one review published by, or funded by, the U.S. government determined that Asiacell paid al-Qaeda-in-Iraq hundreds of thousands of U.S. dollars per month in Ninewa province alone during a substantial part of the 2000s while it served as Ericsson's strategic partner there.

428.    As a result, from 2004 through at least 2019, Ericsson and Asiacell were generally both

involved, directly or indirectly, whenever protection money payments were made to terrorists

in connection with Ericsson's projects for Asiacell.

429.    According to leaked Ericsson internal documents, Defendants also relied upon U.S.-

manufactured "free goods," including sophisticated free American consumer communications

technologies like Apple iPads,[39] as cash equivalents to make corrupt payments to support

Ericsson's ability to make protection payments in Iraq. The terrorists who received those high-

tech, embargoed, free goods used them for vital communications support and as a fungible

cash-equivalent that they could, and often did, monetize through the black markets that were

endemic throughout the Middle East from 2003 through 2022. Ericsson also gave such free

goods as alternative payments and gratuities to the Kurdish intermediaries upon whom

Ericsson partially relied to route protection money to Islamic State, which furthered Ericsson's

ability to make protection payments by helping lubricate Ericsson's relations with its local

allies—the entire point of the iPad gifts in the first instance.

430.    On information and belief, Ericsson AB and Ericsson Inc. also each provided "free goods"

payments to al-Qaeda-in-Iraq terrorists in Iraq in the form of Ericsson cell phones, which were

valuable both as cash equivalents and for their utility as communications devices. They were

particularly valuable as cash equivalents given their ubiquity in Iraq between 2005 and 2007.

Upon information and belief, according to one Confidential Witness identified by the *Schmidt*

Case who had counterterrorism-facing responsibilities in Iraq, Ericsson mobile phones were

the "only phones [he] ever saw" while there (other than the occasional satellite phone) and

were used by U.S. government contractors, government personnel, and Iraqi nationals.

---

[39] Although iPads are generally manufactured in China, they contain significant U.S. manufactured parts (including chips and glass screens) and are typically shipped or sold from the United States.

431.     The Middle East, including Iraq, also featured a robust black market in Ericsson cell

phones. Upon information and belief, the same Confidential Witness, described in the *Schmidt*

Case , recalling seizing "multiple boxes of Ericsson phones" while stationed at a checkpoint

on a major supply route. And as with everyone else in Iraq, Ericsson's cell phones were popular

among and used by terrorists. According to this *Schmidt* Case Confidential Witness, "[t]he

terrorists always had a phone, and it was Ericsson 100 percent of the time." After any terrorist

attack, it was protocol to search terrorists' bodies for the phone (among other items) because

it could contain actionable intelligence. That same Confidential Witness even recounted how

his/her team found the Ericsson cell phone that belonged to the terrorist/security guard who

"blew himself up in the Iraqi Parliament" in 2007. That terrorist kept his Ericsson cell phone

in his boot, which – after the explosion – was no longer attached to his body, and upon

information and belief, that same Confidential Witness personally observed the Ericsson phone

"wedged up [in the boot] against the severed foot."

432.     The Ericsson leaks in 2022 also revealed that LM Ericsson and Ericsson AB—in

their role as supplier, on behalf of themselves and key Ericsson divisions and manufacturers, like

Ericsson Inc., that Ericsson promoted in Iraq—also used its strategic partners to deploy another

popular tactic in the corporate corruption and illicit finance toolkit from 2003 through 2022 known

by some as "offloading."

433.     Offloading is a notorious corruption strategy that was always (and remains) especially

popular with corrupt European and American multinational corporations that desire to make

large streams of regular and predictable illicit payments to known recipients. In a typical

version of an "offloading" transaction, criminal corporations, including Ericsson, negotiate

with a trusted ally, like a strategic partner or captive subcontractor, to serve as an intermediary

upon which the corporation can "offload" some aspect of that illicit payment stream. The offloading partner is thus able to theoretically offload the legal exposure it would otherwise risk incurring onto its ally, which typically has significantly less (or even zero) legal exposure even it its conduct were detected by relevant local governing authorities. In exchange for taking on a role in the illicit payment stream, the offloading partner typically provides a benefit to make it worth the ally's while, such as off-books cash payoffs, commercially unreasonable terms (in the ally's favor) on another aspect of their business relationships, free goods, and so on. As a result, when Western corporations and local partners engage in a pattern of transactions reflecting offloading tactics to facilitate corrupt payments by a Western company (usually the offloader) through a local partner (usually the intermediary), the local partner typically can expect to charge a fee of some sort, and yield a substantial profit from the offloading relationship (a win/win for both sides of this criminal coin).

434.    Offloading was popular among multinational corporations during the United Nation's Oil-for-Food program from 1998 through 2003, several of whom used local businesses as intermediaries to make off-books payments to Saddam Hussein's regime, which funds were used to finance terrorism. Not surprisingly, Ericsson ordinarily hired consultants and subcontractors who had gained substantial illicit economy experience during the Oil-for-Food era that could help Ericsson operationalize and sustain an offloading scheme for terrorist finance, like what Ericsson pursued with Ericsson's Iraqi partners, Asiacell and Korek.

435.    The history of Ericsson's behavior in Iraq, as first revealed during the 2022 Ericsson leaks, is consistent with Defendants' widespread following of an offloading strategy in Iraq. Ericsson relied on an offloading strategy to route some of their protection money value to the Relevant Terror Organizations. Defendants did so by, among other things, routing cash payments

through intermediaries. Moreover, on information and belief, Defendants also negotiated discounted pricing on certain commercial aspects of their deals with Asiacell and Korek to provide these customers with excess value for the purpose of, and with the specific intent to, facilitate Asiacell's and Korek's respective protection payments to terrorists on each of their own behalves and on behalf of their partner, Ericsson (while also permitting Asiacell and Korek to each keep some of that excess value for themselves as a fee for participating in Ericsson's offloading strategy).

436.    When corporations, like Ericsson, embrace offloading as a corruption scheme, the criminal rot tends to spread far and wide throughout the organization, as it requires a team effort to sustain an offloading scheme at a large multinational corporation. Thus, offloading schemes tend to be practiced by only the most brazen of corporate criminals, as they are one of the maximalist ways (from an organizational perspective) a corporation can route illicit payments to third parties. Simply put, one-off dirty consultants are far easier. But for large scale payments, offloading offers superior efficiency advantages for the criminal enterprise. Defendants practiced an all-of-the-above approach, in which they used more common illicit transfer strategies (e.g., slush funds and corrupt consultants) while also embracing an offloading approach through their relationships with strategic partners and subcontractors.

437.    Given LM Ericsson's "One Ericsson" model, which places tremendous scrutiny on the commercial terms at issue, Ericsson's offloading practices necessarily involved both LM Ericsson's C-Suite (which had to approve the egregious deals) and its cross-functional commercial, legal, compliance, and technical teams in the United States (which had to approve and operationalize those deals).

438.    As a result of Defendants' adherence to such offloading practices, even corrupt value transfers to Asiacell and Korek that did not directly go to the terrorists – e.g., a large offbooks cash payment to officers, employees, or agents of Asiacell or Korek – still often flowed significant value to the Relevant Terror Organizations because LM Ericsson, Ericsson AB, and Ericsson Inc. (via Ericsson AB's role as Ericsson Inc.'s agent in Iraq) agreed with its Iraqi partners like Asiacell and Korek that everyone involved would help everyone else with their protection money needs. On information and belief, Ericsson regularly routed large-value protection payments through its partners via such an "offloading" strategy.[40]

439.    Ericsson's Consultants. Ericsson leveraged its long-standing consultants in Iraq to route protection payments to the Relevant Terror Organizations.

440.    According to leaked Ericsson internal documents, Defendants paid al-Awsat Telecommunications Service Company ("al-Awsat") to serve as a conduit in order to route tens of millions of dollars to others, through consulting work where: (a) the ultimate beneficiary could not be identified; (b) there was "deficient proof of work"; and (c) "the money ultimately ended up in a Jordanian bank account."[41] These were three classic indicia of a company routing value to the Relevant Terror Organizations in Iraq. According to leaked Ericsson internal documents,

> In interviews, [at least two witnesses] stated that Al-Awsat were paid 500k USD under the label "Security Service" without a clear scope of delivery. … In [an] interview [with Ericsson, a witness] stated that the amount was requested to be added by [chief of LM Ericsson's Iraq Country Unit] Tarek Saadi … In interviews with [Ericsson, one or more witnesses] has confirmed that no security services from Al-Awsat have been rendered, and in reference

---

[40] Given offloading is the most effective way to conceal illicit payments (that's why it exists, after all), Plaintiffs have only scratched the surface, and discovery is likely to reveal additional instances of Defendants' offloading relationships.

[41] Notably, al-Awsat means "the middle" in Arabic, thus expressly and without irony referencing Ericsson's use of al-Awsat as a "buffer" between Ericsson and those whom Ericsson needed to pay off as the price of doing business in Iraq.

to the 500k USD … [i]t has not been possible to trace the ultimate beneficiary of this money.

441.    According to leaked Ericsson internal documents, Defendants authorized al- Awsat and its proprietor, Jawhar Surchi, to execute agreements on Defendants' behalf. Indeed, according to those leaked documents, Surchi and al-Awsat were internally viewed as indistinct from Ericsson to such an extent over time that al-Awsat was no longer referred to by its name "al Awsat" but instead simply as "Ericsson."

442.    According to leaked internal Ericsson documents, one or more Ericsson employees told LM Ericsson's investigators that Ericsson directed large U.S. Dollar-denominated "commission" and "security services" payments to al-Awsat "regardless of whether there were deliveries ongoing or not," which were classic indicia of a company routing value to al-Qaeda, AQI, and Islamic State through an intermediary.

443.    From at least 2005 through at least 2017, Ericsson relied upon the services of al- Awsat and its sister company, Alawsatiya, to route illicit funds through suppliers.[42] During this period, Defendants caused al-Awsat and Alawsatiya to be paid at least $10.5 million. According to Ericsson, "[t]he 10.5M USD paid to Alawsatiya into Al-Awsat's accounts was not reflected in their accounts at all, and therefore we are unable to ascertain who the ultimate beneficiary owner was for this money." On information and belief, al-Awsat and Alawsatiya diverted a substantial percentage of this money to al-Qaeda, al-Qaeda-in-Iraq, and ISIS from 2005 until at least 2017.

---

[42] According to al-Awsat's owner, Jawhar Surchi, Alawsatiya was a "secondary contractor" that served as an extension of al-Awsat.

444.    On information and belief, Ericsson retained other consultants from 2005 through at least 2019, which Defendants used to route protection money payments to the Relevant Terror Organizations, through these FTOs' agents in Iraq.

445.    Ericsson's Security, Logistics, and Transportation Subcontractors. LM Ericsson, Ericsson AB, and Ericsson Inc. also relied upon LM Ericsson's security, logistics, and transportation suppliers, with whom Defendants contracted, to route Ericsson's protection money payments to the Relevant Terror Organizations from 2005 through at least 2019.

446.    During this period, Ericsson relied upon, among others, Security and Logistic Services ("SLS"), which was a supplier to Ericsson, and Cargo Iraq, which was also an Ericsson contractor, albeit one that Defendants tried to conceal on their books.

447.    Ericsson intended for its security, logistics, and transportation suppliers to divert a substantial amount of the sums they were paid by Ericsson to the Relevant Terror Organizations because the suppliers understood that Ericsson affirmatively desired that they pass on such money to the terrorists in order to secure a more favorable business environment in Iraq for Ericsson. And those suppliers did what Ericsson intended them to do.

448.    Ericsson's Slush Funds. According to leaked Ericsson documents, Defendants maintained an "uncontrolled slush fund" that they operationalized through their employees and subcontractors. Ericsson "used" its longtime subcontractor SLS "to provide cash for transportation services." SLS did not provide legitimate transportation security services but chose to simply pay the terrorists. According to leaked Ericsson internal documents, Ericsson's "suppliers were used as an uncontrolled slush fund between 2016-2018" and Ericsson "cannot rule out that other suppliers [had] been used in [a] similar manner until today."

449.    Ericsson's personnel in Iraq went to great lengths to create slush funds in every manner possible. For example, Ericsson's personnel working on Defendants' Asiacell contracts developed a scrapping scheme in which Ericsson employees used unrecorded cash from the sale of decommissioned equipment to pay for illicit off-books expenses.

450.    Ericsson operated its scrapping scheme as a slush fund generation tactic from at least 2014 through at least 2017. According to Ericsson: A scrapping scheme was established, which involved selling decommissioned equipment owned by Asiacell on a swap project for 2000 sites, including Nokia and Huawei sites. Ericsson's Asiacell KAM [i.e., Key Account Manager] and Operations teams have been using the unrecorded cash as a 'slush fund' for other expenses. … Over 188K USD between 2014-2017 has been identified by the investigation. The spent included hotels, dinners, bonuses for contractors, parties, personal expenses, taxis and miscellaneous purchases. This process does not follow any of the four Ericsson routines for handling cash.

451.    On information and belief, some of the sums described above, including but not limited to "bonuses for contractors" and "personal expenses" were euphemisms for payments to the Relevant Terror Organizations, and Defendants' scrapping scheme was another mechanism through which Ericsson created the purpose-built slush funds it needed for its payoffs, including to al-Qaeda and al-Qaeda-in-Iraq (in at least 2014) and to Islamic State (from at least 2014 through 2017).

452.    The 2014 Asiacell Base Stations Contract, offers a good illustration of Defendants' general practice of making protection payments to terrorists in Iraq. Throughout the spring and summer of 2014, LM Ericsson faced an imminent financial crisis, causing it to announce major restructuring, impairments, and the need to substantially increase revenue. Against this

backdrop of intense corporate pressure, in the summer of 2014, while Ericsson began working under the 2014 Asiacell Base Stations Contract, ISIS was rampaging across Iraq, including the northern Iraqi geographies in which Ericsson's work was being performed. Given ISIS's universal taxation practices, and use of such tax revenue to finance terrorism, every responsible company exited the areas seized by ISIS. Ericsson, however, stayed.

453.    On June 10, 2014, Islamic State seized Mosul. The next day, instead of planning their departure, Ericsson was looking for contractors to work on a project upgrade under the 2014 Asiacell Base Stations Contract. One or more of Ericsson's employees and/or agents expressed concern about the security environment in Iraq and encouraged Ericsson to invoke its "force majeure" clause in the Asiacell contract so that Ericsson would not have to work in or near Islamic State-held territory, and the issue was escalated to Ericsson's regional management.

454.    According to leaked Ericsson internal documents, an "email review" of Defendants' emails showed that Ericsson "persever[ed] to maintain business continuity" in northern Iraq "[i]n the weeks following the capture of Mosul by ISIS on 10 June 2014." For example, during this period, an LM Ericsson manager emailed one of Ericsson's subcontractors operating in Islamic State-controlled territory and instructed him as follows: "Kindly let's keep each other updated daily so that whenever there's any window to perform activity if the security situation allows, so that we grab any chance available."

455.    Between on or about June 11, 2014 and on or about June 17, 2014, Tom Nygren, LM Ericsson's Vice President and General Counsel for the Middle East Region, strongly recommended that Defendants invoke force majeure and withdraw from the Iraqi geographies controlled by Islamic State.

456.    But on June 18, 2014, Rafiah Ibrahim, Head of Ericsson's Middle East & Africa Region, and Tarek Saadi, then-head of Ericsson's Iraq Country Unit, rejected Mr. Nygren's recommendation. According to Ericsson, "[d]espite the strong recommendation from Tom Nygren," "Rafiah Ibrahim" "and Tarek Saadi" "decide[d] not to invoke force majeure because it would be 'premature' and 'destroy [Ericsson's] business.'"

457.    According to Ericsson, Roger Antoun, an Ericsson manager who worked on the 2014 Asiacell Base Station Contract, said the proposal by Ericsson's employees to invoke force majeure was "escalated" to LM Ericsson's global headquarters and Mr. Antoun "raised it verbally as well." On information and belief, LM Ericsson's senior global leadership sided with Ms. Ibrahim and Mr. Saadi, and approved Defendants' continued business in Islamic State-controlled territory.

458.    On July 13, 2014, LM Ericsson conducted a meeting of its regional leadership for the Middle East, during which meeting the participants openly discussed continuing to do business in Islamic State-controlled territory. At this meeting, Ericsson AB's senior executive for the Middle East and Africa, Ms. Ibrahim, shared information with the group that Islamic State's abductions in Iraq were "impacting business." Ms. Ibrahim and Ericsson AB's senior Middle East management team, however, concluded that "for now," there would be "no changes," meaning that Ericsson would continue to do business in Iraqi territory controlled by Islamic State even though Defendants understood the risks in doing so.

459.    The day after Ericsson AB's meeting, on July 14, 2014, according to leaked Ericsson documents, Ericsson asked Asiacell, which Ericsson viewed as one of its Iraqi "partners," to request "permission from 'local authority ISIS'" to permit Ericsson to continue to work in Mosul even after Islamic State fully seized the city in Summer 2014.

460.    Later that summer, LM Ericsson, Ericsson AB, and Asiacell prepared a letter to Islamic State requesting the terrorist group's permission to continue working in northern Iraq. Among other things, Ericsson and its "partners" at Asiacell asked Islamic State to "[p]lease facilitate the mission of the technical team … of Ericsson which is contracted by Asiacell for the maintenance and setting up of the towers" and "thank[ed]" Islamic State for its "cooperation." According to a leaked Ericsson report, Ericsson could not rule out the possibility that this "facilitation" involved Ericsson's financing of terrorism in Iraq.

461.    LM Ericsson, Ericsson AB, and Asiacell then caused an engineer named Affan – who had been working for Ericsson's subcontractor, Orbitel, on tower tests in Mosul – to personally deliver Ericsson's and Asiacell's permission letter to the terrorists at Islamic State's office in Mosul.

462.    LM Ericsson, Ericsson AB, and Asiacell insisted that the work continue and sent Affan to deliver their letter to Islamic State even though LM Ericsson, Ericsson AB, and Asiacell understood that Islamic State terrorists had previously detained several other workers performing services under Defendants' 2014 Asiacell Base Stations Contract.

463.    LM Ericsson and Ericsson AB communicated directly with Affan prior to his interaction with Islamic State to instruct him to hand-deliver Ericsson's and Asiacell's permission letter to ISIS.

464.    LM Ericsson and Ericsson AB also communicated with their Iraqi subcontractor, Orbitel, which employed Affan on Ericsson's behalf, in order to pressure Orbitel to deliver Ericsson's and Asiacell's letter to Islamic State. As Affan put it, "Ericsson put pressure on my company, and my company put pressure on me."

465.    After Affan hand-delivered the joint Ericsson/Asiacell letter to Islamic State, he was contacted by Islamic State terrorists and instructed to appear at a meeting point. When Affan did so, he was detained by a sheikh, Haji Saleh, who was an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecommunications businesses in northern Iraq. Haji Saleh told Ericsson's senior manager in Iraq that Ericsson must pay millions of U.S. dollars to Islamic State in order to continue its work in Northern Iraq.

466.    According to leaked Ericsson internal documents, an Islamic State "sheikh" – on information and belief, Haji Saleh – called Rabbah Dannawi, an Ericsson project manager in Iraq, and told Mr. Dannawi that Ericsson and its employees were "infidels," Islamic State was demanding that Ericsson pay a religious tax of millions of U.S. dollars, and Mr. Dannawi was "reachable" even in Oman or Lebanon. After Mr. Dannawi "hung up the phone," Affan frantically called back but no one from Ericsson returned his calls.

467.    Ericsson, Asiacell, and Orbitel abandoned Affan for several weeks, while he was placed under house arrest by Islamic State. Describing how Ericsson treated him, Affan put it simply: "They sold me." Referring to Ericsson, Affan said: "They destroyed me."

468.    After a few weeks, Islamic State terrorists told Affan that he was free to leave. Islamic State did so because Ericsson facilitated the payment of millions of U.S. dollars to Islamic State as a "business tax," which Islamic State had previously communicated to Ericsson must be paid for Defendants to do business in parts of northern Iraq that were controlled or contested by Islamic State. According to leaked Ericsson documents, an Ericsson manager admitted that Ericsson worked through Asiacell to make "arrangements to obtain the release of the hostage and to let Ericsson continue the work in Mosul." Based on his personal observations, Affan also concluded that Ericsson purchased security from Islamic State by paying protection

money to it. On information and belief, Ericsson routed some of these payments to Islamic State through, among other terrorists, Haji Saleh, an Islamic State terrorist responsible for collecting "taxes" and "levies" from telecom firms in northern Iraq.

469.    Defendants did not merely pay "business taxes" to Islamic State. From at least 2014 through at least 2017, Ericsson also facilitated the payment of "customs taxes" to Islamic State, which Islamic State assessed on trucks traveling through or near territory controlled by Islamic State.

470.    As part of the 2014 Asiacell Base Stations Contract, for example, Ericsson and its partner Asiacell had to transport expensive cell towers and equipment from Erbil in northern Iraq to Ramadi in western Iraq. According to leaked Ericsson documents, Defendants' transportation contractor, Cargo Iraq, had two options: the "legal way" and the "Speedway." While the "Speedway" was both longer (in terms of distance) and more expensive (in terms of illicit protection payments, styled as "customs taxes," required to be made to Islamic State), it was actually much faster than the "legal way" because it avoided the lawful Iraqi checkpoints that the Iraqi government established throughout the country in an attempt to halt Islamic State's rapid advance at the time. The International Consortium of Investigative Journalists published a graphic, see Figure 1, depicting Ericsson's choice.[43]

Figure 1

---

[43] Sydney P. Freedberg, Maggie Michael and Amir Musawy, The Ericsson List: Leak Exposes Ericsson's Secret Dealings With ISIS Amid Iraq Corruption Spree, Int'l Consortium of Investigative Journalists (Feb. 27, 2022), https://tinyurl.com/5yjnnjyr ("ICIJ, Ericsson List").



## Dodging government checkpoints

An alternative route between Ramadi and Erbil avoided delays and high tariffs at government checkpoints and instead passed through some ISIS areas in 2016-2017, according to drivers and other locals interviewed by ICIJ and NDR.

471.    Ericsson instructed Cargo Iraq to take the "Speedway" because Ericsson calculated that doing so was better for its bottom line (notwithstanding the cost of payoffs to Islamic State). On information and belief, this was because, among other reasons, Defendants' contracts with Asiacell and Korek harshly penalized project delays. In short: Defendants bribed Islamic State so that Ericsson could avoid paying substantial late fees to its Iraqi customers—which fees would have exceeded the amounts Ericsson had to pay Islamic State to take the "Speedway." Moreover, even without the prospect of costly project delays, taking the "Speedway" allowed Ericsson to avoid paying official customs taxes that the Iraqi government assessed at various checkpoints along the "legal way."

472.    According to leaked Ericsson documents, Defendants regularly paid thousands of dollars per truck to transport their equipment on the "Speedway" through Islamic State's territory while providing services under the 2014 Asiacell Base Stations Contract. For example, in March 2017, according to such Ericsson documents, Ericsson paid $22,000 per truck for three loads on a single day. According to such leaked Ericsson data, Roger Antoun stated in an interview that Ericsson had paid an illegal 'Speedway' option to the transporter Cargo Iraq [] for faster transportation of equipment in Iraq. According to Roger Antoun, Cargo Iraq were engaged by Ericsson, on instruction by non-government customer Asiacell, for transportation during 2016 and 2017. With the specific purpose to circumvent the official customs. That had been increased to 25% from 10%-15% by the government since the ISIS invasion [in 2014]. Cargo Iraq were not registered as an Ericsson supplier and were paid in cash through Security and Logistic Services (SLS), a supplier to Ericsson. The timeframe and geographic areas covered by these transportations indicate that areas controlled by local militias, including ISIS, has been passed.

473.    Collectively, LM Ericsson, Ericsson AB, and Ericsson Inc. facilitated at least several million U.S. dollars' worth of such "customs tax" payments to Islamic State terrorists to transport goods on the "Speedway" from at least 2014 through at least 2019. Indeed, the transactions above, which describe only one day in March 2017, resulted in at least $16,500 flowing from Defendants to Islamic State on a single route in a single day. Indeed, in a leaked report, Ericsson itself concluded that "[b]y avoiding official customs by transporting through areas controlled by militias, including ISIS, it cannot be excluded that Cargo Iraq engaged in … potential illicit financing of terrorism to carry out transportation operations for Ericsson."

474.    The 2004 Asiacell Networks Contract, supra ¶ 292(a), offers another good illustration of Defendants' general practice of making protection money payments to terrorists in Iraq from at least 2004 through at least 2019. From 2004 through approximately 2008, Ericsson expanded Asiacell's network throughout central and northern Iraq, including in Baghdad and Mosul. Throughout, Defendants and Asiacell viewed one another as strategic "partners," in the same way they were a decade later.

475.    While Defendants built out Asiacell's network in central Iraq from 2004 through 2008, al-Qaeda and al-Qaeda-in-Iraq ran sophisticated protection money operations that specifically focused on extracting business taxes and customs taxes from telecommunications companies that were doing business in central Iraq and/or shipping equipment through northern Iraq, both of which described Defendants' services to, and partnership with, Asiacell.

476.    From 2004 through at least 2008, al-Qaeda and al-Qaeda-in-Iraq collectively extracted millions of U.S. dollars each year from persons affiliated with the 2004 Asiacell Network Contract. The U.S. government has determined that al-Qaeda-in-Iraq extracted large amounts of protection money from persons associated with the 2004 Asiacell Network Contract between about 2005 through about 2008 (at least), which included monthly six-figure payments of "business taxes" in al-Qaeda-in-Iraq-contested provinces, including Ninewa and Baghdad, where Ericsson performed under the 2004 Asiacell Network Contract.

477.    Ericsson played a key role in the Asiacell-related protection money payments to al-Qaeda and al-Qaeda-in-Iraq from 2004 through at least 2008.

478.    Defendants did not limit their protection money payments in Iraq to Asiacell-related work. Ericsson's corruption was programmatic throughout Iraq and extended specifically to Ericsson's work for Korek in Iraq. According to leaked Ericsson internal documents, Elie

Moubarak, Ericsson's account manager for Korek, engaged in "corruption and financial irregularities" in order to facilitate Ericsson's business in Iraq. On information and belief, LM Ericsson and Ericsson Inc. routed protection money payments to the Relevant Terror Organizations from 2005 through at least 2019 in connection with Ericsson's Korek-related work as described above.

479.    In each instance above, LM Ericsson and Ericsson AB authorized and coordinated the payment(s) to the terrorists. Although LM Ericsson and Ericsson AB could have vetoed any such payment, they chose not to—just as Ericsson opted not to hire sufficient private security to protect its projects and equipment from terrorist attacks—because Ericsson prioritized profits over all else, including any risks that its substantial payments to violent terrorists would facilitate violent terrorism.

480.    Indeed, the events alleged above are merely examples and reflect the tip of what is likely an historically large legal iceberg, as Ericsson went to unusual lengths to conceal its protection payments to terrorists. Discovery is therefore likely to reveal additional culpable (and illegal) relationships, strategies, and payments.

481.    Ericsson's protection payments delivered substantial monetary value, usually in U.S. dollars, to the Relevant Terror Organizations from 2004 through 2022. Given the size of Defendants' business in Iraq during that time frame, the frequency of its contracts, the nature of the Iraqi projects for which Defendants were contracted, and LM Ericsson's admissions about Defendants' conduct in Iraq, Ericsson's total protection payments – including cash payments through Ericsson's uncontrolled slush funds and value transfers through Defendants' agents, partners, consultants, and contractors – delivered at least several million U.S. dollars

per year in total value to the Relevant Terror Organizations from at least 2004 through at least 2019.

482.    From 2004 through 2014, the total value of the protection payments that Ericsson caused to flow through to al-Qaeda and al-Qaeda-in-Iraq likely exceeded $50 million—and may be far in excess of that number. Among other reasons, the U.S. military and media both confirmed in numerous reports that al-Qaeda-in-Iraq charged telecommunications companies in Iraq a "going rate" of $200,000 per month per province in order to receive al-Qaeda-in-Iraq's protection. At all times, al-Qaeda-in-Iraq claimed dominion over at least five provinces in Iraq, and thus it is extremely unlikely that Ericsson only paid a single $200,000 monthly fee to purchase security from AQI for all of Ericsson's projects nationwide.

483.    Even applying that unrealistic assumption, however, Ericsson likely paid al-Qaeda-in-Iraq around $25 million, which is the result if one assumes that Ericsson merely paid the bare minimum $200,000 fee during each of the approximately 130 months when al-Qaeda-in-Iraq operated al-Qaeda's protection networks in Iraq from spring 2003 through spring 2014. Considering the publicly confirmed rates that AQI charged telecommunications companies like Ericsson in Iraq from 2004 through 2014, Plaintiffs' estimates regarding Ericsson's protection payments to al-Qaeda and al-Qaeda-in-Iraq are conservative.

484.    Moreover, the vast sums Ericsson paid throughout from at least 2004 through at least 2019 facilitated the terrorists' financial reserves for at least several years thereafter. As a result, Islamic State was still likely benefitting from Ericsson's 2019 largesse, for example, in February 2022 when leaked Ericsson internal documents revealed Defendants' past aid to terrorists.

      *c. Defendants Admitted That Ericsson Likely Purchased Security From Al-Qaeda And Islamic State In Iraq*

485.    Ericsson has, in sum and substance, admitted that it purchased protection from al- Qaeda, al-Qaeda-in-Iraq, and Islamic State from at least 2011 through at least 2019 and that it obstructed U.S. counterterrorism operations until at least February 15, 2022. In addition to the statements alleged *supra* other examples of LM Ericsson's admissions (on behalf of itself and Ericsson AB and as Ericsson Inc.'s agent) include, but are not limited to:[44]

    *a.*    Via its CEO, Mr. Ekholm: "We . . . received communication from the DOJ about a breach notice related to our DPA, … it's our assessment that the resolution will likely result in monetary and other measures"[45]

    *b.*    "Ericsson has been active in Iraq since the lifting of a UN embargo led to the reopening of the telecoms equipment market. Since then, Ericsson has continued its work in the country, including during periods of civil unrest. Iraq is one of a number of countries where increased concerns about security and risk to colleagues' well-being is closely monitored. The company has processes in place to manage security risks, covering both employees and subcontractors."[46]

    *c.*    "[Ericsson's] investigating team [] identified payments to intermediaries and the use of alternate transport routes in connection with circumventing Iraqi Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. Investigators could not determine the ultimate

---

[44] Consistent with its typical practice and its "One Ericsson" structure, LM Ericsson's public statements about misconduct in Iraq refer only to "Ericsson," and do not specify any other entity. See LM Ericsson, Press Release: Update: Iraq Media Inquiries (Feb. 15, 2022).

[45] Telefonaktiebolaget LM Ericsson (ERIC) CEO Börje Ekholm on Q1 2022 Results – Earnings Call Transcript (Apr. 14, 2022), https://tinyurl.com/mw2yzrv9.

[46] LM Ericsson, Press Release: Update: Iraq Media Inquiries (Feb. 15, 2022).

recipients of these payments. Payment schemes and cash transactions that potentially created the risk of money laundering were also identified."[47]

d.  "[An] investigation [by Ericsson relating to unusual expenses] included the conduct of Ericsson employees, vendors and suppliers in Iraq during the period 2011-2019. It found serious breaches of compliance rules and the Code of Business Ethics. It identified evidence of corruption-related misconduct, including: Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; and improper use of sales agents and consultants. In addition, it found violations of Ericsson's internal financial controls; conflicts of interest; non-compliance with tax laws; and obstruction of the investigation." [48]

e.  "Ericsson terminated a number of third-party relationships and prioritized the Iraq country business for enhanced training and awareness activities, policies and procedures, and third-party management processes."[49]

f.  Via its CEO, Börje Ekholm: LM Ericsson and its subsidiaries had identified "unusual expenses" relating to Iraq "dating back to 2018."[50]

g.  Via its CEO, Mr. Ekholm: in sum and substance, LM Ericsson and its subsidiaries (as paraphrased by a reporter, with Mr. Ekholm's quote) "may have made illicit payments, but that the company had often struggled to

---

[47] Id.
[48] Id.
[49] Id.
[50] The National, Telecoms Company Ericsson Gave Millions to ISIS in Iraq, Report Says; A Leaked Internal Report by the Swedish Business Shows Corruption and Terrorist-Linked Transactions Between 2011 and 2019 (Feb. 28, 2022), https://tinyurl.com/v93j5szx.

identify the final beneficiary … [because] '[w]e [i.e., LM Ericsson and its subsidiaries] can't determine where money sometimes really goes, but we can see that it has disappeared.'"[51]

h.   Via its CEO, Mr. Ekholm: "What we [i.e., LM Ericsson and its subsidiaries] are seeing is that transport routes have been purchased [by LM Ericsson and its agents] through areas that have been controlled by terrorist organisations, including ISIS."[52]

i.   Via its CEO, Mr. Ekholm: LM Ericsson could not disprove that its money flowed to Islamic State: "The question on financing armed factions cannot be substantiated" one way or another.[53]

j.   "[M]edia will focus on the conduct of business in unstable regions where terrorist organizations and corruption are present."[54]

d. *Independent Media Reports Corroborate Plaintiffs' Interpretation of Ericsson's Conduct in Iraq*

486.   Widespread media coverage confirms that Ericsson tried to pull a fast one on the U.S. government, Ericsson's shareholders, and American victims of terrorism, including Plaintiffs and their family members, and only came clean once a heroic whistleblower leaked the evidence of Ericsson's continued corporate crime spree and deception. Only then, once caught, did Ericsson admit its culpability. As the BBC's headline reported: "Ericsson says it may have paid bribes to Islamic State terrorists."[55] Other such reports include, but are not limited to:

---

[51] ICIJ, Ericsson List.
[52] The National, Telecoms Company Ericsson Gave Millions to ISIS in Iraq.
[53] Greg Miller and Louisa Loveluck, Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible Payments to ISIS, Washington Post (Mar. 2, 2022).
[54] LM Ericsson, Press Release: Comment Regarding Recent Media Inquiries (Feb. 8, 2022).
[55] BBC, Ericsson Says It May Have Paid Bribes To Islamic State Terrorists (Feb. 16, 2022) ("Ericsson['s] … boss said it may have paid off Islamic State (IS) in Iraq to access key transport routes. … Chief executive Börje Ekholm

a. Voice & Data, February 2022: "Ericsson [] said that its employees may have funded terrorism in Iraq and the Middle East. While it remains under investigation, the statements issued by [LM Ericsson] have all but confirmed it … Ericsson itself reported that the illicit payments might not have stopped until 2019 …. Notably, [LM Ericsson] has noted that during a period that lasted the entire 2010s, it found 'serious breaches' of compliance rules and the Code of Business Ethics. … A media statement [by LM Ericsson]… read, 'It identified evidence of corruption-related misconduct, including: Making a monetary donation without a clear beneficiary; paying a supplier for work without a defined scope and documentation; using suppliers to make cash payments; funding inappropriate travel and expenses; improper use of sales agents and consultants'. Let us break this down. 1. Making a monetary donation without a clear beneficiary: means that company funds … potentially … fund[ed] terrorist activities in Iraq and the Middle East. 2. Paying a supplier for work without a defined scope and documentation: a way to cover up the transfer of funds. 3. Funding inappropriate travel and expenses: using money to bribe ISIS for access to certain roads. This could also be used as a method to cover up fund transfers to terrorist beneficiaries. 4. Improper use of sales agents and consultants: this can mean a lot of things, such as sales agents being used as middlemen, to begin with. Furthermore, the investigating team also identified payments to intermediaries and the use of alternative transport routes in connection with circumventing Iraqi

---

[said that] … an internal probe started in 2019 had found …. [that] [m]oney was paid to access areas in Iraq that were controlled by [Islamic State]").

Customs, at a time when terrorist organizations, including ISIS, controlled some transport routes. This means that Ericsson intended to avoid Iraqi authorities, and as such, paid money to ISIS and other terrorist organizations controlling some routes at that time. Of course, the investigators could not determine the ultimate recipients of these payments. However, Ericsson did note that that did create a risk of money laundering. All of this points to a serious implication; Ericsson … funded terrorist activities during the time. However, Ericsson has said that none of its employees were 'directly involved' in funding any terrorist organization. Which really is not a great defense, to be honest."[56]

b.  Guardian, February 2022: "Confidential documents have revealed how … [LM Ericsson] is alleged to have helped pay bribes to [] Islamic State … in order to continue selling its services after the militants seized control of large parts of Iraq. … The leak of internal investigations at Ericsson, [] also found that the firm had put its contractors at risk and allowed them to be kidnapped by the militants ...."[57] "In addition to the findings about the alleged payments to [Islamic State], the investigations uncovered allegations [LM Ericsson] was involved in corruption in at least 10 countries across four continents. That would suggest a pattern of wrongdoing by Ericsson that is far wider than what the telecoms giant publicly admitted to in 2019, when it entered into a $1bn [] settlement with the [DOJ]."[58] "[Ericsson's] [i]nvestigators concluded that

---

[56] Voice & Data, Ericsson Has to Sleep in the Bed it Made in Iraq (Feb. 17, 2022), 2022 WLNR 4973266.
[57] Rob Evans and Michael Safi, Revealed: Leaked Files Show How Ericsson Allegedly Helped Bribe Islamic State, Guardian (Feb. 27, 2022).
[58] Id.

the multinational firm was likely to have been involved in channelling bribes to [Islamic State] to allow its products to be transported across parts of Iraq that were held by the terrorists." [59] "[Ericsson's] payments [to Islamic State] … were [also] made through a slush fund run by contractors working for the Swedish multinational, according to [Ericsson's] investigators." [60] "The leaked documents also show how Ericsson jeopardised their contractors in Iraq in the pursuit of profits, as managers strove to continue the firm's commercial operations even after [Islamic State] took control of Mosul. According to investigators, emails showed 'this persistence resulted in the kidnapping of [contractors] while doing fieldwork for Ericsson'. The investigators added that even after the kidnapping, Ericsson sought to carry on doing business in the area."[61]

c.  The National, February 2022: "[LM Ericsson] has been accused of spending 'millions of dollars' to smuggle equipment into ISIS-controlled territory in Iraq … in a leaked internal report by the company … The ICIJ said that between 2011 and 2019, Ericsson made payments 'to sustain its business in Iraq, financing slush funds, trips abroad for defence officials and payoffs through middlemen to corporate executives and possibly terrorists'. 'The internal investigation describes a pattern of bribery and corruption so widespread, and company oversight so weak, that millions of dollars in payments couldn't be accounted for — all while Ericsson worked to maintain

---

[59] Id.
[60] Id.
[61] Id.

and expand vital cellular networks in one of the most corrupt countries in the world.'"[62]

d.  Agence France Presse, April 2022: "[LM Ericsson's CEO] Börje Ekholm conceded in a newspaper interview … that some Ericsson employees may have bribed [Islamic State] members for road transport through areas controlled by [ISIS] in Iraq. The admission was made before the publication of a report by the [ICIJ] revealing that an internal Ericsson investigation from 2019 was never made public. The internal probe had identified possible corruption between 2011 and 2019 in the group's Iraqi operations."[63]

e.  National Iraqi News Agency, April 2022: "The Swedish judiciary announced … the opening of an investigation into possible corruption crimes that … Ericsson is suspected of being involved in, linked to the payment of bribes to ISIS elements in Iraq. According to [Swedish] Attorney General Lev Gortz, the investigation covers the period from 2011 to 2019. …. 'We have good reasons to believe that corruption may have been committed in Iraq during this period, …,' Gortz [said]. … [LM Ericsson's] CEO, Börje Ekholm, admitted in a newspaper interview [] that some Ericsson employees may have bribed ISIS elements to move overland through ISIS-controlled areas in Iraq."[64]

f.  ICIJ, June 2022: "The [SEC] is probing … Ericsson over its conduct in Iraq following company admissions that it may have made payments to [] Islamic

---

[62] The National, Telecoms Company Ericsson Gave Millions to ISIS in Iraq.
[63] Agence France Presse English Wire, Sweden Opens Criminal Probe Into Ericsson Iraq Graft (Apr. 20, 2022).
[64] National Iraqi News Agency, Sweden Opens an Investigation Into Possible Corruption Crimes for Ericsson in Iraq (Apr. 21, 2022).

State … The announcement comes nearly five months after the [ICIJ] and 30 media partners … detail[ed] a widespread pattern of alleged corruption and graft, [and] revealed that [LM Ericsson] had paid tens of millions of dollars in suspicious payments from 2011-2019 to sustain its business in Iraq. … Days after the Ericsson List was published, U.S. prosecutors told [Ericsson] that it had breached [the DPA] by failing to fully disclose the misconduct in Iraq and that the department was weighing whether Ericsson or its executives would face new fines or prosecution for breaking terms of the deal."[65]

487.    White-collar crime scholars also confirmed that Ericsson's conduct comprised an admission of wrongdoing. As former federal prosecutor Michael Volkov, author of the widelyread Corruption, Crime, and Compliance blog, summarized on June 15, 2022:

> Ericsson is having a tough time. First, in 2019, Ericsson settled FCPA charges with [DOJ] and the SEC for … $1 billion … Second, Ericsson had an independent compliance monitor appointed for a three-year term under its deferred prosecution agreement. And then — last year, Ericsson was notified by DOJ that it failed to conduct a proper internal investigation in Iraq because it failed to disclose additional misconduct to DOJ, most of which centered on bribery payments made to ISIS terrorists … DOJ has another opportunity to resolve the Ericsson matter to confirm prior policy statements highlighting a tough stance on recidivists — those defendants that have multiple violations of the FCPA or violated deferred or nonprosecution agreements. … DOJ is lining up against Ericsson to bring a major enforcement action for violating their 2019 [DPA] by failing to disclose bribery conduct in Iraq involving illegal payments to ISIS. Last year, DOJ announced that Ericsson violated its [DPA] by failing to disclose deficiencies in its prior internal investigation. Specifically, DOJ claimed that Ericsson failed to provide certain documents and factual information about bribery conduct. The alleged violations focus on Ericsson's conduct in Iraq. … In March 2021, DOJ alerted Ericsson of its multiple breaches of its settlement agreements for failing to disclose to the government that it paid bribes to ISIS to gain access to transport routes in Iraq.[66]

---

[65] Maggie Michael, US Securities Regulator Opens Probe into Ericsson's Conduct in Iraq, Int'l Consortium of Investigative Journalists (June 9, 2022), https://tinyurl.com/cce5atpr.
[66] Michael Volkov, SEC Joins DOJ in Probe of Ericsson ISIS Bribery Payments, Corruption, Crime & Compliance (June 15, 2022), 2022 WLNR 18715111.

488.    Similarly, Hogan Lovells LLP also concluded that Ericsson's Iraq-related conduct plausibly constituted an admission of Ericsson's payments to anti-American terrorists:

> An often-cited example of an entity engaging in illegal practices to rapidly expand their business is Telefonaktiebolaget LM Ericsson (Ericsson). Following investigations, Ericsson entered into a $1 billion criminal settlement with U.S. authorities in 2019. Ericsson admitted to a campaign of corruption through, amongst other material failures, improper payments to secure lucrative government contracts, and collusion to falsify its account books. There are perhaps further issues arising for Ericsson through its involvement in high-risk jurisdictions. In February 2022 it disclosed that an internal investigation had found that it may have been making payments to the Islamic State militia in Iraq since 2011. As part of a project to modernise LTE services in the region, Ericsson allegedly made payments to facilitate the transport of its goods through ISIS controlled areas, as well as for the 'protection' of its offices. …[67]

489.    Despite Ericsson's use of careful phrasing in their public statements that merely appeared to imply a remote possibility that their illicit and corrupt payments might have ended up in terrorists' hands, even Defendants' admissions did not go nearly as far enough: Defendants fatuously implied that it was some mystery where their illicit payments went, when Defendants were well aware that the only plausible conclusion is that Defendants' intermediaries paid the Relevant Terror Organizations on Defendants' behalf.

> e. The Terms and Rates That Governed Lafarge S.A.'s Participation in Islamic State's Protection Networks In Iraq Confirmed That Defendants Also Participated In The Same Protection Networks as Lafarge

---

[67] Crispin Rapinet, Liam Naidoo, Reuben Vandercruyssen, Nick Roper, Corruption In The Telecoms Sector: Beware The Elephant In The Room, Hogan Lovells LLP, Engage: Legal Insight and Analysis (Oct. 11, 2022), https://tinyurl.com/59tfb2yf. Hogan Lovells's legal analysis also confirms the plausibility of Plaintiffs' allegations concerning endemic corruption in the Middle Eastern telecoms sector more generally. See id. ("Corruption risks are significant within the telecommunications sector, and at least four of the top ten enforcement penalties under the FCPA have been imposed on telecommunications companies. Risks that have plagued the sector for decades are being investigated and penalised with increasing frequency … The sector risk, amongst other factors, requires relevant entities and compliance functions to frequently re-evaluate their processes to ensure effective internal compliance measures. … The telecommunications sector operates in a fast paced, competitive and global sphere …. To counter the risks of enhanced scrutiny, the shortcomings of Ericsson … serve as useful case studies of practices to avoid. We observe that there are particularly high risks when seeking to obtain licences and concessions for new contracts, especially for those with official counterparties, in developing jurisdictions. Ericsson serves as a reminder to prioritise compliance over the desire to obtain first mover advantage by engaging in corrupt practices.").

490.    Islamic State's protection agreement with Lafarge, S.A. of France, and its Syrian subsidiary (collectively, "Lafarge") strongly supports Plaintiffs' conclusion that Defendants routed at least several million U.S. dollars to al-Qaeda and al-Qaeda-in-Iraq from 2004 through 2014, and at least several million dollars to ISIS from 2014 through at least 2019.

491.    On October 18, 2022, Lafarge admitted as to the terms of its protection deal with Islamic State and al-Qaeda's branch in Syria, Jabhat al-Nusra when Lafarge pleaded guilty to providing material support to foreign terrorist organizations by, among other things, "schem[ing] to pay ISIS and [al-Nusra Front] in exchange for permission to operate a cement plant in Syria from 2013-to 2014."[68] As Lafarge has admitted, and DOJ has confirmed, Lafarge "paid monthly 'donations' to armed groups, including ISIS and [al-Nusra Front], so that employees, customers and suppliers could traverse checkpoints controlled by the armed groups …; and eventually agreed to make payments to ISIS based on the volume of cement that LCS [LaFarge's Syrian subsidiary] sold to its customers, which Lafarge and LCS executives likened to paying "taxes."[69]

492.    The evidence set forth in Lafarge's guilty plea – without anything more – would permit a reasonable fact finder to conclude that Defendants purchased security from Islamic State and Jabhat al-Nusra just like Lafarge. Indeed, to conclude anything otherwise requires one to ignore nearly every relevant data point to how Islamic State, al-Qaeda, and al-Qaeda-in-Iraq (inclusive of Jabhat al-Nusra, which was an al-Qaeda-in-Iraq alias) operationalized their respective protection money networks in Iraq and Syria from 2004 through at least 2019.

---

[68] U.S. Dept of Justice, Lafarge Pleads Guilty to Conspiring to Provide Material Support to Foreign Terrorist Organizations (Oct. 18, 2022), https://tinyurl.com/bdf3zrew.
[69] Id.

493. First, Lafarge and Ericsson were the only two large multinational corporations on earth that made the depraved choice to continue conducting business as usual on the ground from inside Islamic State's caliphate from 2014 through 2017. For that reason alone, it is more likely than not that Ericsson purchased its security in Iraq from Islamic State pursuant to terms that were substantially like those between was purchase could have negotiated terms with Islamic State that were better than those to which Lafarge agreed.

494. Second, Islamic State's ranks were heavily populated with former al-Qaeda-in- Iraq members, who knew that Ericsson purchased security from al-Qaeda-in-Iraq for at least a decade prior to 2014. Given Ericsson's likely status as one of the largest overall corporate financiers of al-Qaeda-in-Iraq from 2003 through 2014, it is not plausible that the full universe of Islamic State's thousands of terrorists in Iraq and Syria would tolerate an outcome where Ericsson paid al-Qaeda-in-Iraq for a decade but refused to pay ISIS thereafter.

495. Third, Ericsson presented greater upside to Islamic State as a potential participant in ISIS's protection networks than did Lafarge from 2014 through 2017. Ericsson had far more money, project sites that needed protecting, valuable goods, technology, and cell phones—for which FTOs like ISIS had an insatiable appetite—that ISIS could accept in lieu of cash. Moreover, Ericsson presented ISIS with a scalable protection market opportunity that far exceeded the potential global upside associated with Lafarge. Considering Ericsson's status as the number one overall potential business partner for Islamic State during its caliphate era from 2014 through 2017, the terms of Islamic State's protection agreement with Lafarge likely represented the floor of what Defendants had to pay.

496. Lafarge's deal with Islamic State proves Islamic State's "going rate" for guaranteeing protection to a multinational corporation operating within ISIS's Caliphate was approximately

$400,000 per month: according to DOJ and Lafarge, "[f]rom August 2013 through October 2014, Lafarge and LCS paid ISIS and ANF, through intermediaries, the equivalent of approximately $5.92 million, consisting of fixed monthly 'donation' payments to ISIS and ANF, payments to ISIS-controlled suppliers to purchase raw materials, and variable payments based on the amount of cement LCS sold."[70]

497.    Moreover, in 2017, the European Parliament published an official analysis of Islamic State's protection networks in the Middle East that strongly supports the conclusions above: in its analysis concerning the protection money networks created by al-Qaeda, refined by al-Qaeda-in-Iraq, and continued by Islamic State, the European Parliament concluded that "[t]he case of the Swiss … conglomerate LafargeHolcim" was "typical of" the al-Qaeda-in-Iraq/Islamic State protection money "modus operandi" in geographies the terrorists controlled."[71] Lafarge's "management wanted to remain operational despite the seizure of territory by [Islamic State]" and therefore "obtained" Islamic State's "permission to pass through checkpoints in exchange for paying taxes." [72] Referring to Islamic State, Lafarge "admit[ted] that 'unacceptable' arrangements had been made to protect its cement factory" and "recognised that its local branch belonging to Lafarge 'handed funds over to third parties in order to come to an arrangement with a certain number of armed groups," "targeted by sanctions', without being able to identify their ultimate recipient." [73]

---

[70] See id. ($5,920,000 divided by 14 months comes out to $422,857.14). For the avoidance of all doubt, Plaintiffs believe that Lafarge's payments to al-Qaeda, al-Qaeda-in-Iraq, Jabhat al-Nusra, and Islamic State began well before August 2013, and, accordingly, that Lafarge likely routed substantially more money to FTOs than was depicted by the dollar amount set forth in the plea.

[71] European Parliament, Directorate-General for External Policies, Policy Department, The Financing of the 'Islamic State' in Iraq and Syria (ISIS), at 11 (Sept. 2017), https://tinyurl.com/yd3dy6rz. While this report was limited to Islamic State, Defendants knew, as did the European Parliament, that Islamic State followed the same protection money-related tactics, techniques, and procedures as did al-Qaeda through its branch, al-Qaeda-in-Iraq.

[72] Id.

[73] Id.

498.    From 2014 through at least 2017, Ericsson operated under nearly identical circumstances as Lafarge. Considering the European Parliament's conclusion that the Islamic State-Lafarge protection arrangement revealed by the Lafarge scandal was Islamic State's "modus operandi" for ISIS protection rackets throughout Islamic State's caliphate on both sides of the Iraqi-Syrian border. As a result, considering the European Parliament's analysis, Lafarge's and Ericsson's obvious similarities strongly supports Plaintiffs' allegations that: (i) Ericsson likely began making protection payments to Islamic State in 2014, and continued paying ISIS thereafter, until at least 2019 by making regular payments to ISIS throughout that five-year period; and (ii) Ericsson did so through Ericsson's use of illicit transactions with, or through intermediaries, which were designed to route protection payments to al-Qaeda, al-Qaeda-in-Iraq, and ISIS.

499.    On balance, given that Ericsson was far larger and wealthier than Lafarge, it is more likely than not that the rates that Islamic State and Jabhat al-Nusra charged Defendants to purchase their respective FTOs' protection in Iraq and Syria were equal to or greater than the rates ISIS charged Lafarge. Even if one merely assumes, however, that Islamic State and Jabhat al-Nusra only charged Ericsson the same per month rate that ISIS charged Lafarge, Defendants' participation in Islamic State's protection network in Iraq necessarily caused a torrent of cash and free goods to flow from Defendants to ISIS and Jabhat al-Nusra.

500.    For example, assume that Islamic State agreed to sell its protection to Ericsson for a monthly purchase price equal to the monthly rate that ISIS charged Lafarge during Islamic State's 42-month-long "caliphate" era from June 2014 until December 2017. Even such a conservative assumption, however, suggests that Ericsson likely paid Islamic State, at least, more than $17 million to buy security from ISIS monthly from June 2014 and December 2017.

Defendants Made Protection Payments To Terrorists In Afghanistan

501.    Like post-Saddam Iraq, post-9/11 Afghanistan was an extreme rarity in the international telecoms marketplace: a "virgin" geography that required a total, end-to-end reconstruction (in the case of Iraq) or construction (in the case of Afghanistan) and the attendant possibility for the outsized profits associated with being a first mover in any new market.

502.    Just as Defendants did in Iraq from 2003 until 2022, Defendants also sought to capture as much of Afghanistan's "virgin" telecoms market. To do so, Defendants followed the same "One Ericsson" approach they deployed in Iraq. Ericsson's strategy to compete in Afghanistan relied upon the close collaboration of LM Ericsson, Ericsson AB, and Ericsson Inc. Ericsson AB supported the strategy through its European office as well as its office in Pakistan ("Ericsson Pakistan") and its office in Afghanistan ("Ericsson Afghanistan").[74]

503.    After Kabul fell in April 2001, LM Ericsson and Ericsson AB quickly went to work lobbying U.S. and United Nations officials to award what they expected to be highly lucrative projects helping build a modern telecommunication system in Afghanistan.

504.    Defendants' Afghanistan-related contracts were negotiated by, supervised by, and implemented by, LM Ericsson, Ericsson AB, and Ericsson Inc., including many the same LM Ericsson and Ericsson AB officers, employees, or agents who operationalized Defendants' scheme to participate in the Global Terror Syndicate's protection money networks in Iraq – and to make the associated protection payments to the Relevant Terrorist Organizations that such groups required in order to provide their "protection" to LM Ericsson, Ericsson AB, and Ericsson Inc. facilities, convoys, goods, and personnel in Afghanistan and Pakistan.

---

[74] For much of the two decades since 9/11, Defendants collaborated to serve customers in Afghanistan through a host of Ericsson entities and personnel inside and outside of Afghanistan, including, but not limited to, LM Ericsson and Ericsson AB in Sweden, Ericsson AB's branch.

505.    Ericsson Pakistan served as Ericsson's operational, logistics, and transportation artery into Afghanistan and therefore played an essential role in Ericsson's supply of goods and services to its Afghan customers, including MTN. From 2002 through at least 2021, most of the expensive communications equipment packages that Defendants supplied to customers in Afghanistan, e.g., an RBS-6000 for MTN Afghanistan, were first manufactured and/or designed by Ericsson Inc. in the United States, then transferred to Ericsson AB for shipment to Pakistan, where Ericsson AB's local branch, Ericsson Pakistan, took custody of such equipment. Once Ericsson Pakistan received Defendants' Afghan-bound goods, Ericsson Pakistan would transport Defendants' goods overland through truck convoys that traveled through al-Qaeda and Haqqani Network-dominated areas in Pakistan (e.g, Pakistan's FATA region) before crossing into Afghanistan, where Defendants' convoys then traveled through Syndicate-dominated territory throughout Afghanistan, before reaching their destination in northern, southern, eastern, or western Afghanistan.[75] On information and belief, Ericsson Pakistan continued to play such a role even after Ericsson AB opened its Afghan branch, Ericsson Afghanistan, on or about 2012.

506.    On November 8, 2001, pursuant to Contract No. DAAB0798CD010, the U.S. Army contracted with Ericsson Inc. to provide communications equipment and network services support to the Army's Global War on Terrorism-related operations after 9/11 (the "2001 U.S. Army Counterterrorism Contract" or "2001 Contract"), which was initially valued at

---

[75] At all times, al-Qaeda and the Taliban controlled or contested the key geographies through which Ericsson Pakistan's convoys were required to travel. This was a function of the disposition of the Afghan government (which was concentrated in Afghanistan's urban areas, like Kabul) as compared to that of al-Qaeda and the Taliban (which dominated the rural and mountainous areas that comprised Afghanistan's border with Pakistan). Thus, there was no functional way for Defendants' convoys to travel from Pakistan into Afghanistan without such convoys having to travel through hundreds of miles of terrorist-controlled or contested territory, e.g., Haqqani-controlled territory on both sides of the Afghan/Pakistan border.

$4,411,243.[76] From November 8, 2001 through January 26, 2020, Ericsson Inc. continuously contracted with the Army pursuant to a series of amendments to the 2001 U.S. Army Counterterrorism Contract, under which Ericsson Inc. continuously provided communications and network services to the U.S. Army's counterterrorism forces in Afghanistan, and later Iraq, doing so from 2001 (in the case Afghanistan) and 2003 (in the case of Iraq) until, on information and belief, January 26, 2020 (in the case of both Iraq and Afghanistan), when the Army closed the contract.[77] The Army paid Ericsson Inc. at least $28,224,016 pursuant to the 2001 U.S. Army Counterterrorism Contract.

507.    In the two decades thereafter, Defendants always viewed Afghanistan as a key "virgin" market opportunity, i.e., a new market that required a complete rebuild from top to bottom, which promised unusually robust profits for Ericsson's globally integrated, end-to-end offerings. On May 29, 2012, for example, Anders Lindblad, president of LM Ericsson's Middle East Region publicly stated, inter alia, that: (i) Ericsson believed "Afghanistan has seen a tremendous amount of growth in the country's communications market over past few years"; (ii) Ericsson was "seeing significant investments" and "demand for advanced services" in Afghanistan's booming telecoms sector; and (iii) Ericsson's "Managed Services agreement" with MTN for MTN Afghanistan was "a clear sign of the Afghan telecom market's maturity

---

[76] For the avoidance of all doubt, Plaintiffs' invocation of the "Global War on Terrorism" is a reference to the various foreseeable locations under which Ericsson Inc. intended to perform under this contract, meaning, Ericsson Inc. would support the U.S. Army's counterterrorism-facing forces in the various countries to which they deployed in response to al-Qaeda-sponsored terrorism around the world after 9/11.

[77] See, e.g., 2001 U.S. Army Counterterrorism Contract, Apr. 15, 2002 Amendment (Supplemental Agreement For Work Within Scope between U.S. Army and Ericsson Inc. for which the Army paid Ericsson Inc. an additional $425,739 to Contract No. DAAB0798CD010); id., Aug. 29, 2002 Amendment (Army's exercise of an option pursuant to Contract No. DAAB0798CD010, for which the Army paid Ericsson Inc. an additional $599,999); id., Sept. 30, 2002 Amendment (additional Army funding for Ericsson Inc.'s services pursuant to Contract No. DAAB0798CD010, for which the Army paid Ericsson Inc. $1,848,839).

and [Ericsson was] confident that MTN Afghanistan [would] begin to see immediate benefits, as a result of this partnership."

508.    On information and belief, LM Ericsson, Ericsson AB, and Ericsson Inc. were parties to, or otherwise provided goods or services pursuant to, every major Ericsson contract, in or relating to, Afghanistan from 2001 through 2022, including, but not limited to, each contract set forth above, and made protection payments to al-Qaeda and the Taliban, including its Haqqani Network, in connection with all such contracts.

509.    Ericsson's payments in Afghanistan were consistent with foreign-headquartered telecommunications companies' standard operating practice on projects with comparable funding profiles, security risks, and geographical coverage in Afghanistan and Iraq. In following that standard practice, Ericsson caused protection payments to flow to terrorists that were, on information and belief, worth at least 20 to 40 percent of the value of Ericsson's Afghanistan contracts—a common rate for protection payments to Afghanistan Syndicate terrorists. As a result, across its contracts, Ericsson made payments to al-Qaeda and the Taliban, including its Haqqani Network, worth at least several million dollars per year from at least 2007 through at least 2020, the period when Ericsson and its strategic partner in Afghanistan, MTN Group and its local subsidiary, MTN Afghanistan (collectively, "MTN"), collaborated hand-in-hand to rapidly construct MTN's communications and cellular networks throughout Afghanistan from 2007 through at least 2012, and then augment MTN's networks under an end-to-end managed services agreement from 2012 through at least 2020.

510.    From 2008 until, on information and belief, 2017, Ericsson Inc. routed protection payments to al-Qaeda in Afghanistan to purchase protection on Ericsson's behalf by paying al-Qaeda in lucrative, military-grade vehicles and equipment—including, according to Colonel Tango,

"free communications equipment, including trucks, trailers, signal communications equipment, operation based sustainment equipment, phones, radios, computers, laptops, desktops, signals pieces, satellite nodes and capabilities," which "Ericsson in Iraq and Afghanistan would consciously" transfer to al-Qaeda by "leav[ing]" such goods in a mutually agreed upon area, where al-Qaeda would assume possession of them, completing the direct value transfer from Ericsson Inc. to al-Qaeda.

511.    From 2008 until 2021, Ericsson also fueled the profits that al-Qaeda and the Taliban derived from the Syndicate's protection networks in Afghanistan. Defendants did so by directly enabling, and participating in, the Taliban's manipulation of Afghanistan's cellular networks to attack Americans there. In so doing, Ericsson facilitated the rapid expansion of the Taliban's nationwide protection rackets in Afghanistan, because Ericsson's assistance enabled the key tower shutdowns upon which the Taliban protection networks relied to evade U.S. forces at night. Ericsson AB and Ericsson Inc. worked together to facilitate the Taliban's ability to sponsor acts of terrorism targeting Americans in Afghanistan.

512.    Ericsson AB and Ericsson Inc. also directly joined—alongside their partner, MTN—in the Taliban's attack on Americans in Afghanistan by directly enabling the functionality necessary for MTN to make the Taliban's scheme maximally effective.

513.    At all times, such conduct by Ericsson and its agents and allies was understood and intended by all concerned to purchase security from al-Qaeda and the Taliban, including its Haqqani Network, in Afghanistan and Pakistan to aid Ericsson's Afghanistan business.[78]

---

[78] Plaintiffs believe discovery is likely to reveal that Defendants also deployed consultants in Afghanistan and Pakistan like how they did in Iraq, but Defendants have managed, to date, to conceal the identities of any and all consultants whom they may have hired to support their business efforts in Iraq and Afghanistan. Given the nature of Ericsson's business, the consultant-heavy nature of the global telecoms industry in high-risk jurisdictions, and Defendants' own use of consultants to route protection payments to terrorists in Iraq, and bribes to others who could impact their business throughout the world, it is highly likely that Defendants followed the same playbook in Afghanistan, and also used consultants to route illicit payments there like in Iraq.

      *f.  Leaked Ericsson Documents and Subsequent Public Statements Corroborate Ericsson's Knowing Participation In Terrorist Protection-Money Networks In Afghanistan*

514.    Ericsson's public statements after its latest criminal scandal emerged in February 2022, and the revelations contained in Defendants' internal documents—first leaked and reported by the media on February 15, 2022—offer some indications of Ericsson's general policy of purchasing security from al-Qaeda-affiliated terrorists and their progeny in Afghanistan through financial assistance (e.g., protection payments to such FTOs), operational assistance to such FTOs (e.g., obstruction of U.S. counterterrorism operations to such FTOs), and logistical assistance to such FTOs (e.g., the provision of high-tech U.S. cell phones as "free goods" bribes to such FTOs), including, but not limited to:

      *a.*  The Ericsson Leak in 2022 Revealed Ericsson's Afghanistan-Facing Corporate Leadership Sponsored Protection Payments to Terrorists: Prior to at least February 15, 2022, Ericsson concealed the fact that beginning in at least 2014, senior Ericsson officers and employees who were responsible for Ericsson's business in both Iraq and Afghanistan frequently discussed Ericsson's protection payments to Sunni terrorists as the cost of doing business in the Middle East.

      *b.*  The Ericsson Leak in 2022 Revealed Ericsson's Willingness To Use "Permission Letters" To Participate in an al-Qaeda-Derived Protection Network: Prior to at least February 15, 2022, Ericsson concealed the fact that it requested "permission letters" from Islamic State terrorists in Iraq who followed the long-standing al-Qaeda protection money playbook by granting

them formal authority to work in Iraq. Ericsson's willingness to participate in an al-Qaeda-derived protection money racket in Iraq that featured permission letters between corporate participant and FTO offers further indication of similar conduct in Afghanistan, where al-Qaeda's and the Taliban's protection rackets deployed the same "permission letter" tactics that proved persuasive to Defendants in Iraq.

c.  The Ericsson Leak in 2022 Revealed Ericsson's Indifference to Funding Consequences in Extreme Terrorist Finance Environments Similar to Afghanistan: Prior to at least February 15, 2022, Ericsson concealed the fact that it had a documented track record of expressed indifference to where their money went in geographies that posed an extreme risk for terrorist finance, including, but not limited to, Iraq, Afghanistan, and Pakistan. For example, Ericsson admitted that, at best, it did not know, and until 2022 did not care, where its money went, as long as its profitable work remained unimpacted in Iraq even at the moment of arguably the greatest terrorist finance risk in western corporate history: when Islamic State operated its own geographically contiguous caliphate in Iraq and Syria from 2014 through 2017. Given Islamic State's reputation as the only Salafist terrorist organization that was even more brutal than al-Qaeda and the Taliban, if Defendants were willing to be indifferent to the funding consequences of its business in, and near, Islamic State-controlled or contested territory from at least 2014 through at least 2019, as shown by Ericsson's leaked data, the February 2022 leak revealed that Defendants likely took a substantially

similar approach to facilitate Defendants' protection payments to al-Qaeda and the Taliban in Afghanistan.

d.   The Ericsson Leak in 2022 Revealed Ericsson's Deployment of Slush Funds In Extreme Terrorist Finance Risk Environments: Prior to at least February 15, 2022, Ericsson concealed the fact that Ericsson AB's Middle East branches sponsored the operation of an uncontrolled slush fund in Iraq to permit Ericsson to route payments to FTOs in Iraq through Defendants' partners, consultants, contractors, and slush funds, which Ericsson encouraged while often avoiding the details. Given the nature of Defendants' "One Ericsson" approach, in which Ericsson AB's Middle East headquarters in the U.A.E. had full visibility into the books of Ericsson AB's branches in Iraq, Jordan, Lebanon, the U.A.E., Afghanistan, and Pakistan. A slush fund of the scale practiced by Ericsson in Iraq as revealed in February 2022 would not have been possible without Defendants' enterprise-wide corruption scheme because of the integrated nature of Ericsson's Middle Eastern business and associated controls, which enabled their Iraqi slush fund. Given that Defendants pursued their business in Afghanistan using the same regional internal controls and personnel, the February 2022 leak revealed that Defendants likely deployed a similar slush fund approach to facilitate Defendants' protection payments to al-Qaeda and the Taliban in Afghanistan.

g.   *Ericsson Inc. Made Direct Free Goods Payments Of Sensitive U.S. Origin Communications Technologies To Al-Qaeda*

515.    From at least 2008 until at least 2019, and on information and belief from on or about 2002 until 2022, Ericsson worked on numerous large contracts throughout Afghanistan, including several in or near Jalalabad, Nangarhar Province, Afghanistan, where Ericsson derived profits from several substantial relationships with customers there, including the U.S. Army and MTN, among others. Before detailing Ericsson's protection payments to al-Qaeda operatives in N2KL below, Plaintiffs first describe the local business and security environment in N2KL while Ericsson was contracted to work there.

516.    From 2001 through 2020, Ericsson Inc. provided contracted-for services to the U.S. Army in Afghanistan, including N2KL generally and Jalalabad in particular, and the U.S. government compensated Ericsson Inc. for such contractual performance, pursuant to the 2001 U.S. Army Counterterrorism Contract.

517.    Most American counterterrorism professionals viewed Afghanistan's contiguous Nangarhar, Nuristan, Kunar, and Laghman Provinces, which sat astride the border with Pakistan (or near it), as a single Afghan region collectively called "N2KL." Throughout this time, N2KL was the most important, and notorious, al-Qaeda stronghold in Afghanistan. And Jalalabad, in Nangarhar Province, was al-Qaeda's key to N2KL. As such, counterterrorism practitioners widely viewed Jalalabad as the worst, and most notorious, al-Qaeda stronghold in Afghanistan from 2001 through 2022. For example, when al-Qaeda redeployed its al-Qaeda-in-Iraq members from Iraq back to Afghanistan to support al-Qaeda's violence alongside the Taliban there, Jalalabad was among the locations chosen by al-Qaeda so that its returning members from Iraq could effectively integrate into the already-existing joint al-Qaeda-Taliban cells in Nangarhar Province and the rest of N2KL. This was the business and security environment in which Ericsson made its decisions.

518.    In 2008, Ericsson Inc. made direct free goods payments of in which it transferred sensitive U.S. origin items to al-Qaeda operatives in Nangarhar Province, Afghanistan. Given the totality of the circumstances, Ericsson Inc. also likely continued making similar "free goods" protection payments of sensitive U.S.-origin goods to al-Qaeda throughout the period from at least 2009 through at least 2017. Simply put, Ericsson Inc. faced far greater incentives to make such payments from 2009 through 2017 than it did in 2008, because al-Qaeda and its fused-at-the-hip Taliban allies in Nangarhar were as great a threat – if not greater – to Ericsson Inc. from 2009 through 2017 as they were in 2008. As a result, Ericsson Inc.'s motivation for making such payments to al-Qaeda was as great or greater from 2009 through 2017 as it was in 2008.

519.    Ericsson Inc. facilitated the flow of U.S. origin cell phones, laptops, and other similarly communications devices to al-Qaeda as protection: Ericsson Inc. decided that the cheapest way to secure Ericsson Inc.'s work in the areas of Afghanistan in which al-Qaeda was a dominant threat from attack was to pay al-Qaeda to leave them alone and instead attack other targets – like Plaintiffs and their family members.

520.    Upon information and belief, as alleged in the *Schmidt* Case Confidential Witness Colonel Tango observed Ericsson Inc. personnel in Iraq in 2003-2004 and Afghanistan in 2008 and corroborated substantial aspects of Plaintiffs' allegations that Defendants routed technology-based "free goods" to al-Qaeda as a means of purchasing protection from it. Based on Colonel Tango's personal observations in Iraq and Afghanistan, knowledge of attack data patterns, training, and counterterrorism expertise, Colonel Tango concluded, in sum and substance, that it is "likely" that Ericsson agreed to purchase security from al-Qaeda in Afghanistan by, at least, making protection payments to al-Qaeda operatives in the al-Qaeda's stronghold in the

N2KL region of eastern Afghanistan near al- Qaeda's and the Haqqani Network's historic sanctuaries in Pakistan while Colonel Tango served in Afghanistan in 2008.

521.    According to Colonel Tango, Ericsson Inc. likely operated in Afghanistan pursuant to a conscious agreement with al-Qaeda in which Ericsson Inc. directly transferred valuable U.S. origin goods to al-Qaeda as payment for the latter's provision of security to Ericsson in Afghanistan. Ericsson Inc. intentionally transferred, according to Tango, lucrative goods specifically intended for al-Qaeda's receipt: Ericsson in Iraq and Afghanistan would consciously leave free communications equipment, including trucks, trailers, signal communications equipment, operation-based sustainment equipment, phones, radios, computers, laptops, desktops, signals pieces, satellite nodes and capabilities.

522.    Colonel Tango's views as described above were based upon Colonel Tango's direct observations and the resulting conclusions that Colonel Tango drew based upon Colonel Tango's training and on-the-ground experiences and observations while deployed in Afghanistan in 2008 and Iraq in 2003-2004, including, but not limited to, Colonel Tango's knowledge concerning:

    a.    Ericsson Inc. in Afghanistan and Iraq;

    b.    al-Qaeda's attack-related tactics, techniques, and procedures in Afghanistan and Iraq;

    c.    U.S. contractors' willingness to make extreme "compromises" in eastern Afghanistan that stand out even by Afghan standards, which included substantial "free goods" transfers to al-Qaeda;

    d.    al-Qaeda's village-based protection money strategies and tactics in eastern Afghanistan, including al-Qaeda's Jalalabad stronghold in the N2KL; and

> e. observations regarding the dramatic change in the nature of the threat from al-Qaeda to U.S. personnel in the Middle East between 2003-2004 and 2008, which corroborated COL Tango's the view that al-Qaeda-inspired protection rackets targeting Americans in the Middle East had completely changed the security equation confronting U.S. servicemembers in the region by the time COL Tango deployed to Afghanistan in 2008.

523. Ericsson Inc.'s likely scheme to route high-tech U.S. communications equipment to al-Qaeda in Afghanistan offered significant benefits to both Ericsson Inc. and al-Qaeda.

524. First, Ericsson Inc.'s technology-based "free goods" payments saved Ericsson Inc., on information and belief, millions of U.S. Dollars over the life of the scheme because every piece of U.S. technology that Ericsson Inc. transferred to al-Qaeda to purchase security from the FTO represented less cash that Ericsson Inc. needed to pay to buy their protection.

525. Second, the unique facts attendant to the transportation routes in eastern Afghanistan meant that Ericsson derived greater profit by transferring such technologies to al-Qaeda. In eastern Afghanistan, such as the N2KL region, many U.S. installations were only accessible via air because al-Qaeda operatives and their Taliban allies serving together in joint cells there controlled every major ground-based chokepoint. As a result, whenever any U.S. military unit, or government contractor, operated in N2KL, they did so pursuant to strict rules designed to ensure that sensitive U.S. technology was not transferred to terrorists. To do so, the U.S. government imposed a simple rule for which there were only two lawful choices: (1) take the sensitive tech with you when you leave; or (2) destroy or disable the sensitive U.S. tech before you leave.[79]

---

[79] This principle reflected the U.S. government's universal approach for protecting sensitive technologies and data in a high-terrorist-risk environment like Iraq, Afghanistan, and Pakistan. Thus, for example, if a U.S. Army Blackhawk

526.   According to Colonel Tango, every U.S. Army contractor operating in eastern Afghanistan, including Ericsson Inc., knew that was no legal "Option 3" under which Defendants could cause the transfer such U.S. technologies to al-Qaeda in Afghanistan (like Defendants knew in Iraq, where they knew there was no "Legal Way" Defendants could send their convoys through Islamic State territory in Iraq). According to Colonel Tango, Ericsson Inc. rejected the legal way (Options 1 and 2) in favor of a highly illegal, but far more profitable, Option 3 (also like it did in Iraq)—monetize the technology as a cash equivalent with which to purchase protection from al-Qaeda in Afghanistan.

527.   Ericsson Inc. did so, according to Colonel Tango, by consciously coordinating directly with al-Qaeda operatives in eastern Afghanistan in order to transfer to al-Qaeda some of the same U.S.-origin technologies that Ericsson Inc. supplied to the U.S. Army in Afghanistan pursuant to the 2001 U.S. Army Counterterrorism Contract. Supra at II.B.3. According to Colonel Tango, Ericsson Inc. and al-Qaeda in Afghanistan accomplished such value transfers through covert tactics including the use of one or more mutually agreed upon "dead drop" locations in the vicinity of al-Qaeda's Jalalabad stronghold in Nangarhar Province. According to Colonel Tango, at such location, Ericsson Inc. personnel intentionally deposited Ericsson Inc.'s sensitive U.S.-origin communications technologies with the specific intent that al-Qaeda operatives retrieve such free goods as a bribe in exchange for al-Qaeda's protection to Ericsson Inc. in Afghanistan.

---

helicopter is shot down, Army training instructs that soldiers must protect the Army's sensitive communications technologies inside by destroying as much of the helicopter as possible (most of all its communications equipment) with an incendiary charge before leaving the area.

528.    According to Colonel Tango, Ericsson Inc.'s corrupt high-tech U.S.-origin transfers to al-Qaeda in Afghanistan in 2008 "likely" included, but may not have been limited to, free goods comprised of Ericsson's:

> a.    "communications equipment";
>
> b.    "trucks";
>
> c.    "trailers";
>
> d.    "signal communications equipment";
>
> e.    "operation based sustainment equipment";
>
> f.    "[cellular] phones";
>
> g.    "radios";
>
> h.    "computers";
>
> i.    "laptops";
>
> j.    "desktops";
>
> k.    "signals pieces"; and
>
> l.    "satellite nodes and capabilities."

529.    According to Colonel Tango, when Ericsson Inc. arranged to transfer valuable, high-tech U.S. communications technologies to al-Qaeda in Afghanistan, Ericsson Inc. did so in direct defiance of long-settled practices in the U.S. Army – and every other national-security-facing component of the U.S. government in Afghanistan – to either take the sensitive U.S. communications technologies with you when you leave a high-terrorist-risk area of Afghanistan or, if you cannot do so, destroy such items to prevent al-Qaeda and the Taliban from redeploying them in the Syndicate's terrorist campaign targeting Americans in Afghanistan.

530.    Ericsson Inc.'s direct transfers of U.S.-origin communications technologies to al-Qaeda in 2008, as described above, likely caused Defendants to flow significant value in U.S. communications technologies to al-Qaeda in Afghanistan equivalent to more than $1 million in 2008 alone. Plaintiffs' belief is based upon, inter alia:

    *a.*   the nature of Ericsson Inc.'s U.S.-origin technology in Afghanistan, which comprised expensive, state-of-the-art, military-grade communications gear that Ericsson Inc. supplied to, and maintained for, the U.S. Army's use in its counterterrorism missions targeting al-Qaeda after 9/11 pursuant to Ericsson Inc.'s 2001 U.S. Army Counterterrorism Contract;

    *b.*   the volume of Ericsson Inc.'s equipment in question, which necessarily was substantial given the fact that such equipment was supposed to have been destroyed, which necessarily meant there was a large amount of it;

    *c.*   the near-universal black market economics attendant to the re-sale of Ericsson Inc.'s goods, e.g., Ericsson's U.S.-origin cell phones, laptops, and similar decides, the cash equivalent value of which increased about 10X the moment al-Qaeda assumed possession of such goods from Ericsson Inc.; and

    *d.*   the then-prevailing rates that al-Qaeda-affiliated terrorists charged large multinational telecommunications companies, like Ericsson Inc., in exchange for al-Qaeda's agreement to provide protection.

531.    A wide range of additional conduct pursued by Ericsson, its allies, and its competitors substantially corroborates Plaintiffs' allegations. For starters, Defendants already crossed – by far – the largest hurdle to paying off al-Qaeda: a possible reluctance to do business with an FTO. Through their payments to Islamic State, however, Defendants demonstrated their

explicit willingness to approve direct transactions with FTOs like al-Qaeda when Defendants approved, and operationalized, Ericsson's participation in Islamic State's protection networks in Iraq through, inter alia, Defendants' request for, and use of, a "permission letter" from Islamic State, for which Ericsson told ISIS "please" and "thank[s]."  Ericsson Inc.'s choice to participate in al-Qaeda's protection network in eastern Afghanistan by paying al-Qaeda in high-end U.S. communications technologies from 2008 through 2017 was of a piece with Defendants' choice to participate in Islamic State's protection networks by paying ISIS money to purchase protection from 2014 until at least 2019. Ericsson's willingness to partner with ISIS in such a way, on its own, strongly suggests Plaintiffs' allegations concerning al-Qaeda are likely true.

532.    Plaintiffs' allegations that Ericsson Inc. directly assisted al-Qaeda and the Taliban through Ericsson Inc.'s routine free goods protection payments to al-Qaeda are also plausible because Ericsson Inc. confronted a similar counterterrorism choice when it helped Ericsson AB support the terrorists' manipulation of MTN's network in Afghanistan, which Ericsson Inc. did during these period (2008-2017), and in the same place (N2KL and Jalalabad), while Ericsson Inc. also worked for the U.S. Army in Afghanistan under its 2001 Contract.  When al-Qaeda and the Taliban needed Ericsson's help to attack Americans through their shared manipulation of MTN's cellular networks, Ericsson Inc. participated in their violence by knowingly provided significant technical assistance that provided valuable communications and logistics support to these terrorists' attacks against Americans in Afghanistan.

533.    Similarly, when Ericsson Inc. agreed to purchase security from al-Qaeda by paying al-Qaeda through direct free goods transfers that also bolstered the Syndicate's communications and logistics abilities—including Ericson's cell phones, sat phones, and trucks—to al-Qaeda

operatives who served the joint al-Qaeda-Taliban cells that targeted Americans throughout N2KL, it made a similarly unlawful choice to directly aid these terrorists in a manner that that would enable their attacks against Americans in Afghanistan by bolstering their communications networks and logistics chains.

534.  Plaintiffs' allegations that Ericsson Inc. provided direct, and lethal, communications- and attack-related aid to al-Qaeda through Ericsson Inc.'s "free goods" bribes to the FTO are also plausible because Ericsson Inc. also likely partnered with Ericsson AB to deliver other similarly valuable aid to the same terrorists (al-Qaeda and the Taliban), while being aware of the same inextricable connection between Ericsson's aid and al-Qaeda's resulting violence against Americans in Afghanistan (by granting al-Qaeda and the Taliban the ability to leverage MTN's and Ericsson's communications technologies to attack Americans in Afghanistan) in the same area (N2KL and Jalalabad) during the same time (2009 through 2017).

535.  Ericsson AB's deliberate choice to aid the joint al-Qaeda-Taliban cells that was responsible for all, or nearly all, the violence in N2KL from 2008 through 2021 strongly supports Plaintiffs' allegations that Ericsson Inc. purchased protection from al-Qaeda – and by extension, their joint cell members from the Taliban – by making substantial "free goods"-based protection payments to al-Qaeda in N2KL, including Jalalabad, from at least 2008 through 2017.

536.  Defendants also operated in an Afghanistan contracting environment in which the U.S. military's contractors, like Ericsson Inc., commonly purchased protection from terrorists as the cost of doing business.   Ericsson Inc.'s payments to al-Qaeda while under the 2001 U.S. Army Counterterrorism Contract was consistent with this approach.

537.    Defendants' history of using iPads and other high-end communications devices as "free goods" bribe payments to actors in Ericsson's business environment who could help or harm Ericsson further supports the plausibility of Plaintiffs' allegations.

538.    In addition, Ericsson's decades-long strategic partner in Afghanistan, MTN, was also a rapacious payor of protection money to the Syndicate.  From 2008 through today, MTN has likely paid more than $2 million per month to the Syndicate, through MTN's payments to the Taliban, including those payments that MTN routed to operatives acting for dual-hatted al-Qaeda/Taliban polyterrorist Sirajuddin Haqqani. MTN's enormous monthly payments to the Taliban substantially heighten the plausibility of Plaintiffs' allegations because it is more plausible that Ericsson Inc.'s in-country personnel would act in a manner like Defendants' strategic partner there than the alternative:  that they would stand firm against the terrorists while their key business ally in the country funded them so much.

539.    Ericsson competitors' conduct in the Afghan telecoms marketplaces further corroborates the plausibility of Plaintiffs' allegations by showing the willingness of terrorists in Afghanistan to accept donated high-tech "free goods" as a form of payment.  For example, U.S. government officials have concluded that it is likely that two of Ericsson Inc.'s largest competitors in the telecoms manufacturing space, Chinese telecoms giants Huawei Co. and ZTE Corporation, are likely to have made similar transfers of high-tech communications equipment to Syndicate terrorists in Afghanistan.  For example, on June 8, 2012, *Business Insider* confirmed – citing American "military sources" and "former and current intelligence sources" – that that "China [was] likely to remain an aggressive and capable collector of sensitive U.S. economic information and technologies."[80] Thus, "[a]nother concern raised by [U.S. military] sources

---

[80] Business Insider, *Military Sources: China Could Shut Down All The Telecommunications Technology It Sold To America* (June 8, 2012).

[was] that Huawei and the other Chinese telecommunications companies [i.e., ZTE] also provide[d] technology to Iran and the Taliban."[81]

540.    On information and belief, Ericsson Inc. continued making similar free goods bribes to al-Qaeda from at least 2009 through at least 2017, while Ericsson Inc. continued to provide substantially similar services to the U.S. Army in the same context and N2KL geographies that, collectively, caused Colonel Tango to conclude it was "likely" that Ericsson Inc. had agreed to provide such aid to al-Qaeda in 2008.  On information and belief, Ericsson Inc.'s direct transfers of U.S.-origin communications technologies to al-Qaeda through the scheme described by Colonel Tango above caused Ericsson Inc. to flow value in U.S. communications technologies to al-Qaeda each year from 2009 through 2017 that was equal to, or greater than, the value that Ericsson flowed to al-Qaeda in 2008.  Simply put, if Colonel Tango's conclusion is correct, then it necessarily follows that it is likely that Ericsson Inc. continued sponsoring such payments after 2008 because (a) the incentives for Ericsson Inc. to continue engaging in such conduct remained; and (b) Defendants continued pursuing their broader globally integrated corruption enterprise, of which payoffs to terrorists like al-Qaeda and Islamic State were a part until at least 2019.

541.    Simply put, al-Qaeda-affiliated terrorists' typically charged telecommunications- adjacent companies that sought to buy protection from al-Qaeda regular, large, six- and seven- figure payments from the companies to al-Qaeda, its allies like the Taliban, or its progeny like ISIS. Given al-Qaeda's past practices when extracting protection payments from telecommunications companies in Iraq and Afghanistan, the cash equivalent value of the free goods payments from Ericsson Inc. to al-Qaeda in Afghanistan as alleged herein were highly

---

[81] *Id.*

likely to be similarly sized as other free goods payments made to al-Qaeda and similar FTOs by other large international telecoms companies in the Middle East, and was likely worth more than $1 million as a result.[82]

542.    Independent of Defendants' free goods payments to the Syndicate, Ericsson also directly assisted the Taliban's protection networks through its manipulation of the Afghanistan cellular infrastructure on their behalf and its provision of the associated ability to manage such technologies. Through such conduct, Ericsson optimized the Taliban's protection networks anywhere in Afghanistan that featured an MTN cell tower – which was nearly everywhere in Afghanistan that the Syndicate operated by the time most Plaintiffs were attached there. Through such technical assistance to the Taliban, Ericsson directly increased the profitability of the Syndicate's protection rackets—and the al-Qaeda and Taliban acts of terrorism to which such networks were inextricably intertwined—by giving the terrorists the ability to operate their protection networks during at times and places that eluded U.S. counterterrorism operations, resulting in more Syndicate acts of terrorism that killed and maimed Americans in Afghanistan, including Plaintiffs.

Attack Disparity Data Independently Provides Sufficient Basis To Conclude Defendants Made Protection Payments To Terrorists In Iraq And Afghanistan

543.    As one of the largest multinational corporate targets for any protection money network operating in Iraq and Afghanistan since 2001, Ericsson avoided attacks at such an astonishing rate, as shown by the substantial disparities between attacks targeting Ericsson and attacks targeting others similarly situated, that Ericsson's attack disparity-related evidence is so

---

[82] The devices themselves were also weapons in the hands of al-Qaeda, which used cell phones and laptops to inter alia, detonate bombs, gather intelligence, coordinate attacks, and barter for other black market goods given such goods' status as valuable cash equivalents on the black market.

powerful that such data, alone, supports the factual conclusion that Ericsson "likely" operated in Iraq pursuant to an agreement with the Relevant Terror Organizations in which Defendants purchased security through these FTOs by routing protection payments to them.

544.    Plaintiffs have analyzed the attack patterns associated with Ericsson's work in Iraq and Afghanistan since from 2002 through 2022.

545.    Attack data from both countries reveals a substantial disparity between the frequency with which Ericsson convoys were attacked on while traveling on transportation routes knowns to be targeted by the Relevant Terror Organizations in Iraq from 2004 through 2021.

546.    The attack disparity between Ericsson's convoys and other similarly situated convoys that traveled in Iraq during this period is substantial, obvious, and measurable.

547.    From 2004 through 2014, the substantial disparity between the volume of attacks targeting Ericsson convoys in Iraq cannot be explained by any factor other than the existence of a protection agreement between Ericsson and al-Qaeda-in-Iraq, pursuant to which AQI redirected its violence away from Ericsson and towards other targets in Iraq and Syria, including Plaintiffs.

548.    From 2014 through at least 2017, the substantial disparity between the volume of attacks targeting Ericsson convoys in Iraq cannot be explained by any factor other than the existence of a protection agreement between Ericsson and Islamic State, pursuant to which ISIS redirected its violence away from Ericsson and towards other targets in Iraq and Syria, including Plaintiffs.

549.    Upon information and belief , in the *Schmidt* Case several Confidential Witnesses confirm that if a substantial disparity in the rate of attacks targeting two Western target sets in Iraq or Afghanistan exists after the counterterrorism practitioner normalizes the data between the two

target sets to enable an apples-to-apples comparison – *e.g.*, the rate of attacks targeting U.S. military convoys and Ericsson convoys traveling in the same area) between the U.S. military and Ericsson – the only plausible explanation is that the target set for which there was a substantial disparity in the direction of not being attacked was likely operating in-country pursuant to an agreement to purchase security from the al-Qaeda-affiliated terrorists in the area by making protection payments to them.

550.    Upon information and belief, one Confidential Witness in the *Schmidt* Case, corroborated that a substantial attack disparity as described above could, on its own, permit the conclusion of a protection relationship between al-Qaeda and Defendants, based upon his/her experience while serving in Iraq first with the U.S. military in Iraq in 2003-2004 and later with one of the largest private security contractors that operated in Iraq in 2006-2007.  While serving in Iraq, this *Schmidt* Case Confidential Witness had specific responsibilities for, *inter alia*, security, transportation, and force protection.  The same *Schmidt* Case Confidential Witness also learned about well-known strategies used by terrorists and Western companies alike to illicitly transfer money and goods into, and out of, Iraq. Upon information and belief, and based on the *Schmidt* Case's Confidential Witness's personal observations in Iraq, familiarity with al-Qaeda-in-Iraq insurgent strategy and tactics, government training, and specific experience in connection with protecting Western officials and contractors from attack in Iraq, the Confidential Witness concluded, in sum and substance, that a substantial disparity in the attack patterns could offer strong support that the company in question likely had an arrangement with the terrorists.

551.    On information and belief, insurance records in the custody and control of Ericsson would further confirm the substantial attack disparity between Ericsson and other similarly situated persons in Iraq.

**E.    EACH DEFENDANT FACILITATED ERICSSON'S PROTECTION PAYMENTS TO THE RELEVANT TERROR ORGANIZATIONS**

552.    Each Defendant – LM Ericsson, Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm – was an indispensable participant in Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State; the first three for the entirety of the period alleged herein, Ibrahim from at least 2014 through 2019, and Ekholm from 2017 through present.

553.    In addition to the allegations set forth in the rest of this Complaint, Plaintiffs set forth additional allegations below as to why each Defendant's conduct act facilitated Ericsson's protection payments alleged herein, and such payments would not have been possible without each Defendant's specific wrongful choices.[83]

554.    The synchronicity required for the scheme's success was consistent with Defendants' broader adherence to their "One Ericsson" business mantra. Had any Defendant chosen to resist, Ericsson's protection payments scheme would have collapsed, al-Qaeda, al- Qaeda-in-Iraq, and Islamic State would not have received vast sums of money Defendants funneled to them, and the acts of international terrorism that injured Plaintiffs may not have occurred.  For that, each Defendant is liable.

        a.    <u>LM Ericsson</u>

---

[83] For the avoidance of all doubt, Plaintiffs are not limiting their Defendant-specific allegations to this subsection. This subsection provides representative examples of the roles each Defendant played in the various key details attendant to Defendants' protection payments to al-Qaeda, al- Qaeda-in-Iraq, and Islamic State.

555.    LM Ericsson was an indispensable participant in Defendants' protection payments to the Relevant Terror Organizations. LM Ericsson's conduct actively facilitated Defendants' protection payments alleged herein, and such payments would not have been possible without LM Ericsson's specific wrongful choices.

556.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to ISIS by administering Ericsson's enterprise-wide corruption scheme, in which Defendants' willingness to pay FTOs played a key role.

557.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to flow to ISIS by deliberately constructing Ericsson's global compliance program to aid, rather than stop, illicit payments, including those to terrorists.

558.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to flow to ISIS by deliberately constructing Ericsson's global compliance program to aid, rather than stop, illicit payments, including those to terrorists.

### a.    *LM Ericsson Created And Led Ericsson's Enterprise-Wide Illicit Payments Scheme From The Late 1990s Through 2022*

559.    In the late 1990s, LM Ericsson devised and perfected Ericsson's enterprise-wide corruption scheme, which LM Ericsson, Ericsson AB, and Ericsson Inc. thereafter jointly pursued from at least the late 1990s through at least 2019. At all times throughout this period, LM Ericsson instructed, or otherwise encouraged, Ericsson's divisions and associated leadership, including Ericsson AB, Ericsson Inc., Defendant Ekholm, and/or Defendant Ibrahim, to participate in various facets of Ericsson's company-wide scheme.

560.    LM Ericsson's deliberate refusal to implement meaningful internal controls was the essential ingredient that made Defendants' enterprise-wide corruption scheme possible in the first instance. The SEC found, for example, that "Ericsson knowingly and willfully failed to

implement adequate internal accounting controls with respect to retention of consultants and agents, payment of bribes, and making improper payments."[84]

561.    "In particular," the SEC found, "Ericsson failed to implement controls to ensure the effective enforcement of its policies and procedures that, among other things, (a) required employees properly to document and account for payments to agents and consultants, including the ultimate recipients of the payments and the reasons for the payments; (b) required adequate due diligence for the retention of third-party agents and consultants; (c) required completed due diligence and a fully executed contract with a third party before the third party could begin providing services; (d) required that agreed-upon payments be commensurate with the services to be performed and that the services paid for were performed; (e) prohibited certain compensation arrangements with third parties, such as advance payments; and (f) established oversight procedures, by personnel at Ericsson's headquarters and others, to ensure that third parties were retained and paid pursuant to appropriate controls."[85]

562.    LM Ericsson encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to make and/or facilitate illicit payments to unlawful recipients in order to drive greater profits for Ericsson as a matter of unofficial Ericsson corporate policy, including to the Relevant Terror Organizations. LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to create purpose-built intermediary relationships designed to obscure Ericsson's illicit payments, including to the Relevant Terror Organizations.

563.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to design and distribute built-to-fail anti-corruption- and counterterrorism-

---

[84] *Id.* ¶ 83.
[85] *Id.* ¶ 84.

related policies and procedures that were reverse-engineered to ensure the business unit's desired illicit payment outcomes were always possible, by authorizing Ericsson AB to make them, and also by deliberately failing to prohibit payments to terrorists in the first instance, as a reflection of LM Ericsson's see no evil, hear no evil, speak no evil posture, which enabled Ericsson AB's decision to continue doing business inside Islamic State's caliphate from 2014 through 2017.

564.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to create and oversee a built-to-fail compliance program that was designed to facilitate illicit payments by concealing their existence rather than to interdict illicit payments by exposing them.

565.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to persistently lie about such conduct thereafter, including about Defendants' facilitation of protection payments to the Relevant Terror Organizations.

566.    LM Ericsson also encouraged Ericsson AB, Ericsson Inc., Defendant Ekholm, and Defendant Ibrahim to coordinate a comprehensive disinformation campaign to further amplify Ericsson's enterprise-wide corruption scheme by open letters, and press releases that were designed attempting to conceal Ericsson's misconduct through Defendants' comprehensive, whole-of-Ericsson, strategic communications scheme designed to make it easier for Defendants to make illicit payments, including their protection payments to the Relevant Terror Organizations by "reputation washing" Ericsson's *bona fides* on anti-corruption, anti-terrorism, and national security issues.

567.    LM Ericsson's creation and perfection of Ericsson's enterprise-wide corruption scheme from the late 1990s through the early 2000s was a but-for cause of Defendants' vast, nearly two-decades-long scheme of protection payments to the Relevant Terror Organizations.

568.    From the early 2000s through at least 2019, Ericsson's enterprise-wide corruption scheme consistently grew in volume, legal risk for Ericsson, and the predictably devastating outcomes for the United States in the Middle East, including Plaintiffs who were there.  The growth of all three axes – and their intersections with one another, *e.g.*, more bribes meant more DOJ risk – only heightened LM Ericsson's importance to Defendants' ability to sustain Ericsson's company-wide corruption scheme.

569.    It would have been impossible for Ericsson AB to route the totality of the protection payments alleged herein to these FTOs without LM Ericsson's creation of the broader illicit payments scheme upon which Defendants relied to route protection payments to the Relevant Terror Organizations, *e.g.*, the key Ericsson personnel, intermediaries, tactics and techniques, templates, and so on.

### b.    *LM Ericsson Secured Ericsson AB's Ability To Win The Iraq Work, And Ericsson Inc's Ability To Profit From The Iraq Work.*

570.    LM Ericsson was the but-for cause of Ericsson's decision to seek business in Iraq through the application of Ericsson's enterprise-wide corruption model.  This is so because LM Ericsson perfected the model by no later than the late 1990s, administered the application of the model throughout, and protected the model from challenge by, *inter alia*, retaliating against whistleblowers, engaging in reputation-washing on a large-scale for the specific purpose of developing the political capital and media image necessary to deflect criticism though the false narrative that Ericsson was a responsible corporate citizen rather than what it was:  a criminal.

571.    LM Ericsson played a key role in securing Ericsson AB's Iraq-related contracts, and associated financing, from sources funded or operated by the United States government, Iraqi government, and the World Bank, including each of those identified in this Complaint.  LM Ericsson's role was essential, as the underlying contracts upon which Ericsson worked in Iraq would have been impossible without the support of the United States government and the U.S. dollars flowing out of the U.S. government, World Bank, Iraqi government (from the U.S. or the World Bank in Washington, D.C.), or Iraqi customers like Zain Iraq (from the International Finance Corporation ("IFC") in Washington, D.C.)

### c.    *LM Ericsson Approved Ericsson AB's Initial Choice To Participate In Al-Qaeda's, Al-Qaeda-in-Iraq's, And Islamic State's Protection Networks.*

572.    Whenever the senior leadership of a multinational corporation operates a decades- long, enterprise-wide corruption scheme, one of the first hurdles the scheme must surmount to get off the ground is the simple gating issue of headquarters-level approval, because enterprise-wide schemes of the nature at issue here are impossible without the participation of at least some key leaders at the headquarters level.  Such was the case here:  LM Ericsson approved Ericsson AB's decision to continue operating inside of Islamic State's caliphate from 2014 through 2017.

573.    On information and belief, LM Ericsson also approved Ericsson AB's earlier decision to enter the al-Qaeda-in-Iraq protection marketplace—which Ericsson AB made, and LM Ericsson approved, on or about late 2003 or early 2004.  Plaintiffs' belief is based upon at least four factors that, when considered together, strongly support Plaintiffs' conclusion.

574.    *First*, LM Ericsson confronted the **identical illicit relationship question** in 2004 that it faced a decade later in 2014:  should LM Ericsson purchase security from violent actors in the

Iraqi marketplace by making unlawful protection payments to them?  In 2014, LM Ericsson not only chose to do so, but also supported Ericsson AB's, and Defendant Ibrahim's, steamrolling of Ericsson's in-house counsel's legal opposition to Defendants' decision to participate in Islamic State's protection rackets, which cleared the way for Ericsson AB's subsequent payments to flow through to the Relevant Terror Organizations.  The same motivations governed in 2004.

575.    *Second*, LM Ericsson faced the **identical positive economic opportunity** in 2004 that it faced in 2014:  should LM Ericsson purchase security from terrorists to inflate LM Ericsson's profits from Iraq?  In 2014, Islamic State's ascendance throughout much of Iraq motivated LM Ericsson to authorize Ericsson AB's participation in ISIS's growing protection networks and associated protection payments because LM Ericsson and Ericsson AB determined that Defendants could leverage Islamic State's protection networks to substantially increase Ericsson's profits by purchasing security through ISIS, rather than through lawful – and costlier – means.  In late 2003 and early 2004, al-Qaeda-in-Iraq's ascendance throughout much of Iraq presented LM Ericsson with an identical value proposition: make more money by paying bribes to terrorists rather than follow the law.

576.    *Third*, the Relevant Terror Organizations confronted Western corporations, including Defendants, with **substantially similar protection racket-related tactics, techniques, and procedures**, which all three FTOs practiced in the same country (Iraq) and focusing on the same customers (*e.g.*, Asiacell), administrated using the same violent tactics (use threats of harm to Western corporations' property and goods to maximize collections), pursued for the same purpose (raise money to fund terrorist attacks), and used to target the same victims (Americans in the Middle East).  Moreover, LM Ericsson benefited from substantial continuity

in with respect to its key Iraq-facing bad actors, most of all, the ability to use the same proven

cutouts whom Ericsson (and others in the Middle East) had long used to pay bribes to terrorists,

and whom Ericsson itself concluded likely did so in 2014.  As a result, LM Ericsson faced with

the same incentives and threats in late 2003 or early 2004 relevant to its decision as to whether

to authorize Ericsson AB to participate in al-Qaeda-in-Iraq's protection network and make the

associated protection payments that LM Ericsson faced in 2014.

577.    When Ericsson AB necessarily chose to participate in al-Qaeda-in-Iraq's nascent protection

rackets on or about late 2003 or early 2004, LM Ericsson confronted all the same incentives

that persuaded LM Ericsson to approve Ericsson AB's assistance to Islamic State a decade

later.  On information and belief, LM Ericsson made the same choice in late 2003 or early

2004 concerning al-Qaeda-in-Iraq as it made a decade later regarding Islamic State: pay.

### d.  LM Ericsson Supervised Ericsson AB's Subsequent Conduct While Participating in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's Protection Networks.

578.    As part of its supervision of Ericsson AB's participation in the FTOs' protection networks

in the first instance, LM Ericsson also oversaw Ericsson AB's subsequent decision- making

regarding protection payments to the Relevant Terror Organizations.

579.    LM Ericsson's supervision was important.  Defendants' protection payments to the

Relevant Terror Organizations required Defendants to navigate an unusually risky context to

sustain their scheme to pay these FTOS.  Among the other challenges they faced, Defendants

had to account for: (i) the extreme nature of the transaction, *e.g.*, bribes to terrorists; (ii) the

extreme volume of illicit payments, *e.g.*, millions of dollars per year; (iii) the extreme media

microscope that was trained on Iraq while Defendants were making their protection payments

there; (iv) the extreme terrorism risk presented by Iraq while Defendants were making their

protection payments there, which was always – by wide consensus – one of the two greatest counterterrorism threat environments globally for Americans (Afghanistan was the other), and was known as such; and (v) the extreme anti-corruption risk presented by Iraq, which always ranked, alongside Afghanistan, as among the two or three most corrupt countries on earth.

### e.  *LM Ericsson Authorized Ericsson AB's Associated Protection Payments.*

580.    LM Ericsson always approved Ericsson AB's protection payments to terrorists, each time doing so in violation of U.S. law and LM Ericsson's obligations to Ericsson's shareholders. Had LM Ericsson made the legal choice, and rejected such payments, Ericsson AB would not have facilitated them, and the Relevant Terror Organizations would not have received their money.  LM Ericsson's authorization of Ericsson AB's protection payments was thus a but-for cause of the payments being made, and LM Ericsson authorized such payments with the specific intent that Ericsson AB's money flow through to al-Qaeda, al-Qaeda- in-Iraq, and Islamic State because doing so would allow LM Ericsson and its divisions to generate greater profits.

### f.  *LM Ericsson Operationalized Ericsson AB's Protection Payment Scheme In Iraq*

581.    In addition to supervising Ericsson AB's participation in al-Qaeda, al-Qaeda-in- Iraq, and Islamic State protection networks, and associated protection payments to such FTOs, LM Ericsson also played a key role in operationalizing key facets of the scheme, which both enabled the scheme in the first instance and, once underway, made the scheme more effective— which results were exactly as LM Ericsson intended, since LM Ericsson intended to facilitate Ericsson AB's protection payments to the Relevant Terror Organizations.

582.    LM Ericsson also played a key role in Defendants' ability to continue making protection payments by implementing the rewards and punishments wielded by Ericsson as carrots and sticks in defense of Ericsson's continued ability to generate outsized profits from Iraq-related customers by participating in al-Qaeda's, al-Qaeda-in-Iraq, and Islamic State's protection money networks.  With respect to rewards, LM Ericsson approved of Ericsson AB's decisions to elevate protection-money-related-wrongdoers, like Ms. Ibrahim, to global C-Suite facing roles at LM Ericsson.  With respect to punishments, LM Ericsson operationalized Defendants' internal punishments (*e.g.*, sacking whistleblowers under absurd pretextual concerns about Ericsson's purported committed to business integrity) and external punishments (*e.g.*, waging a smear campaign in the media against a whistleblower who correctly identified bribes facilitated by LM Ericsson).  LM Ericsson's authorization of such incentives and disincentives was key to Defendants' ability to continue making protection payments for as long as they did.

### g.    LM Ericsson's CEO Personally Directed Aspects of Defendants' Protection Money Scheme In Iraq

583.    LM Ericsson's CEO, Defendant Ekholm, personally facilitated Defendants' protection payments. *Infra* at II.C.4. LM Ericsson's choice to retain Ekholm in spite of his role in their protection scheme was a ratification by LM Ericsson of Ekholm's conduct.

### h.    LM Ericsson Embraced Defendant Ibrahim, When It Should Have Fired Her, In Order To Enable The Continued Operation Of Defendants' Protection Money Scheme In Iraq

584.    From 2014 through at least 2019, LM Ericsson also helped Ericsson AB route more than $15 million to ISIS by empowering the openly criminal leadership of Ericsson Middle East, which promoted Ericsson's protection payments in Iraq, and Ericsson's co-participation, alongside MTN, the Taliban's use of MTN's cellular networks to attack Americans there.

585.    In so doing, LM Ericsson was also vital to Defendants' protection payments to Islamic State from 2014 through at least 2019 because of how LM Ericsson responded to Ms. Ibrahim's conduct and decision-making. By no later than 2014, LM Ericsson had actual knowledge – through its directors, employees, and agents, including Simpson Thacher.

586.    Defendant Ibrahim: (i) was involved in prior corruption at Ericsson in Malaysia; (ii) supported Ericsson's participation in Islamic State's protection money networks and Ericsson's associated protection payments to ISIS; and (iii) rejected the emphatic counsel of Ericsson AB's top in- house counsel for the Middle East, Tom Nygren, who urged as strongly as possible that Ericsson refrain from doing business with Islamic State and exit ISIS-controlled geographies in light of the certain terrorist finance implications that would follow from Ericsson's decision to remain inside of Islamic State's caliphate even while every other Western corporation on the ground in Iraq and Syria, other than Lafarge SA, did the opposite.

587.    In response, LM Ericsson protected, promoted, and paid Defendant Ibrahim eight (8) years – and counting – when LM Ericsson should have fired Defendant Ibrahim, at the latest, by the summer of 2014, when LM Ericsson should have also disclosed the details of her (and Defendants') conduct to, *inter alia*, DOJ, FBI, and the SEC.

588.    Defendant Ibrahim committed shocking crimes in plain view. Regardless of her obvious criminal exposure at the time, and ever since (which is vast), Ibrahim also demonstrated, in as clear a manner as a senior executive ever could, her shocking willingness to, *inter alia*: (i) cooperate with Islamic State; (ii) defy basic counterterrorism demands by the United States and the civilized world, *e.g.*, Western corporations, please exit Islamic State's caliphate; (iii) violate core and universally adopted anti-corruption principles and practices; and (iv) facilitate extreme human rights violations, including human trafficking, by ISIS.

589. On all four of the preceding points, LM Ericsson knew that Defendant Ibrahim's leadership and conduct – if allowed to continue at Ericsson – effectively guaranteed that Defendants' protection payments would continue flowing to Islamic State on and after 2014.

590. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Ericsson AB would remain substantially influenced by Ibrahim and would continue participating in Islamic State's protection networks and paying ISIS for to secure Defendants' ability to do so.

591. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that LM Ericsson would also remain substantially influenced by Ibrahim (through Ibrahim's role as a member of LM Ericsson's executive team), and LM Ericsson (including through Defendant Ekholm) would continue sponsoring Ericsson AB's and Defendant Ibrahim's participation in Islamic State's protection networks and associated protection payments to ISIS for the right to do so.

592. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Defendant Ekholm would continue to be personally influenced by Defendant Ibrahim in her capacity as a member of LM Ericsson's executive leadership team as well as, later on, her role as personal advisor to Defendant Ekholm.

593. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Ericsson Inc. would continue to serve as both the object of the sales to Iraqi customers (owing to Ericsson Inc.'s centrality on the services side), and would necessarily continue to facilitate the flow of protection payments to Islamic State as a result because Ericsson Inc.'s refusal to provide services to Iraqi

customers would have destroyed Ericsson's ability to make the payments since Ericsson Inc. was key to the entire "turnkey" approach offered by Ericsson AB in the Middle East, including Iraq.

594. LM Ericsson's conscious choice to embrace and promote Defendant Ibrahim in 2014, and continue paying and protecting Ibrahim ever since, ensured that Simpson Thacher, as agent for LM Ericsson – and, on information and belief, Ericsson AB and Ericsson Inc. – would continue to serve in a compromised posture, as Simpson Thacher's reporting chain was hopelessly compromised by Defendant Ibrahim's presence in, or ability to influence, any meaningful compliance counsel that Simpson Thacher could have provided to LM Ericsson, Ericsson AB, or Ericsson Inc. in a hypothetical world where Simpson Thacher chose to honor its legal and ethical commitments, as well as its fiduciary obligations to LM Ericsson, to interdict the ongoing crime spree sponsored Defendants, including Defendant Ibrahim.

595. LM Ericsson also always knew that Defendant Ibrahim's conduct from at least 2014 through at least 2019, if revealed to the world, would vividly expose the fraudulent nature of the Ericsson Group's, including Ericsson AB's constant public and private representations regarding opposition to terrorist groups, support for U.S. counterterrorism operations, adherence to anti-corruption laws, and promotion of human rights causes from at least 2001 through at least 2022. These four issues were not just aspirational goals – they were concrete expressions of Defendants' purported business values, which Defendants devoted enormous time and resources to amplifying for the simple reason that Defendants believed (correctly) that such branding helped Ericsson make more money. Examples of LM Ericsson's knowledge that Defendant Ibrahim's conduct, if exposed, would reveal Defendants' serial frauds concerning these four points included, but were not limited to:

*a.* **Ericsson's Purported Opposition to Terrorist Groups.** LM Ericsson publicly claimed that it staunchly opposed terrorists like Islamic State. LM Ericsson knew, however, that Ericsson actually paid ISIS, coordinated with ISIS, and even said "please" and "thank you" to ISIS, all which Defendant Ibrahim sponsored and operationalized with LM Ericsson's full knowledge and approval (in real-time, or after-the-fact).

*b.* **Ericsson's Purported Support for U.S. Counterterrorism Operations**. LM Ericsson publicly claimed that the Ericsson Group was a trustworthy counterterrorism and national security partner for the United States, and that it would support America's counterterrorism efforts. LM Ericsson knew, however, that Defendant Ibrahim, among others, had directly and shockingly sponsored Defendants' direct violation of two of the most fundamental counterterrorism demands that the United States ever asks of any multinational corporation: don't pay terrorists, and don't do business in geographies controlled by terrorists.

*c.* **Ericsson's Purported Adherence To Universal Anti-Corruption Rules**. LM Ericsson publicly claimed that the Ericsson Group adhered to widely practiced anti-corruption laws and rules, and more generally, that Ericsson was committed to anti-corruption principles as part of its commitment to social good. LM Ericsson knew, however, that Defendant Ibrahim, among others, had sponsored a wide range of anti-corruption violations of almost every imaginable stripe: bribery and protection payments, built-to- fail

internal controls, the business unit overriding the in-house lawyers' extreme compliance concerns, the list goes on.

    *d.*  **Ericsson's Purported Promotion of Human Rights, Including Education for Women and Girls**. LM Ericsson publicly claimed that the Ericsson Group was a strong supporter of human rights generally, with a strong focus on supporting education for women and girls. LM Ericsson knew, however, that Defendant Ibrahim, among others, had sponsored millions in U.S. dollar payments to a terrorist group, Islamic State, that was universally recognized in the United States, Europe, and the Middle East, as the worst human rights violator and enemy of education for women and girls on earth.

596.    Remarkably, LM Ericsson (and Ericsson AB) chose to *highlight* Defendant Ibrahim's purported support for human rights and education for women and girls. LM Ericsson did so because Defendants spent years – and, on information and belief, millions of U.S. dollars – cultivating the Ericsson Group's public image on these issues, which LM Ericsson (and Ericsson AB) believed (correctly) played a material role in helping Ericsson win more business around the world.

597.    Even simpler, though, LM Ericsson knew that Defendant Ibrahim demonstrated not just a lack of business ethics but an affirmative willingness to engage in conduct that was obviously shocking and appalling to all who were aware of it—as demonstrated by, *inter alia*, the universal scorn Ericsson received from the media and knowledgeable commentators after its secrets leaked in February 2022.

598.    In 2014, LM Ericsson knew or was willfully blind to the fact that any responsible multinational corporation in its position would promptly fire (or cause the firing of) Defendant Ibrahim.  Instead, LM Ericsson *promoted* Ms. Ibrahim, and elevated her to a new title at both

599.    Ericsson AB and LM Ericsson by virtue of her roles on an executive leadership team for the Ericsson Group and then later her elevation to personal advisor to LM Ericsson's CEO.

600.    As a result of LM Ericsson's conscious decision – starting in 2014 and continuing ever since, including through the date of this Complaint – to keep Defendant Ibrahim inside the Ericsson tent even after she did all that she did, Defendant Ibrahim continued to facilitate Defendants' participation in Islamic State's protection networks and associated protection payments to ISIS while wearing both her hat as a senior executive of Ericsson AB and her hat as a member of LM Ericsson's executive leadership team.

Ericsson AB

601.    Ericsson AB was an indispensable participant in Defendants' protection payments to the Relevant Terror Organizations.  Ericsson AB's conduct actively facilitated Defendants' protection payments alleged herein, and such payments would not have been possible without Ericsson AB's specific wrongful choices.

602.    Ericsson AB operationalized the global corruption scheme devised by LM Ericsson, including through Ericsson AB's:  (a) illicit payments to unlawful recipients in order to drive greater profits for Defendants as a matter of unofficial Ericsson corporate policy; (b) operation of purpose-built intermediary relationships designed to obscure Ericsson's illicit payments; (c) adherence to LM Ericsson's decades-long deception about such conduct thereafter; and (d) deliberately sustaining a built-to-fail compliance culture where Ericsson AB consciously avoided doing having any credible compliance function relating to Iraq so that Defendants'

ability to pay bribes to Iraqi recipients, including the Relevant Terror Organizations, would remain unfettered.

603.    Ericsson AB was necessary to operationalize LM Ericsson's decision to seek business in Iraq through the application of Ericsson's enterprise-wide corruption model.  This is so because Ericsson AB served as LM Ericsson's face, on the ground, around the world, and was responsible for conducting day-to-day operations while LM Ericsson focused on strategic matters such as communications, lobbying, legal, compliance, and crisis management.

604.    Ericsson AB, inclusive of its Iraqi branch, were the counterparties to most, if not all, the contracts in Iraq for which Defendants paid protection money to al-Qaeda, al-Qaeda-in- Iraq, and Islamic State.  Such payments would have been impossible had Ericsson AB not agreed to make such payments in order to maximize Defendants' profits associated with Ericsson AB's contracts in Iraq.

605.    Ericsson AB was a link in the decision-making chain that authorized Ericsson's protection payments to the Relevant Terror Organizations.  Ericsson AB's management always approved such payments, each time doing so in violation of, *inter alia*, United States law.  Had Ericsson AB made the legal choice, and rejected such payments, LM Ericsson could have not otherwise forced the issue because Ericsson AB could have just refused to do the work, as such work was procured with bribery in violation of U.S. law.  Instead, Ericsson AB chose to facilitate illicit payments with the specific intent that Ericsson AB's money flow through Ericsson AB's intermediaries to reach the Relevant Terror Organizations because Ericsson AB consciously sought a competitive advantage in the Iraqi marketplace by obtaining below-cost security through their protection payments to al-Qaeda, al-Qaeda-in- Iraq, and Islamic State, rather than

invest in real security or pull out of the terrorist-controlled geographies as nearly every other responsible company did at the time.

606.    Aside from directly causing Defendants' protection payments to be routed to the terrorists through Defendants' purpose-built cutouts, Ericsson AB also played an essential role in Defendants' ability to continue making protection payments by operationalizing the rewards and punishments wielded by Ericsson as carrots and sticks in defense of Ericsson's continued ability to generate outsized profits by participating in the terrorists' protection money networks. For example, Ericsson AB elevated protection-money-related-wrongdoers, like Ms. Ibrahim, to global C-Suite facing roles at LM Ericsson. Ericsson AB's participation in LM Ericsson's broader carrot/stick scheme against whistleblowers was essential to Defendants' ability to continue making protection payments for as long as they did.

607.    On information and belief, Ericsson AB also directly retained Simpson Thacher and/or Ericsson AB assented to the retention of Simpson Thacher on Ericsson AB's behalf by LM Ericsson. When Ericsson AB did so, Ericsson AB had the specific intent that Simpson Thacher deflect any United States government scrutiny concerning Ericsson's illicit payments in Iraq, including those relating to the Relevant Terror Organizations. Ericsson AB and Simpson Thacher agreed as to that course of conduct, and thereafter successfully obstructed the United States government's counterterrorism operations. This conduct was a but-for cause of Defendants' protection payments in Iraq by no later than 2014, when Ericsson AB, on information and belief, retained Simpson Thacher alongside LM Ericsson or, alternatively, assented to LM Ericsson's retention of Simpson Thacher on behalf of Ericsson AB. Ericsson AB and Simpson Thacher were aware of Defendants' payments to al-Qaeda, al- Qaeda-in-Iraq, and Islamic State, Ericsson AB and Simpson Thacher both knew such payments were illegal

and foreseeably aided acts of terrorism against Americans, and both Ericsson AB and Simpson Thacher both affirmatively chose to conceal such information from the United States government even though Ericsson AB and Simpson Thacher both had an affirmative duty of disclosure given Ericsson AB's assertion that Ericsson was fully cooperating with the then-existing U.S. government investigation of Ericsson.

608.    Ericsson AB coordinated with LM Ericsson and Defendant Ibrahim to continue Ericsson operations in Islamic State-controlled territory during its "caliphate" era from at least 2014 through at least late 2017, and Ericsson AB similarly coordinated (alongside LM Ericsson and Defendant Ibrahim) with Defendant Ekholm to continue Ericsson operations in ISIS-controlled territory throughout at least 2017, when Defendant Ekholm served as CEO of LM Ericsson, which service began on January 16, 2017.  Ericsson AB did so even though Ericsson AB knew that such continued Ericsson AB operations in ISIS-governed geographies would inevitably cause millions of dollars in additional "tax" payments by Ericsson AB, including Defendants' intermediaries, to flow through to Islamic State.  Had LM Ericsson made the lawful choice, and instructed Ericsson AB to cease operations from inside of Islamic State's caliphate, most of Defendants' protection payments to Islamic State would not have occurred.[86]

609.    As a result of the foregoing, Ericsson AB's conduct caused millions of U.S. dollars in protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq as protection payments from at least

---

[86] True, Ericsson AB would have paid the terrorists some money even had LM Ericsson told Ericsson AB to avoid ISIS's caliphate from 2014-2017 since Islamic State also extracted protection payments from businesses operating near their territory.  While Islamic State extracted substantial revenue from companies that conducted operations near to its caliphate (but not inside of it), SIS extracted far more revenue, however, from the companies that *both* remained inside their caliphate and also continued operating outside of it.  Had LM Ericsson made the responsible choice, Ericsson AB might likely would have still made some payments to ISIS, but the volume of such payments would have been lower.

2004 through at least 2014, and Ericsson AB's conduct caused millions of U.S. dollars in protection payments to flow to Islamic State each year from at least 2014 through at least 2019.

610.    On information and belief, from 2014 through at least 2019, Ericsson AB caused more than $15 million in financial transactions related to the protection payments that Ericsson AB was routing to Islamic State on behalf of itself, as well as LM Ericsson, and Ericsson Inc.

Ericsson Inc.

611.    Ericsson Inc. also actively participated in the protection payments to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State through numerous channels of support that included, but were not limited to, the examples offered below.

612.    *First*, Ericsson Inc. directly transferred sophisticated, U.S.-origin, military grade communications technologies to al-Qaeda in Afghanistan from at least 2008 through, on information and belief, at least 2017.  .

613.    *Second*, Ericsson Inc. manufactured and/or procured devices for LM Ericsson and Ericsson AB – for which Ericsson Inc. served as the U.S. division, rather than a traditional subsidiary – that Ericsson Inc. knew or recklessly disregarded were being used by LM Ericsson and Ericsson AB as currency for at protection payments to the Relevant Terror Organizations or, alternatively, to compensate the Ericsson intermediaries that made such payments.  Had Ericsson Inc. declined to perform this role, Defendants' ability to participate in, and financially benefit from, al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets would have been substantially degraded.

614.    *Third*, under Defendants' "One Ericsson" organizational framework, Ericsson Inc.'s involvement in Ericsson AB's Iraq work was necessary to sustain Defendant' flow of protection payments to the Relevant Terror Organizations.  Under Defendants' "One Ericsson" model, Ericsson organized itself as a single entity with a headquarters in Sweden and divisions,

rather than subsidiaries, in key geographies. Consistent with its "One Ericsson" approach, LM Ericsson structured Defendants' operations to minimize redundancies between "divisions" of Ericsson, e.g., Ericsson Inc., and foster interdependence amongst Ericsson's corporate family to foster seamless collaboration between geographies, divisions, and personnel.

615.    Under the resulting organizational chart, Ericsson Inc. was therefore a necessary participant in essentially all Ericsson AB work worldwide. This outcome attained regardless of whether Ericsson Inc. was a party to the contract between Ericsson and the customer in question. As a result, Ericsson Inc.'s participation in the Iraq work was a but-for cause of such work continuing: had Ericsson Inc. refused to continue servicing Iraq-related customers, Ericsson AB's ability to sustain the protection racket would have collapsed because Ericsson AB would not have been able to offer the "turnkey" engineering, network, and technical services that served as Ericsson's calling card with customers worldwide, including those in Iraq.

616.    Indeed, according to the *Schmidt* Case's Confidential Witness with direct, first-hand knowledge of LM Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the Middle East, because of Ericsson Inc.'s support to Ericsson AB, Ericsson's customers in the Middle East experienced seamless "turnkey" services support, which was one of the key value propositions Ericsson offered to its Middle Eastern customers.

617.    *Fourth*, Ericsson Inc. affirmatively chose to continue supporting LM Ericsson's and Ericsson AB's work in Iraq well after Ericsson Inc. knew, or recklessly disregarded, that LM Ericsson operated an enterprise-wide corruption program that, at a minimum, alerted Ericsson Inc. to the foreseeable risk that its LM Ericsson, which Ericsson Inc. understood to effectively be on a decades-long global white collar illicit payments crime spree lasting from at least the late 1990s through at least 2022. Ericsson Inc.'s knowledge of this fact alone, couple with

Ericsson Inc.'s continued facilitation of Defendants' work in Iraq thereafter, represented an affirmative choice by Ericsson Inc. to look the other way while its corporate affiliate applied the Ericsson playbook to Iraq, with the predictably foreseeable result that bribes would be paid to terrorist and anti-American violence would follow.

618.    From 2004 through 2022, Ericsson Inc provided its unfettered support for Defendants' business operations in Iraq while knowing that LM Ericsson and Ericsson AB operated an enterprise-wide corruption scheme.  In so doing, Ericsson Inc. consciously avoided the foreseeable – if not inescapable – result:  a company with a commitment to corruption that starts in its C-Suite (like LM Ericsson) and billions in potential profits on the line (given Iraq's distinction of being one of the only "virgin" telecoms markets in the world) in one of the most violent places in the world (Iraq), in which bribing terrorists is the more economically profitable choice (also Iraq) is likely to connect the dots, conclude that it could bribe its way to security and greater profit, and therefore pay bribes to terrorists while doing business in what was widely perceived to be the most corrupt, most violent, country on earth.

619.    *Fifth*, Ericsson Inc. provided essential support to the cross-functional Ericsson Group teams that were indispensable to Defendants' ability to regularly, and reliably, leverage Ericsson's U.S. contacts to support LM Ericsson's and Ericsson AB's Iraq-related business development efforts.  Defendants' cross-functional teams were a vital cog in their Iraq machinery because of the central role played by the United States in post-Saddam Iraq and, most of all, the lead role played by Washington, D.C.-based political, diplomatic, national security, media, and finance stakeholders.  Ericsson Inc. maintained an office in Washington, D.C. to enable the activities of Ericsson's cross-functional teams so that they could seamlessly collaborate in the most important city in the world to their business: the District of Columbia.

620.    Moreover, between the U.S. government and the World Bank, Washington, D.C. provided outsized support for Iraq's telecommunications sector, including money and technical support, related to supporting Iraq's telecoms-related procurement budgets throughout the post-Saddam era.  As a result, Ericsson Inc.'s support for Defendants' Washington, D.C.-based cross-functional team operations was a but-for cause of such teams' ability to help Ericsson land the Iraq work for which Defendants paid protection money. Had Ericsson Inc. declined to share its personnel and office in Washington, D.C., Defendants' ability to effectively compete for Iraq- related work would have evaporated because the U.S. government generally refused to provide robust financial support to companies involved in Iraqi reconstruction that did not have a meaningful presence in the United States.  Ericsson Inc.'s status as a U.S. company therefore helped Defendants seize Iraq-related opportunities because Defendants could invoke their U.S. presence to bolster their credibility as a potentially trustworthy partner for the U.S. government in a conflict zone like Iraq.

621.    *Sixth*, on information and belief, Ericsson Inc. directly supported all or nearly all of Ericsson AB's contracts with its Iraqi and Afghanistan customers related to networks and managed services.  Ericsson Inc. accomplished such support through Ericson Inc.'s direct participation in Ericsson AB's performance of all or nearly all of Ericsson's contracts with customers in Iraq and Afghanistan alleged in this Complaint.

622.    From 2001 through 2022, multinational corporations operating in the United States, Europe, and the Middle East almost universally relied upon transaction structures known as "inter-company transfers" or "inter-company transactions" to maximize corporate efficiencies while simultaneously integrating all the corporation's subsidiaries or divisions into a single

"One Company" operational structure.[87]  On information and belief, when Ericsson AB employed Ericsson Inc. to help Ericsson AB provide Ericsson's contracted-for technologies and services to Ericsson AB customers in Iraq and Afghanistan—including all such customers and contracts alleged in this Complaint, —Ericsson AB compensated Ericsson Inc. through such inter- company transactions between Ericsson AB and Ericsson Inc.  On information and belief, Ericsson AB transmitted instructions to Ericsson Inc. detailing how Ericsson Inc. was to account for the various services, goods, and personnel that Ericsson Inc. provided to Ericsson AB while participating in Ericsson AB's provision of services to Ericsson AB's customers and contracts in Iraq and Afghanistan, including every such customer and contract alleged in this Complaint.

623.    Plaintiffs' allegation is plausible based upon Ericsson's prior statements, corporate structure, and the practices of other companies like Ericsson.

624.    Ericsson Inc. knew that it and the other Defendants aided and abetted the Relevant Terror Organizations as alleged in this Complaint because, on information and belief, Ericsson Inc. earned substantial compensation through its provision of goods, services, personnel, and technologies to Ericsson AB related to Ericsson AB's contracts with Ericsson customers in Iraq and Afghanistan.  Simply put, Ericsson Inc. always knew that Ericsson AB's unethical and criminal overseas sales practices were an integral part of Ericsson's operations globally, and it is not plausible – nor would it have been credible at the time, or now – for Ericsson Inc. to have concluded that Ericsson Inc. could lawfully earn money through its participation in

---

[87] Given Ericsson's unique "divisions, not subsidiaries" corporate structure, Plaintiffs' use of this nomenclature does not mean to suggest that Plaintiffs concede the separateness between LM Ericsson, Ericsson AB, and Ericsson Inc.. For the avoidance of all doubt, Plaintiffs allege—consistent with Ericsson's admission in its guilty plea in 2019— that LM Ericsson, Ericsson AB, and Ericsson Inc. collaborated seamless together as "One Ericsson" under a corporate model that eschewed boundaries between entities in recognition of their division relationships.

Ericsson AB's provision of goods and services to Ericsson's customers in Iraq and Afghanistan once Ericsson Inc. knew – as it did all along – that Ericsson AB was committed to an enterprise-wide corruption scheme.

625.    Accordingly, when Ericsson Inc. facilitated Ericsson's protection payments, or Ericsson's other unlawful conduct in Iraq or Afghanistan alleged in this Complaint, Ericsson Inc. did so while sharing the same bases as every other Defendant for knowing that Ericsson's conduct (including Ericsson Inc.'s own conduct), aided and abetted the acts of terror committed by the Relevant Terror Organizations against Americans in the Middle East, including Plaintiffs.

626.    As a result of the foregoing, Ericsson Inc.'s conduct caused millions of U.S. dollars in protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq as protection payments from at least 2004 through at least 2014, and Ericsson Inc.'s conduct caused millions of U.S. dollars in protection payments to flow to Islamic State from at least 2014 through at least 2019.

Börje Ekholm

627.    Ekholm facilitated the payments alleged herein through his conduct as described in this Complaint, including, but not limited to, Ekholm's approval of such payments in 2017.

Rafiah Ibrahim

628.    Ibrahim knew about and, on information and belief, personally approved of Ericsson's protection payments to al-Qaeda-in-Iraq and Islamic State beginning no later than June 2014. From the moment her 2014 promotion to Head of the Middle East and Africa Market Area was announced in June, Islamic State terrorists' emergence in Iraq, including Islamic State's taking of Mosul, was top-of-mind for Ibrahim and other Ericsson employees in Iraq. Ericsson's regional leadership, including—and beginning in July, led by—Ibrahim, rejected suggestions of suspending work on Asiacell's network and instead opted to formally ask Islamic State for

permission to continue that work via hand-delivered letter. Ericsson's leadership, including Ibrahim, and Ericsson's strategic partner Asiacell were undoubtedly aware that "permission" for Western corporations to conduct business in its territory was not freely given by Islamic State (or its predecessor al-Qaeda-in-Iraq) but would come at a price. Given that Ericsson's work continued mostly unabated, it is reasonable to infer that Ericsson met Islamic State's price.

629.    Ibrahim's long and varied tenure with Ericsson suggests her familiarity with its long-documented history of surreptitiously making corrupt (and illegal) payments to third parties. For example, between 2008 and 2010, Ibrahim was Ericsson's head of the North Africa region, which spanned 11 countries, including Egypt (where she was based at the time). In 2019, when LM Ericsson entered into the DPA with DOJ and Ericsson's Egyptian subsidiary, Ericsson Egypt Ltd., pled guilty to criminal FCPA charges, both entities admitted that from 2000 to 2016, they "through various executives, employees, and affiliated entities, used third-party agents and consultants to bribe foreign government officials and/or manage off-the-books slush funds in countries where it pursued contracts to conduct telecommunications business [and that] [t]he agents were often engaged through sham contracts and paid pursuant to false invoices."

**Defendants' Protection Payments To The Relevant Terror Organizations Had A Substantial Nexus To The United States**

a.    Defendants' Conduct Relied On American Contacts

630.    Ericsson's protection payments were closely tied to the United States. Ericsson Inc. made payments through Ericsson AB or another LM Ericsson subsidiary acting as its sales agent in Iraq. Ericsson AB obtained—for the immediate benefit of Ericsson Inc. and the ultimate

benefit of LM Ericsson—contracts with the U.S. government, Iraqi government, Korek, and Asiacell, or subcontracts with other prime contractors for those same entities.

631.　As an initial matter, the claims asserted in this amended complaint arise from Ericsson's illegal conduct in conducting business in post-Saddam Iraq beginning no later than 2004. That business—building telecommunications infrastructure in post-Saddam Iraq—may never have happened without U.S. Government funding and a U.S.-based company with whom Ericsson could partner. In May 2003, shortly after the end of major combat operations in Iraq, the U.S. Department of Defense awarded a $35 million contract to U.S.-based WorldCom, Inc. (a/k/a MCI) to build a small wireless phone network in Baghdad for U.S. civilian and military personnel in Iraq, for which Ericsson agreed to provide 2,000 mobile phones. WorldCom and Ericsson also contracted to have LM Ericsson (likely through Ericsson AB) supply the equipment that WorldCom needed to build a network based on the Global System for Mobile Communication (GSM) standard, including 17 cell towers. After the U.S. Government decided to bar WorldCom/MCI from being awarded new government contracts in August 2003, Ericsson was quickly able to capitalize on its prior work to win new contracts from Iraqi network operators Korek (on or about November 2003) and ITPC (on or about November 2004)—both of whom invariably relied upon at least some U.S. Government funds to pay Ericsson for its work.

632.　Moreover, Ericsson's protection payments in Iraq required extensive involvement of U.S. personnel and facilities in the global Ericsson mobile business unit, Ericsson Inc., which operated in practice as a division of LM Ericsson's integrated structure rather than an independent subsidiary.

633.    From 2003 through 2022, LM Ericsson – the parent of both Ericsson AB and Ericsson Inc., the latter of which was its crown jewel and a wholly owned subsidiary – maintained a substantial Iraq-focused presence in the United States, including in Washington, D.C. (*i.e.*, inside this District) and the broader Washington, D.C. metropolitan area, through the Iraq-related activities, travels, transactions, and communications of LM Ericsson's officers, employees, and agents in the United States, including in this District.  For example, LM Ericsson and Ericsson Inc. always deployed cross-functional Ericsson teams who worked in Ericsson Inc.'s Washington, D.C. office on behalf of Ericsson Inc. and LM Ericsson, in order to advance Ericsson's critical global requirements, which often hinged upon access relationships with key Washington, D.C. stakeholders, government and non-government alike. According to one former leader of such LM Ericsson and Ericsson Inc. office in Washington D.C., as she/he published online, Ericsson's D.C. office aided LM Ericsson's and Ericsson Inc.'s "influencing plan[s]" in North American as well as Ericsson's "global" "plans", and coordinated directly with LM Ericsson's executives.

634.    As LM Ericsson's wholly owned subsidiary in the United States, and the entity responsible for technical innovation, mobile telephony, customer billing, and enterprise management, Ericsson Inc. was the indispensable ingredient to, and partner in, LM Ericsson's next generation network offering worldwide from 2000 through 2022, as sold by its many divisions throughout the world.  Through Ericsson Inc. and other U.S. subsidiaries, LM Ericsson also acquired U.S.-technology from, and collaborated with, other U.S.-based technology companies to design, develop, and support Ericsson products and services that were sold or provided for Ericsson's Iraqi projects and contracts during that period.  Simply put, Ericsson Inc. provided the U.S. technology (including software and intellectual property), provided the U.S. services,

and facilitated other key U.S. commercial relationships that were indispensable to the integrated networks that LM Ericsson sold to customers worldwide through Ericsson AB or other subsidiaries, including Iraq. As such, like many other multinational companies (*e.g.*, medical supply firms) that leveraged U.S. economic prowess, technical expertise, manufacturing strength, and favorable legal regime for their sales in Iraq, LM Ericsson structured its sales in Iraq to operate (through Ericsson AB or another subsidiary) as Ericsson Inc.'s exclusive representative in Iraq, consistent with decades-long Iraqi practice.

635.    Ericsson purposely availed itself of the United States, including its patent system, to position itself as the technological and service leader in several important sectors of the global telecommunications industry. Ericsson used that position, as well as a variety of products and services benefitting from Ericsson's U.S. patents, to win the lucrative contracts in Iraq and Afghanistan that gave rise to the illegal protection payments at the very heart of this action. Ericsson also acquired U.S.-based companies to fuel its growth in key business segments for which global demand, particularly in the Middle East, was expected to increase.

636.    Ericsson could not have obtained or implemented telecommunications contracts in Iraq without maintaining a substantial U.S. presence through its regular deployment of LM Ericsson and Ericsson AB officers, employees, and agents into the United States in order to, *inter alia*, coordinate with Ericsson Inc. for purposes of designing the bid strategy, executing the bid, performing the subsequent work, and managing finances, for the Iraqi contracts alleged herein, and fraudulently conceal Ericsson's facilitation of protection payments to al-Qaeda, al-Qaeda-in- Iraq, and Islamic State through false statements to LM Ericsson shareholders that LM Ericsson reached into the United States to issue, often jointly with Ericsson Inc., and sometimes through Ericsson Inc. (*i.e.*, Ericsson Inc. is the primary author of a media statement formally

on behalf of LM Ericsson). Such close cooperation was consistent with LM Ericsson's admission that its subsidiaries operate as divisions of LM Ericsson, rather than independent entities, and a hallmark of their "One Ericsson" model, which was a popular business model for trans-Atlantic multinational corporate collaboration within one family, as demonstrated by its widespread deployment by other Western industries, *e.g.*, medical supply, during Oil-for-Food and reconstruction-era Iraq.

637.    Indeed, LM Ericsson's leadership regularly acted in furtherance of Ericsson's illicit protection money scheme while physically present in the United States.  Such contacts were not fortuitous:  LM Ericsson promoted the cross-pollination of its European and American workforces.  Such practices started at the very top:  LM Ericsson's CEO, Börje Ekholm, lived and worked in the United States while leading LM Ericsson since 2017, including, on information and belief, during the period when Mr. Ekholm approved protection payments from 2017 through at least 2019.  LM Ericsson authorized Mr. Ekholm to lead them from the United States so that LM Ericsson, through Mr. Ekholm's presence in America, could leverage the unique economic, cultural, technological, and financial networks of the United States. While he led LM Ericsson as its CEO from 2017 through 2022 – including while he helped obstruct U.S. counterterror efforts – Mr. Ekholm was a Connecticut resident often working out of New York City.  In February 2022, near in time to when Ericsson's Iraq scandal broke, Mr. Ekholm sold his Connecticut home and, on information and belief, relocated to Colorado, where he now resides and has a P.O. Box.

638.    Ericsson Inc. personnel in the United States routinely supported Ericsson AB's implementation of Defendants' contracts in Iraq, just as Ericsson Inc. personnel in the U.S. did with respect to the rest of Defendants' North Middle East region, which was comprised of Iraq,

Afghanistan, Jordan, Lebanon, and Syria. Ericsson Inc.'s provision of such services to Ericsson AB's ability to perform under its Iraqi contracts and thereby enable Defendants' Iraq-derived profits, which Defendants' protection payments were designed to inflate.

639.    Ericsson's protection payments in Iraq (alleged above) involved sales of telecommunications technologies and services sourced from and/or provided largely in the United States, and Ericsson's protection payments were intended to maximize the profits that Ericsson Inc., and, by extension, LM Ericsson, derived from contracts in Iraq for the sale of Ericsson Inc.'s specialized goods and services (like, for example, the CBiO). Moreover, on information and belief, Ericsson procured many of the core radio network components for the systems they installed all over the globe, including in Iraq, from U.S.-based companies. At a minimum, Ericsson used those U.S. companies' technology in the mobile network and broadband systems Ericsson built and installed for its global customer base. For example, Ericsson bundled Ericsson Inc. services with Cisco ASR 9000 routers for its Iraqi client Korek.

640.    The object of Ericsson's network and radio contracts in Iraq, including on information and belief every contract with Asiacell and Korek, was to provide U.S.-origin technology and services, including but not limited to the RBS 6000, the Cisco ASR 9000, and the CBiO system, that were sourced in whole or in part by Ericsson Inc. or another LM Ericsson subsidiary in the United States. Each such contract was negotiated, executed, and/or serviced in whole or in part in the United States]; each required extensive communications with Ericsson Inc. personnel located in the United States; and each required Ericsson to pay protection money to terrorists as a cost of doing business in terrorist-contested areas, such that all revenue and profit flowing to Ericsson Inc. from Ericsson's Iraq business was a result in part of payments to terrorists.

Those revenues and profits were then used in turn to fund future payments to al- Qaeda, al-Qaeda-in-Iraq, and Islamic State to secure work on new projects in Iraq.

641.    Many of the projects to which Ericsson contributed protection payments were managed by and for the benefit of counterparties who were funded by one or more U.S. government components based in Washington, D.C., including, but not limited to, through USAID and the Department of Commerce. For example, in 2003, USAID began awarding contracts for the reconstruction of Iraq's telecommunications networks.  By making protection payments in connection with such projects, Ericsson breached U.S. government-based, Washington, D.C.-negotiated contractual requirements prohibiting material support to the Relevant Terror Organizations

642.    Many of the projects to which Ericsson contributed protection payments were also managed by and for the benefit of counterparties who were funded by the World Bank, through its members the IFC and the Multilateral Investment Guarantee Agency ("MIGA"), both of which were based in Washington, D.C.  For example, Zain Iraq entered into a $650 million managed services contract with Ericsson in November 2011 after securing a $400 million debt facility from IFC earlier that year. By making protection payments in connection with such projects, Ericsson breached MIGA- and IFC-based, Washington, D.C.-negotiated contractual requirements prohibiting material support to the Relevant Terror Organizations.

643.    Many—and on information and belief all—Ericsson contracts in Iraq alleged herein relied on Ericsson's contacts with the United States, and were for the purpose (in whole or in part) of generating business for Ericsson Inc.  Given the managerial role played by LM Ericsson and Ericsson AB overseeing Ericsson's Iraq business, including on behalf of Ericsson Inc., LM

Ericsson and Ericsson AB personnel often worked with and relied on Ericsson Inc.'s U.S. assets to implement Ericsson's Iraqi projects

644.    LM Ericsson's and Ericsson AB's U.S.-based contacts were important. The United States led Coalition forces in Iraq and spearheaded the civilian reconstruction effort. When other entities like the World Bank funded telecommunications projects in Iraq, they did so in close consultation with the U.S. government and in service of U.S. objectives.[88] LM Ericsson's and Ericsson AB's cooperation with their U.S. affiliates, including Ericsson Inc., was thus material in Ericsson obtaining work from its Iraqi customers, including Korek and Asiacell. Ericsson would not have obtained the Korek and Asiacell contracts alleged herein without promising close coordination with Ericsson Inc. and LM Ericsson's other subsidiaries in the United States. That was particularly true because the subject matters of the Iraqi contracts under which Ericsson was paid from 2004 through 2022 focused heavily on the development of Iraq's mobile network and associated business services solutions – the two signature roles played by Ericsson Inc. in LM Ericsson's globally integrated corporate network. LM Ericsson's work in Iraq depended on its relationship with Ericsson Inc.

645.    From 2004 until 2022, LM Ericsson – for which Ericsson Inc. served as a U.S. division – and Ericsson AB maintained a substantial presence in the United States, including Washington, D.C., through the travel, communications, transactions, and services that LM Ericsson's officers, employees, and agents obtained in, or routed via, Washington, D.C. LM Ericsson's Washington, D.C.-based agents' conduct. As *Reuters* observed a few days after LM Ericsson's

---

[88] Many, and on information and belief most, of Defendants' contracts were awarded by Iraqi customers who received World Bank funding, and as such, Defendants' Iraq-related contracts were often governed by the World Bank's standard contractual provisions, which typically required both the funding recipient (*e.g.*, Asiacell) and the prime contractor who would receive the money downstream (*e.g.*, LM Ericsson) to adhere to strict counterterrorism standards that usually included certifications and reporting requirements applicable to both funding recipient and prime contractor who deploys the World Bank's money.

Iraq scandal broke, through "[Mr.] Ekholm," LM Ericsson strategized to, and did, financially "benefit[] from Washington's diplomatic pressure against Huawei [concerning, in part, anti-terrorism issues], which drove [Huawei] out of the U.S. and most of Europe" causing Ericsson's "sales" to "soar[]."[89]

646.     LM Ericsson's presence in Washington, D.C. from 2004 until 2022 was accomplished, in part, by LM Ericsson's Washington, D.C.-based compliance and legal agents, public relations agents, lobbyists, and consulting and/or accounting firms. Some of those agents may have been retained by Ericsson Inc. via its office in Washington, D.C., acting as a division of and agent for LM Ericsson.  LM Ericsson's Washington, D.C. actions furthered both LM Ericsson's receipt of U.S. dollars from U.S.-based customers or lenders, which LM Ericsson diverted to terrorists in Iraq in the first instance, and LM Ericsson's successful concealment of its aid to terrorists and obstruction of U.S. policy thereafter. Examples of LM Ericsson's routine and direct presence in Washington, D.C. to further its Iraq-related protection payments and obstruct U.S. counterterrorism efforts include, but are not limited to:

a.   <u>LM Ericsson's DOJ and SEC-Facing Presence in Washington, D.C.</u>:

LM Ericsson routinely interacted with, and facilitated ongoing protection payments by making fraudulent Iraq-related representations, while present in Washington, D.C., to DOJ's and SEC's FCPA Units (which both received the information, and are based in, Washington, D.C.), while LM Ericsson knew of the key role played by DOJ and SEC in protecting Americans from terrorist

---

[89] Reuters, The Effect of ISIS Case for Ericsson May Go Far Beyond The Fine, republished by NoticiasFinancieras – English (Feb. 18, 2022), 2022 WLNR 5092252. Among the U.S. government's stated Huawei-related national security concerns, Huawei was, and remains, subject to significant U.S. terrorism-related allegations concerning Huawei's alleged sanctions evasion and money laundering relating to Huawei's provision of services to notorious IRGC fronts in Iran.

threats as recognized by longstanding, widely publicized, official joint DOJ/SEC pronouncements and knew that LM Ericsson's nearly decade-long concealment of vital al-Qaeda and Islamic State-related information from the U.S. government foreseeably aided such terrorists attacks targeting America and its citizens.

b. LM Ericsson's Customer- and Lender-Facing Presence in Washington, D.C.: LM Ericsson routinely deployed its officers, directors, and agents to meet with key Washington, D.C.-based customers and lenders, including U.S. government military, aid, and commercial agencies in Washington, D.C., and World Bank stakeholders whom facilitated billions in Iraq-related revenue for LM Ericsson and Ericsson Inc. which LM Ericsson secured through the artificial commercial benefits it derived from its protection payments, which themselves violated LM Ericsson's counterterrorism obligations under standard U.S. government and World Bank contracts that were ordinarily negotiated in Washington, D.C. and governed by Washington, D.C. law.

c. LM Ericsson's Media-Facing Presence in Washington, D.C.:

Through LM Ericsson's Washington, D.C.-oriented press releases, and Washington, D.C. located officers, employees, and agents—with whom LM Ericsson and Ericsson Inc. routinely cross- pollinated under LM Ericsson's unusual "division"-based integrated corporate approach (in which Ericsson Inc. and other LM Ericsson subsidiaries serve as divisions of LM Ericsson rather than in  traditional parent/subsidiary roles)—LM Ericsson routinely published joint statements with its division, Ericsson Inc (which has an agent

and office in this District) statements inside Washington, D.C. that LM Ericsson specifically intended to use to influence key Iraq-, terrorism-, and corruption-focused Washington, D.C. media outlets, Washington, D.C.-based journalists, Washington, D.C.-based opinion-makers, and Washington, D.C.-based think tanks, in order to protect LM Ericsson's associated branding, which was vital to keep LM Ericsson's Iraq-related money U.S. dollar pipeline—and Defendants' attendant protection payments to terrorists—flowing undetected until 2022. Simply put, LM Ericsson knew that its heavily U.S.-centric business would come under severe pressure in Washington, D.C. if the U.S. government learned it had been bribing anti-American terrorists responsible for beheading and blowing up Americans on camera for more than a decade.

647.    Ericsson consummated its transactions through the United States banking system, by relying upon U.S.-based accounts to obtain the cash necessary to make Ericsson's slush fund-based protection payments, and wiring the funds necessary to make Ericsson's intermediary-based protection payments. On information and belief, Ericsson relied upon the U.S. dollar (or "USD") as its currency of choice for illicit Iraq-related payments in the Middle East. Plaintiffs' belief is based upon, among other things:

  a.  the universal preference by terrorists in the Middle East for USD-denominated payments, which usually required a U.S.-based correspondent bank when the original transaction occurred in Iraq;

  b.  LM Ericsson's and Ericsson AB's historical reliance (as documented in LM Ericsson's Deferred Prosecution Agreement) on U.S. dollars routed via U.S.

banks when making other corrupt payments to Middle Eastern intermediaries, including consultants and vendors, in violation of U.S. law, as reported in the press and admitted by LM Ericsson in its Deferred Prosecution Agreement;

c. LM Ericsson's use of USD as the controlling currency in many (if not most) of its commercial agreements, including with European counterparties;

d. Ericsson's profile as a multinational enterprise that worked continuously in Iraq since the fall of Saddam, which ordinarily entailed heavy reliance upon U.S. dollars routed through the U.S. financial system given the interlocking nature of the U.S. and Iraqi systems (by design) after Saddam; and

e. Ericsson's recognition that the U.S. dollar was a better currency both for tactical reasons (the currency of choice for illicit cash transactions worldwide) and financial reasons (as the world's reserve currency).

648.    Upon information and belief, as alleged in the *Schmidt* Case, Confidential Witnesses confirm the centrality of U.S. banks and the U.S. financial system to transactions in Iraq during the post-Saddam era.  According to one Confidential Witness, for example, after the U.S. invasion of Iraq, "U.S. banks were the primary operators in Iraq . . . and the U.S. dollar was the currency that was used for everything."  Based on his/her experience, the same Confidential Witness concluded that, "the U.S. financial system was the only way any Western [multinational] company could move [significant] funds into Iraq without paying an exorbitant transaction fee like 30 percent" or using all cash, which would have been "very risky" because the company could easily get robbed.

649.    On information and belief, payments made by Ericsson AB to various Middle Eastern intermediaries, including consultants and vendors, were wired through correspondent bank

accounts in America—likely in New York, New York. For example, between 2011 and 2013, Ericsson AB made several payments from one of its Middle Eastern branch offices in Dubai to consultants with bank accounts located in the Middle East and Africa region (including in Djibouti and Qatar) for which the funds were wired through correspondent bank accounts in New York. *See* Information, *U.S. v. Telefonaktiebolaget LM Ericsson,* No. 19-CRIM-884 (S.D.N.Y. Dec. 6, 2019), at ¶¶ 42, 59, 61, 63, 105. On information and belief, some of Ericsson AB's work in Iraq was carried out from that same Dubai branch office.

650.    Ericsson's ability to leverage U.S. markets, relationships, legal protections, technologies, and intellectual property enhanced the potency of the resulting terrorist finance and logistical aid that Defendants provided to the Relevant Terror Organizations.

651.    With respect to Ericsson's cash-based protection money payments, Ericsson's ability to reliably and regularly access U.S. dollar-related bank accounts in the United States was essential to Defendants' ability to consistently make the high-dollar, U.S. dollar-denominated bulk cash protection payments demanded by the Relevant Terror Organizations. Such ability, in turn, amplified the lethality of the resulting terrorist finance that flowed through to al- Qaeda, al-Qaeda-in-Iraq, and Islamic State because the U.S. dollar was the currency of choice for all such FTOs at all times in Iraq, Afghanistan, and Syria because their ability to transact in U.S. dollars allowed them to, on net, purchase more weapons, pay more fighters, and conduct more operations, owing to the economic advantages presented by the USD over every other currency in Iraq, Afghanistan, Pakistan, Syria, Jordan, Iran, and the Persian Gulf – the jurisdictions that mattered most to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's ability to commit attacks against Americans in Iraq, Afghanistan, and Syria from 2005 through 2022.

652.    With respect to Ericsson's free goods-based protection payments, Ericsson's ability to reliably and regularly purchase brand-name American communications devices, including Apple iPads, iPhones, and similarly iconic American consumer technologies, provided a potent stream of hard-to-trace off-books cash equivalents that Ericsson—on its own, or through its intermediary partners, consultants, and subcontractors—passed along to terrorists as an alternative to cash payoffs on behalf of Ericsson in order to "protect" their business interests in high-risk markets like Iraq. For example, ever since the late 2000s, iPhones and iPads purchased from the United States have been the gold standard mobile phone of choice for illicit "free goods" donations by corporations to a recipient who can harm or hurt their business outlook. The reason is simple: iPhones and iPads were (and remain) imbued with powerful, iconic brand (and cash) value because of their association with the United States.[90] As one commentator explained in 2019, "[a] civil servant friend of mine was still offered a brand-new iPhone as a "gift" in 2016; I've yet to hear of anyone who was bribed with a Huawei."[91]

653.    LM Ericsson also depended upon access to the United States to maximize its ability to conceal its decades-long protection payment scheme from U.S. counterterrorist practitioners, because LM Ericsson depended upon U.S. relationships and service providers to operate Ericsson's entire virtual private network (or "VPN") system at Ericsson's offices in the Middle East, including Iraq, Qatar, Lebanon, and the United Arab Emirates.  The communications security afforded by the state-of-the-art, U.S.-sourced VPN enhanced Ericsson's ability to

---

[90] The foregoing is not a criticism of Apple, the U.S. consumer, or telecoms companies that sell Apple products. Ordinarily, criminals who use free iPhones and iPads obtained in the United States as a cash equivalent alternative used to facilitate corrupt payoffs in the Middle East, like Ericsson and Ericsson, do not openly disclose to their seller their intentions to use the devices purchased in the U.S. for illicit reasons overseas.  (Instead, they often cheat the sellers in the U.S. by doing things like breaking the cell phone contracts that the sellers need to earn a profit.) Ericsson, however, harbored an illicit intent, distinguishing Ericsson from manufacturers (like Apple) or consumer brands (like Best Buy) that did not double as a decades-long global corruption factory, terrorist financier, and obstructor of U.S. counterterror efforts (like Ericsson).

[91] Yuan Ren, *Opinion: Why My Chinese Dad Switched From an iPhone to a Huawei*, N.Y. Times (Jan. 5, 2019).

avoid detection of its unlawful payment schemes by the authorities, including the U.S. government.

654.    LM Ericsson also depended upon access to America to enable it to continue making protection payments after Ericsson started doing so. LM Ericsson also purposefully availed itself of the United States by reaching into the U.S. in or about 2013 or 2014 for the specific purpose of retaining a captive American law firm that LM Ericsson could, in turn, wield as a sword and shield, through the imprimatur of United States legal compliance afforded to LM Ericsson by its retention of American lawyers operating out of the Nation's capital in Washington, D.C. LM Ericsson retained Simpson Thacher for this purpose.

655.    LM Ericsson retained Simpson Thacher on or about 2013 or 2014 in order to leverage Simpson Thacher's presence in American as its agent in order to obtain numerous U.S.- only benefits on LM Ericsson's, which that enabled LM Ericsson to continue to sponsor Ericsson AB's assistance to the Relevant Terror Organizations from 2014 through 2022. For example, from 2013 or 2014 through 2022, LM Ericsson leveraged its relationship with, and benefits resulting from brand association with, Simpson Thacher, and it instrumentalized Simpson Thacher's services as a form of cover and concealment for Defendants' continuing corruption scheme, including Defendants' associated protection payments to al-Qaeda, al-Qaeda- in-Iraq, and Islamic State from 2013 or 2014 through 2022.

656.    LM Ericsson converted its U.S. contacts with Simpson Thacher into continued cover for Defendants' scheme to route protection payments to FTOs. LM Ericsson's ability to launder Ericson's compliance-related reputation by leverage Simpson Thacher's involvement as LM Ericsson's retained "reputation launderer" was important to Defendants' continued ability to route assistance to al-Qaeda and Islamic State in Iraq and Afghanistan from 2013 or 2014

through 2022.  For example, LM Ericsson was able to conceal its protection payments for at least eight (8) years while benefiting from the imprimatur of Simpson Thacher's captive-by-design reputation of Ericsson.  Thus, LM Ericsson's Simpson Thacher-related contacts with the United States, including Washington, D.C., helped Defendants continue to flow valuable assistance to the FTOs that killed and injured Plaintiffs from 2013/2014 through 2021.

657.    LM Ericsson extracted its desired-for cover-and-concealment value from its deployment of Simpson Thacher from 2013/2014 through 2022 entirely because of LM Ericsson's ability to reach into America—including inside this District—to extract substantial value for LM Ericsson—and for Ericsson AB and, on information and belief, Ericsson Inc. Ekholm, and Ibrahim—by leveraging the firm's American contacts, including those of its individual partners.  LM Ericsson's ability to extract value through its Simpson Thacher-related American contacts benefited from numerous channels of U.S. value flow from the firm to LM Ericsson based from U.S.-located value channels that included, but were not limited to:

> a. Simpson Thacher's attorneys located and licensed in the U.S., including one or more of the firm's attorneys in this District;
>
> b. Simpson Thacher's offices in the U.S., including the firm's office in this District;
>
> c. Simpson Thacher's brand in the U.S., including its reputation with important government, media, and non-profit stakeholders in this District; and
>
> d. Simpson Thacher's networks in the U.S., including those in this District.

658.    LM Ericsson could not have leveraged Simpson Thacher's eight-year-long reputation washing exercise on Ericsson's behalf into the potent, terrorist-enabling assistance such conduct enabled without the needed cover provided to LM Ericsson's based upon  Ericsson's

ability to represent its business partners and investors, among others, that Ericsson was represented by a United States law firm with offices in Washington, D.C., from and through which LM Ericsson could—on its own behalf, and on behalf of Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm—continue to manage any of the predictably foreseeable Washington, D.C.- related fallout from LM Ericsson's long-standing, enterprise-wide, corruption scheme, including Ericsson's associated protection payments to the Relevant Terror Organizations.

659.    LM Ericsson's conduct caused millions of U.S. dollars in protection payments to flow to al-Qaeda, al-Qaeda-in-Iraq as protection payments from at least 2004 through at least 2014, and LM Ericsson's conduct caused millions of U.S. dollars in protection payments to flow to Islamic State from at least 2014 through at least 2019.

Defendants' Conduct Targeted The United States

660.    At all relevant times, Defendants knew that the Taliban was targeting the United States. The Taliban did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, the Taliban directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that it could inflict pain in the United States and influence U.S. policy.  As the U.S. Attorney for the Southern District of New York stated, the "Haqqani Network and the Taliban have been and are engaged in highly public acts of terrorism against U.S. interests, including U.S. and coalition forces in Afghanistan."[92]  And the Taliban's ultimate, publicly stated goal was to effect a withdrawal of U.S. forces from Afghanistan.  Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

---

[92] Press Release, U.S. Dept of Justice, *Manhattan U.S. Attorney Announces Extradition Of OFAC-Sanctioned Afghan Man For Narco-Terrorism Offenses* (Feb. 6, 2019).

661.    Ericsson made direct payments to the Relevant Terror Organizations knowing that each FTO would use Ericsson's payments to target U.S. citizens in terrorist attacks. Those payments were no accident. Ericsson intentionally directed its money to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State, and intentionally aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist campaigns, in exchange for each FTO's agreement to route its attacks away from Ericsson's business interests and toward U.S. forces instead.

662.    Ericsson's decision to pay protection money to the Relevant Terror Organizations was also expressly aimed at the United States, because when making those payments, LM Ericsson, Ericsson AB, and Ericsson Inc. knew they were aiding al-Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks that were designed specifically to influence U.S. policy by killing and injuring American personnel.

**Defendants' Protection Payments To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda And Al-Qaeda-In-Iraq Acts of International Terrorism Against Americans In Iraq, Syria, And Afghanistan**

1.    Al-Qaeda Relied Upon Protection Money And Donations To Fund Its Terrorist Attacks Against Americans In Iraq, Syria, And Afghanistan

663.    From 2004 through 2014, al-Qaeda's protection rackets in Iraq and Syria provided substantial cash flow to both al-Qaeda's local branches in Iraq and Syria, but also al-Qaeda's "core" leadership in Afghanistan and Pakistan. Al-Qaeda continuously operated, and profited from, al-Qaeda-in-Iraq's protection rackets until al-Qaeda-in-Iraq split with al-Qaeda in 2014 to become Islamic State. In so doing, al-Qaeda's network, like a multinational enterprise with operations in more than 60 countries, seamlessly moved its protection money profits between branches, like al-Qaeda-in-Iraq, and al-Qaeda core.

664.    For decades, al-Qaeda has relied upon protection money payments and donations as key sources of revenues to finance its terrorist operations. In so doing, al-Qaeda doctrine

emphasized taking advantage of the protection money opportunities afforded by environments in which the central state was weak, corruption was endemic, and al-Qaeda had (or could quickly manufacture) a strong presence.

665.    Throughout the 1990s, al-Qaeda funded its operations through two primary income streams: protection rackets and donations. Al-Qaeda extracted protection payments and large contributions from businesses in the Persian Gulf, which al-Qaeda used to fund operations that targeted Americans and its allies in the Middle East.

666.    Al-Qaeda's decades-long doctrinal emphasis on fundraising through the collection of protection money – which al-Qaeda sometimes referred to as "taxes," "donations," "fees," or *zakat* – was also a reflection of bin Laden's and al-Qaeda's organizational, obsession with securing regular, predictable, income streams that were less susceptible to interdiction by al-Qaeda's Western enemies.

667.    Al-Qaeda's reliance on protection money as a foundation of its global network intensified after 9/11. Al-Qaeda recognized, as deceased al-Qaeda financial chief Sa'id al-Masri stated, "without money, jihad stops." Accordingly, al-Qaeda and its branches generated significant "tax" revenue by exploiting the business communities in Iraq and Syria through sophisticated protection rackets throughout those countries, even extracting payments for the use of public highways.

668.    Al-Qaeda core directly oversaw – and profited from – the protection rackets operated by al-Qaeda branches, including al-Qaeda-in-Iraq. by installing at least one trusted al- Qaeda core terrorist into the protection money operation of each al-Qaeda branch. In Iraq, for example, al-Qaeda core's protection money designee was a personal representative of bin Laden who reported to him directly.

669.    Al-Qaeda's strategy in Iraq and other geographies key to its ability to launch attacks in Iraq (*e.g.*, Syria, Jordan, and Afghanistan) also included wiping out any opposition within the protection rackets from anyone not belonging to an al-Qaeda-affiliated (and al-Qaeda- dues-paying) group so that al-Qaeda (including its branches) could exercise a monopoly on the best protection rackets in Iraq and other al-Qaeda-contested geographies.

### a.    *Defendants' Cash-Based Protection Payments To Al-Qaeda Aided and Abetted Al-Qaeda's Acts of Terrorism*

670.    By 2011, al-Qaeda and its branches had targeted Iraq, Afghanistan, Syria, and Turkey as the best places to kill Americans, and al-Qaeda and its branches had developed and fully operationalized industrial-scale protection rackets designed to finance operations by both al-Qaeda core and its regional allies in all three countries, having built its rackets in Iraq and parts of Syria by 2004, in Afghanistan by 2005-2006, and in most of the rest Syria by 2011.

671.    Al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra also cross-pollinated the funds they raised from protection rackets in Iraq and Syria because all three FTOs relied upon the same networks of financiers in Iraq and Syria.

672.    While al-Qaeda's branches in Iraq and Syria were the first al-Qaeda allies after 9/11 to pursue industrial-scale protection rackets to fund attacks, they were not the last.

673.    While al-Qaeda was pursuing its full-scale terrorist campaign in Iraq from 2003 through 2005, al-Qaeda and its allies in Afghanistan, including the Taliban and the Taliban's Haqqani Network, were carefully studying al-Qaeda's terrorist campaign in Iraq to optimize their ability to attack and kill Americans in Afghanistan (and Iraq).

674.    Under al-Qaeda's tutelage – and following more than two years of "proof of concept" in Iraq courtesy of al-Qaeda's Iraqi branch – the Taliban imported al-Qaeda's and al- Qaeda-in-Iraq's protection money playbook and strategy into Afghanistan, just as the Taliban imported

al-Qaeda-derived attack tactics.  For example, the Taliban (including its Haqqani Network) imported al-Qaeda's calcium ammonium nitrate fertilizer-based bomb strategy from al-Qaeda-in-Iraq.

675.    From 2004 through at least 2014, al-Qaeda and al-Qaeda-in-Iraq jointly ran their sophisticated protection money operation in Iraq and Syria to finance their operations in, among other places, Iraq, Syria, Afghanistan, and Pakistan.  The proceeds from that protection money operation funded their terrorist attacks against Americans in Afghanistan, Iraq, and Syria, from at least 2004 through at least 2019.

### b. *Defendants' Free Goods-Based Protection Payments, Including High-Tech, U.S.-Origin Cell Phones and Laptops, Aided and Abetted Al-Qaeda's Acts of Terrorism*

676.    Defendants' choice to transfer U.S.-origin cell phones was inextricably connected to the acts of terrorism committed by Al-Qaeda and the Taliban in Afghanistan because the Syndicate could use nearly every feature of Defendants' cell phones as a weapon with which to attack Americans.  Defendants' direct transfer of military-grade, U.S.-origin communications technologies to al-Qaeda as a form of "free goods" protection payments assisted al-Qaeda to devastating effect by causing more frequent, effective, and lethal al-Qaeda and Taliban suicide attacks, IED strikes, and complex attacks.  In the hands of al-Qaeda, sophisticated communications technologies were a weapon that targeted the United States and its citizens in Afghanistan and Iraq, and were vital to al-Qaeda's ability to enable attacks against Americans.

677.    In 2010, Eric Schmidt, then Google's Chair and CEO, and Jared Cohen, then the Director of Google Ideas, noted, among other things:

      *a.*    "[F]or all the inspiring stories and moments of hope abetted by the use of connection technologies, the potential of such technologies to be manipulated or used in dangerous ways should not be underestimated. The world's most

… violent transnational groups— from al Qaeda … to the … Taliban—are effectively using technology to bring on new recruits, terrify local populations, and threaten democratic institutions. …"

b.  "The same encryption technologies used by dissidents and activists to hide their private communications and personal data from the state are used by would-be terrorists…"

c.  "Afghanistan's telecommunications networks provide a useful case study … Since U.S. and NATO forces first launched military operations there in 2001, cell-phone access in Afghanistan has grown from zero to 30 percent. … At the same time, the Taliban have become increasingly savvy about using mobile technology to malicious and deadly effect. Taliban militants have used cell phones to coordinate attacks, threaten local populations, and hold local businesses hostage …"

d.  "In February 2009, Taliban inmates in Kabul's Policharki prison used cell phones to orchestrate a number of coordinated attacks on Afghan government ministries.

e.  In Afghanistan—and Iraq, too—it is not uncommon for insurgents to use cell phones to detonate roadside bombs remotely."[93]

678.  Defendants' assistance was inextricably intertwined with al-Qaeda violence in Afghanistan for at least [XXXX] reasons.

679.  **<u>Weapons.</u>**  Defendants' "free goods" payments of free cell phones also armed al-Qaeda because Defendants' free phones were, themselves, weapons when wielded by Syndicate

---

[93] Eric Schmidt and Jared Cohen, *The Digital Disruption: Connectivity and the Diffusion of Power*, Foreign Affairs, Vol. 89, Issue 6 (Nov. 1, 2010), 2010 WLNR 28476557.

terrorists.  By 2008, while "cell phone[s]" were "[n]othing special in America," cell phones were "having a profound effect in Afghanistan[,]" where "[m]any Afghans now rel[ied] on cell phones, as [did] Taliban militants."[94] As the *Associated Press* reported at the time, "Taliban" "militant fighters rely on mobile phones to communicate and coordinate their operations."[95]

680.    Al-Qaeda and the Taliban also used deployed some of Defendants' "free goods" donations of cell phones as part of their IEDs, using the phones to detonate the bombs that killed Americans in Afghanistan, including on information and belief many Plaintiffs.[96]  By 2005, "[i]t [was] an irony of the digital age that technology ha[d] aided the security forces in detecting and thwarting terrorist operations … helped terrorists do their evil."[97] "High-tech communication" technologies, including "[c]ell phones," in the hands of an al-Qaeda operative after 9/11, constituted a "weapon at the disposal of" the al-Qaeda "terrorist" because "[c]ell phones" "were a key in" Al-Qaeda's ability to execute "coordinated attack[s]," including "suicide terrorist attack[s]," which attacks were "facilitated by" al-Qaeda's access to "hi-tech communications" technologies, including "[c]ell phones."[98]  Moreover, when the Syndicate's IED campaign intensified in 2009-2010, so did its reliance on cell phones, which remained a key detonator.[99]

---

[94] NPR Morning Edition, *Cell Phones Connect Afghans to Rest of World* (Feb. 26, 2008), 2008 WLNR 3764701.

[95] Noor Khan, *Taliban Destroy 2 Phone Towers in Southern Afghanistan*, AP DataStream (Mar. 2, 2008).

[96] *See, e.g.*, AllAfrica.com English, *Terrorists Drew World's Attention in Madrid* (Apr. 2, 2004) ("Technology has also linked al-Qaeda to the Madrid bombings. Al-Hayat claims that an Islamist source revealed to the newspaper that al-Qaeda trained its fighters in Afghanistan to use mobile phones for setting off explosive devices. The source told al-Hayat that the explosions on the trains were triggered by mobile phones with alarm clocks set to go off at a specific time.").

[97] James D. Zirin (Member, Council on Foreign Relations), *Terrorism in the Digital Age*, Wash. Times (Dec. 6, 2005), 2005 WLNR 19631068; United News of Bangladesh, *Bomb at Pakistan Shiite Procession Kills 7* (Nov. 24, 2012) ("Officials say Taliban frequently use cellular phones as remote detonators for bomb attacks.").

[98] *Id.*

[99] *See, e.g.*, CNN Newsroom, *Goes Green; Updates on Major Accident on Missouri's I-44 Crash- Part 1*, AP Alert–Environment (Aug. 6, 2010) (CNN reporting that "the Taliban us[ed] IEDs in a deadly campaign of intimidation against Afghan villagers," the Taliban's "IEDs" were "the top killers of American and coalition forces," "often made of cheap materials like fertilizer" and "detonated by" "something as simple as a cell phone").

681.    **Funding.**  Moreover, when Ericsson Inc. provided free communications technologies to al-

Qaeda, Ericsson Inc. provided the terrorists a cash equivalent that sponsored tremendous

violence given the going rate of $2,000 per black market cell phone.[100]  Defendants' "free

goods" deliveries of U.S.-origin cell phones to al-Qaeda carried outsized value as a "free

goods" protection payment to such terrorists because the centrality of cellular phones in

Afghanistan ensured their status as one of the single most valuable items any person, including

any terrorist, could possess.  As the *Sydney Morning Herald* explained, from 2004 onward,

"[c]ommunications [were] vastly better" in Afghanistan and, as a result, "Afghans who [could]

afford a mobile phone ***clutch[ed] them like talismans***; even the Taliban spokesman avail[ed]

himself of the best technology: a satellite phone with an automatic message bank that

respond[ed] in 10 languages."[101]

682.    Defendants' "free goods" deliveries of U.S. origin communications technologies to al-

Qaeda also aided the terrorists' fundraising campaigns because it gave the Syndicate the

technical tools they required to send communications to others requesting (or demanding)

payments, including, but not limited to, sending text messages to Afghans soliciting *zakat*

contributions and sending messages to companies, including Defendants, soliciting protection

payments or, if such terms were already agreed upon, reminding that a payment was due.[102]

---

[100] The going rate for a "clean" American cell phone on the black market is a 10X markup.  The phones that get busted out into this market are ordinarily priced at around $200 per phone (because the annual contract heavily subsidizes the device itself).  Thus, when black market sellers flip an ordinary American cell phone, they can expect to earn about $2,000 per black market cell phone.

[101] Paul McGeough, *In the Shadow of the Guns*, Sydney Morning Herald (Aug. 27, 2005), 2005 WLNR 28183961.

[102] *See*, *e.g.*, Rachel Ehrenfeld and John Wood, *Funding Terror; New Technology Terrorists Can Use*, Wash. Times (Mar. 15, 2007) ("We are on the cusp of a new era of terror financing, that of mobile payments or 'm-payments.' … Are Hamas, al Qaeda, Hezbollah and their likes far behind?  Soon, every mobile-phone owner will be able to send money, pay bills and make purchases anywhere, anytime. … Without the implementation of a real-time digital anti-money- laundering compliance framework, the m-payment system is well suited to become the 'killer application' for

683.    Defendants' "free goods" payments of U.S.-origin communications technologies, including cell phones, to al-Qaeda also allowed al-Qaeda to maintain its cell phone stockpile without spending as many previous U.S. Dollars to do so, providing the FTO a substantial logistical and financial windfall.  In 2006 the *Independent* reported on the common experience, reflected by the example of an Afghan's experience in the Taliban's stronghold of Kandahar, that "the Taliban in his district [had] little money but they ha[d] mobile phones."[103]

684.    **Communications.**  Al-Qaeda depended upon a vast stockpile of cell phones in order to conduct its global terrorist enterprise in Afghanistan, Pakistan, the U.A.E., Iran, and the other key geographies worldwide from which al-Qaeda facilitated terrorist attacks against Americans in Afghanistan and Iraq.  When Defendants provided "free" U.S.-origin cell phones to al-Qaeda, they furnished a key supply of untraceable phones to the terrorists that aided their communications, attack planning, attack operations, logistics, propaganda, smuggling, and travels – every facet of the terrorists' enterprise targeting Americans in Afghanistan and Iraq.

685.    Al-Qaeda alone, for example, required tens of thousands of untraceable mobile phones each year for the thousands of operatives it deployed in Afghanistan and Pakistan in support of the attacks.   For example, in 2002, media accounts noted that "[t]housands of al Qaeda members hiding in Pakistan use[d] cell phones,"[104] while, "[i]n Afghanistan, al Qaida were using top-of-the-range cellular phones,"[105] both of which trends always endured.

---

money laundering and terror financing. All you need is a stored value card and m-payments enabled mobile phone and carrier …[for] members of Hamas and Hezbollah in the United States to send money back to the Middle East, or to each other all over the world … [including in areas like] Dubai[,] … a well-known conduit for al Qaeda, Hamas and Hezbollah funding."), 2007 WLNR 4912741.

[103] Nelofer Pazira, *Taliban's Terror Tactics Reconquer Afghanistan*, Independent on Sunday (UK) (August 20, 2006), 2006 WLNR 17604097.

[104] Ralph Joseph, *Chemical Labs Show Al Qaeda Still Active*, Wash. Times (Oct. 6, 2002), 2002 WLNR 383410.

[105] Phil Hazlewood and Tom Whitehead, *Role of Aircraft Patrolling Skies*, PA News (Feb. 13, 2003).

686.    Defendants' transfer of U.S.-origin communications technologies to al-Qaeda also directly facilitated communications between forward deployed al-Qaeda and Taliban, including Haqqani Network, terrorists in Afghanistan and their leadership in Pakistan, which accelerated the pace of the Syndicate's attack planning and logistics-related communications, causing more al-Qaeda and Taliban attacks against Americans in Afghanistan. Defendants' free cell phones were vital because, given the nature of communications between Afghanistan and Pakistan, "telecommunication" technologies were "[t]he only way" that "Taliban commanders" at "Taliban headquarters in Pakistan" could communicate with "Taliban" "field commanders in Afghanistan and outside actors in" other countries,[106] *e.g.*, al-Qaeda.

687.    **Tradecraft.** Defendants' technology-based free goods bribes were also easier to conceal given how Defendants leveraged black markets to cover their tracks. On information and belief, Ericsson Inc. supplied free U.S. origin communications technologies to al-Qaeda because Ericsson Inc. understood that al-Qaeda and its allies, like other terrorist groups, long emphasized exploiting black markets to derive untraceable terrorist cash flow, which Ericsson Inc. leveraged to further conceal Defendants' assistance.

688.    **Logistics.** Defendants' "free goods" deliveries of U.S.-origin communications technologies, including cell phones, also provided direct logistical support to al-Qaeda by furnishing untraceable, valuable, cell phones, which the Syndicate could use to communicate with one another to securely coordinate smuggling, transportation, attack plans, and the like.

Defendants' Value Flow To Al-Qaeda And Al-Qaeda-In-Iraq Aided And Abetted Al-Qaeda's And Al-Qaeda-In-Iraq's Attacks Against Americans In Iraq, Syria, And Afghanistan From At Least 2005 Through At Least 2017

---

[106] Stewart Bell, *Canada Listening In On Taliban Exchanges*, National Post (May 1, 2007), 2007 WLNR 28591271.

689.    From 2004 through 2014, al-Qaeda's protection rackets in Iraq and Syria provided substantial cash flow to both al-Qaeda's local branches in Iraq and Syria and to al-Qaeda's "core" leadership in Afghanistan and Pakistan. Al-Qaeda continuously operated, and profited from, al-Qaeda-in-Iraq's protection rackets until al-Qaeda-in-Iraq split with al-Qaeda in 2014 to become Islamic State. In so doing, al-Qaeda's network, like a multinational enterprise with operations in more than 60 countries, seamlessly moved its protection money profits between branches, like al-Qaeda-in-Iraq, and al-Qaeda core.

690.    Al-Qaeda and al-Qaeda-in-Iraq viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was to expel the United States from the entire region to facilitate an al-Qaeda-led caliphate there.

691.    Osama bin Laden repeatedly called for al-Qaeda supporters from around the world, including Iraq, to facilitate al-Qaeda's attacks against Americans in Iraq and Afghanistan through public statements between 2001 through 2011.

692.    Under al-Qaeda's organizational structure, a substantial portion of the value that flowed to al-Qaeda-in-Iraq while it operated as an al-Qaeda branch from October 2004 through February 2014 flowed through to al-Qaeda's "core" in Afghanistan and Pakistan. This occurred because al-Qaeda and al-Qaeda-in-Iraq conducted an integrated campaign against the United States in Iraq and Afghanistan, through which al-Qaeda-in-Iraq flowed funds, fighters, training and expertise, and logistical aid to al-Qaeda in Afghanistan and Pakistan, facilitating al-Qaeda's and its Syndicate allies' attacks against Americans in Afghanistan from at least 2006 through at least 2017.

693.    The U.S. government agreed.  For example, in June and July 2006, the U.S. government publicly emphasized the intimate relationship between al-Qaeda core in Afghanistan/Pakistan and al-Qaeda-in-Iraq in public statements or publications:

a.    U.S. officials published an authenticated bin Laden audiotape in which bin Laden called for holy war in Iraq and stated that al-Qaeda's "banner of jihad ha[d] not fallen" and al- Qaeda vowed to "keep up [al-Qaeda's and its branches'] fight to bleed [the United States'] money dry, kill [America's] men so that ([U.S.] forces) go home defeated" and al-Qaeda and its branches would "continue [their] fight against [America and Americans] everywhere, in Iraq, in Afghanistan, in Somalia and in Sudan";

b.    U.S. officials publicly stated that bin Laden had publicly mourned Zarqawi and urged his and Zarqawi's supporters to continue to attack Americans in Iraq;

c.    U.S. officials publicly stated that bin Laden's public statements reflected "a recognition on [bin Laden's] part how important Al-Qaeda in Iraq [was] in pursuing Al-Qaeda's central strategy"; and

d.    U.S. officials publicly stated that "Ayyub al-Masri [was] an Egyptian national and a senior Al-Qaeda leader in Iraq" who was '[t]rained in Afghanistan and Pakistan," and served as "an explosives expert specializing in the construction of Vehicle-Borne [IEDs], the same bombs responsible for large numbers of US troop casualties."

a.    ***Funds Raised In Iraq And Syria By Al-Qaeda And Al-Qaeda-In-Iraq Funded Al-Qaeda And Al-Qaeda-In-Iraq Attacks In Iraq, Syria, And Afghanistan***

694.    From 2004 until 2014, al-Qaeda and al-Qaeda-in-Iraq relied upon the same parent/subsidiary-inspired, al-Qaeda-designed, al-Qaeda-in-Iraq-executed protection rackets to optimize al-Qaeda's global terrorist capabilities by ensuring that al-Qaeda core leveraged al-Qaeda-in-Iraq's network through al-Qaeda core's receipt of a percentage of all income from al-Qaeda-in-Iraq's protection money racket, all of which was in accordance with the Qaeda core's protection money playbook used by bin Laden and his lieutenants.

695.    Al-Qaeda directly and substantially participated in al-Qaeda-in-Iraq's protection rackets through al-Qaeda's personnel and practice.  Al-Qaeda installed al-Qaeda "core" lieutenants into the al-Qaeda-in-Iraq's protection money bureaucracy inside Iraq to ensure that al-Qaeda core received its proper share.  Al-Qaeda core also ensured that al-Qaeda-in-Iraq also operated purpose-built bureaucracies designed to route a percentage of all al-Qaeda-in-Iraq back to al-Qaeda "core" in Afghanistan and Pakistan to facilitate al-Qaeda's global jihad against Americans.  Among other things, al-Qaeda-in-Iraq maintained an internal account known as the "General Treasury," which al-Qaeda-in-Iraq used to flow a percentage of all its Iraq-based income back to al-Qaeda "core" in Afghanistan and Pakistan.

696.    Senior al-Qaeda core terrorists documented their need for funds from al-Qaeda-in-Iraq in order to conduct attacks against Americans in Afghanistan.  In July 2005, for example, Zawahiri instructed Zarqawi to transmit $100,000 to al-Qaeda in Afghanistan.  Similarly, in May 2007, Shaykh Mustafa Abu al-Yazid, a senior al-Qaeda leader in Afghanistan, highlighted al-Qaeda core's desperate need for funds from al-Qaeda's Iraqi branch:

> As for the needs of the Jihad in Afghanistan, the first of them is financial. The Mujahideen of the Taliban … lack funds. And there are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of Jihad. They also need personnel from their Arab brothers and their brothers from other countries in all spheres: military, scientific, informational and otherwise. And here we would like to

point out that those who perform Jihad with their wealth should be certain to only send the funds to those responsible for finances and no other party, as to do otherwise leads to disunity and differences in the ranks of the Mujahideen.

697.    While al-Qaeda and its branches' names evolved over time, this core relationship between protection money and two-way positive cash flow for al-Qaeda and its allies in Iraq, Syria, Afghanistan, and Pakistan remained constant at all relevant times.[107]

698.    Al-Qaeda-in-Iraq directly funded al-Qaeda "core" from 2004 through 2014 through at least four channels, usually through U.S. dollar-denominated payments. *First*, al- Qaeda-in-Iraq made large U.S. dollar-denominated cash payments to al-Qaeda core upon the latter's request, which were smuggled by al-Qaeda and/or al-Qaeda-in-Iraq operatives from Iraq, Syria, and the Persian Gulf (where they raised money) to al-Qaeda core in Afghanistan and Pakistan. *Second*, al-Qaeda-in-Iraq paid al-Qaeda core a percentage of its net income (or "excess funding") befitting its status as a branch of al-Qaeda. *Third*, al-Qaeda-in-Iraq provided vital logistical aid that enabled al-Qaeda core's other money-making rackets to generate more cash flow.  For example, al-Qaeda-in-Iraq helped al-Qaeda core move narcotics through Iraq and into the Middle East for distribution, which generated cash flow for al-Qaeda core and its ally, the Taliban, in Afghanistan and Pakistan. *Fourth*, al-Qaeda-in-Iraq's successful attacks also directly strengthened al-Qaeda core's ability to raise funds and sign new recruits (who ordinarily contributed to both al-Qaeda and al-Qaeda-in-Iraq) in order to facilitate attacks against Americans in Afghanistan by materially strengthening al-Qaeda's ability to successfully present bin Laden's strategic narrative to the broader pool of global terrorist-curious followers whom were choosing between al-Qaeda and another organization by giving

---

[107] Even after al-Qaeda and ISIS split in 2014, the same protection rackets continued to fund the global operations of both FTOs and their respective regional affiliates worldwide.

al-Qaeda the ability to present itself to prospective financiers and new terrorist recruits as both the senior leader of the global jihadist cause and the terrorist organization with the greatest capabilities and track record of killing Americans after 9/11, which helped it raise more money.

699.    Between 2004 and 2014, Al-Qaeda-in-Iraq collectively routed more than one million U.S. dollars per year, in cash, goods, labor, and other value, to al-Qaeda core in Afghanistan and Pakistan. The Relevant Terrorist Organizations used that cash to facilitate attacks against Americans in Afghanistan, including those Plaintiffs killed and/or injured as a result of the Intercontinental Hotel, Park Palace Hotel and Expulsion Attacks.

### b.  *Al-Qaeda Redeployed Al-Qaeda-In-Iraq Terrorists To Afghanistan And Pakistan To Facilitate Al-Qaeda's Attacks Against Americans In Afghanistan*

700.    Zarqawi himself recognized that Iraq was but one front in al-Qaeda's larger transnational campaign against the United States. As Zarqawi promised (in writing), if al-Qaeda failed in Iraq, al-Qaeda's al-Qaeda-in-Iraq operatives would, as Zarqawi put it, "pack out [their] bags and search for another land, as is the sad, recurrent story in the arenas of jihad."

701.    From the 1990s through 2021, the mountainous areas in the Afghanistan/Pakistan border were always the world's most iconic safe haven for al-Qaeda and its members.

702.    Consistent with this ethos, al-Qaeda regularly redeployed al-Qaeda-in-Iraq terrorists to Afghanistan and Pakistan in order to facilitate al-Qaeda's attacks against Americans in Afghanistan and Pakistan (where the al-Qaeda-in-Iraq terrorists were folded into pre-existing joint al-Qaeda/Taliban cells) and Iraq (through the relationships that al-Qaeda-in-Iraq terrorists developed while deployed in Afghanistan and Pakistan).

703.    In so doing, al-Qaeda core and al-Qaeda-in-Iraq were simply following the time-honored al-Qaeda playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed,

or cross-pollinated, with al-Qaeda terrorists in other theaters. Al-Qaeda did this time and again from the 1990s through 2021, including with respect to the movement of its terrorists into, and out of, Afghanistan, Somalia, Sudan, Bosnia, Chechnya, Iraq, and Syria.

704.    Al-Qaeda's use of al-Qaeda-in-Iraq terrorists in Afghanistan and Pakistan began under Zarqawi, who deployed elite al-Qaeda-in-Iraq terrorist operatives to Afghanistan to demonstrate his (and al-Qaeda-in-Iraq's) subordinate status and as tribute to bin Laden. This approach was consistent with Zarqawi's, and bin Laden's, desire for al-Qaeda-in-Iraq to support terrorist operations by al-Qaeda's other branches worldwide.

705.    Al-Qaeda's use of al-Qaeda-in-Iraq terrorists in Afghanistan and Pakistan intensified dramatically from 2006 through 2010, when a substantial portion of al-Qaeda-in- Iraq's terrorists in Iraq, including hundreds of fighters in the leadership and senior ranks, fled Iraq for al-Qaeda's historic mountainous safe havens in Afghanistan and Pakistan.  Al-Qaeda-in-Iraq terrorists continued redeploying from Iraq to Afghanistan until at least 2014.

706.    Al-Qaeda's strategy of having al-Qaeda-in-Iraq terrorists melt back to Afghanistan and Pakistan to augment the joint al-Qaeda/Taliban cells there from 2006 through 2014 reflected al-Qaeda's view, shared amongst jihadists around the world at the time, that Afghanistan offered strong prospects of victory over the Americans.

707.    Al-Qaeda facilitated these redeployments, which were like prior al-Qaeda redeployments out of parts of Afghanistan in the months following 9/11.  Most non-Iraqi or non- Syrian Arabs who joined al-Qaeda-in-Iraq and later departed Iraq or Syria joined al-Qaeda in Afghanistan and Pakistan, where such terrorists often had pre-existing relationships through their training, travel, finance, or indoctrination; most of the Iraqi and Syrian members of al-Qaeda-in- Iraq melted away to Syria, where they benefited from centuries-old tribal and smuggling networks.

Indeed, it was not uncommon for an al-Qaeda-in-Iraq terrorist to retreat first to Syria (from Iraq) and then to Afghanistan or Pakistan (from Syria).

708.    Al-Qaeda-in-Iraq terrorists whom al-Qaeda redeployed to Afghanistan and Pakistan were amongst the most elite of al-Qaeda's operatives worldwide, having survived the Darwinian process in Iraq through which U.S. forces eliminated the less capable operatives. As a result, these al-Qaeda-in-Iraq terrorists greatly augmented the capabilities and experience of the joint al-Qaeda/Taliban cells they served in Afghanistan and Pakistan, including the effectiveness of al-Qaeda's suicide bomb, IED, and complex attacks.

709.    Given their extraordinary capabilities, al-Qaeda strategically marbled its al-Qaeda-in-Iraq operatives throughout al-Qaeda's organization in Afghanistan and Pakistan, with a particular emphasis on reinforcing the existing al-Qaeda strongholds in Nangarhar, Nuristan, Kunar, and Laghman Provinces (al-Qaeda's historic headquarters in Afghanistan), Ghazni Province (where al-Qaeda terrorist Ahemed Jan Wazir led a joint al-Qaeda/Taliban cell that attacked Americans in Ghazni while also functioning as part of the Kabul Attack Network), and the Haqqani-controlled territories in Afghanistan and Pakistan (where a new generation of al-Qaeda terrorists, like Sirajuddin Haqqani, led al-Qaeda's campaign in Afghanistan and Pakistan after 9/11, including its attacks targeting Americans in Kabul).

710.    Al-Qaeda-in-Iraq collectively routed at least hundreds of terrorists to al-Qaeda core in Afghanistan and Pakistan each year from 2004 through 2014, whom al-Qaeda core used to facilitate attacks against Americans in Afghanistan from 2004 through at least 2017.

### c.   *Al-Qaeda Facilitated Al-Qaeda-In-Iraq's Provision Of Key Training And Expertise To Terrorists Targeting Americans In Afghanistan*

711.    Al-Qaeda organized al-Qaeda-in-Iraq so that the latter could provide training and expertise to the former – and its allies. Al-Qaeda and al-Qaeda-in-Iraq, along with most Islamists,

viewed Iraq as the central front against America from 2003 through at least 2007. Al- Qaeda and al-Qaeda-in-Iraq worked to make the insurgency in Iraq what Afghanistan was to the earlier generation of jihadists — a melting pot for jihadists from around the world, a training ground, and an indoctrination center. In so doing, al-Qaeda and al-Qaeda-in-Iraq ensured that a substantial number of fighters who had traveled to Iraq could return to their home countries, augmented with new skills and experienced existing extremist networks in the communities to which they returned.

712.    Al-Qaeda-in-Iraq terrorists publicly confirmed their status as teachers of terror to allied Islamists around the world. For example, in 2007, senior al-Qaeda-in-Iraq terrorist Abu Omar al-Baghdadi publicly boasted, "one of the (enemy) devils was right in saying that if Afghanistan was a school of terror, then Iraq is a university of terrorism. … The fear of the American [M]arines has disappeared from the hearts of the people of the world, as the mujahideen have become thousands from the few … after the fall of the infidel Baath regime."

713.    Al-Qaeda's use of al-Qaeda-in-Iraq trainers provided another key mechanism through which al-Qaeda facilitated attacks against Americans in Afghanistan. Before 9/11, al- Qaeda operated training camps in eastern Afghanistan at the Taliban's request. By 2005, al- Qaeda began bringing AQI instructors from Iraq to train the Taliban how to fight Americans.

714.    Al-Qaeda depended upon al-Qaeda-in-Iraq for Iraq-experienced operatives, who furnished training and expertise to al-Qaeda core and al-Qaeda's allies in Afghanistan, including the Taliban and its Haqqani Network. This allowed al-Qaeda-in-Iraq to export tactical innovations gleaned in Iraq to al-Qaeda's terrorists and their partners operating in Afghanistan and Pakistan. As Mullah Dadullah, a key Taliban commander, publicly stated in 2006, "we have 'give and take' relations with the mujahidin in Iraq."

715.    Such cross-pollination benefits extended to the Haqqani Network as well. For example, al-Qaeda leveraged al-Qaeda-in-Iraq trainers to teach the Haqqanis how to conduct suicide bomb attacks against Americans based upon innovations and lessons learned from Iraq.

716.    The training continued throughout the relevant timeframe of this case. In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province – both reportedly hosted by the Taliban. One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.

717.    Al-Qaeda also facilitated relationships between al-Qaeda-in-Iraq and al-Qaeda and Taliban (including Haqqani Network) terrorists based in Afghanistan and Pakistan, through which such groups' Afghanistan and Pakistan-based terrorists traveled to Iraq and embedded with al-Qaeda-in-Iraq to attack Americans as part of what al-Qaeda euphemistically termed "live fire training exercises" before returning to Afghanistan and Pakistan with their new skills. Through al-Qaeda-facilitated, al-Qaeda-in-Iraq-furnished, live-fire training exercises in Iraq, al- Qaeda and the Taliban, including its Haqqani Network, enhanced the lethality of their suicide bomb, IED, and complex attacks against Americans in Afghanistan.

718.    Al-Qaeda's use of al-Qaeda/al-Qaeda-in-Iraq polyterrorist trainers revolutionized al-Qaeda's use of suicide bombings, IEDs, and complex attacks in Afghanistan, and directly enhanced the lethality of the joint al-Qaeda/Taliban cells that committed the attacks that killed and injured Plaintiffs in Afghanistan. Through its al- Qaeda-in-Iraq trainers, al-Qaeda was able to train more terrorists, build more bombs, plan more attacks, and execute more operations during that period.

719.    Al-Qaeda-in-Iraq's training of al-Qaeda's and the Taliban's Afghanistan and Pakistan operatives occurred in a range of training camps around the world including, but not limited to, camps in Afghanistan, Pakistan, Iraq, Iran, Syria, and Somalia.

720.    Al-Qaeda-in-Iraq trainers provided al-Qaeda terrorists and their allies in Afghanistan and Pakistan with lessons learned from Iraq that offered cross-cutting efficiencies for al-Qaeda's terrorist enterprise in Afghanistan and Pakistan.  For example, al-Qaeda-in-Iraq terrorists helped al-Qaeda import sophisticated bomb triggers, design concepts, and proven strategies to defeat American countermeasures, all of which enhanced al-Qaeda's and its partners' IED and suicide bomb attacks against Americans in Afghanistan.

### d.  *Al-Qaeda-In-Iraq Provided Logistical Aid To Al-Qaeda Core*

721.    Al-Qaeda doctrine emphasized leveraging the logistical strengths of al-Qaeda's branches to facilitate operations by al-Qaeda core. Al-Qaeda and al-Qaeda-in-Iraq recognized that al-Qaeda's operations against the United States in Iraq, Syria, Afghanistan, and Pakistan were part of a single al-Qaeda campaign that was linked by common financial, human recourses, travel, and communications needs.

722.    As a legacy of the extensive network that Zarqawi and his lieutenants built from the late 1990s through 2006, al-Qaeda-in-Iraq at all times until 2014 operated extensive and sophisticated logistics networks inside Iraq, which were supported by al-Qaeda-in-Iraq's extensive logistics network throughout the Middle East, North Africa, and Europe, including, but not limited to, Iran, Afghanistan, and Pakistan. Within Iraq, al-Qaeda-in-Iraq had dedicated logistics officers for each province, who coordinated with al-Qaeda-in-Iraq's Finance Council to ensure that money, terrorists, and material flowed where necessary to maximize the lethality of al-Qaeda-in-Iraq's campaign against the United States in the Middle East.

723.    Al-Qaeda leveraged al-Qaeda-in-Iraq's extensive global logistics networks to fund, arm, equip, and manage al-Qaeda's terrorist campaign in Afghanistan and Pakistan.

724.    Al-Qaeda's strategy of leveraging the logistics networks of its branches, like al- Qaeda-in-Iraq, was one of the core mechanisms through which al-Qaeda facilitated al-Qaeda core's own operations in Afghanistan and Pakistan.

725.    Through al-Qaeda-in-Iraq's global logistics network, al-Qaeda raised funds, recruited new terrorists, and facilitated transactions on the Taliban's behalf, all of which facilitated attacks against Americans in Afghanistan by joint al-Qaeda/Taliban cells there.

**Defendants' Protection Payments To Islamic State Aided And Abetted Islamic State Acts of International Terrorism Against Americans In France, Belgium, And Afghanistan**

1.    <u>Islamic State Relied Upon Protection Money Payments And Donations To Fund Its Terrorist Attacks Against Americans In France, Belgium, And Afghanistan</u>

726.    Islamic State also modeled al-Qaeda's and al-Qaeda-in-Iraq's doctrinal emphasis on the use of protection rackets and donations as two cornerstones of the group's terrorist finance strategy. In so doing, Islamic State adopted the same tactics, techniques and procedures as practiced by al-Qaeda and al-Qaeda-in-Iraq.

727.    From 2014 through 2021, Islamic State relied upon sophisticated protection rackets in Iraq and Syria to finance Islamic State's operations in Iraq and Syria, as well as Islamic State's operations through key Islamic State branches, including its branch in Afghanistan, as well as in Europe, including in France and Belgium.

2.    <u>Defendants' Value Flow To Islamic State Aided And Abetted Islamic State's Attacks Against Americans In France, Belgium, And Afghanistan From 2014 Through 2022</u>

728.    Islamic State viewed their operations in Afghanistan, Pakistan, Iraq, Iran, Syria, and the Persian Gulf as a single integrated campaign whose purpose was to expel the United States from the entire region to facilitate Islamic State's caliphate there.

729.    Abu Bakr al-Baghdadi, the leader of Islamic State until his death in 2019, repeatedly called for Islamic State supporters worldwide to facilitate Islamic State's attacks against Americans in Iraq, Afghanistan, Syria, and Turkey through his public statements from 2014 through 2019.

730.    Having himself taken refuge with Zarqawi's former allies in the Datta Khel region of North Waziristan, Pakistan between 2012 and 2013, Baghdadi's history confirms the interconnections between Islamic State's activities in Iraq/Syria and Afghanistan/Pakistan.

731.    Under Islamic State's organizational structure, copycatted from al-Qaeda, a substantial portion of the value that flowed to Islamic State in Iraq and Syria from 2014 thought at least 2022 flowed through Islamic State's "core" there and benefited Islamic State's "Khorosan" branch in Afghanistan and Pakistan.  This occurred because Islamic State conducted an integrated campaign against the United States in Iraq, Syria, Afghanistan, and Pakistan through which Islamic State's "core" in Iraq and Syria flowed funds, fighters, training and expertise, and logistical aid to Islamic State's branch in Afghanistan and Pakistan, facilitating Islamic State's attacks against Americans in Afghanistan from 2014 through 2021, including the August 2021 suicide bomber attack at Kabul International Airport, which killed 13 Americans, including Lance Corporal Jared M. Schmitz and Sergeant Nicole Gee, whose family are among the Plaintiffs.

a.    ***Islamic State Funds Raised In Iraq And Syria Funded Islamic State Attacks In Iraq, Syria, And Afghanistan***

732.    Islamic State generally copied or absorbed al-Qaeda's and al-Qaeda-in-Iraq's approach to sharing funds between geographies, as well as al-Qaeda's and al-Qaeda-in-Iraq's universal preference for U.S. dollars.

733.    From 2014 through 2021, Islamic State's fundraising activities in Iraq and Syria directly funded Islamic State's branch in Afghanistan and followed at least five practices that were clearly inspired by al-Qaeda.

734.    *First*, from 2014 through 2017, Islamic State's "core" in Iraq and Syria provided the essential "start-up capital" that Islamic State's branch in Afghanistan and Pakistan relied on to establish itself.

735.    *Second*, Islamic State's "core" in Iraq and Syria made regular cash payments to Islamic State's branch in Afghanistan and Pakistan for the specific purpose of facilitating the latter's attacks against Americans.

736.    *Third*, Islamic State's "core" in Iraq and Syria provided key logistical aid that enabled Islamic State's branch in Afghanistan and Pakistan to derive more cash from Islamic State's money-making rackets in South Asia.  For example, Islamic State's "core" helped Islamic State's branch in Afghanistan and Pakistan move fundraisers through the key Middle Eastern geographies in which Islamic State solicited donations.

737.    *Fourth*, Islamic State's successful attacks in Iraq also directly strengthened the ability of Islamic State's branch in Afghanistan and Pakistan ability to raise funds and sign new recruits (who ordinarily financially contributed to Islamic State) in order to facilitate attacks against Americans in Afghanistan by materially strengthening Islamic State's sales pitch to ability to successfully present Baghdadi's strategic narrative to the broader pool of global

738.   terrorist-curious followers whom were choosing between Islamic State and another organization (like al-Qaeda) by giving Islamic State the ability to present itself to such prospective financiers and new terrorist recruits as both the senior leader of the global jihadist cause, but also the one with the greatest capabilities and track record of success killing Americans after 9/11.

739.   *Fifth*, Islamic State's "core" in Iraq and Syria stockpiled its cash haul from Iraqi and Syrian protection rackets throughout Iraq from 2014 through 2017 in anticipation of a global insurgency thereafter.  Such cash stockpiles totaled hundreds of millions of U.S. dollars and continued to facilitate attacks by Islamic State and its branches thought at least 2022.

740.   From 2014 through 2021, Islamic State's "core" in Iraq and Syria collectively routed millions of U.S. dollars' worth of cash, goods, and other value to Islamic State's branch in Afghanistan and Pakistan, including at least several hundred thousand U.S. dollars per year derived from its protection rackets in Iraq, which Islamic State used to facilitate attacks against Americans in Afghanistan during that same period.

   **b.   *Islamic State Redeployed Its Iraq and Syria Based Terrorists To Afghanistan And Pakistan To Establish And Lead Islamic State's Branch There***

741.   Islamic State continued al-Qaeda's and al-Qaeda-in-Iraq's practice of redeploying terrorists from Iraq and Syria to Afghanistan and Pakistan in order to facilitate terrorist attacks against Americans in Afghanistan and Pakistan (where the arriving Islamic State terrorists were folded into pre-existing Islamic State cells in the border region) and Iraq and Syria (through the relationships that Islamic State terrorists developed while in Afghanistan and Pakistan).

742.   In so doing, Islamic State followed al-Qaeda's time-honored playbook, in which al-Qaeda terrorists operating in one theater regularly redeployed to, or cross-pollinated with, terrorists

in other theaters. Al-Qaeda and al-Qaeda-in-Iraq, from whose ranks Islamic State populated its fighters, routinely did the same from the 1990s thought at least 2022.

743.    Islamic State's strategy of having Islamic State "core" terrorists in Iraq and Syria melt back into Afghanistan and Pakistan to augment the Islamic State branch there from 2014 thought at least 2022 followed the al-Qaeda playbook and reflected Islamic State's view, shared amongst jihadists around the world at the time, that its loss of a caliphate in Iraq and Syria was merely a setback, and Afghanistan offered the strongest prospect of victory over the Americans.

744.    Islamic State "core" terrorists from Iraq and Syria whom Islamic State redeployed to its branch in Afghanistan and Pakistan were among the most elite of Islamic State's operatives worldwide, having survived the Darwinian process in Iraq in which U.S. forces eliminated the less capable operatives. As a result, these Islamic State terrorists greatly augmented the capabilities and experience of Islamic State cells they served while in Afghanistan and Pakistan, including the effectiveness of Islamic State's suicide bomb attacks.

745.    Islamic State's use of Islamic State "core" terrorists in Iraq and Syria to facilitate the operations of Islamic State's branch in Afghanistan and Pakistan began with the formation of the Afghanistan/Pakistan branch, which was accomplished by the flow of at least hundreds of hardened Islamic State veterans from Iraq in 2014 and 2015 and the continued flow of such Islamic State "core" terrorists thought at least 2022.

746.    On December 27, 2016, Russia, China, and Pakistan publicly warned that Islamic State activity in Iraq and Syria was generating a new Islamic State threat in Afghanistan and Pakistan. Their warnings were validated only weeks later when Islamic State executed a massive suicide bomb attack in Kabul, Afghanistan on February 7, 2017, followed by another

spectacular attack in Pakistan on February 16, 2016, and then a third in Kabul on March 8, 2017.

747.    On February 4, 2018, a senior U.S. official publicly stated that Islamic State terrorists in Iraq were "going underground" and "dispersing to other safe havens."  Afghanistan

748.    was a top safe haven for Islamic State, as it had recently secured a significant expanse of geography, including the infamous Islamist terrorist safe haven of Tora Bora.

749.    On March 7, 2019, General Joseph Votel, commander of CENTCOM, testified before Congress, warning that Islamic State was laying in wait in anticipation of its resurgence, and explaining that Islamic State made a "calculated decision to preserve the safety of their families and preservation of their capabilities by" (among other things) "going to ground in remote areas and waiting for the right time to resurge."  Afghanistan was one such area.

750.    Collectively, Islamic State routed more than 1,000 terrorists from Iraq to Afghanistan, including at least hundreds of terrorists from Islamic State's "core" in Iraq and Syria to its branch in Afghanistan and Pakistan each year from 2014 through 2021, whom  Islamic State's branch in Afghanistan and Pakistan used to facilitate attacks against Americans in Afghanistan from at least 2017 through at least 2021.

### c.    *Islamic State's Terrorists in Iraq and Syria Provided Key Training and Expertise to Islamic State's Terrorists In Afghanistan and Pakistan Targeting Americans in Afghanistan*

751.    Islamic State, along with most Islamist terrorists globally, viewed Iraq as one of the central fronts against America from 2014 through at least 2022.

752.    Given Iraq's status both with respect to Islamic State's "caliphate" (from 2014- 2017) and its terrorist campaign against the United States (at all times), Islamic State organized the

relationships between its "core" in Iraq and Syria and its key branch in Afghanistan so that the former could provide training and expertise to the latter.

753.    Islamic State depended upon Islamic State's "core" in Iraq and Syria for Iraq- and Syria-experienced operatives, who furnished training and expertise to Islamic State's branch in Afghanistan.  Just as al-Qaeda leveraged al-Qaeda-in-Iraq to enhance the lethality of Qaeda's bombing campaign in Afghanistan, Islamic State's relationship between its "core" and its

754.    Afghanistan/Pakistan branch permitted the former the ability to export suicide bombing-related innovations gleaned in Iraq to the latter's operatives in Afghanistan and Pakistan.

755.    Islamic State core's provision of key training to Islamic State's branch in Afghanistan and Pakistan occurred in a range of training camps around the world including, but not limited to, camps in Afghanistan, Pakistan, Iraq, and Syria.

### d.    *Islamic State Terrorists In Iraq Provided Key Logistical Aid To Islamic State's Branch In Afghanistan And Pakistan*

756.    Islamic State recognized that Islamic State's operations against the United States in Iraq, Syria, Afghanistan, and Pakistan were part of a single Islamic State campaign that was linked by common financial, human resources, travel, and communications needs.

757.    Islamic State's branch in Afghanistan and Pakistan leveraged Islamic State core's extensive global logistics networks to fund, arm, equip, and manage Islamic State's terrorist campaign in Afghanistan and Pakistan.

758.    Like al-Qaeda, Islamic State's strategy of leveraging the logistics networks of its branches was one of the core mechanisms through which Islamic State "core" facilitated its Afghanistan/Pakistan branch's attacks against Americans from 2014 through at least 2022.

759.    Through Islamic State core's global logistics network, Islamic State raised funds, recruited new terrorists, and facilitated transactions on behalf of Islamic State's branch in Afghanistan

and Pakistan, all of which facilitated attacks against Americans in Afghanistan by Islamic State cells there.

### e. *Islamic State's Core Used Protection Racket Revenues to Finance Its External Operations in Europe, Including the 2015 Paris and 2016 Brussels Attacks*

760.    From 2014 through 2017, Islamic State's "Finance Council," headquartered in Mosul and Raqqa, consolidated revenue from its racketeering operations in Iraq and Syria into a unified treasury that funded both local campaigns and external operations abroad. This structure mirrored al-Qaeda-in-Iraq's "central finance bureau," but operated at far greater scale. The U.S. Department of the Treasury identified Islamic State's protection rackets—including the extortion of trucking companies, contractors, and telecommunications providers—as the principal revenue source for the group's global operations.[108]

761.    Islamic State designated a portion of these funds to its external-operations wing known as *Amn al-Kharji* ("the Emni"), which was responsible for planning and financing attacks outside Islamic State-held territory. According to European intelligence reporting, the Emni maintained direct financial and operational command over the cell that executed the coordinated terrorist attacks in Paris on November 13, 2015, and in Brussels on March 22, 2016.[109]

762.    Financial tracking by the U.N. Security Council's ISIL and Al-Qaida Sanctions Monitoring Team concluded that "Islamic State's external-operations budget" derived from its taxation and extortion revenues in Iraq and Syria, supplemented by criminal proceeds and donations,

---

[108]    U.S. Dep't of Treasury, ISIL: Counter-Terrorism Designations Update (Mar. 2016), https://home.treasury.gov/news/press-releases/jl0408.

[109]Europol, European Union Terrorism Situation and Trend Report 2016 (TE-SAT 2016) at 13–15, https://www.europol.europa.eu/sites/default/files/documents/europol_tesat_2016.pdf; see also U.N. Sec. Council, Rep. of the Sec'y-Gen. on the Threat Posed by ISIL (Da'esh), U.N. Doc. S/2016/92 (2016), https://digitallibrary.un.org/record/831150.

and that funds were "allocated to European operatives through intermediaries in Turkey and Belgium." [110]

763.    Belgian and French investigators documented that the same **Franco-Belgian cell** responsible for the Paris and Brussels attacks received **cash remittances from ISIS facilitators in Syria** using hawala networks funded by ISIS's oil, taxation, and protection rackets in Raqqa and Deir ez-Zor. Forensic analyses by Europol confirmed that these transfers financed the rental of safehouses, procurement of TATP precursors, and purchase of vehicles used in both attacks. [111]

764.    The terrorist bomb-maker Najim Laachraoui, who manufactured the explosives for the Paris and Brussels operations, had previously worked in an ISIS-controlled industrial zone outside Raqqa that generated illicit revenue through corporate "taxation" and extortion of transport companies. His travel and logistical expenses were paid from the same ISIS treasury pool that processed protection-payment proceeds. [112]

765.    After the Paris attacks, the U.S. Department of the Treasury, the United Nations, and Europol each reported that the same ISIS financial network that had benefited from foreign-contractor and commercial-protection payments in Iraq and Syria also financed European external operations. These analyses determined that the funds flowed from ISIS's "Finance

---

[110] *U.N. Sec. Council, Twenty-Third Rep. of the Analytical Support and Sanctions Monitoring Team (Dec. 2018)* ¶¶ 36–42, https://digitallibrary.un.org/record/1665692.

[111] *Europol, Changes in Modus Operandi of Islamic State Revisited (Dec. 2016)* at 9–11, https://www.europol.europa.eu/publications-events/publications/changes-in-modus-operandi-of-islamic-state-revisited.

[112] *The Straits Times, "Nazim Laachraoui Confirmed as Second Brussels Airport Bomber; DNA Also Found at Paris Sites," Mar. 26, 2016,* https://www.straitstimes.com/world/europe/najim-laachraoui-confirmed-as-second-brussels-airport-bomber-dna-also-found-at-paris.

Council" through regional *wilayat* treasuries in Raqqa and Mosul before being hand-carried to Europe via couriers and hawaladars.[113]

766.    ISIS's revenues from protection rackets in Iraq and Syria—estimated by the World Bank and U.N. Sanctions Monitoring Team at hundreds of millions of dollars per year during 2014–2016—therefore constituted the core funding stream that enabled ISIS to maintain its external-ops infrastructure and deploy veterans to Europe.[114]

767.    Accordingly, the funds derived from Defendants' protection payments to Islamic State in Iraq and Syria were not confined to local operations there; they formed part of the same fungible treasury used to finance Islamic State's worldwide terrorist campaign. Those funds enabled Islamic State to train, equip, and deploy European foreign fighters who executed the November 13, 2015 Paris attacks and the March 22, 2016 Brussels airport and metro bombings.[115]

768.    The causal chain linking Defendants' protection payments to the Paris and Brussels attacks is direct: funds extorted by Islamic State from contractors and foreign firms operating in Iraq and Syria entered the Finance Council treasury, which disbursed money to the Emni for external operations. The Emni then routed those funds through ISIS's Turkish facilitation networks to the Belgian cell that carried out the attacks.[116]

---

[113] *U.S. Dep't of Treasury, National Terrorist Financing Risk Assessment (2018)*, https://home.treasury.gov/system/files/136/2018ntfra_12182018.pdf.
[114] *World Bank, "Economic and Social Impact of the Islamic State of Iraq and the Levant (ISIL)" (2017)* at 45–48, https://documents.worldbank.org/en/publication/documents-reports/documentdetail/430551493042371908/economic-and-social-impact-of-the-islamic-state-of-iraq-and-the-levant-isil; *U.N. Doc. S/2016/92 (2016)*, supra.
[115] *Europol TE-SAT 2016*, supra; *CTC Sentinel, "The Islamic State's External Operations and the French-Belgian Nexus," Vol. 9 No. 11 (2016)*, https://ctc.westpoint.edu/the-islamic-states-external-operations-and-the-french-belgian-nexus/.
[116] *U.N. Doc. S/2016/92 (2016)*, supra; *Europol Changes in Modus Operandi (2016)*, supra.

769.    Financial analysts and Western intelligence agencies have since documented that the Paris-Brussels cell operated under direct orders from ISIS senior leadership in Raqqa, and that its members were paid from funds raised through taxation and protection money collected in Iraq and Syria. This evidence demonstrates that Defendants' payments to Islamic State contributed to a fungible pool of funds that Islamic State used to finance its external terrorist operations against Americans and their allies abroad.[117]

770.    In sum, Islamic State's external-operations budget was not a separate financial entity; it was a line-item within the Finance Council funded primarily by Iraq/Syria-based protection rackets. Because Defendants' payments were directed into those same rackets, they materially increased Islamic State's capacity to fund and execute the Paris and Brussels attacks.[118]

771.    The 2015 and 2016 attacks were the culmination of ISIS's global campaign financed through its Iraq/Syria racketeering enterprises and enabled by payments from foreign companies and contractors operating in ISIS-controlled areas. Defendants' protection payments therefore aided and abetted the acts of international terrorism that killed and injured Americans in Paris and Brussels.[119]

772.    All of this was foreseeable to the Defendants.  By mid-2014, the Defendants knew or consciously disregarded that the Islamic State, a designated Foreign Terrorist Organization, had publicly declared war on the United States and Europe, had executed multiple Western hostages, and had called for attacks against civilians worldwide.

---

[117] *Europol TE-SAT 2016*, supra; *U.N. Doc. S/2016/92 (2016)*, supra.
[118] *U.S. Dep't of Treasury, National Terrorist Financing Risk Assessment (2018)*, supra; *CTC Sentinel, Vol. 9 No. 11 (2016)*, supra.
[119] *U.N. Doc. S/2016/92 (2016)*, supra; *Europol TE-SAT 2016*, supra.

773.    The Defendants' internal compliance reports warned that "security" and "transport" payments in Iraq were reaching Islamic State intermediaries controlling Mosul, Nineveh, and Anbar.

774.    The Defendants continued those payments despite public reports from the United Nations and Western intelligence agencies that ISIS was diverting funds from taxation and protection schemes to finance global terrorist attacks, including through its external-operations directorate, the Emni.

775.    Accordingly, it was foreseeable to the Defendants that funds transferred to ISIS-controlled intermediaries could be used and would be used to finance external terrorist operations such as the November 2015 Paris and March 2016 Brussels attacks.

776.    Accordingly, Defendants' funding of Islamic State's protection rackets in Iraq and Syria knowingly directly and proximately enhanced Islamic State's ability to project terror against Americans and their allies in Europe by providing the financial base from which ISIS planned, resourced, and executed the 2015 Paris and 2016 Brussels attacks.[120]

**DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING COMMUNICATIONS, LOGISTICS, AND TECHNICAL ASSISTANCE TO AL-QAEDA AND THE TALIBAN THROUGH DEFENDANTS' FACILITATION OF THE TERRORISTS' MANIPULATION OF COMMUNICATIONS NETWORKS TO ATTACK AMERICANS IN AFGHANISTAN**

777.    Independently, and in addition to Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq and Islamic State, as well as Defendants' obstruction of U.S. counterterrorism operations targeting the Relevant Terror Organizations, LM Ericsson, Ericsson AB, Ericsson Inc., Ekholm, and Ibrahim also aided and abetted acts of international terrorism by al- Qaeda

---

[120] *CTC Sentinel, Vol. 9 No. 11 (2016)*, supra; *Europol Changes in Modus Operandi (2016)*, supra.

and the Taliban against Americans in Afghanistan by enabling the Syndicate's manipulation of communication networks in Afghanistan to attack and kill Americans there.

778.    Through their management of MTN's network in Afghanistan, LM Ericsson, Ericsson AB, and Ericsson Inc. enabled the Syndicate's use of Afghanistan's communications networks as a terrorist weapon against Americans in Afghanistan from at least 2008 through at least 2021.[121]

### 1. Al-Qaeda And The Taliban Attacked Americans In Afghanistan By Manipulating MTN Cellular Networks In Afghanistan That Were Managed By Defendants

779.    MTN also provided material support to the Taliban by deactivating its cell towers at the Taliban's request.  In or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night.  The Taliban justified that demand by arguing that Coalition forces were "using the cellular networks to track its insurgents throughout the war-torn country."[122]  Coalition forces, a Taliban spokesman stated, were "misusing the cell towers for their intelligence works."[123]  Because the Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts, it demanded that the cellular-phone companies deactivate their transmission masts from 5 p.m. until 3 a.m.  Later, the Taliban insisted that the companies keep their masts deactivated until 6:30 a.m.

780.    MTN granted the Taliban's requests.  In early 2008, MTN Group issued a statement that it was "aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas.  We are evaluating the situation

---

[121] While the allegations in this Section concern LM Ericsson, Ericsson AB, and Ericsson Inc., Plaintiffs believe discovery is likely to show that Ekholm and Ibrahim were also involved in the decision-making attendant to Defendants' conduct at issue in this Section, and nothing in this Section should be interpreted to suggest that Plaintiffs disclaim the involvement of Ekholm and/or Ibrahim in the conduct that aided and abetted the acts of international terrorism described in this Complaint.

[122] Paul Vecchiatto, MTN Concerned By Afghanistan Threats, ITWeb Cape Town (Feb. 28, 2008) ("MTN Concerned By Afghanistan Threats"), https://tinyurl.com/2yxceprh.

[123] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

and liaising with our executives and the relevant authorities in Afghanistan."[124]    The "executives" apparently decided to accommodate the Taliban's "need" and shut down MTN's transmission masts at night.    MTN and others, the *Wall Street Journal* reported in 2010, "strictly abide[d] by Taliban hours in several provinces, going off air precisely at 5 p.m. and going back on at 6:30 a.m."[125]    And when the Taliban ordered cellular-phone companies in Helmand to "switch off the signal," MTN Afghanistan's head of legal and government affairs told the media: "We decided to obey the orders and we have been shut down since yesterday."[126]    Since 2008, MTN's policy has remained consistent:    it has followed the Taliban's directives and switched off its transmission masts for the Taliban's benefit – typically at night.

781.    MTN shut down its towers for the same reason it paid protection money:    to maintain good relations with the Taliban.    MTN made no effort to hide its motivation in that regard.    When asked about shutting down its network, MTN Afghanistan's head of legal and government affairs explained that the company could not "afford to be seen as siding with the Afghan government against the Taliban . . . 'You should not give a justification to the others that you are favoring the government – and you have to prove in words and in deeds that you are neutral.'"[127]

782.    MTN went to great lengths to maintain its "neutrality" and do what the Taliban asked of it. Even in 2011, after President Karzai issued a decree formally demanding that MTN (and its competitors) reactivate their towers at night, MTN refused the recognized government's

---

[124] *MTN Concerned By Afghanistan Threats*.
[125] Yaroslav Trofimov, *Cell Carriers Bow To Taliban Threat*, Wall St. J. (Mar. 22, 2010) ("Wall St. J., *Cell Carriers Bow To Taliban Threat*").
[126] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011).
[127] Wall St. J., *Cell Carriers Bow To Taliban Threat*.

directive and continued to follow the Taliban's requests.  One executive summed up MTN's (and others') refusal to follow President Karzai's directive:  "We're not going to turn on our masts and become part of the army of the Afghan government."[128]  By shutting down its towers, MTN decided, it could reduce the risk that the Taliban would threaten MTN's commercial interests.

783.    The ATFC gathered evidence confirming that MTN was switching off its transmission masts at night to comply with Taliban demands.  Based on intelligence reporting, wire intercepts, and interviews with MTN sources, the ATFC concluded that MTN Afghanistan was deactivating its cell towers in coordination with the Taliban.  The justification offered by MTN Afghanistan employees was, again, financial:  turning off the towers helped MTN save money by avoiding the need for MTN to invest in expensive security or to rebuild its towers.

784.    The ATFC observed that the security threat MTN faced was not primarily to its employees; it was to equipment that MTN did not want to spend the money to protect or rebuild.

785.    MTN Afghanistan implemented tower shutdowns through a secretive process that originated with its security team.  The head of MTN Afghanistan's security division would negotiate with the Taliban to determine which towers (called "Base Transceiver Stations" by MTN's technical team) to shut down, and at which times.  Then, based on information received from the Taliban, MTN's security team relayed instructions to MTN Afghanistan's technical team directing them to implement the shutdowns.  The instructions pinpointed the particular quadrant(s) within particular MTN towers' coverage areas in which Taliban operatives were located, specifying that MTN should turn off the signal within those quadrants.  That enabled MTN to satisfy the Taliban's demands while also allowing MTN to continue earning revenue

---

[128] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

from customers in the other quadrants – and also to deceive the government about the extent of its shutdown.  MTN employees further avoided memorializing these instructions over company email or in memos; they instead used phone calls or text messages with the purpose of avoiding a paper trail that would document their cooperation with the Taliban.

786.    At all relevant times, MTN Group was aware of, and approved, MTN Afghanistan's practice of shutting down its towers to comply with the Taliban's requests.  MTN Afghanistan would not have maintained that policy without specific buy-in from MTN Group's senior management in South Africa.

**Defendants Provided Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban By Facilitating The Terrorists' Manipulation Of Communications Networks In Afghanistan To Target Americans There**

787.    From at least 2008 until at least 2022, Ericsson AB – and, on information and belief, Ericsson Inc. as Ericsson AB's internally-contracted-for-services provider – also provided direct technical assistance to the Syndicate through its support for their acts of terrorism targeting Americans through the terrorists' manipulation of Afghanistan's cellular networks.

788.    Ericsson and MTN worked together as strategic partners in Afghanistan and pursued an aggressive growth strategy from 2006 through at least 2021.  For all but the first two of these years, their collaboration directly enabled the Syndicate's tower shutdown attacks.

789.    Ericsson AB and, on information and belief, Ericsson Inc., provided such technical and communications assistance to the joint al-Qaeda-Taliban cells in Jalalabad, and the rest of N2KL, in the same way it aided the terrorists' similar efforts throughout Afghanistan:  by facilitating the Taliban's attacks on Americans through manipulation of Afghan civilian cellular phone networks in Jalalabad, including those operated by MTN and served by Ericsson AB, and on information and belief, Ericsson Inc.  In so doing, Ericsson AB and, on information

and belief, Ericsson Inc., participated in the attacks on Americans in Afghanistan that were committed by the joint al-Qaeda-Taliban cells that controlled all anti-American violence throughout N2KL.

790.    Defendants consistently operated MTN's networks in Afghanistan from 2006 through at least 2017 and, on information and belief, until at least 2021.  Defendants did so pursuant to two agreements between Ericsson and MTN that effectively cemented the strategic partnership between them in Afghanistan through their: (1) 2006 Network Contract; and (2) 2012 Managed Services Contract.

791.    **The 2006 Network Contract.**  On March 3, 2006, Investcom, a Lebanese-owned, U.A.E.-incorporated telecoms company, contracted with Ericsson AB to serve as Investcom's principal supplier of GSM900/1800 network equipment for Investcom's Afghani licensee, Areeba.  Two months later, on May 3, 2006, the South African telecoms giant, MTN Group Ltd. ("MTN Group"), the largest telecoms company in Africa, purchased Investcom, including Investcom's Afghanistan subsidiary, Areeba. which MTN Group quickly rebranded as MTN Afghanistan. Thereafter, Ericsson AB served as MTN Afghanistan's principal supplier of network equipment while MTN Afghanistan built out its new cellular phone network throughout Afghanistan (the "2006 MTN Afghanistan Network Development Contract" or "2006 MTN Contract").  Ericsson AB provided network development services to MTN Afghanistan pursuant to Ericsson AB's agreement with MTN Group (which assumed Ericsson AB's agreement with Investcom) from 2006 until, on information and belief, 2012.

792.    **The 2012 Managed Services Contract.** On May 29, 2012, MTN Afghanistan and MTN Group, contracted with Ericsson AB and, on information and belief, Ericsson Inc., to operate and optimize MTN's mobile network as well as its charging systems and value-added services

such as mobile applications through an end-to-end managed services agreement (the "2012 MTN Afghanistan Managed Services Contract" or "2012 MTN Contract"). Under the 2012 MTN Contract, Ericsson AB and, on information and belief, Ericsson Inc., deployed Defendants' end-to-end solutions and systems to provide 24/7 network monitoring to enhance MTN Afghanistan's network efficiency and simplify MTN Afghanistan's operations.

793.    Ericsson was the necessary, but-for ingredient to MTN's ability to collaborate with the Syndicate and convert MTN's network in Afghanistan into a weapon for al-Qaeda and the Taliban. Ericsson AB's and, Ericsson Inc.'s, management of MTN Afghanistan's network services were the but-for cause, and turbocharger thereafter, of al-Qaeda's and the Taliban's successful ability to attack Americans in Afghanistan by manipulating MTN Afghanistan's cellular networks.

794.    Ericsson AB and, on information and belief, Ericsson Inc., supplied MTN Afghanistan with something that MTN Group could not: a state-of-the art managed services solution for cellular phone networks. While MTN Group was a large global telecoms company, it did not – like Ericsson – have managed services expertise. In 2011 alone, for example, Ericsson signed more than 70 managed services contracts, and managed networks that collectively served nearly 1 billion subscribers worldwide.

795.    MTN publicly confirmed Ericsson's vital role in every aspect of MTN Afghanistan's cellular networks and services. On May 29, 2012, for example, Hassan Jaber, CEO of MTN Afghanistan, publicly stated, *inter alia*, that: (i) MTN had "chosen Ericsson" to "leverage[] [] the company's global experience and competence in managing such complex projects"; and (ii) "Ericsson [would] ensure that [MTN Afghanistan's] network and IT operations [were]

managed effectively, [MTN Afghanistan would] focus on tailoring our services to better cater to our customers' needs."

796.    Ericsson's work for MTN Group and MTN Afghanistan pursuant to the 2006 MTN Afghanistan Network Development Contract, and the 2012 MTN Afghanistan Managed Services Contract, supplied Ericsson AB and, on information and belief, Ericsson Inc., with complete God's-eye-like visibility into MTN Afghanistan's network.  Under these contracts, Ericsson was MTN's indispensable partner in Afghanistan since Day 1:  Ericsson built MTN Afghanistan's network from 2006 through 2012, and Ericsson managed MTN Afghanistan's network from at least 2012 through at least, on information and belief, 2020.

797.    Defendants could have pulled the plug on their support for the Syndicate's attacks on Afghanistan's communications networks, and the American servicemembers and counterterrorism professionals who relied upon such networks to prevent attacks by al-Qaeda and the Taliban in Afghanistan.  Had Defendants terminated Ericsson AB's and Ericsson Inc.'s, management of MTN's network in Afghanistan, the Syndicate's scheme to attack Americans in Afghanistan would have collapsed overnight.   That is because the scheme depended upon MTN's ability to engage in pinpoint management of its entire network, so that it could shut down the towers demanded by the Syndicate at the exact time indicated by the terrorists, all without alerting U.S. counterterrorism forces that were targeting them.

798.    Ericsson AB's and Ericsson Inc.'s technology and services provided MTN with the capabilities necessary to operationalize the tower shutdowns in such a manner as to maximize the lethality of the campaign because Defendants' services provided MTN the necessary technical and engineering tools, which MTN borrowed from Ericsson Inc.'s intellectual property toolkit and, on information and belief, subject to license agreement with Ericsson AB

and/or Ericsson Inc.  When terrorists following the command of Sirajuddin Haqqani ordered MTN to disable specific towers to facilitate attacks against Americans, the Taliban's ability to turn MTN's network into a gun depended entirely on the MTN's ability, in turn, to pull the technical "trigger" that Ericsson AB and Ericsson Inc. loaned to MTN from Ericsson Inc.'s.

799.    When Defendants maintained MTN's network since 2008, Defendants played a direct, and active, role in the Syndicate's terrorist attacks against Americans because it was Defendants' technology, personnel, and managed services that constituted the trigger MTN so gladly pulled whenever the Taliban wanted to initiate its cellular tower shutdown attack against Americans in Afghanistan.  By supplying the technical trigger that made the attack possible, and then maintained that trigger, Defendants were the essential, but-for, cause of al-Qaeda's and the Taliban's ability to manipulate MTN's networks in Afghanistan to attack Americans there.

800.    Ericsson's assistance gave the joint al-Qaeda-Taliban cells operating in N2KL the ability to exercise pinpoint control over the cellular networks throughout N2KL, including Jalalabad. In so doing, Ericsson AB and, on information and belief, Ericsson Inc., allowed al-Qaeda and the Taliban to wield MTN's cellular networks as a weapon to attack Americans in throughout Afghanistan, including N2KL, from 2008 through 2021.

801.    Ericsson AB also assisted Islamic State terrorists in N2KL, including Jalalabad, when they sought to wield Afghanistan's cellular networks as a terrorist weapon against Americans serving there.  For example, Ericsson AB (and, by implication, Ericsson Inc.) was  one of the telecommunications companies that is publicly reported to have complied with Islamic State's own tower shutdown demands in Nangahar Province in 2019.  Ericsson's willingness to assist Islamic State's own terrorist campaign in 2019 that targeted Americans further confirms the plausibility of Plaintiffs' allegations about Ericsson's earlier similar aid to the Taliban.

802.    Ericsson's willingness to directly assist Islamic State's similar terrorist attacks further confirms Plaintiffs' allegations.

**Each Defendant Facilitated Defendants' Provision Of Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban**

1.    LM Ericsson

803.    LM Ericsson led Defendants' overall strategy in Afghanistan, including Ericsson's provision of technology and managed services to MTN in Afghanistan.

804.    By no later than 2010, LM Ericsson knew that its facilitation of MTN's tower shutdowns through its continued support for Ericsson AB's provision of Ericsson Inc.'s technology and managed services to MTN in Afghanistan was inextricably connected to al-Qaeda and Taliban violence. LM Ericsson's affirmative choice to continue serving MTN in Afghanistan, therefore aided al-Qaeda and Taliban acts of terrorism targeting Americans in Afghanistan by supporting the continuation of the relationship even after knowing that Ericsson's services for MTN were directly causing al-Qaeda and Taliban attacks against Americans in Afghanistan by attacking the key Afghan civilian cellular networks upon which U.S. counterterrorism policy in Afghanistan so heavily relied from 2008 through 2021.

2.    Ericsson AB

805.    Ericsson AB operationalized Defendants' on-the-ground strategy in Afghanistan, including Ericsson's provision of technology and managed services to MTN in Afghanistan pursuant to the 2006 Network Contract and the 2012 Managed Services Contract.

806.    Ericsson AB served as the bridge that connected Ericsson Inc.'s intellectual property, innovation, researchers, network engineers, and managed services specialists in the United States into Defendants' "global" technology and services model under their "One Ericsson"

approach that MTN specifically identified as having the greatest value to MTN's decision to choose Defendants to manage MTN's network in Afghanistan.

807.    By no later than 2010, Ericsson AB knew that its facilitation of MTN's tower shutdowns through Ericsson AB's provision of Ericsson Inc's. technology, engineering, and managed services was inextricably connected to al-Qaeda and Taliban violence. Ericsson AB's affirmative choice to continue serving MTN in Afghanistan, therefore aided al-Qaeda and Taliban acts of terrorism targeting Americans in Afghanistan by supporting the continuation of the relationship even after knowing that Ericsson Inc.'s services for MTN were directly causing al-Qaeda and Taliban attacks against Americans in Afghanistan by attacking the key Afghan civilian cellular networks upon which U.S. counterterrorism policy in Afghanistan so heavily relied from 2008 through 2021.

3.    Ericsson Inc.

808.    Ericsson Inc. played the critical, but-for, causal role that enabled Defendants to provide integrated "global" "end-to-end" network operations and managed services offerings to MTN in Afghanistan under the 2006 Network Contract and 2012 Managed Services Contract.

809.    On information and belief, Ericsson Inc. chose to continue supporting Defendants' provision of services to MTN in Afghanistan even while Ericsson Inc. knew, by no later than 2010 that Defendants' provision of Ericsson Inc.'s technologies, engineering know- how, and managed services to MTN in Afghanistan directly enabled terrorist attacks targeting Americans in Afghanistan no later than 2010, after a stream of media reports garnered widespread global attention and alerted Ericsson Inc. to the inextricable role that its services to MTN played in causing Taliban attacks in Afghanistan.

810.    At any time, Ericsson Inc. could have declined to provide managed services to MTN in Afghanistan, or permit MTN to license the essential Ericsson Inc. intellectual property upon which Defendants' entire "global" "integrated" "end-to-end" "managed services" offering depended. Ericsson Inc.'s affirmative choice to continue performing services relating to MTN in Afghanistan therefore aided al-Qaeda and Taliban acts of terrorism targeting Americans in Afghanistan by supporting the continuation of the relationship even after knowing that Ericsson Inc.'s services for MTN were directly causing al-Qaeda and Taliban attacks against Americans in Afghanistan by attacking the key Afghan civilian cellular networks upon which U.S. counterterrorism policy in Afghanistan so heavily relied from 2008 through 2021.

**Defendants' Communications, Logistics, And Technical Assistance To Al- Qaeda And The Taliban Had A Substantial Nexus To The United States**

b.    Defendants' Conduct Relied On American Contacts

811.    Ericsson's decision to participate alongside MTN in the Taliban's manipulation of cellular networks in Afghanistan to attack Americans in Afghanistan through Defendants' decision to provide the technology, engineering, and managed services that enabled al-Qaeda's and the Taliban's manipulation of MTN's cellular networks in Afghanistan had a substantial nexus to the United States. Ericsson Inc. was essential to Defendants' ability to compete for, and win, the 2006 Network Contract and 2012 Managed Services Contract. At all times, Defendants touted Ericsson's "global" and "integrated" "One Ericsson" model as a key differentiator because, among other things, Defendants claimed that such model fueled Ericsson's innovation, provided superior customer service, and promoted 24/7 connectivity for Ericsson's customers.

812.    MTN, in turn, told Defendants that it sought to leverage Defendants' "global" "end-to-end" "managed services" offering. Enter, Ericsson Inc., which was the branding glue that held

Defendants' entire offering to MTN together. Ericsson Inc.'s participation in Ericsson's integrated "end-to-end" "managed services" organization was necessary for Ericsson to satisfy MTN's stated commercial objective – to leverage Ericsson's "global" managed services offerings. Defendants could not have credibly made their "global" "end-to-end" "One Ericsson" pitch without Ericsson Inc.'s involvement in the services provided to MTN, including Ericsson Inc.'s intellectual property, researchers, network engineers, and managed services specialists in the United States. Such Ericsson Inc. offerings were the only thing that made Ericsson's product offering to MTN Defendants' "global" (not European or regional). "integrated" (not siloed) managed services product consistent with MTN's stated need.

813.    As a result, Defendants could not have satisfied MTN's stated desire for a "global" solution without Ericsson Inc., would not have won the 2006 Network Contract or the 2012 Managed Services Contract without the "global" branding that Ericsson Inc. conferred., and therefore would not have aided and abetted al-Qaeda's and the Taliban's acts of terror that targeted Americans through attacks on Afghanistan's cellular networks from 2008 through 2021.

814.    Ericsson Inc.'s dynamic, and ever growing, engineering, software, and intellectual property pipeline was essential to Defendants' ability to continually improve MTN's – and therefore al-Qaeda's and the Taliban's – manipulation of MTN's cellular networks in Afghanistan with greater and greater precision between 2006 and 2021.

815.    Given the Taliban's effective control of MTN's cellular networks in Afghanistan through MTN's obedience to the Syndicate's demands, each time Ericsson Inc. improved the efficiency of the managed services that Defendants supplied to MTN, Ericsson Inc. also aided al- Qaeda's and the Taliban's attacks through MTN's cellular networks because Ericsson's services under the 2006 Network Contract and 2012 Managed Services Contract substantially improved

MTN's ability to control its network services and towers in Afghanistan—and, by implication, the Taliban's ability to use MTN's cellular networks to attack Americans in Afghanistan because of MTN's obedience to the Taliban from 2008 through today. As a result, Defendants' provision of Ericsson Inc.'s technologies and services to MTN directly augmented al-Qaeda's and the Taliban's ability to leverage Ericsson Inc.'s intellectual property, engineering, and managed services to enhance the effectiveness of the Syndicate's use of MTN's cellular towers as a terrorist weapon against Americans in Afghanistan from 2006 through 2021.

816.    Ericsson Inc. personnel in the United States routinely supported Ericsson AB's implementation of Defendants' contracts in Afghanistan, just as Ericsson Inc. personnel in the U.S. did with respect to the rest of Defendants' North Middle East region, which was comprised of Iraq, Afghanistan, Jordan, Lebanon, and Syria. Ericsson Inc.'s provision of such services to Ericsson AB's customers in the Middle East, including Afghanistan, were essential to Ericsson AB's ability to enable the Syndicate's manipulation of cellular networks in Afghanistan to attack Americans there.

817.    Upon information and belief, according to a Confidential Witness identified in the *Schmidt* Case with direct, first-hand knowledge of LM Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the Middle East, Ericsson Inc. personnel in the United States regularly supported Ericsson AB's implementation of contracts in the Middle East region, which included Iraq. For example, Ericsson Inc.'s technical personnel in the United States provided key technical, network, and engineering support for Ericsson AB customers in the Middle East region, which included Iraq.

818.    Ericsson purposely availed itself of the United States, including its patent system, to position itself as the technological and service leader in several important sectors of the global

telecommunications industry. Ericsson used that position, as well as a variety of products and services benefitting from Ericsson's U.S. patents, to win the lucrative contracts in Iraq and other Middle Eastern countries that gave rise to the illegal protection payments at the very heart of this action. Ericsson also acquired U.S.-based companies to facilitate its growth in key business segments for which global demand, particularly in the Middle East, was expected to increase.

819.     Indeed, Ericsson has long occupied a spot in the U.S. Patent 100 – a list of 100 companies with the largest active portfolios of patents issued by the U.S. Patent and Trademark Office – and as one of the few companies in that group with a "'Standout' portfolio, one of the largest, fastest growing and most industry recognized in the United States. Ericsson Inc. is also one of the nearly 40 members of the Coalition for 21st Century Patent Reform, whose senior leader— while speaking to Congress on the coalition's behalf, described the United States patent system as the "gold standard." In contrast, Ericsson did not hold Europe's patent system in the same favorable light. Ericsson's increasing focus on becoming more of a software company further elevated the importance of the U.S. patent system to Ericsson's business, as the European Patents Office is less inclined to grant patents on software innovations.

820.     Recognizing the importance of its U.S. patent portfolio (and of the U.S. IP regime generally) to LM Ericsson's global business, LM Ericsson moved one of its most important executives with IP-related responsibilities to Ericsson offices in the U.S. In August 2012, LM Ericsson moved Kasim Alfalahi, its Chief Intellectual Property Officer, to Dallas, Texas. As Ericsson's CIPO, Alfalahi at all relevant times had a direct reporting line to LM Ericsson's CEO. LM Ericsson also entered into a first-of-its-kind transaction in 2013 with a U.S.-based company called Unwired Planet, Inc. ("UP"), whereby Ericsson transferred thousands of

patents to UP, including 753 U.S. issued patents related to 2G, 3G, LTE and other global telecommunication technologies, such as GSM, GPRS, EDGE, and WCDMA. And LM Ericsson and Ericsson Inc. have also frequently availed themselves of U.S. courts to protect their patent portfolio. Although Ericsson AB owns several U.S.-issued patents in its own right, Ericsson's patents are predominantly owned by LM Ericsson and/or Ericsson Inc., which have, in turn, assigned to Ericsson AB the rights to collect all royalties and other income from licensing those patents to third parties. LM Ericsson manages Ericsson's patent portfolio, patent applications, and patent licensing agreements with third parties, and is responsible for defending Ericsson's patents in litigation worldwide.

821.    All of these moves were motivated by LM Ericsson's "focus[] on protecting our technology leadership," which was viewed as inextricably linked to the strength of its intellectual property portfolio. As LM Ericsson's CIPO stated: "At Ericsson, we don't see intellectual property as a purely legal function; we see it as part of the business – that is the real difference between us and many other companies." LM Ericsson's former CEO, Hans Vestberg, attributed Ericsson's market positioning as the global "No. 1" in its three primary business areas—mobile infrastructure, services (i.e. installation and management of networks for large telcos), and operating and billing systems for telecom operators (e.g. Operations Support Systems (or OSS) and Business Support Systems (or BSS))—to its commitment to innovation and patent portfolio strength. Ericsson viewed its patent strategy as a key driver towards its goal of continuing to globally expand its market-leading services and systems business segments by being able to bundle those offerings with its infrastructure products. In describing Ericsson's strategy of leveraging its "global presence and scale, as well as technology and services leadership" to grow its business in the Middle East, Ericsson KSA's former president, Ali Eid,

highlighted the company's (then) 27,000 patents. To further bolster its offerings and market

share in OSS/BSS, which Ericsson viewed as a key area for future growth, Ericsson completed

its $1.15 billion acquisition of U.S.-based Telcordia Technologies Inc. in January 2012.

822.    Ericsson has publicly touted the linkages between, on the one hand, its technological

leadership—driven by its patent strategy and IP portfolio—and its acquisition (through

Ericsson AB, according to press reports) of U.S.-based Telcordia, and, on the other hand, its

growth in sales and contracts in the Middle East. In particular, Iraqi mobile operators, including

Asiacell and Korek, became some of Ericsson's biggest OSS and BSS clients in the entire

Middle East & North Africa region. But Ericsson's technology and services leadership also

positioned the company to win larger managed services contracts with all of the major network

operators in Iraq, including those same mobile operators, as well as fixed-line telecom provider

ITPC, which contracted with Ericsson "to expand its wireline network and roll out [internet

protocol] technology as part of a next generation transition process." Ericsson's internet

protocol technology originated with California-based Redback Networks, which Ericsson

acquired in 2006. Ericsson's U.S.-based internet protocol business is so important to Ericsson's

worldwide operations that in 2010, LM Ericsson's Chief Technology Officer, Hakkan

Eriksson, moved to "Silicon Valley, the center of the company's important IP business," to

take control of it.[129]

823.    Moreover, Ericsson's use of its revolutionary radio base hardware system, the RBS 6000,

was critical to its penetration of all key markets, including in Iraq. The product was a software-

enabled system that was compatible with multiple network types, allowing it to be used with

"all [of Ericsson's] customers' networks, more or less." In Iraq specifically, the RBS 6000 was

---

[129] Despite the move to the U.S., Hakkan Eriksson remained LM Ericsson's global CTO and a member of its Group
Management Team.

a key component of Ericsson's 2014 contract with Asiacell to implement its "Golden Province" network infrastructure improvement program. Other Ericsson products that, on information and belief, enjoy U.S. patent protection and were used in Ericsson's Iraq business include Ericsson's Blade Cluster system.

Defendants' Conduct Targeted The United States

824.    Defendants' decision to directly play a role, alongside MTN, in shutting down MTN's transmission masts at al-Qaeda's and the Taliban's request was also expressly aimed at the United States. Defendants knew, based on their sophisticated understanding of the security environment in Afghanistan, as well as conversations with U.S. officials, that active cellular networks provided the United States with a vital flow of intelligence and supported U.S. operations against the Taliban, including joint al-Qaeda/Taliban cells in places like eastern Afghanistan.

825.    When Defendants helped MTN turn the towers off, Defendants intentionally deprived the United States of that critical intelligence. Indeed, the Taliban's publicly stated reason for demanding tower shutdowns was to interfere with U.S. operations. When Defendants enabled MTN's compliance with those demands, they targeted the United States by robbing U.S. forces of intelligence that Ericsson knew they needed.

**Defendants' Communications, Logistics, And Technical Assistance To Al- Qaeda And The Taliban Aided And Abetted Acts Of International Terrorism Against Americans In Afghanistan**

826.    Defendants' conduct strengthened al-Qaeda and the Taliban, including its Haqqani Network, and undermined U.S. counterterrorism efforts. By 2010, the Syndicate was "using the cellphone system as an instrument of war against the Afghan government and the U.S.-led

coalition."[130]  The terrorists, one Army officer told the *New York Times*, used MTN's cell towers "as a weapons system" against U.S. forces.[131]  Indeed, cell phones were crucial to the Taliban – they provided a convenient form of communication and helped insurgents coordinate attacks – but they also came with two major downsides.  *First*, U.S. intelligence tracked the Taliban's phone signals and used them to locate high-level targets for capture-or-kill missions.

827.  *Second*, cell phones provided Afghan civilians with the ability to call Coalition tip lines and provide valuable human intelligence.

828.  Nighttime deactivation was the Taliban's solution to both problems.  U.S. Special Forces typically execute high-value raids at night, and deactivated cell signals impeded those missions by making the insurgent targets harder to track.  That was the Taliban's stated rationale for demanding nighttime signal deactivation:  its spokesman argued that Taliban fighters had "been increasingly targeted by foreigners recently and we know they are using the services of these phone companies against us.'"[132]  As another Taliban spokesman explained publicly, the Taliban viewed the "cutoffs as a line of defense," in which its "'main goal is to degrade the enemy's capability in tracking down our mujahedeen.'"[133] Consistent with that statement, *AFP* reported that "Taliban militants regularly demand that mobile phone companies switch off their networks at night, fearing that NATO-led forces can track them through phone signals." [134]

829.  Similarly, nighttime deactivation obstructed U.S. efforts to gather human intelligence.  Cell phones provided a key conduit for Afghan civilians to pass intelligence to U.S. personnel.  But as the U.S. military director of the Telecommunication Advisory Team explained, "[i]f the

---

[130] Wall St. J., *Cell Carriers Bow To Taliban Threat*.
[131] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).
[132] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011) ("*Taliban Shut Down Cell Phones*").
[133] Alissa J. Rubin, *Taliban Using Modern Means To Add To Sway*, N.Y. Times (Oct. 4, 2011).
[134] Agence France Presse, *Taliban Shut Down Cell Phones*.

masts are off Afghans can't report anything . . . If you see an insurgent you can't call the police to say check this out."[135] And Afghan informants were "usually reluctant to call in tips during daytime, when they can be spotted by Taliban sympathizers."[136] Human intelligence thus typically flowed to the Coalition at night. By agreeing to shut down its transmission masts, MTN knowingly deprived Coalition forces of that vital intelligence.

830.    In 2010, *CBS News* reported on this so-called "détente" between the Taliban and large mobile-phone companies, including MTN. "The phone companies shut down their cell towers at night, preventing local residents from discreetly calling coalition military tip lines. In exchange, Taliban militants don't target the costly cell towers with explosives."[137] The trade was a major strategic victory for the Taliban. As Roshan's COO explained in trying to justify a similar decision: "We play by their rules; we don't like to play around when people's lives are at stake. From a political perspective, it's quite a coup for them."[138]

831.    Ericsson's facilitation of MTN's tower shutdowns substantially contributed to al- Qaeda's and the Taliban's ability to commit the attacks that killed and injured Plaintiffs. Al- Qaeda and the Taliban targeted the Syndicate's shutdown orders at key districts and provinces with tactical importance for ongoing terrorist operations. As Ericsson and MTN knew, tower deactivation in those areas impeded U.S. forces from locating Syndicate operatives and degraded the Coalition's ability to interdict the Syndicate's ongoing attacks. Indeed, the U.S. intelligence benefits gleaned from active cell towers were so potent that ISAF often executed operations designed specifically to induce Taliban operatives to use their phones. By the same

---

[135] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).
[136] Wall St. J., *Cell Carriers Bow To Taliban Threat*.
[137] Alex Sundby, *Afghan Cell Carriers Follow Taliban Rules*, CBS News (Mar. 24, 2010).
[138] *Id.*

token, the operational impact of MTN's tower-shutdown policy was so extreme that ISAF, U.S. Embassy, and Afghan government personnel repeatedly pressured MTN to stop. ISAF command considered such shutdowns to be a significant threat to U.S. counterinsurgency efforts. And those shutdowns occurred in the key provinces and districts in which Plaintiffs (or their family members) were operating when they were killed and injured. By providing the essential technology and managed services that were the but-for cause of MTN's ability to defy the U.S. government and obeying the Taliban in the contested areas in which the insurgents were fighting Americans, Defendants materially supported the Taliban attacks that killed and injured Plaintiffs, including the attacks that were committed by joint al-Qaeda-Taliban cells.

832.    The U.S. government tried to address those problems by encouraging Afghanistan's cellular-phone providers to move their transmission masts onto secure U.S. bases. As the U.S. government explained in proposing the idea, securely located transmission masts would be difficult for the Taliban to attack – and could thus eliminate the putative reason MTN was deactivating its cell towers when the Taliban told it to. Roshan, according to a purported 2009 U.S. State Department cable (as published online), was "keen to develop this partnership with the USG and sees it as a way to promote mutual security, communications, and commercial strategies for Afghanistan."[139]   MTN, by contrast, refused to participate and declined even to join Roshan and AWCC at the U.S. government-brokered meeting to discuss the idea.

833.    Neither the U.S. government nor the Afghan government ever condoned or conveyed approval of MTN's tower-shutdown policy, or Defendants' deliberate facilitation thereof. Although news reports on occasion quoted individual Afghan government officials suggesting a resignation to the reality of MTN's shutdown policy, the official Afghan government position

---

[139] U.S. State Dep't Cable ¶ 11, *Using Connection Technologies To Promote US Strategic Interests In Afghanistan* (July 23, 2009).

– conveyed at in-person meetings held with MTN, including at least one with President Karzai himself – was that cell-phone companies must keep their towers active at night. The U.S. government was even more strongly committed to that position. ISAF leadership especially rejected the suggestion that MTN's conduct represented an acceptable way of protecting its network. ISAF expected MTN to keep its towers on, invest in security to protect them itself rather than paying the Taliban, and ultimately rebuild them if necessary. ISAF considered that course of action not only feasible, but mandatory for a company like MTN reaping profits in an insurgency-afflicted country like Afghanistan.

834. Defendants' direct facilitation of the Taliban's tower shutdowns also directly aided al-Qaeda. Dual-hatted al-Qaeda/Taliban polyterrorists, like Sirajuddin Haqqani, played a central role in the Syndicate's tower scheme. Dual-hatted al-Qaeda/Taliban polyterrorists like Sirajuddin also attacked Americans in Afghanistan through the use of MTN's cell tower shutdowns as weapons against the United States. Thus, when Defendants facilitated MTN's tower shutdowns, Defendants provided direct operational assistance to al-Qaeda in Afghanistan in addition to Defendants' assistance to the Taliban.

**DEFENDANTS AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM BY PROVIDING OPERATIONAL ASSISTANCE TO THE RELEVANT TERROR ORGANIZATIONS THROUGH DEFENDANTS' OBSTRUCTION OF UNITED STATES COUNTERTERRORISM OPERATIONS TARGETING THE RELEVANT TERROR ORGANIZATIONS**

835. Independently, and in addition to Defendants' protection payments to al-Qaeda, al-Qaeda-in-Iraq and Islamic State, *supra* part II, LM Ericsson, Ericsson AB, Ericsson Inc., Ibrahim, and Ekholm also aided and abetted acts of international terrorism by al-Qaeda, al- Qaeda-in-Iraq, and Islamic State against Americans in Afghanistan by obstructing United States counterterrorism operations targeting the Relevant Terror Organizations in the Middle East.

836.    LM Ericsson, Ericsson AB, and Ericsson Inc. obstructed U.S. government counterterrorism operations targeting al-Qaeda and al-Qaeda-in-Iraq from at least 2003 through at least 2022, Ibrahim did so from at least 2014 through at least 2022 while acting in her capacity as an Ericsson AB employee and while acting in her capacity as an LM Ericsson employee and personal counselor to Ekholm, and Ekholm did so from at least 2017 until at least 2022 while serving as CEO.[140]

837.    Defendants obstructed U.S. government counterterrorism operations targeting Islamic State from 2014 through at least 2022, and Ekholm did so from 2017 until at least 2022 while serving as CEO.

    **1. The U.S. Government Prevented Acts Of International Terrorism Against Americans In Afghanistan By Conducting Counterterrorism Operations In The United States And The Middle East That Targeted The Relevant Terror Organizations**

        a.  <u>U.S. Counterterrorism Operations Against Al-Qaeda, Al-Qaeda-In- Iraq, And Islamic State Relied Upon A Whole-Of-Government Approach In Which The Department Of Justice And Other Agencies Shared Information In Order To Prevent Terrorist Attacks</u>

838.    From at least 2004 through at least 2022, the United States counterterrorism operations that targeted the transnational terrorist finance, logistics, and personnel networks upon which the Relevant Terror Organizations relied depended upon a whole-of-U.S.- government effort in which the Department of Justice played a key role in developing, vetting, and sharing actionable information concerning the Relevant Terror Organizations terrorist finance,

---

[140] Ekholm served on LM Ericsson's Board of Directors prior to when Ericsson installed him as CEO in 2017. Plaintiffs believe discovery is likely to show that Ekholm knew Defendants' protection money payments earlier prior to when he became CEO in 2017, likely enabled such scheme to continue by violating his own fiduciary obligations to as the Board member of a publicly traded company with actual knowledge of such company's payments to FTOs, and nothing in this Complaint should be interpreted to suggest otherwise.

logistics, and networks worldwide, which helped protect Americans from attack in France, Belgium, and Afghanistan.

839.    This approach reflected America's broad post-9/11 counterterrorism emphasis on cross-pollination of data, intelligence, and investigative leads between various departments of the U.S. government in order to prevent future attacks by al-Qaeda and its progeny, including al-Qaeda-in-Iraq and Islamic State, against Americans.

840.    United States counterterrorism strategy from 9/11 through 2022 always depended upon the key role that the National Security Division, USAO-DC, DOJ FCPA Unit, FBI Washington Field Office, SEC FCPA Unit, Treasury Office of Terrorism and Financial Intelligence, and State Bureau of Counterterrorism each played – individually, and as part of the post-9/11 "whole-of-government" counterterrorism strategy in response to al-Qaeda, al-Qaeda- in-Iraq, and Islamic State – with respect to developing actionable intelligence necessary to prevent acts of international terrorism by allowing the whole-of-U.S.-government efforts to more effectively interdict terrorist finance, disrupt terrorist networks, and impair terrorist logistics.

841.    From 2003 through 2022, the U.S. government published other reports and made multiple public statements that similarly alerted Defendants that their provision of cover and concealment to the Relevant Terror Organizations foreseeably aided such FTOs' ability to attack Americans in Afghanistan, Europe and elsewhere.

842.    In November 2004, Assistant Treasury Secretary Juan Zarate testified before Congress that focusing on the sources and movement of monies used to fund terrorist groups in Iraq was absolutely critical to effective counter-terrorism policy in Iraq. Zarate further testified that the U.S. government has taken a coordinated interagency approach to that very issue, which employs robust information sharing across various components of the Treasury Department,

DOJ (from whom Defendants were concealing material information that they were duty-bound to share), the State Department, the Department of Defense, the Department of Homeland Security, the Intelligence Community, and the National Security Counsel.[141]

843.    In February 2005, Assistant Secretary Zarate gave a keynote address at an anti-counterfeiting summit in which he emphasized the importance of collaboration and information sharing between major players from the international private sector (*e.g.*, Ericsson, among others) and the U.S. government in gathering the information required to "triumph over a wide array of terrorist financing" in Iraq and other countries.  Mr. Zarate further stated that "Every day it becomes more apparent that following dirty money and attacking its illicit sources is an essential part of winning the financial war on terrorism."[142]

844.    In April 2006, Ambassador-at-Large for Counterterrorism at the U.S. Department of State, further emphasized the importance of "unified statecraft" – built upon cooperation between non-state actors from the private sector and the U.S. government (and other nations) – to "counter th[e] multi-layered threat" posed by "al-Qaida and its affiliates."  At one point, he bluntly stated, "The government needs the private sector" in the counterterrorism effort.  He further explained that he was hopeful that private sector actors would buy into the concept of

---

[141] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), quoted in Dep't of the Treasury, Testimony of Juan Carlos Zarate, Assistant Secretary, Terrorist Financing and Financial Crimes, U.S. Dep't of the Treasury, Before the Senate Permanent Subcomm. On Investigations of the Comm. on Governmental Affairs (Nov. 15, 2004), https://tinyurl.com/bdd6ykzw. The Treasury Department and State Department both amplified Assistant Secretary Zarate's comments in the national media. See, e.g., CQ Congressional Testimony, Hussein's Abuse of the U.N. Oil Free Food Program (Nov. 15, 2004) (quoting Zarate testimony)

[142] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit--* (Feb. 1, 2005), https://tinyurl.com/4b78zs5e. The Treasury Department and State Department both amplified Assistant Secretary Zarate's comments in the national media.  *See, e.g.*, U.S. Dep't of State, Release, *Zarate Cites Need For Public-Private Cooperation, Flexibility*, States News Serv. (Feb. 1, 2005) ("Continued success against terrorist financing will require 'strong and flexible plans' and better ways of collecting and sharing financial data without overburdening the financial sector, he said. Effective mechanisms depend on greater collaboration and information sharing within the government and with the private sector,' Zarate said.").

public-private partnerships in this area because of the private sector's exposure as a terrorist target "for exploitation or destruction."[143]

845.    In April 2008, the Treasury's Under Secretary for Terrorism and Financial Intelligence observed how terrorists "rely on financial support networks," which "are not only a rich source of intelligence [for U.S. counterterrorism efforts] but also . . . a vulnerability we can exploit . . . against al-Qaeda" and "the Iraqi insurgency" (*i.e.*, al-Qaeda-in-Iraq).  He explained how receiving real-time information, particularly from private sector actors, about terrorists' fast-evolving financial networks is critical to "better understand the relationship among [terrorists' financing nodes] and identify potential vulnerabilities . . . [and] sources and conduits of illicit finance."[144]

846.    In March 2009, Lieutenant General David P. Fridovich, commander for Special Operations Command, reiterated the importance of taking "a whole-of-government, or interagency, approach to this challenge [of eliminating the networks of terrorist facilitators]." LTG Fridovich explained the importance of the government's existing and planned collaboration with partner nations and the private sector, noting that DOD's exchange with "the private sector has been especially informative as we learn how better to deal with the rapidly developing cutting edge financial technologies like internet and cellphone money transfers."  He further

---

[143] Ambassador Henry A. Crumpton, Coordinator for Counterterrorism, U.S. Dep't of State, *The Role of Public and Private Partnerships in the Global War on Terrorism; Remarks to the 5th Annual International Counterterrorism Conference: Public and Private Partnerships; Washington, D.C.* (Apr. 20, 2006), https://2001-2009.state.gov/s/ct/rls/rm/2006/64977.htm. The State Department amplified Ambassador Crumpton's comments in the national media.  *See, e.g.*, State Dep't Documents and Publications, *Government-Private Partnership Key to Defeating Terrorism; Careful Investment Can Replace Ideology Of Hatred With Hope, Says Official* (Apr. 20, 2006) (quoting Ambassador Crumpton's speech).
[144] Under Secretary for Terrorism and Financial Intelligence Stuart Levey, U.S. Dep't of the Treasury, Press Release, *Under Secretary for Terrorism and Financial Intelligence Stuart Levey Testimony* (Apr. 1, 2008), https://home.treasury.gov/news/press-releases/hp898. Treasury amplified Under Secretary Levey's comments in the national media.  *See, e.g.*, Stuart Levey, *Anti-Terrorism Financing*, CQ Congressional Testimony (Apr. 1, 2008) (quoting Under Secretary Levey's speech).

elaborated on the focus of recent collaborative efforts and exchanges as al-Qaeda's facilitation networks, noting that "[a]ny tracking of money flows in support of the insurgents and terrorists operating in Iraq and Afghanistan links almost immediately to transregional and global facilitation networks that pose very real threats to the United States and our interests." Finally, in highlighting the success to date and future promise of the government's Iraq Threat Finance Cell, he expressed how DOD was "eagerly participating in the establishment of" a similar program focused on Afghanistan-based terrorism threats.[145]

847.    In September 2011, Assistant Treasury Secretary of Counter-Terrorist Finance, Daniel Glaser, testified before a House Subcommittee about how substantial sums of money are critical to terrorist groups—not just to carry out attacks, but to also recruit and train operatives, procure weapons, make 'martyr' payments to terrorists' families, and to gain support from local populations.    According to Glaser, terrorists' constant need for funding underscored the importance to counterterrorism efforts of receiving information and intelligence "to identify sources of illicit finance [for terrorists] and those individuals and entities that comprise [their] illicit finance networks."  This financial intelligence allows counterterrorist efforts to identify vulnerable points in terrorist finance networks that are susceptible to disruption, including those related to terrorist groups' increasing use of criminal activity to raise money.  Secretary Glaser also explained how "[f]ollowing the money can often yield valuable insights into a terrorist organization and help discover previously unidentified leadership and support nodes." He then touted the Treasury's Office of Financial Intelligence's successful efforts against core

---

[145] LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* U.S. House of Representatives, *Tracking And Disrupting Terrorist Financial Networks: A Potential Model For Interagency Success?*, Hearing, House Committee on Armed Services, Terrorism, Unconventional Threats and Capabilities Subcommittee (Mar. 11, 2009).

al-Qaeda achieved by being able to "undermine[] terrorist financial networks across the globe."[146]

848.    In a November 2013 statement before a Senate Committee, FBI Director James Comey described how the FBI works with its law enforcement and intelligence community partners to advance the Bureau's top priority of counterterrorism, particularly as to "Al-Qaeda and its affiliates." Notably, Director Comey emphasized that "there must be cooperation with the private sector" for the government's counterterrorism efforts to succeed, drawing on his assessment of the effectiveness of another public-private partnership in the cybersecurity space where "[t]he private sector is the key player" and provides to its federal and international partners "real-time threat intelligence, every day."[147]

849.    Following the emergence of the Islamic State as a prime terrorist threat, Samantha Power, U.S. Permanent Representative to the United Nations, wrote that all countries must rely on and support private sector actors to help them "identify and block financial transactions benefiting ISIL and other terrorist groups" and identify terrorist financiers and other facilitators. As an example of some of those key transactions, Ms. Power specifically highlighted the "crude tax and protection rackets" that ISIL employs to raise "hundreds of millions of dollars . . . [and] pay its followers and fund attacks around the world."[148]

850.    And in May 2017, Marshall Billingslea, as the nominee for Assistant Treasury Secretary for Terrorist Financing, did not mince words in his opening statement before the Senate

---

[146] *Id.*

[147] FBI Director James B. Comey, *quoted in* FBI, *Homeland Threats And The FBI's Response; Statement For The Record Befor*e *The Senate Committee On Homeland Security And Governmental Affairs* (Nov. 14, 2013), https://tinyurl.com/2s4z78t8.

[148] Ambassador Samantha Power (U.S. Permanent Representative to the U.N.), *Samantha Power: Putting ISIS Out Of Business*, CNN Wire (Dec. 17, 2015), https://tinyurl.com/46tswhph.

Committee considering his nomination when saying that "disrupting terrorist finance and illicit trade requires working closely with the private sector."[149]

851.    Moreover, Ericsson personnel have attended in-person U.S. government presentations emphasizing the U.S. government's reliance on actionable information from private sector actors to protect America from asymmetrical threats like terrorism.

852.    On July 31, 2019, for example, at least one senior executive acting on behalf of Ericsson attended a presentation at the Washington, D.C. office of the Center for Strategic and International Studies ("CSIS"), a think tank that focuses on, *inter alia*, counterterrorism (the "CSIS Meeting").  During this presentation at the CSIS Meeting, Christopher Krebs, a senior U.S. cybersecurity official, while addressing the importance of "private public partnership," told those in the room, including Defendants:

> *We have to continue working together between government and industry to understand what the challenges are and employee mitigations that are collaborative, coordinated and effective. ... So, it's going to take all of us working together. ... You will hear the perspectives later today from the government players, but it also requires very close coordination with government and industry. ... it requires trusted and confidential working relationship. ... So again, the call to action here, is government, industry continuing to work together.*

853.    As the DOJ FCPA Unit and the SEC FCPA Unit publicly observed in 2012, for example, "DOJ's and SEC's FCPA enforcement actions" regularly successfully interdicted illicit schemes by "third parties, including agents, consultants, and distributors," who were "commonly used to conceal [] [corrupt] payment[s]" "in [] business transactions,"[150] and

---

[149] Marshall Billingslea, *Opening Statement Of The Nominee For Assistant Secretary Of The Treasury For Terrorist Financing*, U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 16, 2017), https://tinyurl.com/4brujnkv.
[150] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 60.

therefore supported America's post-9/11 counterterrorism efforts because "corruption" "impede[d] U.S. efforts to" "combat … terrorism."[151]

854.    With respect to interdicting the Relevant Terror Organizations transnational terrorist networks, financiers, logisticians, and tactics operationalizing protection money, "taxation," and the use of cash equivalents like "free goods," the effectiveness of the U.S. government's whole-of-government counterterrorism strategy substantially depended upon DOJ's and SEC's illicit payments-related law enforcement efforts, including those of the National Security Division, USAO-DC, FBI-WFO, DOJ FCPA Unit, and SEC FCPA Unit. This was because such above-described the Relevant Terror Organizations terrorist lanes often depended upon modes of value transfer that sounded in corruption, money laundering, and other illicit transnational activity for which DOJ and SEC had substantial expertise.

855.    The National Security Division, USAO-DC, DOJ FCPA Unit, FBI Washington Field Office, SEC FCPA Unit, Treasury Office of Terrorism and Financial Intelligence, and State Bureau of Counterterrorism's contributions to the U.S. government's whole-of-government counterterrorism operations regularly protected Americans from terrorist attacks by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State in, *inter alia*, France, Belgium and Afghanistan from 2002 through 2022 in at least four ways.

856.    *First*, whole-of-U.S.-government efforts routinely secured U.S. federal criminal indictments and convictions of key transnational al-Qaeda, al-Qaeda-in-Iraq, and Islamic terrorist operatives, financiers, and logisticians who directly funded, armed, and staffed such FTOs' terrorist attacks against Americans in France, Belgium and Afghanistan.

---

[151] *Id*. at 2-3.

857.  *Second*, whole-of-U.S.-government efforts regularly developed actionable information for on-the-ground U.S. government counterterrorism operations in France, Belgium and Afghanistan designed to protect Americans from terrorist attack (and rescue American hostages) by targeting key the Relevant Terror Organizations terrorist operatives, financiers, logisticians, supply cashes, funding sites, safe houses, and other key targets that directly funded, armed, and staffed such FTOs' terrorist attacks against Americans in France, Belgium and Afghanistan.

858.  *Third*, whole-of-U.S.-government efforts routinely reduced the overall funds, weapons, and equipment available to the Relevant Terror Organizations for use against Americans in France, Belgium, and Afghanistan by interdicting the corruption, money laundering, narcotics, sanctions evasion, and fraud schemes upon which the terrorists relied, even short of an indictment or conviction.

859.  *Fourth*, whole-of-U.S.-government efforts regularly facilitated intelligence sharing between the U.S. government and key counterterrorism allies (e.g., many European or Middle Eastern governments) or participants in the terrorist finance scheme in question (e.g., the universe of companies that chose to pay Islamic State) by developing vetted information that American officials could deploy in the Middle East in order to protect Americans from the Relevant Terror Organizations attacks in France, Belgium, Afghanistan, Europe and elsewhere.

860.  United States counterterrorism operations always targeted al-Qaeda, al-Qaeda-in- Iraq, and Islamic State protection networks – literally every day at issue in this case.  In fact, given the central role that such networks played in financing and arming these FTOs in Iraq and

Afghanistan, there were usually multiple, large-scale, U.S. counterterrorism operations always targeting the protection networks, often dozens of separate ones at the same time.

861.    In 2010, for example, U.S. Army Brigadier General Jeffrey Buchanan publicly stated explained how the U.S. government and its Coalition partners were continuing to prioritize counterterrorism operations targeting al-Qaeda-in-Iraq's extortion networks because the United States recognized that, with respect to "al Qaeda," "al Qaeda in Iraq" "remain a threat," "remain dangerous[,]" "[a]nd [al-Qaeda-in-Iraq is a] part of the [al-Qaeda] network" and thus "includes al Qaeda's ability to recruit Iraqi fighters, al Qaeda's ability to bring foreign fighters across the border into Iraq, their ability to plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money."[152] In that context, BG Buchanan observed that "al Qaeda continues to change its tactics and how it adapts" and "[b]ecause [al-Qaeda's and al-Qaeda-in-Iraq's] financial networks have been so degraded, they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of the country."[153]

862.    From 2004 through 2014 (in the case of al-Qaeda and al-Qaeda-in-Iraq), and from 2014 through at least 2019 (in the case of Islamic State), the operative FTOs' protection rackets generally shared the same features described by BG Buchanan above: they were multi-faceted, dynamic, and constantly evolving in response to non-stop 24/7 pressure from the United States, directly through U.S. forces or through Coalition partners like the Iraqi government. In addition to BG Buchanan's public statement in 2010, a constant stream of additional U.S. government announcements and associated media reports regularly highlighted how the U.S. government

---

[152] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces- Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.
[153] *Id.*

believed that the effectiveness of American counterterrorism operations in Iraq that specifically targeted al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks were inextricably connected to reducing such FTOs' ability to kill Americans in the Middle East.

863.    Examples of such reports included, but were not limited to:

> a.  Defense Department Documents, January 2007: "[S]uspected terrorists were captured [] during a raid conducted north of Baghdad that targeted an individual with ties to a senior al Qaeda leader who has … conducted extortion operations …"[154]

> b.  Associated Press, July 2007: "On July 9, [2007] Iraqi security forces detained four suspects allegedly responsible for running an extortion network and two individuals suspected of planning attacks against coalition forces. … Iraqi police detained four suspects allegedly engaged in extorting protection money from local contractors and using the funds to finance al Qaeda in Iraq activities."[155]

> c.  Washington Post, November 2007: "A good way to prepare for operations in Iraq is to watch … 'The Sopranos,'' said Maj. Gen. Rick Lynch, commander of U.S. forces in central Iraq, referring to the hit HBO series about the mob. 'You're seeing a lot of Mafioso kind of activity.'… [Detained AQI operative] Abu Nawall admitted … that the group 'gets a lot of money through extortion….' … The racketeering operations extended to nearly every type of

---

[154] Def. Dep't Documents, *American Forces Information Service News Articles, Combined Operation Nets Insurgents, Weapons in Baghdad* (Jan. 24, 2007), 2007 WLNR 1420339.
[155] Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007).

business in [Mosul], including … a cellphone company, which paid the insurgents $200,000 a month.[156]

    *d.* <u>American Forces Press Service, April 2010</u>: "In … Mosul, Iraqi soldiers and U.S. advisors searched … for a suspected AQI member believed to extort money from [] transporters and contractors to fund the terrorist group. … [U.S.] operations resulted in the deaths or arrests of at least six suspected senior AQI leaders believed to greatly contribute to funding the terrorist group by their involvement in a highly-organized extortion … ring based in Mosul. … The six … include the overall AQI commander of northern Iraq, four men who head the group's funding, and a regional commander for Mosul. 'The capture of all six AQI extortion … network leaders … will likely greatly disrupt AQI operations and prevent future attacks throughout Iraq,' U.S. military officials said … 'The money collected from extortion … comprises the bulk of AQI's income, which is subsequently used to fund the terrorist group's deadly attacks.'"[157]

    *e.* <u>Associated Press, October 2009:</u> "[A]n extortion network known as the Islamic State of Iraq and related to al-Qaida in Iraq based in … Mosul. … targeted … those who own or work at construction sites and local businesses … Extortionists then use the [] money to fund terrorist attacks …"[158]

    *f.* <u>Associated Press, September 2010</u>: "Iraqi forces … searched … for a suspected al-Qaida in Iraq leader allegedly responsible for extorting money

---

[156] Amit R. Paley, *Iraqis Joining Insurgency Less for Cause Than Cash*, Wash. Post (Nov. 20, 2007).
[157] American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010), 2010 WLNR 6913562.
[158] AP Alert - Business, *Iraqis Arrest Numerous Terrorism Suspects* (Oct. 14, 2009).

from … contractors and … transportation workers in order to fund terrorist operations …"[159]

    *g.* <u>New York Times, December 2013</u>: "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Using extortion … the Qaeda affiliate is largely self-financing. … In Mosul, most of the security force members who are not from the area have left the city, and Al Qaeda controls whole sections of territory."[160]

<u>U.S. Counterterrorism Operations Designed To Protect Americans From Attack By The Relevant Terror Organizations In France, Belgium, And Afghanistan Relied Upon The Effectiveness Of The U.S. Government's Anti-Corruption And Anti-Money Laundering Efforts</u>

864.    From at least 2004 through at least 2022, the United States counterterrorism operations that targeted the transnational terrorist finance, logistics, and personnel networks upon which the Relevant Terror Organizations relied depended upon a whole-of-U.S.- government effort in which the Department of Justice played a key role in developing, vetting, and sharing actionable information concerning the Relevant Terror Organizations terrorist finance, logistics, and networks worldwide, which helped protect Americans from attack in France, Belgium, and Afghanistan.

865.    The United States government did not approve, publicly or privately, of Defendants' protection payments. The U.S. government relied on its chosen Western contractors – including Defendants – to take responsibility for ensuring the financial integrity of their

---

[159] Assoc. Press, *Iraqi Forces Arrest 2 Al-Qaida Suspects*, AP Alert – Terrorism (Sept. 2, 2010).
[160] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).

contracting practices in Iraq. At all times, the U.S. government conveyed the message that protection payments violated U.S. law and undermined U.S. foreign-policy objectives in Iraq.

866.    The U.S. government has long been on record that protection payments to terrorists are unlawful – no matter their motivation. In 2007, for example, an Assistant Attorney General emphasized at a public press conference that "corporations are on notice that they cannot make protection payments to terrorists."[161] In 2022, similarly, the Deputy Attorney General emphasized that "business with terrorists cannot be business as usual."[162]

867.    The U.S. government viewed protection payments to terrorists in Iraq and Afghanistan the same way. Government officials stated that, as with Chiquita's payments to terrorists in Colombia, protection payments to al-Qaeda-affiliated terrorists undermined U.S. reconstruction objectives in Iraq and Afghanistan. For example, at a House Subcommittee hearing, an Assistant Deputy Defense Undersecretary for Program Support was asked whether "facilitation payments . . . to ensure that trucks aren't bothered [are] legal under United States law?"[163] He responded: "Clearly, it's not . . . and it's counterproductive to what we're trying to do."[164] The U.S. Special Inspector General for Afghanistan Reconstruction ("SIGAR") similarly opined that "I don't think that there should ever be or ever condone paying off a [terrorist] entity for anything . . . Obviously that's wrong; it's against the law and counter to any counterinsurgency or reconstruction initiative that we would like to see put in place."[165]

868.    The Congressional Commission on Wartime Contracting found it "particularly alarming" that "subcontractors on U.S.-funded convoys, road construction, and development projects pay

---

[161] U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty*.
[162] Deputy Attorney General Lisa O. Monaco, *quoted in* U.S. Dep't of Justice, *Deputy Attorney General Lisa O. Monaco Delivers Remarks Announcing A Guilty Plea By Lafarge On Terrorism Charges* (Oct. 18, 2022), https://tinyurl.com/yzb9sb8m ("DAG Statement").
[163] *Hearing on Corruption in Afghanistan Defense Contracting* (statement by Rep. John F. Tierney (D. Mass.)).
[164] *Id.* (Statement of Assistant Deputy Undersecretary Gary Motsek).
[165] *Funding The Enemy* at 196.

insurgent groups for protection."[166] Based on such statements, Defendants knew that the U.S. government was institutionally opposed to protection-money payments.

869.    The United States' recent charges against Lafarge S.A. highlights Defendants' deliberate choice to contradict U.S. counterterrorism policy to suit their own selfish interests. According to Deputy Attorney General Monaco, speaking for the United States, "[m]any companies made the right choice — the *only lawful choice: to leave the region rather than join hands* with [al-Qaeda- and Islamic State-linked] terrorists" in Iraq and Syria.[167] "Lafarge" – like Ericsson – "made a different decision: to go into business with ISIS and al-Nusrah — two of the world's most notorious and brutal terrorist organizations."[168]

870.    Defendants' protection payments to the Relevant Terror Organizations directly undermined the United States desire to combat extortion-related terrorist finance—a cornerstone of United States policy specifically designed to protect Americans overseas. U.S. government reports and statements alerted Defendants that resisting terrorists' demands for protection payments was a cornerstone of American counterterrorism policy in Iraq, Syria, and Afghanistan.[169]

---

[166] *CWC Report* at 73.

[167] DAG Statement (emphasis added).

[168] *Id.*

[169] *E.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 6, 2 (Jan. 30, 2006) ("During the past quarter, [SIGIR] continued to advance aggressive oversight of the use of U.S. funds in Iraq's reconstruction. … SIGIR's role in Iraq's reconstruction aims to help secure the overall success of the U.S. effort and thereby honor the sacrifices of the soldiers and contractors killed or wounded. SIGIR's most notable achievements during the past quarter were the arrests of four U.S. citizens for bribery, fraud, and theft involving Iraq reconstruction funds on contracts valued at more than $13 million. These arrests signal that the United States is unequivocally committed to fighting corruption and promoting accountability on all fronts in Iraq. SIGIR's Audit and Inspections divisions continued to focus oversight on [inter alia] ... the effort to fight corruption in Iraq … SIGIR remains committed to intensifying U.S. efforts to promote an effective anticorruption system … [and] to support anticorruption institutions in Iraq."); U.S. Dep't of Defense, Measuring Stability and Security in Iraq, May 2006 Report to Congress in Accordance with Department of Defense Appropriations Act 2006 (Section 9010), at 3 (May 26, 2006) ("The United States remains committed to … helping Iraqis … establishing … rule of law …, and fighting corruption."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 119 (July 31, 2006) ("[In] the Corruption Perception Index, compiled by Transparency International[,] Iraq ranks 21st in countries perceived as most corrupt in the world. The U.S. Embassy-Iraq has identified assisting the Iraqi government in its efforts to reduce corruption as one of its highest priorities."); The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Our goal is … to degrade and ultimately destroy ISIL through a comprehensive and sustained counterterrorism strategy so that

871. Given the centrality of anti-corruption to U.S. counterterrorism policy in Iraq and Afghanistan after 9/11, protection payments also violated express U.S. government contracting requirements and regulations. Under the terms of their contracts, prime contractors bore responsibility for ensuring the integrity of U.S. spending in Iraq. The government imposed requirements designed to ensure that private contractors lived up to that responsibility. For example, USAID's contracts contained a "standard clause" reminding its contractors that "U.S. law prohibits transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism. It is the legal responsibility of the contractor/recipient to ensure compliance with these Executive Orders and laws."[170] CENTCOM contracts followed DOD guidelines that similarly mandated that defense contracts—and DOD's Contracting Officers who negotiated and enforced them—must include a standard clause in

---

it's no longer a threat to Iraq, the region, the United States, and our partners. … [T]he United States will carry out a comprehensive strategy to defeat ISIL … [for which] the [] core elements [included] … Disrupting ISIL's Finances … The U.N. Security Council resolution that passed unanimously … demonstrated the broad international consensus to disrupt ISIL's finances. We are [] working aggressively … on a coordinated approach that includes: … limiting ISIL's ability to extort local populations;… and disrupting the flow of external donations to the group. Our domestic laws also provide additional tools in this effort, enabling us to sanction or prosecute those who fund ISIL's activities."), http://tinyurl.com/6yce8e3z; Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, December 17, 2014−March 31, 2015*, at 31-32 (Apr. 30, 2015) ("Several U.S. agencies play a role in disrupting ISIL's ability to fund operations. A broad1. U.S. government team is arrayed against this problem, including DoS, Treasury, DoD, and the intelligence community … work to accomplish the following strategic goals: … [inter alia] • Limit ISIL's ability to extort local populations. • … disrupt[] the flow of external donations to the group. • Prevent ISIL from accessing the financial system. … Some of the ongoing activities to disrupt ISIL's financing include: … Limiting ISIL's ability to extort local populations. ISIL[] extorts money in connection with daily transactions ranging from fuel and vehicle movement in ISIL-held territories to school fees for children. The U.S. government is working to limit ISIL's ability to transact extorted monies …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, September 30, 2015*, at 59 (Nov. 25, 2015) ("[T]he U.S. government is pursuing a four-part strategy to disrupt ISIL's ability to finance operations: 1. Disrupt ISIL's sources of revenue. Cut off ISIL's ability to generate revenue from … extortion in ISIL-controlled territories … and external donations. 2. Cut off ISIL's access to the regional and international financial systems. Restrict ISIL's ability to move and use its funds by accessing financial systems … and [] limit ISIL's ability to … move funds. 3. Target ISIL's financial leadership and facilitators. Identify and target key financiers within the ISIL structure. 4. Disrupt ISIL's external networks. Deny ISIL access to the international financial network that could support it in resupplying its war effort.").

[170] Memo. from Bruce N. Bower, USAID Regional Inspector General to Earl W. Gast, USAID Afghanistan Director, *Review Of Security Costs Charged To USAID's Projects In Afghanistan* (Review Report No. 5-306-10-002-S) at 11 (Sept. 29, 2010), https://tinyurl.com/2p82chxz.

every contract requiring government contractors to comply with all U.S. and Iraqi laws, including laws prohibiting the provision of material support to terrorists.[171]

872.    Prime contractors were required to include those same clauses in their contracts with their subcontractors and to ensure that their subcontractors complied with them.[172] The "vetting" requirements were especially strict for any subcontractors that were to be armed under the contracts. Most Defendants' protection payments – whether made directly, or through subcontractors – violated those requirements and reflected a failure to live up to their responsibility to ensure the legality of their contract spending in Iraq.

873.    Contractors typically concealed their protection payments from the U.S. government (and the Iraqi government) by funneling the money through networks of subcontractors and mischaracterizing the payments in their books and records as "security," "transportation," "logistics" or other similar costs. For that reason, the U.S. government (and the Iraqi government) was unaware of the specific illegal payments that Defendants made.

874.    As the U.S. government became aware of broader patterns of corruption in Iraq, it implemented a number of programs to curtail illicit payments. For example, Congress created SIGIR, which scrutinized and audited government contracting as part of a broader anti-corruption mandate. The U.S. Embassy in Baghdad also aggressively pushed anti-corruption efforts. The net effect of these various efforts was to elevate anti-corruption to a distinct line of effort in the U.S. strategy in Iraq, and to convey unmistakably to industry participants that protection payments were unacceptable.

---

[171] *See* Office of Under Secretary of Defense, *Class Deviation – Implementation Of The Synchronized Predeployment & Operational Tracker (SPOT) To Account For Contractor Personnel Performing In The United States Central Command Area Of Responsibility*, Memorandum for Directors Of Defense Agencies (Oct. 17, 2007).

[172] *See*, *e.g.*, USAID Contract No. DFD-I-00-05-00250, § H.15 (Sept. 27, 2005) ("[t]his provision must be included in all subcontracts/subawards"); USAID Contract No. 306-C-00-11- 00506, § H.17 (Oct. 29, 2010) (same).

875.    The U.S. government also implemented a wider array of programs designed to combat corruption in Iraq more broadly.  Defendants' protection payments also stymied those programs by fueling the type of corruption that U.S. agencies were attempting to eradicate.

876.    The U.S. government on occasion encouraged companies to hire local Iraqis or employ local Iraqi businesses in connection with some projects.  However, this was not a license for Western companies, including Defendants, to allow (much less instruct) their partners, consultants, and contractors to pay terrorists.  On the contrary, the U.S. government at all times communicated its expectation that Defendants should vet their local partners and take affirmative steps to ensure that the money they paid to those partners did not flow to al-Qaeda, al-Qaeda-in- Iraq, and Islamic State.  And the U.S. government repeatedly made clear that the payment of protection money – or the payment of terrorist "taxes" – in exchange for permission to proceed with U.S.-funded projects was illegal and counterproductive.  Neither USAID nor Multinational Forces-Iraq ever suggested that such payments were either an inevitable consequence or an acceptable cost of implementing U.S.-funded projects in areas controlled or contested by al- Qaeda, al-Qaeda-in-Iraq, or Islamic State.

877.    In September 2010, General Petraeus issued formal contracting guidance designed to further discourage protection payments to terrorists.  In the guidance document, General Petraeus emphasized that "[w]here our money goes is as important as the service provided or the product delivered."[173]  He thus instructed contracting officers to "[h]old prime contractors responsible for the behavior and performance of their sub-contractors," with an understanding that "[e]xcessive sub-contracting tiers provide opportunities for criminal networks and insurgents to divert contract money from its intended purpose."[174]  At bottom, the U.S.

---

[173] COMISAF's Contracting Guidance at 1.
[174] Id.

government's goal was to improve its systems and ensure that its "vendors and contractors" did not "empower the wrong people or allow the diversion of funds" to insurgents. [175] The government took a number of steps to implement that guidance, including by ramping up its own vetting efforts and affirmatively suspending or debarring certain contractors with suspected links to insurgents.

878.    For several reasons, Defendants nonetheless remained able to execute their payments to insurgents despite the U.S. government's efforts to discourage and stop them. *First*, in Iraq and Afghanistan, the government often lacked visibility into the subcontracting networks through which the payments flowed and thus had to "rely exclusively on prime contractors" to vet and supervise the subcontractors.[176] When Defendants knowingly funneled protection money through those subcontractors, the structure of the transactions made it difficult for the government to trace the money with sufficient precision to take corrective action. Such payments frustrated the U.S. military's policy of identifying and terminating "contracts with supporters of the insurgency."[177]

879.    *Second*, the U.S. government faced staffing shortages that impeded its efforts to fully monitor the large number of contractors and subcontractors operating in Iraq and Afghanistan. With a limited number of qualified contracting officers available – and a vast network of contracts to supervise – the government lacked the resources to investigate every payment made by Defendants or their subcontractors. Defendants were able to exploit those resource constraints to conceal their protection payments from U.S. government personnel.

---

[175] Id.

[176] U.S. Special Inspector General for Afghanistan Reconstruction, *Contracting With The Enemy,* at 8, Audit No. 13-6 (Apr. 2013).

[177] *Id.*

880.   Defendants did so even though they were duty bound to affirmatively flag such issues for the U.S. agencies funding their projects with U.S. taxpayer money.

881.   Third, because the U.S. government's contractors often had better access to on- the-ground information than it had, the U.S. government relied on the good faith of its contractors to prevent payments to terrorists. Due to Defendants' business ties – and the long in- country tenures of many of their personnel, as compared to the typically short rotations of U.S. government deployments – Defendants had unique real-time visibility into where their money was going. The government's need to rely on Defendants to use that unique visibility to do the right thing made it even easier for Defendants to conceal their payments from U.S. regulators.

882.   Given those constraints, it was Defendants (not the U.S. or Iraqi governments) that had the resources, expertise, and obligation to ensure that their practices did not materially support al-Qaeda, al-Qaeda-in-Iraq, or Islamic State. As the U.S. Senate Finance Committee's Oversight and Investigations Unit reported in 2020, when a Western company's "work [in] some of the most" "dangerous," "active hotspots for terrorist activity" "generates more than $1 billion in revenue" directly or indirectly through U.S. federal government "grants," "both USAID's and OFAC's processes clearly state that it was the responsibility of the [company] to vet all sub-grantees" and the Western company plainly "has a duty to ensure that funds acquired from the U.S. government … do not end up supporting terrorist activity."[178]

883.   In such circumstances, if a Western company had "access to the appropriate public information and should have known how, but failed to, properly vet [a contractor] as a sub-grantee, resulting in the transfer of U.S. taxpayer dollars to an organization with an extensive history of supporting … terrorists," it is the company that "bears the sole responsibility for

---

[178] U.S. Senate Finance Committee Oversight and Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, at 5-8, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

their failure to properly vet [the contractor]" because "[h]ad [the company] employed [reasonable] due diligence … methods …, taxpayer dollars would not have exchanged hands with an organization that is known to fund terrorist organizations."[179] "Particularly concerning," according to the U.S. Senate Finance Committee's Oversight and Investigations Unit, "is [when a Western company] attempt[s] to shift the blame to the federal government for [its] own inability to properly vet a subcontractor" for terrorist finance.[180]

884.    In sum, the U.S. government clearly stated its opposition to protection payments and attempted to curtail them.  But those efforts were imperfect, and, at all times, Western contractors, including Defendants, functioned as the U.S. government's principal tool against terrorist financing.  But Defendants abused that trust to pay off the Relevant Terror Organizations and thereby increase their profit margins.  Ericsson's conduct forms the basis of this lawsuit; Plaintiffs expressly disclaim any challenge to the U.S. government's policy decisions.

**Defendants Provided Operational Assistance To Al-Qaeda, Al-Qaeda-In- Iraq, And Islamic State By Obstructing United States Counterterrorism Operations Against The Relevant Terror Organizations**

885.    Ericsson's participation in the FTOs' protection-money rackets gave it firsthand access to important information about how terrorists were raising money in Iraq.  No later than 2013 (when it was under investigation by the U.S. government for foreign bribery), Ericsson was required to disclose this information to the U.S. government and others, but it chose instead to conceal it to prevent Ericsson's own complicity with terrorists from coming to light.  Thus, at various points thereafter, Ericsson hid information about the protection-money rackets, including the identities of terrorist actors (*e.g.*, Haji Saleh), corrupt contractors and

---

[179] Id. at 10-11.

[180] *Id.*

subcontractors (*e.g.*, al Awsat), and details regarding how money was solicited and collected that allowed the FTOs' finance mechanism to flourish. This concealment independently aided al-Qaeda's, al-Qaeda-in- Iraq's, and Islamic State's violence.

886.    From at least 2013 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely and substantially obstructed United States counterterrorism operations designed to protect Americans from terrorist attacks by the Relevant Terror Organizations by lying to multiple key members of the U.S. government's whole-of-government counterterrorism team, including, but not limited to, the National Security Division, DOJ FCPA Unit, and SEC FCPA Unit.

887.    Eventually, Defendants' global bribery scheme – but not the terrorist finance aspects of such scheme – was detected, in part. In 2013, the SEC launched an FCPA investigation of LM Ericsson's and its subsidiaries corrupt practices worldwide, and DOJ launched its own investigation in 2015 (but neither learned that Ericsson obstructed U.S. counterterrorism efforts until at least 2022).

888.    Even then, however, Defendants' obstruction of U.S. counterterrorism efforts endured: from 2013 through 2022, LM Ericsson, Ericsson AB, Ericsson Inc., and Ekholm represented to DOJ, as well as LM Ericsson's shareholders, that Defendants were fully cooperating with the United States' then-ongoing criminal and civil anti-corruption investigations.

889.    Ericsson brazenly obstructed U.S. counterterrorism efforts by concealing Defendants' payoffs to terrorists throughout the course of DOJ's and SEC's respective investigations. During the early phase (from 2013 through 2015), while Defendants were promising cooperation and good corporate citizenship to DOJ and SEC, they still plotted to pay off terrorists. During the middle phase (from 2016 through 2018), Defendants continued their

payoffs to Islamic State – while still lying to everyone else. Amazingly, while LM Ericsson was finalizing its parallel resolutions with DOJ and SEC in 2019, it was simultaneously making the deliberate – and obviously wrongful – choice to conceal its protection payments to al-Qaeda, al- Qaeda-in-Iraq, and Islamic State under the pretense that corrupt payments to the world's most notorious anti-American terrorist group were not "material."

890.    To obstruct U.S. government counterterrorism operations designed to protect Americans from attack by the Relevant Terror Organizations, Defendants routinely structured illicit transactions to conceal their protection payments on books-and-records, including, but not limited to, through Defendants': (i) illicit transactions with and through intermediaries, including their Iraqi partners, consultants, and contractors; (ii) use of slush funds and cash payoffs; and (iii) creation and maintenance of deliberately deficient internal controls.

891.    To obstruct U.S. government counterterrorism operations designed to protect Americans from attack by the Relevant Terror Organizations, Defendants routinely made materially false representations to, *inter alia*, the National Security Division, DOJ FCPA Unit, SEC FCPA Unit, and FBI, that obstructed such U.S. counterterrorism authorities' investigations and intelligence concerning al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq and Syria. LM Ericsson, Ericsson AB, and Ericsson Inc. routinely caused such obstructive communications to be made to U.S. government officials from at least 2013 through at least 2022, and Ekholm did so from at least 2017 through at least 2022.

892.    On December 6, 2019, LM Ericsson and its subsidiaries—which LM Ericsson admitted "operated as divisions of the parent, rather than separate and independent entities"—(1) admitted to a years-long campaign of corruption undertaken to solidify its grip on telecommunications business in five countries; and (2) entered into a Deferred Prosecution

Agreement with DOJ, under which LM Ericsson agreed to pay total criminal and regulatory penalties to the United States government in the amount of $1,060,570,432, one of the largest corruption fines ever imposed.

893.    As *Reuters* observed, Ericsson's subsequent "excuse for not fessing up earlier" – i.e., "that the [Iraq] transactions … didn't meet Ericsson's 'materiality' threshold" – was "unlikely to sit well with the Department of Justice, which takes a dim view of anything less than full disclosure in anti-corruption probes."[181] According to *Reuters*, Ericsson's "[k]eeping [Ericsson's] Iraqi skullduggery under wraps while in negotiations with the Feds is a distinctly bad look" considering "[LM Ericsson]'s 2019 [FCPA] settlement over graft in China, Vietnam, Indonesia, Kuwait and Djibouti made clear that the hefty size of the fine was partly due to Ericsson's foot-dragging."[182]

894.    DOJ agreed.  On March 2, 2022, LM Ericsson publicly admitted: "On March 1, 2022, the DOJ informed Ericsson that the disclosure made by the company prior to the DPA about its internal investigation into conduct in Iraq in the period 2011 until 2019 was insufficient. Furthermore, it determined that the company breached the DPA by failing to make subsequent disclosure related to the investigation post-DPA." As the *Washington Post* reported, DOJ "accused … Ericsson of violating a billion-dollar legal settlement by failing to fully disclose evidence of alleged corruption and possible payments to terrorists in Iraq."[183]

---

[181] Ed Cropley, Ericsson's ISIS Fallout Could Go Beyond Big Fines, Reuters (Feb. 16, 2022).
[182] *Id.*
[183] Greg Miller and Louisa Loveluck, *Justice Department Accuses Ericsson of Failing to Fully Disclose Alleged Fraud and Possible* Payments *to ISIS*, Washington Post (Mar. 2, 2022).

895.   The SEC *concurred*.  On June 9, 2022, LM Ericsson reported that the SEC "has notified the Company that it has opened an investigation concerning the matters described in the Company's 2019 Iraq investigation report."[184]

896.   Upon information and belief, and as alleged in the *Schmidt* Case , according to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's and *Ericsson* AB's enterprise-wide strategy to make illicit payments to increase Ericsson profits in high-risk jurisdictions, the following conclusions are "obviously" correct:

    *a.* LM Ericsson's and Ericsson AB's "top management" both "approved" Ericsson's decision to "bribe[]such terrorist organizations" – i.e., the Relevant Terror Organizations – "but also wanted to hide it from DOJ+SEC+IRS during their penalty negotiations up to the signing of the DPA in December 6, 2019."

    *b.* When LM Ericsson's and Ericsson AB's "top management" concealed information concerning Ericsson's decision to "bribe[] such terrorist organizations," Defendants' "top management" did so "in spite of the existence" – by no later than "2018" – of Defendants' "revealing Internal Compliance Report" concerning their payments in Iraq."

    *c.* "[LM Ericsson's] CEO [i.e., Börje Ekholm] should have presented [Defendants' "Internal Compliance Report" regarding Iraq] to those US Authorities," including "DOJ," "without delay, before the signing of the DPA."

---

[184] LM Ericsson, Press Release: Update on Ericsson Engagement with U.S. Authorities (June 9, 2022).

897.    The suspicious timing of Simpson Thacher's final report (and the fact that Simpson

Thacher was simultaneously advising LM Ericsson on the DOJ investigation) also suggests

that the report was intentionally delayed until just after the ink on LM Ericsson's DPA had

dried so that Ericsson could get away with not disclosing it to the DOJ—and, if necessary, to

give Ericsson the ability to say it could not have disclosed Simpson Thacher's findings to the

DOJ before finalizing their settlement.    LM Ericsson and the DOJ executed the DPA on

November 26, 2019.    The DOJ filed the related criminal charges and put out a press release

announcing the DPA on December 6, 2019.    And Simpson Thacher "finished" its report on

December 11, 2019.

**Each Defendant Facilitated Ericsson's Operational Assistance To The Relevant Terror Organizations Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting The Relevant Terror Organizations**

a.    <u>LM Ericsson</u>

898.    Defendants' corporate culture of obstruction, like their corporate culture of corruption,

started at the top:    LM Ericsson directed Defendants' obstruction of U.S. counterterrorism

operations.

899.    From the start of the DOJ's and SEC's respective investigations, LM Ericsson specifically

intended to impede the U.S. government's ability to uncover LM Ericsson's bribes to al-Qaeda

and Islamic State in Iraq and Afghanistan.    LM Ericsson's agent, Simpson Thacher, has boasted

in marketing materials how "the Firm convinced the SEC to drop certain issues from its

ongoing investigation" of a "global telecommunications company . . . regarding alleged

payments to government officials in various countries in violation of the FCPA."

900.    LM Ericsson hired Simpson Thacher with the specific intent that Simpson Thacher deflect

any United States government scrutiny concerning Ericsson's illicit payments in Iraq,

including those relating to the Relevant Terror Organizations. LM Ericsson and Simpson Thacher agreed as to that course of conduct, and thereafter successfully obstructed the United States government's counterterrorism operations. *Id*. This conduct was a but-for cause of Defendants' protection payments in Iraq by no later than 2014, when LM Ericsson had already retained Simpson Thacher, both LM Ericsson and Simpson Thacher were aware of Defendants' payments to the Relevant Terror Organizations, both LM Ericsson and Simpson Thacher knew such payments were illegal and foreseeably aided acts of terrorism against Americans, and LM Ericsson and Simpson Thacher both affirmatively chose to conceal such information from the United States government even though both had an affirmative duty of disclosure given LM Ericsson's assertion that it was fully cooperating with the then-existing U.S. government investigation of Ericsson.

901.    On information and belief, LM Ericsson represented to DOJ – directly, or through its agent, Simpson Thacher – that LM Ericsson was fully cooperating with DOJ's investigation.

> b. Ericsson AB

902.    Consistent with the "One Ericsson" model, Ericsson AB had control of most Ericsson employees and other personnel (from Ericsson's customers, strategic partners, consultants, and other vendors, suppliers, and subcontractors with whom Ericsson AB contracted) relevant to the Corporate Defendants' obstructive conduct. By exercising direct control over those individuals, Ericsson AB helped LM Ericsson operationalize its obstruction.

903.    Moreover, on information and belief, Simpson Thacher also represented Ericsson AB (in addition to LM Ericsson) in connection with the SEC and DOJ probes of Ericsson's corrupt payments and other potential FCPA violations.[185] Because Ericsson AB was jointly

---

[185] Ordinarily, in a government investigation, a firm in Simpson Thacher's position that represents the parent corporation would represent its various divisions and encompassed subsidiaries. In particular, the Statement of Facts

represented by Simpson Thacher, it was jointly aware of LM Ericsson's obstructive conduct and facilitated it through its ongoing concealment

c.  <u>Ericsson Inc.</u>

904.    On information and belief, Ericsson Inc. was aware of Ericsson's transfers of U.S.-origin communications technologies to al-Qaeda in Afghanistan and thus obstructed U.S. counterterrorism operations—thereby providing operational assistance to al-Qaeda—by concealing information regarding those transfers (just as it concealed information regarding Defendants' illicit payments to Islamic State).

905.    Moreover, Ericsson Inc. concealed its own likely direct payments to terrorists in Iraq and Afghanistan.  Given that, upon information and belief and according to one Confidential Witness identified in the *Schmidt* Case, "[t]he Ericsson people in Iraq between [March 2003 and February 2004] were generally Americans"—combined with his/her observations about stark attack disparities in military-led convoys that included (versus those that did not include) Ericsson personnel—it is reasonable to infer that the Ericsson personnel on the ground either made or were directly involved in the making of protection payments to al-Qaeda-in-Iraq and al-Qaeda "core" in Afghanistan.

906.    Upon information and belief, Ericsson Inc. also participated in the Corporate Defendants' obstruction scheme by operationalizing Ericsson's whistleblower intimidation machinery, particularly by leveraging the U.S. legal system to maximize Ericsson's ability to threaten former Ericsson Inc. employees. This was designed to intimidate those employees from

---

attached to and incorporated by reference in, LM Ericsson's DPA stipulated that "LM Ericsson was a holding company operating worldwide through its subsidiaries and affiliated entities," and that its "subsidiaries acted as divisions of the parent, rather than separate and independent entities."

communicating with the U.S. government about Defendants' conduct, including (on information and belief), the conduct alleged herein.

907.    Upon information and belief, and as alleged in the *Schmidt* Case, according to a Confidential Witness with direct, first-hand knowledge of LM Ericsson's, Ericsson AB's, and Ericsson Inc.'s operations in North America, Europe, and the Middle East, Ericsson caused a draft letter agreement to be transmitted to one or more former employees of Ericsson Inc. in the United States that contained, *inter alia*, the following:

| ERICSSON ≥ | | Ericsson Internal POLICY | | |
|---|---|---|---|---|
| Prepared (also subject responsible if other) | | No. EUS-08:008075 Uen | | |
| Approved | Checked | Date 2020-04-06 | Rev AM | Reference |

---

### 11    Proprietary Information
Please read, sign and return to your HR Generalist

FROM:    Legal Department

RE:    PROPRIETARY INFORMATION

This letter is to remind you of your continuing obligations regarding proprietary information of Ericsson Inc., Ericsson Canada Inc. and their parent companies, subsidiaries and affiliates (collectively, the "Company"). Company proprietary information includes (but is not limited to) proprietary information concerning Company products, technology and all non-public aspects of Company business.

Under the terms of agreement(s) signed pursuant to your employment with the Company, it is a violation to disclose or use for your own benefit or the benefit of any other individual or entity the confidential or proprietary information of the Company. Federal, provincial, and state laws establish similar post-employment obligations under the law, including a duty not to disclose or use information that may be classified as a trade secret or proprietary information of your prior employer.

While we understand your loyalties will be with your future employers, we expect you to observe and comply with your responsibilities to the Company, just as your future employers will expect with regard to their proprietary information.

We wish you the best of luck in the future.

Sincerely,

Ericsson Legal Department

_____    Employee's Name

_____    Employee's Signature

_____    Date

313

908.    Plaintiffs refer to this letter, and substantially similar communications demanding confidentiality from former employees of Ericsson Inc., as the "Ericsson Legal Threat Letter."

909.    Although phrased as a "reminder," the Ericsson Legal Threat Letter is clearly a threat, as it threatens legal consequences under both contracts as well as federal, state, and local laws for any person who discloses Ericsson's confidential or proprietary information. The demand for secrecy is sweeping: the letter refers to confidential or proprietary information without specifying what that is, and makes it clear that it applies to information relating not only to Ericsson Inc., but also to the company's parent, subsidiaries, and affiliates. It is also unqualified: it does not exclude, for example, reports of information to law enforcement authorities. And it purports to be binding, as it requires the employee's signature.

910.    It is well-known across industries that such broad and unqualified demands for secrecy chill whistleblowing activity by intimidating putative whistleblowers. Employees will err on the side of self-preservation by staying silent if they are concerned that disclosing information about their employer's illegal activities will result in adverse consequences—and doubly so if they have recently signed a document promising not to disclose that information.

911.    Precisely for this reason, such demands are illegal. For example, Securities and Exchange Commission Rule 21F-17 prohibits any person from taking action to impede an individual from communicating information to the Commission, including by "enforcing, or threatening to enforce, a confidentiality agreement" with respect to that communication.

912.    Pursuant to this rule, the Commission has repeatedly brought enforcement actions against companies that adopt broad confidentiality policies or agreements that do not inform employees of their right to disclose information to law enforcement authorities.

913.    Suppressing potential whistleblowers was important to Ericsson because, for years, LM Ericsson was systematically breaking the law around the world. Indeed, for engaging in widespread bribery, record-keeping violations, and internal controls violations, Ericsson admitted to one of the largest Foreign Corrupt Practices Act sanctions in U.S. history in 2019. The government explained that Ericsson did not receive full credit for cooperation in connection with that investigation because Ericsson failed to voluntarily disclose all of its serious misconduct, produced materials in an untimely manner, and did not fully remediate the violations. Indeed, years after Ericsson's 2019 settlement, it emerged that Ericsson had withheld information about payments to Islamic State.

914.    Consistent with Ericsson's policy of covering up its wrongdoing, LM Ericsson and Ericsson AB depended upon Ericsson Inc. to ensure that Ericsson's whistleblower intimidation machinery functioned as Defendants corruptly intended—to intimidate any whistleblowers who challenged any aspect of Ericsson's criminal schemes.

915.    Thus, LM Ericsson and Ericsson AB relied upon Ericsson Inc. to transmit the Ericsson Legal Threat Letter to one or more former Ericsson Inc. employees who directly serviced Ericsson AB's customers in the North Middle East Group – which covers Afghanistan, Iraq, Jordan, Lebanon, and Syria – from an Ericsson Inc. office in America. This letter was transmitted even after Ericsson's December 2019 resolution with the U.S. government, indicating specific intent to cover up wrongdoing.

916.    The Ericsson Legal Threat Letter appears to be a form letter that was sent not only to one Ericsson Inc. employee, but on information and belief to every exiting Ericsson Inc. employee. Each time, the letter was transmitted not only for the benefit of Ericsson Inc., but also for all of that company's parents, subsidiaries, and affiliates, including LM Ericsson and  Ericsson

AB. Each time, the letter was transmitted from an Ericsson Inc. office in the United States, to an employee in the United States, referencing U.S. laws, and requesting a signature in the United States.

917.    LM Ericsson and Ericsson AB caused Ericsson Inc. to transmit the Ericsson Legal Threat Letter with the shared specific intent for LM Ericsson and Ericsson AB to each reach into the United States to use Ericsson Inc. to intimidate every former Ericsson Inc. employee who could potentially expose LM Ericsson's and Ericsson's enterprise-wide corruption scheme from 2001 through at least February 15, 2022, of which Defendants' terrorist finance was an inextricable part, including the foreseeable risk that evidence of LM Ericsson's and/or Ericsson AB's payments to terrorists throughout the Middle East, including al-Qaeda, al-Qaeda-in-Iraq, the Taliban, and Islamic State.

918.    When LM Ericsson and Ericsson AB reached into America through Ericsson Inc. to transmit Ericsson's Legal Threat Letter to former Ericsson Inc. employees in the U.S. who could expose Ericsson AB's unlawful conduct while working for high-risk Middle Eastern customers, LM Ericsson and Ericsson AB sought to secure significant business benefits derived from LM Ericsson's and Ericsson AB's desired consequential actions inside America:

> a.    Ericsson Inc. acted on behalf of LM Ericsson and Ericsson AB, and attempted to procure a signed admission from each newly fired Ericsson Inc. employee residing in America, which LM Ericsson and Ericsson AB valued specifically because of their need to deter whistleblowing given Ericsson's admitted, extensively documented, criminal conduct.

> b.    Acting through Ericsson Inc. in the U.S., LM Ericsson and Ericsson AB asked each Ericsson Inc. employee in America to "[p]lease read, sign and return to

your HR Generalist" in Ericsson Inc.'s office in the United States. When LM Ericsson and Ericsson AB used Ericsson Inc. to send this request to the U.S.-based newly fired employees of the latter, LM Ericsson and Ericsson AB intended to secure a strong piece of evidence against former Ericsson Inc. employee, which LM Ericsson and Ericsson Inc. specifically intended to use in an American court.

c.  Each time Ericsson Inc. secured a signature on behalf of LM Ericsson and Ericsson AB from a newly fired Ericsson Inc. employee in the United States, LM Ericsson and Ericsson AB obtained a valuable business asset – i.e., the signed document – that LM Ericsson and Ericsson AB could (and, on information and belief, often did) later use to extract further advantages from Ericsson Inc. and the American legal system.

d.  Acting through Ericsson Inc. in the U.S., LM Ericsson and Ericsson AB reached into America to threaten potential whistleblowers and witnesses.

919.  At all times, LM Ericsson and Ericsson AB knew that Ericsson faced substantial criminal risk under United States law, given LM Ericsson's and Ericsson AB's operation of an enterprise-wide corruption scheme in which LM Ericsson and Ericsson AB violated numerous laws of the United States prohibiting, *inter alia*, the provision of material support to terrorists.

920.  LM Ericsson and Ericsson AB reached into the United States to wield Ericsson Inc. as both sword and shield.  LM Ericsson and Ericsson AB leveraged unique advantages offered by America's legal system, including the rule of law, reliable courts, discovery, and so on, to attempt, through Ericsson Inc., to proactively compel former Ericsson Inc. employees to choose

to remain silent about whatever they know given the explicit legal threat for which LM Ericsson and Ericsson AB relied upon Ericsson Inc.'s presence in America.

921.    LM Ericsson and Ericsson AB also knew that Ericsson AB's most profitable network development and managed services contracts outside of America and Europe tended to be in the so-called "virgin" telecoms markets that offered the potential for Ericsson to build an entire network from scratch—with the attendant chance for LM Ericsson and Ericsson AB to realize outsized profits.  In every "virgin" telecom market that existed from 2001 through 2022, however, the reason for the market opportunity was simple:  the country in question posed the most severe terrorist finance and anti-corruption risk possible.  From 2001 through 2022, Iraq and Afghanistan exemplified this trend.

922.    Given LM Ericsson's status as a publicly traded company whose shares trade in America, LM Ericsson and Ericsson knew that LM Ericsson's and Ericsson AB's ability to keep profiting from Ericsson's enterprise-wide corruption scheme, including their protection payments to FTOs arising thereunder, depended upon LM Ericsson's and Ericsson AB's ability to manage the vast U.S.-linked-Dodd-Frank-whistleblower-risk arrayed against LM Ericsson given its criminal conduct in Iraq, Afghanistan, and elsewhere from 2001 through 2022.  As a result, ever since the SEC's Dodd-Frank whistleblower rules took effect on August 12, 2011, LM Ericsson's and Ericsson AB's ability to protect their ability to profit from illicit payment strategies, like Ericsson AB's choice to purchase protection from FTOs by making protection payments to them, has depended on suppressing whistleblowers in the United States and avoiding U.S. law enforcement.

923.    LM Ericsson and Ericsson AB also actively managed their U.S.-related whistleblower risk arising from Ericsson's top-down corruption model and associated payments to FTOs like al-

Qaeda as Ericsson AB's cost of doing business in "virgin" telecom markets like Iraq and Afghanistan.

924.    From 2011 through 2022, LM Ericsson and Ericsson AB also knew that Ericsson Inc.'s former employees in America could utilize the U.S. legal system's robust legal protections for whistleblowers, for which America stood alone amongst the Western legal world, as the only jurisdiction in which the government offers potential 8- and 9-figure "bounty" awards to incentivize disclosures.

925.    LM Ericsson and Ericsson Inc. attempted to manage the risks described above by routinely deploying Ericsson Inc. to threaten former Ericsson Inc. employees inside the United States to minimize the chance that LM Ericsson and Ericsson Inc. would get caught.

      d.    <u>Börje Ekholm</u>

926.    Ekholm in particular played a critical role in Defendants' obstruction of U.S. counterterrorism operations designed to protect Americans from attack by al-Qaeda, al-Qaeda-in-Iraq, and Islamic State.  Among other things, Ekholm approved Ericsson's overall strategy, which facilitated protection payments to Islamic State in Iraq, and the related obstruction of U.S. counterterrorism operations thereafter.

927.    Rafiah Ibrahim, Ericsson's head of the Middle East and Africa regions and member of LM Ericsson's Executive Leadership Team since 2017, had personal knowledge of Ericsson's illicit activities in Iraq and played an active role in key aspects of them.  In March 2019, while Ericsson's outside counsel from Simpson Thacher was conducting an internal investigation of Ericsson's corruption and the DOJ/SEC investigation was nearing its end, Ericsson announced that Ibrahim would be leaving her position as regional head for Middle East and Africa (and her post on LM Ericsson's Executive Leadership Team) to become a strategic "advisor" to

Ekholm beginning on August 31, 2019—even though no replacement for her had yet been identified. Although dressed up as a mere personnel change and perhaps even a promotion for Ibrahim, Ekholm's move to make Ibrahim one of his "advisors" was recognized by some industry insiders as an obvious "euphemism for 'gardening leave'". It is clear in hindsight that Ekholm made that decision with knowledge of at least some of Ericsson's illegal conduct in Iraq (as well as Ibrahim's culpability for that conduct).

928.    On information and belief, Ibrahim is still employed by LM Ericsson as an "advisor" to Ekholm. Ekholm most likely decided not to fire Ibrahim to conceal from the U.S. Government Ericsson's illegal activities in Iraq. Ekholm was laser-focused on finalizing Ericsson's dealings with DOJ and SEC so Ericsson could "close this legacy chapter" and "move forward." Had Ericsson cut Ibrahim loose rather than paying her to assume a fake role as Ekholm's personal strategic advisor (without being on the same continent as the person she was advising), she undoubtedly would have told the U.S. Government where all of Ericsson's bodies were buried. This would have jeopardized Ericsson's ongoing settlement negotiations with the DOJ and SEC and potentially exposed Ericsson to fines and penalties even larger than those under contemplation at the time.

929.    Although plaintiffs allege that Ekholm and other Ericsson executives knew about their payments to terrorists in Iraq much earlier, and that Ekholm knew while he was on LM Ericsson's Board prior to his appointment as CEO in 2017, Ekholm admitted publicly that he knew of the illegal payments in Iraq as early as 2018, which prompted Simpson Thacher's internal investigation in 2019.

930.    In the wake of Simpson Thacher's final report leaking to ICIJ, Ekholm has conveniently claimed in public that in 2019 he had instructed certain Ericsson officials to "disclose fully [the

report's findings] to the DOJ" but that others at Ericsson decided against this following an "internal process." Ekholm had many incentives to portray himself in a favorable light at that time; it was just one week until Ericsson's annual shareholder meeting where shareholders would vote on, among other things, whether to maintain the existing board members (including Ekholm) and whether to approve Ekholm's proposed compensation for the year ahead, and whether to discharge Ekholm from personal liability related to the Iraqi scandal. And proxy firms were recommending to shareholders that they vote to remove Ekholm as CEO. However, if Ekholm's claim to have given instruction is true, it is an admission that Ekholm recognized the imperative to share this information about Ericsson's terrorist payoffs in Iraq with the U.S. Government, but that Ericsson deliberately withheld that information in the hopes that it would stay under wraps and that Ekholm was on board with that decision.

    e.  <u>Rafiah Ibrahim</u>

931.    As alleged *supra*, Simpson Thacher uncovered evidence during the course of its internal investigation that Ibrahim was directly involved with many of Ericsson's corrupt payments in Iraq, including to FTOs. Simpson Thacher conducted this investigation around the same time that the DOJ and SEC were beginning to wrap up their investigations of Ericsson concerning similar types of corrupt payments in other countries. Upon learning of STB's discovery of a limited subset of Ibrahim's conduct as Head of Middle East and Africa, CEO Börje Ekholm sought to remove Ibrahim from her role while disincentivizing her from cooperating with law enforcement authorities, including the U.S. Government, and possibly spilling the tea on Ericsson's dirty deeds in Iraq (and elsewhere). Thus, rather than abruptly firing this long-tenured Ericsson executive outright—which would have raised red flags (and potentially jeopardized Ericsson's ability to renew lucrative business with key customers in her region)—

Ekholm and Ibrahim reached their own "sham" agreement in early 2019: On August 31, 2019, Ibrahim would "voluntarily" step down as Head of Ericsson's Middle East and Africa Region and become an "advisor" to Ekholm—essentially a "no-show" job for which she would be handsomely compensated—and Ibrahim would remain within the Ericsson tent and not tell the U.S. where the bodies were buried.

932.   Ericsson and Ekholm engineered this arrangement so that Ibrahim's departure would be announced in mid-March 2019 as a mere redeployment that would not take effect until nearly six months later—on August 31, 2019.   Rolling out the announcement this way was strategic on several fronts.   First, because Ibrahim's departure as Middle East/Africa Market Head was not effective immediately, Ericsson avoided raising suspicions that the move was driven by Ibrahim's potential involvement in criminal activity or other misconduct severe enough to necessitate an abrupt change.   Second, by announcing that Ibrahim would move into the role of an advisor to Ekholm, Ericsson created a narrative that could be publicly spun as a "promotion" and that would, at the very least, counteract any implication that Ibrahim was engaging in criminal behavior.   (After all, why would a CEO publicly emphasizing his company's newfound commitment to compliance publicly announce appointing a corrupt executive as a personal advisor?)   Third, by removing Ibrahim from LM Ericsson's Executive Team, her name would no longer be featured in Ericsson's Annual Reports (or other SEC filings), and her compensation would no longer need to be disclosed publicly.[186]   More importantly, however, was the fact that by making Ibrahim an "advisor", the mere fact of her

---

[186] Ericsson's Annual Reports disclosed individual compensation for members of LM Ericsson's Board of Directors and for the CEO.  The compensation for the other 14 members of LM Ericsson's Executive Team was not broken out individually but was reported in aggregate form. Nevertheless, certain shareholders and certainly LM Ericsson's Board of Directors likely had more visibility into the Executive Team's compensation than provided in the Annual Reports alone.

continued employment by Ericsson (and any change in that status) would no longer be readily verifiable by the public. And lastly, consistent with Ericsson's foundational commitment to putting profits above all else, allowing Ibrahim to remain as Ericsson's Head of Middle East and Africa region empowered her to use her relationships with the region's largest telecom companies one last time to finalize a handful of new and lucrative long-term deals for Ericsson— including a massive contract with Asiacell for network expansion and optimization in Iraq that Ericsson announced on July 11, 2019.

933.    By agreeing to this deal, Ibrahim also became an indispensable participant in Ericsson's strategy of obstructing the U.S. Government's investigation of Ericsson and concealment of material information regarding FTO activities in Iraq from the U.S. Government.

**Defendants' Operational Assistance To The Relevant Terror Organizations Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting The Relevant Terror Organizations Had A Substantial Nexus To The United States**

934.    LM Ericsson's and Ericsson AB's ability to reach into the United States was both the but for cause, and turbocharger thereafter, of Defendants' operational assistance to the Relevant Terror Organizations though Ericsson's obstruction of U.S. counterterrorism operations from at least 2015 through at least 2022. LM Ericsson's routine communications inside the United States, mostly on information and belief in Washington, D.C., enabled additional terrorist violence by the Relevant Terror Organizations by concealing Ericsson's payments to the terrorists and thus depriving the U.S. government of the intelligence, investigative leads, and network understandings it needed to attack the protection rackets Ericsson financed. If LM Ericsson had not reached into the United States as it did, it would not have been able to obstruct U.S. counterterror efforts as it did.

935.    Ericsson's ability to conceal its illegal protection payments to FTOs was, in part, based on the credibility and favor that Ericsson Inc. had built up, on behalf of Defendants, by interfacing and working with the U.S. Government on national security issues over the course of several years.  Specifically, following LM Ericsson's January 2012 acquisition of New Jersey- based Telcordia Technologies, Ericsson had effectively acquired a seat on the U.S. National Security Telecommunications Advisory Committee ("NTSAC") that had been occupied by Telcordia's CEO, Mark Greenquist, since January 2011.

936.    The NSTAC is comprised of up to 30 senior executives from the U.S. telecommunications industry and was established to provide the President, through the Secretary of Homeland Security, with information and advice regarding national security and cybersecurity issues arising from domestic and global communications infrastructure, new communications technologies, and the everchanging threat environment, among other things.

937.    After gaining that toehold on the NTSAC through its Telcordia acquisition, Ericsson achieved full and direct access when President Obama appointed the chairman of Ericsson Inc., Angel Ruiz, to the NTSAC in 2013, where he remained through at least 2018. Angel Ruiz was not merely the top brass at Ericsson Inc.; he was also a member of LM Ericsson's 15-person Executive Leadership Team.   Accordingly, LM Ericsson was able to have one of the key members of its leadership team regularly interfacing with the highest levels of the U.S. Government on some of the nation's most sensitive national security issues.

938.    LM Ericsson's ability to earn the U.S. Government's trust and the attendant credibility it afforded Ericsson as a trusted advisor/partner to the U.S. not only enabled Ericsson's concealment of its corrupt conduct in Iraq (and the related counterterrorism implications) but proved quite lucrative.  As just one example, in 2014, the Department of Defense purchased a

"miliary communications system" from Ericsson AB for $35.1 million in connection with Operation Inherent Resolve in Iraq. Ironically, this allowed Ericsson to profit from the U.S. military's effort to defeat the al-Qaeda-in-Iraq and Islamic State terrorists--which effort was necessitated, in large part, by the very protection payments Ericsson made over the course of many years that allowed those FTOs to grow and thrive.

939. United States counterterrorism operations concerning Iraq, Afghanistan, Syria, and Turkey often featured a transnational component with a heavy Washington, D.C. element. This reflected the heavy centralization of stakeholders relevant to Iraq, Afghanistan, Syria, and Turkey in Washington, D.C., including, but not limited to:

> a. Washington, D.C.-Based U.S. Government Agencies, including the U.S. Department of Justice, U.S. Department of State, U.S. Agency for International Development, U.S. Department of the Treasury, and U.S. Department of Commerce;

> b. Washington, D.C.-Based International Organizations, including the World Bank and IFC;

> c. Washington, D.C.-Based Iraq- and Afghanistan-Focused Think Tanks, including, but not limited to, the Foundation for Defense of Democracies; and

> d. Washington, D.C.-Based Media, including, but not limited to: (i) Washington, D.C.- headquartered media including, but not limited to, the Washington Post and Washington Times; (ii) Washington, D.C.-located news bureaus or reporters for mainstream media outlets, including, but not limited to, ABC News, the Associated Press, Bloomberg, CBS News, Fox News, the New

325

York Times, Politico, and the Wall Street Journal; and (iii) Washington, D.C.-located strategic communications professionals.

940.   Given Washington, D.C.'s central status to the U.S. government's whole-of-effort counterterrorism policy, the U.S. government's counterterrorism operations that targeted the al- Qaeda, al-Qaeda-in-Iraq, and Islamic State transnational terrorist networks, financiers, and logisticians, and operatives that directly funded, armed, and staffed the Relevant Terror Organizations attacks against Americans in France, Belgium and Afghanistan from 2004 through 2022 typically depended upon the close cooperation – including robust information sharing – between an array of Washington, D.C.-located U.S. government components.  These included, but were not limited to, the:

     *a.*   U.S. Department of Justice National Security Division, which was at all times part of Main Justice and located at 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530 ("National Security Division");

     *b.*   U.S. Attorney's Office for the District of Columbia, which was at all times located at 555 Fourth Street, NW Washington, D.C. 20001 ("USAO-DC");

     *c.*   U.S. Department of Justice FCPA Unit, which was at all times part of the Fraud Section of DOJ's Criminal Division and located at: (i) 950 Constitution Ave., NW, Washington, D.C. 20530; and (ii) 1400 New York Ave., NW, Bond Building--4th Floor, Washington, D.C. 20005 ("DOJ FCPA Unit");

     *d.*   U.S. Federal Bureau of Investigation Washington Metropolitan Field Office, which was at all times located at 601 4th St NW, Washington, D.C. 20535 ("FBI Washington Field Office" or "WFO");

  *e.* U.S. Securities and Exchange Commission FCPA Unit, which was at all times located at 100 F Street, NE, Washington, D.C. 20549 ("SEC FCPA Unit");

  *f.* U.S. Department of the Treasury Office of Terrorism and Financial Intelligence, which was at all times located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220 ("Treasury Office of Terrorism and Financial Intelligence"); and

  *g.* U.S. Department of State Bureau of Counterterrorism, which was at all times located at 2201 C Street NW, Washington, DC 20520 ("State Bureau of Counterterrorism").

941. Mr. Ekholm, who resided (and still resides) in the United States at all relevant times while serving as LM Ericsson's CEO, was physically present in the United States while personally participating in Ericsson's obstructive conduct.

942. Ms. Ibrahim purposefully availed herself of contacts in the United States when she entered into the arrangement with Ericsson and Ekholm to nominally serve as the latter's "advisor" because he resided in the United States at all relevant times between 2019 and the present.

**Defendants' Operational Assistance To The Relevant Terror Organizations Through Defendants' Obstruction Of U.S. Counterterrorism Operations Targeting The Relevant Terror Organizations Aided And Abetted The Terrorists' Acts Of International Terrorism Against Americans In France, Belgium, And Afghanistan**

943. Each of Defendants' obstructive acts set forth in this section impaired then- ongoing American counterterrorism operations specifically designed to protect Americans from attack by the Relevant Terror Organizations by affirmatively lying to the U.S. government about core facts relevant to American counterterrorism in France, Belgium and Afghanistan. Among other reasons, Defendants impaired the U.S. government's counterterrorism efforts regarding:

a.  the existence and extent of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's telecom- facing protection money rackets;

b.  the identities of key intermediaries who operationalized such rackets on behalf of Western companies, including Ericsson;

c.  such intermediaries' corresponding the Relevant Terror Organizations points of contact;

d.  the protection-money related tactics, techniques, and procedures followed by the Relevant Terror Organizations; and

e.  al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's preferred methods of value transfer and communication in such FTOs' telecoms-facing protection rackets.

944.    When Ericsson obstructed U.S. counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq (inclusive of its alias, Jabhat al-Nusra), the Taliban, and Islamic State, Ericsson provided critical operational assistance to these FTO's terrorist attacks against Americans in France, Belgium and Afghanistan, including Plaintiffs.

**DEFENDANTS FRAUDULENTLY CONCEALED THEIR ASSISTANCE TO AL-QAEDA, AL-QAEDA-IN-IRAQ, THE TALIBAN, AND ISLAMIC STATE**

945.    From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. provided vital cover and concealment to the Relevant Terror Organizations terrorists who facilitated attacks against Plaintiffs in France, Belgium, and Afghanistan by breaching Defendants' legal obligations to, *inter alia*, the United States, LM Ericsson's shareholders, and Plaintiffs, to speak truthfully concerning its relationships with counterparties, including the Relevant Terror Organizations; Ekholm did so from 2017 until at least 2022 while serving as LM Ericsson's CEO.

946.    From 2003 through at least February 15, 2022, Ericsson actively and fraudulently concealed its illicit transactions with the Relevant Terror Organizations alleged herein to cloak its illegal activities.

947.    While facets of Defendants' scheme were eventually detected – in part – by the United States government, , such detection did not reveal Defendants' decision to purchase security from the Relevant Terror Organizations for at least fifteen (15) years from at least 2004 through at least 2019.

948.    From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. routinely structured illicit transactions to conceal their protection payments in books-and-records, including, but not limited to, through Defendants': (i) illicit transactions with and through intermediaries, including their strategic partners, consultants, and contractors; (ii) use of slush funds and cash payoffs; and (iii) creation and maintenance of deliberately deficient internal controls.

949.    From at least 2004 through at least 2022, LM Ericsson, Ericsson AB, and Ericsson Inc. regularly provided cover and concealment to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection money rackets in Iraq and Syria by issuing public statements that fraudulently assured, *inter alia*, U.S., European, and Middle Eastern governments, LM Ericsson's shareholders, and Plaintiffs, that LM Ericsson, Ericsson AB, and Ericsson Inc. (i) followed a rigorous compliance policy; (ii) were subject to terrorism-related risks, while concealing Ericsson's protection payments; and (iii) were cooperating fully with the U.S. government's investigation of Ericsson's illicit payments.  LM Ericsson's, Ericsson AB's, Ericsson Inc.'s, and Ekholm's routine provision of such unlawful cover and concealment aid to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq and Syria

through Defendants' false public statements from 2003 through 2022 included, but were not limited to:

a. On June 22, 2004, Ericsson Inc. represented to LM Ericsson's shareholders: "Integrity and ethics has always been a significant part in the way Ericsson conducts business. Ericsson continues to further strengthen this through its Code of Business Ethics and Conduct, which is aimed toward all its employees."[187]

b. On April 11, 2014, LM Ericsson represented to its shareholders that: (i) LM Ericsson adhered to "a solidified approach to responsible business including rigorous compliance processes"; (ii) LM Ericsson "emphasi[zed]" that "conducting business responsibly takes a full value chain perspective," "begins with supply chain[,] and extends through Ericsson's own operations including the sales process"; and (iii) "we are focused on building a strong foundation for corporate responsibility within the company."[188]

c. On May 13, 2014, LM Ericsson—acting through its Group Vice President of Sustainability and Corporate Responsibility, Elaine Weidman-Grunewald—represented to its shareholders that: "Globally, [corruption] is a huge impediment to doing business in many parts of the world. When you have corrupt societies you also, in general, would have, for example, greater human rights abuses and many other problems … We have a zero tolerance to corruption of the [C]ompany, and so we just put a huge focus on this. We

---

[187] Ericsson Inc., *Press Release, Ericsson's Leading Technology Contributes Significantly to Global Sustainable Development, published in* Business Wire (June 22, 2004).
[188] LM Ericsson, *Press Release: Ericsson Emphasizes Responsible Business, Energy and Technology for Good in 2013* (Apr. 11, 2014).

don't want to be involved in the wrong kind of business. It doesn't mean that we're perfect or any company is perfect, but it means we're putting a focus on this, and all of our employees know that this is not the way we're going to do business. So, we have a code of business ethics, and every one of our 114,000 employees is required to acknowledge that they have read and understand this code and the requirements and the principles that we set forth in the code. … Why is it important globally? Because this is really dragging and holding societies down, holding people back, holding back development. … So, we decided to do the human rights impact assessment, and we worked together with Shift to do that. We're just completing that now. It was a quite a huge learning experience. … [T]he main learning with the U.N. guiding principles is really when companies traditionally would look at human rights impacts, [they] would traditionally look at the risks to themselves or to their brand about being present in the market. The new U.N. guiding principles are about the impact on people, the local stakeholders, the local communities. It's not so much like what is Ericsson's risk. Of course, we look at that as well, but we also look at potential negative human rights impact on people, basically. … One huge accomplishment was to get the top-level executive team and the CEO to really see the value and the need to be active in this area and see the benefits of it."[189]

d.  In June 2016, LM Ericsson—via its CEO, Hans Vestberg—fraudulently represented that: at LM Ericsson, "[r]educing corruption," "fighting crime

---

[189] *Heather Clancy, How She Leads: Elaine Weidman-Grunewald, Ericsson, Greenbiz, (May 13, 2014), https://tinyurl.com/eh3jr2xj.*

and terrorism," and "strengthening and improving the equity of fiscal policy," were "core" to achieving the "[Sustainable Development Goals]" to which LM Ericsson professed to adhere.[190]

e.  On March 19, 2017, LM Ericsson and Ericsson Inc. jointly published a statement from LM Ericsson's Group Vice President of Sustainability and Corporate Responsibility, Ms. Weidman-Grunewald, which fraudulently represented that, with respect to corporate social responsibility, Ericsson was "Turning intentions into impact," and that: "Ericsson's deep-rooted commitment to the [Sustainable Development Goals] is well documented. Technology for Good is the concept we work with every day to address sustainable development challenges like … humanitarian issues, [and] human rights … We recently launched our 23rd Sustainability & Corporate Responsibility Report and are turning our intentions into impact in a number of ways."[191]

f.  On September 18, 2018, Ericsson AB (including through Rafiah Ibrahim, Head of Ericsson Middle East and Africa) represented to LM Ericsson's shareholders that Ericsson engaged "[i]n an effort to make quality secondary education more accessible in Iraq" purportedly reflected Ericsson's ongoing "work[]" in "Iraq to leverage" "our employees to make a positive impact" in

---

[190] Hans Vestberg, *quoted in* LM Ericsson, *ICT and SDGs*, at 7, 18-19, 29.
[191] LM Ericsson and Ericsson Inc., *Taking Action On The Sustainable Development Goals* (May 12, 2016) (quoting Ms. Weidman-Grunewald), https://www.ericsson.com/en/blog/2016/5/taking- action-on-the-sustainable-development-goals.

recognition, as Ms. Ibrahim stated, of Ericsson's purported efforts to ensure that "girl[s]" in Iraq could "receive [a] quality education."[192]

g.  On July 11, 2019, LM Ericsson represented to its shareholders that: "Under [LM Ericsson's] agreement [with Asiacell], Ericsson will provide network design and optimization as well as expansion services … Ericsson will also offer round-the-clock network monitoring, problem restoration and performance enhancement services."[193]

h.  On December 6, 2019, LM Ericsson represented to its shareholders that: (i) "The resolution relates to historical FCPA breaches ending Q1 2017"; (ii) "In parallel to the investigations, [LM Ericsson] has since 2016, together with external expert advisors, conducted a comprehensive review of the Company's anti-corruption program …[and] has been taking significant steps to improve its Ethics and Compliance program"; (iii) "Pursuant to the resolutions, Ericsson has agreed to continue enhancing its internal controls and its compliance program"; and (iv) "Reaching a resolution with the US

---

[192] LM Ericsson, *Press Release: Ericsson and Zain Bring 'Connect to Learn' Education Initiative to Iraq* (Sept. 18, 2018). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement was accurate only because LM Ericsson concealed Defendants' gigantic, regular protection payments to Islamic State—which Defendants had been making to ISIS specifically for the more than four years since its February 2014 inception by the time this statement—which LM Ericsson knew, through its own personnel and agents on the ground as well as U.S. government and media reports, directly funded ISIS's rampage against schools for women and girls throughout Iraq, which was the signature issue that Islamic State opposed above nearly all else. LM Ericsson could not accurately describe its true relationship to schools for women and girls in Iraq – i.e., that LM Ericsson was responsible for funding the people blowing them up, burning them down, and murdering everyone inside – so LM Ericsson concealed such fact from its disclosures, including this statement.

[193] LM Ericsson, *Press Release: Asiacell Selects Ericsson Services for Superior User Experiences in Iraq* (July 11, 2019). In addition to the other reasons that this statement fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM Ericsson's payoffs to Islamic State because this statement omitted Ericsson's key service to Asiacell as the leader and orchestrator of protection money payments made on both Ericsson's and Asiacell's behalf. LM Ericsson's service as Asiacell's protection money partner was a core service (albeit an illegal one) that LM Ericsson provided to Asiacell.  This statement fraudulently concealed such fact.

authorities allows us to close this legacy chapter" and "now move forward
…"[194]

    *i.*  On March 3, 2020, LM Ericsson represented to its shareholders that "[w]e
have … a significant proportion of our sales to emerging markets in the …
Middle East" and "[o]ur extensive operations are subject to additional risks,
including … acts of terrorism."[195]

950.    Each of the statements in the previous paragraph fraudulently concealed Ericsson's
protection payments to the Relevant Terror Organizations by addressing LM Ericsson's
purported operational risks from terrorism in the Middle East while concealing Ericsson's
payoffs to terrorists in Iraq, the implications of those payoffs, and/or the true nature of the
services Ericsson provided to its Iraqi customers like Korek and Asiacell.

951.    LM Ericsson, Ericsson AB, and Ericsson Inc. also combined as One Ericsson, or the
"Ericsson Group" to participate in events, and coordinate shared statements, that were designed
to conceal, and did conceal, Defendants' nearly two-decade-long-campaign of protection
payments and logistical aid to the Relevant Terror Organizations.

952.    Defendants pursued a "One Ericsson"-inspired strategy of issuing combined open
statements published at high-profile international events in the United States – in which
Defendants participated as the "Ericsson Group" – that concealed Ericsson's protection
payments to the Relevant Terror Organizations.

---

[194] LM Ericsson, *Press Release: Ericsson Reaches Resolution on U.S. FCPA Investigations* (Dec. 6, 2019).
[195] LM Ericsson, *2019 Annual Report*, at 127 (Mar. 3, 2020). In addition to the other reasons that this statement
fraudulently concealed LM Ericsson's conduct set forth herein, this statement also fraudulently concealed LM
Ericsson's payoffs to Islamic State because LM Ericsson described risks from terrorism without revealing that LM
Ericsson's behavior had worsened such risk, by providing a dependable, large-scale, stream of income to terrorists in
LM Ericsson's key Middle Eastern markets. This statement fraudulently concealed such fact.

953.    Defendants' use of events in the United States that promoted adherence to the U.N.'s Sustainable Development Goals – which the signers, including Defendants, touted as a group of "17 Goals to Transform Our World" (the "Sustainable Development Goals" or "SDGs") – illustrates how Defendants operationalized the cover and concealment they afforded to the Relevant Terror Organizations.  U.N. Sustainable Development Goal 16 (or "SDG 16") specifically committed its backers to "target[ing]" conduct intended to, inter alia, protect Americans (and others) against terrorist attacks by the Relevant Terror Organizations – the three FTOs that dominated the attention of the U.N. at all times:

[Sustainable Development] Goal 16 [T]argets

**16.1** Significantly reduce all forms of violence and related death rates everywhere

\*\*\*

**16.3** Promote the rule of law at the national and international levels and ensure equal access to justice for all
**16.4** By 2030, significantly reduce illicit financial and arms flows, strengthen the recovery and return of stolen assets and combat all forms of organized crime
**16.5** Substantially reduce corruption and bribery in all their forms
**16.6** Develop effective, accountable and transparent institutions at all levels
\*\*\*
**16.A**    Strengthen relevant national institutions, including through international cooperation, for building capacity at all levels, in particular in developing countries, to prevent violence and combat terrorism and crime[196]

954.    Defendants were aware, through their statements regarding Sustainable Development Goal 16's anti-corruption and counterterrorism goals, that Ericsson's protection payments and

---

[196] United Nations, *Sustainable Development Goal 16: Promote Just, Peaceful and Inclusive Societies* (2014), https://tinyurl.com/ycx9mahf.

obstruction of U.S. counterterrorism operations facilitated attacks against Americans by the Relevant Terror Organizations.[197]

955.    On September 24, 2014, Defendants were the only corporate sponsor of an coordinated an open letter published in New York in which the participants professed their commitment to all of the Sustainable Development Goals, including SDG 16's anti-corruption and counterterrorism goals (the "Ericsson Group Open Letter").[198]  The Ericsson Group Open Letter provided, in part, as follows:

> We, the under-signed, believe transparent, accountable and inclusive institutions are vital. … [and that] [w]e should also join forces to implement anti-corruption measures … Corruption thrives in every corner of the world and in countries of every income level. …   Now more than ever we must act to enshrine good governance within the sustainable development goals. Please join us. … **SIGNATORIES …Ericsson Group**[199]

956.    The Ericsson Group Open Letter was the result of a high profile event in the United States, which one or more senior Ericsson executives, including Vice President for Sustainability and Corporate Responsibility Elaine Weidman-Grunewald, attended. Notably, of the 25 signatories on the original Open Letter published in the United States on September 24, 2014, Ericsson was the ***only*** major multinational corporate signatory:  all the others were nonprofits.[200] In so

---

[197] For example, according to LM Ericsson: (i) "the 2030 Agenda for Sustainable Development includes 17 Sustainable Development Goals (SDGs) and 169 associated targets," ICTs and SDGs, at 18; (ii) "In addition to ongoing development priorities …, [the new SDGs] set out a broad range of interconnected economic, social and environmental objectives including more peaceful and inclusive societies," *id.*; (iii) LM Ericsson supported "achieving at least 10 of the SDGs in the following areas: ,,, Reducing corruption, fighting crime and terrorism and strengthening and improving the equity of fiscal policy." *Id.* at 29.

[198] Ericsson Group, et al., *Opening Statement From The Event: "Ending Poverty: Why Strong, Accountable Institutions Matter," 24 September 2014, New York* (Sept. 24, 2014), https://tinyurl.com/mu9ybz3y ("Ericsson Group Open Letter").

[199] Ericsson Group Open Letter, (emphasis in original).

[200] Aside from "Ericsson Group," the other signatories to the Open Letter as originally published in the United States on September 24, 2014 were:  (1) Article 19; (2) CAFOD; (3) Civicus; (4) FUNDAR; (5) Gemawan; (6) Global Organization of Parliamentarians Against Corruption; (7) Human Rights First Rwanda Association; (8) Interaction; (9) Institute for State Effectiveness; (10) Kemitraan; (11) Namati; (12) Partnership for Governance Reform; (13) Pattiro; (15) Plan UK; (16) Ploughshare Group; (17) Publish What You Fund; (18) Publish What You Pay Indonesia; (19) Restless Development; (20) Rights Rwanda; (21) Safer World; (22) Save the Children; (23) Transparency

doing, Defendants cynically transformed their purported support for the Sustainable Development Goals into a highly effective smokescreen that covered and concealed Ericsson's company-wide embrace of payments to the Relevant Terror Organizations – the three FTOs that were always the U.N.'s greatest counterterrorism focus.

957.   Notably, Defendants published the Ericsson Group Open Letter at the same time – Fall 2014 – when Defendants were simultaneously serving as one of Islamic State's largest multinational corporate financial partners and financiers. This timing was a feature, not a bug, of Ericsson's efforts to conceal ISIS's protection rackets, and Defendants' participation therein.

958.   After 2014, Defendants repeatedly returned to Ericsson's purported adherence to the Sustainable Development Goals even while they flagrantly defiled them. On May 12, 2016, for example, LM Ericsson publicly reiterated Defendants' purported adherence to all the Sustainable Development Goals, which included anti-corruption and counterterrorism. After LM Ericsson observed that "[j]oint research between Ericsson and the Earth Institute at Columbia University highlights ICT's role in accelerating achievement of the United Nations Sustainable Development Goals by 2030," LM Ericsson represented that, with respect to the U.N.'s "Sustainable Development Goals," Ericsson was "[t]urning intentions *into impact*" because "Ericsson's *deep-rooted commitment to the SDGs*" – necessarily including SDG 16's anti- corruption and counterterrorism goals "is *well documented*."[201]

959.   In June 2016, LM Ericsson again repeated its public assurances that it was committed to adhering to all the Sustainable Development Goals, which included SDG 16's Goals relating

---

International Indonesia; (24) Transparencia Mexicana; (25) Transparency International; and (26) United Nations Association of the USA.

[201] Elaine Weidman-Grunewald, LM Ericsson, *Taking Action On The Sustainable Development Goals* (May 12, 2016), https://www.ericsson.com/en/blog/2016/5/taking-action-on-the- sustainable-development-goals.

to anti-corruption and counterterrorism, doing so in a public report, titled *ICTs and SDGs*, which LM Ericsson jointly published in the United States alongside its co-author, The Earth Institute, of Columbia University.[202]

960.    After LM Ericsson published ICTs and SDGs, LM Ericsson appears to have scrubbed ICTs and SDGs from Ericsson's websites.[203] On information and belief, LM Ericsson did so as a reflection of Defendants' consciousness of guilt regarding Defendants' aid to al-Qaeda, al-Qaeda-in-Iraq, and Islamic State and associated knowledge that *ICTs and SDGs* comprised relevant evidence concerning Ericsson's aid to such FTOs. Among other reasons, Ericsson's understanding of its terrorism-related criminal and civil exposure is the most plausible explanation for why LM Ericsson would put so much effort into ICTs and SDGs in the summer of 2016 only to essentially discard it a few years later.[204]

961.    Until at least February 15, 2022, when Ericsson publicly admitted to much of the corrupt conduct alleged herein, none of the Plaintiffs had any knowledge of Defendants' violations alleged herein. Further, until recently, Plaintiffs could not have discovered, by the exercise of reasonable diligence, that Defendants engaged in the violations alleged herein because Defendants actively and fraudulently concealed these violations to cloak their illegal activities. Defendants fraudulently concealed their illegal activities, as alleged herein, by, *inter alia*,

---

[202] Hans Vestberg, LM Ericsson, *quoted in* LM Ericsson and The Earth Institute, Columbia University, *ICTs and SDGs, How Information and Communications Technology Can Accelerate Action on the Sustainable Development Goals, Final Report*, at 7 (June 2016) ("[C]ompanies like Ericsson are working with others to achieve shared societal goals and collectively tackle global challenges. … In the late 1890s our founding father, Lars Magnus Ericsson coined the phrase that "access to communication is a basic human need." Today, this underpins our vision of being a relevant and responsible driver of positive change by using Technology for Good. As an industry leader, our ideas, technology and people have had real impact, helping to transform lives, industries and society as a whole. As the world embarks on the ambitious journey of achieving the 17 Sustainable Development Goals (SDGs), it is our responsibility to work with other stakeholders to extend the benefits of communication by ensuring they are affordable and accessible to all. … The report builds on the work of the Broadband Commission for Sustainable Development, a forum Ericsson has been deeply engaged in since its launch in 2010."), https://tinyurl.com/3p92wr64.
[203] Plaintiffs have not located any Ericsson-related website in which *ICTs and SDGs* can be located.
[204] About two months after LM Ericsson published *ICTs and SDGs*, on September 28, 2016, Congress enacted JASTA over President Obama's veto. There was no comparable legislative enactment during this period concerning the FCPA.

making false and misleading entries in their books and records, filing false and/or misleading documents with the U.S. government, and issuing false press releases, reports, and other statements concerning, *inter alia*, their compliance program.

962. Ericsson also deployed its counsel at Simpson Thacher to conceal its conduct. On information and belief, a Simpson Thacher team lead by DC-based partner, Cheryl Scarboro, began representing LM Ericsson beginning in 2013 (or early 2014 at the latest). Ms. Scarboro joined Simpson Thacher in June 2011 after spending 19 years at the SEC, where she "had a hand in every major FCPA investigation" conducted by the SEC and also "worked closely with the Justice Department's FCPA team." That extensive experience caused the Wall Street Journal to refer to her as ***the*** "SEC's FCPA guru." During her later years at the SEC, she spent a great deal

963. of time leading FCPA investigations into illicit payments made by many companies to the Iraqi government to win contracts under the U.N.'s Oil-For-Food Program.

964. Given the sheer volume of countries listed in prior media reports concerning allegations of bribery by Ericsson and the number of countries in which the SEC appeared to be investigating, the real possibility of enterprise-wide corruption at Ericsson could not be ignored. Once Simpson Thacher became aware of Ericsson's own "list" of 15 *additional countries* not being investigated by the SEC or DOJ where there was evidence of possible corrupt Ericsson activity (which was no later than 2018). Regardless, given Ericsson's business activity in war- torn Middle Eastern countries—particularly Iraq and Afghanistan, both of which were widely-known to have endemic corruption problems—Simpson Thacher should have neither advised LM Ericsson nor acquiesced in LM Ericsson's instruction to exclude those jurisdictions from any internal investigations into corrupt payments and related possible FCPA violations.

965.    The publicized and well-known connections between endemic corruption in Iraq and Afghanistan and connections between that corruption and terrorist financing presented extreme risks for Ericsson's business in those countries, requiring investigation—if not from the outset of the probe then at any number of times before LM Ericsson and the DOJ finalized and executed their DPA.[205]  Given Ms. Scarboro's specific experience concerning bribery and corruption in Iraq under the Oil-For-Food Program, the failure to seriously investigate Iraq is even more stunning.

966.    Simpson Thacher's representation of LM Ericsson in connection with the SEC and DOJ FCPA probes, including the internal investigation(s), was not truly independent but instead appeared to be beholden to the interests of LM Ericsson's executive team and shareholders—producing a "captive" investigation that was controlled at all times by LM Ericsson while it was, literally, on a transnational white collar crime spree.  Moreover, the internal investigation itself appears to have been conducted in large part by Ericsson's in-house compliance team with the report being prepared "with the help of Simpson Thacher."  And on information and belief, Simpson Thacher did not implement any type of independent reporting structure designed to encourage Ericsson employees (including possible whistleblowers) to voluntarily report to Simpson Thacher serious corporate misconduct without fear of reprisal.

---

[205] See, e.g., Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), quoted in U.S. Dep't of the Treasury, Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit-- (Feb. 1, 2005), https://tinyurl.com/4b78zs5e ("[W]e know that financial subterfuge was at the heart of how Saddam and his cronies skirted international financial restrictions and the United Nations Oil for Food Program (OFF). … This abuse of the international financial system and of the OFF program . . . may also now be part of the financial backing that now fuels the Iraqi insurgency and terrorism inside Iraq."). See also Section VI.C.1 infra (describing, respectively, allegations in ATA lawsuit captioned Abecassis v. Oscar S. Wyatt, Jr., No. 09-cv-00001 (S.D. Tex. Jan. 2, 2009), and allegations in JASTA lawsuit captioned Atchley v. AstraZeneca UK Ltd., No. 17-cv- 02136 (D.D.C. Oct. 17, 2017).

967.    Moreover, over the course of the probes, Simpson Thacher had preexisting and ongoing representations of LM Ericsson and/or Ericsson Inc. in several litigations.[206]

968.    Nor was the internal investigation comprehensive.  As the ICIJ reporters themselves observed:

> The internal review, while damning, often fails to reach specific conclusions and suggests an incomplete investigation into some of the most explosive allegations, including that payments were made to terrorists. Internal investigators didn't interview officials of either the main transport firm moving Ericsson equipment through ISIS territory or the subcontractors the company relied on to work in ISIS-held Mosul, for example.[207]

969.    This lack of comprehensiveness was likely a byproduct of Simpson Thacher not conducting the investigation itself but instead purporting to merely oversee Ericsson's investigation of its own potentially illegal payments.

970.    Lastly, the conclusions reached in Simpson Thacher's report based on Ericsson's internal investigation lacked credibility.  Many of the "findings" were written in the passive voice to obfuscate the culpability of particular Ericsson personnel.  Other findings were obvious examples of Simpson Thacher pulling punches.  For example, the report appeared to treat Ericsson's use of intermediaries as a basis to "conclude" that no Ericsson employees were "directly involved" even though Ericsson conducted its illegal business using intermediaries for exactly that reason.  Similarly, Simpson Thacher's reporting ignored the notorious protection money relationships between Iraqi Kurds and Islamic State, which then permitted Simpson Thacher to downplay the seriousness of Defendants' payments to their Kurdish agents.

---

[206] *See, e.g.*, *Siti-Sites.com, Inc. v. Verizon Communications, Inc.*, No. 1:10-cv-03751 (S.D.N.Y.); *True Position, Inc. v. LM Ericsson Tel. Co.*, No. 2:11-cv-04574 (E.D. Pa.).
[207] ICIJ, Ericsson List.

971.    But all of these problems with the internal investigation and related concealment of corrupt

payments (including to terrorists) from the SEC and DOJ were deliberate, part of the plan all

along.  Indeed, Simpson Thacher touted as early as 2015 (on information and belief) the great

job it was doing for Ericsson in its marketing materials:

972.    [T]the Firm convinced the SEC to drop certain issues from its ongoing investigation" of a

"global telecommunications company . . . regarding alleged payments to government officials

in various countries in violation of the FCPA.

973.    Simpson Thacher's and LM Ericsson's active concealment continued through 2019, as

further suggested by the suspect timing of Simpson Thacher's final report, which was dated

December 11, 2019—just days after LM Ericsson and the DOJ executed and publicly released

their DPA. This sequencing was likely aimed at providing LM Ericsson and its executives some

measure of protection for not having shared it with the United States before its probes were

concluded.

974.    Defendants' conduct as alleged herein was wrongfully concealed and carried out in a

manner that was intended to, and did, preclude detection.

## DEFENDANTS KNEW THEY WERE AIDING AND ABETTING ATTACKS ON AMERICANS BY THE RELEVANT TERROR ORGANIZATIONS

1.    Defendants' Conduct Suggests That They Were Aware Their Protection Payments And Obstruction Of United States Counterterrorism Operations Aided And Abetted The Relevant Terror Organizations Attacks Against Americans

975.    The manner in which all Defendants acted to avoid discovery of their protection payments

and other aid to FTOs strongly supports the inference that they were aware at all relevant times

that their conduct was unlawful and that it aided and abetted terrorists.

976.    *First*, the Corporate Defendants and Mr. Ekholm retaliated against whistleblowers while

promoting (or at a minimum, retaining) those who were instrumental to Ericsson's corrupt

payments and other value transfers to terrorists.  As alleged, in mid-2014, Roger Antoun, an Ericsson manager for one of Asiacell's Iraq projects had suggested invoking force majeure in its

977.    Iraq customer contracts in mid-2014 due to recent surges in Islamic State violence and control of certain territory.  He was fired in January 2019 for certain conduct related to an "uncontrolled slush fund" set up through Ericsson subcontractors that Ericsson determined may have been used to make payments to terrorists, while others who were more directly responsible for illegal payments to third parties—like Tarek Saadi and Rafiah Ibrahim—were kept on.  What is more, when asked directly about Ericsson's failure to terminate some of the most culpable individuals responsible for what was leaked in the ICIJ press reports, LM Ericsson deflected.  All of this shows that the Corporate Defendants and Mr. Ekholm wished to deter people from speaking out about serious misconduct while keeping the most culpable persons whose loyalty was not in question on side.

978.    *Second*, as alleged, the 2019 agreement between Mr. Ekholm and Ms. Ibrahim to prevent her from spilling the beans to the U.S. government (and possibly other law enforcement authorities) about the illegal conduct that she oversaw as Ericsson's Head of the Middle Eastern and Africa market area (and possibly in other regions before 2014) suggests that the Individual Defendants (as well as the Corporate Defendants) were all aware of how their illegal conduct may have aided and abetted notorious Middle East terrorist groups.  As alleged, even the manner in which Ms. Ibrahim's "transition" was announced was deliberately structured in a manner to avoid raising public suspicion that she was responsible for staggering misconduct.

979.    *Third*, over the entire course of DOJ's and SEC's investigations into Ericsson's illegal third party payments from 2013 through December 2019, LM Ericsson actively concealed from DOJ

and SEC information about their internal investigation into Ericsson's illegal payments in Iraq (and 14 other countries), including "possible" payments to al-Qaeda-in-Iraq and Islamic State, before entering a guilty plea (for Ericsson's Egypt subsidiary), settling with the SEC, and entering into a DPA with DOJ—all while purporting to be fully cooperative and transparent with U.S. law enforcement.

980.    *Fourth*, all Defendants continued to conceal any whisper of their illegal Iraq payments after the conclusion of the SEC and DOJ probes into Ericsson's corrupt payment schemes – through February 2022, until they had to address them when parts of Simpson Thacher's final investigative "report" leaked to reporters.  DOJ has publicly taken the position that LM Ericsson breached its ongoing obligations to the U.S. government under the DPA by having concealed the existence of that investigation and the findings set forth therein (representing the second time in roughly two years DOJ has accused LM Ericsson of breaching the DPA). Having apparently recognized just how problematic its conduct has been, LM Ericsson voluntarily agreed on December 14, 2022, to remain under the supervision of an independent monitor for a full fourth year (even though the monitorship required by Ericsson's agreements with DOJ and SEC would have concluded by the end of 2022).

981.    *Fifth*, even as late as 2022, the Corporate Defendants were requiring departing employees to sign confidentiality agreements that failed to clearly inform their employees that nothing in those agreements would preclude them from (or punish them for) sharing relevant information with law enforcement or other governmental authorities.

982.    *Sixth*, as alleged, almost everything about LM Ericsson's retention of Simpson Thacher with respect to the SEC and DOJ FCPA probe, including the way in which Ericsson's/Simpson Thacher's internal investigation was conducted, the "conclusions" reached in the final report,

and the circumstances surrounding the preparation of that report all suggest that Defendants wanted to bury, conceal, and/or minimize any evidence of Ericsson's illegal conduct in Iraq.

**Defendants Knew They Operated In A Hyper-Corrupt Environment In Which Corporations Commonly Made Protection Payments To Terrorists**

983.    Defendants knew they operated in a business environment in Iraq that posed extreme terrorist finance risks because Iraq was hyper-corrupt, and Western companies there – and their regional and local partners, consultants, and contractors – routinely made protection payments as the cost of doing business. These conditions were always obvious to Defendants.

984.    Defendants knew that the facts throughout this section applied with equal force to business transactions made throughout Iraq, including in northern Iraq (including Mosul and Erbil), central Iraq (including Baghdad), and western Iraq (including Anbar).

985.    LM Ericsson, Ericsson AB, and Ericsson Inc. are sophisticated companies that specialize in performing work in high-risk countries like Iraq. Given Ericsson's integrated business model in which Ericsson AB and Ericsson Inc. serve as divisions of LM Ericsson, and the contractual role they undertook to monitor the local security environment, Defendants each monitored open-source reporting on the risks of operating in Iraq, Syria, and other similarly risky places they did business. As part of those efforts, Defendants' standard practice necessarily included conducting basic research on the local market and the mechanics of local subcontracting. Even cursory research of that nature would have uncovered the reports and statements as alleged herein or other similar reports.

986.    On information and belief, Defendants were aware of the reports, statements, studies, events, and litigations below, or similar ones, and their substance, which alerted Defendants that their conduct foreseeably aided anti-American terrorists through Defendants' officers, employees, and agents in the United States, Sweden, and Iraq, Defendants' corporate security

345

departments in all three countries, and Defendants' in-house sales, legal, and compliance teams, all of whom would have regularly received the reports, or similar ones, referenced herein.

987.    Defendants' management, and their compliance, legal, and corporate security departments, also subscribed to intelligence reporting services that further alerted them to the link between their corrupt contracting practices and terrorist finance.  For example, Strategic Forecasting Inc., popularly known as Stratfor, is a global strategic intelligence firm that allows individuals and companies to receive intelligence updates on countries around the world.

988.    Stratfor regularly reported on protection payments in Iraq, including by directly emailing Defendants copies of media reports.

989.    On information and belief, based on purported Stratfor subscription lists (as published online), one or more executives, employees, or agents of Defendant LM Ericsson, and one or more executives, employees, or agents of Defendants Ericsson AB and Ericsson Inc. had access to Stratfor's intelligence services when those messages were transmitted.  The recipient list included at least five (5) employees of Defendants who regularly received the type of updates alleged above.

a.    Defendants Knew The Iraqi Business Climate Was Hyper-Corrupt

990.    From 2000 through 2022, Defendants' senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that Iraq was a hyper-corrupt business environment in which payoffs were routine and where it was unusual for a major transaction to move forward *without* an illicit payment.

991. **United States government reports**, including those by the Department of Defense ("DOD"), Special Inspector General for Iraq Reconstruction (or "SIGIR"), and Lead Inspector General for Operation Inherent Resolve (or "LIGOIR"), alerted Defendants that they operated in a hyper-corrupt environment in which the risk of financial crime was extreme.[208]

992. **Terrorism scholars** also routinely reported that corruption in Iraq was endemic and impacted the specific areas in which Ericsson conducted business. On July 1, 2009, for example, the U.S. Army War College published *Criminals, Militias, and Insurgents: Organized Crime in Iraq*, an extensive analysis of the nexus between corruption and terrorist finance in Iraq that was authored by terrorist finance scholar Dr. Phil Williams,[209] which reported that:

---

[208] *E.g.*, Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Oct. 30, 2005) ("Corruption was endemic in the prior regime, and its legacy of corruption still burdens the country."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 21 (Dec. 2006) ("[C]orruption is rampant."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 4, 129 (Jan. 30, 2007) ("Corruption continues to plague Iraq. … Corruption continues to limit the ability … to manage reconstruction efforts and key areas of economic policy. … Transparency International ranks Iraq 161st of 163 countries measured."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 5, 99 (Apr. 30, 2007) ("SIGIR has repeatedly observed that corruption is a significant impediment … funds have been subject to improper diversion. … Because of the deteriorating security …, sectarian political climate, and outdated laws, anticorruption experts believe that opportunities for corruption have increased."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 147 (Apr. 30, 2008) ("[T]he World Bank listed Iraq as … lacking corruption controls."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2008 Report to Congress*, at 5 (Jan. 9, 2009) ("Corruption in Iraq remains a significant problem."); Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 8 (Jan. 30, 2009) ("[General Raymond Odierno:] Corruption is still a huge problem across the board … [that] will take quite a long time to solve it. … [C]orruption is worse now in Iraq than it has been since the 2003 invasion.") (quoting, inter alia, General Ray Odierno, Commander of U.S. Forces – Iraq); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at 11 (Jan. 29, 2010) ("One of Iraq's primary economic challenges going forward is … endemic corruption … [that] increased risk to both the investment capital and the business model.").

[209] Dr. Phil Williams, *Criminals, Militias, and Insurgents: Organized Crime in Iraq* (U.S. Army War College July 1, 2009), https://tinyurl.com/5yab72a8. In the Forward, Douglas C. Lovelace, Jr., explained that, given "the vulnerability of conflict and post-conflict situations to organized crime" and the inextricable linkage between such crime and terrorism in Iraq, Afghanistan, and other conflict areas, protecting Americans in such places "require[d]" "a holistic … strategy in which security, development, and the rule of law complement[ed] one another." *Id.* at vii.

a.  "The legacy of Saddam Hussein, the debilitating consequences of sanctions, … and the rise of anomic conditions after [2003], perpetuated a culture of corruption."[210]

b.  "[T]he U.S. presence brought with it a massive injection of cash for reconstruction, much of which was handled … ad hoc … with little oversight. The reconstruction program provided enormous opportunities for corporate malfeasance on the U.S. side. … The result was that Iraq rapidly metamorphosed into one of the most corrupt countries in the world. According to Transparency International's Corruption Perceptions Index for 2007, Iraq was ranked number 178, below Haiti, and above only Somalia and Myanmar."[211]

c.  "[C]orruption in Iraq is both pervasive and endemic [and] … corruption is both top down and bottom up, coming from within government and from outside. It is both a political and economic condition on the one side, and an instrument of criminal organizations, militias, insurgents, and terrorists and their sympathizers and associates on the other."[212]

d.  "The various forms of corruption in Iraq … [includes] criminal corruption. Critically, corruption is not only a condition characterizing governments and bureaucracies but also an instrument used by criminal organizations to advance their illicit business interests and protect the illicit markets in which

---

[210] *Id*. at 199.
[211] *Id*. at 199-200. Of course, Iraq was near the top of the corruption index even before the 2003 invasion.  For example, the Oil-for-Food scandal was the largest collective FCPA scandal of all time.  But after 2003, Iraq regularly occupied one of the top three slots.
[212] *Id*. at 207.

they operate. The use of corruption as an instrument, of course, is much easier where direct and factional corruption is endemic."[213]

993.    In 2010, the National Defense University publication, *Prism*, published another analysis by Dr. Williams concerning the nexus between organized crime and terrorism in Iraq.[214] Dr. Williams reported, among other things, that:

  a.   *"The development of a 'political-criminal nexus' [in Iraq] mirrored that in many other parts of the world … [and] undermined U.S. interests [in Iraq.]"*[215]

  b.   "[T]he injection of large amounts of money for economic reconstruction without adequate control or oversight and no plan for effective disbursement exacerbated both crime and corruption [in Iraq]."[216]

  c.   "Reconstruction moneys tempted … U.S. corporations and contractors [to engage in corruption]—many of which performed abysmally in terms of task completion. Reconstruction was vital but its implementation, in spite of all the efforts of the [SIGIR], facilitated and encouraged the growth of corruption and organized crime."[217]

994.    **Media reports** regularly alerted Defendants that Iraq was endemically corrupt and large deals there usually involved big payoffs.[218] Indeed, reports routinely alerted Defendants that

---

[213] *Id.* at 208-09.

[214] Dr. Phil Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, Prism, Vol. 1, No. 2, Published by Institute for National Strategic Security, National Defense University (2010), https://tinyurl.com/4f6x8nra.

[215] Id. at 61.

[216] *Id.*

[217] *Id.*

[218] *E.g.*, Rod Nordland and Michael Hirsh, *The $87 Billion Money Pit; It's The Boldest Reconstruction Project Since The Marshall Plan. And We Cannot Afford To Fail. But Where Are The Billions Really Going?*, Newsweek (Nov. 3, 2003) (cover story) ("American companies are barred by law from paying bribes … abroad. But Iraq is still largely a lawless place. And one company director for a British firm … in Baghdad says that makes all the difference. 'I've never seen corruption like this by expatriate businessmen. It's like a feeding frenzy,' he says. … One prominent Iraqi businessman said he was told he'd have to raise his bid by $750,000 to get a major contract, so long as he kicked back that amount to the contractor's rep. … *Newsweek* witnessed such behavior directly: An Iraqi-Anglo joint venture did

Iraq's telecommunications sector in particular was endemically corrupt throughout both the Saddam and post-Saddam eras.  In 2004, for example, a *Washington Times* article concerning telecoms companies in Iraq reported, among other things, that:

    *a.* The Iraqi government "is investigating whether illegal payoffs were made to secure cell phone contracts …, said [L. Paul] Bremer [former head of the CPA]."

    *b.* "Mr. Bremer ordered the cell phone contract investigation after receiving a memorandum [] from John A. Shaw, the [D]eputy [U]ndersecretary of [D]efense for [I]nternational [T]echnology [S]ecurity, who said the contracts should be revoked because of fraud."

    *c.* "Mr. Shaw states in a June 14 memorandum to [Mr. Bremer] that an investigation by his office had uncovered 'fraud on the Ministry of Communications by Orascom, Atheer and AsiaCell,' three companies that … won cell phone licenses for three regions of Iraq."

    *d.* "A [U.S. government] report … states that … bribes [were used] to secure cell phone contracts worth $500 million. … [A U.S. government] report states that payments were made to two Iraqi officials, two British contractors and

---

a relatively small job in the magazine's Baghdad bureau. When a final price had been agreed, the company's Iraqi manager said, 'Shall we add a commission of 10 percent?' Commission? 'Well, you would keep that of course,' he said. In other words, a kickback. When *Newsweek* declined, he said, 'You're the first one who didn't want a commission.'"), 2003 WLNR 3489142; John Heilprin, *Army Probes Wide-Ranging Contractor Fraud*, Associated Press, *republished in* Intelligencer (Jan. 28, 2007) ("From high-dollar fraud to conspiracy to bribery and bid rigging, Army investigators have opened up to 50 criminal probes involving battlefield contractors in the war in Iraq and the U.S. fight against terrorism…"), 2007 WLNR 2014425; Dave Zweifel (Editor Emeritus of *The Capital Times*), Editorial, *War Profiteers Work Their Schemes In Iraq*, Capital Times (Mar. 10, 2008) ("American corporations have long taken advantage of the nation's taxpayers in a time of war, and the war that our country is fighting in Iraq is no exception. … [The] *Chicago Tribune* outlined just how pervasive war profiteering is … [today] in [Iraq] …To put it mildly, []contractors don't give the U.S. and its taxpayers discounts … War is a good time to make money and that's exactly what military contractors do. … There's gold in them thar battlefields."), 2008 WLNR 4748217.

two American officials as part of the fix. Pentagon investigators have said bribes of up to $11.5 million were paid to Iraqis and other foreign nationals to win the contracts for the three companies …"

*e.* "Mr. Bremer said corruption remains a major problem in Iraq[:] … '[C]orruption in the Iraqi system … [is] a serious problem… [a]nd institutionalized.'"

*f.* "Mr. Bremer … also said the U.N. [O]il-for-[F]ood program was corrupt 'throughout.' Contracts for that program, which was designed to provide humanitarian goods to Saddam's regime, included 10 percent to 19 percent 'kickers' that were payoffs."[219]

995.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants as to the hyper-corrupt nature of the Iraqi business environment in which they did business.

<u>Defendants Knew Corruption In Iraq Was Inextricably Connected To Terrorism</u>

996.    Defendants knew that their corrupt payments in Iraq foreseeably aided terrorists.

997.    From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) knew that corruption in Iraq, like that which Defendants practiced as a matter of strategy, was always inextricably linked to terrorist violence given the unique features of the Iraqi business, political, and terrorist context.

998.    **United States government reports** alerted Defendants that corrupt practices in Iraq foreseeably aided terrorists there.  On August 10, 2006, for example, President George W.

---

[219] Bill Gertz, *Iraq Probing Cell Phone Deals Reported Payoffs By Saddam Ally Under Scrutiny*, Washington Times (July 8, 2004), 2004 WLNR 812238.

Bush publicly observed that "corruption" "impedes our efforts to" "combat" anti-American "terrorism."[220] Also in 2006, the Department of Defense warned that "[i]t is increasingly difficult to distinguish [criminals'] activities from those committed by insurgent and terrorist groups who are also engaged in kidnappings, extortion, murder, and other illegal behavior," and that "criminal activity … is an increasingly important source of funding for insurgent and terrorist groups."[221] Other reports repeatedly alerted Defendants to similar effect.[222]

999.    **Media reports** and **terrorism scholars** also routinely reported that corruption in Iraq was inextricably linked to terrorist violence. In 2009, for example, Dr. Williams' study published by the U.S. Army War College reported that "[c]orruption in Iraq also often leads to or entails

---

[220] President's Statement on Kleptocracy, 2 Pub. Papers 1504 (Aug. 10, 2006).

[221] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, November 2006 Report to Congress*, at 5 (Nov. 30, 2006).

[222] *E.g.*, President George W. Bush, Proclamation No. 7750, 69 Fed. Reg. 2287 (Jan. 14, 2004) ("I have determined that … persons who have committed, participated in, or are beneficiaries of corruption in … [foreseeably risked] serious adverse effects on … the security of the United States or against … terrorism."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 7 (Apr. 30, 2006) ("Corruption is another form of insurgency in Iraq."); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, November 2006 Report to Congress*, at 5 (Nov. 30, 2006) ("Iraq … must effectively deal with militias … However, a range of … factions that pursue their own interests through the use of … extortion, bribery, and corruption is threatening accomplishment of these actions."); Stuart W. Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at Introduction, 9 (July 30, 2007) ("SIGIR views" "the endemic corruption" "in Iraq" "as a 'second insurgency.'" "According to the U.S. Embassy's Anti-Corruption Strategy, the endemic corruption problem in Iraq … funds illegal actors and activities, including terrorism[.]"); U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2008 Report to Congress*, at 6 (Mar. 7, 2008) ("Corruption, in the form of extortion, theft and bribery, is rampant in parts of the [Government of Iraq] and business sector. Corruption in the … transport industries is [] linked to the financing of extremists."); Stuart W. Bowen, Jr., *Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 32 (Apr. 30, 2008); The White House, *National Security Strategy* 38, 49 (May 2010) ("[P]ervasive corruption is a …severe impediment to development and global security. … Transnational criminal threats… cross borders[,]… subverting government institutions through corruption and harming [American] citizens worldwide. … The crime-terror nexus is a serious concern as terrorists use criminal networks for logistical support and funding."); U.S. Dep't of Justice and Securities and Exchange Commission, *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 2-3 (Nov. 14, 2012) ("The Costs of Corruption … [C]orruption [] undercuts good governance and impedes U.S. efforts to… combat … terrorism across the globe."); U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 26-27 (Aug. 24, 2015) ("The U.S. government has observed that numerous terrorist organizations worldwide engage in criminal activity to fund their organizations and operations. Globally, [al-Qaeda], [Islamic State], [and] the Haqqani Network …, for example, are known to be financed … by proceeds derived from … extortion. … [B]oth criminal organizations and terrorist groups continue to develop international networks and establish alliances. … [L]ooking forward, … the risk that [terrorist groups] will collaborate with [] criminal organizations increases. Collaboration can serve as a force multiplier for both criminal and terrorist groups, bolstering their capabilities, strengthening their infrastructure, and increasing their wealth.").

violence, which is not always characteristic of corruption elsewhere."[223]  Indeed, "[c]orruption in Iraq is [] closely related to violence: both are instruments of criminal organizations and are typically used by these organizations as part of their risk management strategies."[224]  As a result, according to Dr. Williams, "corruption, organized crime, and insurgent and militia violence become difficult to disentangle analytically, let alone physically disrupt. One American official averred that 'corruption funds the insurgency, so there you have a very real threat to the new state.'"[225] In 2010, likewise, Dr. Williams reported that "[c]orruption in Iraq was [] integrally related to violence."[226] In 2014, similarly, *Thomson Reuters* published an analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez regarding the nexus between Iraqi corruption and Islamic State violence and the "convergence between commodities and terrorism": [a] common feature in many conflict zones is the weakening of the society's value system. Any kind of person is involved in every kind of business. This generalized break down of values is particularly true for the territory controlled by the Islamic State. For nearly thirty years people in the region have been involved in various forms of black market and smuggling activities, first to get around the dictatorships in the region, then to circumvent the Oil-For-Food program in the 90s, and today to ensure funding of the Islamic State.[227]

1000.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that corruption in Iraq was inextricably tied to terrorist violence.

---

[223] Williams, *Criminals, Militias, and Insurgents*, at 208.
[224] *Id*. at 210.
[225] *Id*. at 211.
[226] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, at 48-49.
[227] Jean-Charles Brisard and Damien Martinez, *Islamic State: The Economy-Based Terrorist Funding*, at 6 (Thomson Reuters Accelus Oct. 2014), https://tinyurl.com/2d26cvxx (hereinafter, "Brisard and Martinez").

<u>Defendants Knew They Did Business In Geographies That Were Insecure And Targeted By Terrorists</u>

1001.    From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (including Ericsson Iraq and its agents) knew that their Iraq-related business required transactions in Iraq and transportation using Iraqi, Turkish, and Syrian routes that were specifically targeted by the Relevant Terror Organizations.

1002.    Defendants also knew that the Relevant Terror Organizations targeted companies and individuals associated with the United States specifically because they wanted to be paid protection money in larger amounts and specifically in U.S. dollars – the currency of choice for every FTO in Iraq and Afghanistan.

1003.    United States government reports and statements alerted Defendants that their Iraqi business was conducted in an insecure environment and that their transportation and logistics networks were specifically at high risk for illicit payments. In 2007, for example, the SIGAR reported that, "Security continues to pose a significant threat to reconstruction in" the "transportation and communications" "sector" "in Iraq," including "telecommunications."[228]

1004.    **Media reports** and **terrorism scholars** alerted Defendants that their business required transportation through terrorist-controlled or contested areas.  In 2007, for example, the *Associated Press* reported that while "[t]he threat from al-Qaida … has been significantly reduced," its allies had "established 'almost mafia-like presence' in some areas" like Baghdad

---

[228] Stuart W. Bowen, Jr., *Quarterly and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 103 (July 30, 2007).

according to "the top U.S. commander in Iraq," "Gen. David Petraeus," who "stressed" that "al- Qaida remains a very dangerous and very lethal enemy of Iraq."[229]

1005.   In 2009, similarly, Dr. Williams's report published by the U.S. Army War College also identified insecure Iraqi geographies – which overlapped with areas where Defendants conducted business – that were notoriously targeted by Sunni terrorists like al- Qaeda-in-Iraq (and later, Islamic State) for protection money payments from Western corporations, and their partners, consultants, and subcontractors:

> a.   "[O]rganized crime did not suddenly arise from the chaos of invasion and occupation but had deep roots in an authoritarian and corrupt state subject to international sanctions."[230]

> b.   "[T]he actions of the international community in the 1990s unintentionally widened and intensified the scope of organized crime and the illicit economy. By 2003 all the conditions for an upsurge of organized crime were present; the toppling of the regime provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit transfer strategies, and notorious intermediaries who make the entire corruption economy work – including those who facilitate protection payments to terrorists."[231]

> c.   "An additional factor" that facilitated al-Qaeda-in-Iraq's criminal terrorist finance strategies "was 'the collapse of road security,' especially in the Sunni triangle."[232]

---

[229] Associated Press, *Petraeus: Al-Qaida Presence in Baghdad Has Been 'Significantly Reduced'* (Oct. 28, 2007) (internal quotations omitted), https://tinyurl.com/hr58hszp.
[230] Williams, *Criminals, Militias, and Insurgents*.
[231] *Id*. at xi (emphasis added).
[232] *Id*. at 125.

d.   Parasitic taxes on commerce, reconstruction, and the transportation of oil (whether it is part of the licit trade or stolen and diverted) are highly profitable."[233] "Extortionists have few, if any, start-up costs, especially if they already have a reputation for violence; payments tend to be recurring; and, in Iraq, the number of businesses which could be targeted grew as the reconstruction process gradually became more effective."[234]

e.   "In …2004, as opposition in Iraq developed into a full-blown insurgency, the occupying forces lost control of the highways. This allowed insurgents to extort money from contractors (both American and Iraqi) involved in [] reconstruction [], and from [] truck drivers, whether carrying legal loads such as … reconstruction materials or engaged in theft and smuggling. For Sunni insurgents, the legality or illegality of the load was irrelevant. Indeed, they not only subjected drivers to extortion, but confiscated 'a portion of the … goods transported through the areas they control' as a tax for safe passage. One contractor noted that the insurgents would sometimes 'hijack a truck…' to illustrate their power and establish their credibility. Gradually, however, the process became institutionalized and, as with extortion elsewhere, the threat itself was sufficient."[235]

f.   "[E]xtortion and skimming are [] pervasive [and] … are real moneymakers in Iraq."[236]

---

[233] *Id*. at 159.

[234] *Id*.
[235] *Id*. at 158.
[236] *Id*. at 162.

g. "Profits were clearly extensive, enduring, and highly lucrative" to "violent actors in Iraq's post-Hussein conflict milieu."[237]

h. "[M]ilitias—because they provide protection to particular segments of the population— have enormous opportunities for both extortion and black market activities. Markets in Baghdad resemble those in Moscow in the 1990s when even small market stallholders were required to make protection payments—often under the guise of ostensibly legitimate fees—in return for which they were allowed to continue selling."[238]

1006. In 2010, a National Defense University publication, *Prism*, published another analysis by Dr. Williams in which he reported, among other things,

> that U.S. operational units appreciated the organized crime component … As early as July 2004, Marine commanders were acknowledging that it was difficult to overemphasize the importance of organized crime in the insurgency. The perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties.[239]

1007. Similar reports were published over the next decade. In 2015, for example, Dr. Jonathan Schanzer of the Foundation for Defense of Democracies reported that the Turkish government "allowed extremists of various stripes to go in" to Iraq and Syria and "it's actually created a security problem on the other side of the Turkish border" in Iraq and Syria where "there is infrastructure there representing Nusra front, ISIS, other Salafi and jihadi groups."[240]

---

[237] *Id.*
[238] *Id.* at 158.
[239] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, at 55.
[240] Dr. Jonathan Schanzer (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *House Financial Services Committee hearing on Task Force to Investigate Terrorism Financing* (Apr. 22, 2015), 2015 WLNR 12099026.

1008.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports, studies, statements, and maps that alerted Defendants that they did business in Middle Eastern geographies in which terrorists extracted protection money.

**Defendants Knew Multinational Corporations' Illicit Transactions In, Or Relating To, Iraq, Afghanistan, Syria, And Turkey Were Routinely Designed To Route Protection Payments To Al-Qaeda And Islamic State Branches Operating In The Middle East and Europe**

1009.  From 2000 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents), knew that multinational corporations' illicit transactions in, or relating to, Iraq, Afghanistan, Syria, and Turkey were routinely designed to route protection payments to al-Qaeda-affiliated and Islamic State-affiliated terrorists in geographies, like France, Belgium, and Afghanistan, where they posed a severe threat.

1010.  United States government reports alerted Defendants that their illicit Iraq- related transactions foreseeably caused protection money to flow to the Relevant Terror Organizations. In April and August 2010, for example, DOD reported that "[d]espite" its "serious … losses, [al-Qaeda-in-Iraq] is still capable of conducting" attacks and "continues its efforts to gain funds through widespread extortion efforts."[241]

1011.  Media reports alerted Defendants that multinational corporations doing business in or near terrorist-contested geographies routinely facilitated protection payments to terrorists as the cost of doing business using mechanisms like those used by Defendants in Iraq. Such reports included, but were not limited to:

---

[241] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2010 Report to Congress*, at 34 (Apr. 29, 2010); *see also* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, June 2010 Report to Congress*, at 35-36 (Aug. 20, 2010).

a. St. Louis Post-Dispatch, October 1999: "Businessmen are still aiding bin Laden … [and] are continuing to transfer tens of millions of dollars … U.S. intelligence officials [said] the payments are 'protection money'…"[242]

b. Scotsman, September 2001: "al-Qaeda … runs an international network of up to 80 front companies in more than 50 countries … Financial backing for al-Qaeda's terrorist activities [inter alia] comes from 'protection money' …."[243]

c. Newsweek, May 2008: "Al Qaeda in Iraq is no stranger to racketeering. The group has long raised money through [criminal] activities … The group's spies also … tell Al Qaeda leaders about businesses own[ed] [by high profile persons in Iraq] … The haul from these illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection' payments from legitimate businesses."[244]

d. American Forces Press Service, October 2009: "[A] Mosul-based al-Qaida in Iraq cell leader … served as the former extortion ringleader for the region … [and was] suspected of extorting money from companies in Mosul. … the [] team found and apprehended a man suspected of using extortion money to fund attacks … [who was] alleged to be closely associated with extortion network members operating in northern Iraq."[245]

e. Australian, December 2010: "[T]he Commission on Wartime Contracting said … billion[s] in U.S. funds were lost to waste and fraud in Iraq … over a

---

[242] St. Louis Post-Dispatch, *World* (Oct. 29, 1999), 1999 WLNR 931817.
[243] Ilona Amos, *Spotlight Put On Bin Laden Links With UK*, Scotsman (Sept. 17, 2001), 2001 WLNR 2379387.
[244] Lennox Samuels, *Al Qaeda In Iraq Ramps Up Its Racketeering*, Newsweek (May 20, 2008), https://tinyurl.com/4ezvphc9.
[245] American Forces Press Service, *Iraqis Arrest Bombing Suspects in Baghdad*, Defense Department Documents (Oct. 26, 2009), 2009 WLNR 21347934.

decade through lax oversight of contractors, poor planning, and payoffs to …

insurgents."[246]

f.  CBS News, August 2014: "Much of the funding for [] Islamic State… is

coming from extortion … a counterterrorism source told CBS News …

primarily from citizens of European countries, including employees of

corporations who quietly pay … the source told CBS News…."[247] "A CBS

News report … reveals that a Scandinavian corporation recently paid []

$70,000 … and it is this method that ISIS is gathering funds."[248]

g.  Telegraph, September 2016: "Lafarge allegedly paid taxes to ISIL to protect

its cement making business in Syria … [and agreed] to pay taxes to [Islamic

State] in return for continuing its operations in Syria. … [LaFarge] bought the

site in 2007 before beginning operations there in 2011. Le Monde reported in

June that it had seen letters sent by Lafarge managers in Syria 'revealing

arrangements that Lafarge made with the jihadist group to continue

production until September 19, 2014.' … [A] 'pass stamped with an ISIL

stamp and endorsed by ISIL's finance chief in the Aleppo region' proves

[LaFarge] had struck a deal with ISIL to allow for free circulation of its goods

…"[249]

---

[246] Hugh Tomlinson and Giles Whittell, *Pentagon Billions Probed; War On Terror Mired In Graft*, Australian (Dec. 29, 2010), 2010 WLNR 25535341.

[247] CBS News, *"Multiple Kidnappings For Ransom" Funding ISIS, Source Says* (Aug. 21, 2014), https://tinyurl.com/ymv4r77v.

[248] CBS News (Washington, D.C.), *CBS News: 'Multiple Kidnappings For Ransom' Bring ISIS Funding* (Aug. 21, 2014), https://tinyurl.com/an8v4r7b.

[249] Henry Samuel, *Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To Isil' And Environmental Concerns*, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.

1012.   Media reports alerted Defendants that when telecommunications companies that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like Defendants – engaged in illicit transactions as the cost of doing business, such activity routinely was intended to cause protection payments to reach terrorists using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

    a.   Washington Post, November 2007: "A good way to prepare for operations in Iraq is to watch … 'The Sopranos,'' said Maj. Gen. Rick Lynch, commander of U.S. forces in central Iraq, referring to the hit HBO series about the mob. 'You're seeing a lot of Mafioso kind of activity.'… [Detained AQI operative] Abu Nawall admitted … that the group 'gets a lot of money through extortion….' … The racketeering operations extended to nearly every type of business in [Mosul], including … a cellphone company, which paid the insurgents $200,000 a month."[250]

    b.   Times Record News, August 2008: "[T]he Taliban [] expand[ed] 'their extortion campaign, [and] demand[ed] that businesses pay 'protection money' … [T]here were several cell phone companies operating in [] Afghanistan, the Taliban went to the … companies and offered not only 'protection,' but damage to a competitor, for a price.'"[251]

    c.   Agence France Presse, September 2012: "'Revenue extorted from nationwide enterprises such as … mobile telephone operators … goes to the Taliban Financial Commission which answers to the Taliban leadership,' said the report. Estimates of Taliban income from contracts funded by the United

---

[250] Amit R. Paley, *Iraqis Joining Insurgency Less for Cause Than Cash*, Wash. Post (Nov. 20, 2007).
[251] Times Record News, *Anatomy Of Terror* (Aug. 21, 2008), 2008 WLNR 31329261.

States and other overseas donors range from 10 percent to 20 percent of the total, usually by the Taliban agreeing protection money with the contractor or demanding a cut.' "[252]

d.  Canadian Press, June 2013: "[In] Mosul and the surrounding countryside, … al-Qaida was never really routed … Michael Knights, an analyst … who closely follows regional security issues, said al-Qaida in Iraq has long generated cash from businesses … through extortion of large firms such as mobile phone companies."[253]

e.  Independent, October 2013: "Al-Qa'ida is once again making ground attacks on cities like Fallujah … The same is true of … Mosul …, where ISIS is reported to levy protection money on everybody from the local green-grocer to satellite phone … companies – bringing in monthly revenue of $8m."[254]

f.  Business Insider, December 2015: "ISIS … pulls in hundreds of millions of dollars from 'taxing' … those who live in the territory the group controls in Iraq and Syria. ISIS is thought to make as much as $800 million or $900 million from residents and businessmen in its territory, American and European officials [said] … [T]he militants have created a complex financial system to extract as much money as possible from individuals and businesses. ISIS charges import taxes, rent for businesses, fines for breaking laws, utility

---

[252] Agence France Presse, *Taliban Made $400mn In 2011 From Taxes, Extortion: UN* (Sept. 11, 2012), https://www.nation.co.ke/news/world/Taliban-made--400-mn/1068-1504748- w0sl0a/index.html.
[253] Sameer N. Yacoub and Adam Schreck, *Spreading Shakedowns and Distrust of Authorities Embolden Al-Qaida in Iraq's Restive Mosul*, Canadian Press (June 20, 2013).
[254] Patrick Cockburn, *As Syria Disintegrates, So Too Does Iraq*, Independent (Oct. 29, 2013), 2013 WLNR 27123183.

bills, and income tax. … ISIS' 'Office of Resources' controls the group's … operations … [relating to] … mobile-phone companies …"[255]

1013. **Terrorism scholars** alerted Defendants that their transactions posed a severe risk of routing protection payments to terrorists. Dr. Williams's 2009 study, for example, was published by the U.S. Army War College and documented an extensive analysis of protection rackets operated by terrorists in Iraq – including the key role played by intermediaries in lubricating the entire protection money economy there.[256] Dr. Williams reported, *inter alia*, that:

   a.  "As one observer notes: 'AQI in certain parts of Iraq is basically running protection rackets … and engaging in criminality.'"[257]

   b.  "One businessman involved in construction noted that there were two options: 'one, they give you the contract for a price but then you have to provide your own security; the other deal is that for a certain percentage of the contract they will provide you with gunmen.'"[258] "In his last four contracts, the businessman had paid $500,000 in bribes."[259]

   c.  "In [Diyala] Province in July 2007, AQI … extorted about $3,000 from a local sheikh almost in passing."[260] "Much more has probably been obtained from white collar criminals in Mosul who reportedly have also been targeted by AQI."[261]

---

[255] Pamela Engel, *ISIS Has Found A Huge Money-Making Method That Is 'Impervious To Sanctions And Air Raids'*, Business Insider (Dec. 2, 2015).
[256] Williams, *Criminals, Militias, and Insurgents*.
[257] *Id.* at 232-33.
[258] *Id.* at 160.
[259] *Id.*
[260] *Id*. at 233.
[261] *Id.*

d. "Larger businesses are also subject to extortion and generally find it preferable to make payoffs than to incur the risks and costs associated with resistance."[262]

e. "As one military spokesman notes, '[t]he racketeering operations extended to nearly every type of business in the city, including a Pepsi plant, cement manufacturers, and a cellphone company, which paid the insurgents $200,000 a month." [263]

f. "For contractors and subcontractors, of course, these payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[264]

g. "Knowing that extortion payments are required for the movement of supplies and people, contractors inflated their bids accordingly."[265]

h. "Extortion from contractors involved in construction projects also had a debilitating impact, increasing the costs of most projects and offering opportunities for diversion of funds to insurgent groups."[266]

1014. In 2010, the National Defense University published another analysis by Dr. concerning terrorist protection rackets in Iraq.[267] Among other things, Dr. Williams reported that, with respect to "the range of criminal activities perpetrated by … political groups using crime to fund their cause":

---

[262] *Id*. at 158.

[263] *Id*.

[264] *Id*. at 159.

[265] *Id*.

[266] *Id*. at 259.

[267] Williams, *Criminals, Militias, and Insurgents*, at 259.

1015.   Extortion (and its less malevolent concomitant, protection) became pervasive. And the reconstruction efforts multiplied the opportunities. Large amounts of money for reconstruction were poured into Iraq with inadequate oversight … Iraqis were awarded contracts with protection money almost invariably built in, some of which went to … the insurgency.[268]

1016.   Similarly, in 2014, Thomson Reuters published its analysis by terrorism scholars Jean-Charles Brisard and Damien Martinez, which detailed Islamic State's continuation of al-Qaeda-in-Iraq's protection money operation and warned the multinational corporations who subscribe to Thomson Reuters (owner of, inter alia, Westlaw) that illicit transactions in Iraq foreseeably facilitated protection money payments to Islamic State:

> a.   "In its quest to establish administrative and civil control over its conquered territory, the [Islamic State] has implemented taxes on a variety of commercial activities. In Mosul alone, [Islamic State] is believed to raise US$8 million in taxes each month. Such taxes include the following:
>
> - a tax on all goods;
> - a tax on telecommunication companies;
> - a tax on cash withdrawals from bank accounts;
> - a 5% tax collected for social welfare and other public purposes on all salaries;
> - a road tax of US$200 in Northern Iraq;
> - an US$800 custom tax per truck entering Iraq …;
> - a tax on looting archeological sites (20% in Aleppo, 50% in Raqqa); and
> - a protection tax for non-Muslim communities (known as jizya)."[269]
>
> b.   "In total, the extortion/tax system imposed in areas under its control in Iraq and Syria could generate as much as US$30 million per month for [Islamic State], or US$360 million a year."[270]

---

[268] *Id.* at 48-49.
[269] Brisard and Martinez, at 5.
[270] *Id.*

365

c. "Today these methods of funding by extortion are common to many different terrorist groups across the globe. However, in the case of the Islamic State, there is a relative ingenuity in imposition of these new taxes. In the short term, Western groups already operating in the area could find themselves exposed to this pernicious funding mechanism and thereby constrained by the payment of protection money.

d. "It is known that the Islamic State not only gets its funding from [inter alia, taxation], but that it has diversified from the known traditional avenues, and is using more unusual methods to generate its funds. This is the risk that the compliance community must face on a daily basis, not only dealing with a large majority of known risks (conventional terrorism financing for some countries, for certain entities)." [271]

e. "The compliance community has a clear idea of the inherent risks … Various criminal cases including those linked to bribery has [sic] prompted companies … to take action and put in place measures and processes to both increase control over, and to mitigate their exposure to these risks. The emergence of the Islamic State…, and the necessity to identify its financing channels is proving to be a stress test for [] compliance teams." [272]

1017. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that corporations' illicit

---

[271] *Id.*

[272] *Id.* at 7

transactions in, or relating to, Iraq, Afghanistan, Syria, and Turkey were routinely designed to route protection payments to the branches of terrorist groups operating there.

<u>Defendants Knew Al-Qaeda's And Islamic State's Terrorist Campaigns In Iraq And Afghanistan Were Inextricably Linked</u>

1018.    Defendants knew that al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's integrated global terrorist campaigns against the United States linked Iraq and Afghanistan.

1019.    Indeed, the close and intimate relationship between al-Qaeda and Islamic State terrorists in Iraq and Afghanistan has been repeatedly made clear to the public (and Defendants) since the mid-2000s. Both groups, and their branches, in both countries, viewed the Iraq and Afghanistan terrorist campaigns against America as part of the same integrated effort to drive the United States out of the Middle East.

1020.    United States government reports and statements alerted Defendants as to the inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in- Iraq, and the similarly inextricable connection between Islamic State "core" in Iraq and Syria and Islamic State's "branch" in Afghanistan. For starters, U.S. military documents confirmed the vital nature of the Iraq/Afghanistan linkage. For example, according to a report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in-Iraq's] long-term war against the United States and its allies": "[r]eflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

1021.    The cornerstones of U.S. counterterrorism policy, as reported by the State Department annually from 2006 through at least 2010, included the recognitions that: (i) "[a]l- Qaida's worldwide networks are augmented by ties to local Sunni extremists"; and (ii) "[w]hile the

largest concentration of senior al-Qaida members now resides in Pakistan, the network incorporates members of al-Qaida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, and Europe who continue working to carry out future attacks against U.S. interests."[273]

1022.   Consensus intelligence assessments prepared by the U.S. government known as National Intelligence Estimates (each, an "NIE") also confirmed the intimate relationship between al-Qaeda and its most important subsidiary, al-Qaeda-in-Iraq. In 2006, for example, a published NIE concerning al-Qaeda and al-Qaeda-in-Iraq determined, among other things, that:

  a.   "Al-Qa'ida, now merged with Abu Mus'ab al-Zarqawi's network, is exploiting the situation in Iraq to attract new recruits and donors and to maintain its leadership role."

  b.   "Bin Ladin, [] al-Zawahiri, and al-Zarqawi," were "particularly" "key [al-Qaeda] leaders," whose loss "in rapid succession, probably would cause [AQ] to fracture…"

  c.   "[T]he Iraq jihad is shaping a new generation of terrorist leaders and operatives; perceived jihadist success there would inspire more fighters to continue the struggle elsewhere. The Iraq conflict has become the 'cause celebre' for jihadists, … cultivating supporters for the global jihadist movement."

  d.   "Zarqawi … could broaden his popular appeal and present a global threat. The increased role of Iraqis in managing the operations of al-Qaida in Iraq

---

[273] U.S. Dep't of State, Country Reports on Terrorism 2005 at 218 (Apr. 2006); see also U.S. Dep't of State, Country Reports on Terrorism 2006 at 270 (Apr. 2007) (same); U.S. Dep't of State, Country Reports on Terrorism 2007 at 299 (Apr. 2008) (same); U.S. Dep't of State, Country Reports on Terrorism 2008 at 318 (Apr. 2009) (same); U.S. Dep't of State, Country Reports on Terrorism 2009 at 275 (Aug. 2010) (same).

might lead veteran foreign jihadists to focus their efforts on external operations."

1023. In 2007, the United States published another NIE that assessed, *inter alia*:

    a. "Al-Qa'ida is and will remain the most serious terrorist threat …, as its central leadership continues to plan high-impact plots, while pushing others in extremist Sunni communities to mimic its efforts and to supplement its capabilities. We assess the group has protected or regenerated key elements … including: a safehaven in the Pakistan Federally Administered Tribal Areas (FATA), operational lieutenants, and its top leadership."

    b. "[A]l-Qa'ida will continue to enhance its capabilities … through greater cooperation with regional terrorist groups. Of note, we assess that al-Qa'ida will [] seek to leverage the contacts and capabilities of al-Qa'ida in Iraq [], its most visible and capable affiliate …"

    c. "[I]ts association with AQI helps al-Qa'ida to energize the broader Sunni extremist community, raise resources, and to recruit and indoctrinate operatives…."

1024. The United Nations' al-Qaeda/Taliban/Islamic State experts[274] concurred – publicly. For example, the U.N. Security Council's al-Qaeda sanctions monitoring team reported in 2006, among other things, that "[t]he Taliban have also continued to benefit from a close relationship with Al-Qaida and related foreign groups."

---

[274] Reflecting their common heritage, for most of the relevant period, the same or a substantially related United Nations sanctions regime governed al-Qaeda, the Taliban (including its Haqqani Network), al-Qaeda-in-Iraq, Jabhat al-Nusra, and Islamic State.

1025.  Al-Qaeda's leadership agreed.  From 2003 through 2022, al-Qaeda's and al- Qaeda-in-Iraq's respective leaders (and later Islamic State's leadership) viewed Iraq and Afghanistan as a single linked campaign against the American "Crusaders."  Such FTOs' approach ignored geographic boundaries with respect to their operations in these two countries – facilitated throughout by Iran's IRGC, which permitted al-Qaeda and its branches to operate a landbridge connecting Iraq and Afghanistan through Iran.

1026.  From 2001 through his death in 2011, Osama bin Laden's public statements similarly confirmed al-Qaeda's and al-Qaeda-in-Iraq's view that attacks against Americans in Iraq and Afghanistan were part of the same terrorist campaign.

1027.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that al-Qaeda, al-Qaeda-in- Iraq, and Islamic State inextricably linked their campaigns in Iraq and Afghanistan together.

**Defendants Knew Their Illicit Transactions Aided Terrorist Attacks By Causing Financial Assistance To Flow To The Relevant Terror Organizations Through Defendants' Protection Payments To Them**

1028.  Defendants knew that they were supplying funding to the Relevant Terror Organizations terrorists who were intent on attacking Americans in Iraq, Syria, and Afghanistan, as well as Europe and elsewhere. That Defendants chose to funnel their illicit payments through partners, consultants, and contractors, , only heightens their culpability. Defendants intentionally used the contracting process to insulate themselves from the illicit payments on paper, but that process offloading responsibility to local partners, consultants, and contractors several layers removed was simply their technique for encouraging the payments while avoiding detection and accountability. The protection payments may often have been physically delivered by an intermediary, but Defendants knew they were occurring and purposefully orchestrated them.

That is because Defendants could only obtain their desired business outcome by ensuring that their money actually reached the Relevant Terror Organizations. Had Defendants' partners, consultants, and contractors spent the money on some other legitimate purpose, rather than directing it to the Relevant Terror Organizations, Defendants would not have obtained the security benefit they wanted.

1029.   From 2004 through 2022, Ericsson's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) knew that Defendants' illicit transactions in Iraq foreseeably caused protection money to flow to the Relevant Terror Organizations. Plaintiffs' allegations exclusively concern Ericsson's understanding of the foreseeable counterterrorist finance risks posed by Defendants' illicit Iraq-related transactions. Plaintiffs do not allege that Ericsson knew their Iraq-related conduct foreseeably aided terrorists targeting the United States from 2004 through 2022 merely because Defendants did business in Iraq during this time. Instead, Plaintiffs' allegations in this part focus on Ericsson's knowledge that illicit Iraq-related transactions throughout this period foreseeably aided terrorists.

1030.   Defendants knew their illicit Iraq-related transactions facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

1031.   From 2004 through 2022, it was common knowledge among businesses operating in Iraq, including Defendants, that illicit transactions pursued by Western corporate and contracting parties were typically designed to cause U.S. dollars to flow to terrorists in Iraq, including al-Qaeda and al-Qaeda-in-Iraq (from 2004 through 2014) and Islamic State (from 2014 through

at least 2022), in the form of protection money routed through transactions that were often plainly illicit on their face. Because the Relevant Terror Organizations always openly demanded the money – and because local agents usually paid it through relatively straightforward, albeit highly illegal, means – Western companies on the ground in Iraq were widely aware of the practice. Defendants were sophisticated companies with billions of dollars in revenues at stake in Iraq. They knew this prevailing understanding that their illicit Iraq-related transactions were foreseeably flowing to the Relevant Terror Organizations.

1032. Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's own public statements alerted Defendants that their illicit Iraq-related transactions would be used to facilitate murderous attacks on Americans. The Relevant Terror Organizations openly proclaimed that the protection money was for terrorism. The demands for payments, which al-Qaeda, al-Qaeda-in- Iraq, and Islamic State themselves tied to the insurgency, alerted Defendants to the connection between the payments and terrorist violence.

1033. Defendants' illicit transactions were also the fruits of Defendants' negotiation of their payments in circumstances that left no doubt about whom they were financing. With respect to the large-scale payments negotiated directly with the Relevant Terror Organizations, LM Ericsson, Ericsson AB, and Ericsson Inc. (or their agents) met with high-level representatives acting on behalf of such terrorist groups who openly represented their respective Financial Commissions (each maintained one). The payments to local al-Qaeda, al-Qaeda-in- Iraq, and Islamic State regional cell leaders likewise occurred via negotiations with cell leaders who openly identified as the Relevant Terror Organizations members. Given the al-Qaeda- and Islamic State-controlled or contested geographies in which Defendants operated, Defendants

assuredly knew that the intermediaries they were paying off through their illicit Iraqi transactions worked for the Relevant Terror Organizations.

1034.  Al-Qaeda and Islamic State memorialized their respective protection rackets (al-Qaeda, through AQI, from 2004 through 2014, Islamic State from 2014 through at least 2022) in documents that further notified Defendants that they were financing terrorists. Most prominently, the Relevant Terror Organizations often conveyed their demands for protection payments in so-called "Night Letters." Night Letters – whose name comes from their frequent delivery during the night – were documents on official al-Qaeda, al-Qaeda-in-Iraq, or Islamic State letterhead bearing the relevant group's insignia. Although Night Letters could convey a variety of threats, the Relevant Terror Organizations commonly sent them to companies to demand protection payments. Night Letters were a staple of the terrorist playbook, widespread in Iraq, particularly in areas controlled by al-Qaeda or Islamic State, and were one of the principal means through which al-Qaeda and Islamic State communicated their demands for protection money to companies, including Defendants.

1035.  Similarly, after effecting the illicit transactions that routed protection payments, companies regularly received so-called "tax receipts" from the Relevant Terror Organizations, so they would have documentation proving they had paid their dues to the terrorists. For example, Islamic State's Financial Commission, following the al-Qaeda playbook, "has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies" paid to their "protection racket."[275] And those tax receipts – like the Night Letters – appeared on Islamic State letterhead and made clear on their face that protection money was intended for Islamic State's benefit. On information

---

[275] Financial Action Task Force, *FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 12 (Feb. 2015), https://tinyurl.com/5b98bmbh

and belief, Defendants or their agents received Night Letters and tax receipts from the Relevant Terror Organizations in connection with their projects in Iraq.

1036.   Defendants did not believe – nor was it true – that their protection payments were necessary for them to avoid imminent death or serious bodily injury. After 2004, al-Qaeda and Islamic State typically did not extract protection payments by physically confronting companies and threatening immediate violence; rather, the threats were often vaguer and future-looking.

1037.   Many times, those threats were directed at Defendants' equipment or projects, rather than their personnel. Given the non-immediate nature of the threats, Defendants could have notified the U.S. government of al-Qaeda's and Islamic State's protection rackets and tried to enlist the military's aid in responding. But rather than avail themselves of such options, Defendants decided that the simplest (and most profitable) option was to pursue the illicit transactions necessary to make or facilitate the payments that the Relevant Terror Organizations demanded.

1038.   Indeed, Defendants knew that their large, regular protection money payments to the Relevant Terror Organizations strengthened such FTOs' racketeering enterprise both through funding its operation and by generally causing dramatic inflation in the prices – and associated terrorist finance extracted by the FTOs – attendant to the illicit economy in Iraq. As a result, Defendants' large-scale protection money payments had a multiplier effect for the terrorists, by raising the price of the economic activity generally. Ericsson's conduct therefore perversely made it so that only large multinational corporations could consistently secure reliable protection money arrangements with these FTOs, because for everyone else, the prices were often too high due to the inflation caused by Defendants (and their multinational peer companies). Thus, Defendants knew that their conduct made kidnapping and murders more likely by (a) facilitating the growth of the entire protection money racket while simultaneously

(b) causing dramatic price inflation, pricing out people at the lower end of the new illicit economy Defendants helped birth and sustain.

1039.   Although Defendants' protection payments to the Relevant Terror Organizations agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to such FCPA violations. Whether or not Defendants technically violated the FCPA or their contractual obligations to their U.S. and Iraqi customers, their transactions with an intermediary with the specific intent of routing protection money directly to terrorist groups targeting the United States – which intermediaries flowed Defendants' resources through to their intended terrorist recipients – supplied the Relevant Terror Organizations with U.S. dollars, sourced from U.S. transactions processed by U.S. banks in the U.S., and valuable U.S. free goods, including valuable American high-tech communications technologies that provided encrypted communication capabilities and doubled as cash-equivalents in Iraq, like the iPads that Ericsson regularly sourced from the United States and used as cash equivalents in its corrupt transactions in the Middle East—all of which the Relevant Terror Organizations used to fund attacks against Americans in Paris, Belgium, Iraq, Afghanistan, Syria, and Turkey.

1040.   While each of the above items on its own alerted Defendants, specific aspects of their illicit transactions and corrupt business practices also further alerted them that they were facilitating the flow of protection payments to terrorists, including, but not limited to, Defendants' corrupt payments in Iraq involving: (1) illicit transactions with strategic partners, consultants, and contractors; (2) slush funds; and (3) intentionally deficient internal controls.

a.   Defendants Knew Their Illicit Transactions With Iraq-Related Intermediaries Caused Protection Payments To Flow To Terrorists

1041. Defendants knew, and intended, that their illicit transactions with their partners, consultants, and contractors were designed to, and would, facilitate protection payments through such intermediaries on behalf of Defendants.

1042. Defendants knew their practice of routing illicit cash payments and other illicit value through intermediaries, including Defendants' self-described partners (like Asiacell), consultants (like al-Awsat), and security, transportation, and logistics contractors (like SLS and Cargo Iraq) would conceal their regular protection payments to terrorists.

1043. Defendants knew their illicit transactions with intermediaries facilitated protection payments to FTOs because (at a minimum) Defendants' employees and agents in Iraq – who were from Iraq, operated businesses in Iraq, and lived in Iraq for decades – knew it to be true.

1044. Defendants knew that the excessive fees they illicitly routed to their intermediary partners, consultants, and contractors were red flags for unlawful payments.[276]

1045. Defendants knew that their inability to document the services provided by their intermediary partners, consultants, and contractors was a red flag that such intermediaries were illicitly passing value along to third parties, i.e., the terrorists.[277]

1046. Defendants knew that a substantial percentage of corrupt value they helped flow to their intermediaries reached the Relevant Terror Organizations. For example, as one Iraqi company

---

[276] *See, e.g., A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 22 ("[c]ommon red flags associated with third parties include . . . excessive commissions to third-party agents or consultants"), https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.

[277] *Id.* at 60 ("DOJ's and SEC's FCPA enforcement actions demonstrate that third parties, including agents, consultants, and distributors, are commonly used to conceal the payment of bribes … in international business transactions. Risk-based due diligence is particularly important with third parties … some guiding principles always apply. First, … companies should understand the qualifications and associations of its third-party partners … The degree of scrutiny should increase as red flags surface. Second, companies should have an understanding of the business rationale for including the third party in the transaction … [and] should understand the role of and need for the third party and ensure that the contract terms specifically describe the services to be performed [and] … payment terms … Moreover, companies may want to confirm and document that the third party is actually performing the work for which it is being paid and that its compensation is commensurate with the work being provided. Third, companies should undertake some form of ongoing monitoring of third-party relationships.").

officer publicly explained in 2007, the "contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents who demand cash payments in exchange for the supply convoys' safe passage" – so that of every $1 million he received, $500,000 was flowed through to the FTOs.[278]

1047.   United States federal criminal prosecutions alerted Defendants that their illicit transactions through intermediaries facilitated protection payments to terrorists. On March 19, 2007, for example, Chiquita Brands International, Inc. ("Chiquita"), a multinational banana supplier, pleaded guilty in this District to having provided material support to the United Self- Defense Forces of Colombia ("AUC") in Colombia.[279] Chiquita had routed protection payments to the AUC – then designated as a Specially Designated Global Terrorist – "through various intermediaries," and had falsely accounted for them as "security payments."[280] Chiquita later argued that it paid AUC protection money "under threat of violence," but DOJ responded that the "payments were illegal and could not continue."[281] It thus charged Chiquita with (and Chiquita pleaded guilty to) the federal crime of transacting with a Specially Designated Global Terrorist.[282]  In so doing, Chiquita admitted that "[f]or several years Chiquita paid [an FTO] by check through various intermediaries[,]" it "recorded these payments in its corporate books and records as 'security payments' or payments for 'security' or 'security services'" but "never received any actual security services in exchange for the payments."[283]

---

[278] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.

[279] *See* Plea Agreement, *United States v. Chiquita Brands Int'l, Inc.*, No. 07-cr-00055-RCL (D.D.C. filed Mar. 19, 2007), Dkt. 11.

[280] Press Release, U.S. Dep't of Justice, *Chiquita Brands International Pleads Guilty To Making Payments To A Designated Terrorist Organization & Agrees To Pay $25 Million Fine* (Mar. 19, 2007) ("*Chiquita Brands International Pleads Guilty*").

[281] *Id.*

[282] *See* 50 U.S.C. §§ 1701, 1705; 31 C.F.R. §§ 594.201(a), 594.701(c); Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001).

[283] *Chiquita Brands International Pleads Guilty*.

1048.  In DOJ's 2007 press release announcing Chiquita's plea deal, an Assistant Attorney General declared: "Like any criminal enterprise, a terrorist organization needs a funding stream to support its operations.  Thanks to … this prosecution, that funding stream is now dry and corporations are on notice that they cannot make protection payments to terrorists."[284] The U.S. Attorney for this District further warned: "Funding a terrorist organization can never be treated as a cost of doing business. American businesses must take note that payments to terrorists are of a whole different category. They are crimes." [285]

1049.  On information and belief, Defendants were aware of the Chiquita settlement and the U.S. government's clear message that it considered protection payments illegal. The settlement received extensive scrutiny among the international business community and was the subject of recurring media coverage. Media outlets describing the settlement included United Press International on March 14, 2007, the Washington Times on March 19, 2007, the Associated Press on March 20, 2007, and the Washington Post on August 2, 2007.[286]

1050.  United States government reports alerted Defendants that their illicit transactions through intermediaries foreseeably aided terrorists. In 2011, for example, the Final Report of the U.S. Congress' Commission on Wartime Contracting in Iraq and Afghanistan documented to Congress (and Defendants) that:

1051.  Another significant cost of overseas-contingency contracting is diversion— payments commonly made for safe passage of U.S. convoys and for protection of

---

[284] *Id.*

[285] *Id.*

[286] *See* United Press Int'l, *Chiquita To Pay $25M For Terrorist Payoffs* (Mar. 14, 2007); Matt Apuzzo, *Chiquita Pleads Guilty To Doing Business With Terrorists*, Assoc. Press (Mar. 20, 2007); *Chiquita Pleads To Protection Payoffs*, Wash. Times (Mar. 19, 2007); Carol D. Leonnig, *In Terrorism-Law Case, Chiquita Points to U.S.*, Wash. Post (Aug. 2, 2007).

1052.   U.S. personnel performing reconstruction projects. … In Iraq and Afghanistan, significant … issues include: … diversion of contract funding to the insurgency

1053.   … In Iraq and Afghanistan, U.S. funds have been diverted to insurgents … as a cost of doing business … While there is no official estimate of the amount of U.S. funds diverted to insurgents, it certainly comes to a significant percentage of a project's cost. … Because they directly strengthen the insurgency, diverted funds pose far more danger than other kinds of waste and have a disproportionately adverse impact on the U.S. effort.[287]

1054.   The Commission on Wartime Contracting's finding was widely reported in the media. As the Boston Globe summarized, for example, "[t]he final report by the Commission on Wartime Contracting found at least $31 billion has been lost during the past decade through lax oversight of contractors, poor planning, and payoffs to … insurgents in … Iraq."[288] The Associated Press and others also published similar reports.[289]

1055.   In 2012, DOJ and SEC jointly warned sophisticated multinational corporations, like Ericsson, that "DOJ's and SEC's FCPA enforcement actions demonstrate that third parties, including agents, consultants, and distributors, are commonly used to conceal [] [corrupt] payment[s]" "in [] business transactions,"[290] and such "corruption" "impedes U.S. efforts to "combat … terrorism."[291]

---

[287] Commission on Wartime Contracting in Iraq and Afghanistan, *Transforming Wartime Contracting: Controlling Costs, Reducing Risks*, at 32, 70, 73-74 (Aug. 2011).

[288] Stephanie Ebbert, *Brown Returns From US War Zone; Reservist Trained In Afghanistan*, Boston Globe (Sept. 2, 2011), 2011 WLNR 17388152.

[289] *See*, e.g., Richard Lardner, *AP Exclusive: Up To $60B In War Funds Said Wasted*, AP Online (Aug. 30, 2011) ("As much as $60 billion in U.S. funds has been lost to waste and fraud in Iraq and Afghanistan over the past decade through lax oversight of contractors, poor planning and payoffs to warlords and insurgents, an independent panel investigating U.S. wartime spending estimates.").

[290] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 60.

[291] *Id*. at 2-3.

1056.  In 2018, public reports submitted to Congress by the Lead Inspector General for Operation Inherent Resolve highlighted the extreme terrorist finance risks posed by illicit transactions in Iraq and alerted Defendants, among other things, that:

    *a.*  "ISIS … generate[d] income from extortion, taxation, and illicit trafficking activities," facilitated by "middlemen who engaged in transactions with the group."[292]

    *b.*  "The [FBI] reported that while ISIS did not appear to have links to transnational criminal organizations, it was involved with income-generating crimes and as a result had formed connections with preexisting smuggling and black market networks in the region."[293]

    *c.*  An "unstable security situation" near Syria's border with Iraq "raised the risk that combatants might divert humanitarian assistance," and "the risks of humanitarian assistance being diverted to armed groups … included … imposition of taxes, duties, and fees on USAID implementers and beneficiaries; [and al-Qaeda-affiliated terrorists'] control of local councils and [contractor's] camp management that assist USAID implementers identify eligible beneficiaries."[294]

1057.  **European government reports** also alerted Defendants that their illicit transactions with, or through, intermediaries were designed to route protection payments to terrorists. The European Parliament's 2017 report concerning Islamic State's terrorist finance strategies, for

---

[292] Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, *Report to the United States Congress, January 1, 2018–March 31, 2018*, at 32 (May 5, 2018).

[293] *Id.*

[294] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2018–September 30, 2018*, at 55 (Nov. 5, 2018).

example, alerted Defendants that, with respect to the protection money operation created by al-Qaeda, refined by al-Qaeda-in-Iraq, and continued by Islamic State, "[t]he case of the Swiss … conglomerate LafargeHolcim" was "typical of" the al-Qaeda-in-Iraq/Islamic State protection money "modus operandi" in geographies the terrorists controlled." [295]

1058.   The history, media, and litigation attendant to multinational corporations' illicit payments to Iraqis revealed by the United Nations' Oil-for-Food Program scandal from 1998 to 2003 alerted Defendants that their intermediaries were foreseeably paying protection money to terrorists on Defendants' behalf. The Oil-for-Food scandal alerted Defendants that intermediaries often served as conduits for illicit payments in Iraq by no later than 2005, when the scandal was already a major matter subject to multiple investigations worldwide, including several by U.S. authorities.[296] Through their knowledge of the Oil-for-Food scandal, Defendants knew that the routing of programmatic illicit payments to violent actors in Iraq through notorious intermediaries in Iraq, Lebanon, Syria, and Jordan was a universal feature of Iraqi society during the five years immediately preceding the U.S. invasion in 2003.

1059.   The Oil-for-Food scandal alerted Defendants that the use of sham consulting deals to route payments was a signature strategy in the Iraqi corruption playbook, and that such notorious use of intermediaries to route illicit payments in Iraq under the Oil-for-Food program birthed a worldwide scandal and was, at all relevant times, the largest collective FCPA scandal in U.S.

---

[295] European Parliament, Directorate-General for External Policies, Policy Department, *The Financing of the 'Islamic State' in Iraq and Syria (ISIS)*, at 11 (Sept. 2017), https://tinyurl.com/yd3dy6rz. While this report was limited to Islamic State, Defendants knew, as did the European Parliament, that Islamic State followed the same protection money-related tactics, techniques, and procedures as did al-Qaeda through its branch, al-Qaeda-in-Iraq.

[296] See, e.g., Stuart W. Bowen, Jr., Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction, at 111 (Jan. 30, 2006) ("GAO, other congressional investigators, the Defense Intelligence Agency Iraq Survey Group, and others have reported that Iraq gained billions in illicit revenues through smuggling and corruption [under the U.N. Oil-for- Food program]."); Stuart W. Bowen, Jr., Special Inspector General for Iraq Reconstruction, Hard Lessons: The Iraq Reconstruction Experience, at 6 (Feb. 2, 2009) ("[B]eneath the sanctions and authorized oil sales, an illicit economy flourished [under Oil-for-Food]. Institutionalized corruption infected both the government and the supporting UN programs, spawning powerful criminal elements within Iraq.").

history.[297] In 2012, for example, a joint report by DOJ and SEC noted in 2012, "SEC charged [a] former CEO … for his role in schemes to bribe Iraqi[s] … in connection with the United Nations Oil-For-Food Programme and to bribe Iraqi[s] … to purchase the company's fuel additives," for which "the company used false invoices and sham consulting contracts to support large bribes that were passed on to foreign officials through an agent, and the bribes were mischaracterized as legitimate commissions and travel fees in the company's books and records."[298]

1060.    The Oil-for-Food scandal alerted Defendants to the prominent role that universal taxes or kickbacks played in illicit Iraqi dealings because Defendants knew that Saddam's regime imposed a 10% After Sales Service Fee as "a mandatory kickback to be paid by all suppliers" from 2000 through 2003.[299] The Oil-for-Food scandal alerted Defendants that the recipients of illicit payments in Iraq ordinarily collected these payments from multinational corporations – ostensibly to pay for consulting services but in reality functioned as an illicit source of cash flow for Saddam's regime that was free of U.N. oversight. Defendants knew that, according to the Volcker Commission, recipients of illicit payments in Iraq sometimes collected their payoffs without memorializing them in a contract; the "ten percent fee" was often paid "without labeling it an 'after-sales-service' fee or without inserting an after-sales-service

---

[297] Compl. ¶ 1, *SEC v. Textron Inc.*, No. 07-cv-01505 (D.D.C. Aug. 23, 2007), ECF No. 1; Compl. ¶ 1, *SEC v. Novo Nordisk A/S*, No. 09-cv-00862 (D.D.C. May 11, 2009), ECF No. 1; Compl. ¶¶ 2-3, *SEC v. Innospec, Inc.*, No. 10-cv-00448 (D.D.C. Mar. 17, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Daimler AG*, No. 10-cv-00473 (D.D.C. Mar. 22, 2010), ECF No. 1; Compl. ¶¶ 1-3, *SEC v. Gen. Elec. Co.*, No. 10-cv-01258 (D.D.C. July 27, 2010), ECF No. 1; Compl. ¶¶ 33-41, *SEC v. ABB Ltd.*, No. 10-cv-01648 (D.D.C. Sept. 29, 2010), ECF No. 1;
[298] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 44 n.5. Compl. ¶¶ 51-60, *SEC v. Johnson & Johnson*, No. 11-cv-00686 (D.D.C. Apr. 8, 2011), ECF No. 1; Deferred Prosecution Agreement, *United States v. DePuy, Inc.*, No. 11-cv-00099-RBW (D.D.C. Apr. 8, 2011), ECF No. 1-1; Deferred Prosecution Agreement, *United States v. Weatherford Int'l Ltd.*, No. 13-cr-733 (S.D. Tex. Nov. 26, 2013), ECF No. 4.
[299] Paul A. Volcker et al., Manipulation of the Oil-for-Food Programme by the Iraqi Regime, at 276 (Oct. 27, 2005) (the "Volcker Report"). The Volcker Report was a 623-page report by the Volcker Commission, a U.N.-commissioned Independent Inquiry Committee led by former U.S. Federal Reserve Chair Paul Volcker.

provision in the applicable contract."[300] Defendants also knew that multinational corporations typically concealed illicit payments on their books by routing them through third-party intermediaries, like "consultants" or suppliers who acted as their sales agents in Iraq.

1061.    The Oil-for-Food scandal also alerted Defendants that Western companies routed these corrupt payments to Saddam's regime through notorious intermediaries even though the public purpose of the international sanctions program (which such transactions, like Defendants' here, circumvented) was to choke off Saddam's ability to finance terrorist activities.[301] In fact, it was widely reported that Saddam used the illicit revenue obtained from corrupt foreign suppliers through the Oil-for-Food Program to finance international terrorist attacks.[302] Indeed, public reports concerning Iraq's Oil-For-Food scandal from Congress, media outlets, third-party watchdogs, and non-governmental organizations from 2004 through 2007 further alerted Defendants that their suspicious payments to intermediaries in Iraq, Syria, Jordan, and Lebanon relating to "trucking," "shipping," "logistics," "security," and "commissions" – among other classic Iraqi euphemisms – foreseeably enabled anti-American terrorist finance because that was exactly what had recently happened under Saddam.[303]

---

[300] *Id*. at 249.

[301] *See* Iran Sanctions Act of 1990, Pub L. No. 101-513, § 586F(c)(1), 104 Stat. 1979, 2051 (Iraq sanctions imposed on "a country which has repeatedly provided support for acts of international terrorism"); Determination Iraq, 55 Fed. Reg. 37,793 (Sept. 13, 1990) (determining that "Iraq is a country which has repeatedly provided support for acts of international terrorism").

[302] *See, e.g.*, Cynthia R. Fagen, *Iraq's Oil for Terror; $72 Million to Palestinians*, N.Y. Post (Oct. 17, 2004) ("Saddam Hussein secretly bankrolled a notorious Palestinian terrorist group with $72 million worth of vouchers from the U.N.'s corrupt oil-for-food program"), https://tinyurl.com/3t9fha7u; Statement of Chairman Henry Hyde, *The Oil-for-Food Program – Tracking the Funds: Hearing Before the H. Comm. on Int'l Relations*, 108th Cong. 9 (Nov. 17, 2004) (Saddam funded Palestinian terror through "kickback money Saddam demanded from suppliers"), https://tinyurl.com/59ncafjx; David Marr, *Report Ties Iraq Terrorism To Payoffs*, Sydney Morning Herald (Oct. 6, 2006) (prominent multinational corporation's "kickbacks to Saddam Hussein" during the "oil for food scandal," which the company and its intermediaries "disguised as trucking fees," "may have financed terrorism"), 2006 WLNR 26874182.

[303] *See generally id.*

1062.   Anti-Terrorism Act litigation alerted Defendants that their illicit transactions with fronts or intermediaries in geographies at an elevated risk for terrorist finance, including Iraq, foreseeably facilitated protection payments to terrorists on Defendants' behalf.

1063.   On March 12, 2008, American victims of FTO-affiliated kidnappers in Colombia sued Chiquita, the iconic American banana company, for making protection payments to the terrorist group FARC. See Compl. ¶¶ 1-2, Julin et al. v. Chiquita Brands Int'l, Inc., No. 08-cv- 20641 (S.D. Fla. Mar. 12, 2008), ECF No. 1. Among other things, plaintiffs alleged that:

> a.   "In order to disguise the payments, and ensure their continued and undetected flow to FARC, Chiquita and/or Banadex [Chiquita's wholly owned subsidiary] at times placed false names and non-existent employees on their payroll, providing those funds on local paydays to regional FARC commanders." Id. ¶ 192.
>
> b.   "Chiquita assisted … FARC terrorists on how to create front[s] … Through this deception, Chiquita … continue[d] its secret practice of covertly channeling funds to FARC, [and] was also able to mislead regulators, auditors, or anyone else examining Chiquita and Banadex's books-and-records. [Chiquita] could point to the false front[s] … to (falsely) record its payments to FARC as legitimate [] expenses." Id. ¶ 193.
>
> c.   "Chiquita also drew up fictitious contracts with legitimate, operating organizations, or alternatively overvalued existing contracts it maintained with such organizations, for the express purpose of burying (in its bookkeeping) its secret payments to FARC." Id. ¶ 194.

1064.   On January 2, 2009, American victims of attacks committed by FTOs funded by Saddam during Oil-for-Food sued defendants who allegedly routed illicit payments to Iraqis to secure lucrative Iraqi business. *See* Compl. ¶¶ 1-2, *Abecassis et al. v. Oscar S. Wyatt, Jr., et al.*, No. 09-cv-00001 (S.D. Tex. Jan. 2, 2009), ECF No. 3.  Plaintiffs alleged, *inter alia*, that:

> a.   "Defendants provided illegal, financial and material support for known terrorists" funded by Iraqi sponsors of terrorism during the Saddam era by routing value "through third-party intermediaries at inflated prices …, knowing that part of the [] price was being used to pay illegal surcharges and kickbacks" that financed terrorism. Id. ¶¶ 1, 4.

> b.   "To conceal these illegal surcharge payments, [Defendant] … deposit[ed] millions of dollars in a bank account controlled by [the Iraqi terrorist sponsor] at the Jordan National Bank in Amman, Jordan." Id. ¶ 171.

> c.   "To conceal these illegal surcharge payments, [Defendant] agreed to pay [its business partner] inflated commission[s] … on the original []transactions, with knowledge and expectation that the [business partner] would then make the surcharge payments to the [Iraqi terrorist sponsor]." Id. ¶ 175.

> d.   "[Defendant] purchased [goods] from … third parties, knowing that premiums paid to the third parties were used to pay illegal surcharges and kickbacks to [the Iraqi terrorist sponsor]." Id. ¶ 177.

1065.   On October 17, 2017, American victims of attacks committed by Iraqi terrorists funded by illicit payments to the terrorist-controlled Iraqi Ministry of Health ("MOH") sued supply companies who allegedly, *inter alia*, made corrupt payments to the terrorist-controlled

Ministry. *See* Compl. ¶¶ 1-2, *Atchley et al. v. AstraZeneca UK Ltd., et al.*, No. 17-cv-02136 (D.D.C. Oct. 17, 2017), ECF No. 1.  Among other things, plaintiffs alleged that:

    *a.* "The distribution stage presented yet another occasion for Jaysh al-Mahdi to extract corrupt payments from foreign suppliers. The standard Kimadia [i.e., the MOH entity responsible for procurement of imported drugs and medical supplies] sales contract imposed harsh penalties for late deliveries and conditioned payment on successful delivery. Meeting these conditions required the sign-off of multiple MOH officials, including the Kimadia Deputy Director General of Imports, individual warehouse managers, and members of the Facilities Protection Service nominally providing 'security' for the shipments. As detailed in the Contract Management article, MOH employees historically have leveraged these positions to force companies to make additional corrupt payments throughout the distribution process." Id. ¶ 155.

    *b.* "Like Saddam had done under Oil-for-Food, the [Iraqi terrorists] also extracted corrupt payments funded through sham or inflated payments by the suppliers relating to such items as post-sales 'services,' 'warranties,' 'equipment donations,' 'contractual facilities,' 'maintenance,' and 'training.' Corrupt payments through sham services agreements was the signature bribe of the Oil-for-Food scandal; while the nomenclature later changed, the practice continued once the Sadrists assumed control of MOH." Id. ¶ 156.

    *c.* "The inventory stage similarly allowed Jaysh al-Mahdi to collect corrupt payments from medical-goods suppliers. Kimadia's standard sales contract

imposed steep penalties on companies whose goods did 'not comply with specifications'(e.g., failed MOH testing) or went 'missing.' That gave the Facilities Protection Service, whose members guarded MOH warehouses, significant leverage over medical-goods suppliers: if they failed to provide security, pilfered medicines from warehouse storage, or failed to properly maintain the goods (e.g., by shutting off the power to a warehouse storing refrigerated goods), Kimadia could accuse the company of default and levy the penalties specified in the contract. That leverage allowed Jaysh al-Mahdi agents to extract additional payments from foreign suppliers." Id. ¶ 157.

d.  "Defendants' … sham 'training' and 'travel' expenses … functioned as a slush fund for cash payments to [] Jaysh al-Mahdi agents." Id. ¶ 160.[304]

1066.  On January 4, 2022, the United States Court of Appeals for the D.C. Circuit decisively rejected every core legal argument advanced by the defendants in *Atchley*, broadly ruling that corrupt payments to terrorists in Iraq, including protection payments, supported liability under the ATA.[305] Defendants knew about the D.C. Circuit's *Atchley* ruling, which received significant media coverage,[306] and further incentivized Defendants to continue concealing

---

[304] In *Atchley*, the intermediary question concerned Defendants' allegedly intentional use of buffers, like consultants from Lebanon and Jordan and local Iraqi "scientific bureaus," to route payoffs to terrorists who controlled the Iraqi Ministry of Health; the intermediary question in *Atchley* was not properly whether the Iraqi Ministry of Health was an intermediary because the D.C. Circuit determined the Ministry was no longer an independent intermediary once, as alleged, it had been taken over and instrumentalized by Jaysh al-Mahdi.

[305] See generally Atchley et al. v. AstraZeneca UK Ltd., et al., 22 F.4th 204 (D.C. Cir. 2022).

[306] *See*, *e.g.*, Andrew C. Nichols, Esq. (Charis Lex P.C.), *D.C. Circuit Continues Its War On Acronyms*, DC Circuitry (Jan. 11, 2022) ("Last week, the D.C. Circuit revived the claims of victims of terrorist attacks in Iraq against U.S. [] companies and their foreign suppliers, who allegedly secured [] contracts by paying off the terrorists."); *see also* Mike Scarcella, *Update 1-U.S. Court Revives Lawsuit Against Pfizer, Others On Iraq Terrorism Funding Claims*, Reuters Gulf Financial News (Jan. 4, 2022); Khorri Atkinson, *DC Circ. Revives Terror-Funding Case Against AstraZeneca*, Law360 (Jan. 4, 2022); Ross Todd, *Litigator of the Week: Kellogg Hansen's Josh Branson Revives an Anti-Terrorism Act Suit Against Big Pharma Companies*, AmLaw Litigation Daily (Jan. 7, 2022).

their corrupt payoffs to the Relevant Terror Organizations – which Ericsson continued doing until its internal documents leaked about six weeks later.

1067.   Defendants knew about plaintiffs' corruption- and protection money-related ATA allegations in *Chiquita*, *Abecassis*, and *Atchley*, which alerted Defendants that their own illicit transactions through intermediaries foreseeably caused protection payments to flow to terrorists on Defendants' behalf. Defendants knew about these ATA lawsuits because, among other reasons, such cases were widely covered in the media, relevant to Defendants' business, and known to Defendants' employees and agents, including, but not limited to, Defendants' legal, sales, management, and compliance personnel in Iraq, Sweden, and the United States.

1068.   Media reports and terrorism scholars alerted Defendants that their illicit transactions through intermediaries were foreseeably routing protection payments to terrorists on Defendants' behalf. In 2007, for example, McClatchy published a blockbuster report by Hannah Allam, who led the Cairo desk of its award-winning Middle East bureau, which reported that illicit transactions associated with Western companies operating in Iraq were invariably designed and used to flow protection money through intermediaries to al-Qaeda and al-Qaeda-in-Iraq on behalf of such Western companies, which payments, in turn, financed terrorist attacks against Americans in the Middle East.[307] Ms. Allam and McClatchy reported, inter alia, that:

1069.   "Iraq's deadly insurgent groups have financed their war against U.S. troops in part with hundreds of thousands of dollars in U.S. rebuilding funds that they've extorted from Iraqi contractors in Anbar province."

---

[307] Hannah Allam, *Iraq Aid Helps To Kill U.S. Troops?: Insurgents Extort Payoffs From Contractors In Anbar Province*, Sacramento Bee (Aug. 27, 2007), 2007 WLNR 16739213.

a.  "The payments, in return for the insurgents' allowing supplies to move and construction work to begin, have taken place since the earliest projects in 2003, Iraqi contractors, politicians and interpreters involved in reconstruction efforts said."

b.  "A fresh round of rebuilding spurred by the U.S. military's recent alliance with some Anbar tribes -- 200 new projects are scheduled -- provides another opportunity for militant groups such as al-Qaida in Iraq to siphon off more U.S. money, contractors and politicians warn."

c.  "An [United States] embassy spokesman" in Baghdad "said … that 'in terms of contracting practices, we have checks and balances in our [U.S. government] contract awarding system to prevent any irregularities from occurring. Each contracted company is responsible for providing security for the project.'"

d.  "Providing that security is the source of the extortion, Iraqi contractors say. A U.S. company with a reconstruction contract hires an Iraqi subcontractor to haul supplies along insurgent-ridden roads. The Iraqi contractor sets his price at up to four times the going rate because he'll be forced to give 50 percent or more to gun-toting insurgents who demand cash payments in exchange for the supply convoys' safe passage."

e.  "One Iraqi official said the arrangement makes sense for insurgents. By granting safe passage to a truck loaded with $10,000 in goods, they receive a 'protection fee' that can buy more weapons and vehicles."

f.  "Sometimes the insurgents take the goods, too."

g.  "Suleiman … displayed a stack of photos [that] … showed crumbling, half-finished structures overgrown with weeds and surrounded by patchworks of electrical wires. He blamed such failures on …'[t]hose responsible for these projects' … [who gave] money to al-Qaida. Frankly, gunmen control contracting in Anbar,' he said."

h.  "None of the Iraqi contractors agreed to speak on the record -- they risk losing future U.S. contracts and face retaliation from insurgent groups. Some of the Iraqis interviewed remain in Fallujah or Ramadi on the U.S. payroll; others had fled to Arab countries and Europe after they deemed the business too risky. "'I put it right in my contracts as a line item for 'logistics and security,'' said one Iraqi contractor who is still working for a major American company with several long-term projects in Anbar. 'The Americans think you're hiring a security company, but how you execute it is something else entirely. This is how it's been working since Day One.'"

i.  "One Iraqi contractor who is working on a U.S.-funded rebuilding project in the provincial capital of Ramadi said he faced two choices when he wanted to bring in a crane, heavy machinery and workers from Baghdad: either hire a private security company to escort the supplies for up to $6,000 a truck, or pay off locals with insurgent connections. He chose the latter, and got $120,000 for a contract he estimates to be worth no more than $20,000. 'The insurgents always remind us they're there,' the contractor said. 'Sometimes they hijack a truck or kidnap a driver and then we pay and, if we're lucky, we get our goods returned. It's just to make sure we know how it works.'

'Insurgents control the roads,' he added. 'Americans don't control the roads -- and everything from Syria and Jordan goes through there.'"

j. "An Iraqi who used to work as an interpreter for Titan Corp., the U.S. company that supplies local interpreters to U.S. forces in Iraq, said he witnessed countless incidents of insurgents shaking down contractors during the two years he spent as a translator on a U.S. military base in Anbar. He said he was stunned when, from early 2004 to his departure in summer 2006, a parade of sheiks with known insurgent connections were awarded contracts worth hundreds of thousands of dollars."

k. "Fawzi Hariri, a member of the Iraqi Cabinet and head of the government's Anbar Reconstruction Committee, said some U.S. rebuilding funds certainly have gone into insurgents' pockets …"[308]

1070. McClatchy's report received widespread coverage and republication.[309] A week later, one newspaper's editorial board – in a piece titled "'Insurgent tax'" – noted Ms. Allam's "telling report" "about the inextricable circumstances burdening the American mission in Iraq," in which "she relayed how Iraqi insurgents have financed their operations, including attacks on American troops, with American money extorted from Iraqi contractors."[310] With respect to the question of "[h]ow" "the extortion work[ed]," the same editorial stated the following:

---

[308] *Id.*

[309] *See, e.g.,* Hannah Allam, *Militants Extort Rebuilding Funds; Iraqi Contractors Pay 'Insurgent Tax' with U.S. Money Earmarked for Infrastructure,* Myrtle Beach Sun News (Aug. 27, 2007), 2007 WLNR 16672127; Hannah Allam, *Militants Siphon Off Rebuilding Funds,* News& Observer (August 27, 2007), 2007 WLNR 16691310; Hannah Allam, *Conflict In Iraq: Insurgents Use Extorted U.S. Money to Fight Troops; Through Extortion, Anti-American Insurgents are Obtaining Some of the Money Intended for the U.S. Rebuilding Effort in Iraq,* Miami Herald (August 27, 2007), 2007 WLNR 16667609; Hannah Allam, *Iraqi Militants Taking a Cut of Contract Funds / Insurgents Extort Money for Safe Passage of Goods, Workers Report,* Houston Chronicle (Aug. 27, 2007), 2007 WLNR 16732391.

[310] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.

1071. American companies hire Iraqi subcontractors to help with reconstruction projects. Those subcontractors supply their own security. They do so by paying off Iraqi insurgents with protection money. … This "insurgent tax" isn't cheap. One Iraqi contractor explained … that he sets his price knowing that 50 percent or more will go to insurgents. The result is doubly damaging. Reconstruction proceeds more slowly, as money gets diverted. … [and] the cash fuels the insurgency … as weapons and soldiers flow into Iraq. … [T]he violence has generated an economy of its own, American money sustaining the insurgents.[311]

1072. From 2004 through 2022, similar reports published by the media and terrorism scholars alerted Defendants that their illicit transactions with intermediaries were foreseeably routing protection payments to terrorists.  Such reports included, but were not limited to:

   a. Courier Mail, November 2005: "The [] Opposition [] demanded a royal commission into alleged kickbacks paid by the Australian Wheat Board to Saddam … AWB … paid almost $300 million to Jordanian company Alia to truck wheat into Iraq under the UN's [O]il-for-[F]ood program …Alia … channelled the money back to the regime. Despite Alia increasing the cost of transporting wheat into Iraq by 400 per cent in four years, AWB has insisted it was an unwitting pawn of Saddam. … [Future Australian Prime Minister] Kevin Rudd said ... [that] under UN sanctions … Australian companies … [caused] '$300 million to be paid illegally to Saddam …' he said. 'This slush fund is still available to the Iraqi insurgency and poses a continuing threat to [] troops in Iraq.'"[312]

---

[311] *Id.*

[312] Steven Wardill, *Full Probe Demanded Into Wheat Contracts*, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.

b. Dr. Phil Williams, July 2009: "By 2003 all the conditions for an upsurge of organized crime were present; the toppling of the regime provided the catalyst Iraq and Syria have long shared related economies, traditions, illicit transfer strategies, and notorious intermediaries who make the entire corruption economy work – including those who facilitate protection payments to terrorists."[313] "For contractors and subcontractors, of course, [protection] payments became simply the cost of doing business in an environment where security and law had been lacking and were almost certainly factored into contract bids to U.S. authorities in Iraq."[314] "While the scale of extortion is impossible to determine, in a culture where baksheesh and 'fixers' have long been necessary and in which the United States has spent enormous amounts on reconstruction, it is almost certainly in the millions of dollars."[315] "[T]he appropriation of organized crime methodologies by key Iraqi power centers increased the resilience of insurgents, terrorists, and militias."[316] Thus, "analysis [must] be broadened to include targets beyond those groups directly attacking U.S. forces. Financiers, facilitators, and criminal groups working with insurgents also need to be on the target list."[317]

c. Jean-Charles Brisard and Damien Martinez, October 2014: "[I]t is very likely that, given the amounts involved, … anti-money laundering teams and specialized suppliers are well positioned to identify dubious middlemen. It

---

[313] Williams, *Criminals, Militias, and Insurgents*, at xi.

[314] *Id*. at 159

[315] *Id*.

[316] *Id*. at 262.

[317] *Id*. at 263.

has emerged that the [Islamic State] is making use of the old networks put in place by the Baath Party to circumvent the Iraq Oil-For-Food program."[318]

"[I]f organizations across the globe do not take steps to conduct a thorough assessment of all of the possible [terrorist finance] risks, they could find themselves engaged in the financing structure of one of the most violent terrorist groups in the world. … There is a consensus among compliance officers today that the Islamic State is a clear and present danger … Islamic State is making use of well- established facilitators and money laundering networks, some of which were set up decades ago, to take care of the financial side of the organization … All this information placed end to end should in theory be able to highlight every dubious situation, commercial transaction or operation.[319]

    *d.* Newsweek, November 2014: "At its heart, the ISIS money machine runs on the fear— and greed—of the millions of people it controls. It also manifests itself in a wide range of financial activities, many of them outsourced via middlemen and driven by hordes of self-interested parties. … ISIS also depends on the steady income it extracts from private donors, the heavy taxation and extortion it levies on its captive population … The …extortion that go[es] toward funding ISIS's day-to-day operations provide[s] a steady cash flow, [former governor of Nineveh province Atheel] al-Nujaifi says. … [E]xtortion, … [] help fund[s] ISIS's day-to-day operations …"[320]

---

[318] Brisard and Martinez, at 7.
[319] *Id*. at 9-10.
[320] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

e.   Telegraph, September 2016: "Lafarge allegedly paid taxes to ISIL … [and] has been accused of making arrangements with [Islamic State] … In order to keep making cement Lafarge bought licences from and paid taxes to ISIL middle-men …."[321]

f.   Construction Europe, April 2017: "Swiss-listed cement firm LafargeHolcim has been asked to divulge any relationship it has had with militant groups … follow[ing] recent allegations that senior executives … agreed to pay protection money to [] terrorist organisations. … An inquiry into Lafarge[] … has been opened by prosecutors in Paris, and French human rights groups have filed a lawsuit, alleging the firm had 'business relations' with ISIS. While already admitting that 'significant errors of judgement' were made at the plant, which was evacuated in 2014, … LafargeHolcim said, 'The local company provided funds to third parties to work out arrangements with a number of... armed groups, including sanctioned parties, in order to maintain operations."[322]

g.   Globe and Mail, June 2018: "France has put cement giant LafargeHolcim under formal investigation over allegations of terrorist financing … [based on] allegations that Lafarge paid the Islamic State and other terrorist groups in Syria more than US$15-million between 2011 and 2014 for supplies and assurances they wouldn't attack the company's new plant … [E]ight former Lafarge executives, including two former [CEOs], have been put under

---

[321] Henry Samuel, *Paris-Plages May Say Au Revoir To Sand Over Complaints Provider 'Paid Taxes To ISIL' And Environmental Concerns*, Telegraph Online (Sept. 28, 2016), 2016 WLNR 29671392.
[322] Construction Europe, *Syria Questions For LafargeHolcim: Possible Terrorist Links Investigated At Swiss-Based Company After "Significant Errors Of Judgement" Were Made* (Apr. 1, 2017), 2017 WLNR 13774661.

formal investigation over allegations of terrorist financing. … [T]he FBI has launched an investigation. … 'The activities of Lafarge … are a perfect illustration of how multinationals can fuel conflicts …,' said Miriam Saage-Maass, legal director at ECCHR. … Lafarge executives were determined to keep [] operating as the country's civil war escalated and other western companies pulled out. … Lafarge executives often disguised the payments as 'donations' and relied on a pair of intermediaries, including a [] consultant, to make the payments to rebel groups. The relationship between the company and [Islamic State] became so formalized, [ISIS] issued travel permits to Lafarge workers and the company paid a 10-percent 'tax' to the terrorists."[323]

1073.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that also alerted Defendants that their illicit transactions involving intermediaries were foreseeably designed and used to route protection payments to terrorists on Defendants' behalf.

1074.  Indeed, in addition to alerting Defendants that their illicit Iraq-related transactions with intermediaries were routinely used to route illicit payments to terrorists, from 2004 through 2022, sources like those described throughout this section alerted Defendants that each of their specific intermediary "buffer" tactics foreseeably routed protection payments to terrorists, including Ericsson's reliance upon: (a) Iraq-headquartered companies that LM Ericsson touted as a "partner," like Asiacell and Korek; (b) Iraqi, Jordanian, or Lebanese consultants, like al-Awsat; and (c) security, transportation, logistics contractors, like SLS and Cargo Iraq.

> a. *Defendants Knew Their Illicit Transactions With Iraqi Partners Caused Protection Payments To Flow To Terrorists*

---

[323] Paul Waldie, *Lafarge Under Investigation In France Over Allegations Of Terrorist Financing*, Globe and Mail (June 29, 2018), 2018 WLNR 19862585.

1075.  Defendants knew their illicit transactions with their Iraqi partners, like Asiacell and Korek, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.  Several Confidential Witnesses confirm this point.  According to Colonel Romeo, for example any major international company operating in Iraq would have known that any transport checkpoint not staffed by Coalition forces was run by "the bad guys" and that any money paid to them for passage "isn't going to pay for holidays . . . but instead they are using the money to further fund the insurgency for things like weapons and IED." Any ethically run company "should turn around."

1076.  Media reports alerted Defendants that illicit transactions involving Iraq- headquartered companies that operated in areas where al-Qaeda or Islamic State-affiliated terrorists were present – like the Defendants' "partners" Asiacell and Korek – routinely were for purposes of routing protection payments to such terrorists as the cost of doing business using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

> a.  Knight Ridder, November 2005: "Ahmed, a [] resident with long-standing ties to local insurgent groups, … said businesses … had been paying local insurgents protection money, as much as $70,000 a month. Al-Qaida in Iraq demanded the money. 'Al-Qaida said they needed the money to operate….' he said."[324]
>
> b.  New York Times, December 2013: "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is

---

[324] Mohammed Al Dulaimy (Knight Ridder Foreign Service), *Al-Qaida in Iraq, Local Insurgents at Odds*, *republished in* St. Paul Pioneer Press (Nov. 13, 2005), 2005 WLNR 18333033.

gaining territory in both western Iraq and neighboring Syria. … Using extortion … the Qaeda affiliate is largely self-financing. … In Mosul, most of the security force members who are not from the area have left the city, and Al Qaeda controls whole sections of territory."[325]

c. Australian Broadcasting Corporation, January 2014: "In … Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses, according to the US-based Council on Foreign Relations (CFR)."[326]

d. NPR, April 2014: "In Mosul, the extortionists prey on thousands with regular demands and threats. The story of one small business owner shows how it works. Tawfik ran a computer shop in Mosul until last year. … He says he left Mosul after an anonymous caller demanded about $114,000 for jihad, or holy war … Several other people interviewed said the problem of extortion is entrenched and ongoing."[327]

e. Daily Mail, June 2014: "According to the Council on Foreign Relations, ISIS was already extorting taxes from Mosul businesses before its takeover…"[328]

1077. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their Iraqi partners were foreseeably making protection payments to terrorists on Defendants' behalf.

   a. *Defendants Knew Their Illicit Transactions In Iraq With Local Consultants Caused Protection Payments To Flow To Terrorists*

---

[325] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).
[326] Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014), 2014 WLNR 425449.
[327] Alice Fordham, *For Extremists In Syria, Extortion Brings Piles Of Cash From Iraq*, NPR (Apr. 21, 2014), https://tinyurl.com/5ejx25y7.
[328] Michael Seamark, *Jihadi Terror Group PLC*, Daily Mail (June 19, 2014), 2014 WLNR 16625914.

1078.  Defendants knew their illicit transactions with their Middle Eastern consultants, like al-Awsat, facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

1079.  Media reports alerted Defendants that their illicit transactions with their Iraqi, Jordanian, and Lebanese consultants, including Kurdish intermediaries affiliated with then-head of Kurdistan's regional government, Mahsoud Barzani – like those who served as Defendants' agents in Iraq – foreseeably aided terrorists because such consultants notoriously had longstanding protection arrangements with Sunni terrorists, including al-Qaeda, al-Qaeda-in-Iraq, and Islamic State. Therefore, Defendants' illicit transactions involving such consultants raised multiple red flags for possible protection payments. On top of the reports above, such media reports also included:

>   a.  UPI, July 2014: "Prime Minister Nouri al-Maliki …, in a nationally televised broadcast …, blamed Kurds for allegedly protecting insurgents in their capital city of Erbil and for allowing the militant group Islamic State to use Erbil as a base of operations."[329]

>   b.  Newsweek, November 2014: "Interviews with Iraqi, Kurdish, European, Syrian and American government officials, analysts and intelligence agents sketch a portrait of ISIS's robust, sprawling, and efficient financial operation. … At its heart, the ISIS money machine runs on the fear—and greed—of the millions of people it controls. It also manifests itself in a wide range of financial activities, many of them outsourced via middlemen and driven by

---

[329] Ed Adamczyk, *Kurds Pull Out of Iraqi Government, Except for Parliament Members*, UPI NewsTrack (July 11, 2014).

hordes of self-interested parties. … ISIS is probably getting help from its oil-rich neighbors … [D]espite their hostility to ISIS, the Kurds in Iraq, Turkey and Syria have all done deals with ISIS, often through middlemen. … The regional Kurdish government in Iraq recently arrested some of its own citizens along with a number of Kurdish politicians and security officials for acting as intermediaries … on behalf of ISIS. … [and] ISIS members [] infiltrated Erbil, Iraqi Kurdistan's capital…."[330]

*c.* Foreign Affairs, December 2014. "ISIS' enemies are getting richer from [Islamic State- related] trade, too: Kurdish part-time smugglers who facilitate ISIS' oil sales can earn up to $300,000 each month. A Kurdish newspaper recently published a list of people involved with ISIS … The list includes individuals with the last names of several Kurdish ruling families ... Kurdish facilitators also provide goods to ISIS, including trucks, gas cylinders (for cooking and heating), gasoline, and other necessary commodities."[331]

*d.* Carnegie Council, March 2015: "It seemed … ISIS would be content to own Mosul. There was an understanding [] between [] ISIS … and Masoud Barzani, [] president of the Kurdistan regional government, that [ISIS] would not attack the Kurds."[332]

*e.* New York Times, November 2015: "'[T]he United States and its allies have concentrated their efforts on trying 'to stop [ISIS] from getting access to the

---

[330] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

[331] Louise Shelley, *How ISIS Makes Bank*, Nat'l Herald Trib. (Pakistan) (Dec. 3, 2014), 2014 WLNR 34092636 (republication of article published by *Foreign Affairs* (subscription)).

[332] David L. Phillips (*Author of The Kurdish Spring: A New Map of the Middle East*), *quoted in* Carnegie Council Transcripts and Articles (Blog), *The Kurdish Spring: A New Map Of The Middle East* (Mar. 20, 2015), 2015 WLNR 8346795.

financial system' … That has also proved to be difficult. The Islamic State

trades with individuals and businesses in the countries it is fighting, selling

… to Kurds in Iraq …, among others."[333]

1080.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others

published similar reports and statements that alerted Defendants that their illicit transactions

with, or through, their Iraq-related consultants were likely routing protection payments to

terrorists on Defendants' behalf.

> a.  *Defendants Knew Their Illicit Transactions with Security, Transportation, and Logistics Contractors in Iraq, Syria, Jordan, Turkey, Qatar, the U.A.E., And Lebanon Caused Protection Money to Flow to Terrorists*

1081.  Defendants knew their illicit transactions with their Iraq, Syria, Jordan, Turkey, Qatar,

U.A.E., and Lebanon-based security, transportation, and logistics contractors, like SLS and

Cargo Iraq, facilitated protection payments to terrorists because Defendants' employees and

local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for

decades – knew such fact to be true.  Through such persons and media coverage, Defendants

knew that, like the *Associated Press* reported in 2006, "[t]he route to Jordan and Syria goes

through Anbar province, a stronghold of Sunni insurgents."[334]

1082.  **Media reports** and **terrorism scholars** alerted Defendants that illicit transactions

involving security contractors that operated in areas where al-Qaeda or Islamic State-affiliated

terrorists were present – like the ones Defendants used – routinely routed protection payments

to such terrorists as the cost of doing business using mechanisms like that used by Defendants

in Iraq.  Such reports included, but were not limited to:

---

[333] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, N.Y. Times (Nov. 29, 2015).
[334] Sameer N. Yacoub, *Sectarian Divisions Change Baghdad's Image As A City Of Religious Coexistence,* AP Worldstream (July 3, 2006).

a.   Akron Beacon Journal, September 2007: "American companies" "suppl[ied] their own security" "[and by] paying off Iraqi insurgents with protection money" "[resulting in] American money sustaining the insurgents."[335]

b.   Los Angeles Times, September 2010: "The report, released [] by the inspector general of the U.S. Agency for International Development, says subcontractors hired to protect a development project near Jalalabad may have paid more than $5 million to the militants through local authorities. The report says local authorities often demand a 20% 'protection tax' in such circumstances. Under those deals – along the lines of extortionist protection rackets in the U.S. – the Taliban … promises that they won't attack … their equipment and won't try to halt the contract work… "[336]

c.   Christian Science Monitor, October 2010: "The Senate investigation also turned up mounting evidence to suggest that largely unmonitored Pentagon contracts with private security companies … may also be lining the pockets of Taliban insurgents who agree not to attack convoys in exchange for cash. 'If you want to know the driving force of corruption in Afghanistan, it's not Afghan culture,' warns Anthony Cordesman, a security specialist at the Center for Strategic and International Studies in Washington. 'It's American contracting.' "[337]

1083.   Media reports and terrorism scholars also alerted Defendants that their illicit transactions with their transportation and logistics service providers – like the ones Defendants used –

---

[335] Akron Beacon J., *Editorial: 'Insurgent Tax'* (Sept. 3, 2007), 2007 WLNR 17238345.
[336] Paul Richter, *Audit:  U.S. Government Funds May Have Gone To Taliban*, L.A. Times (Sept. 30, 2010).
[337] Anna Mulrine, *Rogue Security Companies Threaten US Gains In Afghanistan War*, Christian Sci. Monitor (Oct. 21, 2010).

operating in areas where al-Qaeda or Islamic State-affiliated terrorists were present likely operated to route protection money to terrorists as the cost of doing business using mechanisms like that used by Defendants in Iraq.  Such reports included, but were not limited to:

a. Inter Press Service, September 2008: "Often … logistics companies have to pay protection money … In one route, between the capitals of Kandahar and Urozgan provinces [in Afghanistan], contractors pay millions in protection money …"[338]

b. Dr. Phil Williams, July 2009: "Truckers" "pa[id] $500 for protection money [per truck]."[339] "Truckers were willing to cooperate with 'smuggling gangs, pay bribes or use forged papers … [and] the whole process was lubricated by pervasive corruption …"[340] "The going rate for allowing [] trucks to pass was typically $500. The huge volume of truck traffic made the practice highly lucrative. With rail and air service inoperable in most of the country, many areas, especially Baghdad, relied on truck convoys for basic goods and reconstruction materials. The dilemma for transportation services was multiple tolls in different locations exacted by different actors—although for those involved … there was often enough money to cover all these tolls."[341]

c. Washington Post, March 2010: "The essential question, said an American executive …, is 'whether you'd rather pay $1,000' for Afghans to safely

---

[338] Anand Gopal, *Afghanistan:  Subsidised Fuel Trail Winds Back To Pakistan*, Inter Press Service (Sept. 30, 2008).
[339] Williams, *Criminals, Militias, and Insurgent*s, at 84-85.
[340] *Id*. at 85.
[341] *Id*. at 158-59.

deliver a truck, even if part of the money goes to the insurgents, or pay 10 times that much for security provided by the U.S. military or contractors."[342]

d. Al Jazeera America, December 2013: "[S]ince the U.S. military withdrawal in 2011 … violent attacks have sharply increased. … The number of dead so far this year now rivals 2006 and 2007 figures, when sectarian fighting was at its most feverish … The majority of the recent attacks have been carried out …, primarily, by a branch of Al-Qaeda that has folded in Al-Qaeda in Iraq with its affiliates in Syria to become known as Al-Qaeda in Iraq and Syria (AQIS). The group continues to absorb fighters filing across the 400- mile border the two countries share. … 'Going back to 2006 is the major fear,' [said] Michael Knights, a research fellow at the Washington Institute for Near East Policy … Also solidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local support in cities … where Iraqi security forces have failed to gain a foothold. 'Since 2010 AQIS has been self-funding through organized crime rackets involving … protection payments from large Iraqi companies, plus trucking …' Knights said."[343]

e. Newsweek, November 2014: "ISIS applies a 'tax' to all goods imported to or exported from the city. ISIS even 'taxes' groups providing genuine humanitarian aid in its own war zone. 'ISIS taxes people transporting nearly anything,' says one Lebanese intelligence officer. …"[344]

---

[342] Karen DeYoung, *Afghan Corruption: How To Follow The Money?*, Wash. Post (Mar. 29, 2010).
[343] Jamie Tarabay, *Iraq In 2014: Back To Civil War?*, Al Jazeera America (Dec. 21, 2013), https://tinyurl.com/5k57c4vx.
[344] Janine di Giovanni, Leah McGrath Goodman, and Damien Sharkov, *How Does ISIS Fund Its Reign of Terror?*, Newsweek (Nov. 14, 2014) (cover story), https://tinyurl.com/a6rzx9k8.

f. Washington Post, December 2014: "Islamic State … provid[ed] … a salary of up to $1,100 per month … for each fighter's family. The largesse is funded with … the extortion of truckers and others who cross Islamic State territory."[345]

g. Louise Shelley, September 2015: "Terrorists … exploit supply chains. … [T]errorists in border areas tax the cross-border flow of goods. … Terrorists share a major concern of legitimate businesses supply chains—as they need to ensure the safe and timely delivery of goods without disruption. … Terrorists make substantial money by controlling supply chains … as well as by taxing … others that pass through borders or territory that they control. The ability to tax the transit of commodities is one key to their financing. Organized crime groups' extortion of trade has been known for a significant period, which is why they are so deeply involved in ports and the trucking industry. Yet terrorist groups on many different continents also profit from exploiting supply chains and taxing trade. … Terrorists often generate revenues by taxing the supply chains that move legitimate … products across territory they control. Through corruption … terrorist groups … bolster their own in key border areas, ports, and other transport hubs. Therefore, they have learned from organized crime the importance of controlling territory and have

---

[345] Kevin Sullivan and Karla Adam, *Hoping To Create A New Society, The Islamic State Recruits Entire Families*, WashingtonPost.com (Dec. 25, 2014), 2014 WLNR 36516895.

capitalized on the corporate world's need to move commodities long distances in the increasingly globalized economy."[346]

1084.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their illicit transactions with, and through, their security, transportation, and logistics service providers were likely making protection payments to terrorists on Defendants' behalf.

<u>Defendants Knew Their Uncontrolled Iraqi Slush Funds Caused Cash-Based Protection Payments To Flow To Terrorists, And Intended For Their Officers, Employees, Agents, Partners, Consultants, And Contractors To Use Slush Funds To Covertly Route Protection Money To Terrorists</u>

1085.  Defendants knew that their strategy to generate hard-to-trace, off-the-books cash sources through uncontrolled slush funds for their illicit Iraq-related transactions caused USD- based protection payments to terrorists.

      *a.  Defendants Knew, And Intended, That Their Uncontrolled Iraqi Slush Funds Would Facilitate Covert Protection Payments To Terrorists*

1086.  Defendants knew their use of uncontrolled Iraqi slush funds would help them conceal their regular protection payments to terrorists. Defendants knew their Iraqi slush funds facilitated cash-based protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq for decades – knew such fact to be true.

1087.  United States government reports alerted Defendants that their uncontrolled slush funds foreseeably enabled money laundering that was vital to terrorist finance because slush funds provided the untraceable cash that intermediaries acting for terrorists required to make illicit

---

[346] Louise Shelley, *quoted in* SEC Wire, *George Mason University Founder and Director, Terrorism, Transnational Crime and Corruption Center Louise Shelley, Prepared Testimony Before the House Financial Service Committee Hearing on Could America Do More? An Examination of U.S. Efforts to Stop the Financing of Terror* (Sept. 9, 2015).

protection payments.  In November 2006, for example, a senior DOJ official publicly observed that "[s]hell corporations and nominees are widely used mechanisms to launder the proceeds from crime, particularly bribery (e.g. to build up slush funds). The ability for competent authorities to obtain and share information regarding the identification of companies and their beneficial owner(s) is therefore essential … for preventing … money laundering."[347]

1088.  **Media reports** alerted Defendants that terrorists operating in high-risk environments routinely depended upon uncontrolled slush funds maintained by their funders. Such reports included, but were not limited to:

> a.  United Press International, April 2002: "Slush funds are not a sovereign prerogative. Multinationals, banks, corporations, religious organizations, political parties, and even non-governmental organizations salt away some of their revenues and profits in undisclosed accounts, usually in offshore havens. … [P]added invoices, sham contracts, fictitious loans, interest accruing on holding accounts, back to back transactions with related entities [were] all [types of transactions] used to funnel money to the slush funds. Such funds are often set up to cover for illicit and illegal self-enrichment, embezzlement, or tax evasion. … BBVA's payments to [terrorist group] ETA may have been a typical payment of protection fees. Both terrorists and organized crime put slush funds to bad use. They get paid from such funds, and maintain their own."[348]

---

[347] Stuart G. Nash (U.S. Associate Deputy Attorney General), *Lack of Ownership Information for Suspect Incorporations Companies – Part 2, Testimony Before the Senate Homeland Security and Governmental Affairs Permanent Investigations Committee*, Congressional Testimony via FDCH (Nov. 15, 2006) (cleaned up), 2006 WLNR 19827292.

[348] Sam Vaknin (UPI Senior Business Correspondent), *Analysis: Slush Funds - Part 2*, UPI North American News (Apr. 23, 2002).

b.  Hindustan Times, February 2003: "Delhi Police will interrogate … Abdul Gani Bhat for his alleged role in funding terrorist organisations with slush funds … from Pakistan."[349]

c.  National Post, February 2004: "Israel's raids may … chok[ed] off the slush funds used to underwrite terrorism, [and] … help stanch the flow of … blood."[350]

d.  Courier Mail, November 2005: "[Future Australian Prime Minister] Kevin Rudd [said]: '[S]lush fund[s] … available to the Iraqi insurgency [] pose[] a … threat to [] troops.'"[351]

e.  Australian, July 2006: "Crown prosecutor Mark Dean detailed lurid accounts of jihadi training camps, terror slush funds, secret meetings and bomb-making recipes …"[352]

f.  Daily Telegraph, August 2006: "[A] Saudi anti-corruption drive … recogni[zed] that the slush funds associated with other Saudi arms contracts have helped finance terrorism."[353]

g.  Indo-Asian News Service, June 2009: "With slush funds being increasingly used for financing terrorism, Indian financial institutions are planning to

---

[349] Sudhi Ranjan Sen and Vibha Sharma, *Bhat to be Questioned on Terror Funding*, Hindustan Times (Feb. 11, 2003), 2003 WLNR 111300.
[350] Nat'l Post (Canada), Editorial, *Follow the Shekel*s (Feb. 26, 2004), 2004 WLNR 10998196.
[351] Steven Wardill, *Full Probe Demanded Into Wheat Contracts*, Courier Mail (Australia) (Nov. 2, 2005), 2005 WLNR 17628572.
[352] Cameron Stewart, *Laughs Turn Cold as Prosecution Puts Case*, Australian (July 25, 2006), 2006 WLNR 12749446.
[353] Roland Gribben, *Defence BAE Lands Arms Deal For A New Generation*, Daily Telegraph (Aug. 19, 2006), 2006 WLNR 14368620.

increase investment in their anti-money laundering systems, a survey by …
KPMG has found."[354]

h.  Assam Tribune, March 2011: "Much of the slush-money stashed away in
foreign banks is linked to illegal transactions in narcotics and hawala money-
laundering, not to mention obvious terror links … [reflected by] the
proliferation of slush-funds abroad …."[355]

i.  Telegraph, December 2012: "[M]ilitant groups … are getting involved in []
lucrative … trade and the slush funds earned is a major source of 'sustaining
insurgency'."[356]

j.  AllAfrica.com English, October 2015: "[Nigerian] President Muhammadu
Buhari's charge to the international community … to strengthen mechanisms
for dismantling havens for proceeds of corruption … appropriately advertises
the receiving countries of illicit fund flows as equally promoters of corruption.
… [M]any of the receiver-countries, mostly in the western world, are coming
to terms with the fact that uncontrolled movement of slush funds is at the heart
of heightening global … terrorism …"[357]

1089.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others
published similar reports and statements that alerted Defendants that their Iraqi slush funds
foreseeably caused protection payments to flow to terrorists on Defendants' behalf.

a.  *Defendants Knew, And Intended, That Their Cash-Related Practices In Illicit
Iraqi Transactions Would Facilitate Covert Protection Payments To
Terrorists*

---

[354] Indo-Asian News Service, *Financial Sector to Strengthen Anti-Money Laundering Systems* (June 18, 2009).
[355] Assam Tribune, Editorial, *Shameful Negligence* (Mar. 14, 2011), 2011 WLNR 5028725.
[356] Wasim Rahman, *Plea to Check Illegal Mining*, Telegraph (India) (Dec. 5, 2012), 2012 WLNR 25931403.
[357] AllAfrica.com English, *On Havens for Slush Funds* (Oct. 15, 2015).

1090.  Defendants knew that terrorists craved access to cash – particularly U.S. dollars, the currency of choice for terrorists worldwide. Indeed, the riskier the operation, the more important for it to be paid fully in cash.

1091.  United States government reports alerted Defendants that bulk U.S. dollar cash payments and associated cash smuggling was a key strategy to route payments to terrorists. The following are just a few examples of such reports:

a.  Treasury Department, 2005: "[O]nce funds are raised for insurgent groups, they must be transported … and disbursed within Iraq. … [T]he physical transportation of cash into Iraq [and] … [r]eliance on currency for transactions … carries significant risks with respect to insurgency financing."[358]

b.  The White House, 2006: "Funds … provide the fungible, easily transportable means to secure all other forms of material support necessary to the survival and operation of terrorist organizations. Our enemies raise funds through a variety of means, including soliciting contributions from supporters; operating businesses, NGOs, and charitable fronts; and engaging in criminal activity such as … extortion … They transfer funds through several mechanisms, including … cash couriers … Effective disruption of funding sources and interdiction of transfer mechanisms can help our partners and us to starve terrorist networks of the material support they require."[359]

---

[358] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658. The U.S. government addressed this program on or about 2005 through its facilitation of electronic banking throughout Iraq, which obviated Defendants' need to rely upon cash. *Id*.

[359] The White House, *National Strategy for Combating Terrorism*, at 12 (Feb. 2006).

c. Treasury Department, 2015: "Combined with the widespread demand for U.S. currency globally, multiple terrorist groups, including AQ and its affiliates, ISIL, Al-Shabaab, Hizballah, and FARC, will continue to use cash smuggling as a less efficient alternative for moving funds globally."[360] "The use of cash is attractive to criminals mainly because of its anonymity, portability, liquidity and lack of audit trail. According to the surveyed cases, since 2007, 18 [terrorist finance]-related prosecutions in the United States have in some way involved the use of cash to transfer funds to terrorist organizations. These cases have involved various FTOs, including core AQ, AQ in Iraq (the predecessor organization to ISIL), AQAP, Al-Shabaab, Hizballah, and FARC."[361]

d. Treasury Department, 2015: "People use cash for a variety of reasons, including because it has no fee per transaction, it is readily available and accepted worldwide for consumers, is confidential, cannot be hacked, and does not run out of battery power. Unlike electronic transfers of funds, cash does not leave a digital trace. … The same characteristics that make cash dependable and portable to everyday consumers are also attractive to criminals. … Recognizing that using cash for unexplained large consumer or commercial purchases can be an indicator of illicit activity, and the initial U.S. AML/CFT statute imposed a cash reporting requirement to mitigate against this risk."[362]

---

[360] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 56 (Aug. 24, 2015).
[361] *Id*. at 54-55.
[362] U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing, Report to Congress*, at 23 (2020).

     *e.*  LIGOIR, May 2020: "Treasury and the [U.N.] both reported that ISIS primarily uses cash … funds within and out of Syria and Iraq and through neighboring countries."[363]

1092.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their use of cash in Iraq foreseeably caused protection payments to flow to terrorists on Defendants' behalf.

**Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Help Conceal Their Protection Payments To Terrorists**

1093.  Defendants also knew their intentionally deficient internal controls were a feature, not a bug, and were purpose-built to facilitate and conceal Ericsson's corrupt payments, including its protection payments to terrorists.

1094.  Defendants knew their intentionally deficient internal controls facilitated protection payments to terrorists because Defendants' employees and local agents in Iraq – who were from Iraq, operated business there, and lived there for decades – knew such fact to be true.

1095.  Defendants also knew their practice of facilitating payments without clear beneficiaries facilitated protection payments to terrorists because Defendants' employees and agents in Iraq knew such fact to be true.

1096.  United States government reports alerted Defendants that their practice of facilitating illicit payments without clear beneficiaries was a tactic used to conceal terrorist finance. Such reports and statements included, but were not limited to:

     *a.*  Treasury Department, September 2006: "[D]onors are encouraged to … consider[] protective measures to prevent … abuse by terrorists. …

---

[363] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20 (May 13, 2020).

[E]ffective internal controls … can prevent … terrorist financing …".[364]

"When supplying [] resources …, fiscal responsibility on the part of a [payor] should include: ... determining that the potential grantee of … contributions has the ability to … protect the resources from … exploitation by terrorist organizations and/or their support networks …"[365]

b.   DOJ and SEC, November 2012: "Effective policies and procedures require an in-depth understanding of the company's business model, including its products and services, third-party agents, customers, government interactions, and industry and geographic risks. Among the risks that a company may need to address include the … use of third parties; gifts, travel, and entertainment expenses; … donations; and facilitating and expediting payments. … [Routine corporate internal controls] systems can be a good way to …, if properly implemented, prevent[] and detect[] potential FCPA violations."[366]

c.   LIGOIR, May 2018: "An ongoing USAID OIG investigation found that employees of a U.S.-based nongovernmental organization knowingly diverted USAID-funded food kits to a militant organization operating in northern Syria … employees of the non- governmental organization … submitted falsified beneficiary lists to USAID to conceal the [terrorists]' participation in the … program."[367]

---

[364] U.S. Dep't of the Treasury, *U.S Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities*, at 2-3 (Sept. 2006).
[365] *Id*. at 8.
[366] *A Resource Guide to the U.S. Foreign Corrupt Practices Act*, at 48.
[367] Lead Inspector Gen. for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2018–March 31, 2018*, at 69 (May 5, 2018).

    *d.*  Senate Finance Committee, December 2020: "A [] robust and fundamentally sound system of screening and vetting is needed to [ensure] that contributions made to [an entity in a high risk terrorist environment] are not funding illicit organizations."[368]

1097.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their intentionally deficient internal controls were a tactic to conceal their protection payments.

**Defendants Knew Their Obstruction Of United States Counterterrorism Operations Provided Operational Assistance To Al-Qaeda And The Taliban**

1098.  From 2013 through 2022, LM Ericsson's and Ericsson AB's senior managers, lawyers, and compliance personnel in Sweden and the United States, including their shared agents in the Middle East (such as Ericsson Iraq and its agents) and cross-functional compliance and legal personnel in the United States knew that Defendants' lies to counterterrorism-facing components of the United States government, including DOJ and the FBI, foreseeably obstructed U.S. government counterterrorism operations targeting the same protection networks about which Defendants lied to the United States.

    a.  <u>Defendants Knew Their Conduct Obstructed U.S. Government Counterterrorism Operations Targeting The Relevant Terror Organizations</u>

1099.  Defendants knew their false communications to the United States government, including DOJ and FBI, obstructed U.S. counterterrorism operations targeting al-Qaeda, al-Qaeda-in-Iraq, and Islamic State because Defendants' employees and local agents in Iraq – who were from Iraq, operated business in Iraq, and lived in Iraq from the 1990s through the 2020s, and whose knowledge is imputed to Defendants – knew such fact to be true.

---

[368] U.S. Senate Finance Committee Oversight & Investigations Unit, *World Vision Financial Transactions, Memorandum to Senator Charles E. Grassley*, 10-11 (Dec. 22, 2020), https://tinyurl.com/5ax34th7.

1100.  From 2004 through 2022, it was common knowledge among businesses operating in Iraq, including Defendants, that the United States pursued a whole-of-government approach to post-9/11 counterterrorism in the Middle East, that DOJ and FBI keyed such efforts by sharing actionable evidence and intelligence with on-the-ground U.S. counterterrorism personnel in Iraq, Syria, and Afghanistan, and that companies that lie to DOJ about their payments to al-Qaeda, al- Qaeda-in-Iraq, and Islamic State impede U.S. counterterrorism operations by depriving U.S. counterterrorism personnel in the Middle East – both DOJ and FBI, as well as others based upon information shared by DOJ and FBI – of vital information concerning al-Qaeda, al-Qaeda-in- Iraq, and Islamic State protection networks, including, but not limited to:

   a.  identities of the associated terrorist operatives, intermediaries, and financiers associated with the protection network;

   b.  demands made by the terrorists operating the protection network;

   c.  location of the terrorists operating the protection network;

   d.  modality of value transfer, including the currency, used by the protection network;

   e.  means of communication, including phone numbers, emails, and in-person cutouts, used by the protection network;

   f.  bank account details associated with the terrorist or their intermediary cutout for the protection network; and

   g.  pattern-of-life information about the above-described persons associated with protection networks, upon which U.S. counterterrorism operators depended for successful raids of suspected terrorists.

1101.   Western companies on the ground in Iraq were widely aware of the reality that the more information the United States government had concerning counterterrorism threats, the more likely the U.S. could protect its citizens from attack by the Relevant Terror Organizations in France, Belgium, and Afghanistan. Defendants were sophisticated companies with billions of dollars in revenues at stake in Iraq, which was the paradigmatic example of this point. They knew this prevailing understanding that their lies to DOJ and FBI concerning their involvement with al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks in Iraq were foreseeably obstructing U.S. government counterterrorism operations targeting the Relevant Terror Organizations.

1102.   Defendants' obstruction of U.S. counterterrorism operations was also the fruit of Defendants' lies to DOJ and FBI in circumstances that left no doubt about whom they were aiding. LM Ericsson, Ericsson AB, Ericsson Inc., and Ekholm (or their agents) met with U.S. counterterrorism-facing U.S. law enforcement, including, but not limited to, the DOJ FCPA Unit and the FBI, who openly acted on behalf of the United States and as part of an integrated response to the Relevant Terror Organizations through DOJ's and FBI's participation in Iraq-facing counterterrorism efforts, fusion cells, threat finance cells, and similar cross-departmental counterterrorism operations.

1103.   Defendants knew, and intended, that their lies to DOJ and FBI concerning their involvement in al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks would obstruct U.S. counterterrorism investigations into the very terrorist networks with which Defendants were profitably collaborating and Defendants intended to accomplish such obstruction in order to allow Defendants' participation in the terrorists' protection money racket – and associated outsized profits for Defendants – to continue.

1104.   Defendants also consciously avoided investigating Ericsson's conduct in the geographies that posed the greatest risk specifically for terrorist finance in order to conceal the truth about Ericsson's knowing participation in al-Qaeda, al Qaeda-in-Iraq, and Islamic State protection rackets. Instead, Ericsson later boasted that it persuaded the United States against investigating Ericsson's conduct in such geographies. This sequence of events confirms that Ericsson intended to conceal its conduct in the geographies that Ericsson's outside counsel later boasted at having successfully shielded from government scrutiny.

1105.   Defendants knew that Ericsson was one of the largest multinational corporations operating in all of Iraq, Iran, Syria, Afghanistan, Pakistan, Turkey, and Lebanon, and Defendants also knew that Ericsson was the only major multinational corporations (other than Lafarge S.A.) to continue to maintain an on-the-ground-presence inside of Islamic State's caliphate from 2014 through 2017. Armed with such knowledge, Defendants knew that their information concerning al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection rackets in Iraq offered significant value to U.S. counterterrorism operations against those terrorists in the Middle East. Defendants therefore knew that their decision to lie to DOJ would degrade the quality of the information DOJ shares with its associated U.S. government fusion cell partners in Iraq, and increase the effectiveness, resiliency, and profitability of the FTOs' protection networks and associated financial, logistics, and personnel aid to the Relevant Terror Organizations acts of terrorism against Americans in the Middle East.

1106.   Although Defendants' obstruction-based assistance to the Relevant Terror Organizations agents provided especially valuable aid for such FTOs' terrorist attacks, the causal nexus was not limited to conduct that violated investigative disclosure -related statutes, e.g., 18 U.S.C. § 1001 (false statements). Whether or not Defendants technically violated U.S.C. §1001 or a

similar obstruction-related criminal prohibition, their lies to DOJ and FBI with the specific intent of concealing information about the Relevant Terror Organizations' protection networks, and Defendants' participation therein, supplied the Relevant Terror Organizations with vital communications, operations, logistics, and intelligence assistance, sourced from U.S. communications received by U.S. law enforcement in Washington, D.C., all of which the Relevant Terror Organizations used to fund attacks against Americans in France, Belgium, Iraq, Afghanistan, Syria, and Turkey.

Defendants Knew Their Obstruction Of U.S. Government Counterterrorism Operations Targeting The Relevant Terror Organizations Aided The Relevant Terror Organizations Aided Attacks Against Americans

1107.   Defendants knew their provision operational aid, cover, and concealment to al- Qaeda, al-Qaeda-in-Iraq, and Islamic State regarding such FTOs' protection rackets aided al- Qaeda, al-Qaeda-in-Iraq, and Islamic State attacks against Americans because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

1108.   United States government reports and statements alerted Defendants that their cover and concealment of al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks undermined U.S. government counterterrorism efforts in France, Belgium, and Afghanistan. For example, DOJ and SEC repeatedly communicated to Ericsson that their cover and concealment of illicit payments could harm U.S. national security by facilitating terrorism when DOJ and SEC published the FCPA Resource Guide in 2012, which documented DOJ's and SEC's views that companies that concealed corrupt payments foreseeably aided terrorists.

1109.   From 2003 through 2022, the U.S. government published other reports and statements that similarly alerted Defendants that their provision of cover and concealment to al- Qaeda, al-

Qaeda-in-Iraq, and Islamic State foreseeably aided such FTOs' ability to attack Americans in France, Belgium, and Afghanistan.[369]

1110.  U.S. government reports also specifically emphasized the importance of obtaining accurate information from the private sector to the U.S. government's ability to mitigate the terrorist finance and logistics risks that specifically arise when foreign telecom companies do business in ultra-high-risk geographies, like Iraq. For example, according to a White House statement of U.S. counterterrorism strategy in 2018:

1111.  Terrorists cannot sustain their operations without [information technology]. The United States and our partners … in the private sector must, therefore, prevent terrorists from using [information technologies sourced from the United States] while safeguarding these resources for legitimate use. To accomplish this, we will increase information-sharing with the private sector …[370]

---

[369] Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* Dep't of the Treasury, Testimony of Juan Carlos Zarate, Assistant Secretary, *Terrorist Financing and Financial Crimes, U.S. Dep't of the Treasury, Before the Senate Permanent Subcomm. On Investigations of the Comm. on Governmental Affairs* (Nov. 15, 2004), https://tinyurl.com/bdd6ykzw; Juan C. Zarate (Assistant Secretary, Dep't of the Treasury), *quoted in* U.S. Dep't of the Treasury, *Keynote Address of Assistant Secretary Juan C. Zarate --Harpers Bazaar/International AntiCounterfeiting Coalition Summit--* (Feb. 1, 2005), https://tinyurl.com/4b78zs5e; Ambassador Henry A. Crumpton, Coordinator for Counterterrorism, U.S. Dep't of State, *The Role of Public and Private Partnerships in the Global War on Terrorism; Remarks to the 5th Annual International Counterterrorism Conference: Public and Private Partnerships; Washington, D.C.* (Apr. 20, 2006), https://2001-2009.state.gov/s/ct/rls/rm/2006/64977.htm; Under Secretary for Terrorism and Financial Intelligence Stuart Levey, U.S. Dep't of the Treasury, Press Release, *Under Secretary for Terrorism and Financial Intelligence Stuart Levey Testimony* (Apr. 1, 2008), https://home.treasury.gov/news/press-releases/hp898; LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* U.S. House of Representatives, *Tracking And Disrupting Terrorist Financial Networks: A Potential Model For Interagency Success?*, Hearing, House Committee on Armed Services, Terrorism, Unconventional Threats and Capabilities Subcommittee (Mar. 11, 2009); Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Dep't of the Treasury), quoted in U.S. Dep't of the Treasury, Written Testimony Of Treasury Assistant Secretary Daniel L. Glaser Before The House Financial Services Subcommittee On Oversight And Investigations (Sept. 6, 2011), https://home.treasury.gov/news/press-releases/tg1287; FBI Director James B. Comey, *quoted in* FBI, *Homeland Threats And The FBI's Response; Statement For The Record Before The Senate Committee On Homeland Security And Governmental Affairs* (Nov. 14, 2013), https://tinyurl.com/2s4z78t8; Ambassador Samantha Power (U.S. Permanent Representative to the U.N.), *Samantha Power: Putting ISIS Out Of Business*, CNN Wire (Dec. 17, 2015), https://tinyurl.com/46tswhph; Marshall Billingslea, *Opening Statement Of The Nominee For Assistant Secretary Of The Treasury For Terrorist Financing*, U.S. Senate Comm. on Banking, Housing, and Urban Affairs (May 16, 2017), https://tinyurl.com/4brujnkv.

[370] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).

1112.   International organizations and terrorism scholars also alerted Defendants to these risks. For example, according to the 2016 Global Terrorism Index (published in 2016):

> Since the publication of the 2015 Global Terrorism Index (GTI), the … emphasis on engaging the private sector in [Preventing Violent Extremism] is a welcome one, and there are obvious reasons to do so. … DO NO HARM … [M]ost important[ly], the private sector must make every effort to Do No Harm.

1113.   Companies, as well as those institutions and structures engaging them (civil society and governments) must be held accountable and must engage responsibly. This means not only engaging with reputable businesses and business sectors to abstain from corrupt practices, but also focusing on the outcomes of that engagement. … Vetting: … we had better be sure of who we are working with.

1114.   Equally as important as knowing who our partners are, is knowing who their partners are. … There is a real concern that if the wrong company or an unethical company is engaged, the risk is to do more harm to a community than good.[371]

1115.   Terrorism scholars alerted Defendants that their concealment of their payments to the Relevant Terror Organizations foreseeably aided such FTOs by undermining United States counterterrorism policy, which relied upon complete, and truthful information from multinational corporations conducting business in areas at severe risk for terrorist finance, like Defendants. In 2014, for example, terrorism scholar Louise Shelley observed that:

> The effort to counter ISIS should also involve Western businesses. The cigarette industry follows the ebb and flow of the illicit cigarette trade. Energy and pharmaceutical companies monitor the movement of their commodities in the region. Transport companies have insights into the dynamics of illicit trade, and insurance companies have insights into kidnapping. That is why public-private partnerships are key. Corporations can share the information they already collect on illicit trade routes, smuggling shipments, and key facilitators. They can also warn consumers not to purchase the counterfeit and smuggled commodities that

---

[371] Amy E. Cunningham and Khalid Koser, *Why Preventing Violent Extremism Is The Private Sector's Business*, 2016 Global Terrorism Index Report (2016), https://tinyurl.com/4e5c7ybe.

fund terrorism. For now, the government response to ISIS has not taken the business community enough into account. But without such cooperation, Washington cannot hope to successfully counter the nimble ISIS.[372]

1116.  In 2016, similarly, terrorism scholar Celina Realuyo, Professor of Practice at National

Defense University, publicly testified before Congress that:

> In the post-9/11 world, we have witnessed how "following the money trail" has enhanced our efforts to counter the threats around the world. Since international financial flows are not controlled or managed by governments, public-private partnerships with the many facets of the financial services industry are essential in combating threats … terrorist financing … Governments no longer enjoy a monopoly on national security or the use of force as they did in the past; therefore, they need to adopt a "whole of society" approach … ISIL relies heavily on extortion and the levying of "taxes" on local populations under its control … The contemporary threat posed by ISIL to global security has been empowered by a dangerous convergence of terrorism and crime that generates significant income for the group. The systematic practice of "taxation," … provide vital resources for the group's military, financial, recruitment, and propaganda campaigns. … Unilateral, individual country efforts are not enough to counter terrorist financing and money laundering. Our international financial system is far more interconnected and interdependent than ever before. International cooperation between the public and private sectors is therefore paramount.[373]

1117.  In 2019, terrorism scholar Stephen Tankel, Assistant Professor in the School of

International Service at American University, published an analysis that also observed the

central role of accurate private sector information to the effectiveness of American

counterterrorism efforts against al-Qaeda- and Islamic State-affiliated terrorists worldwide:

> [T]here are almost four times as many Sunni Islamist militants operating in 2018 as there were on 9/11. … [T]he movement's ongoing strength stems in large part from the fragile nature of the states in which the majority of its adherents operate … across parts of South and Central Asia … where … [m]any of these governments are poorly run and corrupt … [W]hen it comes to terrorists' use of technology … the need for public- private partnerships and international collaboration is even greater. Governments, multinational organisations and alliances, and the private sector must come together … to combat[] jihadists locally and globally.[349]

---

[372] Shelley, *How ISIS Makes Bank.*
[373] Celina Realuyo, *Stopping Terrorist Financiers*, Written Statement Before the House Fin. Servs. Comm. Terrorism Financing Task Force, CQ Congressional Testimony (June 23, 2016). [349] Stephen Tankel, *How Jihadists Went 'Glocal' And What To Do About It – Analysis*, Eurasia Review (Nov. 6, 2019), https://tinyurl.com/mwv7xa67.

1118. International organizations also alerted Defendants that concealment and cover are essential to the effectiveness of terrorists' ability to maximize their cash flows from illicit sources. For example, Transparency International confirmed in a 2014 report that "transparency, accountability, and countercorruption …initiatives also depend heavily on the active involvement of other actors, such as government, business, and civil society, to ensure that checks and balances are in place and adhered to."[374] Similarly, a report published by the FATF in 2015 also alerted Defendants that Islamic State's ability to maximize ISIS cash flow from its protection rackets in Iraq and Syria – and attendant ability to fund attacks that killed Americans – substantially depended upon the cover and concealment afforded to the key nodes of ISIS's protection networks in Iraq and Syria.[375]

1119. Media reports alerted Defendants that their cover and concealment of al- Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's protection networks undermined U.S. government counterterrorism efforts in France, Belgium and Afghanistan. Such reports included, but were not limited to:

> a. Congressional Quarterly Today, March 2009: "[S]elf-supporting terrorist groups have been increasingly drawn to crime, from petty credit card fraud to

---

[374] Transparency International UK, Defense and Security Programme, *Corruption Threats & International Missions*, at 11-13 (2014), https://tinyurl.com/2m54yzxj.

[375] FATF Report, *Financing Of The Terrorist Organisation Islamic State In Iraq And The Levant (ISIL)* (Feb. 2015) ("ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as bank looting, extortion, control of oil fields and refineries, and robbery of economic assets and illicit taxation of goods and cash that transit territory where ISIL operates … ISIL manages a sophisticated extortion racket by robbing, looting, and demanding a portion of the economic resources in areas where it operates, which is similar to how some organized crime groups generate funds. This vast range of extortion, including everything from fuel and vehicle taxes to school fees for children, is done under the auspices of providing notional services or 'protection.' … The need for greater international co-operation between countries to combat the ISIL threat is without question. … For example, law enforcement agencies should continue to leverage their international working relationships [with public sector and private sector partners] to proactively identify and develop investigative leads involving illicit money flows related to terrorism and/or terrorist groups such as ISIL. … Discussions should include the sharing of best practices for detecting and investigating individuals who are illicitly financing ISIL."), https://tinyurl.com/3hnjz2wm.

global drug cartels to finance training and activities. [U.S. Army Lieutenant General] David P. Fridovich, director of special operations for Special Operations Command, emphasized how Defense Departments efforts to cooperate with other government entities and the private sector have been integral to terrorism finance prevention strategy in Iraq and Afghanistan. 'To us, it means very simply that DoD, no matter how we may adjust and organize, by ourselves, will fail to eliminate these networks,' Fridovich said. 'We must work not only within our own interagency but with the coalition, other partner nations and the private sector.'"[376]

b.  Inside the Pentagon, March 2009: "One of the key ways that SOCOM fulfills its 'synchronization' responsibilities is to host gatherings -- twice a year -- of roughly 100 counterthreat finance analysts, investigators and case agents from the combatant commands, as well as the Treasury, State, and Homeland Security departments, the FBI, the Drug Enforcement Agency and officials from Britain, Australia and Canada. Representatives from the private sector are also invited, [LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM)] said. 'This has become the premier forum for U.S. government threat finance [information] exchange,' according to [LTG Fridovich's] testimony. 'Exchange with the coalition, and the private sector has been especially

---

[376] LTG David P. Fridovich, Director of Special Operations (Threat Finance Team) for U.S. Special Operations Command (SOCOM), *quoted in* Daniel Fowler, Caitlin Webber and Rob Margetta, *Several Hearings Highlight Persistent Threat of Worldwide Terrorism*, Congressional Quarterly Today (Mar. 11, 2009).

informative as we learn better how to deal with the rapidly developing cutting edge financial technologies like Internet and cell phone money transfers.'"[377]

1120.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that their fraudulent concealment of their protection payments to the Relevant Terror Organizations foreseeably aided such FTOs by obstructing American counterterrorism efforts.

**Defendants Knew Their Facilitation Of Al-Qaeda's And The Taliban's Attacks On Communications Networks Provided Communications, Logistics, And Technical Assistance To Al-Qaeda And The Taliban in Afghanistan**

   a.  Defendants Knew Their Conduct Facilitated Al-Qaeda's And The Taliban's Manipulation Of Networks In Afghanistan

1121.  Ericsson was aware of the widespread threat of terrorist violence throughout Afghanistan. On October 18, 2014, for example, Ericsson AB's President of North Middle East Region, Tarek Saadi, publicly stated, in sum and substance, that Ericsson was bullish on Afghanistan – despite decades of conflict and the fact that the Taliban still controlled large parts of the country – because Ericsson was observing significant growth in MTN's mobile and mobile data traffic in Afghanistan.

1122.  Defendants also knew, per a statement released by MTN Group in 2008, that "MTN Group" was "monitoring threats to its Afghanistan operation closely."[378] Defendants knew that MTN intended to respect the Taliban's "need" to shut down cellular networks:

1123.  The MTN Group is aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas. We are evaluating the situation and liaising with our executives and relevant authorities in

---

[377] Inside the Pentagon, *New DOD, Treasury Team To Disrupt Taliban*, Al Qaeda Funding (Mar. 19, 2009).
[378] *MTN Concerned By Afghanistan Threats*.

Afghanistan. The MTN Group does not expect this to have a material impact on its operations in Afghanistan. No further details can be made available at this stage.379

1124.   As explained above, MTN Group made the decision – and instructed its subsidiary – to comply with the Taliban's demands. Those decisions had a substantial connection to the United States for the reasons explained below.

<u>Defendants Knew Their Facilitation Of Al-Qaeda's And The Taliban's Manipulation Of Communications Networks In Afghanistan Aided The Relevant Terror Organizations Aided Attacks Against Americans</u>

1125.   Defendants knew that their assistance to the Taliban aided their attacks against Americans because the Taliban publicly stated as much to the international media.

1126.   Defendants also knew such facts were true based on Defendants' own employees and agents on the ground in Iraq and Afghanistan, who knew such fact to be true.

**Defendants Knew Al-Qaeda's Role**

  b.   <u>Defendants Knew Al-Qaeda Waged A Terrorist Campaign Against The United States</u>

1127.   Defendants knew that al-Qaeda waged a global terrorist campaign against the United States in which al-Qaeda and its branches and allies in Iraq, Afghanistan, Syria, and elsewhere attacked Americans to drive the United States out of the Middle East.

1128.   Defendants knew about al-Qaeda's global terrorist campaign against the United States, including its key focus on attacking Americans in Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

1129.   United States government reports alerted Defendants to the globally interconnected nature of al-Qaeda's campaign against the United States. The U.S. government long recognized the

---

379 *Id.*

inextricable connection between al-Qaeda "core" in Afghanistan and Pakistan and al-Qaeda-in-Iraq. For starters, U.S. military documents confirmed the vital nature of the relationship. For example, according to a declassified report prepared by CENTCOM in 2007, al-Qaeda-in-Iraq's "leadership" was already preparing "plans" "by late 2005" in which "AQI leadership" would "use" their Iraqi strongholds "as a base for [al-Qaeda's and al-Qaeda-in- Iraq's] long-term war against the United States and its allies." "Reflective of this global jihad worldview was the fact that propaganda distributed by [AQI] began to show fighters in Afghanistan as well as in Iraq in their videos and flyers."

1130.   United States counterterrorism policy also recognized, as cornerstones of the U.S. strategy against al-Qaeda and al-Qaeda-in-Iraq, that (i) "[a]l-Qaida's worldwide networks are augmented by ties to local Sunni extremists"; and (ii) "[w]hile the largest concentration of senior al-Qaida members now resides in Pakistan, the network incorporates members of al-Qaida in Iraq and other associates throughout the Middle East, Southeast Asia, Africa, and Europe who continue working to carry out future attacks against U.S. interests."[380] Other U.S. government reports confirmed the inextricable ties between al-Qaeda's operations in Iraq and Afghanistan.[381]

---

[380] U.S. Dep't of State, *Country Reports on Terrorism 2005* at 218 (Apr. 2006); *see also* U.S. Dep't of State, *Country Reports on Terrorism 2006* at 270 (Apr. 2007); *U.S. Dep't of State, Country Reports on Terrorism 2007* at 299 (Apr. 2008); U.S. Dep't of State, *Country Reports on Terrorism 2008* at 318 (Apr. 2009); U.S. Dep't of State, *Country Reports on Terrorism 2009* at 275 (Aug. 2010).

[381] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2005* at 217 ("al-Qaida's top leaders continue to plot and direct terror attacks worldwide … Over the past four years, al-Qaida, its affiliates and those inspired by the group were also involved in many anti-U.S. or anti-Coalition attacks in Africa, Europe, the Middle East, Afghanistan, Pakistan, and Iraq, including suicide bombings and vehicle-borne improvised explosive devices."); The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 1-2, 4, 34 (Dec. 2006) ("Iraq is vital to regional and even global stability, and is critical to U.S. interests. … It is now a base of operations for international terrorism, including al Qaeda. … Al Qaeda is responsible for … some of the more spectacular acts: suicide attacks, large truck bombs, and attacks on significant religious or political targets. Al Qaeda in Iraq is now largely Iraqi-run and composed of Sunni Arabs. Foreign fighters—numbering an estimated 1,300—play a supporting role or carry out suicide operations. Al Qaeda's goals include … driving the United States out of Iraq. … As one Iraqi official told us, 'Al Qaeda is now a franchise in Iraq, like McDonald's.' Left unchecked, al Qaeda in Iraq could continue to incite violence … A chaotic Iraq could provide a still stronger base of operations for terrorists who seek

1131. Media reports alerted Defendants to the globally interconnected nature of al- Qaeda's campaign against the United States.

1132. **Terrorism scholars** also alerted Defendants to the globally interconnected nature of al-Qaeda's campaign against the United States, including, but not limited to:

    *a.*   Dr. Matthew Levitt, 2003: "Al-Qaeda successfully built an entrenched and sophisticated international logistical and financial support network of the kind that eventually facilitated the attacks of September 11."[382]

    *b.*   Professor Jimmy Gurulé 2008: "Since the September 11, 2001 terrorist attacks, al Qaeda emerged as the head of a global Islamist terror movement, comprised of dozens of deadly jihadist groups" and "[s]everal members of the al Qaeda terror movement [were] designated as FTOs."[383] "[Al-Qaeda] used

---

to act regionally or even globally. Al Qaeda will portray any failure by the United States in Iraq as a significant victory that will be featured prominently as they recruit for their cause in the region and around the world. Ayman al-Zawahiri, deputy to Osama bin Laden, has declared Iraq a focus for al Qaeda: they will seek to expel the Americans and then spread 'the jihad wave to the secular countries neighboring Iraq.'"); David S. Cohen (Under Secretary for Terrorism and Financial Intelligence, Treasury Dep't), *quoted in* U.S. Dep't of the Treasury, *Remarks of Under Secretary for Terrorism and Financial Intelligence David Cohen before the Center for a New American Security on "Confronting New Threats in Terrorist Financing"*, (Mar. 4, 2014) ("al-Qa'ida 'core' [] spawned numerous affiliates that recruit[ed] their own jihadists, organize[d] their own operations, and raise[d] their own funds"), https://home.treasury.gov/news/press-releases/jl2308. [358] *E.g.*, Newsweek, *Terror Goes Global*, *republished by* PR Newswire, *International And Asia Highlights And Exclusives - February 19, 2001 Issue* (Feb. 11, 2001) ("[Newsweek] COVER: 'Terror Goes Global' … Intelligence officials tell Newsweek that they believe … Al Qaeda [] is trying to forge ties with Hizbullah, Hamas and Palestinian Islamic Jihad. … Increasingly linked by the Internet, Islamic extremists are on the move and in contact with each other … Bin Laden's movement has gone as transnational as any global corporation."); Kathy Gill, *OBL Death Is Symbolic*, Moderate Voice (May 2, 2011) ("*Foreign Affairs* noted … Al Qaeda is stronger today than when it carried out the 9/11 attacks. Accounts that contend that it is on the decline treat the central al Qaeda organization separately from its subsidiaries and overlook its success in expanding its power and influence through them."), 2011 WLNR 8478998; Alan Clendenning, *Terror 'Franchises' A Huge Risk*, Associated Press, *republished by* Herald News (May 19, 2011) ("They … send bombs to the United States from Yemen and mount bloody attacks in Iraq and Pakistan. These homegrown terror groups worldwide are informally dubbed al-Qaida franchises. Rohan Gunaratna, who heads the Center for Political Violence and Terrorism Research …, predicted that al-Qaida and the franchises are 'likely to pose an enduring threat in the foreseeable future.' Al-Qaida now has about 10 major franchises, although the Afghanistan-Pakistan group has splintered into smaller and more dangerous ones. Al-Qaida provides ideological inspiration and sometimes direct training and funding. The franchises have goals within their own regions but also international aspirations, which include U.S. … targets."), 2011 WLNR 9988400.

[382] Dr. Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on Post-Modern Terrorism (Sept. 8, 2003), https://tinyurl.com/5pdjpkza.

[383] Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé").

its substantial financial resources to establish links, leverage support and maintain the loyalty of more than 20 militant jihadist groups globally" and "provided financial assistance to these terrorist surrogates to underwrite specific jihadi operations, purchase weapons, and train thousands of their members at al Qaeda-run camps in Afghanistan, Pakistan, … and elsewhere."[384]

    *c.*  Leah Farrall, 2011: "When the pressure on al Qaeda eased between 2003 and 2006, because the United States was focusing less on Afghanistan, the group was able to regenerate its capacity and intensify its planning for global operations. But the U.S. drone campaign against al Qaeda in Pakistan's tribal areas has again put pressure on it, and the group has [] tapped … its franchises, particularly AQI. In 2008, for example, it asked AQI to carry out attacks against Danish interests in retaliation for a Danish newspaper's publication of cartoons … When subsidiaries do carry out attacks outside their territories, al Qaeda requires that they be conducted within set parameters. For example, al Qaeda heavily encourages suicide attacks and repeated strikes on preapproved classes of targets, such as public transportation, government buildings, and vital infrastructure. Once a location has been authorized, the branch and the franchises are free to pursue plots against it. But al Qaeda still emphasizes the need to consult the central leadership before undertaking large-scale plots,

---

[384] *Id*. at 73.

plots directed against a new location or a new class of targets, and plots utilizing a tactic that has not been previously sanctioned …"[385]

d.  Daniel Byman, 2012: "From the start, … al-Qa'ida was unusual: it was both a group with its own agenda and operations, as well as a facilitator for other terrorist groups. So al-Qa'ida in the 1990s carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen and, at the same time, acted as 'quartermaster for jihad,' … Thus, from its inception, al-Qa'ida was immensely concerned with its relationship with outside groups. While, traditionally, groups with a similar mindset who operate in the same theater as one another compete fiercely for money and recruits, for al-Qa'ida, the attitude was different. Al-Qa'ida did still compete with other Salafi-jihadist groups, but at the same time, it believed that its own mission entailed furthering their aims. In order to fulfill this mission, it trained fighters from these other groups and undertook propaganda efforts on behalf of their causes."[386] "Al-Qa'ida has always been both a group with its own agenda and a facilitator of other terrorist groups. This meant that it not only carried out attacks on U.S. targets in Kenya, Tanzania, and Yemen throughout the 1990s, but it helped other jihadist groups with funding, training, and additional logistical essentials. … After September 11, 2001, this process of deepening its relationship with outside groups took off, and today a number of regional groups bear the label 'al-Qa'ida' in their name, along with a more local

---

[385] Leah Farrall (Former Senior Counterterrorism Intelligence Analyst with the Australian Federal Police), *How Al Qaeda Works: What the Organization's Subsidiaries Say About Its Strength*, Foreign Affairs (Mar. 1, 2011), 2011 WLNR 29001382.
[386] Daniel Byman (Saban Ctr. for Mid. E. Policy at the Brookings), *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at 3 (Aug. 2012), https://tinyurl.com/m4nuskbs.

designation. Some of the most prominent affiliates include al-Qa'ida of Iraq (AQI) …"[387] "While there are clear benefits for an affiliate in linking with al-Qa'ida, there are also rewards for the al-Qa'ida core: • Mission Fulfillment and Reach. Having a diverse array of affiliates helps al-Qa'ida extend its reach … • Relevance. Especially since 9/11, … [s]ome of the most notorious "al-Qa'ida" attacks attempted since 9/11 have in fact been carried out by affiliate groups. • Logistics. Beyond the ability to carry out attacks, affiliates offers al-Qa'ida access to their media resources, recruiters, and other core parts of their organizations. • Hardened Fighters. Since its inception, al-Qa'ida has sought members who are experienced and dedicated. Many of the affiliates who come to al-Qa'ida do so with just such a cadre."[388]

e.  Juan Zarate, 2013: "Treasury's [counterterrorism] strategy … aimed at targeting networks of key financial actors and nodes in the terrorist support system. The point was … to make it harder for individuals who were financing terrorists … Our analyses therefore focused on the networks of actors and institutions providing the financial backbone to terrorist enterprises. Interestingly, we found that there were all-purpose financiers who would give to multiple causes— 'polyterror' supporters."[389]

f.  Thomas Joscelyn, 2013: "The 9/11 commission … pointed [out that] very early on, [] more than two decades ago, … bin Laden [] employed a strategy of … planting seeds in a variety of countries to try and hopefully cultivate … affiliates

---

[387] *Id*. at iv.
[388] *Id*. at v.
[389] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41 (Public Affairs 2013) ("Zarate, *Treasury's War*").

or branches. … in some spectacular ways, these efforts have actually worked. … al-Qaida's core is not confined… to Afghanistan and Pakistan. … [b]ased on al-Qaida's literature, including a … published letter from [] al-Zawahiri is that [Afghanistan and Pakistan are] basically where [al-Qaeda's] general command is actually headquartered, and they have a series of committees and advisers surrounding [] al-Zawahiri. But the general command dispatches operatives around the globe to oversee their interests,… [with] specific operatives who … are in touch with the general command, who have been dispatched by the general command, and they're operating in places such as Egypt, Libya, Syria, Yemen, Sinai …, across the globe, basically. … [R]ecent evidence [suggests] that al-Qaida in Iraq … considered dispatching operatives to launch [an] attack in … the U.S."[390]

1133.   The same information sources described throughout this section alerted Defendants that al-Qaeda and al-Qaeda-in-Iraq's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi geographies in which Defendants conducted business.  Examples of such reports include, but are not limited to:

   a.   Iraq Study Group, December 2006: "Four of Iraq's eighteen provinces are highly insecure—Baghdad, Anbar, Diyala, and Salah ad Din. … In Anbar, the violence is attributable to the Sunni insurgency and to al Qaeda …"[391]

---

[390] Thomas Joscelyn (Foundation for Defense of Democracies), *quoted in* Federal News Service Transcripts, *Hearing of the Terrorism, Nonproliferation and Trade Subcommittee of the House Foreign Affairs Committee Subject: "Global al-Qaida: Affiliates, Objectives and Future Challenges"* (July 18, 2013), 2013 WLNR 17723295.
[391] The Iraq Study Group (James A. Baker, III, and Lee H. Hamilton, Co-Chairs), *The Iraq Study Group Report*, at 6 (Dec. 2006).

b.  DOD, March 2007: "Violence in Baghdad, Diyala, and Balad is characterized by sectarian competition for power and influence between AQI and JAM, principally through murders, executions, and high-profile bombings."[392] "Violence in Anbar is characterized by Sunni insurgents and AQI attacks against Coalition forces."[393]

c.  DOD, September 2007: "Although Irbil, Dahuk and Sulaymaniyah are generally stable, AQI maintains a presence in those areas and there is some evidence that AQI is increasingly targeting the region. Attacks on infrastructure, such as roads and bridges, have increased …, likely in an effort to hinder … Coalition forces' mobility and undermine local confidence in … Coalition forces' ability to protect them. For example, the Sarahah Highway Bridge (south of Kirkuk), which was destroyed on June 2, [2007,] was a key conduit for transportation between the southern and northern provinces."[394]

d.  DOD, September 2008: "AQI and affiliated Sunni insurgent groups … remain active in the North, particularly in Ninewa and Tamim Provinces, where the possibility of Kurdish annexation of Ninewa districts and Kirkuk is a polarizing issue."[395]

---

[392] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2007 Report to Congress*, at 14 (Mar. 2, 2007).

[393] *Id.*

[394] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2007 Report to Congress*, at 23 (Sept. 14, 2007).

[395] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, September 2008 Report to Congress*, at 27 (Sept. 26, 2008).

    *e.*   DOD, January 2010: "AQI remains the most active and violent group in Iraq and initiates the vast majority of [high profile attacks] in areas such as Anbar Province, Mosul, Kirkuk, Diyala, and Baghdad."[396]

    *f.*   SIGIR, January 2010: "DoD reports that the al-Qaeda in Iraq (AQI) terrorist network … appear[s] to be targeting mixed urban areas—including those in Ninewa, Tameem, Diyala, and Baghdad provinces …"[397]

1134.   Defendants also knew that al-Qaeda facilitated attacks involving the Taliban, including its Haqqani Network, in Afghanistan, given the topic's wide coverage in mainstream media outlets.  The following are just a few examples of such reports:

    *a.*   On June 30, 2005, the Boston Globe quoted General David Barno, former head of the US military in Afghanistan, who predicted "that most of the [Taliban] would collapse in the coming 'year or so,' leaving behind a 'small hard-core remnant . . . which is essentially a wholly owned subsidiary of Al Qaeda.'"[398]

    *b.*   On May 30, 2007, the Washington Times reported that "[t]he Taliban has merged its propaganda and field operations with those of the global al Qaeda network led by Osama bin Laden" and "[t]he Taliban have changed immensely in the last year due to the mentoring they are getting from leading Arab jihadists in Pakistan with al Qaeda, both in the realm of battlefield tactics and media operations, … [and] are doing what works in Iraq and often

---

[396] U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, December 2009 Report to Congress*, at vii (Jan. 29, 2010).

[397] Stuart W. Bowen, Jr., *Quarterly Report and Semiannual Report of the Office of the Special Inspector General for Iraq Reconstruction*, at 41 (Jan. 30, 2010).

[398] Victoria Burnett, *17 Aboard Downed Copter Feared Dead*, Boston Globe (June 30, 2005), 2005 WLNR 10289401.

succeeding… Before his [] death …, the Taliban's military commander, Mullah Dadullah, claimed that the Taliban's planning and operations were one and the same with those of al Qaeda. Afghan officials also said the Taliban's suicide bombing attacks in Kabul and other large cities were approved in advance by senior al Qaeda operatives in Pakistan. 'The Taliban is now an integral part of an internationalized jihad,' said Waheed Mujda, an Afghan writer who served as a deputy minister in the Taliban's government between 1997 and 2001."[399]

    *c.* On November 29, 2009, the Associated Press reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs used to kill U.S. troops.[400]

    *d.* On December 3, 2009, Secretary of State Hillary Clinton testified publicly that the U.S. government viewed al-Qaeda and the Taliban "not as separate independent operators" but "as part of a syndicate of terrorism."[401]

    *e.* On December 15, 2009, the Wall Street Journal quoted Admiral Mullen as saying that U.S. officials were "deeply concerned about the growing level of collusion between the Taliban and al Qaeda."[402]

    *f.* On January 5, 2010, the Wall Street Journal reported in a front-page article that the December 30, 2009, attack on Camp Chapman was carried out by a

---

[399] Philip Smucker, *Taliban Learns Tactics, Propaganda From Al Qaeda*, Washington Times (May 30, 2007), 2007 WLNR 10111354.

[400] Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[401] S. Hr'g 111-479, at 24.

[402] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

bomber working with al-Qaeda, and that the Taliban had claimed responsibility for it.[403]

g.  On January 21, 2010, Secretary of Defense Robert Gates stated publicly that al-Qaeda and the Taliban "had formed a 'syndicate' of terrorist groups," and that the Taliban was one of the "factions" that was "working under the umbrella of Al Qaeda."[404]

h.  On January 18, 2011, the Long War Journal reported that "the Taliban and al Qaeda are known to have conducted a joint operation against [] Bagram Airfield" that consisted of a "complex assault [] launched late at night" against a U.S. airbase involving "[h]eavily armed fighters, including at least four fighters wearing suicide vests."[405]

i.  On May 28, 2011, the Washington Post reported that Secretary Clinton said the goal of United States talks with the Taliban was "to split the Taliban from al-Qaeda."[406]

j.  On April 30, 2012, the Guardian reported:  "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign.  In particular, it contributes military expertise to the spectacular attacks organised out of Waziristan, it sends groups of fighters from there to the front lines and it inspires."[407]

---

[403] Siobhan Gorman et al., *CIA Blast Blamed on Double Agent*, Wall St. J. (Jan. 6, 2010).
[404] Wash. Post, *Gates Casts Qaeda As Terror Syndicate* (Jan. 21, 2010).
[405] Bill Roggio, *Senior German Al Qaeda Leader Killed In Afghanistan*, Long War J. (Jan. 19, 2011), https://tinyurl.com/k9cd3tpe.
[406] Karen DeYoung, *Clinton Sees 'Turning Point' After Brief Visit to Pakistan*, Wash. Post (May 28, 2011).
[407] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, The Guardian (Apr. 30, 2012).

k.  On October 21, 2015, an opinion piece in the New York Times described Zawahiri's "oath of fealty" to Mullah Mansour, who was the Taliban's Supreme Leader from July 2015 until his death in May 2016.[408]

1135.   Defendants also knew that al-Qaeda and its progeny prized their safe haven in Afghanistan and would likely deploy their terrorist resources there.  As terrorism scholar Colin P. Clarke observed, "[w]ithin the broader jihadi universe, al-Qaeda existed as a central node and maintained connections, linkages, and alliances with a diverse array of groups, including the Afghan Taliban."[409] According to Dr. Clarke, "[i]n many ways, Afghanistan, despite its geographic location outside of the Middle East and North Africa, has served as one of the, if not the, most critical hubs in the global jihad over the past four decades. It is a place that militants have continually returned to, even after other conflicts have drawn them away."[410]

1136.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that al-Qaeda waged a globally integrated terrorist campaign against the United States.

Defendants Knew Protection Payments Aided Al-Qaeda

a.  *Defendants Knew Their Cash-Based Protection Payments Aided Al-Qaeda*

1137.   Defendants knew protection payments aided al-Qaeda's operations worldwide because Defendants' employees and agents in the United States, Sweden, and Iraq knew such fact to be true.

---

[408] Thomas Joscelyn & Bill Roggio, *Are We Losing Afghanistan Again?*, N.Y. Times (Oct. 21, 2015).
[409] Dr. Colin P. Clarke, After the Caliphate: The Islamic State & the Future Terrorist Diaspora24 (Polity 2019).
[410]  *Id.*

1138.  **United States government reports and statements** alerted Defendants that their protection payments in Iraq aided al-Qaeda's worldwide campaign, including, but not limited to:

> a.  <u>Treasury Department, 2005</u>: "[T]he Zarqawi Network … use[s] a variety of classic al Qaida-type terrorist financing mechanisms, including: * Funds provided by charities, Iraqi expatriates, and other deep pocket donors, primarily in the Gulf, but also in Syria, Lebanon, Jordan, Iran, and Europe; * Criminal activities, such as … extortion …."[411]
>
> b.  <u>U.S. Army, November 2010</u>: "al Qaeda in Iraq … remain a threat, and they remain dangerous … [and remain] part of the [al-Qaeda] network …[,] [which] includes al Qaeda's ability to … plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money.  … al Qaeda continues to change its tactics and how it adapts. … they've … increased their extortion efforts, especially focused on … truck drivers in the northern part of [Iraq]."[412]
>
> c.  <u>Treasury Department, 2015</u>:  "GLOBAL SOURCES OF TERRORIST FINANCING[.] In order to operate, [al-Qaeda] requires significant funding. While the cost of an individual terrorist attack can be quite low, maintaining a terrorist organization requires large sums. Organizations require significant funds to create and maintain an infrastructure of organizational support, to

---

[411] Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005), https://home.treasury.gov/news/press-releases/js2658.

[412] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces- Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

sustain an ideology of terrorism through propaganda, and to finance the ostensibly legitimate activities needed to provide a veil of legitimacy for terrorist organizations. As deceased AQ financial chief Sa'id Al-Masri put it: 'without money, jihad stops.' Although financial activities can vary significantly among different terrorist groups, several areas of commonality exist. … 1. CRIMINAL ACTIVITY[.] Terrorist groups engage in a range of criminal activity to raise needed funds. Extensive revenue from … criminal activities such as extortion have permitted AQ affiliates and other terrorist groups to generate significant revenue. … [E]xploitation of local populations … has become a key revenue source for numerous terrorist groups worldwide. … this form of pseudo-sovereignty-based fundraising has spread to other un- or under-governed territories around the world, most recently Iraq and Syria.'"[413]

1139.   U.S. government reports also alerted Defendants that their protection payments in the form of "free goods," comprised of high-tech communications technologies donated to terrorists through Ericsson's uncontrolled Iraqi slush funds and intermediary partners, consultants, and contractors—which Defendants sometimes facilitated as an in-kind alternative to cash-based protection payments—also aided the Relevant Terror Organizations.

1140.   For example, according to a White House statement of U.S. counterterrorism strategy in 2018:

> The technological advances of the past century have created an interconnected world in which it is easier than ever to quickly move people, funding, material, and information across the globe. The backbone of this interconnected system is information technology—largely created and facilitated by the United States Government and private industry—that is

---

[413] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 14-15 (Aug. 24, 2015).

increasingly enabling faster transactions of all kinds across the world.
Terrorists use these same publicly available technologies to command and
control their organizations and to plot attacks, travel, and abuse the global
financial system to raise funds and procure weapons, materiel, and basic
necessities. Terrorists cannot sustain their operations without these resources.
The United States[,] … [a]round the globe, [] will promote effective
enforcement of legislation and policies aimed at protecting … communication
industries.[414]

1141. **Media reports** alerted Defendants that protection money payments in Iraq aided al-

Qaeda's operations worldwide. The media routinely reported that al-Qaeda doctrine

emphasized the extraction of protection money as a core fundraising tactic from the late 1990s

through 2004. Such reports included, but were not limited to:

    *a.* Agence France Press, October 1998: "[B]in Laden has … exhausted his own

        [] fortune, … and now depends on donations [and] … protection money to

        finance his operations."[415]

    *b.* Washington Post, September 2001: "The legend of … bin Laden is that of …

        a business- savvy nomad who has used … a constellation of companies to

        finance a global network … Ever since his days as a student of economics and

        finance …, bin Laden has shown a special affinity for raising and managing

        money. … Bin Laden has built upon those sources and methods to finance his

        terrorism. … Bin Laden's organization draws large amounts of money from

        … 'protection money' …, a former senior U.S. official said."[416]

    *c.* Sunday Mail, September 2001: "Severing the financial arteries that feed []

        bin Laden's war machine has become a priority… Intelligence sources

---

[414] The White House, *National Strategy for Counterterrorism of the United States of America*, at 15 (Oct. 2018).
[415] Agence France Presse English Wire, *Osama Bin Laden Gets Money From Saudi Royalty: US Intelligence* (Oct. 10, 1998).
[416] Robert O'Harrow Jr., David S. Hilzenrath, and Karen DeYoung, *Bin Laden's Money Takes Hidden Paths To Agents of Terror; Records Hint at Complex Financial Web*, Washington Post (Sept. 21, 2001), 2001 WLNR 13158661.

believe … [b]usinessmen throughout the Middle East … [were] paying millions of dollars in protection money."[417]

d.  Mirror (UK), October 2001: "[B]in Laden has bought off the Taliban by giving them [] 70 million and is said to own and operate the vicious regime. The terrorist leader has been secretly funding Mullah Omar Muhammad and his leaders … The money bin Laden gives the Taliban comes from businesses … and protection money from … firms to ensure he keeps his activities in their area to a minimum."[418]

e.  Herald (Glasgow, Scotland), October 2001: "US government sources told the Washington Post that the CIA has concluded that bin Laden 'owns and operates' the Taliban. … The [Post] was told the money [bin Laden provides to the Taliban] comes from three primary sources: legal and illegal businesses or front companies bin Laden operates; protection payments he receives from … companies…; and entities that are masked as charities."[419]

f.  APA (English News Service), October 2001: "An Austrian economics professor …, Prof. Friedrich Schneider said … between ten and 20 per cent of Al Qaida's income came from 'classical' criminal activities such as …'protection money'."[420]

---

[417] Sunday Mail (Australia), *War On Terror; The World Waits; The Money Trail* (Sept. 23, 2001), 2001 WLNR 5323188.

[418] Andy Lines, *War On Terror: Battlefront: Pounds 70 M It's Honey Money To Aid Taliban, Mirror (UK)* (Oct. 12, 2001), 2001 WLNR 9358733. On information and belief, most of the referenced payments in this source were primarily denominated in U.S. dollars and/or facilitated by U.S. dollar-denominated transactions, and the Mirror's reference to pounds was merely a conversion by the journalist for its intended U.K. audience.

[419] Kay Jardine, *West Is 'Thirsty for Bloodshed'*, Herald (Glasgow, Scotland) (Oct. 12, 2001), 2001 WLNR 3862913.

[420] APA (English News Service), *Economics Professor Says Al Qaida Backed By 4.85 Billion Dollars* (Oct. 25, 2001), 2001 WLNR 130475.

g. <u>Cleveland Plain Dealer, November 2001</u>: "[B]in Laden" "co-opted" "other terror groups… [and] … [h]is … protection rackets … have been exceedingly lucrative."[421]

h. <u>Associated Press, February 2002</u>: "[A]n al-Qaida training manual aimed at teaching Osama bin Laden's followers the best ways to kill thousands of people and spread fear in the United States … [known as the] 11-volume 'Manual of Afghan Jihad' … offers advice on how to raise funds for covert operations through extortion."[422]

i. <u>PA News, December 2003</u>: "[A]l Qaida operatives levy a 'tax' on shipments as they pass borders or areas under the terror network's influence, in Iran, Pakistan, Turkmenistan and other countries."[423]

j. <u>BBC International Reports (Europe), October 2004</u>: "[T]he merging of organized crime and terrorism is a new phenomenon. BND President Hanning assumes 'that terrorist structures, such as … Al-Qa'idah, finance their fight through the extortion of protection money as well as direct involvement in drug-trafficking.' "[424]

1142. From 2004 through 2014, media reports regularly alerted Defendants that their protection payments in Iraq directly benefited al-Qaeda's worldwide operations. The following are just a few examples of such media reports:

---

[421] Elizabeth Sullivan, *How To Turn A Terrorist Into A Has-Been*, Cleveland Plain Dealer (Nov. 19, 2001), 2001 WLNR 11203968.

[422] Hamza Hendawi, *Al-Qaida Manual Pushes Mass Fatalities Visibility*, Associated Press, *republished in* Wichita Eagle (Feb. 2, 2002), 2002 WLNR 1319548.

[423] Mark Sage, *Bin Laden 'Funding Terror Through Drugs'*, PA News (Dec. 29, 2003).

[424] BBC International Reports (Europe), *German Intelligence Chief Says Bin-Ladin Still Alive* (Oct. 10, 2004).

a.  <u>Cleveland Plain Dealer, October 2006</u>:  "There simply are not enough coalition forces in Iraq to be everywhere to impose security. Al-Qaida operatives … seem to be running their own protection rackets …"[425]

b.  <u>New York Times, November 2006</u>:  "The insurgency in Iraq is now self-sustaining financially, raising tens of millions of dollars a year from … [inter alia] … crimes …, a classified United States government report has concluded. [I]ts most surprising conclusion: '… terrorist and insurgent groups in Iraq may have surplus funds with which to support other terrorist organizations outside of Iraq.'"[426]

c.  <u>Los Angeles Times, June 2007</u>:  "By January [2007], the Islamic State's proclamations appeared on walls and were circulated in leaflets [in Iraq]. … 'They issued laws and decrees like a real state,' said [an Iraqi victim] …. Papers demanding protection money were sent to homes [and] Al Qaeda backers flexed their muscle …"[427]

d.  <u>National Public Radio, July 2007</u>:  "[Peter Bergen stated:] '… al-Qaida in Iraq is beginning to finance al-Qaida central in the Afghan-Pakistan border, because al-Qaida in Iraq is making a lot of money from … from protection money … and is now, financially, a quite viable organization.'"[428]

---

[425] Cleveland Plain Dealer, Opinion, No Honey Coating Only Hard Choices Lie Ahead In Violence-Torn Iraq; It's Time To Explain Them Honestly To The American People (Oct. 25, 2006), 2006 WLNR 18536168.

[426] John F. Burns and Kirk Semple, *U.S. Finds Iraq Insurgency Has Funds to Sustain Itself*, N.Y. Times (Nov. 26, 2006).

[427] Ned Parker, *The Conflict In Iraq: Baghdad Neighborhood Purged*, Los Angeles Times (June 27, 2007), 2007 WLNR 12080034.

[428] Peter Bergen, *quoted in* NPR Talk of the Nation, *A Closer Look at al-Qaida in Iraq* (July 23, 2007), 2007 WLNR 14086129.

e. <u>Reuters News, September 2007</u>:  "[V]igorous fund-raising from protection rackets … helped keep al Qaeda active."[429]

f. <u>Reuters News, December 2007</u>:  "Iraq has pulled back from the brink of civil war, but recent security gains are fragile and still reversible, the top U.S. commander in Iraq, General David Petraeus, said … Petraeus said he viewed Sunni Arab al Qaeda as the main enemy in Iraq… MAFIA RACKETS[.] Petraeus said most attacks were carried out by al Qaeda in northern Iraq, … He said al Qaeda had turned to 'mafia-style' rackets to finance its operations …. Shi'ite militias were involved in similar rackets."[430]

g. <u>Associated Press, March 2008</u>:  "The suicide bombers who have killed 10,000 people in Iraq, including hundreds of American troops, usually … come from outside Iraq. … 'Al- Qaida recruits these people from the Middle East and North Africa, hitting them at the most vulnerable time of the life,' said [a] senior [U.S.] analyst[] … The demand for many foreign fighters begins in places such as the dingy back streets of teeming Iraqi cities  such as of northern Mosul – where al-Qaida still holds sway. An al-Qaida cell decides it needs two suicide bombers. They put in an order which is funded by money made  through racketeering, extortion and kidnapping. That request travels to Damascus and to the facilitators and recruiters training young men in North Africa and Saudi Arabia. Three months later, the bomber is delivered, military investigators and officials say."[431]

---

[429] William Maclean, *Refile-Analysis-Algeria Rebel Attacks Test Govt Security Policy*, Reuters News (Sept. 23, 2007).
[430] Ross Colvin, *Petraeus: Iraq Security Fragile, Gains Reversible*, Reuters News (Dec. 29, 2007).
[431] Patrick Quinn (Associated Press), *US Military Study Of Iraq Detainees Provides Insights Into The Motivations Of Foreign Fighters*, AP Worldstream (Mar. 15, 2008) (emphasis added).

h.  Reuters Gulf Financial News, August 2011: "Al Qaeda has resurfaced in former Iraqi strongholds … [and has] been carrying out bolder attacks… Mosul, is seen as one of the last urban strongholds of al Qaeda in Iraq … [Al Qaeda in Ninewa Province] funds operations through extortion …"[432]

i.  Economist, November 2013: "al-Qaeda is … making its presence heavily felt, collecting protection money to help pay for its operations. … [Iraqi Prime Minister Maliki's] aides stress that 'al-Qaeda is a common threat to everyone.' Indeed, a group responsible for many of the recent … bombings, [ISIS], gives its allegiance to al-Qaeda."[433]

j.  New York Times, December 2013: "The United States is quietly … combat[ting] an explosion of violence by a Qaeda-backed insurgency that is gaining territory in both western Iraq and neighboring Syria. … Qaeda's regional affiliate, the Islamic State in Iraq and Syria, has become a potent force in northern and western Iraq. … [S]aid Michael Knights, an expert on Iraqi security …[:] … 'There is one place in the world where Al Qaeda can run a major affiliate without fear of a U.S. drone or air attack, and that is in Iraq and Syria.' … Using extortion … the Qaeda affiliate is largely self-financing."[434]

1143.  **Terrorism scholars** alerted Defendants that their protection payments aided al- Qaeda. For example, in 2009, Dr. Williams reported that "the proceeds from protection fees …

---

[432] Rania El Gamal, Suadad al-Salhy, Jim Loney, and Ruth Pitchford, *Analysis–Iraq Al-Qaeda Regroups, Shi'ite Militias Threaten*, Reuters Gulf Financial News (Aug. 28, 2011).
[433] Economist, *Civil Strife In Iraq: Going All Wrong* (Nov. 2, 2013), 2013 WLNR 27433452.
[434] Michael R. Gordon and Eric Schmitt, *U.S. Sends Arms To Aid Iraq Fight With Extremists*, N.Y. Times (Dec. 25, 2013).

strengthened nonstate groups and provided resources for their continued challenge to the Baghdad government."[435] According to Dr. Williams, "al-Qaeda" "need funding and are unlikely to remain aloof when others are making money, either legally or through illicit activities" and thus "even if they are not directly involved they are almost certainly imposing some kind of tax or demanding a slice of the profits in return for allowing the trade to operate."[436]

1144.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that protection payments aided al-Qaeda's terrorist campaign against the United States.

> a.  *Defendants Knew "Free Goods"-Based Protection Payments Aided Al-Qaeda*

1145.  Defendants' above-described knowledge applied equally to Defendants' "free goods" payments of cell phones to al-Qaeda.  At all times, Defendants knew that al-Qaeda prioritized obtaining U.S.-origin cell phones for their unique operational benefits to the terrorists.

1146.  In the decades after 9/11, press reports regularly alerted Defendants to al-Qaeda's desire to source U.S.-origin phones to facilitate attacks against Americans in Afghanistan.  On June 20, 2003, for example, the *Boston Globe* reported that al-Qaeda operative "Iyman Faris" "pleaded guilty to providing material support to terrorists and conspiracy to provide support" and admitted that he "attended an Al Qaeda training camp in Afghanistan," and, thereafter, "transported a cache of money and cellular phones for Al Qaeda" in "Afghanistan for use by bin Laden's fighters."[437]  A few months later, the *Associated Press* reported that "[p]rosecutors" stated that "Faris" "assisted al-Qaeda's work" when he "traveled to Pakistan and Afghanistan"

---

[435] Williams, *Criminals, Militias, and Insurgents*, at 161.
[436] *Id*. at 177.
[437] Amber Mobley, *U.S. Citizen Admits Planning Al Qaeda Attack Trains and a Bridge Allegedly on Hit List*, Boston Globe (June 20, 2003), 2003 WLNR 3428108; see Derrill Holly, 20 years for alleged bridge plot;

and "carr[ied] out low-level missions for [al-Qaeda] terrorists" by, among other things, "provid[ing]" "cell phones and cash to al-Qaeda members."[438]

1147.  In later years, similar media reports documented al-Qaeda's continuing efforts to source communications technologies, cell phones, and similar dual-use weapons from the United States. For example, on June 7, 2010, it was widely reported that a "federal grand jury" "charged a Texas man with attempting to provide al Qaeda with global positioning instruments, cell phones and a restricted publication on U.S. weapons in Afghanistan."[439]

1148.  Indeed, media reports specifically alerted Defendants that al-Qaeda's strategy for its joint cells with the Taliban in Afghanistan relied on cell phones as detonators for al-Qaeda's signature calcium ammonium nitrate ("CAN") fertilizer bombs.[440]

1149.  Such reports also alerted Defendants that al-Qaeda's reliance upon iconic American communications technologies deepened in the late 2000s, not unlike the knowledge, communications security, and communications efficiency benefits, among others, familiar to most smartphone users after the iPhone revolutionized the space in the late 2000s.

Defendants Knew Protection Payments Aided Al-Qaeda-In-Iraq

1150.  Defendants knew protection payments aided al-Qaeda-in-Iraq because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

---

[438] Derrill Holly, *20 Years For Alleged Bridge Plot; Iyman Faris, 34, Tried to Withdraw a Guilty Plea; Prosecutors Say He Assisted Al-Qaeda's Work*, Associated Press, *reprinted in* Philadelphia Inquirer (October 29, 2003), 2003 WLNR 14764150.
[439] David C. Morrison, *Behind the Lines: Our Take on the Other Media's Homeland Security Coverage*, CQ Homeland Security (June 7, 2010), 2010 WLNR 11991958.
[440] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009).

1151. **United States government reports** alerted Defendants that their protection payments aided al-Qaeda-in-Iraq.[441]

1152. **Media reports** alerted Defendants that protection payments provided vital funding that aided al-Qaeda-in-Iraq's operations in Iraq, Syria, and Afghanistan.[442]

---

[441] *E.g.*, Daniel L. Glaser (Assistant Secretary, Counter-Terrorist Finance, Department of the Treasury), *quoted in* U.S. *Dep't of the Treasury, Testimony of Acting A/S Glaser on Financing for the Iraqi Insurgency* (July 28, 2005) ("The financing networks of the Iraqi insurgency are complex and diverse. Insurgents draw on both external financing and on internal Iraqi sources of funds and materiel. For example, … jihadist groups use … Criminal activities, such as … extortion …"),https://home.treasury.gov/news/press-releases/js2658; U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, March 2010 Report to*, at 34 (Apr. 29, 2010) ("AQI … continues its efforts to gain funds through widespread extortion efforts."); *see also* U.S. Dep't of Defense, *Measuring Stability and Security in Iraq, June 2010 Report to Congress*, at 35-36 (Aug. 20, 2010) (same); American Forces Press Service, *Forces Dismantle Terrorist Group in Northern Iraq*, Defense Department Documents (Apr. 2, 2010) ("In … Mosul, Iraqi soldiers and U.S. advisors searched … for a suspected AQI member believed to extort money from [] transporters and contractors to fund the terrorist group. … [U.S.] operations resulted in the deaths or arrests of at least six suspected senior AQI leaders believed to greatly contribute to funding the terrorist group by their involvement in a highly-organized extortion … ring based in Mosul. … The six … include the overall AQI commander of northern Iraq, four men who head the group's funding, and a regional commander for Mosul. 'The capture of all six AQI extortion… network leaders … will likely greatly disrupt AQI operations and prevent future attacks throughout Iraq,' U.S. military officials said … 'The money collected from extortion … comprises the bulk of AQI's income, which is subsequently used to fund the terrorist group's deadly attacks.'"), 2010 WLNR 6913562; Julia McQuaid, Jonathan Schroden, Pamela G. Faber, P. Kathleen Hammerberg, Alexander Powell, Zack Gold, David Knoll, and William Rosenau, *Independent Assessment of U.S. Government Efforts against Al-Qaeda, CNA Report Pursuant to Section 1228 of the 2015 National Defense Authorization Act*, at 175 (Oct. 2017) ("AQI/ISI relied on a variety funding streams. In the runup to the founding of AQI … As of 2009, AQI was essentially self-financing, supporting itself through crimes such as extortion …").

[442] *E.g.*, Pamela Hess (UPI Pentagon Correspondent), *Analysis: Zen and The Art of Counterinsurgency*, UPI News (July 29, 2004) ("It is tough to overemphasize the importance of organized crime in the insurgency, Marine commanders say. Millions of dollars flow through the country daily in an unofficial economy and have for the past decade. The perpetrators are motivated by self-interest and greed. They not only plan and carry out violence but pay others to do the same. One commander compared the intransigence of Iraqi organized crime networks to that of the mafia in Sicily before World War II. It has the same stranglehold on whole local economies and populations, and is protected by family and tribal loyalties."); Bilal A. Hibab, *Iraq's Disappearing Oil*, Wilson Quarterly (Sept. 2006) ("A web of corruption and criminality [] is helping to destabilize Iraq, … and financing the country's slide toward chaos … [Al-Qaeda-in- Iraq] [i]nsurgents [in Mosul] attack Iraqi [transportation targets] … in part to force the insurgents to rely on trucks … who usually pay protection money to the insurgents."); Associated Press, *Two Terrorists Killed, 21 Detained In Iraq Raids Today*, AP Alert – Business (July 12, 2007) ("On July 9, [2007] Iraqi security forces detained four suspects allegedly responsible for running an extortion network … [who allegedly extracted] protection money from local contractors and us[ed] the funds to finance al Qaeda in Iraq activities."); Lennox Samuels, *Al Qaeda In Iraq Ramps Up Its Racketeering*, Newsweek (May 20, 2008) ("AQI is … increasingly turning to crime to help finance its deadly operations. … Al Qaeda in Iraq is no stranger to racketeering … [and] long raised money through [crime] … The haul from these illegal enterprises runs to the tens of millions of dollars … AQI… demands 'protection' payments from legitimate businesses. … That money helped AQI purchase arms, pay salaries and bribes and stage attacks."), https://tinyurl.com/4ezvphc9; Andrew E. Kramer, *Iraqi Christians' Secret: Protection Money To Insurgents*, International Herald Tribune (June 26, 2008) ("[P]rotection money … grew into a source of financing for [al-Qaeda-in-Iraq]. [Protection payments] thus became a secret, shameful and extraordinary complication … People deny it, people say it's too complex, and nobody in the international community does anything about it,' said Andrew White, the Anglican vicar of Baghdad. … [M]any … in Iraq paid … knowing full well the money would be used for bombs and weapons to take the lives of others."), 2008 WLNR 11985310; Pamela Hess

1153. **Terrorism scholars** alerted Defendants that their protection payments aided al- Qaeda-in-Iraq worldwide.  Examples of such reports include, but are not limited to:

      a.   <u>Professor Robert Looney, 2005</u>:  "[T]he convergence of large segments of the Iraqi insurgency with elements of organized crime … [and] the insurgency's subtle shift toward increased reliance on criminal activity has implications that are … important for the Iraqi economy. Increased criminal activity is effectively stifling attempts to expand the formal sector. … [A] successful attack on criminal activity in Iraq is as important in determining the country's future as the outcome of the current anti-insurgency campaign. One might even venture to say they are largely one and the same. … Insidious criminal activity is not new to Iraq. In fact, as recent revelations coming out of the United Nations Oil for Food scandal show, criminal activity has long been pervasive in all areas of Iraqi society, from the highest levels of official power to the lowly smuggler trying to eke out an existence during the period of sanctions in the 1990s. … With segments of the insurgency's financial needs

---

(Associated Press), *US: Iraqi Fighters Extort, Kidnap to Raise Funds*, AP DataStream (July 29, 2008) ("Al-Qaida in Iraq is increasingly embracing extortion … to finance its operations ... [by] demanding protection money of local businesses."); AP Alert - Business, *Iraqis Arrest Numerous Terrorism Suspects* (Oct. 14, 2009) ("[A]n extortion network known as the Islamic State of Iraq and related to al-Qaida in Iraq based in … Mosul. … targeted … those who own or work at construction sites and local businesses … Extortionists then use the [] money to fund terrorist attacks …"); Associated Press, *Iraqi Forces Arrest 2 Al-Qaida Suspects*, AP Alert – Terrorism (Sept. 2, 2010) ("Iraqi forces … searched … for a suspected al-Qaida in Iraq leader allegedly responsible for extorting money from … contractors and … transportation workers in order to fund terrorist operations …"); Kerry Murphy (Australian Immigration Lawyer and Arabic Scholar), *What's Eating Syria And Iraq*, Eureka Street (June 17, 2014) ("The capture of … Mosul by [AQI] is a major concern not just for Iraq but for the whole Middle East. … Although Zarqawi was killed…, AQI continued. In towns where it had control or influence, it demanded mafia-style protection payments which helped fund its operations in Iraq and more recently in Syria."), https://tinyurl.com/y98ah99f; Jamie Tarabay, *Iraq In 2014: Back To Civil War?*, Al Jazeera America (Dec. 21, 2013) ("[S]olidifying its financial base are Al-Qaeda and its affiliates, who sought to bolster their local support in cities … where Iraqi security forces have failed to gain a foothold. 'Since 2010 AQIS has been self-funding through organized crime rackets involving … protection payments from large Iraqi companies, plus trucking, smuggling and real estate portfolios,' [Michael] Knights said."), https://tinyurl.com/5k57c4vx.

matching or in some cases overriding its political motivations, an increasing amount of time and effort of these groups is devoted to creating 'in house' criminal capabilities. …. Complicating matters is the near impossibility of establishing effective anti-crime programs in an environment of rampant corruption. … Transparency International [] ranks Iraq as the most corrupt country in the Middle East …, with the country's corruption actually worsening between 2003 and 2004. Instability, high unemployment and corruption have created a volatile mix that is ideal for organized crime. … In this environment, Western intelligence agencies are becoming increasingly worried about the systematic strengthening of ties between terrorists and organized crime. … The current wave of crime and insurgent activity creates, and is in turn supported by, an increasingly sophisticated criminal economy."[443]

b.  <u>Douglas Lovelace, 2009</u>: "[T]he insurgency [in Iraq] was strengthened and sustained by criminal activities," "including" "extortion" aided by "the critical role played by corruption in facilitating and strengthening organized crime," through which "al-Qaeda in Iraq … used criminal activities to fund their campaigns of political violence."[444]

c.  <u>Dr. Phil Williams, 2009 and 2010</u>: "[A] large volume of such" "protection" "payments"… "became a significant revenue source [for anti-American

---

[443] Robert E. Looney (Professor of National Security Affairs at the U.S. Naval Postgraduate School), *The Business of Insurgency: The Expansion of Iraq's Shadow Economy*, National Interest (Oct. 1, 2005), 2005 WLNR 29354864.
[444] Douglas C. Lovelace, Jr., *Foreward* ("Lovelace, Jr., *Foreward*"), *published in* Williams, *Criminals, Militias, and Insurgents*, at vii-viii.

terrorists in post-Saddam Iraq].[445] "Terrorist organizations … use organized crime activities as a funding mechanism. … in Iraq … criminal activities were used … by insurgents … seeking to enhance their resource bases and prosecute their campaigns of violence more effectively… [E]xtortion … helped to fund much of the violence in Iraq. Extortion was highly profitable partly because of the scale of reconstruction and partly because of the loss of security on Iraqi roads. … Foreign fighters and jihadis groups, especially al-Qaeda in Iraq (AQI), exploited various criminal activities to augment their financial base. … Extortion… [was one of AQI's] core funding activities. … AQI's criminal activities continue to finance its resistance in and around Mosul. …"[446] "[I]t is important to emphasize that organized crime in Iraq is not something separate from the insurgency, the sectarian conflicts, or the activities of AQI; rather, it is interwoven with these other organizations and activities, … creating negative but very powerful synergistic effects."[447] "[A] critical component of organized crime in Iraq was the appropriation of criminal methods by … jihadis … In many respects this was a familiar pattern. Groups as diverse as the Irish Republican Army, Liberation Tigers of Tamil Eelam, and Revolutionary Armed Forces of Colombia had long used criminal activities as a funding mechanism. For jihadi groups, especially AQI, criminal activities became a critical source of revenue. … Extortion [was among

---

[445] Williams, *Criminals, Militias, and Insurgents*, at 236.

[446] Lovelace, Jr., *Foreward*, at ix-xvi. Shiite terrorists also practiced protection rackets. *See*, *e.g.*, *id.* at xv ("Shiite militias, especially Jaish-Al-Mahdi (JAM), have been among the most powerful and important groups engaged in organized crime in Iraq—although how much has been carried out under the direct control of the organization and how much by rogue factions is uncertain. [] [C]riminal activities [that] provided Mahdi Army members with important revenue streams[] [included] extortion and protection…").

[447] Williams, *Criminals, Militias, and Insurgents*, at 13.

AQI's] … core funding activities."[448] "Organized crime in Iraq in the months and years after March 2003 … finance[ed] the violent opposition to the occupation forces. … In 2008, the capacity to generate funds through criminal activities enabled al Qaeda in Iraq (AQI) to continue resisting [] the U.S. military."[449]

1154.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that protection payments aided al-Qaeda-in-Iraq's terrorist campaign against the United States.

Defendants Knew Al-Qaeda-In-Iraq Aided Al-Qaeda

1155.  Defendants always knew their aid to al-Qaeda-in-Iraq also aided al-Qaeda. For example, as Kenneth Katzman, a Middle East specialist, observed in 2008, "[t]he links between AQ-I and Al Qaeda's central leadership might be tightening, but they are not new."[450]  The same types of sources referenced throughout this section also alerted Defendants that al-Qaeda-in-Iraq specifically worked with the Taliban, including its Haqqani Network.  For example, Haqqani scholar Anand Gopal reported in 2009, that "[t]he Haqqanis pioneered the use of suicide attacks in Afghanistan, an import from Al Qaeda in Iraq."[451]

1156.  **United States government reports and statements** alerted Defendants that al-Qaeda-in-Iraq aided al-Qaeda, including al-Qaeda's operations and allies in Afghanistan and Pakistan. For example, according to Mr. Katzman, "on July 24, 2007, President Bush devoted much of

---

[448] Williams, *Organized Crime in Iraq: Strategic Surprise and Lessons for Future Contingencies*, at 51.

[449] *Id*. at 47.

[450] Kenneth Katzman (Specialist in Middle Eastern Affairs), CRS Report for Congress, *Al Qaeda in Iraq: Assessment and Outside Links*, at 17 (Aug. 15, 2008), https://tinyurl.com/2p8smj4d.

[451] Anand Gopal, *The Most Deadly US Foe in Afghanistan*, Christian Science Monitor (May 31, 2009), 2009 WLNR 10378180.

a speech to the argument that AQ-I is closely related to Al Qaeda's central leadership" and "noted the following details, including":

    *a.* "In 2004, Zarqawi formally joined Al Qaeda and pledged allegiance to bin Laden. Bin Laden then publicly declared that Zarqawi was the 'Prince of Al Qaeda in Iraq.' President Bush stated that, according to U.S. intelligence, Zarqawi had met both bin Laden and Zawahiri. He asserted later in the speech that, according to U.S. intelligence, AQ-I is a 'full member of the Al Qaeda terrorist network.'"

    *b.* "After Zarqawi's death, bin Laden sent an aide named Abd al-Hadi al-Iraqi to help Zarqawi's successor, al-Masri, but al-Iraqi was captured before reaching Iraq."

    *c.* "That a captured AQ-I leader, an Iraqi named Khalid al-Mashhadani, had told U.S. authorities that Baghdadi was fictitious. In July 2007, Brig. Gen. Bergner, a U.S. military spokesman, told journalists that Mashhadani is an intermediary between al-Masri and bin Laden and Zawahiri."

    *d.* "That AQ-I is the only insurgent group in Iraq 'with stated ambitions to make the country a base for attacks outside Iraq.' Referring to the November 9, 2005, terrorist attacks on hotels in Zarqawi's native Jordan, President Bush said AQ-I 'dispatched terrorists who bombed a wedding reception in Jordan.' Referring to an August 2005 incident, he said AQ-I 'sent operatives to Jordan where they attempted to launch a rocket attack on U.S. Navy ships' docked at the port of Aqaba."[452]

---

[452] Katzman, CRS Report for Congress, *Al Qaeda in Iraq: Assessment and Outside Links*, at 17- 18.

1157.   The United States government regularly published other reports and statements alerting Defendants that al-Qaeda-in-Iraq aided al-Qaeda.[453]

1158.   **United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports** alerted Defendants to the close relationship between al-Qaeda-in-Iraq and al-Qaeda-backed and affiliated terrorists in Afghanistan and Pakistan.  In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban" "continued to benefit from a close relationship with Al-Qaida and related foreign groups."[454] The U.N. regularly published similar reports between 2005 and 2021.

1159.   **Media reports** alerted Defendants that al-Qaeda-in-Iraq aided al-Qaeda, including al-Qaeda's operations and allies in Afghanistan and Pakistan.[455]

1160.   **Terrorism scholars** also alerted Defendants that al-Qaeda-in-Iraq aided al- Qaeda, including al-Qaeda's operations and allies in Afghanistan and Pakistan.[456]

---

[453] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2004* at 7 (Apr. 2005) ("The apparent mergers or declarations of allegiance of groups such as Abu Mus'ab al-Zarqawi's organization with al-Qa'ida suggest that al-Qa'ida is looking to leverage the capabilities and resources of key regional networks and affiliates — a trend that al-Qa'ida could also use to try to support new attacks in the United States and abroad."); The White House, *Press Release: The Rest of the Story: The NIE Reflects Previous Statements About the War on Terror* (Sept. 26, 2006) ("Terrorists Consider Iraq 'The Central Battlefield' In The War On Terror … [and have] made clear that the most important front in their struggle against America is Iraq – the nation bin  Laden has declared the 'capital of the Caliphate.' Hear the words of bin Laden: … 'The most… serious issue today for the whole world is this Third World War… [that] is raging in [Iraq].' … For al Qaeda, Iraq … is the central battlefield where the outcome of this struggle will be decided.'"), https://tinyurl.com/swccct8y.

[454] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).

[455] *E.g.*, Robert J. Caldwell, *Our Enemy, The Face Of Evil*, San Diego Union-Tribune (June 27, 2004) ("Zarqawi and his estimated 2,000 armed terrorists in Iraq are subsidiaries of the global al- Qaeda network. Their hate-filled ideology and savage methods are indistinguishable from the devil's brew that produced 9/11."), 2004 WLNR 16950014; Allan Massie, *Focus: Fight Terrorism, But Don't Make Things Worse By Calling It A War*, Scotsman (Sept. 7, 2006) ("Al-Qaeda, or its subsidiary connection, is active in Iraq, in Afghanistan and in the Afghan-Pakistan borderlands."), 2006 WLNR 15488717.

[456] *E.g.*, Peter Bergen, *After the War in Iraq: What Will the Foreign Fighters Do?*, *published in Bombers, Bank Accounts, & Bleedout*, at 110-12 ("[A]n Iraqi al-Qa'ida operative, Khalid al Mashadani, [] told his interrogators that he had acted as a conduit between the top leaders of al- Qa`ida in Iraq and bin Ladin and Zawahiri. … Mashadani revealed that there was 'a flow of strategic direction, of prioritization of messaging and other guidance that comes from the Al- Qa'ida senior leadership to the Al-Qa'ida in Iraq leadership. … AQI Attacks Outside of Iraq [were foreseeable because] … AQI [was] the only Iraqi insurgent group that ha[d] attacked American targets outside of the country, and ha[d] repeatedly said it plan[ned] to attack the United States itself."); Bombers, Bankers, & Bleedout, at 9, 12 ("AQI is increasingly linked to al-Qa`ida's senior leaders. AQI did not exist before the US invasion, but the organization has grown progressively more integrated with al-Qa`ida Central, especially following Abu Mus'ab al-

1161.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that their aid to al-Qaeda- in-Iraq foreseeably aided al-Qaeda's "core" in Afghanistan and Pakistan.  Indeed, as set forth below, these and other sources alerted Defendants to four ways that Qaeda operatives in Iraq aided their counterparts in Afghanistan: (a) funding; (b) fighters; (c) training; and (d) logistics.

   a.  *Defendants Knew Al-Qaeda-In-Iraq Funded Al-Qaeda*

1162.  From 2003 through 2022, Defendants knew that al-Qaeda-in-Iraq funded al- Qaeda's operations in Afghanistan and Pakistan.

1163.  **United States government reports and statements** alerted Defendants that al- Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. For example, Brigadier General Jeffrey Buchanan publicly stated in 2010 that, with respect to "al Qaeda, ... al Qaeda in Iraq ... remain[ed] ... [a]nd [al-Qaeda-in-Iraq was a] part of [al-Qaeda's] network," which meant that AQI's Iraq capabilities augmented "al Qaeda's ... ability to plan, coordinate and conduct complex operations, and in particular their ability to garner financial resources and raise money. ... [A]l Qaeda continues to change its tactics and how it adapts ... they've ... increased their extortion efforts, especially focused on ... truck drivers in the northern part of [Iraq].[457]

1164.  **Media reports** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. On July 26, 2007, for example, the media reported that a recent

---

Zarqawi's death. ... "Al-Qa'ida in Iraq demand[ed] our attention because it remain[ed] a tactical threat to American troops and, even in decline, ha[d] the potential to spread violence beyond Iraq's borders."); Daniel Byman, *The Resurgence of al Qaeda in Iraq, Testimony Before the Joint Hearing of the Terrorism, Nonproliferation, and Trade Subcommittee and the Middle East and North Africa Subcommittee of the House Committee on Foreign Affairs*, *republished by* Brookings Institution (Dec. 12., 2013) ("AQI [was] perhaps the most important Al Qaeda affiliate. ... Indeed, not only ha[d] it been responsible for the deaths of thousands of Iraqis, it ha[d] sponsored jihadist insurgents next door in Syria and played a significant role in bringing groups like Al Qaeda in the Islamic Maghreb into the Al Qaeda fold.") https://tinyurl.com/2p9hhy4x.

[457] Brigadier General Jeffrey Buchanan (U.S. Army, Director of Strategic Effects, U.S. Forces- Iraq), *quoted in* Federal News Service Transcripts, *Department of Defense Bloggers Roundtable via Teleconference with Brigadier General Jeffrey Buchanan, U.S. Army, Director of Strategic Effects* (Nov. 4, 2010), 2010 WLNR 27820761.

"National Intelligence Estimate" published by "all 16 U.S. intelligence agencies produced after painstaking review" determined that "al-Qaida [was] almost as strong as it was just before Sept. 11, 2001," "identifie[d] al-Qaida in Iraq (AQI) as the terrorist organization's 'most visible and capable affiliate,'" and noted that while "[t]he public version" of the National Intelligence Estimate did not "say so, [] AQI has raised significant money through criminal activities and [] now subsidiz[ed] al-Qaida central."[458]

1165.   **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq passed on some of its income to al-Qaeda in Afghanistan. Examples included, but were not limited to:

   a.   Daniel Byman, 2012: "al-Qa'ida[] … has sought financial help from affiliates and charged potential recruits for training."[459]

   b.   Dr. Matthew Levitt, 2014: "ISIS … was financially self-sufficient for about eight years as a terrorist and insurgent group before committing itself to running a proto-state. … AQI was financially independent by virtue of engaging in tremendously successful criminal activity enterprises domestically within Iraq. … Ayman al-Zawahiri … ask[ed] Zarqawi for money … when international efforts to target al Qaeda's financial channels were taking their toll on al Qaeda's coffers."[460]

1166.   Defendants' knowledge that al-Qaeda-in-Iraq funded al-Qaeda in Afghanistan extended specifically to their own protection payments because Defendants knew that al-Qaeda relied

---

[458] Porterville Recorder (California), *Editorial: An Increasing Threat From Al-Qaida: U.S.: Terror Group Has Regrouped In Pakistan, And Its Iraq Affiliate Is Raising Money, Gaining Expertise* (July 26, 2007), 2007 WLNR 14301976.

[459] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at 34.

[460] Dr. Matthew Levitt, *quoted in House Financial Services Committee Hearing "Terrorist Financing and the Islamic State." Testimony by Matthew Levitt, Director of the Stein Program on Counterterrorism and Intelligence, The Washington Institute for Near East Policy*, *republished in* U.S. Congressional News (Nov. 13, 2014), 2014 WLNR 32049841.

upon al-Qaeda-in-Iraq's protection rackets in Iraq to fund al-Qaeda's operations after 9/11. For example, as al-Qaeda scholar Daniel Byman of the Brookings Institution explained, "[t]he documents discovered in Bin Laden's compound in Abbottabad suggests that the Al Qaeda core is now relying on affiliates for funding, rather than the other way around. Affiliates, in turn, often engage in crime, … to gain money."[461]

1167.   Defendants also knew that their financial aid to al-Qaeda also aided the Haqqani Network. Media reports, for example, alerted Defendants that al-Qaeda and its branches, including al-Qaeda-in-Iraq, funded and logistically sustained the Haqqanis.[462]

1168.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that al-Qaeda-in-Iraq funded al-Qaeda's "core" in Afghanistan and Pakistan.

> a. *Defendants Knew Al-Qaeda-In-Iraq Terrorists Served Al- Qaeda In Afghanistan, Pakistan, And The Persian Gulf*

1169.   Defendants always knew that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells.

1170.   **United States government reports and statements** alerted Defendants that al- Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells.  Examples of such reports include, but are not limited to:

---

[461] Daniel L. Byman, *Al Qaeda, the Islamic State, and the Global Jihadist Movement: What Everyone Needs to Know* 196-97 (Oxford Univ. Press 2015).

[462] *See, e.g.*, Anand Gopal, *The Most Deadly US Foe in Afghanistan*, Christian Science Monitor (May 31, 2009) ("Officials say the Haqqanis use money from Al Qaeda-linked sources … to finance their operations."), 2009 WLNR 10378180.

a.  The White House, September 2006:  "Fighters with experience in Iraq are a potential source of leadership for jihadists pursuing these tactics."[463]

b.  Congressional Research Service, August 2008:  "[T]here are indications that ['Al Qaeda in Iraq (AQ-I)'] leaders are relocating from Iraq to join Al Qaeda leaders believed to be in remote areas of Pakistan, near the Afghanistan border. … [I]f accurate, [this] could suggest that AQ-I now perceives Afghanistan as more fertile ground than is Iraq to attack U.S. forces. The relocation of AQ-I leaders to Pakistan could also accelerate the perceived strengthening of the central Al Qaeda organization."[464] "[R]eports of significant AQ-I relocations to the Pakistan tribal areas bordering Afghanistan … suggest that the links are tightening between AQ-I and Al Qaeda's central leadership as represented by Osama bin Laden and Ayman al-Zawahiri. Both Al Qaeda leaders are widely believed to be hiding in areas of Pakistan near the border with Afghanistan, and many assessments since 2007 say that Al Qaeda is enjoying increasing freedom of movement and action in the border regions. If Al Qaeda's ranks are now augmented by an influx of AQ-I fighters from [] Iraq …, it could be argued that Al Qaeda's overall capabilities to … undermine U.S. efforts [in] Afghanistan, have been increased."[465]

c.  Senator Richard Lugar, October 2009:  "[T]he National Intelligence Strategy … explains that violent extremists, quote, 'are planning to use terrorism …to

---

[463] The White House, *Press Release: The Rest of the Story: The NIE Reflects Previous Statements About the War on Terror* (Sept. 26, 2006), https://tinyurl.com/swccct8y.

[464] Kenneth Katzman (Specialist in Middle Eastern Affairs), *CRS Report for Congress, Al Qaeda in Iraq: Assessment and Outside Links*, at CRS-8 (Aug. 15, 2008), https://tinyurl.com/2p8smj4d.

[465] *Id*. at CRS-17.

attack the United States. Working in a number of regions, these groups aim to … attack U.S. strategic partners and otherwise challenge U.S. interests worldwide,' … This network of extremist Al Qaida cohorts has sprung up across the globe, and its affiliates have aligned their actions and rhetoric with the core Al Qaida leadership in Pakistan to gain notoriety and financing. The largest Al Qaida affiliate, … remains Al Qaida in Iraq. Some of its foreign fighters are returning home to local terrorist branches. … These and other extremists … are connected to a Pakistan core and its nexus of training, planning and operations."[466]

    *d.*  <u>State Department, June 2020</u>: "Although al-Qa'ida in Afghanistan and Pakistan has been seriously degraded, key figures among AQ's global leadership, as well as its regional affiliate al-Qa'ida in the Indian Subcontinent (AQIS), continued to operate from remote locations in the region that historically served as safe havens."[467]

1171. United **Nations al-Qaeda/Taliban sanctions monitoring team reports** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells. In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban" "continued to benefit from a close relationship with Al-Qaida and related foreign groups" with al-Qaeda supplied "non-Afghans" "found fighting alongside the Taliban, or operating in supporting cells."[468] In 2008, similarly, the same U.N. sanctions team published another report

---

[466] Senator Richard Lugar (R-IN), *quoted in* CQ-Roll Call Political Transcriptions, *Sen. John Kerry Holds a Hearing on Al Qaida in Afghanistan* (Oct. 7, 2009) (cleaned up), 2009 WLNR 31263570.
[467] U.S. Dep't of State, *Country Reports on Terrorism 2019* at 148 (June 2020).
[468] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).

that referenced the relocation of al-Qaeda-in-Iraq terrorists to al-Qaeda core in Afghanistan and Pakistan and concluded that "foreign fighters, mainly Uzbeks and Arabs, some of whom may have arrived recently from Iraq [i.e., redeployed al-Qaeda-in-Iraq operatives] … appear to be playing an increasingly important role as advisers" to the Taliban and, through such role, made a key "contribut[ion] to [the Taliban's] success" against Americans in Afghanistan.[469]

1172.　**Media reports** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda "core" in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells. Examples include, but are not limited to:

　　　　a.　Ottawa Citizen, February 2006: "Al-Qaeda militants are moving from Iraq to Afghanistan to fight with the Taliban, officials said yesterday, after the capture of several suspected foreign guerrillas. Authorities in Nimroz province reported the arrest of four men, three Kashmiri Pakistanis and an Iraqi, in an ominous escalation of the threat to NATO forces. … [T]he Iraqi has admitted to being part of a group of al-Qaeda-linked fighters dispatched from Iraq to fight western forces, including Canadians, in Afghanistan. If true, the revelation would show how al-Qaeda is channelling terror back to the country its leadership was forced to flee after the September 2001 attacks in the United States. … 'There is a big group coming from Iraq,' said the Nimroz governor Ghulam Dusthaqir Azad. 'They're linked to al-Qaeda and fought against U.S. forces in Iraq. They have been ordered to come here. Many are suicide bombers.' … The captured Iraqi … was part of a group of 17 militants travelling individually from Iraq to Afghanistan. 'We handed him over to the

---

[469] U.N. Security Council, *Eighth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 22 (May 14, 2008).

anti-terrorism department and they have made several arrests based on information from him,' said Mr. Azad."[470]

b.  NPR, September 2006:  "CHADWICK: You talk about the tactics employed in Iraq … and say that indeed you foresee these tactics spreading to central Asia and that the war on terror is observed by fighters in all these areas who are learning from one another. Mr. RASHID: That's very true. … with the Taliban … this current offensive that they have launched against NATO troops in southern Afghanistan, we are seeing quite phenomenally new tactics: brilliant ambushes, the use of explosive devices, suicide bombings. Now a lot of this seems to have come from Iraq."[471]

c.  ABC News, July 2008:  "DAVID MUIR (ABC NEWS): … General David Petraeus, said [] that he now sees signs that some al Qaeda fighters are retreating from Iraq and refocusing on Afghanistan. … What are you hearing on the ground [in Afghanistan]?

d.  JIM SCIUTTO (ABC NEWS): … US commanders are seeing evidence of that, both in the east and in the south, so are Afghans reporting seeing more foreign fighters, particularly Arab fighters on this side of the border. … Senator Obama's visit today to Jalalabad was telling. Jalalabad is on the Pakistan border and it is Pakistan that both the US and Afghanistan blame for giving refuge to the Taliban and al Qaeda."[472]

---

[470] Tom Coghlan, *Afghans Arrest Iraqi Sent In By Al-Qaeda: Link Suspected, But Never Proved; Detainee Admits Ties To Terror Group*, Ottawa Citizen (Feb. 3, 2006), 2006 WLNR 26438455. 448 Ahmed Rashid, *quoted in* NPR Day to Day, *Has U.S. Already Lost Round One in 'War on Terror'?* (Rashid, *Has U.S. Already Lost Round One*) (Sept. 13, 2006), 2006 WLNR 22951747.

[471] Ahmed Rashid, *quoted in* NPR Day to Day, *Has U.S. Already Lost Round One in 'War on Terror'?* (Rashid, *Has U.S. Already Lost Round One*) (Sept. 13, 2006), 2006 WLNR 22951747.

[472] ABC World News Saturday, *World News Tonight Saturday* (July 19, 2008), 2008 WLNR 13596167.

e. <u>New York Post, July 2008</u>: "After intense US assaults, al Qaeda may be considering shifting focus to its original home base in Afghanistan, where American casualties are running higher than in Iraq, the top US commander in Iraq said yesterday. 'We do think that there is some assessment ongoing as to the continued viability of al Qaeda's fight in Iraq,' Gen. David Petraeus said. Whatever the result, Petraeus said no one should expect al Qaeda to give up entirely in Iraq."[473]

f. <u>Providence Journal, August 2008</u>: "[M]uch of the fighting has shifted from Iraq to Afghanistan. Combat has sharpened in the latter as al-Qaida retreats from Iraq. The flow of foreign jihadists to Iraq has shrunk as more travel to Afghanistan to support al-Qaida and the Taliban. According to Brian Glyn Williams, who researches jihadist Web sites at West Point, 'Iraq is seen as a defeat. The image of Afghanistan is seen as a more pristine jihad.' As U.S. casualties decline in Iraq (13 were killed in July), and as political stability and reconciliation there grow, American soldiers have become four times more likely to be killed in combat in Afghanistan than in Iraq."[474]

g. <u>Reuters, December 2008</u>: "The [alleged U.S.] document said [former Pakistani ISI Lieutenant-General Hamid] Gul had knowledge of the relocation of al Qaeda fighters from Iraq to the Pakistan-Afghan border region this year …"[475]

---

[473] N.Y. Post, *Iraqi Qaeda in 'Afghan Retreat'* (July 20, 2008), 2008 WLNR 13673888.
[474] Providence Journal, *Editorial - Shift Toward Afghanistan* (Aug. 7, 2008), 2008 WLNR 31970104.
[475] Simon Cameron-Moore, *Pakistan Ex-Spy Chief: US Wants Him On Terror List*, Reuters News (Dec. 7, 2008).

1173. **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq fighters also regularly redeployed to al-Qaeda in Afghanistan and Pakistan, where they melted into existing joint al-Qaeda/Taliban cells. Examples of such reports include, but are not limited to:

   a. Ahmed Rashid, 2006: "NATO has told me that there is traffic in men … between Iraq and Afghanistan. … So there's now a kind of cross-fertilization going on, which, of course, is very, very dangerous."[476]

   b. Peter Bergen, Joseph Felter, Vahid Brown, and Jacob Shapiro, 2008: "There is a strong risk of blowback from Iraq. Relatively small numbers of Jihadis will 'bleedout' to fight elsewhere, but they will likely be very dangerous individuals. … Foreign fighters in Iraq have also acquired a number of useful skills that can be used in future terrorist operations, including massive use of suicide tactics, organizational skills, propaganda, covert communication, and innovative improvised explosive device (IED) tactics. Some AQI fighters that have already trickled out of Iraq have bolstered violent movements in Saudi Arabia and Lebanon. This trend will likely continue. … [F]ighters are most likely to join established Jihadi groups in areas of weak government control, such as Afghanistan."[477]

   c. Michael Lieberman, 2009: "Bygones were bygones by 2007, when, after retreating from Iraq, al Qaeda was met with open arms back in Afghanistan. As Abdel Bari Atwan (who, like Bergen, has had the pleasure of interviewing

---

[476] Rashid, *Has U.S. Already Lost Round One*.
[477] *Bombers, Bankers, & Bleedout*, at 7.

bin Laden) notes, 'the alliance between [al Qaeda] and the Taliban is currently stronger than it has ever been.'"[478]

    *d.*  <u>Daniel Byman, 2012</u>: "[A] group may choose to affiliate with al-Qa'ida [because] …• A Haven. One of the most important determinants of a terrorist group's success is whether  it has a haven from which to operate. Al-Qa'ida ran training camps, operated safe houses, and otherwise established a large infrastructure in support of terror. These facilities were an attractive resource for groups looking for a safe environment. … • Common Defense. Because groups share havens, training facilities, and so on with al-Qa'ida, when these locations are targeted …, the groups join al-Qa'ida in fighting back."[479]

    *e.*  <u>Seth Jones, 2013</u>: "[A]l-Qaida in Iraq [] regenerate[d] … [and] al-Qaida in Iraq … establish[ed] Jabhat al-Nusra in Syria.  Those were two … devastating steps in that region that the U.S. withdrawal from Iraq at least allowed.  … [T]hat means that … Afghanistan … will be quite important … an active al-Qaida presence up in Kunar, Nuristan and Nangarhar provinces, … create[s] the possibility for a re-establishment of the organization in an area that it does have local allies."[480]

    *f.*  <u>Daniel Byman, 2013</u>: "AQI-linked conflict is at the heart of the problem of spillover in the Middle East. What happens in Iraq does not stay in Iraq: it has already helped infect Syria, and the furies unleashed by the conflict shape the

---

[478] Michael Lieberman (Fellow, Truman National Security Project), *Al Qaeda and the Taliban Still Tied in a Knot*, Moderate Voice (Dec. 17, 2009), 2009 WLNR 25404336.
[479] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at iv-v.
[480] Seth Jones (RAND Corp.), *quoted in* Federal News Service Transcripts, *Hearing of the Terrorism, Nonproliferation and Trade Subcommittee of the House Foreign Affairs Committee Subject: "Global al-Qaida: Affiliates, Objectives and Future Challenges"* (July 18, 2013), 2013 WLNR 17723295.

politics of Iran, Saudi Arabia, Turkey, and other states. The spillover may even go beyond the Middle East."[481]

1174.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published similar reports and statements that alerted Defendants that al-Qaeda-in-Iraq operatives regularly deployed to serve al-Qaeda's "core" in Afghanistan and Pakistan.

        *a.   Defendants Knew al-Qaeda-In-Iraq Provided Key Training to Al-Qaeda and the Taliban*

1175.   Defendants always knew that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists, and their Taliban allies (including the Haqqani Network) in Afghanistan and Pakistan. According to Peter Bergen, "al Qaeda" facilitated training in Iraq by Sunni terrorists for al-Qaeda's allies in Afghanistan, "the senior leadership of the Taliban and al Qaeda have morphed together ideologically and tactically," and "al Qaeda has learned from Iraq, and the Taliban have learned from the playbook in Iraq."[482]

1176.   Defendants knew that al-Qaeda-in-Iraq trained al-Qaeda and Taliban terrorists through "live fire" training exercises in Iraq.

1177.   **United Nations al-Qaeda/Taliban sanctions monitoring team reports** alerted Defendants that al-Qaeda-in-Iraq provided vital training to al-Qaeda and Taliban (including Haqqani Network) terrorists in Afghanistan, Pakistan, and Iraq.  In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban's" "close relationship with Al- Qaida and related foreign groups" were the route through which "Al-Qaida attack techniques have [] become more evident in Afghanistan, with at least 56 suicide bombings

---

[481] Daniel L. Byman, *The Resurgence of al Qaeda in Iraq, Testimony Before the Joint Hearing of the Terrorism, Nonproliferation, and Trade Subcommittee and the Middle East and North Africa Subcommittee of the House Committee on Foreign Affairs, republished by* Brookings Institution (Dec. 12., 2013), https://tinyurl.com/2p9hhy4x.
[482] Peter Bergen, *Assessing the Fight Against Al-Qaeda: Hearing Before the Permanent Select Committee on Intelligence* (Apr. 9, 2008), https://tinyurl.com/bdzdsrbb.

between 1 January and 27 July 2006, compared with 21 in all 2005, and only 10 between September 2001 and December 2004."[483] Moreover, the U.N. reported, "[n]ew explosive devices are now used in Afghanistan within a month of their first appearing in Iraq."[484] Indeed, reported the U.N., "there have been reports of" "Taliban" from "Afghanistan/Pakistan" "training in [] Iraq." [485] The U.N. regularly published similar reports between 2005 and 2021.

1178.  **Media reports** alerted Defendants that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists and their Taliban allies (including the Haqqani Network) in Afghanistan and Pakistan. Examples include, but are not limited to:

> a. Philadelphia Inquirer, April 2006: "Islamic extremists in Iraq are providing military training and other assistance to Taliban and al-Qaeda fighters from eastern and southern Afghanistan and Pakistan's tribal areas, U.S. intelligence officials [said] … Pakistanis and Afghans are receiving military training in Iraq; Iraqi fighters have met with Afghan and Pakistani extremists in Pakistan; and extremists in Afghanistan increasingly are using homemade bombs, suicide attacks and other tactics honed in Iraq, said U.S. intelligence officials and others who track the issue. Several Afghan and Pakistani 'exchange students' volunteered to join the fight against American and Iraqi forces in Iraq, but they were told to return to Afghanistan and Pakistan to train others there, two U.S. intelligence officials said. … Seth Jones, a specialist on Afghanistan … said: '…[T]here is absolutely no question that the partial evidence strongly suggests that there have been increasing contacts between

---

[483] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).
[484] *Id.*
[485] *Id.*

Afghan insurgents and Iraqi insurgents either in Iraq itself or in Pakistan; the trail is going in both directions.' Extremists traveling to or from Iraq mostly are making their way on routes used by drug traffickers and smugglers through Pakistan's province of Baluchistan … and southern Iran … Tactics that have proved effective in Iraq, especially homemade bombs, suicide and car bombs, and secondary ambushes … increasingly are being used in Afghanistan … 'Everybody accepts that there has been a qualitative shift in the sophistication of these attacks,' said Marvin Weinbaum, a former State Department intelligence expert who is now at the Middle East Institute."[486]

b.  Xinhua News Agency, April 2007: "An al-Qaida-related group in Iraq said … that [Iraq] has become 'a university of terrorism' in an audio recording posted [online]. Abu Omar al-Baghdadi … said …, '[O]ne of the (enemy) devils was right in saying that if Afghanistan was a school of terror, then Iraq is a university of terrorism.'"[487]

c.  Washington Times, May 2007: "[The Taliban] gleaned [lessons] from … skills honed in Iraq. … al Qaeda's trusted Arabs have resumed their roles as military trainers and media advisers for the Taliban … al Qaeda trainers [] facilitate travel for Afghan militants who move between Afghanistan and Iraq and regularly 'wave' to each other over the Internet. In one recent video, Abu Laith al-Libi, a senior Libyan trainer for the Taliban in Afghanistan, sends a

---

[486] Jonathan S. Landay and John Walcott, *Insurgents in Iraq Exporting Tactics; They Are Training Taliban and al-Qaeda fighters, Intelligence Officials Said. Violence Could Escalate in Afghanistan, Complicating U.S. Withdrawal Plans*, Philadelphia Inquirer (Apr. 1, 2006).
[487] Xinhua News Agency, *Militant Group Says Iraq "University of Terrorism"* (Apr. 17, 2007).

message of encouragement to Iraqi insurgents from an al Qaeda and Taliban training base inside Afghanistan."[488]

d.  South China Morning Post, October 2016: "Pakistan and Afghanistan are no strangers to veteran jihadis. Both hosted militants who fought for al-Qaeda against US occupation forces in Iraq between 2003 and 2006. … Zarqawi[] lived in the Pakistani city of Peshawar for nine years prior to [9/11]. Hand-picked Afghan and Pakistani militants from groups allied with al-Qaeda subsequently undertook 'live training' tours of Iraq under the tutelage of al-Zarqawi … and others who have since assumed positions of responsibility in [Islamic State]. While there, they learnt new tactics and skills – notably the use of [IEDs] and suicide bombs – and introduced them in Afghanistan … in 2005."[489]

1179.  **Terrorism scholars** alerted Defendants that al-Qaeda-in-Iraq terrorists regularly provided key training to al-Qaeda "core" terrorists and their Taliban allies (including the Haqqani Network) in Afghanistan and Pakistan. Such reports included, but were not limited to:

a.  Ahmed Rashid, 2006:  "Iraqi/al-Qaida members have come to Afghanistan to train the Taliban here."[490]

b.  Peter Bergen, 2008 and 2009:  "Ability to Export Tactical Innovation[.] … Iraqi suicide and IED tactics are exported from Iraq into the Afghan theater against US … forces. These tactics were learned both by copycatting the Iraqi

---

[488] Philip Smucker, *Taliban Learns Tactics, Propaganda From Al Qaeda*, Wash. Times (May 30, 2007), 2007 WLNR 10111354.
[489] Tom Hussain (Pakistan Affairs Analyst), *In Old Stomping Grounds, Reasons To Be Fearful*, South China Morning Post (October 30, 2016), 2016 WLNR 33357299.
[490] Rashid, *Has U.S. Already Lost Round One*.

insurgency and by sending Jihadis to Iraq for on-the-job training. The Taliban has increasingly adopted suicide attacks, [IEDs], and the beheadings of hostages—all techniques that al-Qa'ida perfected in Iraq. Mullah Dadullah, a key Taliban commander … in 2006 … noted, 'we have 'give and take' relations with the mujahidin in Iraq.' Suicide operations … became prevalent in 2005 after the Taliban saw their success in Iraq. Members of al-Qa'ida Central such as Abdul Hadi al-Iraqi, Omar al-Farouq and Hassan Ghul have been captured or killed either in Iraq or travelling there."[491] "Al Qaida has influenced the Taliban ideologically and tactically to a very great degree. The reason that we're having an epidemic of suicide attacks and beheadings of hostages and IED attacks is because the Taliban sent people to Iraq to learn from the insurgency, and they copy-catted the insurgency."[492]

1180.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that al-Qaeda-in- Iraq regularly provided essential training to serve al-Qaeda's "core" and the Taliban, including its Haqqani Network, in Afghanistan and Pakistan.

> a.   Defendants Knew Al-Qaeda-In-Iraq Provided Key Logistical Aid To Al-Qaeda

1181.  Defendants always knew that al-Qaeda-in-Iraq terrorists regularly provided key logistical aid to al-Qaeda "core" terrorists in Afghanistan and Pakistan.

---

[491] Peter Bergen, *After the War in Iraq: What Will the Foreign Fighters Do?*, *published in Bombers, Bank Accounts, & Bleedout*, at 112.
[492] Peter Bergen, *quoted in* CQ-Roll Call Political Transcriptions, *Sen. John Kerry Holds a Hearing on Al Qaida in Afghanistan* (Oct. 7, 2009) (cleaned up), 2009 WLNR 31263570.

1182.   United Nations al-Qaeda/Taliban Sanctions Monitoring Team reports alerted Defendants that al-Qaeda-in-Iraq provided key logistical aid to al-Qaeda "core" in Afghanistan and Pakistan. In 2006, for example, the U.N.'s al-Qaeda/Taliban sanctions team reported that "[t]he Taliban" "continued to benefit from a close relationship with Al-Qaida and related foreign groups" with al-Qaeda supplied "non-Afghans" "found fighting alongside the Taliban, or operating in supporting cells."[493]

1183.   Media reports and terrorism scholars alerted Defendants that al-Qaeda-in-Iraq terrorists regularly provided key logistical aid to al-Qaeda "core" terrorists in Afghanistan and Pakistan. In 2006, for example, NPR interviewed terrorism scholar Ahmed Rashid, who explained that it was "very true," with respect to "the tactics employed in Iraq and in south Lebanon and elsewhere," that one should "foresee these tactics spreading to central Asia [i.e., Afghanistan and Pakistan] and that the war on terror [was] observed by fighters in all th[494]ese areas who are learning from one another" because "there [was] traffic in … materials between Iraq and Afghanistan … [and] cross-fertilization."[495] In 2008, similarly, terrorism scholar Daniel Byman

1184.   reported that al -Qaeda-in-Iraq's "[l]ogistics" "offer[ed] al-Qa'ida access to [al-Qaeda-in-Iraq's] media resources, recruiters, and other core parts of their organizations."

1185.   From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that al-Qaeda-in- Iraq regularly provided key logistical aid to al-Qaeda's "core" in Afghanistan and Pakistan.

**Defendants Knew Islamic State's Role**

---

[493] U.N. Security Council, *Fifth Report of the Analytical Support and Sanctions Monitoring Team* ¶ 11 (Sept. 20, 2006).
[494] Byman, *Breaking the Bonds Between Al-Qa'ida and its Affiliate Organisations*, at v.
[495] Rashid, *Has U.S. Already Lost Round One*.

b. <u>Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States</u>

1186.   Defendants knew that Islamic State waged a global terrorist campaign against the United States in which Islamic State attacked Americans in Europe, Iraq, Syria, Afghanistan, and elsewhere to drive the United States out of the Middle East.

1187.   Defendants knew about Islamic State's global terrorist campaign against the United States, including its key focus on Iraq, because Defendants' employees and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants – knew such fact to be true.

1188.   Defendants also knew that Islamic State terrorists in Iraq and Syria would foreseeably redeploy to Afghanistan.[496]

1189.   United States government reports alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States while Islamic State acted as a caliphate from 2014 through 2017.[497]

1190.   Throughout Islamic State's "caliphate" era from 2014 through 2017, U.S. government reports and statements alerted Defendants that Islamic State's terrorist campaign against the

---

[496] *See*, *e.g.*, Clarke, *After the Caliphate: The Islamic State & the Future Terrorist Diaspora*, at 24.

[497] *See*, *e.g.*, The White House, *Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL)* (Sept. 10, 2014) ("Islamic State … poses a clear threat to the people of Iraq and Syria, … the broader Middle East, as well as U.S. persons, allies and interests in the region.  Left unchecked, ISIL could pose a growing threat beyond the region …"), http://tinyurl.com/6yce8e3z; Office of the Director of National Intelligence, *Counterterrorism Guide: Islamic State of Iraq and the Levant (ISIL)* (2015) (In June 2014, ISIL unilaterally declared the establishment of an Islamic caliphate and called on all Muslims to pledge allegiance to the group. Since then, ISIL has announced the establishment of eight provinces outside of Iraq and Syria, including in Afghanistan and Pakistan …"), https://tinyurl.com/yckhbv89; U.S. Dep't of State, *Country Reports on Terrorism 2016* at 8 (July 2017) ("ISIS attacks outside its territorial strongholds in Iraq, Syria, and Libya were an increasingly important part of its terrorism campaign in 2016. Most of these attacks took place in countries where ISIS has a declared branch, such as Afghanistan …."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2017– September 30, 2017*, at 26 (Nov. 3, 2017) ("ISIS: Global Reach[.] … Several of the affiliates have acquired funding, weapons, recruitment, and tactics from core ISIS. …ISIS-associated groups were also active in … Afghanistan ...").

United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business.[498]

1191.  Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.[499]

1192.  Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western

---

[498] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2015* at 178-79 (June. 2016) ("Iraq witnessed a continued surge of terrorist activity in 2015, primarily as a result of the actions of [] Islamic State …, which has occupied large areas of the country since early 2014. … Terrorist groups continued to mount a large number of attacks throughout the country."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2016–December 31, 2016*, at 8 (Feb. 2, 2017) ("[W]hile fighting in Iraq and Syria centered on the battles for Mosul and Raqqah, ISIL militants continued insurgent activity outside of those areas in both countries. For example, ISIL militants reactivated  networks in Anbar province and carried out suicide attacks near Karbala in southern Iraq and at checkpoints leading to Fallujah and Amiriyal al-Fallujah."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017*, at 47 (May 6, 2017) ("ISIS's [recent] activity signaled that [it] was transitioning … to an insurgency … In Iraq, ISIS's insurgent activity consisted of harassing attacks and suicide bombings in the central and western parts of [Iraq]. … ISIS continued to use IED and VBIED attacks … in Baghdad … [and] suicide and VBIED attacks in Anbar …").

[499] *E.g.*, The White House, *National Strategy for Counterterrorism of the United States of America*, at 8 (Oct. 2018) ("ISIS remains … the primary transnational terrorist threat to the United States … ISIS retains the financial and material resources and expertise to launch external attacks—including against United States interests—and its senior leaders continue to call for attacks against the United States. The group's global reach remains robust, with eight official branches … regularly conducting terrorist and insurgent operations across Africa, Asia, Europe, and the Middle East."); U.S. Dep't of State, *Country Reports on Terrorism 2018* at 9 (Oct. 2019) ("ISIS's global presence evolved with affiliates and networks conducting attacks in the Middle East, South and East Asia, and Africa. Additionally, battle-hardened terrorists headed home from the war zone in Syria and Iraq or traveled to third countries, posing new dangers."); U.S. Dep't  of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021) ("Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2021–December 31, 2021*, at 23 (Feb. 8, 2022) ("ISIS-Core Leads a Global Organization[.] … ISIS-Core leaders in Iraq and Syria continued to manage the group as a global caliphate, maintaining an element in Iraq and Syria dedicated to overseeing the group's branches around the world. Since 2014, ISIS has incorporated existing jihadist groups or upstart elements into its global organization, expanding into the Arabian Peninsula, South … Asia, Eurasia, Turkey, and Africa. … ISIS leaders provided the group's branches with guidance, media support, and funding.").

Iraqi provinces in which Defendants did business. Such reports included, but were not limited to:

a. State Department, September 2018: "ISIS remained a terrorist threat … and continued to carry out suicide, hit-and-run, and other asymmetric attacks throughout [Iraq]."[500]

b. State Department, October 2019: "Reverting to clandestine tactics following its loss of territory, ISIS … sought to reestablish support among populations in Ninewa, Kirkuk, Diyala, Salah ad Din, and Anbar provinces, in particular. Although ISIS maintained the capability to conduct deadly terrorist attacks in Iraq, these attacks resulted in fewer casualties in 2018 than in 2017."[501]

c. State Department, June 2020: "ISIS continued to present a serious threat to Iraqi stability … ISIS sought to reestablish support among populations in Ninewa, Kirkuk, Diyala, Salah ad Din, and Anbar provinces, especially in the areas of disputed control between the Kurdistan Regional Government (KRG) and the federal government …"[502]

d. LIGOIR, November 2020: "Kirkuk province consistently ranks as one of the most violent provinces in Iraq … The northern Iraqi province, parts of which are claimed by both the central Iraqi government and the semi-autonomous Kurdistan Regional Government (KRG), remains a focal point of ISIS's rural insurgency in Iraq. Both the territorial dispute and the sectarian divide in Kirkuk aid ISIS's survival in [Kirkuk]'s challenging physical terrain. … ISIS

---

[500] U.S. Dep't of State, *Country Reports on Terrorism 2017* at 229 (Sept. 2018).
[501] U.S. Dep't of State, *Country Reports on Terrorism 2018* at 117 (Oct. 2019).
[502] U.S. Dep't of State, *Country Reports on Terrorism 2019* at 117 (June 2020).

[] survive[s] as a lingering insurgency in Kirkuk. … ISIS remains most prevalent in the rural and mountainous regions of southern Kirkuk, where [ISIS] is organized in small insurgent cells. In particular, ISIS exploits the rugged terrain of the Hamrin, Qarachokh, and Makhmour Mountains for safe haven and to evade counterterrorism forces …. Similarly, ISIS uses valleys in [Kirkuk] … to launch mostly small-scale attacks, including ambushes, IED attacks, and small-arms fire that target local security elements, civilians, and infrastructure. … ISIS frequently intimidates, coerces, and kidnaps local civilian and tribal leaders [in Kirkuk] … to obtain resources."[503]

e.   LIGOIR, May 2021: "ISIS remained entrenched in rural areas throughout Iraq and retains freedom of movement, particularly in rugged mountain and desert regions … ISIS continued to exploit ethnic, sectarian, and political tensions… ISIS fighters in Iraq continued to operate in small, mobile cells that primarily conduct simple hit-and-run attacks … ISIS regularly targeted infrastructure, security and military positions, and civilians … ISIS focused its activity during the quarter in Anbar, Diyala, Kirkuk, and Salah ad Din provinces, and in areas surrounding Baghdad and Mosul. … ISIS continues to use the permeable border between Iraq and Syria to smuggle members and affiliates to safe havens it has established in rural and permissive areas, where it can conceal its operations and leaders, avoid security patrols, and intimidate the local population."[504]

---

[503] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2020–September 30, 2020*, at 20 (Nov. 3, 2020).

[504] Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021*, at 16 (May 4, 2021).

     *f.*  State Department, December 2021: "Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a worldwide terrorism campaign, carrying out deadly attacks globally. Illustrating the evolving threat, ISIS affiliates outside Iraq and Syria caused more fatalities during 2020 than in any previous year. ISIS maintained an active presence and low-level insurgency in Iraq and Syria, with increased attacks in both countries during the first half of 2020. In South … Asia, ISIS radicalized individuals to violence, inspiring them to conduct attacks."[505]

"While ISIS remains unable to control territory and its leadership ranks have been significantly degraded, the group remains a serious threat to U.S. interests, security in the region, and beyond. In Iraq and Syria, ISIS fighters continued to wage a low-level insurgency, seeking to destabilize the region, recruit new members, and regain territory.

1193.  … Beyond Iraq and Syria, ISIS branches, networks, and supporters across the Middle East and North Africa remained active, including in the Arabian Peninsula, Libya, the Sinai Peninsula, Tunisia, and Yemen."[506] "Despite its territorial defeat, ISIS continued to conduct operations on a smaller scale, particularly in the North and West [of Iraq], including rural areas … ISIS sought to reestablish footholds in Anbar, Diyala, Kirkuk, Ninewa, and Salah al-Din provinces, especially in the areas of disputed control between the Kurdistan Regional Government and the federal government."[507]

---

[505] U.S. Dep't of State, *Country Reports on Terrorism 2020* at 2 (Dec. 2021).
[506] *Id*. at 112.
[507] *Id*. at 120.

1194.  **Terrorism scholars** alerted Defendants to the globally interconnected nature of Islamic

State's campaign against the United States.  For example, terrorism scholar Katherine Bauer

reported in 2018 that Islamic State's "most significant recent attacks have been traced back to

groups or 'provinces' operating outside of Syria and Iraq."[508]

1195.  From 2003 through 2022, the U.S. government, media, terrorism scholars, and others

published other reports and statements that similarly alerted Defendants that Islamic State

waged a globally integrated terrorist campaign against the United States.

Defendants Knew Protection Payments Aided Islamic State

1196.  Defendants knew protection payments aided Islamic State because Defendants' employees

and agents in the United States, Sweden, and Iraq – whose knowledge is imputed to Defendants

– knew such fact to be true.

1197.  **United States government reports** alerted Defendants that their protection payments

aided Islamic State's caliphate from 2014 through 2017.[509]

---

[508] Katherine Bauer (Fellow, Washington Institute for Near East Policy), *Survey of Terrorist Groups and Their Means of Financing*, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance, at 4 (Sept. 7, 2018), http://tinyurl.com/mter35be.

[509] *E.g.*, U.S. Dep't of State, *Country Reports on Terrorism 2014* at 354, 9, 171 (June 2015) ("ISIL receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … ISIL … use[d] … criminal activities to raise funds for operational purposes. … ISIL earned up to several million dollars per month through its [] extortion networks … In 2014, ISIL derived income from [*inter alia*] … extortion, illegal 'taxation,' … and foreign donations. … [T]he United States used sanctions to ensure that banks, companies, and citizens across the world did not engage in financial transactions with ISIL."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report to the United States Congress, April 1, 2015–June 30, 2015*, at 46 (Aug. 24, 2015) ("ISIL … use[d] … criminal activities to raise funds for operational purposes. Much of ISIL's funding, … was [] gathered in Iraq and Syria. ISIL earned up to several million dollars per month through its [] extortion networks …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, September 30, 2015*, at 58, 61, 63, 64-5 (Nov. 25, 2015) ("ISIL … derives most of its revenue from its control of territory[,] [including] extortion/taxation … ISIL's funds come from several key sources[,] [including] … taxes and extortion from the occupied territories … Most of these constitute a 'sophisticated extortion racket[] … [R]eceipts that confirm ISIL is collecting a 20% 'khums tax' … and that the tax collections are being enforced across the territory it controls. … ISIL also requires local populations in those territories to pay it a percentage of any salary (largely paid in cash). ISIL further imposes 'taxes' on all types of business activities. … ISIL 'stands to profit from taxing all of the sources of revenue to the tune of hundreds of millions of dollars per year.'"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Quarterly Report to the United States Congress, October 1, 2015−December 31, 2015*, at 70-72 (Feb. 16, 2016) ("ISIL's extortion [] and taxation… have funded its military machine for years. …

1198.   Similar U.S. government reports alerted Defendants that their protection payments aided

Islamic State's "global insurgency" from 2018 through 2022.[510]

---

ISIL's administrative apparatus enables it to generate revenue through taxation … and the collection of fees for everything [including] sales of goods … [O]il is second only to taxation and extortion as a source of income for ISIL."); U.S. Dep't of State, *Country Reports on Terrorism 2015* at 6 (June. 2016) ("ISIL relies heavily on extortion and the levying of 'taxes' on local populations under its control …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017*, at 45-46 (May 6, 2017) ("ISIS continued to be able to finance operations in Iraq and Syria … ISIS generates the majority of its revenue from … taxes [] and extortion …"); U.S. Dep't of State, *Country Reports on Terrorism 2016* at 408 (July 2017) ("ISIS receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, April 1, 2017–June 30, 2017*, at 23 (Aug. 3, 2017) ("Coalition airstrikes also killed [ISIS] financial facilitators … and destroyed several ISIS cash storage facilities in Iraq and Syria. Fawaz al-Rawi and Samir Idris were accused of moving millions of dollars for the ISIS network. However, … ISIS still generates millions of dollars … from illegal taxation and extortion …").

[510] *E.g.*, U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing*, at 25 (2018) ("ISIS derives most of its revenue from … the extortion and taxation of civilian populations and economies in Iraq and Syria … However, ISIS also receives limited financial support from within the United States. … U.S.-based individuals have raised or solicited funds specifically for the group itself. These funds are often derived from legitimate sources as well as from small-scale criminal activity. ISIS financiers and supporters abroad also send funds to other ISIS supporters or regional affiliates in foreign jurisdictions that may be routed through the U.S. financial system and may seek to procure sensitive or controlled goods from U.S.-based companies."); U.S. Dep't of State, *Country Reports on Terrorism 2017* at 304, 132 (Sept. 2018) ("ISIS received most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … In 2017, the Government of Iraq … continued to dismantle ISIS's financial activity and safeguard its financial institutions from exploitation by ISIS. Iraq enforced a national directive to prohibit financial transactions with banks and financial companies located in ISIS-controlled areas. It … prohibited … companies located in ISIS-held areas and those suspected of illicit activity from accessing U.S. banknotes… Iraq also barred ISIS financial facilitators … from Iraq's financial system and froze all of their assets."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2018–December 31, 2018*, at 21-22, 31 (Feb. 4, 2019) ("[T]he bulk of ISIS financial and military resources is generated in Iraq and Syria, … ISIS branches worldwide contribute varying degrees of support to the ISIS leadership… ISIS continued to extort money from both individuals and construction companies seeking to rebuild destroyed infrastructure. … ISIS could insert operatives into the reconstruction effort to siphon off money. … Extortion remains a major source of income for [ISIS] … Independent analysts also suggested that ISIS would likely seek to extort companies engaged in  reconstruction in Iraq, and would also insert operatives into reconstruction entities to divert funds to terrorist activities. … [A]part from these efforts, ISIS in Iraq gains revenue from [inter alia] … taxation …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, October 1, 2019–December 31, 2019*, at 41 (Feb. 4, 2020) ("ISIS Generates Revenue Even After Loss of Territory … ISIS continues to generate revenue by [*inter alia*]… extortion, and … front companies."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020*, at 20, 51 (May 13, 2020) ("[E]ven with its territorial defeat, ISIS continues to generate funds in Syria through extortion … and the use of front companies. … ISIS is increasingly brazen in its revenue-producing activities in Iraq and Syria. … ISIS members [] openly extort[] …. ISIS [is] able to move more freely [and] extort protection money …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021*, at 15 (May 4, 2021) ("ISIS generated revenue from extortion, … and moves resources to its safe havens and to operatives throughout Iraq. … ISIS used similar fundraising tactics in Syria, targeting civilian businesses … for possible utilization as front companies."); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many

1199. **Financial Action Task Force ("FATF") reports** alerted Defendants that protection money payments played a key role in financing Islamic State's operations around the world, including in Iraq, Syria, and Afghanistan. For example, the FATF published guidance concerning Islamic State terrorist finance in February 2015, which concluded, among other things, that:

    *a.* "[F]unding is central and critical to [Islamic State's] activities. … ISIL's primary sources of revenue … include … extortion … Cutting off these vast revenue streams is … [an] opportunity … to defeat this terrorist organisation."[511]

    *b.* "ISIL is operating in vast swathes of land across Syria and northern Iraq, allowing ISIL to exploit the local population and material resources through extortion … ISIL takes advantage of the resources in this domain, … taxing local economies. … ISIL obtains the vast majority of its revenues through local criminal and extortion activities …"[512]

    *c.* "ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as … extortion, … illicit taxation of goods and cash that transit territory where ISIL operates; … (3) donations …"[513]

    *d.* "ISIL manages a sophisticated extortion racket by … demanding a portion of the economic resources … [like] how … organized crime groups generate

---

clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …").

[511] Financial Action Task Force, *FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL)*, at 5 (Feb. 2015), https://tinyurl.com/5b98bmbh.

[512] *Id.* at 10

[513] *Id.* at 12

funds. This vast range of extortion, including everything from … vehicle taxes to school fees …, is done under the auspices of providing notional services or 'protection.'"[514]

e.  "ISIL has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies paid." [515]

f.  "Trade of goods and transfers of cash into and out of ISIL-held territory has been significantly disrupted due to the weak security environment. However, according to industry contacts and press reporting, some trade of goods has persisted, as have cash transfers necessary for financing this trade. ISIL is able to impose levies on all goods transiting territory where it operates. ISIL has reportedly imposed specific taxes on the movement of goods in parts of Iraq where it operates, including a road tax of 200 USD in northern Iraq and an 800 USD 'customs' tax on trucks entering Iraq …"[516]

g.  "Some delegations identified terrorist financing risks regarding wire transfers from charitable foundations to conflict zones or areas where ISIL operates. Other risks identified include … raising funds for recipients in a third country which are or are suspected to be part of an organisation [] that engages in violent … activities. These risks are enhanced when the source of the funds and purpose of the transaction is not known or cannot be verified. These instances include transactions not listing any reference or using generic terms

---

[514] *Id.*

[515] *Id.*

[516] *Id.* at 17.

such as 'other', 'services' and 'goods'. In some cases, public appeals for donations have not correlated with the organisations' stated purpose (e.g. educational, health care or humanitarian relief)." [517]

   h.   "ISIL[] will always require funds for operational support and to meet broad organisational requirements. … This report … identif[ied] the most important sources of ISIL funding, particularly … extortion …"[518]

1200.   **Media reports** alerted Defendants that protection payments aided Islamic State. In 2014, for example, *Forbes* analyzed Islamic State's tax rules, which alerted Defendants that their protection payments directly financed anti-American terrorism:

   a.   "Initially, [ISIS] depended on outright violence to raise cash. But as ISIS made the transition to [Islamic State], its revenue extraction became more sophisticated. … ISIL enforced taxes on a variety of commercial activities, including telecommunications companies that had relay towers in ISIL-controlled zones."

   b.   "The New York Times [] noted the extent to which ISIS is regularizing its … tax process … 'Many … received official receipts stamped with the ISIS logo … These forms of taxation … increasingly carry the trappings of regularized tax collection."[519]

1201.   In 2015, the *New York Times* reported the typical experience of any businesses operating inside Islamic State-controlled territory:

---

[517] *Id.* at 19

[518] *Id.* at 32.

[519] Joseph Thorndike, *How ISIS Is Using Taxes To Build A Terrorist State*, Forbes (Aug. 18, 2014), https://tinyurl.com/5c3wa2ap.

a. "Three times a month, Mohammad al-Kirayfawai hands $300 to fighters from the Islamic State for the privilege of driving his refrigerated truck full of ice cream and other perishables from Jordan to a part of Iraq where the militants are firmly in charge. The fighters who man the border post treat the payment as an import duty, not a bribe. They even provide a stamped receipt, with the logo and seal of the Islamic State, that Mr. Kirayfawai, 38, needs for passing through other checkpoints on his delivery route."

b. "Across wide expanses of Syria and Iraq, [] Islamic State … has set up a predatory and violent bureaucracy that wrings every last American dollar … it can from those who live under its control or pass through its territory."

c. "Islamic State[] … exact[ed] tolls and traffic tickets; rent for government buildings; utility bills for water and electricity; taxes on income, crops and cattle; and fines for smoking or wearing the wrong clothes."

d. "'They fight in the morning and they tax in the afternoon,' said Louise Shelley, … of the Terrorism, Transnational Crime and Corruption Center at George Mason University."

e. "[A]s Western and Middle Eastern officials have gained a better understanding of the Islamic State's finances over the past year, a broad consensus has emerged that its biggest source of cash appears to be the people it rules, and the businesses it controls."

f. "Inside that territory, [] Islamic State … has taken over the legitimate revenue collection operations of the governments it has usurped. And it has …

extract[ed] as much as it can from the people, businesses and property it now controls."

g.   "Another Islamic State department, the Diwan al-Rikaz, or the Office of Resources, oversees … a long list of other businesses now controlled by the militants. It operates … mobile phone companies … skimming revenues from all of them."

h.   "The Islamic State also demands a cut of the revenues earned by small businesses. 'We either pay in [goods] or cash, it depends on the production,' said Tarek, a Syrian …"

i.   "Officials of the so-called caliphate dislike the term 'tax,' preferring the Islamic term 'zakat,' which refers to the alms Muslims are required to pay. Although the norm would be 2.5 percent of a person's wealth under typical interpretations of Islamic law, the militants are taking 10 percent, justifying the high rate by saying they are a 'nation in a time of war,' according to a citizen journalist in Raqqa …"

j.   "Islamic State is extracting as much as $800 or $900 million, possibly more, from residents or businessmen inside the territory it controls."

k.   "[U.S. government] [o]fficials assume that the Islamic State must be circulating the money it collects back out into the regional and global financial system since there have not been signs of the kind of rampant inflation that could result from a large influx of currency into a relatively small economy closed off from the surrounding markets."[520]

---

[520] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, New York Times (Nov. 29, 2015).

1202. From 2014 through 2017, similar media reports alerted Defendants that protection payments aided Islamic State during its caliphate era.[521]

1203. From 2018 through 2022, similar media reports alerted Defendants that protection payments aided Islamic State during its post-caliphate global insurgency era.[522]

---

[521] *E.g.*, Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014) ("In … Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses …"), 2014 WLNR 425449; APS Diplomat Operations in Oil Diplomacy, *Ninewah Autonomy Efforts & Petroleum Projects* (Mar. 3, 2014) ("Said to have an IRGC-run base in Iran near Iraq's north-eastern province of Diyala, the ISIS extorts money from business owners in Mosul, funding to fuel its activities in Iraq and Syria. … The tactical alliance between the IRGC and the ISIS is one of the strange things despite the fact that the Neo-Salafi group is killing many Iraqi Shi'ite Arabs …"), 2014 WLNR 5861825; Guy Taylor, *Al-Baghdadi, A Brutal Contender For Bin Laden's Mantle, Emerges In Iraq*, Washington Times (June 13, 2014) ("Under al-Baghdadi's leadership, ISIL's strategy has involved … running 'protection rackets' … in northern Iraq. [] [T]he mafia-style tactics may bring in piles of local cash …"), 2014 WLNR 15982987; Der Spiegel Staff, *The New Face of Terror ISIS; Rise Pushes Iraq to Brink*, *reprinted in* Yerepouni Daily News (Lebanon) (June 26, 2014) ("[F]unding comes from … protection money extorted in Mosul and other Sunni cities in Iraq."), 2014 WLNR 17314098; Lee Smith and Hussain Abdul-Hussain, *On The Origin Of ISIS*, Weekly Standard (Sept. 8, 2014) ("Nor are ISIS's money-raising schemes especially novel in the Middle East. … [one of ISIS's … main source[s] … is taxation …"), 2014 WLNR 38032996; Steven Mufson, *Islamic State Fighters Drawing On Oil Assets For Funding And Fuel*, WashingtonPost.com (Sept. 16, 2014) ("Islamic State has obtained revenue by imposing tariffs, [and] exacting protection money …"), 2014 WLNR 25578145; Economist Intelligence Unit, *MENA Politics: The Pushback*, EIU ViewsWire (March 23, 2015) ("[Islamic State] is left with … extortion and taxes levied in the name of *zakat*, Islamic alms."), 2015 WLNR 8488485; Worcester Telegram & Gazette (MA), Editorial, *Our View: Time to Lead* (Dec. 6, 2015) ("ISIS has grown into the world's most dangerous terrorist organization, financed - some say $50 million per month - by [inter alia] … taxes, tolls and extortion from the people living within or entering its borders."), 2015 WLNR 36138427; Senate Armed Services Committee, Advance Questions for General Joseph L. Votel, U.S. Army Nominee for Commander, U. S. Central Command, Targeted News Service, *Gen. Votel Testifies at Hearing on Nomination to be Commander, U.S. Central Command* (Mar. 9, 2016) ("General Joseph L. Votel" "testi[fied] [that]" "Mosul will remain [Islamic State's] finance hub as [Islamic State] likely will increasingly rely on extortion and tax revenue streams ..."); CNN: Early Start, *Trump Escalates War on News Media; Clinton Returns to California to Fight Sanders; Fierce Fighting in Falluja. Aired 4:30-5a* (June 15, 2016) ("ISIS still has a $2 billion empire thanks in part to new taxes. That's according to a new report from the Center for the Analysis of Terrorism, which … says ISIS made $2.4 billion in 2015. … the main reason why is taxes."), 2016 WLNR 16677887; Pioneer, *ISIS Down, Not Out: Ways To Kill It* (July 9, 2016) ("ISIS first occupied significant stretches of territory in Iraq and Syria … It has raised its finances quite skilfully by … engaging in … extortion, [and] levying of taxes, in territories held by it."), 2016 WLNR 20848601; Patrick Wintour, *Saudi Arabia Must Do More To Prevent Secret Funding Of ISIS, MPs Say*, Guardian (July 12, 2016) ("In a report on … ISIS finances, the [U.K. Parliament] claims [ISIS] in Iraq and Syria is increasingly desperate for more money, … resorting to 'gangsterism and protection rackets' disguised as taxation."), 2016 WLNR 21120198; Vivian Salama, Associated Press, *reprinted in* Canadian Press, *As Territory Shrinks, IS Group Looks For New Money Sources* (Oct. 19, 2016) ("[Former Treasury official Daniel] Glaser said … Islamic State … generated some $30 million per month … from taxation and extortion in 2015. Hisham al-Hashimi, an expert on IS…, said [Islamic State] currently makes about $4 million per month from taxes in Mosul alone. Al-Hashimi said the group charges a 4 per cent income tax on salaries less than $600 per month, and 5 per cent on monthly salaries between $600 and $1,000."); Karen DeYoung and Philip Rucker, *Trump Summons Muslim Nations To Confront 'Islamic Terror Of All Kinds'*, WashingtonPost.com (May 21, 2017) ("Islamic State … has largely funded itself through [inter alia] extortion and taxes … in Syria and Iraq …"), 2017 WLNR 15782138.

[522] *E.g.*, Jonathan Walker, *Source Of Terror Group's Millions Uncovered In New Report By North MP; Oil, Tax, And Trade Key To Daesh*, Sunday Sun (Apr. 29, 2018) ("ISIS raised billions of pounds from [inter alia] … taxing millions of residents … ISIS used a number of lucrative revenue streams to finance its operations across the globe … In recent

1204.   Terrorism scholars further alerted Defendants that their protection payments aided Islamic State.[523]

1205.   From 2014 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements similarly that alerted Defendants that their protection payments aided Islamic State's terrorist campaign.

<u>Defendants Knew Islamic State's Core In Iraq And Syria Facilitated Attacks By Islamic State's Branch In Afghanistan</u>

1206.   Defendants always knew that Islamic State, like al-Qaeda, pursued a globally interconnected campaign against the United States, and therefore that Defendants' aid to

---

years [Islamic State] has attempted to make up for the loss of oil revenue by extracting money from the people living in the remaining territory it controls. Almost everything was taxed, including cash withdrawals, salaries, and roads. It also charged a 'protection' tax for non-Islamic residents."), 2018 WLNR 13011934; Ellen Ioanes, *Here's What's Left Of ISIS — And Why They Still Pose A Major Threat*, Business Insider (Aug. 27, 2019) ("[J]ust because ISIS no longer has a caliphate, that doesn't mean it doesn't have influence or power in the places it once controlled — and that it's not still incredibly dangerous. … In both Iraq and Syria, ISIS is making money by … [*inter alia*] extorting civilians, and skimming funds off rebuilding contracts …").

[523] Jean-Charles Brisard and Damien Martinez (Al-Qaeda Scholars), *Islamic State: The Economy-Based Terrorist Funding*, at 5 (Thomson Reuters Accelus Oct. 2014) ("Since its inception, the [Islamic State] has relied on" "criminal activity to fund its activities, targeting businessmen, local politicians and clerics, in addition to foreign nationals."), https://tinyurl.com/2d26cvxx; Professor Jimmy Gurulé, *quoted in House Financial Services Committee Hearing on "Terrorist Financing and the Islamic State"; Testimony by Jimmy Gurule, Law Professor, Notre Dame Law School*, *republished in* U.S. Congressional News (Nov. 13, 2014) ("ISIS is primarily self-funded. … illicit taxation systems are also a significant source of income for ISIS. …The … ATA could be used against … [persons] that knowingly transfer funds … to … ISIS."), 2014 WLNR 32049937; *Foundation for Defense of Democracies Vice President, Research Jonathan Schanzer, Prepared Testimony Before the House Financial Services Committee Hearing On Task Force To Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing*, *republished in* SEC Wire (Apr. 22, 2015) ("[O]ne dominant trend we continue to observe: the intersection of terrorism and crime. Designated terrorist groups … rather easily [] exploit[] existing businesses and levying oppressive taxes and tolls on the populations they dominate. The Islamic State, for example, extracts taxes …"); *Center For Strategic And International Studies Senior Adviser Mr. Juan C. Zarate, Prepared Testimony Before The House Financial Services Committee Hearing On Task Force TO Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing, As Released By The Committee*, *republished in* SEC Wire (Apr. 22, 2015) ("Islamic State is able to tax … the local population - raising taxes and fees as pressure mounts… This model of financing is not new. For years, al Qaida in Iraq had … extorted … to raise money …"); Peter R. Neumann, *Don't Follow The Money: The Problem With The War On Terrorist Financing*, Foreign Affairs (July 1, 2017) ("[O]nly one thing can truly revolutionize a terrorist group's finances: the seizure of territory. Until 2013, ISIS made most of its money from protection rackets, Iraq's illicit economy, and, to a much lesser extent, foreign donations. But in 2013 and 2014, the group captured vast swaths of … eastern Syria and northern Iraq. By mid-2014, when ISIS declared its caliphate, some six million to eight million people lived under its rule.  The group's finances skyrocketed … ISIS collects taxes, charges fees, and levies tariffs on trade; the group's 2014 revenues from such measures exceeded $300 million."), 2017 WLNR 22264271.

Islamic State's "core" in Iraq and Syria facilitated attacks by Islamic State's "branch" in Afghanistan.

1207.  From 2014 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that similarly alerted Defendants that Islamic State's "core" in Iraq and Syria facilitated attacks against Americans by Islamic State's "branch" in Afghanistan and Pakistan. Indeed, as set forth below, reports by the U.S. government, media, terrorism scholars, and international organizations alerted Defendants to at least two ways that Islamic State's "core" in Iraq and Syria aided attacks by Islamic State's "branch" in Afghanistan and Pakistan: (a) funding; and (b) fighters.

> a.  *Defendants Knew Islamic State's "Core" Funded Islamic State's Branch In Afghanistan*

1208.  Defendants always knew that Islamic State's "core" in Iraq and Syria funded the operations of Islamic State's "branch" in Afghanistan and Pakistan.

1209.  U.S. government reports alerted Defendants that Islamic State's "core" in Iraq and Syria funded the operations of Islamic State's "branch" in Afghanistan.[524]

---

[524] U.S. Office of the Director of National Intelligence, *ISIL Finances: Future Scenarios*, at 17 (Aug. 1, 2016) ("ISIL will need to transfer funding to its affiliates abroad."); U.S. State Dep't, *Country Reports on Terrorism 2016* at 409 (July 2017) ("Funding and External Aid: ISIS-K receives some funding from ISIS."); U.S. State Dep't, *Country Reports on Terrorism 2017* at 305 (Sept. 2018) ("Funding and External Aid: ISIS-K receives some funding from ISIS. Additional funds come from taxes and extortion on the local population and businesses."); U.S. State Dep't, *Country Reports on Terrorism 2018* at 294 (Oct. 2019) ("Funding and External Aid: ISIS-K receives some funding from ISIS. Additional funds come from illicit criminal commerce, taxes, and extortion on the local population and businesses."); Gregory Sullivan (Audit Director, Treasury Department), *Memorandum for Department of Defense Lead Inspector General, Subject: Operation Inherent Resolve - Summary of Work Performed by the Department of the Treasury Related to Terrorist Financing, ISIS, and Anti-Money Laundering for First Quarter Fiscal Year 2021*, at 4 (Jan. 4, 2021) (ISIS continued to move funds in and out of Iraq and Syria, often relying on ISIS facilitators in Turkey and in other financial centers … [ISIS] continued to transfer funds in Iraq and Syria and internationally using money services businesses … located throughout Iraq, Syria, and Turkey."), http://tinyurl.com/erxfykay; Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2021– September 30, 2021*, at 23 (Nov. 4, 2021) (ISIS continued to move funds in and out of Iraq and Syria, often relying on ISIS facilitators in Turkey and in other financial centers … [ISIS] continued to transfer funds in Iraq and Syria and internationally using money services businesses … located throughout Iraq, Syria, and Turkey.").

1210.  Indeed, United States government reports and statements alerted Defendants that their protection payments to Islamic State in Iraq foreseeably aided Islamic State's attacks in Afghanistan.[525]

1211.  **Media reports** alerted Defendants that that Islamic State's "core" relied upon protection money income in Iraq and Syria to fund Islamic State's "branch" operations in Afghanistan.[526]

---

[525] U.S. Dep't of the Treasury, *National Terrorist Financing Risk Assessment*, at 14-15 (Aug. 24, 2015) ("GLOBAL SOURCES OF TERRORIST FINANCING[.] In order to operate, [Islamic State] requires significant funding. … ISIL [] operates sophisticated extortion rackets throughout Iraq and Syria, including extracting payments for the use of public highways … Through these schemes, ISIL can receive upwards of several million dollars a month of revenue."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2016–September 30, 2016*, at 44 (Nov. 4, 2016) ("To makeup the funding gap, ISIL has increasingly resorted to … arbitrary tax increases, which now serve as ISIL's primary source of income. Outside of Iraq and Syria, ISIL continued to operate in concert with local extremist Sunni groups. … In Afghanistan, ISIL elements are active in eastern provinces."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, January 1, 2018–March 31, 2018*, at 32 (May 5, 2018) ("ISIS continued to generate income from extortion[] [and] taxation, … Arms dealers and other middlemen who engaged in transactions with the group told reporters that the group had transferred as much as $400 million out of Iraq …"); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2018–September 30, 2018*, at 45-46, 3 (Nov. 5, 2018) ("ISIS remained able to generate revenue from [inter alia] … extortion and taxes … and external donations. It also continued to draw on cash reserves. Overall, … a 'reduced, covert version' of ISIS will survive in Iraq and Syria and will maintain a presence in neighboring countries and affiliates in multiple countries, including Afghanistan … [A]t least some of ISIS's bureaucratic structures remained intact, and ISIS continued to derive revenue from … extortion, and cash reserves."); U.S. Dep't of State, *Country Reports on Terrorism 2018* at 292 (Oct. 2019) ("ISIS received most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion… ISIS continues to generate revenue from criminal activities and provides financial support to its network of global branches …"); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria… include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …").

[526] Pamela Engel, *A Top US General Picked Apart Donald Trump's ISIS Policy*, Business Insider (Aug. 13, 2015); U.S. Dep't of State, *Country Reports on Terrorism 2020* at 275 (Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches…"); Tom Brooks-Pollock, *Paris Attacks: Where Does ISIS Get Its Money And Weapons From? Where Does ISIS Get Its Money, Guns And Bombs, Both In Europe And In The Middle East?*, Independent Online (Nov. 19, 2015) ("Where does ISIS get its money, guns and bombs, both in Europe and in the Middle East? … To a large extent ISIS is now funding itself – through … [*inter alia*] extortion, [and] taxes …"), 2015 WLNR 34405923; Julianne Geiger, *Is ISIS Back?*, SyndiGate, *reprinted in* Yerepouni Daily News (Oct. 21, 2019) ("Through its extortion …'subsidiar[y]', ISIS threatened commercial enterprises primarily in eastern Syria and western  Iraq in sophisticated protection rackets. … ISIS … 'taxes' netted ISIS around $800 million annually … Taxes included everything from 'welfare' and 'salary' taxes to road taxes, customs taxes for trucks entering Iraq at Syrian checkpoints; non-Muslim protection taxes, and a long list of others. The thing is, ISIS doesn't rely on territory for its economic survival today. It's raised enough to invest and stash away. … In part, that's because its surviving leadership may have smuggled as much as $400 million in cash and gold out of Iraq and Syria. [ISIS]'s extended network will seek to launder this money through front companies in

1212. **Terrorism scholars** alerted Defendants that funds paid to Islamic State's "core" in Iraq and Syria foreseeably aided the operations of Islamic State's "branch" in Afghanistan and Pakistan. In 2018, for example, terrorism scholar Katherine Bauer reported that "[t]he Islamic State's recognition of franchises in eight countries across the Middle East [including Afghanistan] … in November 2014, raised concerns that … [Islamic State] core in Syria and Iraq would share both its wealth and its fundraising expertise with its new affiliates."[527]

1213. From 2014 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that payments to Islamic State's "core" foreseeably financed Islamic State's "branch" in Afghanistan and Pakistan.

      a. *Defendants Knew Fighters from Islamic State's "Core" Served Islamic State's Branch In Afghanistan*

1214. Defendants always knew that Islamic State "core" fighters also regularly redeployed to Islamic State's "branch" in Afghanistan and Pakistan, which Islamic State "core" established with its fighters in the first instance and used as a safe haven for its fighters thereafter, who, like their al-Qaeda cousins, melted into existing Islamic State cells.

1215. **U.S. government reports and statements** alerted Defendants that Islamic State "core" fighters also regularly redeployed to Islamic State's "branch" in Afghanistan.[528]

---

the region … Since the defeat, [ISIS] is raising money through … extortion …"), 2019 WLNR 31720287; Sanjeev Sharma, *Zakat Payments Being Redirected Towards ISIL Affiliates*, Indo-Asian News Service (Feb. 8, 2022) ("Global affiliates of ISIL … raise funds through a variety of methods, including extortion, [and] illicit taxation … ISIL leadership exerts sufficient operational control over its reserves to allow the transfer of significant sums to certain affiliates abroad. … ISIL-K has received in the low hundreds of thousands of dollars from [] ISIL core … ISIL core is assessed to have allocated in excess of $500,000 for the support of ISIL-K.").

[527] Katherine Bauer (Fellow, Washington Institute for Near East Policy), *Survey of Terrorist Groups and Their Means of Financing, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance*, at 3 (Sept. 7, 2018), http://tinyurl.com/mter35be.

[528] *E.g.*, U.S. State Dep't, *Country Reports on Terrorism 2017* at 8 (Sept. 2018) ("ISIS … and [its] affiliates have … adjusted to heightened counterterrorism pressure in Iraq, Syria, Afghanistan, kevin, Somalia, Yemen, and elsewhere. … [T]he return or relocation of foreign terrorist fighters from the battlefield has contributed to a growing cadre of experienced, sophisticated, and connected terrorist networks, which can plan and execute terrorist attacks."); Lead Inspector General for Overseas Contingency Operations, *Operation Inherent Resolve, Report to the United States Congress, July 1, 2018–September 30, 2018*, at 46 (Nov. 5, 2018) ("DoD and the United Nations expressed concern

1216.  From 2014 through 2022, Defendants were alerted that their Islamic State's "core" deployed fighters from Iraq and Syria to Islamic State's "branch" in Afghanistan and Pakistan by other reports regularly published by the U.S. government and media.

**DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL**

### 1.   Defendants Provided Support Tailored To The Violence At Issue Here

1217.  Defendants' aid was tailored to the specific violence at issue: Defendants provided U.S. dollars which the Relevant Terror Organizations required to finance their terrorist campaigns in Iraq, Afghanistan, Syria, and Turkey.

1218.  Money supplied the lifeblood of the terrorist campaigns waged by al-Qaeda, al-Qaeda-in-Iraq and Islamic State. Financing gave these FTOs the means to recruit and pay terrorist fighters; to acquire weapons and explosives with which to attack Americans; and to maintain the vast operational infrastructure needed to sustain the global campaign, including their key regional branches, in Iraq, Afghanistan, Syria, and Turkey.[529] As Representative Ted Poe, Chair of the U.S. House of Representatives Subcommittee on Terrorism, stated in 2015, "[t]ime and time again we are reminded of the massive damage that terrorists cause even with just a little money" – "precisely why our government" has "been tasked with stemming the flow of money to terrorist groups." Simply put, according to Congressman Poe, "[w]hen we can separate the terrorists from their money, lives can be saved." Defendants did the opposite.

1219.  Ericsson's conduct aided al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprises. The very nature of the protection-money demands – backed by violent threats

---

about the presence of foreign ISIS fighters in Syria. … Many fighters, it said, have melted into the local population, while others remain in hiding in neighboring countries. … [M]any fighters had made their way to Afghanistan."); U.S. State Dep't, *Country Reports on Terrorism 2018* at 161-62 (Oct. 2019) ("Countries in Central Asia remained concerned about the potential spillover of terrorism from Afghanistan, as well as the potential threat posed by the return of individuals from Central Asia who traveled to Iraq or Syria to fight with terrorist groups, including ISIS.").
[529] Given Islamic State's assumption of al-Qaeda-in-Iraq's protection money operation, including AQI's tactics techniques, and procedures, the points in this section apply equally to ISIS.

conveyed by the same the Relevant Terror Organizations terrorists who were waging a vicious campaign against the United States in Iraq and Afghanistan – ensured a close connection between the payments and subsequent the Relevant Terror Organizations attacks on Americans. Such attacks were a foreseeable, if not necessary, consequence of Defendants' payments. When Defendants paid the Relevant Terror Organizations protection money, they were not lessening the overall risk of terrorist violence; they were paying the Relevant Terror Organizations to redirect their attacks to other targets. One prevailing slogan among private-security contractors in Afghanistan captured the mentality that prevailed in Iraq: contractors often said, "you want them to fight Big Army [*i.e.*, the U.S. Army] before they fight you." Defendants' payments accomplished exactly that. They paid the Relevant Terror Organizations to attack Coalition forces rather than Defendants' own businesses.

1220. Defendants' protection payments supplied the Relevant Terror Organizations with an important stream of revenue that was used to finance and facilitate those FTOs' terrorist attacks against Americans in Iraq, Afghanistan, Syria, and Turkey. Defendants' protection payments, which created an income stream overseen directly by leadership of each group, gave the Relevant Terror Organizations fungible resources that were vital to their ability to sustain al-Qaeda's and Islamic State's respective terrorist enterprises. For that reason, the Commission on Wartime Contracting observed that, "[i]n Iraq and Afghanistan, significant … issues include[d]" "diversion of contract funding to the insurgency" through "payments commonly made for safe passage of U.S. convoys and for protection of U.S. personnel performing reconstruction projects" "as a cost of doing business" at "a significant percentage of a project's cost[,]" which caused "U.S. funds" "[i]n Iraq and Afghanistan" to be "diverted to insurgents"

and "directly strengthen[ed] the insurgency" such that Defendants caused "a disproportionate adverse impact on the U.S. effort" to combat terrorism in both countries.

1221. The Relevant Terror Organizations institutionalized control of their protection money revenue. The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency. The Relevant Terror Organizations promulgated rules and regulations dictating to local field commanders how to collect (and spend) protection money from foreign businesses. The money flowed both ways – from local commanders up to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's respective financial commissions for use by such FTOs' central leadership, and conversely from the leadership back down to local commanders for use in the field in Iraq, Afghanistan, Syria, and Turkey. That discipline allowed protection money collected from all over Iraq and Syria to finance al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist machine in Iraq, Syria, and Afghanistan.

1222. Defendants' protection payments similarly financed the Haqqani Network. Defendants' payments to al-Qaeda aided the Haqqani Network because al-Qaeda was a key Haqqani Network financier and specifically funded Haqqani Network suicide and IED operations, among others.

1223. Protection payments supplied the Relevant Terror Organizations with the means to buy weapons and explosives for use in terrorist attacks. Weapons capable of killing and injuring Americans cost money, and Defendants' protection payments provided al-Qaeda, al- Qaeda-in-Iraq, and Islamic State, and the Haqqani Network (through al-Qaeda), with a potent  and reliable source of funding to cover the cost of their globalized terrorist campaigns targeting the United States in Iraq, Afghanistan, Syria, and Turkey.

1224.  Protection money payments, like those made by Defendants, delivered the budget surplus to al-Qaeda-in-Iraq, and later Islamic State "core," that was the direct, but-for cause of (a) al-Qaeda-in-Iraq's substantial financial transfers to al-Qaeda's "core" in Afghanistan and Pakistan from 2004 through 2014, and Islamic State core's transfers to Islamic State's branches in Afghanistan and Pakistan from 2014 through 2022; and (b) al-Qaeda's and al-Qaeda-in-Iraq's ability to consistently attract the best terrorist "talent" from 2004 through 2014, and Islamic State's similar recruitment ability from 2014 through 2022.

1225.  With respect to finance, the sheer volume of Defendants' protection payments allowed al-Qaeda and al-Qaeda-in-Iraq to generate large budget surpluses that funded al-Qaeda and al-Qaeda-in-Iraq attacks from 2004 through at least 2016, and allowed Islamic State "core" in Iraq and Syria to generate large budget surpluses that funded Islamic State's operations during its caliphate era (2014-2017) and during its post-caliphate, global insurgency era (2018-2022). Among other things, such surpluses gave the Relevant Terror Organizations vital "rainy day" money that funded attacks well after Defendants' payments, which such FTOs used to fund their operations and strategic redeployments, such as when al-Qaeda-in-Iraq personnel transferred to Afghanistan from 2006 through 2014, or when Islamic State's core created and operated Islamic State's branch in Afghanistan and Pakistan from 2016 through 2022.

1226.  With respect to talent, al-Qaeda-in-Iraq (and later, Islamic State) leveraged budget power to outspend rival Sunni insurgents as al-Qaeda-in-Iraq consolidated its grip on the entire Sunni insurgency in Iraq (which tactic Islamic State replicated a decade later).  Al-Qaeda-in-Iraq generally paid its rank-and-file members around $40-$50 per month (in the 2000s) and $100 per month (in the 2010s, as did Islamic State) and paid its mid-level fighters – the center of

gravity for al-Qaeda's terrorist campaign in Iraq – around $200-$400 per month (as did Islamic State).

1227.   Al-Qaeda-in-Iraq's and Islamic State's respective budget surpluses due to their protection money riches, however, allowed al-Qaeda-in-Iraq and ISIS commanders to win the struggle for terrorist talent by outspending all challengers and going up to $1,000 per month per fighter; the next closest Sunni insurgent group, in contrast, could not afford to spend more than $250. To put that in context, Iraq's soldiers and police were paid about $150 a month.

1228.   Al-Qaeda-in-Iraq's and Islamic State's budget surpluses also funded bonuses that incentivized attacks against Americans in Iraq including rewards of: $10 per day for spies who supported attacks with intelligence; $100 to $200 for a successful IED attack; $500 to $700 for destroying an American vehicle; and $7,000 for shooting down a helicopter.

1229.   The effect of protection payments was especially pronounced because they enabled the Relevant Terror Organizations cell leaders to pay recruits who fought against the Coalition in Iraq and Afghanistan for financial (rather than ideological) reasons.  Al- Qaeda, al-Qaeda-in-Iraq, and Islamic State cell leaders typically operated on thin margins and faced constant pressure to raise enough money both to pay fighters and to launch attacks.

1230.   Protection money was essential to fulfilling both needs.  Had Defendants refused to pay and cut off that source of revenue, it would have forced the Relevant Terror Organizations commanders to, as one U.S. official put it, "deci[de] between paying and feeding [their] troops and launching attacks."  Defendants' payments freed the Relevant Terror Organizations commanders from that choice and enabled them to retain their fighters while continuing with well-funded attacks on Coalition forces in Iraq and Afghanistan.

1231.   This financial link applied to protection payments to the Relevant Terror Organizations in all their types.  Due to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's fundraising apparatus, cash payments to local commanders (or the FTO's Financial Commission) flowed to the FTO's leadership for use wherever the terrorists decided to focus their resources.

1232.   Protection payments by Western multinational corporations like Ericsson supplied one of the most quantitatively significant sources of terrorist finance for al-Qaeda, al-Qaeda-in- Iraq, and Islamic State. For each FTO, protection payments were always one of the top two fundraising tactics, and for most of al-Qaeda-in-Iraq's and Islamic State's existence, protection money ranked number one. The systematic payments effected by large international companies swamped other, smaller-scale protection rackets.

1233.   Protection payments also strengthened the Relevant Terror Organizations by allowing such FTOs to diversify their income.  For designated terrorist groups subject to crippling international sanctions, diversification was critical because it offered al-Qaeda, al- Qaeda-in-Iraq, and Islamic State a degree of financial resiliency that made each less susceptible to American counterterrorism efforts.  That is why, as the U.S. military began to successfully interdict al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's other revenue sources (such as oil smuggling), the Relevant Terror Organizations relied increasingly on their burgeoning protection rackets.  That stream of protection money – particularly from larger, well- financed corporations, including Corporate Defendants – supplied reliable funding for the FTOs and, almost as importantly, offered insurance against the risk of other funding sources drying up on a moment's notice.

1234.   Protection payments from Western companies, including Corporate Defendants, were also qualitatively material to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's terrorist enterprise because of their unique link to al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's leadership.

1235.   Unlike funding from other sources (such as smaller businesses) that were more often spent locally, Corporate Defendants' protection payments generally flowed up al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's organizational chain – or were made directly to top-level al- Qaeda, al-Qaeda-in-Iraq, or Islamic State institutions – and supplied fungible U.S. dollars that leadership could use wherever it saw fit, including attacks outside of the Middle East, such as ISIS's Paris and Brussels Attacks giving rise to those certain ISIS Plaintiffs' claims.

1236.   Independent research by the Centre d'Analyse du Terrorisme (CAT), a French government-supported think tank, determined that the operational cost of the 13 November 2015 Paris attacks was approximately €82,000, while the 7–9 January 2015 Charlie Hebdo and Hyper Cacher attacks cost roughly €26,000. The CAT report broke down the €82,000 Paris attack budget as follows: about €16,000 for weapons procurement, €11,000 for vehicle rentals (eleven vehicles), €20,000 for safe-houses, €3,000 for telephony and SIM cards, and €27,000 for travel and logistics.[530]

1237.   In addition, the payments often conferred intelligence benefits to the Relevant Terror Organizations by providing details about U.S. government, military, and contractor operations in the area.  Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's high-level commanders then used the money and intelligence supplied by Defendants to finance their campaign against the United States in Iraq, Afghanistan, Syria, and Turkey, and in furtherance of their broader

---

[530]https://cat-int.org/wp-content/uploads/2017/03/Financement-des-attentats-2015-VF.pdf

ideological global mission as carried out elsewhere around the world, including in Paris and Brussels.

1238.   Al-Qaeda's, al-Qaeda-in-Iraq's, and Islamic State's top-down organizational hierarchy ensured that protection money collected locally in one province or country helped to finance the Relevant Terror Organizations operations throughout the country or in other key theaters – including areas miles away from the site of the payment and abroad in Europe.  That was a core reason why the Relevant Terror Organizations moved to institutionalize the collection of protection money from large firms, including Corporate Defendants; rather than have commanders spend their protection money locally, the Relevant Terror Organizations directed the funds into the group's central coffers for use on a nationwide, or even global scale. Accordingly, Defendants' payments did not merely fund attacks in the immediate areas of their projects; al-Qaeda's, al-Qaeda-in-Iraq's, and ISIS's process for redistributing those payments made sure that they financed terrorism throughout Iraq, Afghanistan, Syria, and Turkey, as well as those attacks in France, Belgium and elsewhere.

**The Amount Of Protection Money, Fraudulent Concealment Of Defendants' Relationship With Terrorists, And Obstruction Of United States Counterterrorism Operations, Were All Significant**

1239.   As explained above, money is the lifeblood of terrorism—especially for al-Qaeda and its progeny, al-Qaeda-in-Iraq and Islamic State. And as the United States explained in a criminal case targeting a member of al-Qaeda's Syndicate in Afghanistan, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. They need people to provide money."

1240.   Each year from 2004 through at least 2014, Ericsson caused at least several million U.S. dollars in terrorist finance to flow to al-Qaeda (which funded al-Qaeda's and the Haqqani

Network's attacks, and also funded al-Qaeda's aid to al-Qaeda-in-Iraq), and at least several million U.S. dollars in terrorist finance to flow to al-Qaeda-in-Iraq (which funded al-Qaeda-in-Iraq's attacks and its aid to al-Qaeda and the Haqqani Network). From 2014 through at least 2019, Ericsson caused at least several million dollars in terrorist finance to flow to Islamic State (which funded Islamic State's attacks).

1241.  From 2004 through 2022, Defendants' protection payments likely served as one of the largest funding sources for the Relevant Terror Organizations.

1242.  Although the Relevant Terror Organizations needed a large amount of money to sustain their terrorist campaign as a whole, each individual attack required less.

1243.  Although estimates vary, each group often paid many of its rank-and-file fighters $40-$50 per month (during the 2000s) and about $100 per month (during the 2010s), while mid-level commanders were paid between $200-$400 per month. As for many of the signature al-Qaeda-inspired IED types (used by all three FTOs), they usually cost a mere $100 to make.

1244.  While ISIS's core territories in Iraq and Syria enabled it to sustain regular fighter pay-and-benefit schemes through state-like revenue channels (including oil, taxation and extortion) – a fact confirmed by the European Parliament's 2017 study on ISIS financing [Footnote] – in Europe the recruitment and compensation model was more diffuse and often involved diverted welfare payments, student loans or housing allowances from home-country systems, as documented by academic studies showing that some European fighters used welfare benefits to finance travel to conflict zones. These two modes nonetheless serviced the same terrorist financing ecosystem, rendering the defendant's payments to the network reasonably likely to fund operatives both abroad and in Europe.

1245.   At those rates, even a single protection payment of $2,000 to al-Qaeda, al-Qaeda- in-Iraq, or Islamic State could finance substantial terrorist violence: in Afghanistan, Iraq, and Syria. A $2,000 payment made in 2007 to al-Qaeda or al-Qaeda-in-Iraq could put twenty terrorists (at $50 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs.[531] Even in the late 2010s, after rank-and-file salaries doubled to $100, a $2,000 payment made in 2017 to Islamic State could put ten terrorists (at $100 per fighter) and a commander in the field in Iraq, Syria, or Afghanistan for a month, and supply them with five IEDs. Or the terrorists could spend their $2,000 to purchase large quantities of bomb components.  For example, $2,000 could purchase roughly 60 bags of calcium ammonium nitrate ("CAN") fertilizer, which terrorist bombmakers could convert into enough explosive material for approximately 260 large CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat an American armored vehicle) or 650 smaller CAN fertilizer bombs (designed by al-Qaeda and its progeny to defeat American body armor). Defendants regularly facilitated protection payments that were many orders of magnitude higher. Those payments materially strengthened the ability of the Relevant Terror Organizations to finance the attacks that killed and injured Plaintiffs and their loved ones in France, Belgium and Afghanistan.

1246.  U.S. government studies confirm the dramatic impact that even marginal financial contributions produced for the Relevant Terror Organizations.  For example, one 2010 study by DOD concluded that there was a statistically significant relationship between al- Qaeda-in-Iraq terrorist finance, on the one hand, and successful AQI attacks against targets in Iraq, on the other, concluding that each successful attack in Iraq required an approximately $2,700 expenditure from al-Qaeda-in-Iraq. Indeed, this $2,700 figure was conservative, as another

---

[531] In Iraq, Afghanistan, Syria, and Turkey, the costs per fighter, rifle, IED, and suicide bomb were substantially similar.

methodology projected a cost of approximately $1,200 per attack. The same study concluded that even marginal reductions in al-Qaeda-in-Iraq's terrorist funds corresponded with a statistically significant reduction in AQI's successful terrorist attacks.

1247.   Al-Qaeda generally agreed.  In 2010, for example, al-Qaeda publicly boasted in an English language publication that, by al-Qaeda's own accounting, a complex transnational al- Qaeda bomb attack against U.S. targets could be funded for as little as one "$4,200" payment.

1248.   Ericsson's successful and purposeful concealment of their protection payments to the Relevant Terror Organizations from 2004 through February 15, 2022, was also significant— not only with respect to its duration, but also in terms of the amount of effort required to avoid detection or discovery of those illegal payments and the benefit realized by those FTOs from the lack of governmental detection (most notably, by the U.S.) of Defendants' illegal payments and other value transfers to terrorists.

**Defendants Had Culpable Mental States**

1249.   Defendants had highly culpable mental states because LM Ericsson, Ericsson AB, and Ericsson Inc. occupied sophisticated positions as, respectively, one of the world's largest, most well-connected companies, that company's primary operating company in Iraq, and its U.S. subsidiary, and knew full well that their protection payments to the Relevant Terror Organizations would aid anti-American terrorism. Indeed, according to leaked Ericsson documents, Ericsson knew that merely doing business in Iraq "may in itself pose significant political, financial and legal risks and requires diligent controls." Thus, Ericsson's decision to pay the Relevant Terror Organizations was highly culpable.

1250.   Defendants' robust culpability is also demonstrated by LM Ericsson's pattern and practice of rewarding its in-house terrorist financiers while retaliating against whistleblowers.

1251.  After they approved aiding Islamic State, for example, LM Ericsson named Ms. Ibrahim a senior vice president and she became an advisor to its CEO, Börje Ekholm, in 2019.  Mr. Moubarak, for his part, was promoted to Iraq country manager in 2019.  On information and belief, both remain employed by LM Ericsson to this day.   In contrast, Ericsson fired whistleblower Roger Antoun  in 2019.  Such disparate treatment between involved employees also demonstrated Defendants' intent to seek profit rather than prevent terrorist finance or even follow basic compliance norms.

1252.  Defendants' behavior was especially culpable because a substantial portion of the payments – i.e., those from 2013 through on or about at least December 2019 – occurred while LM Ericsson was in active discussions with the U.S. government (first SEC, and later DOJ as well) in which Ericsson pledged good corporate citizenship, cooperation, and respect for anti-corruption while simultaneously scheming to route protection payments to al-Qaeda and al-Qaeda-in-Iraq (from 2013 through February 2014) and Islamic State (from February 2014 until LM Ericsson's DPA in December 2019).

1253.  Indeed, LM Ericsson has a longstanding history of directly lying about its bribery schemes when confronted, only admitting the truth after all its avenues of escape are closed.  A 2016 exchange that occurred in one of Sweden's leading newspapers, *Dagens Nyheter*, offers but one example of this longstanding Ericsson tactic:

> Former executives with … Ericsson say the firm shelled out tens of millions of dollars in bribes between 1998 and 2001, [] Swedish media reported … A former executive … handed the [SEC] documents relating to the alleged kickbacks, Dagens Nyheter daily and Swedish public radio SR said. "Enormous sums were sent via Zurich from the company headquarters in Sweden to secret recipients around the world," Dagens Nyheter said … The newspaper said the biggest bribes included 1.4 billion kronor (140 million euros, $150 million), sent to bank accounts in Malaysia, and 763 million kronor sent to Poland, via the British offshore banking haven of Jersey. … Denying any wrongdoing, Ericsson said the radio documentary reported on a period when the company used commercial

agents to a greater extent 15-20 years ago. "Ericsson has, just like many other companies that are active in the international market, used commercial agents," the spokeswoman told AFP. "This work approach can be attractive as it can be more cost effective than building a large local sales organisation," she said, adding that the group only has "a few agency agreements left" in countries where it's a requirement. .... Quoted by Dagens Nyheter, [Ericsson] said Wednesday it never found "any evidence that bribes were allegedly paid."[532]

1254.   As demonstrated by LM Ericsson's subsequent guilty plea, LM Ericsson's response to *Dagens Nyheter*, as reported above, was replete with lies:  Ericsson denied that it operated a global corruption scheme (a lie); Ericsson implied that it no longer relied upon consultants who served as cutouts to route bribes (another lie); and Ericsson implied that its reason for using consultants as buffers in high-risk jurisdictions was to "be more cost effective" (a material omission because, while bribery was more cost effective than honest sales, it remained illegal).

1255.   LM Ericsson and Ericsson AB were also culpable because they were anti- corruption recidivists.

**Defendants Had A Close Relationship To The Tortfeasors**

1256.   Each Defendant had close relationships to the relevant tortfeasors. LM Ericsson and Ericsson AB, through their own personnel and their Iraqi partners, consultants, and contractors, had direct relationships with the Relevant Terror Organizations.  Ericsson Inc., through LM Ericsson and Ericsson AB, had direct relationships with al-Qaeda, al-Qaeda-in- Iraq, and Islamic State.

1257.  LM Ericsson, Ericsson AB, and Ericsson Inc. also structured their transactions with knowledge of the closeness of their relationship to the tortfeasor.  Defendants' attempts to interpose intermediaries between themselves and the the Relevant Terror Organizations

---

[532] Ilgin Karlidag, *Ex-Ericsson Executives Tell Of Massive Bribery: Report*, Agence France Presse English Wire (Nov. 23, 2016).

operatives to whom Defendants' protection money was ultimately paid only highlights the closeness of Defendants' relationship to the tortfeasors.

**The Duration Of Support Was Long**

1258.    Defendants facilitated the flow of protection payments to al-Qaeda and its progeny for at least fifteen years. Ericsson aided al-Qaeda and al-Qaeda-in-Iraq from at least 2004 through at least 2015. Ericsson aided Islamic State from at least 2014 through at least 2019. Indeed, even Ekholm candidly admitted to the *Financial Times*, "I don't think the bad conduct [in Iraq] changed on January 16, 2017."

1259.    Defendants also obstructed U.S. counterterrorism policy for nearly a decade. From at least 2014 through 2022, Ericsson actively lied to the U.S. government in a manner calculated to impede American counterterrorism efforts by concealing the details of the protection racket in which they participated, the payments they had made, and the associated logistics – all of which was actionable information of the sort upon which American counterterrorism strategy depended.

**ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ USED DEFENDANTS' ASSISTANCE TO COMMIT ACTS OF INTERNATIONAL TERRORISM THAT KILLED AND INJURED PLAINTIFFS IN FRANCE, BELGIUM, AND AFGHANISTAN**

1.    **Islamic State Committed, Planned, And Authorized The Attacks That Injured Plaintiffs In France, Belgium, And Afghanistan From At Least 2012 Through At Least 2021**

1260.    Islamic State committed, planned, and authorized the attacks in France, Belgium, and Afghanistan that killed or injured Plaintiffs and their loved ones there from at least 2012 through at least 2021.

1261.    The U.S. government issued one or more reports to Congress that concluded that Islamic State executed each of the attacks against Plaintiffs herein.

**Al-Qaeda Polyterrorists Facilitated Al-Qaeda's Acts Of International Terrorism In Iraq, Afghanistan, Pakistan, Syria, and Turkey And Helped Commit The Acts Of International Terrorism That Injured Plaintiffs**

1262.   Al-Qaeda relied heavily upon multi-hatted terrorists – known as **"polyterrorists"** to accomplish each of the four modalities of circulate value transfer between Iraq/Syria and Afghanistan/Pakistan – funds, personnel, training, and logistics, *see supra* III.A.6.

1263.   For al-Qaeda, al-Qaeda-in-Iraq, and the Taliban, polyterrorists who served as members of more than one terrorist organization – *e.g.*, a terrorist who served in both al-Qaeda and the Taliban's Haqqani Network – typically played transnational roles and fueled the interconnections between al-Qaeda's core in Afghanistan and Pakistan and al-Qaeda's branches, al-Qaeda-in-Iraq and its Syrian alias, Jabhat al-Nusra.

1264.   As another manifestation of its multinational corporate-inspired approach to terror, al-Qaeda core routinely shared polyterrorist finance facilitators and logistics specialists, ratlines,[533] as well as safe houses, with operatives from its branches in Iraq, Syria, and Afghanistan, including al-Qaeda-in-Iraq (in Iraq, Syria, Afghanistan, and Pakistan), Jabhat al-Nusra (in Syria), and with the Taliban, including its Haqqani Network (in Afghanistan, Pakistan, the U.A.E., Iraq, and Syria).

1265.   Al-Qaeda's and its branches' reliance on polyterrorists after 9/11 was another reflection of al-Qaeda's franchise-approach to terrorism.  At all times, al-Qaeda's and its branches' terrorist enterprise benefited from al-Qaeda operatives who were polyterrorists.  By design, Pakistan-based al-Qaeda operatives were often members of other al-Qaeda branches, most commonly,

---

[533] A "ratline" is comprised of the combination of a vetted and safe covert transport route between two key terrorist geographies (e.g., a route that permits terrorists to move people between Afghanistan and Iraq), safehouses throughout such route, and facilitators who enable the flow of personnel, goods, and communications throughout such route.  It is a universal truth for every FTO that such FTOs' "ratlines" serve as an enormously valuable asset to the FTO, analogous in some respects (in value terms) to the value a company derives from its vital, hard- to-replicate trade secrets.  As such, the sharing of ratlines between FTOs represented an enormously important, and valuable, form of value transfer between FTOs, including value transfer between al-Qaeda and al-Qaeda-in-Iraq.

al-Qaeda-in-Iraq (in Iraq and Syria) or al-Qaeda affiliates like the Haqqani Network and Lashkar-e-Taiba (in Afghanistan and Pakistan). Typically, al-Qaeda's and its affiliates' polyterrorist operatives or agents served al-Qaeda's transnational terrorist activities in support of attacks against Americans in Afghanistan, Iraq, Syria, and other al-Qaeda-targeted areas. Some examples of al-Qaeda's most important polyterrorists include the following.

a. <u>Abu Musab al-Zarqawi</u>

1266. Abu Musab al-Zarqawi was a Jordanian national and a known senior member of al- Qaeda since the 1990s who founded and originally led al-Qaeda-in-Iraq. Until his death, Zarqawi was a notorious anti-American terrorist who, among other things, was known to have personally decapitated at least one American hostage in Iraq on camera.

1267. Zarqawi was an al-Qaeda polyterrorist who served as a member of, among other groups, al-Qaeda and al-Qaeda-in-Iraq. Introduced to bin Laden in 1998, Zarqawi rose quickly through the ranks. By 2000, Zarqawi had established himself as al-Qaeda's most indispensable terrorist operator and was a critical al-Qaeda leader in Afghanistan. In 2001, Zarqawi took the oath of allegiance to al-Qaeda and to Osama bin Laden personally. Written by bin Laden himself, Zarqawi declared: "I recall the commitment to God, in order to listen to and obey my superiors, who are accomplishing this task with energy, difficulty, and giving of self, and in order that God may protect us so God's words are the highest and his religion victorious." Zarqawi adhered to this oath until his death in 2006.

1268. By the summer of 2001, Zarqawi was a well-known senior al-Qaeda operative, and was equally well-versed in every aspect of the al-Qaeda terrorist playbook that he later imported into Iraq. Indeed, he was so well-established that a 30-page guide to al-Qaeda in Afghanistan

for new recruits specifically identified Zarqawi as one of the al-Qaeda leaders there who could be contacted by recruits for aid regarding religious, logistical, or lodging needs.

1269.   Less than a year after joining al-Qaeda, Zarqawi had so demonstrated his terrorist talent and trustworthiness that he was permitted to establish, with al-Qaeda's financial and logistical support, his own al-Qaeda training camp near the border with Iran in Herat, Afghanistan. After he set up al-Qaeda's camp in Herat, Zarqawi regularly traveled between Herat and Kabul on behalf of al-Qaeda. Herat was known then (and now) as a key site of terrorist activity, as the hub that opens the way to Iraqi Kurdistan through Iran. Zarqawi frequently travelled via Iran between Herat, Afghanistan and Iraqi Kurdistan to secure al- Qaeda's survival after 9/11. Bin Laden correctly anticipated that the United States would expel al-Qaeda and its Taliban protectors from Afghanistan after 9/11 and planned for a "progressive redeployment" of al-Qaeda to two locations: Pakistan (where bin Laden and Zawahiri planned to regroup) and Iraqi Kurdistan (where bin Laden contemplated Zarqawi would regroup).

1270.   During the U.S. invasion of Afghanistan in the months after 9/11, it became apparent to al-Qaeda that it needed to strategically redeploy to Pakistan, Iran, and Iraq. Al- Qaeda instructed Zarqawi to flee Afghanistan through Iran into Iraq to set up al-Qaeda-in-Iraq. Zarqawi did so in early 2002 once he eluded capture by American forces and obtained urgent medical care in an escape that was organized by Iran. Soon after, at the direction of al-Qaeda core and with the aid of IRGC leader Qassem Soleimani, Zarqawi founded what became al- Qaeda-in-Iraq.

1271.   By the onset of the U.S. presence in Iraq in 2003, Zarqawi turned al-Qaeda-in-Iraq into the primary Sunni terrorist threat against Americans there by working with al-Qaeda to mobilize the coalition of anti-American Sunni terrorists in Iraq under al-Qaeda's banner – carried in Iraq

by al-Qaeda-in-Iraq – and conducting a series of mass-casualty strikes against prominent U.S. and international targets in Iraq in 2003.

1272.   On September 24, 2003, the United States and United Nations both designated Zarqawi as a terrorist based upon his relationship with al-Qaeda.  Both designations recognized Zarqawi's al-Qaeda membership, the global nature of Zarqawi's network, and the key terrorist threat that Zarqawi and al-Qaeda posed to Americans in Iraq.  Among other things, the Treasury Department determined that Zarqawi and his al-Qaeda-affiliated terrorists "[m]aintain[ed] contacts throughout Europe, the Middle-East, and Western Asia - in Pakistan, Iran, Yemen, Iraq, Malaysia, Afghanistan" and "acted for or on behalf of Al-Qaeda."

1273.   Until his death in 2006, Zarqawi and the al-Qaeda terrorists he led in Iraq targeted Americans.  According to Zarqawi, "[t]he Americans" were al-Qaeda's first "enemy" because they "are the most cowardly of God's creatures" and "are an easy quarry, praise be to God. We ask God to enable us to kill and capture them to sow panic among those behind them …."

1274.   On June 7, 2006, Zarqawi was killed in an American military strike.  In his comments thereafter, President Bush stated that Zarqawi's death was "a severe blow to al Qaeda, and … a significant victory in the war on terror."

b.   Sulayman Khalid Darwish

1275.   At all relevant times, Sulayman Khalid Darwish was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Darwish provided financial and material support to both as a key al-Qaeda and al-Qaeda-in-Iraq fundraiser and recruiter.

1276.   On January 25, 2005, the United States designated Darwish as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated,

among other things, that Darwish: enabled "cash flows to the Iraqi insurgency and al Qaida"; "was designated … for providing financial and material support to the al-Zarqawi Network and al Qaida"; was a " terrorist financier" who "support[ed] Zarqawi, who has launched violent acts against [U.S.] troops"; was part of "the financial backbone of the Iraqi insurgency and al Qaida"; was "a member of the Advisory (Shura) Council of the Zarqawi organization and served as one of Zarqawi's operatives"; was "involved in fundraising and recruiting for the organization"; was "a close associate of Zarqawi and one of the most prominent members of the Zarqawi Network in Syria"; "received training on Zarqawi's orders in the following areas: weapons, topography, artillery training, electronics training, explosives production and the use of explosives" "[w]hile in Afghanistan"; "received training in Afghanistan, Iran, Turkey and Lebanon in document forging and is considered an expert in preparing forged documents for the Zarqawi Network"; "handle[d] mostly financial issues for Zarqawi, collecting, and distributing funds for him" including "donations of $10,000-$12,000 to Zarqawi in Iraq every 20-25 days"; and "was essential to recruiting and dispatching terrorist operatives … for operations [], particularly [in] Iraq. For example, Darwish contacted jihadists who had been in Afghanistan and who were, by 2004, scattered in different countries; he recruited among these jihadists for fighters to join Zarqawi in Iraq."

1277.   On January 25, 2005, the United Nations followed the U.S. lead and designated Darwish pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime.

1278.   On October 26, 2008, Darwish was killed by a U.S. military strike in Syria.

   c.   Muhsin al-Fadhli

1279.   From the early 2000s until his death in 2015, Muhsin al-Fadhli was a veteran al- Qaeda polyterrorist who served as a member of al-Qaeda and al-Qaeda-in-Iraq. In that polyterrorist

505

role, Fadhli served as a key Persian Gulf-based leader for al-Qaeda and al-Qaeda-in- Iraq and a major facilitator for Zarqawi personally. Fadhli supported Iraq-based al-Qaeda and al-Qaeda-in-Iraq operatives to facilitate attacks against U.S. forces. Fadhli also served as one of al- Qaeda's and al-Qaeda-in-Iraq's Iran-based facilitators and helped enable the free flow of al- Qaeda operatives, funds, and material between Afghanistan, Pakistan, Iran, Iraq, and Syria.

1280.  On February 15, 2005, the United States designated Fadhli as a Specially Designated Global Terrorist based on Fadhli's service as an operative for al-Qaeda and al- Qaeda-in-Iraq.[510]  Announcing the designation, the Treasury Department publicly stated, among other things, that Fadhli "was designated under Executive Order 13224 for providing financial and material support to the al-Zarqawi Network and al Qaida" because, among other things, Fadhli was "helping to finance the Iraqi insurgency, as well as al Qaida," provided "financial ties" that "the al-Zarqawi Network depend[ed] on to perpetrate acts of horror and violence," was "an al Qaida leader in the Gulf countries," "fought alongside the Taliban and al Qaida in Afghanistan where he served as a bodyguard and second-in-command for an al Qaida leader," "fought against Russian forces in Chechnya, where he trained in the use of firearms, antiaircraft guns and explosives," was among the select few al-Qaeda operatives who "in early September, 2001, … received forewarning that U.S. interests would be struck," his "support for terrorism extend[ed] to Iraq where he … provid[ed] support to fighters against U.S. … forces and [was] considered a major facilitator connected to the brutal terrorist, Abu Musab al-Zarqawi," including "solidify[ing] the support of key financial backers sponsoring attacks," through "tape … showing evidence of successful attacks in Iraq."

1281.  On February 17, 2005, the United Nations followed the U.S. lead and sanctioned Fadhli pursuant to paragraphs U.N. Security Council Resolution 1526 (2004) based upon his status as

a key operative for al-Qaeda and al-Qaeda-in-Iraq and his being associated with al- Qaeda, Usama bin Laden or the Taliban for participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of Al-Qaida. In so doing, the U.N. made findings consistent with those made by the United States in its SDGT designation.

1282.  On October 18, 2012, the United States government announced a $7 million bounty on Fadhli under its Rewards for Justice program. In so doing, the U.S. determined, among other things, that Fadhli: "facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida terrorist network," was "wanted by Saudi authorities" and "authorities in Kuwait" "in connection with [his] terrorist activities," had "replaced Ezedin Abdel Aziz Khalil (better known as Yasin al-Suri) as al-Qaida's senior facilitator and financier in Iran," "was among the few trusted al-Qaida leaders who received advance notification that terrorists would strike the United States on September 11, 2001," "led" "Al-Qaida elements in Iran" that were "working to move fighters and money through Turkey to support al-Qaida-affiliated elements in Syria," "assisted al-Qaida in moving multiple operatives from Pakistan via Iran and Turkey to destinations in Europe, North Africa, and Syria, and [was] believed likely to continue moving experienced al-Qaida operatives to reinforce and gain influence in these areas."

1283.  On July 8, 2015, Fadhli was killed in an American airstrike in Syria, after being deployed there by al-Qaeda core to play a similar role as he played in Iraq the decade prior.

1284.  Announcing the strike, the Department of Defense stated, among other things, that "Muhsin al- Fadhli" was "a longtime al-Qaida operative" and "a senior al-Qaida facilitator who was among the few trusted al-Qaida leaders who received advance notification of the Sept. 11,

2001, terrorist attacks," whose "death" "degrade[d] and disrupt[ed] ongoing external operations of al-Qaida against the United States."

### d.  Abu Hamza al-Muhajir (aka Abu Ayyub al-Masri)

1285.  Abu Hamza al-Muhajir, aka Abu Ayyub al-Masri, was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Muhajir provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Muhajir was an al-Qaeda core member who learned his terrorist tradecraft at al-Qaeda camps in Afghanistan.  Muhajir was also a long-standing confidante of Ayman al-Zawahiri (who was himself a former member of Zarqawi's organization Egyptian Islamic Jihad before its merger with al-Qaeda in the 1990s), having been one of Zawahiri's best students.  Among other roles he served for al-Qaeda core, Mujahir coordinated all al-Qaeda jihad volunteer operations from Europe and the Middle East before al-Qaeda deployed him from Afghanistan to Iraq to assume the executive officer position under Zarqawi. His *nom de guerre* meant "Abu Hamza, the Migrant," referencing his transnational role and identity.

1286.  In 2006, Muhajir replaced Zarqawi as leader (*emir*) of al-Qaeda-in-Iraq, which role he continued to serve until his own death in 2010.  As a Zawahiri lieutenant, Muhajir's elevation to emir of al-Qaeda-in-Iraq reinforced al-Qaeda's control of al-Qaeda-in-Iraq.  Like Zarqawi, Muhajir pledged allegiance to al-Qaeda in his own personal capacity and in his role as leader of al-Qaeda-in-Iraq.

1287.  On April 18, 2010, Muhajir was killed in a U.S. military strike. Commenting on the event, General Raymond Odierno, commander of U.S. Forces-Iraq, stated that Muhajir's death was "potentially the most significant blow to al Qaeda in Iraq since the beginning of the insurgency" because Muhajir directly linked al-Qaeda-in-Iraq to al-Qaeda "core" in

Afghanistan and represented "the foreign element of al Qaeda that was established here," i.e., in Iraq.

### e.  Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani

1288.  Khaled Abdul-Fattah Dawoud Mahamoud al-Mashhadani, aka Abu Shaheen, was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Mashhadani provided logistical and material support to both groups.

1289.  From 2003 through at least 2007, Mashhadani served as the highest-ranking Iraqi in al-Qaeda core's senior management team in Afghanistan and Pakistan and played a key role helping al-Qaeda and al-Qaeda-in-Iraq fulfill bin Laden's vision of bringing all al-Qaeda-affiliated groups into a unified jihadi structure. Mashhadani helped Zarqawi and his successor, Muhajir, create a truly integrated terrorist force in Iraq through a global jihadist collective commanded by al-Qaeda but with local Iraqis being given leading roles due to their knowledge of the terrain. Mashhadani's efforts also helped al-Qaeda and al-Qaeda-in-Iraq vertically integrate key operations, including their suicide bombing network, to maximize the potency of their attacks against Americans in Iraq.

1290.  On July 4, 2007, Mashhadani was captured by U.S. forces during a raid in Mosul. Announcing the capture, the Department of Defense observed that Mashhadani served as a link between al-Qaeda core and al-Qaeda-in-Iraq. According to Brigadier General Kevin Bergner, who served as the U.S. military's spokesperson in Iraq at the time:  Mashhadani was the highest- ranking Iraqi in the al-Qaeda in Iraq leadership when captured; Mashhadani carried messages from bin Laden and Zawahri to the head of al-Qaeda in Iraq, Muhajir; Mashhadani admitted to interrogators that al-Qaeda's global leadership provided "directions," and "continue[d] to provide a focus for operations" and "continue[d] to flow foreign fighters into

Iraq, foreign terrorists," all to facilitate al-Qaeda's terrorist campaign against America there through al-Qaeda- in-Iraq; and Mashhadani's role demonstrated that there was "a clear connection between al- Qaida in Iraq and al-Qaida senior leadership outside Iraq," because "[w]hat we've learned from not just from the capture of al-Mashhadani but from other al-Qaida operatives is that there [was] a flow of strategic directions of prioritization, of messaging and other guidance that [came] from al-Qaida senior leadership to the al-Qaida in Iraq leadership."

      f.  <u>Sirajuddin Haqqani</u>

1291. Sirajuddin Haqqani (globally known as, and in this complaint, "Siraj") was an al- Qaeda polyterrorist who operated as a member of al-Qaeda, including al-Qaeda core, and the Taliban, including its Haqqani Network, and provided financial and material support to both.

1292. Siraj was the son of bin Laden's long-standing ally, mentor, and protector, Jalaluddin Haqqani, who until 9/11 was the most iconic Islamist terrorist in Afghanistan and Pakistan (and a close second to bin Laden after 9/11). Siraj grew up observing his father play a leadership role coordinating more than half a dozen separate Islamist insurgent groups that had all united in an alliance to drive the Soviet Union out of Afghanistan. Like the phenomenon of the children of professional coaches going into coaching themselves because they grew up marinating in it and becoming great coaches as a result, Siraj's unparalleled biography and personal networks made him a key hub of al-Qaeda/Taliban terror.

1293. On September 13, 2007, the United Nations sanctioned Sirajuddin Haqqani pursuant to the U.N.'s al-Qaeda-Taliban sanctions regime. In its designation, the U.N. concluded, among other things, that Siraj "participat[ed] in the financing, planning, facilitating, preparing, or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of" "the Taliban" and "Al-Qaida"; "recruit[ed] for" or "otherwise support[ed] acts or

activities of" "the Taliban" and "Al-Qaida"; was "one of the most prominent, influential, charismatic and experienced leaders within the Haqqani Network … and [had] been one of the major operational commanders of the network since 2004"; was "a key conduit for terrorist operations in Afghanistan and supporting activities in the Federally Administered Tribal Areas of Pakistan."

1294.  By 2008, Sirajuddin Haqqani was simultaneously: (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military council (essentially, its terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir).

1295.  Sirajuddin Haqqani's service on al-Qaeda's military council – publicly confirmed by U.S. intelligence – necessarily means that Sirajuddin Haqqani swore an oath of allegiance to al-Qaeda, because al-Qaeda only permitted sworn al-Qaeda members to serve on its councils.

1296.  On February 29, 2008, the United States designated Sirajuddin Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States," and in 2012, the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura."

1297.  Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with the Haqqani Network and the rest of the Taliban. Indeed, U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

1298.  Other than Osama bin Laden, Sirajuddin Haqqani was the single most important al-Qaeda leader in Afghanistan and Pakistan after 9/11. By joining al-Qaeda management, Sirajuddin

achieved a level of interoperability and cohesion between al-Qaeda and the Taliban, including its Haqqani Network, that greatly magnified the lethality of the terrorists' campaign.

1299.  Sirajuddin Haqqani was also, like his father, famously pragmatic in service of his extremism.  Siraj was willing to do deals and make trades with people, groups, and governments he disdained if it would help al-Qaeda and the Taliban, including its Haqqani Network, kill more Americans in Afghanistan.

1300.  Sirajuddin Haqqani was the most important transnational Syndicate leader and played a vital role in harmonizing the various strategies and tactics, as well as promoting network efficiencies.  Thus, for example, if an al-Qaeda-in-Iraq operative needed secure travel into Afghanistan's Paktika Province (a Haqqani Network stronghold), he could contact someone from the Haqqani clan and make the necessary arrangements.

1301.  By the mid-2000's, Sirajuddin Haqqani had also spearheaded the emergence of a network of al-Qaeda training camps in North Waziristan, Pakistan, which leveraged the services of dual-hatted Arab al-Qaeda/al-Qaeda-in-Iraq terrorists (often colloquially referred to as the "Arabs") who imported bomb-related lessons learned from Iraq.

1302.  According to a declassified 2008 Defense Intelligence Agency intelligence report, "[Sirajuddin] Haqqani" was "affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda (AQ) in North Waziristan," including "an AQ training center in Miram Shah Dand"; "an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah"; "[a]n AQ training facility called 'Shaki Masood'; and "[a]nother AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan."

1303.  According to the same DIA report, at least several hundred "Arabs" – i.e., dual-hatted al-Qaeda/al-Qaeda-in-Iraq polyterroristsreceive[d] training there (NFI).

1304.   In spring 2010, Sirajuddin Haqqani publicly embraced his status as a member and leader of both al-Qaeda and the Talban during an interview that was widely disseminated around the world.  In the interview, the questioner asked Siraj whether the "mujahideen who emigrate[d] to the land of the Khorasan" – meaning al-Qaeda's foreign fighters in Afghanistan – "form[ed] any obstacle or burden on the Afghan people." In response, Sirajuddin noted that al-Qaeda's foreign fighters "enlighten the road for [fighters from Taliban Afghanistan and Pakistan] and they resist against the cross worshippers by cooperating with us and us with them in one trench."

1305.   In June 2010, an al-Qaeda memorandum sent to bin Laden himself documented Sirajuddin's terrorist operations in Afghanistan and Pakistan on behalf of al-Qaeda.

1306.   In 2011, Sirajuddin Haqqani published and distributed 10,000 copies of a book he authored that encouraged Islamists to follow al-Qaeda's ways, praised al-Qaeda because it "terrifie[d]" its foes, and endorsed attacks against the United States worldwide.

1307.   When Plaintiffs and/or their family members were attacked by al-Qaeda in Iraq and Afghanistan between 2005 and 2016, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted deep cooperation amongst al-Qaeda (including its subsidiaries like al-Qaeda-in-Iraq), the Taliban (including its Haqqani Network), and the IRGC (including Hezbollah and the Qods Force).

1308.   When Plaintiffs and/or their family members were attacked by al-Qaeda in Iraq and Afghanistan between 2005 and 2017, Sirajuddin Haqqani served as the top Syndicate polyterrorist responsible for coordinating key transnational-facing aspects of al-Qaeda's terrorist campaign in Afghanistan and, in coordinating with other al-Qaeda and affiliated terrorists worldwide.

1309.  To this day, Sirajuddin Haqqani remains a senior member of al-Qaeda and a terrorist wanted by the United States for murder.[534]

       g.  <u>Shaykh Aminullah (Fazeel-A-Tul Shaykh Abu Mohammed Ameen Al-Peshawari)</u>

1310.  Fazeel-A-Tul Shaykh Abu Mohammed Ameen Al-Peshawari, aka "Shaykh Aminullah" (in this complaint, "Shaykh Aminullah") was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, including al-Qaeda core, the Taliban, and Lashkar-e-Taiba, and provided financial and material support to all three.

1311.  On June 29, 2009, the United Nations designated Shaykh Aminullah, pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime, under paragraphs 1 and 2 of U.N. Security Council Resolution 1822 (2008), for participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf or in support of al-Qaeda, supplying, selling or transferring arms and related materiel to al-Qaeda; recruiting for or otherwise supporting acts or activities of al-Qaeda. In so doing, the U.N. determined, *inter alia*, that Shaykh Aminullah, as the leader of the Ganj Madrassah in Peshawar, Pakistan: (i) "provided assistance including funding and recruits to the Al-Qaida [] network as of early 2008"; (ii) "also provided funding, explosive suicide vests and other resources to the Taliban"; (iii) "also began a campaign to support Al-Qaida and Taliban militants in Pakistan." The U.N. also found that "[a]s of 2006, Al-Peshawari was providing

---

[534] For more than a decade, and continuing through to today, Sirajuddin Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans. Along with his brothers, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Sirajuddin Haqqani personally spearheaded the terrorists' successful campaign on Kabul in August 2021.  Today, Sirajuddin Haqqani serves as the terrorist responsible for the "Islamic Emirate of Afghanistan's" borders and guns, while his uncle Khalil, and brothers, have responsibilities relevant to intelligence and information.

monetary compensation to families of Al-Qaida and Taliban fighters killed in Afghanistan and was involved in Taliban recruiting activities."

1312.  On July 1, 2009, the United States designated Shaykh Aminullah a Specially Designated Global Terrorist based upon his status as an al-Qaeda/Taliban polyterrorist.  In so doing, the U.S. determined, *inter alia*, that Shaykh Aminullah: (i) "provid[ed] assistance, including funding and recruits, to the al Qaida network"; (ii) "provided funding and other resources to the Taliban, including explosive vests and other resources and actively facilitated the activities of anti-Coalition militants operating in Afghanistan by raising money in support of terrorist activities"; (iii) "beg[a]n a campaign to support militants in Pakistan."  In addition, the U.S. determined that, "[a]s of 2007, [Shaykh Aminullah] was responsible for recruiting fighters and suicide bombers and for the acquisition of funds and equipment for militants in Afghanistan" and "also provided monetary compensation to families of fighters killed in Afghanistan and has been involved in anti-Coalition militia recruiting activities."

1313.  To this day, Shaykh Aminullah remains on the FBI's Most Wanted List as a polyterrorist member and/or supporter of al-Qaeda, the Taliban, and Lashkar-e-Taiba.[535]

       h.  Khalil Haqqani

1314.  Khalil Haqqani was an al-Qaeda polyterrorist who operated as a member of al- Qaeda, including al-Qaeda core, and the Taliban, including its Haqqani Network, and provided financial and material support to both. Khalil was Sirajuddin Haqqani's uncle and Jalaluddin Haqqani's brother was the son of bin Laden's long-standing ally, mentor, and protector,

---

[535] According to the FBI, "Shaykh Aminullah is wanted for questioning in connection with providing material support to Al Qaeda, the Taliban and anti-coalition militias, with the aid of a Pakistan-based terrorist group, Lashkar-e-Tayyiba (LeT)."

Jalaluddin Haqqani.  Like his nephew Siraj, Khalil's biography and personal networks made him a key hub of al-Qaeda and Taliban terror.

1315.   On February 9, 2011, the United States designated Khalil Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States" based upon Khalil Haqqani's status as a polyterrorist who "act[ed] for or on behalf of the Taliban, [] provid[ed] support to al-Qa'ida and [] act[ed] for or on behalf of Sirajuddin Haqqani."  Moreover, according to the United States government, "Khalil [Haqqani] has also acted on behalf of al-Qa'ida (AQ) and has been linked to AQ terrorist operations. In 2002, he deployed fighters to reinforce AQ elements in Paktia Province, Afghanistan."

1316.   On February 9, 2011, the United Nations also designated Khalil Haqqani pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime, under paragraph 2 of U.N. Security Council Resolution 1904 (2009), in recognition of his status as a key al-Qaeda/Taliban polyterrorist. With respect to al-Qaeda, the U.N. determined that Khalil Haqqani: (i) "acted on behalf of Al-Qaida [] and has been linked to its military operations"; and (ii) "deployed fighters to reinforce AQ elements in Paktia Province, Afghanistan" "[i]n 2002." With respect to the Taliban, the U.N. determined that Khalil Haqqani: (i) was "a senior member of the Haqqani Network"; (ii) "provide[d] support to the Taliban and the Haqqani Network operating in Afghanistan"; (iii) "was one of several people responsible for the detention of enemy prisoners captured by the Taliban"; and (iv) had "taken orders for Taliban operations from Sirajuddin Haqqani."

1317.   To this day, Khalil Haqqani remains a senior member of al-Qaeda and a terrorist wanted by the United States for murder.[536]

---

[536] For more than a decade, and continuing through to today, Khalil Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans. Along with his nephews, who were also (and remain) key

i. <u>Ahmed Jan Wazir</u>

1318.  From the mid-2000s until late 2013, Ahmed Jan Wazir was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which role he provided financial and material support to both. In 2008, al-Qaeda and the Taliban (including its Haqqani Network) jointly appointed Wazir to lead their combined cell in Ghazni Province, Afghanistan.  Thereafter, Wazir served as an operative for al-Qaeda and the Taliban, including its Haqqani Network, until his death in late 2013. Wazir led a joint al-Qaeda/Taliban cell based in Ghazni, which committed attacks against Americans in Ghazni and in Kabul (the latter, as a part of the Kabul Attack Network).

1319.  On June 21, 2011, the U.S. designated Wazir as an SDGT.

1320.  On January 6, 2012, the United Nations followed the U.S. lead and designated Wazir under its al-Qaeda/Taliban sanctions regime.  In its designation, the U.N. observed that "Taliban and Al-Qaida militants appointed Ahmed Jan Wazir as a Taliban commander in Ghazni Province" "[i]n 2008" and, among other things, that Wazir: served as a "[k]ey commander of the Haqqani Network"; "[a]ct[ed] as deputy, spokesperson and advisor for Haqqani Network senior leader Sirajuddin Jallaloudine Haqqani"; "[l]iaise[d] with the Taliban Supreme Council"; had "travelled abroad" "with senior Haqqani Network members to the Gulf"; "[l]iaise[d] with and provide[d] Taliban commanders in Ghazni … with money, weapons, communications equipment and supplies"; "conduct[ed] meetings on behalf of the Haqqani Network"; "represented the Haqqani Network at the Taliban's shura and has served as a conduit between the Haqqani Network and the Taliban in Ghazni Province, Afghanistan"; and "provided" other

---

Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Khalil Haqqani helped spearhead the terrorists' successful campaign on Kabul in August 2021.  Today, Khalil Haqqani serves in a cabinet-level role for the "Islamic Emirate of Afghanistan," and is responsible for, *inter alia*, targeting Taliban enemies.

terrorists "in Ghazni Province with money and supplies, including weapons and communications equipment."

1321.  On November 21, 2013, Wazir was killed by an American strike in Ghazni.

       j.   Ezedin Abdel Aziz Khalil (aka Yasin al-Suri)

1322.  At all relevant times, Ezedin Abdel Aziz Khalil (aka Yasin al-Suri) was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Khalil provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Khalil served as a key Iran-based facilitator for al-Qaeda and al-Qaeda-in-Iraq.

1323.  On July 28, 2011, the United States designated Khalil as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Khalil: was  "a prominent Iran-based al-Qa'ida facilitator, operating under an agreement between al-Qa'ida and the Iranian government" who led a "key" "al-Qa'ida network" in "Iran" "since 2005" that "serve[d] as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia" and was "a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan" that "al-Qa'ida" operated pursuant to the "secret deal" between "Iran" and "al-Qa'ida" that "allow[ed] [al-Qa'ida] to funnel funds and operatives through [Iran's] territory" and "much-needed support" to "al-Qa'ida's senior leadership";  "move[d] money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of al-Qa'ida senior leaders"; "collected funding from various donors and fundraisers throughout the Gulf and is responsible for moving significant amounts of money via Iran for onward passage to al-Qa'ida's leadership in Afghanistan and Iraq"; and "facilitated the travel of extremist recruits for al-Qa'ida from the Gulf to Pakistan and Afghanistan via Iran."

### k.  Umid Muhammadi

1324.  At all relevant times, Umid Muhammadi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Muhammadi provided financial and material support to both groups. Among other roles, Muhammadi was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq.

1325.  On July 28, 2011, the United States designated Muhammadi as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Muhammadi: was "an al-Qa'ida facilitator and key supporter of al-Qa'ida in Iraq (AQI)"; "petitioned Iranian officials on al-Qa'ida's behalf"; had "been involved in planning multiple attacks in Iraq"; had "trained extremists in the use of explosives"; and had "received training in Afghanistan on the use of rockets and chemicals."

### l.  Sangeen Zadran

1326.  Sangeen Zadran was an al-Qaeda polyterrorist who operated as a member of al- Qaeda and the Taliban's Haqqani Network, in which role Zadran provided financial and material support to al-Qaeda and the Taliban from the late 2000s until his death in 2013. Zadran proudly and publicly identified as an al-Qaeda "brother" – i.e., an al-Qaeda member.  In September 2009, al-Qaeda's media wing, Sahab, published an interview with Zadran in which he explained that his relationship with al-Qaeda was the same as his relationship with the Taliban.[537]

1327.  On August 16, 2011, the United States designated Zadran as a Specially Designated Global Terrorist.  Announcing the designation, the State Department publicly stated, among other things, that Zadran: was "the Shadow Governor for Paktika Province, Afghanistan and a

---

[537] Zadran stated: "Al-Qaeda and Taliban all are Muslims and we are united by the brotherhood of Islam. We do not see any difference between Taliban and Al-Qaeda, for we all belong to the religion of Islam. Sheikh Usama has pledged allegiance to … Mulla Muhammad Umar and has reassured his leadership again and again. There is no difference between us, for we are united by Islam and the Sharia governs us."

commander of the Haqqani Network"; "help[ed] lead fighters in attacks across Southeastern Afghanistan"; was "believed to have planned and coordinated the movement of hundreds of foreign fighters into Afghanistan," i.e., al-Qaeda; was "connected to many [IED] attacks"; and "act[ed] as a senior lieutenant to Haqqani Network leader Sirajuddin Haqqani."

1328.    On September 5, 2013, Zadran was killed by a U.S. military strike in Pakistan.

m.    <u>Mustafa Hajji Muhammad Khan</u>

1329.    Mustafa Hajji Muhammad Khan was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Khan provided financial and material support to both from 2003 until his death in 2012. Among other roles, Khan was a key facilitator for al-Qaeda and al-Qaeda-in-Iraq, in which role he enabled the movement of fighters and funds amongst Iraq, Afghanistan, Pakistan and the Persian Gulf.

1330.    On March 14, 2011, the United Nations sanctioned Khan pursuant to the U.N.'s al-Qaeda/Taliban sanctions regime. According to the U.N.'s designation, among other things, "Mustafa Hajji Muhammad Khan" was "an Al-Qaida [] facilitator, courier and operative since at least 2003" and "serve[d] as a representative of the Al-Qaida leadership to the former head of Al- Qaida in Iraq [], … Abu Musab al-Zarqawi."

1331.    On September 7, 2011, the United States designated Khan as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Khan: "acted as an al-Qa'ida facilitator, courier and operative since at least 2003"; "facilitated activities for senior Pakistan-based al-Qa'ida operatives"; had "also been active in facilitating the travel of al-Qa'ida members, including escorting an individual to meet with another al-Qa'ida member in 2009"; "recruited a facilitator" "[o]n al- Qa'ida's behalf," "who helped [Khan] move people and money between Gulf countries and Pakistan"; "helped al-

Qa'ida reestablish logistic support networks in Pakistan"; and "served as a messenger between al-Qa'ida and former al-Qa'ida in Iraq leader Abu Musab al-Zarqawi."

1332.   On October 1, 2012, Khan was killed in a U.S. military strike in Pakistan.

> n.   Adel Radi Saqr al-Wahabi al-Harbi

1333.   At all relevant times, Adel Radi Saqr al-Wahabi al-Harbi was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Harbi provided financial and material support to both. Among other roles, Harbi served al-Qaeda and al-Qaeda-in-Iraq through his role as Muhsin al-Fadhli's deputy. In such capacity, Harbi connected al-Qaeda operatives in Iraq and Afghanistan.

1334.   On October 18, 2012, the United States designated Harbi as a Specially Designated Global Terrorist. Announcing the designation, the Treasury Department publicly stated, among other things, that Harbi was a "key member of an al-Qa'ida network operating in Iran and led by Iran-based al-Qa'ida facilitator Muhsin al-Fadhli" who "serve[d] as the deputy to al-Fadhli," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on behalf of al- Qa'ida" by helping "operate a core pipeline that moves al-Qa'ida money and fighters through Iran to support al-Qa'ida activities in South Asia," was "believed to have sought funds to support al-Qa'ida attacks," and "travel[ed] to Afghanistan to join al-Qa'ida and providing technical support … to the terrorist group" "[b]efore joining the Iran-based al-Qa'ida network."

1335.   On October 18, 2012, the United States government announced a $5 million bounty on Harbi under its Rewards for Justice program. In so doing, the U.S. determined, among other things, that Harbi was "an Iran-based al-Qaida facilitator and deputy to al-Fadhli" who "facilitate[d] the movement of funds and operatives through Iran on behalf of the al-Qaida terrorist network," "facilitate[d] the travel of extremists to Afghanistan or Iraq via Iran on

behalf of al-Qaida," "sought funds to support al-Qaida attacks," and was "wanted by Saudi authorities" for "traveling to Afghanistan to join al-Qaida and providing technical support" to it.

1336.  Harbi currently facilitates al-Qaeda operations from his haven in Iran.

o.  Abdul Rauf Zakir

1337.  Abdul Rauf Zakir was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and the Taliban's Haqqani Network, in which role Zakir provided financial and material support to al-Qaeda and the Taliban, including its Haqqani Network, from the late 2000s until his death prior to 2020.  Among other roles, Zakir was a key lieutenant of Sirajuddin Haqqani (himself an al-Qaeda polyterrorist) and a facilitator for al-Qaeda and the Haqqani Network.

1338.  On November 5, 2012, the U.S. designated Zakir as an SDGT.  Announcing the designation, the State Department observed, among other things, that Zakir was "the chief of suicide operations for the Haqqani Network and the operational commander in Kabul, Takhar, Kunduz, and Baghlan Provinces, Afghanistan"; Zakir was "responsible for the Haqqani Network's training program, which include[d] instruction in small arms, heavy weapons, and basic [IED] construction"; Zakir "approached Haqqani Network leader Sirajuddin Haqqani in 2008, requesting financial aid in exchange for expanding the group's influence and operations into northern Afghanistan"; and Zakir had "become a trusted associate and confidant of Sirajuddin" and was "involved in many … high-profile suicide attacks."

1339.  On November 5, 2012, the United Nations followed the U.S. lead and designated Zakir under the U.N.'s al-Qaeda/Taliban sanctions regime.  In its designation, the U.N. recognized, among other things, the same facts noted by the United States when it designated Zakir as an SDGT.

1340. At some point between 2017 and 2019 (the exact date is a secret), Zakir was killed in an American airstrike targeting al-Qaeda operatives in Ghazni Province, Afghanistan who were embedded with the Taliban, including its Haqqani Network. Zakir was killed alongside other al-Qaeda operatives, including Zakir's protectee: Hamza bin Laden, the son and senior male heir of Osama bin Laden. By the time Hamza was killed, he was a key al-Qaeda terrorist in his own right, designated by the U.S. as an SDGT on January 5, 2017.

p.   <u>Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni</u>

1341. At all relevant times, Abd al-Rahman Muhammad Zafir al-Dubaysi al-Juhni was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Juhni provided financial and material support to al-Qaeda and al-Qaeda-in-Iraq. Among other roles, Juhni performed various logistics and leadership functions for al-Qaeda in Afghanistan and Pakistan, including arranging the payment of funds, passing messages and arranging meetings for senior al-Qaeda figures. In 2013, al-Qaeda assigned Juhni to al-Qaeda- in-Iraq, and Juhni relocated from Pakistan to Syria to support al-Qaeda efforts in Syria. During this time, he maintained an affiliation with al-Qaeda's leadership in Afghanistan and Pakistan.

1342. On May 14, 2014, the United States designated Juhni as an SDGT. Announcing the designation, the Treasury Department stated, among other things, that Juhni was "designated for acting for or on behalf of al-Qa'ida"; had "performed various administrative duties for al-Qa'ida, including arranging the payment of funds, passing messages, and arranging meetings for senior al-Qa'ida figures"; "provided logistical support to al-Qa'ida in Afghanistan" "[b]etween 2006 and 2009"; "was responsible for al-Qa'ida's communications courier network in Waziristan in late 2008, and by mid-2009, was in charge of al-Qa'ida administrative affairs for several areas in North and South Waziristan"; "served on al-Qa'ida's Central Shura Council

and as the al-Qa'ida Chief of Security responsible for counterintelligence"; "traveled to Syria accompanied by several individuals to … support al-Qa'ida efforts in Syria" while "he maintained an affiliation with al-Qa'ida leadership in the Federally Administered Tribal Areas of Pakistan."

      q.  <u>Abd al-Rahman Mustafa al-Qaduli</u>

1343.   At all relevant times, Abd al-Rahman Mustafa al-Qaduli was an al-Qaeda polyterrorist who operated as a member of al-Qaeda and al-Qaeda-in-Iraq, in which role Qaduli provided financial and material support to both. Qaduli was an Islamic cleric who lived in Northern Iraq. He joined Al-Qaeda in 2004, and rapidly rose through the ranks, working with al-Qaeda leader Zarqawi and eventually becoming al-Qaeda's liaison for operations with Afghanistan and Pakistan, in which capacity he coordinated between al-Qaeda's leadership and its branch in Iraq.

1344.   On May 14, 2014, the United States designated Qaduli as a Specially Designated Global Terrorist.  Announcing the designation, the Treasury Department publicly stated, among other things, that Qaduli: "joined al-Qa'ida in 2004 under the command of now-deceased AQI leader Abu Musab al-Zarqawi and served as Zarqawi's deputy and the AQI emir of Mosul, Ninawa Province, Iraq"; "was an assistant to al-Zarqawi while in al-Qa'ida and previously served as AQI's representative to al-Qa'ida senior leadership in Pakistan"; and "traveled … to Pakistan on behalf of al-Zarqawi to conduct an interview, which was then to be provided to al-Qa'ida leaders in Afghanistan."

      r.  <u>Abu Afghan al-Masri</u>

1345.   Abu Afghan al-Masri was an al-Qaeda polyterrorist who operated as a member of al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra, in which role Abu Afghan al-Masri provided financial

and material support to all three groups. Among other roles, he was a key facilitator for al-Qaeda, al-Qaeda-in-Iraq, and Jabhat al-Nusra. Like al-Qaeda leader Ayman al-Zawahiri, Abu Afghan al-Masri was an Egyptian who originally joined al-Qaeda in Afghanistan. While serving al-Qaeda in Afghanistan, Abu Afghan al-Masri facilitated ties to terrorist groups operating throughout the Middle East, including groups responsible for attacking U.S. forces in Afghanistan and Iraq. After the conflict erupted in Syria, al-Qaeda "core" redeployed Abu Afghan al-Masri to Syria to facilitate al-Qaeda-in-Iraq's expansion in Syria, and to convert Syria into another haven from which al-Qaeda could launch attacks against the United States.

1346.    On November 18, 2016, U.S. forces killed Abu Afghan al-Masri in an airstrike in Syria. Commenting on the event, the Department of Defense publicly stated that "Abu Afghan al-Masri" was "a senior Al Qaeda leader" who "originally joined Al Qaeda in Afghanistan [and] later moved to its Syrian affiliate"; "had ties to terrorist groups operating throughout Southwest Asia, including groups responsible for attacking U.S. and coalition forces in Afghanistan and those plotting to attack the West"; "had a senior leadership role in Al Qaeda"; "helped organize Al Qaeda activities and was directly affiliated with senior [Qaeda] leaders" in Afghanistan"; and was so important that his "removal from the battlefield represent[ed] another blow to Al Qaeda in Syria and demonstrate[ed] continued U.S. determination to target Al Qaeda leaders wherever they pose[d] a threat to the U.S."

**ISLAMIC STATE, AL-QAEDA, AND AL-QAEDA-IN-IRAQ COMMITTED ACTS OF INTERNATIONAL TERRORISM AGAINST AMERICANS IN FRANCE, BELGIUM, IRAQ, AND AFGHANISTAN AS PART OF ISLAMIC STATE'S, THE TALIBAN'S AND AL-QAEDA'S TRANSNATIONAL TERRORIST CAMPAIGNS TO EXPEL THE UNITED STATES FROM THE MIDDLE EAST AND TO SOW DISCORD IN EUROPE**

**1.    Islamic State Waged A Global Terrorist Campaign To Expel The United States From Iraq, Afghanistan, And The Rest Of The Middle East**

1347.   On February 3, 2014, al-Qaeda-in-Iraq split from al-Qaeda core and Jabhat al- Nusra and asserted its identity as ISIS, which was led by former al-Qaeda/al-Qaeda-in-Iraq polyterrorist Abu Bakr al-Baghdadi.

1348.   On June 29, 2014, Abu Bakr al-Baghdadi announced from Mosul – long Islamic State's Iraq headquarters – that the group known as al-Qaeda-in-Iraq and ISIS was now a caliphate that would henceforth be known as "Islamic State."

1349.   Powered by its rapid expansion and burgeoning protection rackets in Iraq and Syria, Islamic State quickly established a branch in Afghanistan, using at least hundreds of Islamic State fighters from Iraq, as well as substantial Islamic State resources from Iraq.

1350.   Since its formation in 2014, Islamic State has sought to expel Americans from the Middle East through a campaign of terrorist violence targeting Americans worldwide, all of which was in service of Islamic State's existence as a purported "caliphate" dedicated to propagating its radical Salafist Sunni terrorist ideology. David S. Cohen, Under Secretary for Terrorism and Financial Intelligence at the Treasury Department, publicly stated in 2014 that Islamic State "terrorists have slaughtered thousands of innocent people" and "threaten[ed  "American personnel and facilities in Iraq," and "could ultimately pose a direct threat to [U.S.] citizens … outside of the Middle East."

1351.   The U.S. State Department designated Islamic State's predecessor, al-Qaeda-in- Iraq, as an FTO on December 17, 2004, and it has maintained that designation ever since, which has at all times applied to Islamic State. The U.S. State Department has also designated Islamic State's branches as FTOs.  On January 14, 2016, for example, the U.S. designated Islamic State's Afghanistan branch, known as Islamic State's Khoroson Province or "ISIS-K" as an FTO.

1352.   In the summer of 2014, Islamic State rapidly surged throughout Iraq.  On June 10, 2014, it completed its seizure of long-standing al-Qaeda-in-Iraq/Islamic State stronghold Mosul in Ninewa Province.  On June 11, 2014, Islamic State seized Tikrit. On June 18, 2014, the Iraqi government formally requested that the United States military conduct strikes against Islamic State terrorists in Iraq. On June 21, 2014, Islamic State seized three pivotal towns touching upon key Iraqi transportation routes from Turkey, Jordan, and Syria to the rest of Iraq, including the strategic border crossing between Syria's Deir Ezzor Province and Iraq. On August 2, 2014, Islamic State conquered the towns of Sinjar and Zumar, which forced thousands of Yazidi civilians to flee. On August 3, 2014, Islamic State captured the strategically critical Mosul Dam, and a few weeks later, Islamic State completed its seizure of Raqqa province in Syria.

1353.   On August 7, 2014, President Obama announced an escalation of the American military response to Islamic State, including airstrikes designed to weaken Islamic State's ability to terrorize civilians, including Yazidis, in the vicinity of Sinjar, Iraq. The U.S. counterterrorism campaign against Islamic State would eventually be known as Operation Inherent Resolve.

1354.   About six weeks later, on September 22, 2014, Islamic State spokesman Abu Muhammad al-Adnani called for attacks on U.S. citizens around the world in retaliation for Operation Inherent Resolve.

1355.   By the end of October 2014, Islamic State had seized control of territory in Iraq and Syria equal in size to the United Kingdom, and in which more than ten million people resided.  Such geographies included Aleppo, Raqqah and Deir es-Zor governorates in Syria, and Anbar, Diyala, Ninewa, and Salah al-Din Provinces in Iraq.  As a result, Islamic State's profile and

power were a first in the history of contemporary terrorism, and Islamic State exercised authority over a wide array of industrial and commercial activities in Iraq and Syria.

1356.   Powered by its protection rackets and afforded ample freedom of movement through their deal with Iraqi Kurdish leaders, Islamic State continued its advance in Iraq and Syria, and also launched a series of attacks in Europe including the Paris and Brussels attacks, during the rest of 2014 through most of 2016.

1357.   In 2015, Islamic State ranked as the world's deadliest terrorist organization, having carried out more than 1,400 attacks that killed more than 7,000 people in 2015. The **Paris attacks** were **ISIS's deadliest operation outside Iraq and Syria in 2015** and the **third-deadliest ISIS attack globally** that year when measured by fatalities. Paris was unique in scale and sophistication for an external operation: seven coordinated targets, three suicide teams, and direct command-and-control from ISIS's *Emni* in Raqqa.

1358.   The operation's logistical footprint—training, bomb fabrication, and travel of attackers from Syria through Belgium—was later reused for the **March 2016 Brussels attacks**, confirming a continuous financing and operational chain.

1359.   Relative to ISIS's broader 2015 tally (≈7,000 deaths worldwide), the Paris operation accounted was by far the **most lethal ISIS strike on Western soil**.

1360.   ISIS's rationale for **attacking Europe**—France, Belgium, Germany, the U.K., and others—was framed within a **"far enemy" strategy** rooted in al-Qaeda's 1998 fatwa ("to kill the Americans and their allies—civilian and military").

1361.   ISIS revived this doctrine in **2014–2015**, but with a different logic:

    *a.*  **Deterrence and Retaliation:** To punish Western nations for participation in the U.S.-led anti-ISIS coalition (Operation Inherent Resolve).

b. **Polarization:** To provoke anti-Muslim backlash in Europe, fueling radicalization and recruitment among European Muslims.

c. **Propaganda and Legitimacy:** To project global reach after territorial losses in Syria and Iraq, preserving the appearance of a functioning caliphate.

d. **Strategic Equivalence:** To demonstrate parity with Western military power by striking high-value civilian targets in NATO capitals.

1362.   ISIS's official magazine *Dabiq* articulated this rationale explicitly in 2015: "Strike them in their homes… Paris before Rome, Brussels before Washington—so they will know the Caliphate has no borders."[538]

1363.  ISIS's European campaign (2015–2017) required centralized command, cross-border coordination, and substantial financial investment, unlike the dispersed insurgent model in Iraq and Afghanistan.Key characteristics:

a. **External Operations Unit (Emni):** Directed from Raqqa, commanded by Abu Muhammad al-Adnani, which trained and financed European cells.

b. **Recruitment and Logistics:** Dozens of trained European foreign fighters were exfiltrated from Syria into Europe using refugee routes and forged passports.

c. **Funding:** Investigations by Europol and the French DGSI showed that the **Paris (2015)** and **Brussels (2016)** attacks together cost **€80,000–100,000 ($90,000–110,000)**, covering travel, weapons, explosives (TATP), and

---

[538] Dabiq, Issue 12, "Just Terror," Nov. 2015, https://clarionproject.org/islamic-state-isis-isil-propaganda-magazine-dabiq-issue-12-just-terror/

safehouses. Europol estimated the average ISIS external-ops attack in Europe cost 15–20× more than an insurgent bombing in Iraq.[539]

d.   **Network Scale:** The Franco-Belgian cell that carried out Paris and Brussels involved **at least 30 operatives and facilitators**, many of whom fought together in Syria.

1364.   Thus, each European attack required: International travel logistics across at least three countries; Weapons smuggling networks tied to the Balkans; and Urban reconnaissance, encrypted communications, and false-ID procurement. This made the European attacks a vastly more resource-intensive branch of ISIS operations when comparing them to attacks of similar scale in Syria and Iraq. thus depended heavily on the liquidity generated by ISIS's protection rackets and extortion systems to which Defendants' payments directly contributed.

1365.   On October 16, 2016, U.S.-supported Iraqi forces began their attempt to expel Islamic State from Mosul.  The resulting campaign would last more than eight months and entail intense waves of terrorist attacks by Islamic State.

1366.   On June 29, 2017, the Iraqi government declared victory over Islamic State in the final major contested sector in Mosul, and Iraqi Prime Minister Haider al-Abadi officially declared victory over Islamic State in Mosul ten days later.  Within weeks, Islamic State was also defeated in its Syrian redoubt in Raqqa.

1367.   By 2017, Islamic State's spread to Afghanistan—and the corresponding threat posed by the spread of its terror networks—was undeniable.  On April 13, 2017, the U.S. military responded to that threat by deploying the largest non-nuclear weapon in the U.S. arsenal, and colloquially known as the "the mother of all bombs" (or "MOAB") against tunnels and caves

---

[539] *Europol, "Changes in Modus Operandi of Islamic State Revisited," 2016,* https://www.europol.europa.eu/publications-events/publications/modus_operandi_is_revisited.pdf.

that were used by Islamic State in Afghanistan, which killed dozens of Islamic State terrorists there. On April 27, 2017, Abdul Hasib, the leader of Islamic State's branch in Afghanistan, was killed in a joint U.S.-Afghan special forces raid in Nangarhar Province.

1368.   Islamic State was undeterred, however, and it retaliated with its own attacks, setting off a series of retaliatory counterstrikes and violence. On May 3, 2017, Islamic State executed a suicide bombing attack that targeted a NATO convoy traveling on a civilian thoroughfare in Kabul, Afghanistan, which killed and maimed dozens of civilians. On June 15, 2017, Islamic State publicly announced that it had seized the complex of caves in Tora Bora, Afghanistan, upon which al-Qaeda had infamously relied in its escape from American forces in late 2001. On July 14, 2017, the U.S. military reported that it had killed Islamic State's head in Afghanistan, Abu Sayed, in an airstrike on Islamic State's Afghanistan stronghold in Kunar. On July 31, 2017, Islamic State attacked the Iraqi embassy in Kabul, Afghanistan, killing two and injuring three. On August 10, 2017, U.S. forces killed several senior Islamic State terrorists in Afghanistan, including Islamic State's emir there Abdul Rahman, in an airstrike.

1369.   In December 2017, Islamic State's caliphate in Iraq substantially collapsed, as most Islamic State terrorists melted away to either resume their more traditional insurgent tactics in Iraq and Syria (where there were more nearly 10,000 Islamic State operatives or supporters as of early 2018), or, alternatively, re-deploy to Afghanistan (where Islamic State was still experiencing rapid growth). Many chose the latter.

1370.   On October 26, 2019, American special forces killed Islamic State's leader, Abu Bakr al-Baghdadi, in a U.S. raid in Idlib, Syria. Five days later, Islamic State confirmed Baghdadi's death and announced Ibrahim al Hashemi al-Qurayshi as his successor.

**Islamic State Adopted Al-Qaeda's And Al-Qaeda-In-Iraq's Networks, Infrastructure, Ideology, Tactics, Techniques, And Procedures, And Followed Al-Qaeda's Model As A**

**Globally Integrated Terror Network That Facilitated Cooperation Between Islamic State Branches**

1371.  Islamic State's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, Islamic State's:  (1) emulation of al-Qaeda and al-Qaeda-in-Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) following al-Qaeda's multinational corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon protection money payments extracted from companies to finance terrorist operations; and (5) the practice of flowing value from Islamic State terrorists in Iraq and Syria to Islamic State terrorists in Afghanistan and Pakistan.

1372.  Islamic State's terrorist campaign against the United States in Afghanistan, Iraq, and Syria was guided by a number of terrorist first principles, including, but not limited to, Islamic State's: (1) emulation of al-Qaeda and al-Qaeda-in-Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) following al-Qaeda's multinational corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon protection money payments extracted from companies to finance terrorist operations; and (5) the practice of flowing value from Islamic State terrorists in Iraq and Syria to Islamic State terrorists in Afghanistan and Pakistan.[540]

    a.  <u>Islamic State Emulated Al-Qaeda</u>

---

[540] *U.S. Dep't of State, Country Reports on Terrorism 2016* at 6–8 (2017), https://www.state.gov/reports/country-reports-on-terrorism-2016/; *Europol, Changes in Modus Operandi of Islamic State Revisited* (2016), https://www.europol.europa.eu/publications-events/publications/modus_operandi_is_revisited.pdf; *Dabiq*, Issue 12, "Just Terror," Islamic State (Nov. 2015), https://clarionproject.org/islamic-state-isis-isil-propaganda-magazine-dabiq-issue-12-just-terror/.)

1373.   Islamic State self-identified as the heir to bin Laden's legacy.

1374.   Islamic State relied upon al-Qaeda and al-Qaeda-in-Iraq operatives who switched allegiance to Islamic State to fuel its rapid growth.

1375.   Islamic State copied (or otherwise absorbed) al-Qaeda's: hatred of the United States and targeting of Americans in the Middle East to drive the U.S. from the region; Salafist ideology; organizational structure; specific bureaucracies; and policies and procedures. Islamic State also replicated al-Qaeda's external-operations doctrine, which emphasized striking the "far enemy" in the West to punish coalition governments for military action in Muslim lands. To that end, Islamic State mirrored al-Qaeda's model of establishing foreign terrorist networks in Europe composed of trained returnees from the Middle East, supervised by Syria-based command elements, and supported by transnational funding pipelines. This model produced Islamic State's most lethal external operations—the November 13, 2015 Paris attacks and the March 22, 2016 Brussels bombings—each of which was planned by operatives trained in Syria under the direction of the same external-operations bureaucracy that al-Qaeda pioneered, financed through ISIS's protection-money and extortion systems in Iraq and Syria, and executed in accordance with al-Qaeda's blueprint for synchronized, multi-site, high-casualty attacks in Western capitals.[541]

1376.   Islamic State also assumed possession of al-Qaeda-in-Iraq's weapons stockpiles, cash reserves, safe houses, logistics pipelines, facilitators, and protection rackets (including the associated relationships with business and their agents) in Iraq and Syria.

---

[541] *U.S. Dep't of State, Country Reports on Terrorism 2016* at 6–8 (2017), https://www.state.gov/reports/country-reports-on-terrorism-2016/; *Europol, Changes in Modus Operandi of Islamic State Revisited* (2016), https://www.europol.europa.eu/publications-events/publications/modus_operandi_is_revisited.pdf; *BBC News*, "Paris Attacks: What Happened on the Night" (Nov. 9, 2016), https://www.bbc.com/news/world-europe-34818994; *The Guardian*, "Brussels Bombers Identified as ISIS Cell Linked to Paris Attacks" (Apr. 10, 2016), https://www.theguardian.com/world/2016/apr/10/brussels-attackers-planned-second-assault-on-france-belgian-prosecutors.)

1377.  Islamic State fully adopted and applied the terrorist logistics, finance, and operational infrastructure and practices of its predecessor al-Qaeda-in-Iraq.  For example, Islamic State's finance apparatus was structurally similar to that of al-Qaeda-in-Iraq, and Islamic State operated similar internal bureaucracies dedicated to the raising and movement of funds, especially U.S. dollars.

1378.  Islamic State was devoted to the al-Qaeda-in-Iraq protection money framework and strategy.  Like its predecessor, Islamic State relied upon protection money payments from Ericsson and other Western corporations and contractors.  As Under Secretary Cohen publicly explained in in 2014, Islamic State "mimic[ked]" "AQI's extortion networks" in order to finance its attacks.  Indeed, leveraging al-Qaeda in Iraq's experience running protection rackets, Islamic State extracted protection payments even in territories that it did not control.

1379.  Like al-Qaeda and al-Qaeda-in-Iraq, Islamic State also embraced the use of polyterrorists.  Indeed, Islamic State professed to be *even more willing* than other organizations to embrace such terrorists, as Islamic State attempted to position itself as a "catchall" pan- Islamist organization that welcomed the involvement of terrorists from other groups, whom Islamic State used to further augment their ranks through "hybridized" cells.

Islamic State Operated As An Integrated Global Network

1380.  Like al-Qaeda, Islamic State operated as a globally integrated terrorist network, led by a "core" but operationalized by terrorists in dozens of countries, including branches throughout the Middle East.

1381.  Terrorists from Islamic State's "core" in Iraq and Syria committed attacks against Americans in Iraq, Syria, and Afghanistan, and on a few occasions in Europe and Africa.

1382.  Islamic State's globally integrated network was always led by Islamic State's emir, who was also known as the "caliph" at certain times.

1383.  Under Islamic State's globally integrated approach, every Islamic State terrorist associated with any Islamic State branch pledged allegiance to the emir, who was sometimes known as the caliph.

Islamic State Followed A Multi-National Corporate Model

1384.  Islamic State generally embraced, often to the letter, al-Qaeda's and al-Qaeda-in- Iraq's multinational corporate-inspired governance and business models, including al-Qaeda's use of branches, command-and-control system, organizational structures, and ideological mission.

1385.  Islamic State also continued al-Qaeda-in-Iraq's tactic of undercutting their competition in the illicit marketplace, *e.g.*, by competing on "price" by providing security at a cheaper rate than any legal alternative, as well as all illegal alternatives like another competing route that transited through Shia-controlled territory.

1386.  Confiscated Islamic State terrorist training manuals revealed that Islamic State, like al-Qaeda-in-Iraq, aimed to build out a formal and centralized terrorist-run state, supported by an array of administrative functions that focused on collecting "taxes" from companies with business interests in Islamic State's territory and creating terrorist training camps to grow Islamic State's caliphate beyond Iraq and Syria, with a particular emphasis on Afghanistan.

1387.  Islamic State's "Military Council" was charged with the defense of the Caliphate, i.e., conducting terrorist attacks against America and its Iraqi allies.

1388.  Islamic State's "Fighters Assistance Council" used Islamic State revenues from Iraq and Syria to fund foreign fighters and to flow such fighters between Islamic State's Iraq/Syria core, its branch in Afghanistan and its European terror campaign theater.

1389.   Islamic State had a sophisticated, well-developed, and complex financial structure. Islamic State's Finance Council was a cabinet level entity that managed Islamic State's revenue and expenditures derived from illicit proceeds from occupation of territory, including from its protection rackets and illicit taxation of goods and cash that transited territory where Islamic State operated. The "Finance Council" governed all revenue and expenditure streams, established and approved annual budgets, and even had a "Chief Financial Officer" to manage it all. Islamic State's Finance Council oversaw the financial infrastructure of the organization and managed

1390.   Islamic State's cash-based finances via "finance distribution and tax collection centers" in Mosul and "finance storage centers" or cash storage sites in Al Qaim, near the Iraqi-Syrian border. Islamic State also operated multiple "taxation offices" replete with financial auditors.

## THE TERROR ATTACKS

### 1.   THE MARCH 22, 2016 ATTACK ON THE BRUSSELS AIRPORT AND THE BRUSSELS METRO TRAIN

1391.   Early in the morning on March 22, 2016, Ibrahim el Bakraoui, Nadim Laachraoui, and Mohamed Abrini walked together through the Brussels Airport in Zaventem, Brussels, Belgium ("Brussels Airport" or "Airport") disguised as would-be travelers. All three of them were terrorists of THE ISLAMIC STATE and were carrying deadly bombs.

1392.   Shortly before 8:00am local time, the three bombers separated to different places within the main terminal. At 7:58am, the first bomber detonated his bomb near a check-in row at the Brussels Airport ticket counters.

1393.   Approximately 10 seconds later. The second bomber detonated his bomb near a second check-in row of ticket counters at the Brussels Airport. A third bomber was unable to detonate his bomb due to the force of the second explosion.

1394. Khaled el-Bakraoui detonated his bomb on the Brussels Metro just over an hour after the second Airport bomb, killing himself and many of the other passengers in his metro car.

1395. This explosion brought the total number of deaths to thirty-two (32) and injuries to at least three-hundred and forty (340).

1396. Immediately following the Brussels Airport and Metro Attacks, ISIS claimed responsibility for the terrorist bombings through a news agency affiliated with THE ISLAMIC STATE, the Amaq Agency.

1397. The Brussels Airport and Metro Attacks were each organized, committed and coordinated by ISIS.

1398. ISIS helped provide training, weapons, explosives, and other assistance in order to maximize the murderous capabilities of the terrorist attackers.

1399. Brussels was susceptible to attack due to the large number of native Belgians who have traveled to Syria to join ISIS and were permitted to return to Belgium because of their Belgian passports.

1400. Brussels is also a largely symbolic target as it is home to the European Union and NATO headquarters.

1401. The terrorists targeted international flight counters, murdering approximately thirty-two (32) people from fourteen (14) different countries including Belgium, Britain, China, France, Germany, Hungary, India, Israel, Italy, Morocco Netherlands, Peru, Poland, Sweden, and the United States.

1402. The terrorists attacked passengers as young as 20 and as old as 79, indiscriminately killing and maiming the elderly, women, and children. Videos show primary school aged children fleeing from the Airport after the explosions.

1403.   The Brussels Airport Attack was carried out by the suicide bombers, Ibrahim el Bakraoui, Khaled el-Bakraoui, and Nadim Laachraoui, all three of whom were born in Belgium.

1404.   A fourth would-be-bomber, fellow Belgian Mohamed Abrini, fled the Airport after the first two bombs went off but before his explosive detonated. Abrini was later apprehended and interrogated.

1405.   All four men are or were Belgian nationals of Moroccan descent.

1406.   Each and all of the terrorists acted on behalf of ISIS, with the support and aid of the Defendants.

1407.   The four ISIS perpetrators of the attacks all had connections to Syria. Each of the terrorists were members of the Brussels ISIS cell and had traveled to and visited Syria, where they received training and support and were recruited for their eventual operation by ISIS operatives in Raqqa, Syria.

1408.   In June 2015, Bakraoui was arrested in Turkey while attempting to enter Syria and was deported back to Europe. Laachraoui traveled to Syria in February 2013.

1409.   For his part, Abrini moved to Raqqa, Syria in 2015, to visit the grave of his deceased brother Soulaymane.

1410.   This Belgian ISIS Cell (as well as the ISIS terrorists who were part of the Paris ISIS cell which committed the terror attack in Paris, France) in late 2015 is believed to have been run by Abdelhamid Abaaoud, known by his ISIS *nom de guerre* Abu Aomar al Beljiki.

1411.   According to Abrini, Abaaoud, a Belgian national, was an ISIS "emir," who commanded 1000 men in Raqqa, including many Belgians and Frenchmen.

1412.   Abaaoud reportedly headed a unit focusing on repatriating European-origin jihadis in Syria back to their countries of origin to perpetrate terrorist attacks.

1413.  In July 2015, a Belgian court sentenced Abaaoud in absentia (as he was believed to then be in Raqqa, Syria) to 20 years in prison, for his role as a principal recruiter of European jihadis for ISIS.

1414.  Abaaoud recruited Abrini during his 2015 trip to Raqqa, and later dispatched him from Syria to England to pick up $3800 to deliver to Abaaoud's brother, another ISIS operative.

1415.  Abaaoud was eventually killed by French police during a nationwide manhunt following the Paris ISIS 2015 attacks. Before his death, according to former French C/T official Jean Charles Brisard, Abaaoud boasted that he had brought "90 jihadis to Europe" from Syria.

1416.  Abaaoud was believed to have served as a direct link between Raqqa-based ISIS leadership and terror cells in Europe.

1417.  Another key Raqqa-based point of command and control was Osama Attar, known as Abu Ahmed.

1418.  Attar, a Belgian national, initially traveled to Iraq in 2002 to fight against the United States.

1419.  He was later arrested, and imprisoned in Camp Bucca, where he is thought to have meet Abu Bakr al-Baghdadi.

1420.  The Bakraoui brothers, who perpetrated suicide attacks in the Brussels Airport and on the Brussels Metro in Molenbeek, were Attar's cousins.

1421.  In Raqqa, Syria, Attar was responsible for the preparation of terror cells, including military training, providing them with false passports, communication devices, contacts with facilitators and smugglers as well as money.

1422.  From Syria, in the planning stages of the Brussels attacks, Attar exchanged encrypted messages with Laachraoui, providing operational instruction and guidance.

1423.   When the safe house of Laachraoui's cell was raided and the group lost the ammunition for assault rifles, for example, Attar advised him to use explosives instead of guns.

1424.   Attar also received [and caused to be publicly published] the last wills of the Brussels bombers.

1425.   The contacts between the Brussels cell and Attar were confirmed by information discovered on Bakraoui's computer, which was retrieved from a garbage bin near the safe house from which the Brussels Airport attack was launched. Bakraoui and Laachraoui briefed Attar for the last time the day prior to the Brussels Airport and Metro attacks.

1426.   Police recovered 15kg of TATP high explosive, chemicals, detonators, bomb-making materials, and an ISIS flag at the apartment where a taxi driver picked up Bakraoui, Laachraoui, and Abrini.

1427.   The same explosive materials and chemicals were used by the ISIS cell that had committed the terrorist attack in Paris a few months earlier.

1428.   The Brussels Airport and Metro Attacks were designed to send a message of fear, terrorist threat, coordination and power; and are one of many terrorist attacks that ISIS, operating from within Syria, and elsewhere, and with the material support of Defendants.

1429.   In January 2015, Amedy Coulibaly and three other terrorists had attacked the headquarters of a satirical French newspaper *Charlie Hebdo*. During the attack, Coulibaly called CNN and reported that he belonged to THE ISLAMIC STATE, which subsequently claimed responsibility for the attack.  Police later found ISIS flags in Coulibaly's apartment.

1430.   ISIS is determined to use terror attacks against Americans and other freedom loving people. Some additional ISIS attacks are enumerated below, as they demonstrate the pattern of heinous terror committed by ISIS and with the material support of the Defendants.

1431.   On January 27th, 2015, gunmen in Tripoli, Libya, attacked a hotel, killing nine people including one American. The attack was claimed by ISIS, operating from Syria and elsewhere and included a car bomb and grenades. Two days later, ISIS jihadists bombed Egyptian security forces, killing fifty (50) people. Of the fifty (50), fourteen (14) were civilians.

1432.   On November 13, 2015, ISIS organized and coordinated multiple attacks in Paris, with the material support of the Defendants killing one-hundred and thirty (130) people and wounding hundreds more.

1433.   The Paris attacks consisted of three teams including suicide bombers and men armed with assault rifles.

1434.   A suicide bomber also attacked the Stade de France in Paris during an international soccer game between France and Germany where then-President of France Francois Hollande was in attendance.

1435.   Around the same time, gunmen attacked on the street Rue Albert and at a restaurant and bar. Meanwhile, in the center of Paris other shootings were beginning.

1436.   The deadliest attack occurred at Bataclan Hall in Paris, France, a concert venue where eighty-nine (89) people died and at least ninety-nine (99) others were taken to the hospital in critical condition.

1437.   ISIS is believed to have committed each of these attacks and has been overtly and covertly supported and aided by the Defendants in numerous material ways, contributing to the deaths and maiming caused by ISIS, operating from Paris and Brussels.

1438.   On March 22, 2016, ISIS operatives detonated coordinated explosive devices at the Brussels (Zaventem) Airport, killing and maiming civilians, including U.S. nationals. ISIS claimed responsibility. The Brussels operation formed part of the same ISIS

external-operations campaign contemporaneous with Paris; several operatives traveled between ISIS-held territory and Europe. As detailed below, Plaintiffs were murdered or grievously injured in that attack.

1439.  ISIS's external operations directorate directed, financed, and coordinated the Brussels operation as part of its 2015–2016 campaign against Western civilians. Defendants' protection payments and enabling logistics to ISIS (and its predecessor AQI) materially increased ISIS's resources and operational latitude by ensuring that Ericsson's profitable work continued in ISIS-held areas, while funds were diverted to ISIS and its allied facilitation networks. Money and equipment are fungible; by paying protection and providing devices as alleged herein, Defendants knowingly and substantially assisted ISIS's capacity to plan and execute the Brussels Attack.

1440.  The Plaintiffs include those killed and injured in the Brussels Attack, and their family members.

1441.  Plaintiff victims include the Estates of (i) Justin Shults, (ii) Stephanie Shults, and (iii) Gail Martinez, each of whom were murdered in the Brussels Airport Attack. Plaintiff victims also include Carolyn G. Moore, Melchizedek Martinez, Kianni Martinez, Kailani Martinez, Kimo Martinez, N.M, Joseph D. Empey, Richard I. Norby, Mason Wells, and Chaim Winternitz., each of whom suffered physical injuries in the Brussels Airport Attack.  Plaintiffs also include the near family members of each victim, each of whom are entitled to bring claims herein as a result of the death or injuries of their loved ones.

Justin and Stephanie Shults

1442.  Justin and his wife Stephanie met at Vanderbilt University where they graduated in 2008. They married in 2011. Justin and Stephanie were both certified public accountants.

1443.    Justin Shults worked for a company called Clarcor, and often flew back and forth between the United States and Belgium.

1444.    Stephanie's job at Mars, Incorporated took Justin and Stephanie to Belgium in 2014 where they were living at the time they both were murdered at the hands of the ISIS terrorists in the Brussels Airport Attack.

1445.    Stephanie's mother, Carolyn G. Moore, was visiting Justin and Stephanie in Belgium prior to and at the time of the attack. Carolyn was scheduled to fly home to Lexington, KY in the morning of the attack on March 22, 2016. Justin and Stephanie took Carolyn to the airport for her flight home.

1446.    After saying their goodbyes outside of the security screening, a bomb was detonated murdering both Justin and Stephanie and also injuring Carolyn, all to their damage.

Carolyn G. Moore

1447.    After having been driven to the Brussels Airport by her daughter Stephanie and son-in-law Justin, Carolyn G. Moore entered the Brussel Airport.  When the ISIS terrorists detonated their bombs, Carolyn G. Moore was thrown to the ground onto her back with great force and was knocked unconscious.

1448.    Carolyn G. Moore had visited with Stephanie and Justin for a week in Belgium and was heading back to Kentucky on the morning of the attack. It was a cool morning and Justin had on no jacket. They all joked about that and how Stephanie and Carolyn were all bundled up.

1449.    The three of them entered the airport together. Justin told his mother-in-law that she needed to pull her own suitcase so there would be no security issues.

1450.    Initially Carolyn could see Stephanie and Justin as she stood in line. They were sitting in chairs facing the lines. As the section became more crowded, Carolyn was unable to see them

anymore. Then she heard a loud boom and saw a big flash of light above her. She was thrown to the ground and knocked unconscious.

1451.    Carolyn awoke to a young lady trying to pull her backpack from under her. The young lady grabbed her backpack and yelled "run" before running herself. Carolyn stood up and looked around. The floor was gray, and it looked like the ceiling was on the floor. Carolyn remembers yelling for Stephanie for about a minute. After not being able to find Stephanie or Justin, Carolyn exited the airport through a broken window that had been shattered by the explosion.

1452.    Carolyn told a woman she encountered outside the airport that she was looking for her daughter and son-in-law. The woman told Carolyn that everyone had to evacuate to a parking lot a few meters away and suggested that Stephanie and Justin may have been evacuated to another area.

1453.    Carolyn was directed to some buses to be transported to safety to what she believed was a stadium. She went into an office and told them she was still looking for her daughter. They said they would look for her. They then connected Carolyn with a social worker who spoke English.

1454.    Carolyn suffered hearing loss in the blast and could not hear from her right ear. She was given some medicine.

1455.    Carolyn was taken to a hotel by the police where she waited to find her daughter and son-in-law and also waited for her family to arrive from the United States. Her husband, Geary Moore, and Justin's mother and stepfather, Sheila and Jon Shell, had flown to Belgium when they learned of the terrorist attack.  Carolyn, Geary and Justin's parents wanted to look for Justin and Stephanie at hospitals, but the social worker had no idea which hospital they could be at.  The families agonizingly remained in Belgium for about 4 or 5 days before they learned

that Justin and Stephanie had been killed in the attack and their remains had been found. Their families were permitted to view the bodies before they were flown back to the United States for burial.

1456.    The next day the Shults/Shell and Moore families flew home. After a few weeks, Justin and Stephanie's bodies were flown to Dover Airforce Base. The families held a combined funeral, and Justin and Stephanie are buried together in Lexington, KY.

1457.    Carolyn has suffered greatly as a result of not only the heinous murder of her daughter and son in law, but also of her own physical and emotional injuries, all to her damage.

Gail and Melchizedek Martinez, Kianni Martinez, Kailani Martinez, Kimo Martinez and N.M.

1458.    Melchizedek "Kato" Martinez and his wife Gail and four children, Kianni, Kailani Martinez, Kimo Martinez and N.M, were temporarily living in Brussels, Belgium as a family and were traveling to enjoy a family trip to Walt Disney World in Orlando, Florida.

1459.    The family of six traveled together to Brussels Airport at around 5:30am for their 9:30am flight. They stood in line at the airport to retrieve their tickets and check their luggage. Kato went to the restroom and came back. Gail was next to him. Kianni was to the right of him with the other Martinez children.

1460.    At that moment, no less than three feet behind them, a terrorist denoted a bomb.

1461.    Kato was blasted forward and knocked unconscious. He was in and out of consciousness for some time. When he came to, he realized he suffered significant injuries including to his left leg which was severely damaged.

1462.    He looked around and realized that everyone who was within a 2 -foot range of the explosion appeared to be dead.

1463.   Despite his severe injuries and pain, Kato's adrenalin allowed him to search for his family. Kato found his daughter, Kianni, underneath a pile of bodies. Her left leg was blown apart. She was going into shock. After trying to comfort her, he continued searching for his wife and other children.

1464.   Kato then found his wife, Gail. He tried to help her before realizing she did not have a pulse and he believed she was dead. However, he alerted the first responders and asked them to care for his wife, hoping that he was wrong, and that she was still alive.

1465.   Unable to find his other children, Kato knew his adrenaline was subsiding and he was going into shock, and would probably lose consciousness soon, so he also asked the first responders to take Kianni. As the first responders were taking Kianni, Kato recalls her yelling "don't go".

1466.   Kato eventually lost consciousness and the next thing he remembers, he was waking up and being resuscitated. He was taken to the hospital to be treated. He had 3rd degree burns over his entire body, a bullet wound in his left leg.  He also had a left ankle fracture, and shrapnel in his scalp, arms and legs.

1467.   He eventually learned that all of his children were down the hall from him in the hospital also being treated for their injuries. Kianni's injuries included her left leg which was blown apart. She also had 3rd degree burns and shrapnel all over her body. Kimo Martinez injuries included 3rd degree burns over 40% of his body and he was in a coma. Kailani Martinez was also in a coma with 3rd degree burns all over and blast injuries to her legs.  His youngest daughter N.M.'s injuries included 3rd degree burns and blast injuries.

Joseph Dresden "Dres" Empey

1468.   Joseph Dresden ("Dres") Empey had been serving as a missionary for one year and nine months for The Church of Jesus Christ of Latter-day Saints ("Church") in the Paris, France,

mission when he was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

1469.   On the day of the attack, Dres Empey and two other fellow missionaries, plaintiffs Richard Norby, an Elder of the Church, and Mason Wells were at the airport's check-in hall accompanying a fourth missionary, who was on her way to a mission assignment in Ohio, when the ISIS terrorists detonated their explosives.

1470.   After waiting in the line to check in for her flight for only a few minutes, the bomb exploded. Dres was knocked unconscious by the blast.

1471.   After a few minutes, Dres regained consciousness. As he came back into consciousness, he heard an extremely loud ringing in his ears and people yelling. He had no idea what had just happened until the memory of the fact that he was just standing in a line at the airport came back to him. He was laying on his right side, and as he opened his eyes, he saw mostly gray and smoke. When he tried to stand up, he saw people lying all over the floor.

1472.   He realized that there had been an explosion. His first thought was to look for the other three people in his group. He walked around and saw the different people lying on the floor. Many of them were screaming and asking for his help. After looking with no success, Dres went to a large concrete pillar and stood behind it for a second with the fear that there still might be more terrorists or an additional attack. The front doors of the airport were 10-15 meters in front of him, and after leaning against that square pillar for a short while, he moved to the front door.

1473.   Immediately after exiting, Dres found another of his fellow missionaries alive but also injured. It was Mason Wells.

1474.   As Dres was talking with Mason, he looked over and saw a man in a suit laying on the ground that he thought might be Richard Norby. He limped over to the man in the suit and confirmed that it was indeed Richard Norby. He was severely injured. He appeared to have suffered burns and a severe injury to his leg; which had been snapped in the opposite direction.

1475.   After a while, first responders came to attend to Dres and the others. He then received an IV with pain medication. He was placed in an ambulance and taken to the hospital. Once arriving at the hospital, Dres was taken out of the ambulance and began receiving treatment.

1476.   As a result of the bombing, Dres suffered severe burns and injuries.  Recovery from his injuries has been an extensive process.  He spent a few weeks in recovery in Brussels and then subsequently for an extended period after he returned home to the United States, all to his damage.

Richard Norby

1477.   Richard Norby had been serving as missionary President for The Church of Jesus Christ of Latter-day Saints ("Church") when he was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

1478.   While waiting in line at the check-in counter with his fellow missionaries, Richard Norby was severely injured when ISIS terrorists detonated a bomb. Richard recalls a loud explosion, chaos and being thrown to the ground. He could see the smoke and destruction. He looked at his hands and thought it was soot, so he tried to wipe it off only to realize that his skin was coming off. Approximately 10 seconds later, another bomb was detonated.  He was trying to gain his footing and run only to realize that his leg was also injured, and he collapsed to the ground. He called his wife, Pam, who was living with him in Belgium.

1479.   Pam recalls Richard calling her and telling her he had been injured in the terrorist attack at the Brussels Airport and they had been burned and thought his leg was broken.  Hearing this from Richard made Pam feel helpless that she was unable to be with her husband and assist. He was listening to the screams and cries of people that he was unable to assist. Pam was distraught and fearful for Richard and felt helpless as she was not there.

1480.   Richard next recalls waking up in a triage area adjacent to the airport. They put placards on each person that were color coordinated by priority. Richard was in the airport triage area for about 2 hours before he was transported to a hospital.

1481.   Richard's injuries were significant. They included 2nd and 3rd degree burns over 35% of his body. His fibula was broken in two places, his heel was fractured, and his body was littered with shrapnel from head to toe.

1482.   He had to have staples in the back of his head. The punctures on his back were too wide to staple so they just had to heal. He has skin grafts on his right hand. His left hand had shrapnel that caused nerve damage

1483.   Richard's right leg had a wound seven inches long, his calf had a shrapnel would that was two inches wide and a half inch deep.

1484.   While in the hospital, Richard developed a fever and was showing signs of significant blood loss.  Richard had additional surgery to remove a large piece of shrapnel that was causing the bleeding. He also had issues with his toes because of nerve damage from the right leg.

1485.   Richard continues to experience lack of function and pain as a result of his injuries.

1486.   He has needed additional treatment and surgeries because of his permanent injuries and experienced long-term difficulties in his recovery, all to his damage.

Mason Wells

1487.   Mason Wells, a missionary for The Church of Jesus Christ of Latter-day Saints, was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

1488.   He was there with his fellow missionaries, Plaintiffs Richard I. Norby and Joseph "Dres" Empey and another female missionary who they were accompanying to the airport for her flight back to the United States.

1489.   The group was waiting in the line to check in the female missionary for her flight when the first bomb exploded. Mason recalls the force of the blast catapulting him a distance from where he has been standing.

1490.   When Mason realized what had happened, he became overcome by fear, uncertainty, and the threat of death.

1491.   As the smoke cleared, all Mason could think about was his fellow missionaries and the need to get out of the airport to safety. However, his injuries made that a challenging feat. His legs and foot had been shredded by shrapnel and he was burned all over. Although he was afraid to try to move, he was even more afraid to stay where he was.

1492.   Mason finally mustered up the energy and bravery to make a run for it. He dragged his bloodied and mangled body out of the airport and collapsed onto the sidewalk where he was cared for by a young woman.

1493.   A few minutes later, Mason was delighted to see that his fellow missionary, Joseph Dresden Empey, and also Mission President Richard Norby, although also severely injured, had also made it out of the airport to safety.

1494.   Mason's injuries were very severe. He had third degree burns, numerous lacerations, a cracked heel bone and a ruptured Achilles tendon. Mason spent the next two months in

hospitals; first in Belgium, then back home in Utah. He underwent numerous surgeries and surgical procedures and was told he may never run again.

1495.   Mason has scars all over the lower half of his body and continues to deal with the trauma of the horrific memories of that day, all to his damage.

Chaim Winternitz

1496.   Prior to the first bomb being detonated, Mr. Winternitz and his brother-in-law, Mr. Farkash, were at the check-in area of the main terminal of the Airport waiting to board their flight to Israel.

1497.   They were in Brussels for Mr. Farkash's brother, Aharon's, wedding, with 13 relatives and close family friends, including Mr. Winternitz's wife, Esther, and daughter, BW, as well as Mr. Farkash's sister.

1498.   Just before the attack started, Esther went back to the counter to receive her value added tax (VAT) refund. Mr. Winternitz impulsively asked Esther to take BW with her, which she did.

1499.   Hearing the bomb, Mr. Winternitz turned to Mr. Farkash and asked in Yiddish, "Mendy (Mr. Farkash) was that a bomb?"

1500.   They immediately ran towards the main entrance; Mr. Winternitz pushing his suitcase cart.

1501.   Esther and BW were still at the counter claiming the VAT and were not in the immediate vicinity of the bombs.

1502.   As everyone scrambled away from the first explosion, a second bomb went off near the main Airport entrance 37 seconds after the initial explosion.

1503.   The second bomb threw Mr. Winternitz several feet into the air.  The bomb caused burns on most of his body, shattered his right leg and lodged fragments of shrapnel in his legs,

abdomen and head.  His left eardrum was pierced. He suffered severe, permanent and painful injuries.

1504.   Mr. Winternitz was barely able to walk when a stranger came over to him to an emergency room located within the airport.

1505.   Mr. Winternitz spent three hours in the emergency area without being able to contact his family.  During this time, his wife Esther and daughter BW could not locate him and feared he was dead.

1506.   Eventually, Mr. Winternitz was able to contact his mother from the airport emergency area. She then communicated to Esther that Chaim was indeed alive, but it took another six hours for them to be re-united.

1507.   From the airport emergency area, Mr. Winternitz was transported by ambulance to the local Erasme Hospital.  Upon arrival, x-rays were taken, and may of his wounds were stitched closed.  The medical personnel at Esrame Hospital told him that his leg might need to be amputated because of the severity of the injury.

1508.   Later that evening Mr. Winternitz was transferred from Esrame Hospital to AZ Monica Hospital in Antwerp, Belgium.  At AZ Monica Hospital, Mr. Winternitz underwent surgery on his right leg and he was admitted to the ICU.

1509.   Mr. Winternitz remained in AZ Monica Hospital for ten days.  During this time, each day he was transferred to ZNA Stuivenberg Hospital for therapy on his eardrum.

1510.   Eventually, on March 31, 2016 Mr. Winternitz was able to be transferred back to Israel by private air ambulance so that he could be admitted to Hadassah University Medical Center in Jerusalem, Israel for the remainder of his recovery and rehabilitation. The private medical transportation was paid for and arranged by family and friends.

1511. Once admitted to Hadassah University Medical Center, Mr. Winternitz underwent additional surgeries. These included surgeries on his leg and additional procedures to remove shrapnel from his back and head.

1512. While at Hadassah Hospital Mr. Winternitz underwent daily physical therapy.

1513. Mr. Winternitz remained continuously hospitalized at Hadassah Hospital until April 22, 2016, one month after the attack.

1514. The attack caused Mr. Winternitz to permanently lose all hearing in his left ear.

1515. Mr. Winternitz suffered significant injuries to his legs. It was not until eight months after the attack that Mr. Winternitz was finally able to walk again, however, Mr. Winternitz still needs crutches to walk.

## THE NOVEMBER 13, 2015 PARIS ATTACKS

1516. On November 13, 2015, ISIS organized and coordinated multiple attacks in Paris, killing one-hundred and thirty (130) people and wounding and injuring over 350 more innocent people. The Paris attacks consisted of three teams from an ISIS terror cell including suicide bombers and men armed with assault rifles. Teams of ISIS operatives attacked the Stade de France in Paris during an international soccer game between France and Germany where then-President of France Francois Hollande was in attendance.

1517. Upon information and belief, three operatives committed the attack at the Stade de France by detonating suicide vests as they approached the Stadium.

1518. On the same day and approximately at the same time, ISIS gunmen attacked cafes on Boulevard Voltaire. They opened fire with Kalashnikov rifles before detonating suicide belts and vests.

1519.  The deadliest attack occurred at the Bataclan Theatre, a concert venue, where at least eighty-nine (89) people died and at least ninety-nine (99) others were taken to the hospital in critical condition. Plaintiff Helen Jane Wilson was severely injured in the Paris Bataclan Theatre Terrorist Attack.

1520.  During the Paris Bataclan Theatre Terrorist Attack, three ISIS operatives entered the concert hall and opened fire with Kalashnikov rifles before exploding suicide vests.

1521.  Hours after the attack, ISIS released a video through its propaganda arm, the Al-Hayat Media Centre showing a bearded fighter, speaking in Arabic, calling on French Muslims to carry out attacks in France.  Shortly after releasing the video, ISIS officially claimed responsibility for each of these attacks citing recent French airstrikes in Syria, insults directed at the prophet Muhammad and general disgust with French and western civilization as its motives.  The authenticity[542] of ISIS's claim has been verified by several Western government and intelligence officials.

1522.  ISIS has been overtly and covertly supported and aided by the Defendants in numerous ways including but not limited to providing funding to ISIS, enabling the use of funds for passage to Paris from Syria, logistical support, weapons, recruiting training, all of which contributed and caused the deaths and maiming of innocent civilians, including the Plaintiff, Ms. Wilson.

1523.  Key members of the ISIS cell that planned and carried out the Paris Attacks are, upon information and belief: Abedelhamid Abbaaoud (a.k.a. Abu Aomar al-Beljiki), Salah Abdedlsam, Ibrahim al-Bakrawi, Khalid al Bakrawi, Najim Laachraouri, Oussama Atar (a.k.a. Abu Ahmed), Abdelilah Himich (a.k.a. Abu Sulayman al-Faransi), Khaled Zerkani, Mohamed

---

[542]    https://www.theguardian.com/world/live/2015/nov/14/paris-terror-attacks-attackers-dead-mass-killing-live-updates?page=with:block-5646c398e4b06fb53392c5df#block-5646c398e4b06fb53392c5df

Abrini, Fabien Clain (a.k.a. Abu Anas al-Faransi), Mohammed Belkaid (a.k.a. Soufiane Kayal), Ismael Omar Mostefai, Foued Mohamed-Aggad, Samy Amimour, Ibrahim (Brahim) Abdeslam, Chakib Akrouh, Bilal Hadfi, Ahmad al-Mohammad, and M al-Mahmod.

1524.   These operatives organized, scouted locations, conducted pre-attack surveillance, recruited operatives, coordinated operatives, transported weapons and personnel to carry out the attacks, supplied safehouses, assembled suicide vests and bombs used in the attacks, created infrastructure in Paris, disseminated propaganda, provided funds and committed the terrorist attacks that occurred that day in Paris, including the Bataclan Attack in which Ms. Wilson was severely and permanently injured, all to her damage.

1525.   These operatives also joined and fought for various ISIS units and traveled to and from Syria in the months and years immediately prior to the Paris Attacks.

1526.   ISIS's external operations directorate directed, financed, and coordinated the Paris operation as part of its 2015–2016 campaign against Western civilians. Defendants' protection payments and enabling logistics to ISIS (and its predecessor AQI) materially increased ISIS's resources and operational latitude by ensuring that Ericsson's profitable work continued in ISIS-held areas, while funds were diverted to ISIS and its allied facilitation networks. Money and equipment are fungible; by paying protection and providing devices as alleged herein, Defendants knowingly and substantially assisted ISIS's capacity to plan and execute the Paris attacks.

1527.   On November 13, 2015, Ms. Wilson was with her friend, Mr. Nick Alexander, who was travelling with the Eagles of Death Metal, the band scheduled to play at the Bataclan Theatre that evening, as he worked selling merchandise and souvenirs near the theatre's entrance.

1528.  At 9:40 p.m. the first gunshots went off, vividly making popping and crackling noises over the sound of the electric guitars on stage. As Ms. Wilson noticed the gunmen, they opened fired into the crowd again. Mr. Alexander immediately pulled Ms. Wilson to the ground, using his body to protect hers. The couple played dead underneath a table for as long as possible.

1529.  While Mr. Alexander and Ms. Wilson were trying to hide, a gunman came toward their counter and opened fire. Two bullets ripped through Ms. Wilson's thighs, missing her femoral artery by one inch.  Mr. Alexander was killed in the Bataclan Attack – he passed away in Ms. Wilson's arms inside the theatre. Ten minutes later, Ms. Wilson escaped from the theatre.

1530.  Although Ms. Wilson survived the attack after receiving a transfusion in the ambulance, she suffered severe physical and psychological short-term, long-term, temporary and/or permanent injuries. Her injuries include but are not limited to muscle and nerve damage in both legs which affects her ability to sit, stand and/or walk for extended periods of time, significant scarring in both legs as a result of the bullet wounds she sustained, severe psychological trauma including Post Traumatic Stress Disorder ("PTSD") which includes insomnia, flashbacks, depression, and panic attacks.  In addition, she suffers from digestive issues affecting her digestive system, liver and pancreas, all of which are result of the stress she has experienced following the Bataclan Attack.

1531.  Ms. Wilson still experiences chronic pain in both legs. Walking for long periods of time is painful. As a result of these injuries which did and continue to affect her ability to enjoy and experience everyday life, she receives medical treatment for her physical injuries.  In addition, she participates in twice-weekly psychological counseling to address her PTSD and other psychological injuries.   She takes regular medications to address all of these physical and

psychological injuries.  She is required to see her doctors regularly for treatments with her legs, as a result of her permanent disabilities suffered as a result of the terror attack.

**The January 2018 Taliban Attack on the Intercontinental Hotel**

1532.   The Intercontinental Hotel is a 5-star, government owned hotel located in a residential area in western Kabul, near a former royal palace.  It is Afghanistan's first luxury hotel.  It has six floors, 200 rooms, a swimming pool, gym, internet cafe and four different restaurants.  The hotel frequently hosts Afghan politicians and other VIPs, and is a platform for foreign, especially Western, diplomats, businessmen, journalists and tourists visiting Kabul, who use it as a venue for meetings.  It is a highly symbolic landmark, and a recurring soft target for the Taliban.

1533.   On June 28, 2011, at 22:00 local time, nine Taliban terrorists commenced a 5-hour siege of the Intercontinental Hotel in Kabul.  At the time, thirty provincial government officials were meeting at the hotel to discuss the allocation of security responsibilities between the U.S. military and Afghan security forces. The hotel was also hosting an information technology conference.  The terrorists were armed with suicide vests, AK-47 assault rifles, hand grenades and rocket-propelled grenade launchers. The Attack resulted in 21 dead and 18 wounded.  The State Department determined and publicly stated in an official notice that Qari Zakir, the Chief of Suicide Operations and training in small arms, heavy weapons and improvised explosive devices for the Haqqani Network, had planned and implemented the Attack. The Afghan Taliban claimed responsibility for the Attack in an official statement issued by its spokesman Zabiullah Mujahid.

1534.   Shortly after his election, President Trump dropped a GBU-43/B Massive Ordnance Blast Bomb (MOAB), the so-called "mother of all bombs", on terrorists in Afghan caves in April

2017.  Then, on August 21, 2017, in a public speech delivered at Fort Meyer, Virginia, President Trump confirmed that his administration had made a major shift in U.S. policy on Afghanistan. He announced that he was lifting restrictions in the rules of engagement applicable in the theatre that had inhibited U.S. forces in their fight against the Taliban. He stated they now had a "clear mission to defeat the enemy."  He stated that he would "expand authority for American armed forces to target the terrorist and criminal networks that sow violence and chaos throughout Afghanistan."  He promised the U.S. military would remain in Afghanistan in order to "continue its support for the Afghan government and the Afghan military as they confront the Taliban."  He repudiated the Obama Administration's Afghanistan's strategy based on a fixed troop drawdown schedule, focusing instead on the "conditions" on the ground. "We are not nation-building again," he said, "we are killing terrorists." The Taliban responded by escalating its terror attacks.

1535.  On January 20, 2018, at 21:00 local time, five Taliban terrorists commenced a second siege on the Intercontinental Hotel, this one lasting 17 hours.  The terrorists wore suicide vests, and used AK-47 assault rifles, hand grenades and rocket-propelled grenade launchers.  They carried portable sound systems playing Taliban war songs.  The terrorists sought out and specifically targeted foreigners. One of the terrorists shouted "Where are the foreigners?"  The terrorists went room-to-room, hunting foreigners. After a protracted standoff, a combination of Afghan Special Forces, Afghan Army and Norwegian Special Forces stormed the hotel and killed some of the terrorists.  Other terrorists died when they detonated their suicide vests. Many guests were killed or injured jumping or attempting to climb from their room windows. Guests spent terrifying hours overnight hiding in their rooms.  Over 160 guests were rescued.

The Attack resulted in 42 dead, including 4 American citizens, and 14 wounded, including 2 American citizens.

1536.   The Afghan Ministry of Interior Affairs and intelligence services released an official statement that the assault had been organized and carried out by terrorists dispatched by the Haqqani Network.   The Afghan Taliban immediately claimed responsibility for the Attack in an official statement issued by its spokesman Zabiullah Mujahid on January 20, 2018 saying that it had "killed tens of foreign invaders and their puppets."  Before the death count had been completed, Mujahid also told Arabic news channel Al Jazeera, "Our five fighters, Bilal, Ayubi, Khalil, Bashar and Abid entered the building and conducted the operation that resulted in the death of 10 foreigners and Afghan government officials."  On January 22, 2018, then Secretary of State Rex Tillerson stated "We have seen the Taliban's claim of responsibility and condemn terrorist groups for their violent campaign against Afghan and foreign personnel working to improve Afghanistan."

1537.   Defendants' long-running payments and provision of sensitive communications devices in Afghanistan, as pleaded herein, materially increased the capacity and impunity of the Haqqani Network and Taliban cells that executed the Intercontinental Hotel attack.

The Murder of Glenn Selig

1538.  Glenn Selig was a devoted and loving husband and father. At the time of the Intercontinental Hotel Attack, he was 50 years old, had been married to Charyn Selig for 17 years, and they had two cherished then-minor children, a daughter Drew and a son Joshua.  He served on various boards in his local community.   He worked as an award-winning investigative reporter, broadcast journalist and television news anchor for twenty years. He was also an entrepreneur, and founded his own public relations firm, Selig Multimedia, Inc.,

which specialized in handling crisis management and national publicity campaigns for high profile political clients.

1539.   Glenn was in Kabul working on a project to construct a democracy forum event for Afghani women and highlight the work of the democratically elected President Ashraf Ghani.  He was present in the Intercontinental Hotel when the attack commenced, and murdered by the Taliban terrorists.

1540.   Glenn's body was flown to the Armed Forces Medical Examiner ("AFME") at Dover Air Force Base.  The AFME performed a full autopsy examination on his remains on January 28, 2018.  The report places Glenn at the Intercontinental Hotel at the time of the attack.   It concludes that multiple gunshot wounds caused his death, and that the manner of death is homicide.

The Murder of Abdullah Waheed

1541.   Like Glenn Selig, Dr. Abdullah Waheed was a devoted and loving family man. At the time of the Intercontinental Hotel Attack, he was 52 years old, had been married to Alya Waheed for 24 years, and they had three beloved children, two daughters Mina and Meelod, and a son Amanullah.

1542.   Dr. Waheed was a public figure in Afghanistan.  He was the grandson of the late Mohammad Gul Khan Mohmand, an Afghani literary figure and well known politician who served as Afghanistan's Home Minister and as a governor of three provinces.  Dr. Waheed was well-known as a respected academic and political analyst.  During the Afghan War and internal hostilities, he escaped with his family to the United States, and lived in the United States full time for over a decade.  He became a U.S. citizen by naturalization in 2008.  He continued to work for the betterment of Afghanistan even after relocating to the United States. He joined

Afghanistan's diplomatic corps at the request of President Ashraf Ghani in 2015.  Dr. Waheed served as Afghanistan's Consul General to Peshawar, Pakistan from 2015 to 2017, and then as Consul General to Karachi, Pakistan from 2017 until his murder by Taliban terrorists. He was noted for his tenacious diplomatic efforts to forge peace between Afghanistan and Pakistan.

1543.  Dr. Waheed was in Kabul on official business, and staying in the Intercontinental Hotel at the time of the attack.  His murder in the attack was reported in the international press.  His Afghan death certificate, issued by the Ministry of Public Health, certifies his death on January 21, 2018, and lists his U.S. passport number. The U.S. Department of State has issued a Report of Death of U.S. Citizen Abroad that identifies the place and time of his death as the Intercontinental Hotel in Kabul, on January 21, 2018.  Afghan intelligence reported to Fox News that Dr. Waheed was killed in the terrorist attack, was disliked by the Taliban, and that the Taliban may have obtained a hotel guest list and used it to identify his name and room number on the list in a targeted killing.

The Injury of Shawn Kenny

1544.  Shawn Kenny had a 10-year military career as a U.S. Army infantry soldier, before being Honorably discharged in the rank of Sergeant First Class in 2005.  After leaving active duty, Shawn worked for a series of security firms providing security to Department of Defense and civilian concerns in Iraq and Afghanistan.  In 2017, Kabul Balk Safety and Security ("KBSS"), an Afghan security firm, hired Shawn to work as Site Security Manager at the Kabul Intercontinental Hotel.  Shawn arrived in Kabul and commenced work in November 2017.  He lived on-site at the hotel.  KBSS' formal responsibility for the security of the hotel commenced January 1, 2018.

1545.   On the evening of January 20, 2018, Shawn completed his security shift and was resting in his room.  At 20:00 he heard automatic rifle fire and an explosion in the lobby area. Shawn put on his tactical vest, grabbed his radio, AK-47, as well as an AK-75, and as many magazines as he could carry, and descended the stairs.  He engaged terrorists in the hotel restaurant to his left, and exchanged fire with them.  He then had a gunfight with terrorists in the kitchen area to his right.  Being under fire from two directions, he retreated.  He had calls to coordinate with Special Forces, and directed hotel guests to safety.  He fired his weapons to keep the terrorists at bay.  Special Forces directed Shawn to exit the building so that he could brief them and help to plan an assault.  Special Forces then directed Shawn to re-enter the hotel to assist with the assault and navigating the area. On the way inside, terrorists on upper levels threw multiple hand grenades at Shawn that exploded near to him.  Shawn remained inside the hotel until about 04:00 the next morning. When he exited, he remained outside and assisted military personnel.  He was up without sleeping for 25 hours assisting the response.

1546.   During the Attack, the terrorists inflicted numerous injuries on Shawn.  The terrorists set several sections of the hotel ablaze. Shawn was forced to breathe hot, acrid smoke for a prolonged period, injuring his lungs.  Tear gas burned Shawn's eyes and further injured his lungs.  Terrorists threw multiple hand grenades at Shawn, which exploded in a confined space and damaged his ears and hearing.  Shawn's feet, ankles and hands were injured in the Attack. Following the Attack, Shawn received medical treatment from physicians at medical facilities operated by West Tex Medical Services, an Afghan company providing medical services to expatriates in Kabul.  He was also treated at the Afghan German Hospital in Kabul.  Upon returning to the United States, he received follow-on medical treatment in a Veterans Affairs medical facility.   Symptoms from Shawn's injuries persist today.

**The May 2015 Taliban Attack on the Park Palace Hotel**

1547.   The Park Palace Hotel is a mid-range hotel located in Kabul, and caters to foreign researchers, journalists, businessmen and aid workers.   The hotel has both guest rooms for short-term visitors, and a residential area for those living full time in Kabul, including foreign aid workers.  On the evening of May 13, 2015, the hotel was hosting a concert by a well-known Afghani classical musician in support of international aid organizations.   Hotel guests were expected to include the Turkish and Indian ambassadors, and the children of Afghanistan's last monarch Mohammed Zahir Shah, hated by the Taliban.

1548.   On May 13, 2015, at 20:30, just as the concert was scheduled to commence, a Taliban terrorist who had previously entered the hotel as a guest, commenced a siege that lasted approximately 5 hours using a suicide vest, an AK-47 rifle, hand grenades and pistols.  The massacre started in the hotel restaurant, then the terrorist went room-to-room looking for foreigners. Norwegian Special Forces and Afghan security forces responded to the attack and retook the building.  The attack resulted in 15 dead and 6 wounded.  54 hostages were rescued.

1549.   Afghanistan's intelligence service arrested two Taliban terrorists for planning the Park Palace Hotel Attack.  Both confessed to being members of the Haqqani Network.  The Afghan Taliban claimed responsibility for the attack in a statement released by its spokesman Zabihullah Mujahid.   Mujahid said the attack was aimed at "invaders" and specifically an "important meeting" of "important people from many invading countries especially Americans."  He also condemned the "promiscuity and indulgence" of the "night-time parties" hosted at the hotel.

1550.   Defendants' long-running payments and provision of sensitive communications devices in Afghanistan, as pleaded herein, materially increased the capacity and impunity of the Haqqani Network and Taliban cells that executed the Park Palace Hotel attack.

1551.   Dr. Kantor served as Senior Researcher and then Director of the Afghanistan Research and Evaluation Unit, the premier policy think tank in Afghanistan, from 2005-2010.  At the time of the attack, she was employed as Senior Scientist by the International Maize and Wheat Improvement Centre, the world's leader in corn and wheat research and development.  Paula was in Afghanistan to start a new project focusing on the role of Afghani women in wheat-growing.  The overriding theme in her work was uplifting the poorest and most vulnerable. She was present in the Park Palace Hotel Attack, and murdered by Taliban terrorists.

1552.   Paula was shot several times, fighting for her life, and trapped in the lobby of the hotel. She used her cell phone to call outside the hotel, to another hotel guest. The guest handed the phone to a Norwegian Special Forces soldier.  The soldier kept Paula on the phone as the team prepared to enter the blacked out hotel using night vision goggles. Once inside the lobby, a Norwegian medic administered first aid to Paula, who had been shot in her face, and in two other places. The medic accompanied Paula in an ambulance to a nearby hospital, before she died.

1553.   The Norwegian Special Forces soldier who spoke with Paula on the phone has said: "Despite her extremely serious gunshot wounds, she had the presence of mind and willpower enough to pick up her cell phone and to call out. Her call made it possible for us to go in earlier and get more civilians out before the terrorists would find them. It hurts to know that we couldn't save her, but what Paula did, was of enormous significance to many other people that night."

**The Taliban Attacks in Afghanistan**

1554.   Plaintiff Captain ("CAPT") Shastri Boothe served in Afghanistan as a member of the U.S. Army.  On August 7, 2012, CAPT Boothe was injured in a motor truck bomb terrorist attack committed by a joint cell comprised of the Taliban and the Haqqani Network, operating in concert with al-Qaeda, in Logar Province, Afghanistan. The attack severely wounded CAPT Boothe, who suffered a Traumatic Brain Injury, PTSD, and loss of hearing in her left ear. As a result of the August 7, 2012 attack and her injuries, CAPT Boothe has experienced severe physical and emotional pain and suffering.

1555.   Plaintiff Specialist ("SPC") Jared Bland served in Afghanistan as a member of the U.S. Army. On June 20, 2012, SPC Bland was injured in a suicide bomb terrorist attack committed by a joint cell comprised of the Taliban and the Haqqani Network, operating in concert with al Qaeda, in Khost Province, Afghanistan. The attack severely wounded SPC Bland, who suffered severe nerve damage, drop foot, PTSD, and Traumatic Brain Injury. As a result of the June 20, 2012 attack and his injuries, SPC Bland has experienced severe physical and emotional pain and suffering.

1556.   Plaintiff Senior Airman ("SRA") Joshua Chambers served in Afghanistan as a member of the U.S. Air Force. On November 16, 2013, SRA Chambers was injured in a terrorist attack committed by a joint cell comprised of the Taliban and the Haqqani Network, operating in concert with al Qaeda, in Parwan Province, Afghanistan. The attack severely wounded SRA Chambers, who suffered nerve damage, complete loss of function of right foot, and PTSD. As a result of the November 16, 2013 attack and his injuries, SRA Chambers has experienced severe physical and emotional pain and suffering.

1557.   Plaintiff Airman First Class ("AFC") John Mitchell, III served in Afghanistan as a member of the U.S. Air Force. On June 26, 2013, AFC Mitchell was injured in a rocket terrorist attack committed by a joint cell comprised of the Taliban and the Haqqani Network, operating in concert with al Qaeda, in Jalalabad, Nangarhar Province, Afghanistan. The attack severely wounded AFC Mitchell, who suffered a shattered jaw, shrapnel wounds, Traumatic Brain Injury, and PTSD. As a result of the June 26, 2013 attack and his injuries, AFC Mitchell has experienced severe physical and emotional pain and suffering.

1558.   Plaintiff Private Second Class ("PSC") Alex Murtha served in Afghanistan as a member of the U.S. Army. On June 3, 2013, PSC Murtha was injured in a terrorist attack committed by a joint cell comprised of the Taliban and the Haqqani Network, operating in concert with al Qaeda, in Paktika Province, Afghanistan. The attack severely wounded PSC Murtha, who suffered shrapnel wounds, nerve damage, PTSD, and Traumatic Brain Injury. As a result of the June 3, 2013 attack and his injuries, PSC Murtha has experienced severe physical and emotional pain and suffering.

1559.   Plaintiff Gunnery Sergeant ("GYSGT") Brian Worbington served in Afghanistan as a member of the U.S. Marine Corps. On January 17, 2013, GYSGT Worbington was injured in an IED attack committed by a joint cell comprised of the Taliban and the Haqqani Network, operating in concert with al Qaeda, in Nawzad District, Hemland Province, Afghanistan. The attack severely wounded GYSGT Worbington, who suffered an aneurism, nerve damage, vision loss, Traumatic Brain Injury, and PTSD. As a result of the January 17, 2013 attack and his injuries, GYSGT Worbington has experienced severe physical and emotional pain and suffering.

## CLAIMS FOR RELIEF

### COUNT ONE

**VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)**
**On Behalf of all the Plaintiffs against All Defendants**
**JASTA, Aiding and Abetting Liability]**

1560.   Plaintiffs incorporate their factual allegations above.

1561.   The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed, planned, and authorized by the Relevant Terror Organizations, which the United States designated as FTOs under 8 U.S.C. § 1189 or SDGTEs under EO 13224 for several years prior to the relevant attacks.

1562.   The terrorist attacks committed, planned, and authorized by the Relevant Terror Organizations which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.   These attacks included the Brussels Airport Attack, the Paris Bataclan Attack, the Expulsion Attacks, the Intercontinental Hotel Attack and the Park Palace Hotel Attack, in which the Plaintiffs and/or their family members were killed or injured.

1563.  The Relevant Terror Organizations' terrorist attacks appear to have been intended to: (a) intimidate or coerce the civilian populations of France, Belgium, Afghanistan, the United States, and other Coalition nations; (b) influence the policy of the U.S., French, Belgian, Afghan, and other Coalition governments by intimidation and coercion; and (c) affect the conduct of the U.S., French, Belgian, Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1564.  The Relevant Terror Organizations' terrorist attacks occurred primarily outside the territorial jurisdiction of the United States.

1565.  Defendants aided and abetted and knowingly provided substantial assistance to the Relevant Terror Organizations – and aided and abetted and knowingly provided substantial assistance to their attacks on Plaintiffs – by:

      *a.* making, or causing to be made, cash payments to the Relevant Terror Organizations that financed those attacks;

      *b.* transferring important technology that both facilitated and financed those attacks; and

      *c.* obstructing United States counterterrorism policy through their fraudulent concealment of those protection payments and technology transfers to the Relevant Terror Organizations for fifteen years.

1566.  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed, planned, and/or authorized by the Relevant Terror Organizations. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1567.  Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing each form of assistance to the Relevant Terror Organizations, and to their terrorist attacks

1568.  Defendants knowingly aided and abetted The Relevant Terrorist Organizations commissions of an acts of international terrorism, within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

1569.  As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages, and the costs of this action, including their attorneys' fees.

## COUNT TWO

## VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [On Behalf of All Plaintiffs against All Defendants
### JASTA Conspiracy Liabilty

1570.  Plaintiffs incorporate their factual allegations above..

1571.  Plaintiffs allege that Defendants conspired with The Relevant Terror Organizations who committed acts of international terrorism, within the meaning of  18 U.S.C. § 2333(d) and within  the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign

organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

1572.   Plaintiffs allege that their injuries were proximately caused in the Brussels Airport Attack, the Paris Bataclan Attack, the Expulsion Attacks, the Intercontinental Hotel Attack and the Park Palace Hotel Attack.

1573.   These attacks were acts of in of international terrorism as defined by 18 U.S.C. § 2331(1). First, the attacks involved violent acts or acts dangerous to human life that are violation of U.S. criminal laws. Second the attacks  appear to have been intended (a) to intimidate or coerce the civilian populations of the United States, Belgium, France or Afghanistan (b) to influence the police of the United States, Belgium, France, or Afghanistan by intimidation and coercion, and (c) to affect the conduct of the United States, Belgium, France, or Afghanistan by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, these attacks  occurred outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they are accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

1574.   These attacks  were committed, planned, and/or authorized by Islamic State, which the U.S. has designated as an FTO under 8 U.S.C. § 1189 since 2004.

1575.   The  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Relevant Terror Organizatiosn.

1576.   Defendants aided and abetted and knowingly provided substantial assistance to Islamic State, its members.. Defendants did so by making payments to Islamic State that financed these terrorist attacks, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to Islamic State.

1577.   Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly conspired and part, making an agreement with FTO to, among other activities and goals, provide material support for those organizations in violation of 18 U.S.C. § 2339B, and played a role in providing each form of assistance to Islamic State.

1578.   It was reasonable and foreseeable that, as part of the conspiracy and in furtherance of the scheme to support acts of international terrorism, that the Relevant Terror Organiations would, and in fact did, commit acts of international terrorism, including the attacks against Plaintiffs.

1579.   Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

1580.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), the Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT THREE

### VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
### [On Behalf of All Plaintiffs against All Defendants: Primary Liability, 18 U.S.C. § 2339A Predicate]

1581.   Plaintiffs incorporate their factual allegations above.

1582.   Defendants provided material support to the Relevant Terror Organizations in violation of 18 U.S.C. § 2339A. They did so by making payments to the Relevant Terror Organizations that financed their terrorist attacks in France, Belgium, and Afghanistan, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to the Relevant Terror Organizations as such FTOs targeted Americans in France, Belgium, and Afghanistan. Defendants' payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. § 2339A(b)(1). Defendants' obstruction of U.S. counterterrorism efforts for the Relevant Terror Organization's benefit also

provided a service; assistance derived from scientific, technical, or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the obstruction), which likewise qualified as material support.

1583.    Defendants knew that their material support would be used by the Relevant Terror Organizations in the preparation for, or in carrying out, the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing government facilities, financing terrorism, and receiving training from FTOs. Those acts by the Relevant Terror Organizations, in turn, violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. Defendants also disguised the nature of their support, in further violation of 18 U.S.C. § 2339A.

1584.    Defendants' conduct, by providing material support to a group that was committing terrorist acts against Americans, involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a).

1585.    Defendants' support for the Relevant Terror Organizations appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, France, Belgium, Afghanistan, and other nations, (b) to influence the policy of the U.S., French, Belgian, Afghan, and other governments by intimidation and coercion, and (c) to affect

the conduct of the U.S., French, Belgian, Afghan, other governments by mass destruction, assassination, and kidnapping.

1586.  Defendants' provision of material support to the Relevant Terror Organizations occurred primarily outside the territorial jurisdiction of the United States.

1587.  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1588.  Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing material support and resources to the Relevant Terror Organizations, knowing that those organizations would use that support to prepare for or carry out violations of U.S. terrorism laws.

1589.  As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339A, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.


## COUNT FOUR

### VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)[On behalf of All Plaintiffs against All Defendants: Primary Liability, 18 U.S.C. § 2339B Predicate]

1590.  Plaintiffs incorporate their factual allegations above.

1591.  LM Ericsson, Ericsson AB, and Ericsson Inc. provided material support to the Relevant Terror Organizations in violation of 18 U.S.C. § 2339B. Defendants did so by making cash and in-kind payments to the Relevant Terror Organizations, and by obstructing U.S. counterterrorism efforts to provide cover and concealment to the Relevant Terror Organizations as they targeted Americans in France, Belgium, and Afghanistan. Defendants'

protection payments took the form of currency or monetary instruments or financial securities, which qualified as material support under 18 U.S.C. §2339A(b)(1). Defendants' obstruction of U.S. counterterrorism efforts for the Relevant Terror Organizations' benefit also provided the Relevant Terror Organizations with a service; assistance derived from scientific, technical or other specialized knowledge; communications equipment; facilities; and personnel (that is, the persons who carried out the obstruction), all of which likewise qualified as material support. Defendants further disguised the nature of its support, in further violation of 18 U.S.C. § 2339B.

1592.  The United States has designated  al-Qaeda as an FTO under 8 U.S.C. § 1189 since 1999 and al- Qaeda-in-Iraq/ISI/Islamic State since 2004 and has the Taliban as an SDGTE under EO 13224 since 2002. At all times since that designation, Defendants knew that al- Qaeda, al-Qaeda-in-Iraq, the Taliban and Islamic State were each a designated FTO/SDGTE and/or that al-Qaeda, al- Qaeda-in-Iraq, the Taliban and Islamic State had engaged in acts of terrorism against the United States.

1593.  Defendants' conduct, by providing material support to designated FTOs and SDGTEs, involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for al-Qaeda, al-Qaeda-in- Iraq, the Taliban and Islamic State appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, France, Belgium, Afghanistan, Iraq, Turkey, and other nations, (b) to influence the policy of the U.S., French, Belgian, Afghan, Iraqi, Turkish, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., French, Belgian, Afghan, Iraqi, Turkish, and other governments by mass destruction, assassination, and kidnapping.

1594.    Defendants' provision of material support to the Relevant Terror Organizations occurred primarily outside the territorial jurisdiction of the United States.

1595.    Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing material support and resources to the Relevant Terror Organizations, knowing that those organizations were designated FTOs/SDGTEs and that they engaged in terrorist acts.

1596.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct, which proximately caused Plaintiffs' injuries by providing FTOs/SDGTEs with the resources and concealment they needed to carry out the terrorist attacks that injured Plaintiffs. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1597.    As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339B, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT FIVE

### VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(a)
[On behalf of All Plaintiffs against All Defendants:
Primary Liability, 18 U.S.C. § 2339C Predicate]

1598.    Plaintiffs incorporate their factual allegations above.

1599.    Defendants, by making payments to the Relevant Terror Organizations that financed their terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(A).

1600.    Defendants knew that the Relevant Terror Organizations would use those funds in full or in part to carry out acts constituting an offense within the scope of the International Convention

for the Suppression of Terrorist Bombings, as implemented by the United States at 18 U.S.C. § 2332f, including by delivering, placing, discharging, or detonating explosives or other lethal devices in, into, or against places of public use and government facilities, with the intent to cause death or serious bodily injury.

1601.  Defendants, by making payments to the Relevant Terror Organizations that financed their terrorist attacks, unlawfully and willfully provided funds to a terrorist group, in violation of 18 U.S.C. § 2339C(a)(1)(B).

1602.  Defendants knew or recklessly disregarded that the Relevant Terror Organizations would use those funds in full or in part to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and their purposes were to intimidate the U.S., French, Belgian, and Afghan populations, to compel the U.S. and allied governments to effect a withdrawal of U.S. forces from Iraq, Syria, Turkey, and Afghanistan, to kill the Americans and their allies—civilian and military, to punish Western nations for participation in the U.S.-led anti-ISIS coalition, to provoke anti-Muslim backlash in Europe, fueling radicalization and recruitment among European Muslims, to project global reach after territorial losses in Syria and Iraq, preserving the appearance of a functioning caliphate, and to demonstrate parity with Western military power by striking high-value civilian targets in NATO capitals.

1603.  Defendants' provision of funds to the Relevant Terror Organizations involved violent acts and acts dangerous to human life. Defendants' conduct therefore gives rise to primary liability under 18 U.S.C. § 2333(a). Defendants' support for the Relevant Terror Organizations appears, as an objective matter, to have been intended (a) to intimidate or coerce the civilian populations of the United States, France, Belgium, Afghanistan, and other nations, (b) to influence the

policy of the U.S., French, Belgian, Afghan, and other governments by intimidation and coercion, and (c) to affect the conduct of the U.S., French, Belgian, Afghan, and other governments by mass destruction, assassination, and kidnapping.

1604.  Defendants' provision of funds to the Relevant Terror Organizations occurred primarily outside the territorial jurisdiction of the United States.

1605.  Each Defendant, including the Corporate Defendants and the Individual Defendants, knowingly played a role in providing funds to the Relevant Terror Organizations.

1606.  Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1607.  As a result of Defendants' violation of 18 U.S.C. §§ 2333(a) and 2339C, Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

1608.  In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

1609.  Plaintiffs request that the Court:

   a.  Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

   b.  Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti- Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c.   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d.   Award Plaintiffs prejudgment interest; and

e.   Award Plaintiffs any such further relief the Court deems just and proper.

Dated: November 12, 2025                    Respectfully submitted,

HEIDEMAN NUDELMAN & KALIK, PC
5335 Wisconsin Ave, Suite 440
Washington, DC 20015
Telephone:  202-463-1818
Telefax:      202-463-2999

By:  __/s/  *Richard D. Heideman*
        Richard D. Heideman (No. 377462)
        Noel J. Nudelman (No. 449969)
        Tracy Reichman Kalik (No. 462055)
        Joseph H. Tipograph (No. 997533)

*Counsel for All Plaintiffs*